**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**

THE STATE OF LOUISIANA,
By and through its Attorney General, JEFF
LANDRY;

THE STATE OF ALABAMA,
By and through its Attorney General, STEVE
MARSHALL;

THE STATE OF ALASKA,
By and through its Attorney General, TREG R.
TAYLOR;

THE STATE OF ARKANSAS,
By and through its Attorney General, LESLIE
RUTLEDGE;

THE STATE OF GEORGIA,
By and through its Attorney General,
CHRISTOPHER M. CARR;

THE STATE OF MISSISSIPPI,
By and through its Attorney General, LYNN
FITCH;

THE STATE OF MISSOURI,
By and through its Attorney General, ERIC S.
SCHMITT;

THE STATE OF MONTANA,
By and through its Attorney General, AUSTIN
KNUDSEN;

THE STATE OF NEBRASKA,
By and through its Attorney General, DOUG
PETERSON;

THE STATE OF OKLAHOMA,
By and through its Attorney General, MIKE
HUNTER;

THE STATE OF TEXAS,
By and through its Attorney General, KEN
PAXTON;

CIVIL ACTION NO. _____

THE STATE OF UTAH,
By and through its Attorney General, SEAN
REYES;

THE STATE OF WEST VIRGINIA,
By and through its Attorney General, PATRICK
MORRISEY,

PLAINTIFFS

v.

JOSEPH R. BIDEN, JR., in his official capacity
as President of the United States;

DEB HAALAND, in her official capacity as
Secretary of the Interior;

MICHAEL NEDD, in his official capacity as
Deputy Director of the Bureau of Land
Management;

CHAD PADGETT, in his official capacity as
Director of the Bureau of Land Management
Alaska Office;

RAYMOND SUAZO, in his official capacity as
Director of the Bureau of Land Management
Arizona Office;

KAREN MOURITSEN, in her official capacity
as Director of the Bureau of Land Management
California Office;

JAMIE CONNELL, in his official capacity as
Director of the Bureau of Land Management
Colorado Office;

MITCHELL LEVERETTE, in his official
capacity as Director of the Bureau of Land
Management Eastern States Office;

JOHN RUHS, in his official capacity as Director
of the Bureau of Land Management Idaho
Office;

JOHN MEHLHOFF, in his official capacity as
Director of the Bureau of Land Management
Montana-Dakotas Office;

JON RABY, in his official capacity as Director
of the Bureau of Land Management Nevada
Office;

STEVE WELLS, in his official capacity as
Acting Director of the Bureau of Land
Management New Mexico Office;

BARRY BUSHUE, in his official capacity as
Director of the Bureau of Land Management
Oregon-Washington Office;

GREG SHEEHAN, in his official capacity as
Director of the Bureau of Land Management
Utah Office;

KIM LIEBHAUSER, in her official Capacity as
Acting Director of the Bureau of Land
Management Wyoming Office;

AMANDA LEFTON, in her official capacity as
Director of the Bureau of Ocean Energy
Management;

MICHAEL CELATA, in his official capacity as
Regional Director of the Bureau of Ocean
Energy Management Gulf of Mexico Office;

LARS HERBST, in his official capacity as
Regional Director of the Bureau of Safety and
Environmental Enforcement Gulf of Mexico
OCS Office;

MARK FESMIRE, in his official capacity as
Regional Director of the Bureau of Safety and
Environmental Enforcement Alaska and Pacific
Office,

DEFENDANTS.

## COMPLAINT

The States of Louisiana, Alabama, Alaska, Arkansas, Georgia, Mississippi, Missouri, Montana, Nebraska, Oklahoma, Texas, Utah, and West Virginia (collectively "Plaintiff States") bring this civil action against the above-listed Defendants for declaratory and injunctive relief and allege as follows:

## INTRODUCTION

1.      When seeking the Democratic Party's nomination for President, then–former Vice President Joe Biden made no secret of his disdain for domestic energy development. "No more—no new fracking . . . no more drilling on federal lands," he said during a March 2020 Democratic presidential candidate debate. Tarini Parti, *Biden Aims for Tricky Balance on Fracking*, Wall St. J. (Mar. 16, 2020), https://on.wsj.com/3eqA6U2. Concerned that this candid response could hurt his electoral chances "in key states with blue-collar voters like Pennsylvania, Ohio and Colorado," Mr. Biden's campaign spokesman quickly "clarified that the former vice president wouldn't ban fracking"—"[h]e was referring only to his stated policy to ban new permits for oil and gas drilling on federal land and offshore." *Id*.

2.      But that stated policy of banning new drilling permits contravenes congressional commands. The Outer Continental Shelf Lands Act and Mineral Leasing Act set out specific statutory duties requiring executive agencies to further the expeditious and safe development of the abundant energy resources on public lands and the Outer Continental Shelf. In compliance with those statutes, the Department of the Interior has for decades issued leases for the development of oil and natural gas on public lands and offshore waters. Those leases do more than allow America to reach its full energy-production potential—they provide significant environmental benefits because portions of the lease proceeds are invested into vital State environmental defense and restoration projects. In fact, each year the federal government returns billions of dollars to the States and environmental reclamation projects from OCSLA and MLA lease proceeds for critical environmental restoration and

protection projects. *See* Cong. Research Serv., *Revenues and Disbursements from Oil and Natural Gas Production on Federal Lands* (Sept. 20, 2020), https://bit.ly/3rH8D41; Cong. Research Serv., *Federal Oil and Gas Revenues During the COVID-19 Pandemic* (Nov. 23, 2020), https://bit.ly/3rGFaaD. States also use this revenue to pay for public education. And this revenue source has become only more vital to the States during the COVID-19 pandemic.

3.      No matter. It took President Biden just seven days to confirm that neither the United States Code nor billions of dollars in environmental benefits and State revenue would constrain his stated campaign policy. On January 27, 2021, President Biden issued Executive Order 14008; among other things, it imposes a moratorium on all oil and natural gas leasing activities on public lands and offshore waters—unravelling longstanding statutory schemes and destroying States' reliance interests (hereinafter "the Biden Ban").

4.      Executive Order 14008 glistens with irony. It purports to protect the environment, but it constitutes what is likely the single-largest divestment of revenue for environmental protection projects in American history.

5.      Making matters worse, the agencies that President Biden tasked with implementing the Order—the Bureau of Ocean Energy Management and Bureau of Land Management—rushed to halt long-planned lease sales using an opaque and nonpublic process that arbitrarily failed to consider whether the Biden Ban complies with statutory requirements, the public good, or the procedural requirements of the Administrative Procedure Act. And those agencies entirely ignored the obligation to consult with States or Tribes.

6.      Although the restraints imposed by the Administrative Procedure Act, OCSLA, and MLA did not prevent Candidate Biden from making contradictory campaign promises, they do constrain President Biden from translating campaign rhetoric into an energy-development moratorium by fiat—especially one to be implemented outside the public eye.

7.     The Biden Ban fails all the requirements of the APA, OCSLA, and MLA. As a result, all actions taken in reliance upon Executive Order 14008 must be vacated and enjoined, and the agencies ordered to return to the vital work of carrying out their statutory, regulatory, and contractual obligations under the OCSLA's and MLA's oil and gas leasing programs.

## PARTIES

8.     Plaintiff State of Louisiana is a sovereign State of the United States of America. Louisiana sues to vindicate its sovereign, proprietary, and *parens patriae* interests. Below Louisiana's borders, and in the waters of the adjoining Gulf of Mexico, lies vast stores of oil and natural gas. Louisiana is the nation's number two producer of oil, producing almost 1.6 million barrels a day in October 2017, when including production from the Federal Outer Continental Shelf**.** This represents 16.1 percent of the nation's crude oil production, behind Texas, with North Dakota in a close third place. Louisiana is also in the top five of the nation's producers of natural gas, a critical bridge fuel that supplies the nation's electricity plants, among other critical infrastructure. Louisiana and its parishes and municipalities receive hundreds of millions of dollars every year from leasing sales under OCSLA, the Gulf of Mexico Energy Security Act (GOMESA), and the MLA. Additionally, critical coastal restoration projects and hurricane protection projects are funded in part by the proceeds of OCSLA and MLA lease sales and royalties.  These funds are vital to the preservation of Louisiana's coastline and the protections of its ports, through which billions of dollars in U.S. Gross Domestic Product pass annually bringing fuel and food to the rest of the country. Oil and gas development in the Gulf of Mexico and on public lands are key parts of Louisiana's economy—generating substantial tax revenue and jobs. Plaintiff Jeff Landry is the Attorney General of the State of Louisiana. He is authorized by Louisiana law to sue on the State's behalf. His offices are located at 1885 North Third Street, Baton Rouge, LA 70802.

9.      Plaintiff State of Alabama is a sovereign state of the United States of America. Alabama sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State has significant interests in the OCSLA and MLA oil and gas leasing programs and receives substantial revenues from oil and gas leasing. For example, in 2020 alone, Alabama received over $50 million in GOMESA disbursements. *See* U.S. Office of Nat. Resources Revenue,  "Gulf of Mexico Energy Security Act," https://bit.ly/3cNnynj.

10.      Plaintiff State of Alaska is a sovereign state of the United States of America. Alaska sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State has significant interest in the OCSLA and MLA oil and gas leasing programs and receives substantial revenues from oil and gas leasing on public lands and the Outer Continental Shelf. Responsible oil and natural gas development is essential to Alaska's economy.  It creates various economic opportunities for Alaska and its citizens, including well-paying construction and permanent jobs, and opportunities for state, local, and national businesses, while protecting Alaska's pristine environment with robust environmental regulations. For example, the halt of Lease Sale 258 in the Cook Inlet will imminently deprive Alaska of significant proceeds to which it is statutorily entitled. Additionally, Northern Economics' 2018 Study projected that petroleum development in the Chukchi and Beaufort Seas could generate 10,850 annual jobs, $685.3 million in annual labor income in the U.S., and $2.5 billion in Alaska and local government property taxes, Alaska corporate income taxes, royalty payments to Alaska and the U.S., and additional throughput in Trans-Alaska Pipeline System (TAPS).  The Trans-Alaska Pipeline System (TAPS) has safely delivered over 18 billion barrels of crude oil to meet the nation's energy needs for 43 years, produced from both federal and state oil and gas leases.  The ongoing success of this existing infrastructure and its role in Alaska's and the nation's energy infrastructure depends on healthy levels of Alaska crude oil production. The Biden Administration's moratorium directly threatens continued offshore development and production, such as that

conducted in the Chukchi and Beaufort Seas. Moreover, fifty percent of the money received by the federal government from its "sales, rentals, bonuses, and royalties on leases issued" within the National Petroleum Reserve-Alaska (NPR-A) are paid to Alaska. Half of the proceeds go to local communities most directly or significantly impacted by NPR-A development. That money funds search and rescue, fire department, and ambulance services; crisis services and youth programs; power plants; communications systems; community centers and parks; roads; and playgrounds. The development of new energy deposits in the NPR-A will benefit Alaska, local communities, and the nation. Revenues derived from new production will help sustain important services. Industry activity will provide new job opportunities for residents and others while boosting the economy. The Biden Administration's moratorium directly threatens the continued development of the NPR-A.

11.     Plaintiff State of Arkansas is a sovereign state of the United States of America. Arkansas sues to vindicate its sovereign, proprietary, and *parens patriae* interests. Arkansas also receives revenue from federal oil and gas production, which is used to fund schools among other purposes. The State will also be harmed by the imminent increase in energy prices directly caused by the Leasing Moratoriums and the loss of revenues from MLA leasing sales. *See* U.S. Office of Nat. Resources Revenue, https://bit.ly/3w3MK1I.

12.     Plaintiff State of Georgia is a sovereign state of the United States of America. Georgia sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State will be harmed by the imminent increase in energy prices directly caused by the Leasing Moratoriums.

13.     Plaintiff State of Mississippi is a sovereign state of the United States of America. Mississippi sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State has significant interests in the OCSLA and MLA oil and gas leasing programs and receives substantial revenues from oil and gas leasing. For example, in 2020 alone, Mississippi received over $50 million

in GOMESA disbursements. *See* U.S. Office of Nat. Resources Revenue, "Gulf of Mexico Energy Security Act," https://bit.ly/3cNnynj.

14.     Plaintiff State of Missouri is a sovereign state of the United States of America. Missouri sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State will be harmed by the imminent increase in energy prices directly caused by the Leasing Moratoriums and the loss of revenues from MLA leasing sales. *See* U.S. Office of Nat. Resources Revenue, https://bit.ly/3w3MK1I.

15.     Plaintiff State of Montana is a sovereign state of the United States of America. Montana sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State will be harmed by the imminent increase in energy prices directly caused by the Leasing Moratoriums and the loss of revenues from MLA leasing sales. *See* U.S. Office of Nat. Resources Revenue, https://bit.ly/3w3MK1I.

16.     Plaintiff State of Nebraska is a sovereign state of the United States of America. Nebraska sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State will be harmed by the imminent increase in energy prices directly caused by the Leasing Moratoriums and the loss of revenues from MLA leasing sales. *See* U.S. Office of Nat. Resources Revenue, https://bit.ly/3w3MK1I.

17.     Plaintiff State of Oklahoma is a sovereign state of the United States of America. Oklahoma sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State will be harmed by the imminent increase in energy prices directly caused by the Leasing Moratoriums and the loss of revenues from MLA leasing sales. Oklahoma also has significant oil and gas production infrastructure, which is the source of jobs and taxes paid to state and local governments. These revenues will also be diminished and jobs lost due to the moratorium. *See* U.S. Office of Nat. Resources Revenue, https://bit.ly/3w3MK1I.

18.     Plaintiff State of Texas is a sovereign state of the United States of America. Texas sues to vindicate its sovereign, proprietary, and *parens patriae* interests. Texas also has significant oil and gas refining and production infrastructure, which is the source of jobs and taxes paid to state and local governments. These revenues will also be diminished and jobs lost due to the moratorium. The State has significant interests in the OCSLA and MLA oil and gas leasing programs and receives substantial revenues from oil and gas leasing. For example, in 2020 alone, Texas received over $95 million in GOMESA disbursements. *See* U.S. Office of Nat. Resources Revenue, "Gulf of Mexico Energy Security Act," https://bit.ly/3cNnynj.

19.     Plaintiff State of Utah is a sovereign State of the United States of America. Utah sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State of Utah has significant economic interests in federal leases and mineral extraction. The oil, gas, and mining industries pay hundreds of millions of dollars in direct production taxes, mineral royalties, and property taxes, and the State's share of MLA revenues realized from development of leasable minerals on federal lands. Oil and gas leasing also provides economic opportunities for Utahns. Leases generate employment opportunities and contribute to decreased energy costs. Energy jobs are high-paying jobs; energy-related employment produces average earnings at almost twice the rate of other jobs in the State. In 2019, oil, gas and mining supported over 32,000 jobs with payroll of $756.5 million. *See* Utah Economic Data Viewer, https://bit.ly/31apdxU; Utah Governor's Office of Energy Development, https://bit.ly/3rh7yyR. Federal regulation of oil and gas leases also affects Utah's interests regarding mineral leases on state land. "When Utah became a state in 1896, congress granted parcels of land to the State, with revenue from the sale or lease of the land being placed into endowments for certain public institutions, including the public education system. Utah has 3.4 million acres of trust land, and energy and mineral leases, rent and royalties continue to be an important source of revenue for Utah's schools. Under the leadership of the State of Utah School and Institutional Trust Lands

Administration (SITLA), $1.96 billion in revenue has been generated since 1994, growing permanent funds to $2.5 billion." Utah Governor's Office of Energy Development, Foundations for A Better Energy Future (Oct. 2020), https://bit.ly/3vSuY1i. Utah has 33.2 million acres of federal land, 63.1 percent of its total acreage. Cong. Research Serv., *Federal Land Ownership: Overview and Data*, at 8 (Feb. 21, 2020), https://bit.ly/3tMIUYU. Because Utah is a checkerboard of private, state, federal and tribal land, *see* Utah Surface and Mineral Ownership Maps, https://bit.ly/3vSXuQc, state mineral leases are often grouped with federal leases in agreements under the "communitization requirement," for exploration, development, and production within a set boundary. Dr. Timothy J. Considine, *The Fiscal and Economic Impacts of Federal Onshore Oil and Gas Lease Moratorium and Drilling Ban Policies* 44-45 (Dec. 14, 2020), https://bit.ly/3cVSZf3. A moratorium on federal leasing discourages investment from oil and gas companies in leasing or developing state sections when the companies cannot also lease the federal land surrounding the state acreage. Accordingly, lost investment in federal leases results in lost investment in state leases, depriving Utah and Utah schools of state mineral leasing, production, and tax revenues.

20.     Plaintiff State of West Virginia is a sovereign state of the United States of America. West Virginia sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State of West Virginia also depends on revenue from the oil, gas, and mining industries. Severance taxes on oil and gas alone accounted for over $125 million in state and local government revenue in fiscal year 2020. West Virginia Department of Revenue, Several Tax Summary Fiscal Years 2015-2020 https://bit.ly/3si2kEr (accessed Mar. 23, 2021).  Delaying or deferring the March Sale means delaying and deferring growth in this critical revenue stream. And the federal leases themselves produce revenue for the State. As of 2020, there were 150 productive oil and gas leases within West Virginia. U.S. Dept. of Interior Bureau of Land Management, Oil and Gas Statistics-—Table 5, Number of Producing Leases https://on.doi.gov/2P2pbFB (accessed Mar. 23, 2021). These leases yield nearly

$667,000 in revenue for West Virginia and the federal government. U.S. Dept. of Interior, Natural Resources Revenue Data, https://bit.ly/3cfcal9 (accessed Mar. 23, 2021).

21.     Defendant Joseph R. Biden, Jr., is the President of the United States. He is sued in his official capacity.

22.     Defendant Deb Haaland is the Secretary of the Interior. She is sued in her official capacity.

23.     Defendant Michael Nedd is the Deputy Director of the Bureau of Land Management. He is sued in his official capacity.

24.      Defendant Chad Padgett is the Director of the Bureau of Land Management Alaska Office. He is sued in his official capacity.

25.     Defendant Raymond Suazo is the Director of the Bureau of Land Management Arizona Office. He is sued in his official capacity.

26.     Defendant Karen Mouritsen is the Director of the Bureau of Land Management California Office. She is sued in her official capacity.

27.     Defendant Karen Mouritsen is the Director of the Bureau of Land Management California Office. She is sued in her official capacity.

28.     Defendant Jamie Connell is the Director of the Bureau of Land Management Colorado Office. He is sued in his official capacity.

29.     Defendant Mitchell Leverette is the Director of the Bureau of Land Management Eastern States Office. He is sued in his official capacity.

30.     Defendant John Ruhs is the Director of the Bureau of Land Management Idaho Office. He is sued in his official capacity.

31.     Defendant John Mehlhoff is the Director of the Bureau of Land Management Montana-Dakotas Office. He is sued in his official capacity.

32.     Defendant Jon Raby is the Director of the Bureau of Land Management Nevada Office. He is sued in his official capacity.

33.     Defendant Steve Wells is the Acting Director of the Bureau of Land Management New Mexico Office. He is sued in his official capacity.

34.     Defendant Barry Bushue is the Director of the Bureau of Land Management Oregon-Washington Office. He is sued in his official capacity.

35.     Defendant Greg Sheehan is the Director of the Bureau of Land Management Utah Office. He is sued in his official capacity.

36.     Defendant Kim Liebhauser is the Acting Director of the Bureau of Land Management Wyoming Office. She is sued in her official capacity.

37.     Defendant Amanda Lefton is the Director of the Bureau of Ocean Energy Management. She is sued in her official capacity.

38.     Defendant Michael Celata is the Regional Director of the Bureau of Ocean Energy Management Gulf of Mexico Office. He is sued in his official capacity.

39.     Defendant Lars Herbst is the Regional Director of the Bureau of Safety and Environmental Enforcement Gulf of Mexico OCS Office. He is sued in his official capacity.

40.     Defendant Mark Fesmire is the Regional Director of the Bureau of Safety and Environmental Enforcement Alaska and Pacific Office. He is sued in his official capacity.

## JURISDICTION & VENUE

41.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§1331, 2201; 5 U.S.C. §§701-706.

42.     This Court is authorized to award the requested relief under 5 U.S.C. §706, 28 U.S.C. §1361, and 28 U.S.C. §§2201, 2202.

43.     Venue is proper in this District because Defendants are United States agencies or officers sued in their official capacities, the State of Louisiana is a resident of this judicial district, and a substantial part of the events or omissions giving rise to the Complaint occur within this judicial district. *See* 28 U.S.C. §1391(e)(1).

## BACKGROUND

### I.     In the Outer Continental Shelf Lands Act, Congress Directs the Secretary of the Interior to Hold Lease Sales and to Return Lease Funds to Coastal States.

44.     Congress enacted the Outer Continental Shelf Lands Act (OCSLA) more than 70 years ago. OCSLA declares "the outer Continental Shelf" to be "a vital national resource reserve held by the Federal Government for the public," and directs the Secretary of the Interior to make the Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. §1332(3); *see also Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 339 (E.D. La. 2011) (noting "OCSLA's overriding policy of expeditious development").

45.     To facilitate the Outer Continental Shelf's expeditious development, OCSLA directs the Secretary to "administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf." 43 U.S.C. §1334(a). OCSLA authorizes the Secretary "to grant to the highest responsible qualified bidder or bidders by competitive bidding, under regulations promulgated in advance, any oil and gas lease on submerged lands of the outer Continental Shelf" not covered by prior leases. 43 U.S.C. §1337(a)(1). OCSLA sets out a four-step process for the development of the Outer Continental Shelf. *See Hornbeck Offshore Servs.*, 696 F. Supp. 2d 627, 632-33 (E.D. La. 2010) (citing *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984)).

46.     *First*, every five years, the Secretary is required to create a leasing program that "shall consist of a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which he determines will best meet national energy needs for the five-year

period following its approval or reapproval." 43 U.S.C. §1344(a). The creation of each five-year program is a robust process in which the Secretary "must solicit comments from interested federal agencies and the governors of affected states, and must respond in writing to all comments or requests received from the state governors." *Sec'y of the Interior v. California*, 464 U.S. at 337-38 (citing 43 U.S.C. §1344). Additionally, the Secretary must submit each five-year program "to the President and Congress, together with comments received by the Secretary from the governor of the affected state." *Id.* at 338 (citing 43 U.S.C. §1344(d)(2)). The 2017-2022 Five Year Program currently governs oil and gas leasing. It was adopted after an extensive notice-and-comment and consultation period. *See* BOEM, 2017-2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program 3-1 (Nov. 18, 2016), https://bit.ly/2P31zjL; *see also* Cong. Research Serv., *Five-Year Program for Offshore Oil and Gas Leasing: History and Program for 2017-2022* (Aug. 23, 2019), https://bit.ly/2NrUEjP.

47.    *Second*, the Secretary must conduct lease sales in accordance with each five-year program. The Secretary must publish a notice of sale "at least thirty days before the date of the sale." 43 U.S.C. §1337(l). At this stage, "[a]ny Governor of any affected State or the executive of any affected local government in such State may submit recommendations to the Secretary regarding the size, timing, or location of a proposed lease sale." 43 U.S.C. §1345(a). The Secretary "shall accept" such recommendations from a Governor if the Secretary "determines, after having provided the opportunity for consultation, that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State." 43 U.S.C. §1345(c). The Secretary "may accept" such recommendations from a local government executive. 43 U.S.C. §1345(c). The Secretary then holds a lease sale "by competitive bidding." 43 U.S.C. §1337(a)(1).

48.    *Third*, the lessee must submit exploration plans and permits to the Secretary for approval. 43 U.S.C. §1340(c). The Secretary must "approve [or deny] such plan as submitted or modified within thirty days of its submission." 43 U.S.C. §1340(c). The Secretary may "require any

lessee operating under an approved exploration plan to obtain a permit prior to drilling any well in accordance with such plan." 43 U.S.C. §1340(d). Many of the decisions about the permitting process have been delegated to BOEM. Dep't of the Interior, Departmental Manual, 218 DM 1, at 1 (effective Aug. 30, 2016).

49.     *Fourth*, the lessee must submit a final development and production plan to the Secretary. 43 U.S.C. §1351(a)(1). OCSLA "establishes a non-discretionary duty on the Department of the Interior to act, favorably or unfavorably, on drilling permit applications." *Ensco Offshore Co.*, 781 F. Supp. 2d at 336. And the Secretary must forward the plan to the Governor of any affected State for comment and recommendations. 43 U.S.C. §§1345, 1351(a)(3).

50.     By statute, coastal States are entitled to significant portions of the proceeds from Outer Continental Shelf leasing and production. Those revenue rights arise under three separate programs. First, under OCSLA's revenue-sharing program, the States with offshore federal leases located within the first three miles from the State's seaward boundary receive 27 percent of the revenue generated from those leases. 43 U.S.C. §1337(g)(5)(A). Second, the Coastal Impact Assistance Program provides assistance from leases to Alaska, Alabama, California, Louisiana, Mississippi, and Texas. 43 U.S.C. §1356a. Third, the Gulf of Mexico Energy Security Act provides for the sharing of 37.5 percent of qualified Outer Continental Shelf revenues among Alabama, Louisiana, Mississippi, and Texas to aid in coastal-restoration efforts. P.L. 109-432, 120 Stat. 3000, 43 U.S.C. §1331 note.

51.     For example, in 2020 Louisiana collected $156 million from GOMESA, funds which are dedicated to and critical to funding and continuing its Comprehensive Coastal Master Plan for coastal restoration, as well as funding ongoing recovery from the BP Oil Spill. *See* U.S. Office of Nat. Resources Revenue,  "Gulf of Mexico Energy Security Act," https://bit.ly/3cNnynj; BOEM, "Gulf of Mexico Energy Security Act," https://bit.ly/2PaEZ8Y. Through production of crude oil, natural gas, and refining capacity (which is second only to Texas for the nation), these three industries in 2017

supported $72.8 billion in sales in Louisiana and generated over $19.2 billion in household earnings for Louisianans. In 2015 they supported 262,520 jobs and in fiscal year 2017 directly paid $688.7 million in State taxes and fees.  Loren C. Scott, Ph.D., The Energy Sector: Still A Giant Economic Engine for the Louisiana Economy (Apr. 2018), https://bit.ly/3reJJI2.

52.     Similarly, Utah has significant economic interests in federal leases and mineral extraction. The oil, gas, and mining industries pay hundreds of millions of dollars in direct production taxes, mineral royalties, and property taxes, and the State's share of MLA revenues realized from development of leasable minerals on federal lands. In fiscal year 2020, the State received $58.6 million in revenues from federal mineral leases. State of Utah Comprehensive Annual Financial Report (June 30, 2020) at 42, https://bit.ly/3cXJQTs. Those revenues are directed by statute to, among other things, the counties and other political subdivisions, the State Board of Education, the Utah Geological Survey, and the Wildland Fire Suppression Fund. Utah Code §§59-21-1, 35A-8-303, 59-21-2.  The State also collects property tax, severance tax, and conservation fees in connection with its natural resources. For fiscal year 2020, the State of Utah assessed $124.4 million in natural resources property tax,[1] collected by the counties. Utah Tax Commission FY2020 Annual Report at 67-68, *available at* https://bit.ly/3d1V7Sw. Severance tax for oil and gas is a major source of tax revenue, totaling $33.2 million for fiscal year 2020. *Id.* at 19. In fiscal year 2020, the State also collected $3.7 million in oil and gas conservation fees. *Id.* Each postponed lease in the March Sale represents a potential revenue source for the State, the delay of which has harmed Utah. Mineral extraction also produces indirect revenue to the State in the form of increased income and sales tax. Utah produced $4 billion of energy annually, 35 percent of which is coal, 24 percent crude oil, and 34 percent natural gas. Utah Governor's Office

---

[1] Natural resources property tax includes minerals on federal lands. Real property tax includes "all mines, minerals, and quarries in and under the land . . . being on the lands of this state or the United States." Utah Code Ann. §59-2-102(32)(b).  Minerals includes both metalliferous (e.g., iron and copper) and nonmetalliferous (e.g., oil and gas). *Id.* §59-2-102(22), (26).

of Economic Development, 2020 Annual Report (June 2020), https://bit.ly/3cdFEzu. Taxable sales and purchases in mining, and in oil and gas extraction, in fiscal year 2019 totaled $320.8 million. Utah Tax Commission, FY2020 Annual Report, at 60 (Dec. 31, 2020), https://bit.ly/3lKArT1. Abundant energy resources in the State means oil, gas, and minerals will continue to play a significant role in the State's future energy economy.

## II.   The 2017-2022 Five-Year Program.

53.     The Biden Ban implicates the 2017-2022 Five Year Oil and Gas Leasing Program ("the Current Five-Year Program" or "Five-Year Program"). The process of creating the Current Five-Year Program began in 2014, when Barack Obama was President and Joe Biden was Vice President. President Obama's BOEM published a request for information in the Federal Register and sent a letter to all Governors, Tribes, and interested federal agencies requesting input on the Program. *See* 79 Fed. Reg. 34349 (June 16, 2014). Under OCSLA, in connection with BOEM's obligation to take into account economic, social, and environmental values in making its leasing decisions under 43 U.S.C. §1344(a), BOEM received over 500,000 comments in response to the RFI. *See* Five-Year Program 3-1.

54.     In 2015, President Obama's BOEM published the Draft Proposed Program, which analyzed the comments received in response to the RFI and set out a draft schedule of potential lease sales. 80 Fed. Reg. 4941 (Jan. 29, 2015). Publication of the Draft Proposed Program initiated a sixty-day comment period in which BOEM received over one million comments responding to the Draft Proposed Program. Final Program S-1.

55.     In 2016, President Obama's BOEM published the then-Proposed Program, which initiated a ninety-day comment period. 81 Fed. Reg. 14881 (Mar. 18, 2016). Again, President Obama's BOEM received over one million comments and held public meetings and created environmental impact statements in compliance with NEPA. Final Program S-2-3.

56.     In November 2016, President Obama's BOEM published the then-Proposed Final Program after the Secretary determined which areas to include in the lease sales. BOEM's final programs are published under the title "proposed final program," or PFP, because they must be reviewed by Congress and the President and then approved by the Secretary of the Interior. In recognition that "[t]he Gulf of Mexico is known to contain significant oil and gas resources and already has world-class, well-developed infrastructure, including established spill response capability[,] [t]he PFP schedules 10 region-wide lease sales in the areas of the Gulf of Mexico that are not under Congressional moratorium or otherwise unavailable for leasing." Final Program S-2. The Final Program also observed that "[i]n the Gulf of Mexico, infrastructure is mature, industry interest and support from affected states and communities is strong, and there are significant oil and gas resources available." *Id.* Thus, "[t]o take advantage of these incentives to OCS activity, the region-wide sale approach makes the entire leasable Gulf of Mexico OCS area available in each lease sale." *Id.*

57.     One such Gulf of Mexico lease sale approved by the Final Program is GOM OCS Oil and Gas Lease Sale 257. Lease Sale 257 would have comprised the Western and Central Planning Areas of the Gulf of Mexico and a portion of the Eastern Planning Area not subject to congressional moratorium. Final Program S-5; *see also* 86 FR 10132, https://bit.ly/3vDjT47.

58.     The Final Program also scheduled a sale in Cook Inlet, Alaska, "where there is existing infrastructure currently supporting State leasing activities." Final Program S-2. But the Final Program excludes most other Arctic Outer Continental Shelf sales "based on, among other factors, current market conditions, evidence of a lack of industry interest, and the recent increase in onshore oil and gas production." Final Program S-3.

59.     Sixty days after the Final Program was transmitted to President Obama and Congress, on January 17, 2017, the Secretary approved the Final Program, "which schedules 11 potential oil and gas lease sales, one sale in the Cook Inlet (Alaska) Program Area and 10 sales in the GOM Program

Areas." Record of Decision and Approval of the 2017-2022 Outer Continental Shelf Oil and Gas Leasing Program 3 (Jan. 17, 2017). The Secretary's approval further specifically affirms the Final Program's specification that "[t]he GOM sales would be region-wide and include unleased acreage not subject to moratorium or otherwise unavailable ... to provide greater flexibility to industry, including more frequent opportunities to bid on rejected, relinquished, or expired OCS lease blocks." *Id.* The Secretary's approval also reaffirms that "[t]he 10 GOM sales are scheduled to occur over the 5 years of the 2017-2022 Program, with one sale in 2017, two each in 2018-2021, and one in 2022." *Id.*

60.     In accordance with the Five-Year Program, all lease sales, at least until the Biden Ban, occurred on schedule. *See* "Lease Sale 249" (held Aug. 16, 2017), https://bit.ly/3cmuSpC; "Lease Sale 250" (held Mar. 21, 2018), https://bit.ly/3laZD4J; "Lease Sale 251" (held Aug. 15, 2018), https://bit.ly/3et2BR3; "Lease Sale 252" (held Mar. 20, 2019), https://bit.ly/3bEJRME; "Lease Sale 253" (held Aug. 21, 2019), https://bit.ly/2OhYNHI; "Lease Sale 254" (held Mar. 18, 2020), https://bit.ly/3qCpaVH;[2] "Lease Sale 256" (held Nov. 18, 2020), https://bit.ly/2NgFXjG.

### III.     Lease Sale 257 Record of Decision.

61.     In accordance with the Five-Year Program, on November 18, 2020, BOEM published a Proposed Notice of Sale for Lease 257 in the Gulf of Mexico. *See* 85 Fed. Reg. 73508 (Nov. 18, 2020). As OCSLA requires, BOEM sent the Proposed Notice to the Governors of the affected States. Proposed Notice 18. It was also opened for public comment. 85 Fed. Reg. 73508 (Nov. 18, 2020). And the Proposed Notice provided that the time of sale could be delayed "in the case of an event that the BOEM G[ulf] O[f] M[exico] R[egional] D[irector] deems could interfere with a fair and orderly lease sale process. Such events could include, but are not limited to, natural disasters (e.g., earthquakes,

---

[2] Lease Sale 255, which would occur in the Beaufort Sea Program Areas, was included in the Proposed Five-Year Program but removed by the Final Program. *See* Final Program S-7 ("After carefully considering all available information and analyses, the Secretary removed the Chukchi Sea and Beaufort Sea Program Areas from the Proposed Final Program.").

hurricanes, floods), wars, riots, acts of terrorism, fires, strikes, civil disorder, or other events of a similar nature." Proposed Notice 18. A change in presidential administrations is, notably, not on the list.

62.     The Secretary approved the Notice of Sale in a Record of Decision. *See* 86 Fed. Reg. 6365 (Jan. 21, 2021). In the ROD, the Secretary noted reliance on the "Gulf of Mexico Outer Continental Shelf Lease Sale: Final Supplemental Impact Statement" in considering on how to proceed with Lease Sale 257. Approval 3. The Secretary analyzed five separate alternatives, including a no-action option, and determined that Alternative A—a regionwide lease sale with minor exclusions— would be "in the best interest of the Nation and meets the purposes of the OCS Lands Act." Approval 5. The Secretary also determined that Lease Sale 257 "promotes domestic energy production, which can reduce the need for oil imports," and promotes other national interests including "continued employment, labor income, [and] tax revenues." Approval 8. Additionally, the Secretary found that "[c]ontinued oil and gas leasing on the OCS may also reduce the risk of spills from the transportation of imported energy resources" and "revenue sharing with applicable coastal states and political subdivisions . . . can help mitigate the risks and costs assumed by the States and communities in the area of the lease sale." Approval 5, 8.

63.     In the ROD, the Secretary rejected the no-action alternative because "the needed domestic energy sources and the subsequent positive economic impacts from exploration and production, including employment, would not be realized. Furthermore, revenue would not be collected by the Federal Government nor subsequently disbursed to the States." Approval 10. Additionally, the Secretary found that other sources of energy "may have different but comparable levels of negative environmental impacts, such as the risk of spills from the transportation of alternative oil supplies over long distances," meaning the no-action alternative "would not avoid the incremental contribution of the energy substitutes' impacts to those same cumulative effects." Approval 10. Finally, the Secretary's approval noted that the Lease 257 stipulations included "all

practicable means to avoid or minimize environmental harm from the selected alternative." Approval 11.

64.     Lease Sale 257 was formally scheduled for March 17, 2021. Approval 1.[3]

**IV.     Lease Sale 258 Public Comment Process.**

65.     In September 2020, BOEM began the process of preparing Lease Sale 258, which would offer lands in the Cook Inlet, Alaska, in accordance with the Current Five-Year Program. BOEM released a Call for Information and Nominations in the Federal Register to allow industry parties to indicate interest in areas of the sale area. 85 Fed. Reg. 55859 (Sept. 10, 2020). BOEM also released a Notice of Intent to Prepare an EIS, which provided the public with an opportunity to comment on the scope of the lease sale. 85 Fed. Reg. 55861 (Sept. 10, 2020). In January 2021, after accounting for comments, BOEM published a Notice of Availability indicating the area proposed for sale in the Cook Inlet. 86 Fed. Reg. 4116 (Jan. 15, 2021). BOEM also published the draft environmental impact statement for Lease Sale 258 and invited public comment. 86 Fed. Reg. 4117 (Jan. 15, 2021).

**V.     Executive Order 14008 Directs the Secretary to Impose the OCSLA Leasing Moratorium.**

66.     On January 27, 2021, President Biden issued Executive Order 14008, which implements the Biden Ban on energy-production leases on public lands and offshore waters. This Ban is a not-even-veiled attempt to follow-up on President Biden's campaign promises to kill energy production and, indeed, to stymie the entire financial structure that supports fossil-fuel exploration and development programs in the United States and elsewhere in the world. Indeed, reflecting its

---

[3] The Secretary references a Final Notice of Sale as well, but such Notice does not exist on BOEM's public-facing website. Plaintiff States intend to pursue this further in discovery.

radical nature, much of its effect is to arbitrarily suspend operation of the already limited leasing schedules implemented by the Obama Administration.

67.     The Biden Ban arises from the Order's arbitrary moratorium on lease sales on public lands and in offshore waters. Exec. Ord. 14008, Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7619, 7624-25 (Jan. 27, 2021). Section 208 of the Order, citing no authority, commands the Secretary of the Interior to "pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters." 86 Fed. Reg. at 7624-25. Nothing in the Order provides any rationale for this radical departure from the leasing policies of the Obama Administration, which the Trump Administration left in place. The only discernable rationale is to follow through on campaign promises to the most extreme elements of President Biden's coalition. *See* Tarini Parti, *Biden Aims for Tricky Balance on Fracking*, Wall St. J. (Mar. 16, 2020), https://on.wsj.com/3eqA6U2. As discussed below, the Department took several concrete acts to implement the OCSLA Leasing Moratorium relying only upon the Executive Order for justification.

68.     The Order purports to only halt "new oil and natural gas leases." 86 Fed. Reg. at 7624. But development and exploration related to existing leases had already been constructively halted by then-Acting Secretary of the Interior Scott de la Vega's Secretarial Order No. 3395 of January 20, 2021. This Order comprehensively suspends BOEM and BLM's authority to take any action regarding the oil and gas leasing and permitting process. Before the Order, BOEM and BLM regional offices had been delegated authority to approve permits and oversee the exploration and drilling process. *See* Dep't of the Interior, Departmental Manual, 218 DM 1, at 1 (effective Aug. 30, 2016) (delegating BOEM authority over certain OCSLA permitting decisions); *Id.*, 235 DM 1, at 2-3 (effective Oct. 9,

2009) (delegating BLM authority over certain MLA permitting decisions). These delegations allowed the regional offices to bring their expertise and knowledge of local conditions to bear on the complex questions surrounding permit applications and NEPA compliance. Under Secretarial Order 3395, however, all aspects and levels of exploration and development had to be made by nine politically appointed officials in Washington.

69.     The main provisions of the Secretarial Order have been continued by a follow-on order compelling virtually all leasing and development to be approved by the Office of the Assistant Secretary for Land and Minerals in Washington, D.C. *See* Memorandum from Laura Daniel-Davis, Principal Deputy Assistant Secretary Lands and Minerals Management to Bureau Directors (Mar. 19, 2021), https://bit.ly/39a57YM. It is simply not possible for this handful of officials—who lack local knowledge or expertise and the proper technical expertise—to expeditiously and thoroughly consider oil and gas permitting applications and leasing matters. Such decisions raise complex issues under NEPA, the National Historic Preservation Act, MLA, and OCSLA that require the application of technical expertise and local knowledge. *See, e.g.*, Secretarial Order No. 3389, *Coordinating and Clarifying National Historic Preservation Act Section 106 Reviews* (Dec. 22, 2020).[4]

70.     What's more, the Acting Secretary had to quickly backtrack from this Order to clarify that it "does not apply to actions taken with respect to Indian tribal and individual trust and restricted lands." *See* Memorandum to Darryl LaCounte, Director of the Bureau of Indian Affairs from Robert T. Anderson, Senior Counselor to the Secretary (Jan. 25, 2021), https://bit.ly/3r0lzku. This arbitrary

---

[4] Plaintiff States intend to pursue discovery regarding the extent to which Secretarial Order 3395 has prevented the Department from fulfilling its statutory duty of considering permits expeditiously. If it is revealed that the Order has systematically delayed permit consideration, Plaintiff States intend to amend their Complaint to add a count for agency action unlawfully and unreasonably withheld and seek an injunction against implementation of Order 3395. *See Ensco Offshore Co.*, 781 F. Supp. 2d at 336-37.

exemption further highlights that the Biden Ban is the result of campaign promises rather than statutory factors.

71.     By stripping BLM and BOEM of their authorities, the Acting Secretary made it impossible for the Department to live up to its statutory duties. This abdication of statutorily imposed duties and selective enforcement of permitting delegations demonstrates the arbitrary and lawless nature of the Biden Ban and its Leasing Moratoriums. Courts must ensure that the Administration lives up to its nondiscretionary duties in oil and gas exploration and development permitting—a vital national program.[5] *See, e.g.*, *Ensco Offshore Co.*, 781 F. Supp. 2d at 336-37 ("Not acting on permit applications seems contrary to OCSLA's command that drilling development be 'expeditious,' and the APA's command that a permit must be processed 'within a reasonable time.' Together, OCSLA and the APA inform the government's action on permits and require that the government should act expeditiously to advance development in the Outer Continental Shelf, and not to curtail drilling unpredictably or indefinitely.").

72.     Taken together, Executive Order 14008 and the Department's actions on existing leases implement a comprehensive ban on the leasing and development of energy resources on public lands and offshore waters in flagrant disregard for the Department's nondiscretionary statutory duties under OCSLA and MLA.

## VI.    BOEM Unlawfully Rescinds Lease Sale 257's Record of Decision Based on the OCSLA Leasing Moratorium.

---

[5] Plaintiff States intend to pursue discovery regarding the extent to which Secretarial Order 3395 and the March 19, 2021 Memorandum of Laura Daniel-Davis, Principal Deputy Assistant Secretary have prevented the Department from fulfilling its statutory duty to consider permits expeditiously and whether permitting remains delayed by other means even after the purported restoration of delegated authority. If discovery reveals that the Order and its follow-up memo have systematically delayed permit consideration or arbitrarily prioritized permit consideration such that State interests are harmed, Plaintiff States intend to amend their Complaint to add a count for agency action unlawfully and unreasonably withheld and seek an injunction against implementation of Order 3395 and any follow-up memo(s). *See Ensco Offshore Co.*, 781 F. Supp. 2d at 336-37.

73.     On February 18, 2021, Michael Celata, Regional Director of BOEM's Gulf of Mexico Office, issued a Notice to Rescind the Prior Lease 257 Record of Decision. 86 Fed. Reg. 10132 (Feb. 18, 2021). The Notice declared that the Record of Decision "is rescinded immediately." 86 Fed. Reg. at 10132. The half-page-long Federal Register Notice purports to rescind the prior Record of Decision with no analysis, no comment period, no reference to statutory factors, no reference to the Current Five-Year Program, and no consultation with States, Tribes, or local governments. 86 Fed. Reg. at 10132. BOEM's *only* stated rationale is that it must rescind the Record of Decision "to comply with Executive Order 14008." 86 Fed. Reg. at 10132. In short, the Recission lacks even a veneer of reasoned decisionmaking; it merely applies the Biden Ban without considering the longstanding and complex statutory regimes created by Congress after careful deliberation and compromises or the devastating local, state, and national economic and conservation damage imposed by the decision.

74.     BOEM now has no plans to hold Lease Sale 257. Instead, the Recission Notice states only that "BOEM *may* reevaluate GOM Lease Sale 257 and publish an appropriate ROD in the Federal Register." 86 Fed. Reg. at 10132 (emphasis added).

75.     The Recission is a final agency action for purposes of the Administrative Procedure Act because it "marks the consummation of the agency's decisionmaking process" and "legal consequences" will flow from it. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S.Ct. 1807, 1813 (2016); *Ensco Offshore Co.*, 781 F. Supp. 2d at 336 ("And so, agency delay in issuing or denying a permit [under OCSLA], or the failure to act at all, is a final agency action made reviewable by the APA."); *Texas v. United States*, 2021 WL 723856, at *32 (S.D. Tex. Feb. 23, 2021) (holding 100 day moratorium on removals constituted final agency action).

76.     Under the Administrative Procedure Act, an agency action must be vacated if it is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A) & (C). The Recission conflicts with the carefully crafted statutory procedure for Outer

Continental Shelf lease sales set out in OCSLA and implemented through the approved Current Leasing Plan. *See* 43 U.S.C. §§1337, 1340, 1344, 1345, 1351; *Hornbeck Offshore Servs.*, 696 F. Supp. 2d at 632. By amending the Current Five-Year Program and withdrawing the duly issued Record of Decision by fiat, the Recission ignores OCSLA's provisions requiring consultation with the States, submitting a plan to Congress and the President, waiting and comment periods, and several exhaustive environmental impact statements. It also ignores OCSLA's purpose to facilitate the expeditious development of the Outer Continental Shelf. *See* 43 U.S.C. §1332 ("[T]he outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safe-guards, in a manner which is consistent with the maintenance of competition and other national needs."); *Hornbeck Offshore Servs.*, 696 F. Supp. 2d at 632; *Ensco Offshore Co.*, 781 F. Supp. 2d at 336-37.

77.     Agency action must be set aside if it is promulgated "without observance of procedure required by law." 5 U.S.C. §706(2)(D). The Recission, like the Record of Decision, was a substantive rule that was required to undergo notice-and-comment rulemaking, particularly since several comment periods are explicitly prescribed by statute. The Recission did not go through notice and comment. Rather, it was issued with no notice or opportunity for public comment and is immediately effective. "The APA requires rules to undergo notice and comment unless they are exempt." *Texas v. United States*, at *43 (S.D. Tex. Feb. 23, 2021). No exemption to notice-and-comment procedures applies here because the Recission is not an "interpretative rule[], general statement[] of policy, or rule[] of agency organization, procedure, or practice." 5 U.S.C. §553(b)(A); *see also Texas*, 809 F.3d at 171 (exceptions to notice and comment "must be narrowly construed"); *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984) ("Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate

itself before establishing rules and procedures which have a substantial impact on those who are regulated.").

78.     Under the APA, a court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion." 5 U.S.C. §706(2)(A). To meet this standard, "[f]ederal administrative agencies are required to engage in 'reasoned decisionmaking.' This necessarily means that '[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.' More specifically, 'the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Texas v. United States*, 2021 WL 723856, at *39 (S.D. Tex. Feb. 23, 2021).

79.     The Recission offers no explanation whatsoever for the decision to halt Lease Sale 257. The Secretary's Record of Decision approving Lease Sale 257 was based on a robust administrative record and contained an extensive discussion of the OCSLA statutory factors. And the ROD was based on the 2017-2022 Five-Year Program, which was the product of an extensive multiyear proceeding including *millions* of comments, multiple extensive environmental impact statements, consultation with every State government and relevant federal agencies, and submission to Congress and the President. The Rescission acts as if this extensive rulemaking record did not even exist. It does not engage with previous findings or even mention OCLSA's statutory factors. Instead, it occupies half a page of the Federal Register and cites only one source of authority—Executive Order 14008—which itself contains no analysis of the statute or previous rulemaking proceeding. It also ignores the enormous reliance interests which have grown up around the 2017-2022 Program generally and Lease Sale 257 specifically. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) ("In explaining its changed position, an agency must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'").

80.     This unexplained, unreasoned Recission does not clear the APA's arbitrary-and-capricious standard. It fails to consider the Agency's prior position, provides no reasons for changing, and does not consider reliance interests. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) ("*State Farm* teaches that when an agency rescinds a prior policy its reasoned analysis must consider the "alternative[s]" that are "within the ambit of the existing [policy]."); *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books."); *see also Texas v. United States*, 2021 WL 723856, at \*42 ("The seven-page administrative record does not provide any facts that could aid this Court in reasonably discerning what DHS's reasons were for instituting a 100-day pause aside from the general and conclusory concerns enumerated above. [] There is no indication that DHS went through the factors that Congress intended it to consider in its decisionmaking process, nor does the administrative record show what aspects of this issue were seriously considered. In essence, this failure boils down to one defect in the agency's decisionmaking process: a sparse administrative record. Given this defect, the Court has basically no material from which it may evaluate if DHS considered any facts, let alone whether the facts the agency considered 'run[ ] counter' to DHS's ultimate choice to implement the 100-day pause.").

81.     The opaque, rapid, arbitrary, and nonpublic nature of the Recission also demonstrates that it is not the product of reasoned decisionmaking. The Five-Year Program and Record of Decision took more than *six years* to produce; the Recission unraveled them with the stroke of a pen after an agency decisionmaking process that, at *best*, took under six weeks. "That did not leave much time for reflection and analysis." *Texas v. United States*, 2021 WL 723856, at \*41.

82.     Given the extensive prior administrative records leading to the prior decisions, there is a "significant mismatch" between the decision and the administrative rationale. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) ("We are presented, in other words, with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process. It is rare to review a record as extensive as the one before us when evaluating informal agency action—and it should be. But having done so for the sufficient reasons we have explained, we cannot ignore the disconnect between the decision made and the explanation given."). The Recission thus is the opening act of President Biden's attempt to halt oil and gas development and destroy the domestic fossil fuel industry. The Recission doesn't just contravene Congress's unambiguous statutory policy to pursue "expeditious development;" it elides accountability for that result by proceeding outside the APA's transparency-forcing procedures.

83.     Under the APA, a court "shall [] compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §706(1). The Recission offers no reasoning for delaying the sale. Instead, it references only Executive Order 14008 as its sole reason for delay. But the Executive Order itself offers no reason or statutory basis whatsoever for the delay. This unexplained delay is particularly egregious given "OCSLA's overriding policy of expeditious development." *Ensco Offshore Co.*, 781 F. Supp. 2d at 339.

84.     Finally, the Recission is beyond authority conferred by law because it is signed by Michael A. Celata, BOEM's Gulf of Mexico Regional Director, rather than by the Secretary. Congress entrusted the Secretary of the Interior with the authority to approve Notices of Sale and administer the leasing program. *See* 43 U.S.C. §§1337, 1344. Acting under this authority, the Secretary of the Interior issued the Record of Decision approving the Notice of Sale. And the Departmental Handbook specifically withholds any delegation of authority to BOEM for the "[a]cceptance or rejection of state recommendations on the size, timing, or location of oil and gas lease sales, pursuant

to 43 U.S.C. §1345"; "[a]pproval of the Proposed and Final Notices of Sale for an oil and gas lease

sale, pursuant to 43 U.S.C. §1337(1), and approval and signing of the related Record of Decision for

such oil and gas lease sale"; and "[a]pproval of the length of the primary oil and gas lease terms to be

offered in a lease sale, pursuant to 43 U.S.C. §1337(b)." 218 DM 1, at 2-3. Director Celata thus had

no lawful authority to rescind this Record of Decision, nor undo the decisions that are statutorily

entrusted to, and retained by, the Secretary.[6]

85.     Rather than conducting a full rulemaking to reconsider President Obama's Current

Five-Year Program, and the Trump Administration's initiation of the scheduled Lease Sale 257,

President Biden seeks to unilaterally unmake these carefully and transparently considered decisions

through fiat and opaque agency actions buried in a few short paragraphs in the Federal Register—to

the extent they are even publicly disclosed at all. In this way, President Biden's regulatory strategy

emulates his campaign strategy—have it both ways by banning oil and gas production without frankly

accepting the consequences. But regulatory actions, unlike campaign promises, are subject to the

careful constraints of the Administrative Procedure Act.

## VII.   BOEM Unlawfully Delays Lease Sale 258 Based Upon the OCSLA Leasing Moratorium.

86.     In furtherance of the Biden Ban, on February 4, 2021, BOEM published a press release

on its website cancelling the public comment period on the Draft EIS and also the public meetings

about Lease Sale 258. *See* BOEM, "BOEM Cancels Comment Period, Virtual Meetings for Proposed

Lease Sale Offshore Alaska" (Feb. 4, 2021), https://bit.ly/3bF7Xqs. The press release relies solely

---

[6] Making matters worse, Secretarial Order 3395 explicitly divested Director Celata of any authority even "[t]o publish, cause to be published, or aid in the publication of any notice in the Federal Register." Because the Recission does not indicate that it was approved by any of the nine listed officers in Secretarial Order 3395, it also conflicts with this Order, which was in force when Director Celata purported to rescind the Record of Decision. The March 19, 2021, Daniel-Davis memo continues to restrict a wide number of critical decision-making related to existing leasing and vaguely states the list does "not constitute an exhaustive list of actions requiring review by the ASLM."

upon Executive Order 14008 to close the comment period. BOEM later memorialized this press release in a Federal Register notice that also relies solely upon Executive Order 14008. 86 Fed. Reg. 10994 (Feb. 23, 2021). Like the Rescission of Lease Sale 257, the abrupt and unexplained cancellation of Lease Sale 258's comment period is a part of President Biden's *ultra vires* attempt to halt oil and gas exploration and to do so in the most opaque manner possible.

87.     The delay constitutes final agency action under the APA. *See Ensco Offshore Co.*, 781 F. Supp. 2d at 336.

88.     Under the Administrative Procedure Act, an agency action must be vacated if it is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A) & (C). The delay of Lease Sale 258 ignores the process set out by OCSLA and does not even refer to the statute.

89.     The delay of Lease Sale 258 constitutes an unreasonable delay under APA §706(1). Neither the Press Release nor Federal Register Notice provides any reasons for the delay other than Executive Order 14008, which itself provides no reason for delaying leasing. This lack of reasoning, combined with OCSLA's purpose of expeditious development, requires the Court to compel performance of this unreasonably and unlawfully delayed action.

90.     Finally, the delay of Lease Sale 258 is arbitrary and capricious under the APA because the Press Release, Federal Register Notice, nor Executive Order 14008 do not provide any reasons whatsoever for the delay, fail to engage with the statutory factors, and fail to consider reliance interests.

## VIII.   Lease Sales Under the Mineral Leasing Act.

91.     Under the Mineral Leasing Act, the Secretary of the Interior is required to hold lease sales "for each State where eligible lands are available at least quarterly." 30 U.S.C. §226(b)(1)(A). BLM has the authority to lease public lands with oil and gas reserves to private industry for development under the Federal Land Policy and Management Act, 43 U.S.C. §§1701–1787, the MLA, and the

BLM's own regulations and plans. *See* 43 C.F.R. Part 1600 (Planning, Programming, and Budgeting); 43 C.F.R. §3120 (Competitive Leases) and 3160 (Onshore Oil and Gas Operations). BLM's regulations also provide for quarterly lease sales. 43 C.F.R. §3120.1-2(a) ("Each proper BLM S[t]ate office shall hold sales at least quarterly if lands are available for competitive leasing.").[7]

92.     The MLA provides that for oil and natural gas leases on federal lands, in States other than Alaska, 50 percent of bonuses, production royalties, and other revenues are granted to the State in which the lease is located. The remaining 40 percent is granted to the Reclamation Fund, which maintains irrigation systems in several Western States. 30 U.S.C. §191(a). For leases in Alaska, 90 percent of revenues are granted to the State. *Id.*

## IX.     March & April Quarterly Sales.

93.     Several BLM regional offices planned to hold quarterly sales in March and April of 2021 to lease available lands.

94.     On January 8, 2021, BLM's Nevada State Office issued a Notice of Sale offering seventeen parcels for competitive bidding at a March 9, 2021, sale. BLM, Nevada State Office, Notice of Competitive Oil & Gas Internet Lease Sale (Jan. 8, 2021), https://on.doi.gov/38AFVdT.

95.     BLM's Montana-Dakotas State Office issued a schedule for the sale of available parcels, with the actual sale scheduled for March 23, 2021. *See* BLM Nat'l NEPA Register, 2021 March Oil and Gas Lease Sale, https://bit.ly/3ewwGyZ.

---

[7] Additionally, under the Federal Land Policy and Management Act (FLPMA), the Secretary must follow exacting procedures to withdraw public lands from sale including a public hearing, notice and comment period, and State and local government consultation. *See* U.S.C. §§1702, 1714, 1739. FLPMA also requires the Secretary to follow formal procedures in revising Resource Management Plans that include the opportunity for State comments on revisions such as a halt in lease sales. 43 U.S.C. §§1712, 1732; 43 C.F.R. §1610.5-5; *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004).

96.     BLM's Utah State Office scheduled a sale of several parcels, pending a public comment period, for March 30, 2021. *See* BLM, Nat'l NEPA Register, 2021 Utah March Competitive Oil and Gas Lease Sale, https://bit.ly/3rHxnJE.

97.     BLM's Colorado State Office scheduled a sale for March 25, 2021, at which it proposed to lease 83 parcels for over one hundred square miles of land. *See* BLM, Nat'l NEPA Register, March 2021 Oil & Gas Lease Sale, https://bit.ly/3rFK2g4.

98.     BLM's Oklahoma Field Office scheduled a lease sale pending a comment period for April 2021. *See* BLM, Nat'l NEPA Register, April 2021 Competitive Oil and Gas Lease Sale - Oklahoma Field Office, https://bit.ly/2PYs1f6.

99.     BLM's Pecos New Mexico District Office scheduled a lease sale for over five hundred acres for April 2021. *See* BLM, Nat'l NEPA Register, April 2021 Competitive Oil and Gas Lease Sale - Pecos District Office, https://bit.ly/3cjUjrW.

## X.     March & April Lease Sales Cancelled Based on the MLA Leasing Moratorium.

100.     On January 27, 2021, President Biden issued Executive Order 14008, which includes a moratorium on lease sales on public lands and in offshore waters. Exec. Ord. 14008, Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7619, 7624-25 (Jan. 27, 2021). Section 208 of the Order, without citing any statutory authority and contrary to existing law,  orders the Secretary of the Interior to "pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters." 86 Fed. Reg. at 7624-25. The Order thus institutes an MLA Leasing Moratorium to complement its OCSLA Leasing Moratorium.

101.    Although BLM has published no formal notice in the Federal Register halting the previously planned and statutorily required quarterly land sales, it did publish a "*fact sheet*" in which it noted that the President ordered the Secretary of the Interior to halt the leasing of public lands. *See* BLM, Fact Sheet: President Biden to Take Action to Uphold Commitment to Restore Balance on Public Lands and Waters, Invest in Clean Energy Future (Jan. 27, 2021), https://on.doi.gov/3vlnHqj.

102.    Executive Order 14008 caused BLM offices to halt all pending quarterly lease sales in express contravention of the Mineral Leasing Act.[8]

103.    On January 27, 2021, the same day Executive Order 14008 was issued, BLM's Nevada State Office issued what it styled as an "*Errata*," which stated that the previously noticed March 2021 oil and gas lease sale was postponed. BLM, Nevada State Office, Errata #1 (Jan. 27, 2021). The Errata provides no reasons for postponing the March 2021 oil and gas lease sale.

104.    On February 12, 2021, BLM's Montana-Dakotas Office updated the posting for its March 2021 sale to note that "Interior moved to postpone the following scheduled March oil and gas lease sales. Bureau of Land Management (BLM) lease sales in Colorado, Montana, Utah, and Wyoming are postponed." BLM Nat'l NEPA Register, 2021 March Oil and Gas Lease Sale, https://bit.ly/3O IFt8N. The Office gave no further reasoning for the postponement.

105.    On February 12, 2021, BLM's Wyoming Office updated the posting for its March 2021 sale to note that lease sales "are postponed to confirm the adequacy of underlying environmental analysis." BLM Nat'l NEPA Register, 2021 March Oil and Gas Lease Sale, https://bit.ly/3ltYPIG. The Office gave no further reasoning for the postponement.

---

[8] The coordination of BLM State offices on systematically halting lease sales implies that the agency has issued formal instructions that have not been made public. Such a document would constitute final agency action and Plaintiff States intend to pursue it in discovery.

106.     On February 12, 2021, BLM's Utah Office updated the posting for its March 2021 sale to note that "[t]he oil and gas lease sale scheduled for March 30, 2021 has been postponed." BLM, Nat'l NEPA Register, 2021 Utah March Competitive Oil and Gas Lease Sale, https://bit.ly/3l8zXG9. The Office gave no reasoning for the postponement.

107.     On February 17, BLM's Colorado Office updated the posting for its March 2021 sale to note that "[t]he oil and gas lease sale scheduled for March 25, 2021, has been postponed." BLM, Nat'l NEPA Register, March 2021 Oil & Gas Lease Sale, https://bit.ly/38uyXHa. The Office gave no reasoning for the postponement.

108.     On March 4, 2021, BLM's Oklahoma Field Office updated the posting for its April 2021 sale to note that "[t]he oil and gas lease sale scheduled for April, 2021 has been postponed." BLM, Nat'l NEPA Register, April 2021 Competitive Oil and Gas Lease Sale - Oklahoma Field Office, https://bit.ly/3vhzOou. The Office gave no reasoning for the postponement.

109.     On March 4, 2021, BLM's Pecos, New Mexico District Office updated the posting for its April 2021 sale to note that "[t]he oil and gas lease sale scheduled for April, 2021 has been postponed." BLM, Nat'l NEPA Register, April 2021 Competitive Oil and Gas Lease Sale - Pecos District Office, https://bit.ly/3cpXRZJ. The Office gave no reasoning for the postponement.

110.     BLM's Eastern States Office's lease sale page indicates that "BLM-ES holds quarterly lease sales in March, June, September and December." BLM, Eastern States Oil and Gas Leases, https://on.doi.gov/3bElRcd. The page has been updated to note that the "March 2021 oil and gas lease sale has been postponed." *Id.* BLM's Eastern States Office received an Expression of Interest to lease over 200 acres in Monroe County, Ohio. BLM, Nat'l NEPA Register, Expression of Interest 2272, https://bit.ly/3bKqfH3. The status of this Expression of Interest is listed as "Paused." The Office gave no further explanation.

111.     Under the Administrative Procedure Act, an agency action must be vacated if it is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A) & (C). The systematic delay of lease sales is contrary to the MLA's unambiguous command that "[L]ease sales shall be held for each State where eligible lands are available at least quarterly." 30 U.S.C. §226(b)(1)(A). There were eligible lands available, but BLM has cancelled land sales without explanation in violation of its mandatory statutory duty. *See W. Energy All. v. Zinke*, 877 F.3d 1157, 1166 (10th Cir. 2017) ("The WEA's complaint vividly outlines a number of instances where it contends compliance with the Leasing Reform Policy has caused the BLM to fall short of holding quarterly lease sales. If the BLM's current procedures, including those dictated by the Leasing Reform Policy, serve as a roadblock in achieving quarterly lease sales, the BLM will presumably have to abandon both its existing procedures and underlying policies."); *see also WildEarth Guardians v. Bernhardt*, 2020 WL 6701317, at *3 (D.D.C. Nov. 13, 2020) ("If a resource management plan authorizes oil and gas development on certain land parcels, BLM must sell leases for those parcels on a quarterly basis."); *W. Energy All. v. Jewell*, 2017 WL 3600740, at *4 (D.N.M. Jan. 13, 2017) ("WEA has alleged BLM's failure to meet a non-discretionary statutory obligation deprives all WEA members of their legal right to bid on eligible lands available for leasing. Specifically, WEA has identified specific lease sales that were cancelled or postponed for which BLM offered grounds other than a lack of available eligible lands."). In implementing his ban, President Biden ignores not only the accountability-forcing procedures of the APA, but also the MLA's direct statutory commands. Making matters worse, President Biden, the Secretary, and BLM attempt to avoid accountability and judicial review at once for this major action, which deprives the States of potentially billions of dollars in royalties, by failing to even publish any reasoning or documentation for the systematic cancellation of the lease sales.[9]

---

[9] Plaintiff States intend to pursue this refusal to provide public facing documentation and rationales through discovery.

112.    The MLA Lease Sale Moratorium is arbitrary and capricious because the agency offers no explanation whatsoever for the delays, which are announced only in one-sentence postings on the sale notice pages of its websites simply declaring the sales to be postponed. To the extent the "factsheet" on BLM's website offers an explanation, it does so only by reference to Executive Order 14008, which itself offers no reasoning for the constructive moratorium on leasing. The agency's decisions must be vacated as arbitrary and capricious under the APA. *See* 5 U.S.C. §706(2)(A).

113.    BLM's delay also constitutes "unlawfully withheld or unreasonably delayed" agency action. *See* 5 U.S.C. §706(1); *see also Ensco Offshore Co.*, 781 F. Supp. 2d at 336 (E.D. La. 2011) ("Section 706 vests federal courts with the discretion to decide whether agency delay is unreasonable 'when an agency is required to act—either by organic statute or by the APA—within an expeditious, prompt, or reasonable time.'").

114.    Finally, BLM's delays all constitute substantive final rules that were issued without notice and comment in contravention of 5 U.S.C. §706(2)(D).

## XI.    These Actions Will Cause Plaintiff States Irreparable Harm.

115.    The challenged actions will cause harm to Plaintiff States' sovereign, proprietary, and *parens patriae* interests. *See Massachusetts v. EPA*, 549 U.S. 497, 518-520 (2007) (States afforded "special solicitude" in standing inquiry); *see also Texas v. United States*, 809 F.3d at 151-55 (same).

116.    Plaintiff States are entitled to substantial shares of the proceeds from leasing sales under OCSLA, GOMESA, and the MLA. 43 U.S.C. §1337(g)(5)(A); 43 U.S.C. §1356a; 43 U.S.C. §1331 note; 30 U.S.C. §191(a). BLM's and BOEM's failure to hold leasing sales deprives Plaintiff States of significant funds to which they are statutorily entitled.[10] Those funds are vital to not only the State's

---

[10] For example, just last September, BLM sold nearly five hundred acres in Caddo Parrish, Louisiana, entitling the State to substantial revenue. *See* BLM, Eastern States, September 2020 Oil and Gas Lease Sale Decision Record (Sept. 20, 2020), https://bit.ly/3ted8Uk. For a comprehensive chart showing revenue from lease sales, see Louisiana Dep't of Nat. Resources, Revenue to Federal

fiscal health but to the preservation of their territory and the safety of their citizens. *See, e.g.,* Office of the Governor of Louisiana, "Funding Agreements Signed for North and South Lafourche Levee Districts" (Sept. 5, 2019), https://bit.ly/30CLPGV (detailing contribution of GOMESA funds to storm restoration projects); LCPRA, "Louisiana's Share of Federal Offshore Oil & Gas Revenue Increases 14.4 Percent for Coastal Restoration" (Apr. 20, 2019), https://bit.ly/38BbHYe.

117.    Plaintiff Louisiana is harmed by the deprivation of GOMESA lease proceeds, which are deposited annually in the State Coastal Protection and Restoration Fund, a constitutionally dedicated fund in the State Treasury established to provide a recurring source of revenue for the development and implementation of a program to protect and restore Louisiana's coastal area. La. Const. art. VII, §10.2(E)(1). The deprivation of these funds directly harms Louisiana's territory. Louisiana is losing swaths of coastal land—nearly two thousand square miles and counting—due to follow-on effects from environmental catastrophes. *See* LCPRA, "Coastal Crisis," https://bit.ly/3ewyqZ3; *see also* USGS, Land Area Change in Coastal Louisiana (1932 to 2016), https://bit.ly/38ySDcU ("To put these numbers into perspective, this equates to long-term average loss rates of approximately an American football field's worth of coastal wetlands within 34 minutes when losses are rapid to within 100 minutes at more recent, slower rates."). Continued implementation of Louisiana's Coastal Master Plan, the most ambitious coastal restoration plan in the country, is vital to preventing further land loss and protecting estuaries that are nurseries for many of the nation's birds and wildlife. The deprivation of funds caused by the leasing moratorium will directly contribute to the loss of Louisiana's lands.[11] *Cf. Massachusetts v. E.P.A.*, 549 U.S. at 519 (State's "independent

---

Government Collected from Oil and Gas in the Louisiana Outer Continental Shelf (last updated Sept. 30, 2020), https://bit.ly/3taELNW.

[11] *See* LCPRA, Strategic Plan FY 2020-2025, https://bit.ly/3rGjH1D.

interest 'in all the earth and air within its domain'" and "well-founded desire to preserve its sovereign territory" supports standing).[12]

118.     Plaintiff Alaska is imminently harmed by the halt of Lease Sale 258 in the Cook Inlet. Northern Economics' 2018 Study projected that petroleum development in the Cook Inlet could generate 1,750 annual jobs, $101.7 million in annual labor income, and $2.7 billion in total in Alaska and local government property taxes, Alaska corporate income taxes, and royalty payments to the U.S. Responsible oil and gas development in Cook Inlet has supplied a substantial amount of Alaska's consumer energy and enabled significant economic gain. The Biden Administration's moratorium directly threatens the continued development of federal oil and gas resources in Alaska's Cook Inlet.

119.     Plaintiff States are harmed by the deprivation of MLA lease funds deposited to the Reclamation Fund, which several Plaintiff States rely upon to maintain irrigation within their borders. *See* 43 U.S.C. §391; *see also* Charles V. Stern, *The Reclamation Fund: A Primer*, CRS Report R41844 (Apr. 18, 2013).

120.     Plaintiff States are harmed by the deprivation of their statutorily entitled proceeds from MLA lease sales and the regulatory backlog created by the MLA Leasing Moratorium.

121.     For example, the State of Utah is involved in the leasing and drilling of every federal oil, gas, and mineral lease within Utah. Multiple State agencies are involved, including the Public Lands Policy Coordinating Office; the Division of Wildlife Resources; the Division of Oil, Gas, and Mining; and the Office of Energy Development. As a result of the MLA Leasing Moratorium, the lease sale scheduled for March 30, 2021 ("March Sale") with the Canyon Country District Office and the Moab

---

[12] OCSLA leases themselves often provide essential materials for the restoration of Louisiana's coastline. *See, e.g.*, "BOEM Announces Restoration Project for Louisiana's Gulf Coast" (June 4, 2019), https://bit.ly/3bFNC4p ("BOEM has issued 58 leases to convey over 162 million cubic yards of OCS sand for projects to restore approximately 346 miles of the U.S. Atlantic and Gulf Coasts. Approximately 63 million cubic yards of OCS sand have been leased to restore Louisiana's coast.").

Field Office was postponed. *See* Nat'l Fluids Lease Sale System, https://bit.ly/3cd1zHq. That sale included nine parcels totaling 7,213 acres. *See* DOI Environmental Assessment, March 2021 Competitive Oil and Gas Lease Sale (Dec. 2020) https://bit.ly/3cdGdt6. There are also lease sales scheduled for June 8, 2021, September 14, 2021, and December 14, 2021. Nat'l Fluids Lease Sale System, https://bit.ly/3cd1zHq. The nomination cutoffs for those scheduled sales remain unchanged. *Id.* The State participates when the leasing stage progresses to notification of which parcels will be included in upcoming leases sale. The postponement of the lease sale creates a backlog and increased regulatory costs for Utah. And the State stands to lose millions in investment, tax revenue, and statutorily entitled royalty payments from the cancellation of future lease sales. *See* Dr. Timothy J. Considine, *The Fiscal and Economic Impacts of Federal Onshore Oil and Gas Lease Moratorium and Drilling Ban Policies* (Dec. 2020), https://bit.ly/3cVSZf3 (projecting that from 2021 to 2025, Utah will suffer investment losses of $248 million, production losses of $142 million and revenue losses of $27 million from a lease moratorium). Additionally, oil and gas royalties from MLA lease sales and development provide tens of millions of dollars to Utah's Community Investment Board, which supports transportation, utilities, and public health and safety projects across the State. *See* Office of the Legislative Auditor General, Report to the Legislature: A Performance Audit of the Permanent Community Impact Fund (May 2020) https://bit.ly/315hilg.

122.     Plaintiff States are harmed by the deprivation of OCLSA lease funds deposited in the Land and Water Conservation Fund and Historical Preservation Fund. 54 U.S.C. §§200301, et seq; 54 U.S.C. §303102. The revenues deposited in these projects approach $1 billion annually. *See* BOEM, Oil and Gas Leasing on the Outer Continental Shelf 1, https://bit.ly/3tdG92p.

123.     Plaintiff States also have *parens patriae* standing based on the economic injuries that their citizens will be suffer as a result of the Leasing Moratoriums. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) (*parens patriae* standing appropriate when based on

State's "interest in the health and well-being—both physical and economic—of its residents in general"). Plaintiff States' citizens derive enormous benefits in the form of tax revenue and employment from leases issued under the MLA and OCSLA. *See, e.g.*, Loren C. Scott, The Energy Sector: Still an Economic Engine for the Louisiana Economy – An Update (Apr. 2018) (comprehensively outlining benefits of energy sector to Louisiana's economy in the form of tax revenues and jobs).

124.    The Leasing Moratoriums have also injured the Plaintiff States in their sovereign, quasi-sovereign, and proprietary capacities by depriving them of the opportunity to participate in notice-and-comment rulemaking—or to provide input of any kind—about the ban on oil and gas lease sales.

125.    The Leasing Moratoriums also harm Plaintiff States in their capacities as purchasers of energy. Plaintiff States purchase massive quantities of energy in performing their sovereign duties. The Leasing Moratoriums will directly and imminently lead to higher energy prices harming Plaintiff States' ability to exercise their sovereign functions. *See Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) ("At least one state—Texas—has satisfied the first standing requirement by demonstrating that it would incur significant costs."); *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1074 (D.C. Cir. 2017) ("[T]he city has demonstrated an imminent loss of the opportunity to purchase a desired product (reliable and low-cost wholesale power).").

126.    Plaintiff States' injuries are within the zone of interests protected by the MLA and OCSLA. *See Collins v. Mnuchin*, 938 F.3d 553, 574 (5th Cir. 2019) ("The Court 'ha[s] said, in the APA context that the test is not especially demanding.' It has 'conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.' '[T]he test 'forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue.'").

OCSLA expressly gives States a robust role in the leasing process by requiring the Secretary to take their input and justify, in writing, departures from their recommendations. The Leasing Moratorium circumvents this vital statutory right. Additionally, both OCSLA and the MLA expressly entitle States to substantial portions of the proceeds from lease sales and subsequent development. It is thus "beyond doubt that Congress had the financial interests of States" like the Plaintiff States when it enacted OCSLA and the MLA. *Texas v. United States*, 2021 WL 723856, at *29.

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act
### (OCSLA Leasing Moratorium—Unreasonable Delay)
### 5 U.S.C. §706

127.    Plaintiff States repeat and re-allege the allegations in paragraphs 1-126 as if set forth fully herein.

128.    A "reviewing court shall [] compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §706(1).

129.    Acting in reliance upon Executive Order 14008, BOEM has unreasonably and unlawfully withheld and delayed the remaining lease sales in the OCS Five-Year Program.

130.    Acting in reliance upon Executive Order 14008, BOEM has unlawfully and unreasonably rescinded the Record of Decision approving Lease Sale 257 and cancelling the sale, which was scheduled to occur on March 17, 2021.

131.    Acting in reliance upon Executive Order 14008, BOEM has unlawfully and unreasonably delayed Lease Sale 258, which was scheduled to occur in 2021, but which will now be delayed because BOEM has cancelled the public comment period.

132.    The delay actions and Leasing Moratoriums are final agency actions under the APA.

133.     This Court should vacate BOEM's delay actions, and compel BOEM to disregard Executive Order 14008 and hold Lease Sales 257 and 258 according to their previous schedules with reasonable modifications.

**COUNT II**
**Administrative Procedure Act**
**(OCSLA Leasing Moratorium—Failure to Employ Notice and Comment)**
**5 U.S.C. §706**

134.     Plaintiff States repeat and re-allege the allegations in paragraphs 1-133 as if set forth fully herein.

135.     A "reviewing court shall ... hold unlawful and set aside agency action ... found to be ... without observance of procedure required by law." 5 U.S.C. §706(2)(D).

136.     The OCSLA Leasing Moratorium is a substantive rule that was issued without the notice-and-comment period required by 5 U.S.C. §553.

137.     Because the Moratorium is a substantive rule and does not fit an exception to the notice-and-comment requirement, it must be vacated and enjoined.

138.     The Recission of Lease Sale 257's Record of Decision is a substantive rule that was issued without the notice-and-comment period required by 5 U.S.C. §553.

139.     Because the Recission is a substantive rule and does not fit an exception to the notice-and-comment requirement, it must be vacated and enjoined.

140.     The Errata cancelling Lease Sale 258's comment period is a substantive rule that was issued without the notice-and-comment period required by 5 U.S.C. §553.

141.     Because the Errata is a substantive rule and does not fit an exception to the notice-and-comment requirement, it must be vacated and enjoined.

## COUNT III
### Administrative Procedure Act
### (OCSLA Leasing Moratorium—Contrary to Law)
### 5 U.S.C. §706

142.     Plaintiff States repeat and re-allege the allegations in paragraphs 1-141 as if set forth fully herein.

143.     A "reviewing court shall ... hold unlawful and set aside agency action ... found to be ... not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A), (C).

144.     The Recission of Lease Sale 257's Record of Decision and Errata cancelling Lease Sale 258's comment period are contrary to OCSLA's procedures. Neither agency action complied with OCSLA's notice-and-comment and consultation requirements. 43 U.S.C. §§1337, 1340, 1344, 1345, 1351.

145.     The Recission of Lease 257's Record of Decision is contrary to law because it was not issued by the officer authorized by OCSLA to administer the leasing program. *See* 43 U.S.C. §§1337, 1344.

146.     Because both actions are contrary to law, they must be vacated and enjoined.

## COUNT IV
### Administrative Procedure Act
### (OCSLA Leasing Moratorium—Arbitrary and Capricious)
### 5 U.S.C. §706

147.     Plaintiff States repeat and re-allege the allegations in paragraphs 1-146 as if set forth fully herein.

148.     A "reviewing court shall ... hold unlawful and set aside agency action ... found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A).

149.     The Recission of Lease Sale 257's Record of Decision and cancellation of Lease Sale 258's comment period were issued without any reasoning whatsoever and rely only upon Executive

Order 14008, which itself provides no reasons. Both decisions also ignore the statutory factors, prior inconsistent agency positions, and reliance instances.

150.     Because both actions are arbitrary and capricious, they must be vacated and enjoined.

## COUNT V
### Administrative Procedure Act
### (MLA Leasing Moratorium—Contrary to Law)
### 5 U.S.C. §706

151.     Plaintiff States repeat and re-allege the allegations in paragraphs 1-150 as if set forth fully herein.

152.     The MLA Leasing Moratorium, and its systematic delay of scheduled quarterly sales, is a final agency action.

153.     A "reviewing court shall ... hold unlawful and set aside agency action ... found to be ... not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A), (C).

154.     The MLA Leasing Moratorium violates the MLA, which commands the Secretary to hold lease sales "for each State where eligible lands are available at least quarterly." 30 U.S.C. §226(b)(1)(A).

155.     Because the moratorium is contrary to law, it must be vacated and enjoined.

## COUNT VI
### Administrative Procedure Act
### (MLA Leasing Moratorium—Unreasonable Delay)
### 5 U.S.C. §706

156.     Plaintiff States repeat and re-allege the allegations in paragraphs 1-155 as if set forth fully herein.

157.     A "reviewing court shall [] compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §706(1).

158.     BLM's delay of leasing sales is unlawful and unreasonable under the MLA's quarterly land-sale requirement. 30 U.S.C. §226(b)(1)(A).

159.     Because the delay is clearly unlawful and unreasonable, this Court should compel BLM to proceed with land sales according to their previous schedules with reasonable modifications.

## COUNT VII
### Administrative Procedure Act
### (MLA Leasing Moratorium—Arbitrary and Capricious)
### 5 U.S.C. §706

160.     Plaintiff States repeat and re-allege the allegations in paragraphs 1-159 as if set forth fully herein.

161.     A "reviewing court shall ... hold unlawful and set aside agency action ... found to be arbitrary, capricious, [or] and abuse of discretion." 5 U.S.C. §706(2)(A).

162.     The MLA Leasing Moratorium issued without any reasoning whatsoever and relies only upon Executive Order 14008, which itself provides no reasons. The decision also ignores the statutory factors, prior inconsistent agency positions, and reliance interests.

163.     Because the MLA Leasing Moratorium is arbitrary and capricious, it must be vacated and enjoined.

## COUNT VIII
### Administrative Procedure Act
### (MLA Leasing Moratorium—Failure to Employ Notice and Comment)
### 5 U.S.C. §706

164.     Plaintiff States repeat and re-allege the allegations in paragraphs 1-163 as if set forth fully herein.

165.     A "reviewing court shall ... hold unlawful and set aside agency action ... found to be ... without observance of procedure required by law." 5 U.S.C. §706(2)(D).

166.     The MLA Leasing Moratorium is a final substantive rule that BLM issued without the notice and comment required by 5 U.S.C. §553.

167.    Because the MLA Leasing Moratorium does not fit any exception to notice and comment, it must be vacated and enjoined.

## COUNT IX
## OCSLA
## (Citizen Suit)
## 43 U.S.C. §1349

168.    Plaintiff States repeat and re-allege the allegations in paragraphs 1-167 as if set forth fully herein.

169.    "[A]ny person having a valid legal interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this subchapter against any person, including the United States, and any other government instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution) for any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter, or of the terms of any permit or lease issued by the Secretary under this subchapter." 43 U.S.C.A. §1349(a)(1). For purposes of the OCSLA, the term "'person' includes, in addition to a natural person, an association, a State, a political subdivision of a State, or a private, public, or municipal corporation." 43 U.S.C.A. §1331(d). And "[a]n action may be brought under this subsection immediately after notification of the alleged violation in any case in which the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C.A. §1349(a)(3).

170.    Executive Order 14008 and its OCLSA Leasing Moratorium violate OCSLA by failing to adhere to its comprehensive procedures applicable to promulgating and amending Five Year Programs and holding lease sales. *See* 43 U.S.C. §§1337, 1340, 1344, 1345, 1351. OCSLA confers no authority on the President to unilaterally suspend leasing sales and his order to do so thus has no basis in law.

171.     The Secretary has violated OCSLA by failing to adhere to its comprehensive lease sale procedures for Lease Sales 257 and 258 and by allowing an unauthorized officer to cancel Lease Sale 257. *See* 43 U.S.C. §§1337, 1340, 1344, 1345, 1351.

172.     Plaintiff States' injuries are within the zone of interests protected by OCSLA. The Secretary's violations immediately affect Plaintiff States' legal interests by denying the States revenues from March 2021 lease sales, denying conservation funds to help protect the States' coastline from further degradation, and inflicting economic harms upon the States' citizens. *Cf. OXY USA Inc. v. Babbitt*, 122 F.3d 251, 257 (5th Cir. 1997) ("Enacted as section 23(a) of the 1978 amendments to OCSLA, the citizen suit provision establishes a mechanism by which citizens, including lessees, employees, and local and state governmental officials, can participate in the Act's enforcement.").

173.     On March 21, 2021, Plaintiff States gave notice to the Secretary of the Interior of their intent to file suit under OCSLA's citizen suit provision.

174.     Under OCSLA's citizen suit provision, Plaintiff States are entitled to the costs of this litigation, "including reasonable attorney and expert witness fees." 43 U.S.C. §1349(a)(5).

### COUNT X
### Ultra Vires
### (Actions Beyond Authority Conferred by OCSLA and MLA)

175.     Plaintiff States repeat and re-allege the allegations in paragraphs 1-174 as if set forth fully herein.

176.     Ultra vires review is available to review "whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383, 406 (D. Md. 2011) (citing *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002)); *see also Associated Builders & Contractors of Se. Texas v. Rung*, 2016 WL 8188655, at *5 (E.D. Tex. Oct. 24, 2016) ("The DOL, a federal agency also operating within the

Executive Branch, has implemented the President's Executive Order by issuing the Guidance incorporated by reference in the new Rule. Therefore, the Executive Order may be challenged by Plaintiffs on both statutory and non-statutory grounds." (citing *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996))).

177.   Because neither OCSLA nor MLA authorizes the President to unilaterally impose a moratorium on oil and gas lease sales by Executive Order or otherwise, Section 208 of Executive Order 14008 is ultra vires.

**WHEREFORE**, Plaintiff States ask this Court to enter judgment in their favor and to provide the following relief:

a. A declaratory judgment holding that the Leasing Moratoriums are contrary to OCSLA and the MLA;

b. A declaratory judgment holding that the Leasing Moratoriums are procedurally invalid under the APA because the agencies failed to promulgate them through proper notice-and-comment rulemaking procedures;

c. A declaratory judgment holding that the Leasing Moratoriums are arbitrary and capricious under the APA;

d. A declaratory judgment and permanent injunction finding the Leasing Moratoriums invalid and setting them aside;

e. An injunction prohibiting BOEM, BLM, or the Secretary of the Interior from taking any actions based on Section 208 of Executive Order 14008 or any OCSLA or MLA Leasing Moratorium;

f. An order compelling the Defendants to proceed with leasing sales under OCSLA and the MLA as previously scheduled with reasonable allowance for the time lost due to their unlawful actions and this resulting litigation;

g.   All other relief to which Plaintiff States are entitled, including but not limited to attorneys' fees

and costs.

Respectfully submitted,

Dated: March 24, 2021                             /s/   Elizabeth Murrill

TYLER R. GREEN*                          JEFF LANDRY
DANIEL SHAPIRO*                           Attorney General
CONSOVOY MCCARTHY PLLC             ELIZABETH B. MURRILL
222 S. Main Street, 5th Floor                Solicitor General
Salt Lake City, UT 84101                  JOSEPH S. ST. JOHN
(703) 243-9423                              Deputy Solicitor General
                                          LOUISIANA DEPARTMENT OF JUSTICE
                                          1885 N. Third Street
                                          Baton Rouge, LA 70804
                                          Tel: (225) 326-6766
                                          emurrill@ag.louisiana.gov
                                          stjohnj@ag.louisiana.gov
                                          *Counsel for Plaintiff State of Louisiana*

OTHER COUNSEL:

STEVE MARSHALL
   Attorney General of Alabama
Edmund G. LaCour Jr.*
   Solicitor General
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130
Tel: (334) 353-2196
Fax: (334) 353-8400
Edmund.LaCourt@AlabamaAg.gov
*Counsel for the State of Alabama*

TREG TAYLOR
   Attorney General of Alaska
Ronald W. Opsahl (Colo. Bar No. 35662)
   Assistant Attorney General
Alaska Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5100
Fax: (907) 276-3697

Email: ron.opsahl@alaska.gov
*Counsel for the State of Alaska*

LESLIE RUTLEDGE
 Attorney General of Arkansas
Nicholas J. Bronni*
 Solicitor General
Dylan L. Jacobs*
 Assistant Solicitor General
Office of Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.bronni@arkansasag.gov
*Counsel for the State of Arkansas*

CHRISTOPHER M. CARR
 Attorney General of Georgia
Andrew A. Pinson*
 Solicitor General
Office of the Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3409
apinson@law.ga.gov
*Counsel for the State of Georgia*

LYNN FITCH
 Attorney General of Mississippi
Krissy C. Nobile*
 Deputy Solicitor General
State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
*Counsel for the State of Mississippi*

ERIC S. SCHMITT
 Attorney General of Missouri
Justin D. Smith*
 Deputy Attorney General for Special Litigation
Jeff P. Johnson*
Michael E. Talent*

Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-0304
Fax: (573) 751-0774
Justin.Smith@ago.mo.gov
*Counsel for the State of Missouri*

AUSTIN KNUDSEN
  Attorney General of Montana
David M.S. Dewhirst*
  Solicitor General
Montana Attorney General's Office
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
406.444.4145
david.dewhirst@mt.gov
*Counsel for the State of Montana*

DOUGLAS J. PETERSON
  Attorney General of Nebraska
James A. Campbell*
  Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov
*Counsel for the State of Nebraska*

MIKE HUNTER
  Attorney General of Oklahoma
Mithun Mansinghani*
  Solicitor General
Bryan Cleveland*
  Assistant Solicitor General
Oklahoma Office of Attorney General
313 N.E. 21ST Street
Oklahoma City, OK 73105
Phone: (405) 522-4392
mithun.mansinghani@oag.ok.gov
*Counsel for the State of Oklahoma*

KEN PAXTON
  Attorney General of Texas
Brent Webster

First Assistant Attorney General
Judd E. Stone II
   Solicitor General
Patrick Sweeten
   Deputy Attorney General
Office of the Attorney General
P.O. Box 12548 (MC 009)
Austin, Texas 78711-2548
Tel.: (512) 463-4139
Fax: (512) 474-2697
Patrick.Sweeten@oag.texas.gov
Judd.Stone@oag.texas.gov
*Counsel for the State of Texas*

SEAN D. REYES
   Attorney General of Utah
Melissa A. Holyoak*
   Solicitor General
Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
385.271.2484
melissaholyoak@agutah.gov
*Counsel for the State of Utah*

PATRICK MORRISEY
   Attorney General of West Virginia
Lindsay S. See*
   Solicitor General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(304) 558-2021
Lindsay.s.see@wvago.gov
*Counsel for the State of West Virginia*

*\*Admission application forthcoming*