# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

THE STATE OF LOUISIANA,
By and through its Attorney General, JEFF
LANDRY, et al.,

PLAINTIFFS,

v.

JOSEPH R. BIDEN, JR., in his official capacity
as President of the United States; et al.,

DEFENDANTS.

CIV. NO. 2:21-CV-00778-TAD-KK

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION .................................................................................................................1

BACKGROUND ...................................................................................................................2

I.   BY STATUTE, THE FEDERAL GOVERNMENT MUST REGULARLY OPEN THE OUTER
     CONTINENTAL SHELF FOR ENERGY DEVELOPMENT. ...................................................2

     A.   The Outer Continental Shelf Lands Act Establishes a Mandatory, Four-Step Process
          for Scheduling Lease Sales in the Outer Continental Shelf..................................2

     B.   President Obama's Heavily Vetted Five-Year Program Governs Lease Sales
          Occurring Now Through the End Of 2022. ..........................................................2

     C.   President Obama's Five-Year Program Approves Lease Sale 257 in the Gulf of
          Mexico and Lease Sale 258 in Cook Inlet, Alaska. .............................................4

II.  THE MINERAL LEASING ACT REQUIRES THE FEDERAL GOVERNMENT TO HOLD LEASE
     SALES AT LEAST QUARTERLY FOR ENERGY DEVELOPMENT ON FEDERAL LANDS. ........6

III. PRESIDENT BIDEN ISSUES EXECUTIVE ORDER 14008, IMPOSING A MORATORIUM ON
     OFFSHORE AND ONSHORE DOMESTIC ENERGY PRODUCTION. .......................................7

     A.   Relying Solely on the Biden Ban, BOEM Cancels Lease Sales 257 and 258. ........8

     B.   Relying Solely on the Biden Ban, BLM Cancels All Quarterly Lease Sales. ..........8

ARGUMENT..........................................................................................................................9

I.   PLAINTIFF STATES HAVE STANDING TO CHALLENGE THE BIDEN BAN AND THE RESULTING
     OFFSHORE AND ONSHORE LEASE-SALE MORATORIUMS.............................................9

II.  PLAINTIFF STATES ARE ENTITLED TO A PRELIMINARY INJUNCTION. .........................12

     A.   Plaintiffs Are Likely to Succeed on Their Claims that the Biden Ban on OCSLA
          Leasing, and the Recission of Lease Sale 257, Violate the APA.........................12

     B.   Plaintiffs Are Likely to Succeed on Their Claims that the Biden Ban on MLA Lease
          Sales Violates the APA. .................................................................................19

     C.   Plaintiff States Will Suffer Irreparable Harm Without An Injunction.............................22

CONCLUSION......................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) .................................... 10, 24

*California v. Bernhardt*, 472 F. Supp. 3d 573 (N.D. Cal. 2020) ............................................................. 17, 20

*Clean Water Action v. EPA*, 936 F.3d 308 (5th Cir. 2019) .................................................................... 13, 17

*Collins v. Mnuchin*, 938 F.3d 553 (5th Cir. 2019) ........................................................................................ 11

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579 (5th Cir. 2013) ..................... 25

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) ............................................................................ 19

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) ............................ 18

*Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145 (5th Cir. 1984) ..................................................... 13, 14

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) .................................................................. 18, 20

*Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332 (E.D. La. 2011) .................................................. passim

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .......................................................... 17, 18, 20

*Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F. Supp. 2d 627 (E.D. La. 2010) ............................ passim

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390 (5th Cir. 1986) ...................................... 22

*In re Aiken Cty.*, 725 F.3d 255 (D.C. Cir. 2013) .......................................................................................... 20

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .................................... 25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ............................................. 11

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................................................................. 9, 10

*Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279 (5th Cir. 2012) .................................... 12

*Orangeburg, S.C. v. FERC*, 862 F.3d 1071 (D.C. Cir. 2017) ....................................................................... 10

*Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199 (2015) ............................................................................... 13

*Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592 (5th Cir. 1995) ......................................... 12

*Pub. Citizen, Inc. v. Trump*, 435 F. Supp. 3d 144 (D.D.C. 2019) ................................................................ 11

*Sec'y of the Interior  v. California*, 464 U.S. 312 (1984) ......................................................................... 2, 14

*Texas v. United States*, 2021 WL 723856 (S.D. Tex. Feb. 23, 2021) ...................................................... passim

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ............................................................................... passim

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807 (2016) ............................................................ 10

*W. Energy All. v. Jewell*, 2017 WL 3600740 (D.N.M. Jan. 13, 2017) ......................................................... 19

*W. Energy All. v. Zinke*, 877 F.3d 1157 (10th Cir. 2017) ............................................................................. 19

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ................................................................... 1

**Statutes**

5 U.S.C. §553 ................................................................................................................ 12, 21

5 U.S.C. §706 ................................................................................................................ passim

30 U.S.C. §191 ...................................................................................................... 6, 10, 12, 23

30 U.S.C. §226 ............................................................................................................... 6, 19

43 U.S.C. §1331 note ................................................................................................ 10, 12, 22

43 U.S.C. §1332 ................................................................................................................ 2, 16

43 U.S.C. §1334 .................................................................................................................... 2

43 U.S.C. §1337 ............................................................................................................... 2, 10

43 U.S.C. §1344 ....................................................................................................... 3, 14, 15

43 U.S.C. §1345 ............................................................................................................. 11, 15

43 U.S.C. §1356a ...................................................................................................... 10, 12, 22

43 U.S.C. §1701 ....................................................................................................................

**Regulations**

43 C.F.R. §3120 .................................................................................................................... 6

43 C.F.R. §3120.1-2 .............................................................................................................. 7

43 C.F.R. §3160 .................................................................................................................... 6

## INTRODUCTION

With the stroke of a pen just a week after he took his oath of office, President Biden put his campaign promises above federal law and by executive fiat banned all new domestic oil and gas production. Never mind that the Outer Continental Shelf Lands Act (OCSLA) and Mineral Leasing Act (MLA) require the Federal Government to facilitate the expeditious and safe development of American energy resources and set procedures for doing so. And that States rely on statutory revenue-sharing provisions from lease sales for billions of dollars in annual funding—including for education and environmental-restoration projects. And that energy production supports thousands of jobs and significant investment and tax revenue—facts critical always but especially during a global pandemic. And that the Administrative Procedure Act requires the Federal Government to provide reasoned explanations when it changes regulatory course. No—each interest fell silent victim to the President's insistence that he knows better.

He does not. If "ours" really "is a government of laws, not of men," and "we submit ourselves to rulers only if under rules," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 646 (1952) (Jackson, J., concurring in the judgment), the development ban and related acts must be enjoined. The ban does not cite the statutory frameworks requiring oil and gas leasing, explain how the moratorium comports with those statutes and accompanying regulations, or give any reason for the moratorium. Nor does it explain why the Federal Government so drastically changed course without allowing interested parties to express their views. Each of those failings is fatal to the ban. The Court should grant Plaintiffs' motion and enjoin it.

## BACKGROUND

I.    BY STATUTE, THE FEDERAL GOVERNMENT MUST REGULARLY OPEN THE OUTER CONTINENTAL SHELF FOR ENERGY DEVELOPMENT.

### A.    The Outer Continental Shelf Lands Act Establishes a Mandatory, Four-Step Process for Scheduling Lease Sales in the Outer Continental Shelf.

Congress passed the Outer Continental Shelf Lands Act (OCSLA) more than 70 years ago. OCSLA declares "the outer Continental Shelf" to be "a vital national resource reserve held by the Federal Government for the public." 43 U.S.C. §1332(3). To make the most of that resource, OCSLA directs the Secretary of the Interior to make the Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." *Id.*; *see also Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 339 (E.D. La. 2011) (noting "OCSLA's overriding policy of expeditious development").

OCSLA facilitates the Shelf's expeditious development by directing the Secretary to administer a leasing program to sell exploration interests in portions of the Shelf to the highest bidder. 43 U.S.C. §§1334(a), 1337(a)(1). To this end, OCSLA sets out a four-step process in which the Secretary must (1) create a Five-Year Leasing Program, (2) hold lease sales, (3) grant or deny exploration permits and plans, and (4) grant or deny final development and production plans. *See Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F. Supp. 2d 627, 632 (E.D. La. 2010) (citing *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984)). Each step must follow stringent administrative requirements designed to maximize the chances for the public—including affected States and industry—to provide input on those lease sales.

### B.    President Obama's Heavily Vetted Five-Year Program Governs Lease Sales Occurring Now Through the End Of 2022.

Current lease sales in the Outer Continental Shelf are governed by the 2017-2022 Five Year Oil and Gas Leasing Program ("the Current Five-Year Program" or "Five-Year Program"). The process of creating the Current Five-Year Program began in 2014 during the Obama Administration. President Obama's Bureau of Ocean Energy Management (BOEM) published a request for

information in the Federal Register and sent a letter to all Governors, Tribes, and interested federal agencies requesting input on the Program. *See* 79 Fed. Reg. 34349 (June 16, 2014). BOEM received over 500,000 comments in response to the RFI, allowing it to discharge its obligation under OCSLA to take into account economic, social, and environmental values in making its leasing decisions. *See* 43 U.S.C. §1344(a); Five-Year Program 3-1. In 2015, President Obama's BOEM published the Draft Proposed Program. That published draft incorporated responses to the RFI comments and set out a draft schedule of potential lease sales. And started a 60-day comment period in which BOEM received over one million comments. 80 Fed. Reg. 4941 (Jan. 29, 2015). After considering those comments, BOEM next published the Proposed Program, thereby starting a new 90-day comment period. 81 Fed. Reg. 14881 (Mar. 18, 2016). Again, BOEM received over one million comments, held public meetings, and created environmental impact statements in compliance with the National Environmental Policy Act (NEPA). Final Program S-2-3.

After all that, President Obama's BOEM published the Proposed Final Program in November 2016. In it, the Secretary determined which areas to include in the lease sales. In recognition that "[t]he Gulf of Mexico is known to contain significant oil and gas resources and already has world-class, well-developed infrastructure, including established spill response capability," the "PFP schedules 10 region-wide lease sales in the areas of the Gulf of Mexico that are not under Congressional moratorium or otherwise unavailable for leasing." Final Program S-2. The Proposed Final Program also observed that "[i]n the Gulf of Mexico, infrastructure is mature, industry interest and support from affected states and communities is strong, and there are significant oil and gas resources available." Final Program S-2. Thus, "[t]o take advantage of these incentives to OCS activity, the region-wide sale approach makes the entire leasable Gulf of Mexico OCS area available in each lease sale." *Id.*

On January 17, 2017—60 days after the Final Program was transmitted to President Obama and Congress—the Secretary approved the Final Program, "which schedules 11 potential oil and gas

3

lease sales, one sale in the Cook Inlet (Alaska) Program Area and 10 sales in the GOM Program Areas," with "one sale in 2017, two each in 2018-2021, and one in 2022." Record of Decision and Approval of the 2017-2022 Outer Continental Shelf Oil and Gas Leasing Program 3 (Jan. 17, 2017). The Secretary's approval further specifically affirms the Final Program's specification that "[t]he GOM sales would be region-wide and include unleased acreage not subject to moratorium or otherwise unavailable ... to provide greater flexibility to industry, including more frequent opportunities to bid on rejected, relinquished, or expired OCS lease blocks." *Id*.[1]

### C.   President Obama's Five-Year Program Approves Lease Sale 257 in the Gulf of Mexico and Lease Sale 258 in Cook Inlet, Alaska.

The Final Program approved and scheduled two lease sales relevant here. The first is GOM OCS Oil and Gas Lease Sale 257. Lease Sale 257 would have comprised the Western and Central Planning Areas of the Gulf of Mexico and a portion of the Eastern Planning Area not subject to congressional moratorium. Final Program S-5; *see also* 86 FR 10132, https://bit.ly/3vDjT47. The second is Lease Sale 258 in Cook Inlet, Alaska, "where there is existing infrastructure currently supporting State leasing activities." Final Program S-2.

In accordance with the Five-Year Program, BOEM published a Proposed Notice of Sale for Lease 257 in the Gulf of Mexico in November 2020. See 85 Fed. Reg. 73508 (Nov. 18, 2020). As OCSLA requires, BOEM sent the Proposed Notice to Governors of the affected States. Proposed Notice 18. It was also opened for public comment. 85 Fed. Reg. 73508 (Nov. 18, 2020).

The Secretary approved the Notice of Sale in a Record of Decision. *See* 86 Fed. Reg. 6365 (Jan. 21, 2021). In the ROD, the Secretary noted reliance on the "Gulf of Mexico Outer Continental Shelf Lease Sale: Final Supplemental Impact Statement" in considering how to proceed with Lease Sale 257. Approval 3. The Secretary analyzed five separate alternatives, including a no-action option, and

---

[1] Until the Biden Ban, all lease sales in the Five-Year Program occurred on schedule.

determined that Alternative A—a regionwide lease sale with minor exclusions—would be "in the best interest of the Nation and meets the purposes of the OCS Lands Act." Approval 5. The Secretary also determined that Lease Sale 257 "promotes domestic energy production, which can reduce the need for oil imports," and promotes other national interests including "continued employment, labor income, [and] tax revenues." Approval 8. Additionally, the Secretary found that "[c]ontinued oil and gas leasing on the OCS may also reduce the risk of spills from the transportation of imported energy resources," and that "revenue sharing with applicable coastal states and political subdivisions ... can help mitigate the risks and costs assumed by the States and communities in the area of the lease sale." Approval 5, 8.

In the ROD, the Secretary rejected the no-action alternative because "the needed domestic energy sources and the subsequent positive economic impacts from exploration and production, including employment, would not be realized. Furthermore, revenue would not be collected by the Federal Government nor subsequently disbursed to the States." Approval 10. Additionally, the Secretary found that other sources of energy "may have different but comparable levels of negative environmental impacts, such as the risk of spills from the transportation of alternative oil supplies over long distances." Approval 10. That meant the no-action alternative "would not avoid the incremental contribution of the energy substitutes' impacts to those same cumulative effects." *Id.* Finally, the Secretary's approval noted that the Leased Sale 257 stipulations included "all practicable means to avoid or minimize environmental harm from the selected alternative." Approval 11. Lease Sale 257 was formally scheduled for March 17, 2021. Approval 1.

As to Lease Sale 258—which would offer lands in the Cook Inlet, Alaska—BOEM in September 2020 began the process of preparing it in accordance with the Current Five-Year Program. BOEM released a Call for Information and Nominations in the Federal Register to allow industry parties to indicate interest in parcels of the sale area. 85 Fed. Reg. 55859 (Sept. 10, 2020). BOEM also

released a Notice of Intent to Prepare an EIS, which provided the public with an opportunity to comment on the scope of the lease sale. 85 Fed. Reg. 55861 (Sept. 10, 2020). In January 2021, after accounting for comments, BOEM published a Notice of Availability indicating the area proposed for sale in the Cook Inlet and a draft environmental impact statement. 86 Fed. Reg. 4116 (Jan. 15, 2021); 86 Fed. Reg. 4117 (Jan. 15, 2021).

## II.   THE MINERAL LEASING ACT REQUIRES THE FEDERAL GOVERNMENT TO HOLD LEASE SALES AT LEAST QUARTERLY FOR ENERGY DEVELOPMENT ON FEDERAL LANDS.

Besides its offshore interests, the Federal Government also holds energy-producing lands onshore. Congress has likewise made those lands available for development: Under the Mineral Leasing Act, the Secretary of the Interior is required to hold lease sales "for each State where eligible lands are available at least quarterly." 30 U.S.C. §226(b)(1)(A). The MLA provides that for oil and natural gas leases on federal lands, in States other than Alaska, 50 percent of bonuses, production royalties, and other revenues are granted to the State in which the lease is located, and 40 percent is granted to the Reclamation Fund,[2] which maintains irrigation systems in several Western States. 30 U.S.C. §191(a). For leases in Alaska, 90 percent of revenues are granted to the State. *Id.*

BLM has the authority to lease public lands with oil and gas reserves to private industry for development under the MLA, the Federal Land Policy and Management Act, 43 U.S.C. §§1701-1787, and the BLM's own regulations and plans, *see* 43 C.F.R. Part 1600 (Planning, Programming, and Budgeting); 43 C.F.R. §§3120 (Competitive Leases) and 3160 (Onshore Oil and Gas Operations).

---

[2] Congress amended the Reclamation Act of 1902 to expand the sources of revenue to address shortfalls in the fund from its original sources. The bulk of its revenue is from royalties derived from federal lands. *See* Cong. Research Serv., *The Reclamation Fund*, https://bit.ly/31y4pjT (updated May 21, 2019). Ironically, the Bureau of Reclamation announced an award of $42.4 million in grants to 55 projects throughout 13 states stating that "[t]hese grants support President Biden's new Executive Order on Tackling the Climate Crisis at Home and Abroad," *i.e.*, the very order that *drains* the Fund of its most significant recurring source of funding. Bureau of Reclamation, Press Release, https://on.doi.gov/3wfKPac (Mar. 17, 2021).

BLM's regulations also provide for quarterly lease sales. 43 C.F.R. §3120.1-2(a) ("Each proper BLM S[t]ate office shall hold sales at least quarterly if lands are available for competitive leasing."). To comply with the MLA, several BLM regional offices planned to hold quarterly sales in March and April 2021 to lease available lands.[3]

III.   **PRESIDENT BIDEN ISSUES EXECUTIVE ORDER 14008, IMPOSING A MORATORIUM ON OFFSHORE AND ONSHORE DOMESTIC ENERGY PRODUCTION.**

On January 27, 2021, President Biden issued Executive Order 14008 ("the Biden Ban"). Exec. Ord. 14008, Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7619, 7624-25 (Jan. 27, 2021). Notwithstanding all the preceding notice, comment, and final decision-making, the Biden Ban arbitrarily institutes a moratorium on energy production leases in offshore waters and on public lands: Section 208 of the Order commands the Secretary of the Interior to "pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters." 86 Fed. Reg. at 7624-25.

But nothing in the Order provides any rationale for this radical departure from the OCSLA's or MLA's requirements, or from the Obama Administration's leasing plan. Nor has Congress departed from its prior policies or provided any such directive. Indeed, much of the Biden Ban's effect is to

---

[3] *See* BLM, Nevada State Office, Notice of Competitive Oil & Gas Internet Lease Sale (Jan. 8, 2021), https://on.doi.gov/38AFVdT; BLM Nat'l NEPA Register, 2021 March Oil and Gas Lease Sale, https://bit.ly/3ewwGyZ (Montana-Dakotas); BLM, Nat'l NEPA Register, 2021 Utah March Competitive Oil and Gas Lease Sale, https://bit.ly/3rHxnJE (Utah); BLM, Nat'l NEPA Register, March 2021 Oil & Gas Lease Sale, https://bit.ly/3rFK2g4 (Colorado); BLM, Nat'l NEPA Register, April 2021 Competitive Oil and Gas Lease Sale, https://bit.ly/2PYs1f6 (Oklahoma); BLM, Nat'l NEPA Register, April 2021 Competitive Oil and Gas Lease Sale - Pecos District Office, https://bit.ly/3cjUjrW (New Mexico).

*unilaterally suspend* the already limited leasing schedules implemented under the Obama Administration's Five-Year Program. So the Biden Ban's only discernable rationale is to follow through on campaign promises to kill domestic energy production. *See* Tarini Parti, *Biden Aims for Tricky Balance on Fracking*, Wall St. J. (Mar. 16, 2020), https://on.wsj.com/3eqA6U2.

### A.    Relying Solely on the Biden Ban, BOEM Cancels Lease Sales 257 and 258.

On February 18, 2021, Michael Celata, Regional Director of BOEM's Gulf of Mexico Office, issued a Notice to Rescind the Prior Lease 257 Record of Decision. 86 Fed. Reg. 10132 (Feb. 18, 2021). The Notice declared that the Record of Decision "is rescinded immediately." 86 Fed. Reg. at 10132. The half-page-long Federal Register Notice purports to rescind the prior Record of Decision, but it provides no analysis, no comment period, no reference to the statutory factors, no reference to the Current Five-Year Program, and no consultation with the States or Tribes. 86 Fed. Reg. at 10132. BOEM's *only* stated rationale is that it must rescind the Record of Decision "to comply with Executive order 14008." 86 Fed. Reg. at 10132.  BOEM now has *no* plans to hold Lease Sale 257. Instead, the Recission Notice states only that "BOEM may reevaluate GOM Lease Sale 257 and publish an appropriate ROD in the Federal Register." 86 Fed. Reg. at 10132.

Lease Sale 258 fared no better. In early February BOEM published a *press release* on its website cancelling both the public comment period on the Draft EIS and public meetings about Lease Sale 258. *See* BOEM, BOEM Cancels Comment Period, Virtual Meetings for Proposed Lease Sale Offshore Alaska (Feb. 4, 2021), https://bit.ly/3bF7Xqs. The press release relies solely upon Executive Order 14008 to close the comment period. BOEM later memorialized its press release in a Federal Register notice that relies solely on the Biden Ban. 86 Fed. Reg. 10994 (Feb. 23, 2021).

### B.    Relying Solely on the Biden Ban, BLM Cancels All Quarterly Lease Sales.

The Biden Ban caused BLM offices to halt all pending quarterly lease sales in express contravention of the Mineral Leasing Act. Although BLM has published no formal notice in the

Federal Register halting the previously planned, heavily vetted, approved, and statutorily *required* quarterly land sales, it did publish a "fact sheet" in which it noted that the President ordered the Secretary of the Interior to halt the leasing of public lands. *See* BLM, Fact Sheet: President Biden to Take Action to Uphold Commitment to Restore Balance on Public Lands and Waters, Invest in Clean Energy Future (Jan. 27, 2021), https://on.doi.gov/3vlnHqj. And then BLM offices began systematically posting postponement or cancellation notices for their March and April 2021 lease sales.[4]

## ARGUMENT

### I. PLAINTIFF STATES HAVE STANDING TO CHALLENGE THE BIDEN BAN AND THE RESULTING OFFSHORE AND ONSHORE LEASE-SALE MORATORIUMS.

Plaintiff States have standing to challenge the Biden Ban's OCSLA and MLA leasing moratoriums because those actions—and the agency actions taken or foregone in reliance on them— harm Plaintiff States' sovereign, proprietary, and *parens patriae* interests. *See Massachusetts v. EPA*, 549 U.S. 497, 518-520 (2007); *see also Texas v. United States*, 809 F.3d 134, 151-55 (5th Cir. 2015); *Texas v. United States*, 2021 WL 723856, at *10-21 (S.D. Tex. Feb. 23, 2021). Though Plaintiff States have standing under the traditional analysis, they also receive "special solicitude" on this issue. *Massachusetts v. EPA*, 549 U.S. at 518-520.

The Biden Ban's moratoriums inflict on Plaintiff States substantial and irreparable harms that injunctive relief would redress. To take just one example, Plaintiff States are entitled to a substantial share of the proceeds from leasing sales under OCSLA, the Gulf of Mexico Energy Security Act, and

---

[4] *See* BLM, Nevada State Office, Errata #1 (Jan. 27, 2021); BLM Nat'l NEPA Register, 2021 March Oil and Gas Lease Sale, https://bit.ly/30IFt8N (Montana-Dakotas); BLM Nat'l NEPA Register, 2021 March Oil and Gas Lease Sale, https://bit.ly/3ltYPIG (Wyoming); BLM, Nat'l NEPA Register, 2021 March Competitive Oil and Gas Lease Sale, https://bit.ly/3l8zXG9 (Utah); BLM, Nat'l NEPA Register, March 2021 Oil & Gas Lease Sale, https://bit.ly/38uyXHa (Colorado); BLM, Nat'l NEPA Register, April 2021 Competitive Oil and Gas Lease Sale, https://bit.ly/3vhzOou (Oklahoma); BLM, Nat'l NEPA Register, April 2021 Competitive Oil and Gas Lease Sale, https://bit.ly/3cpXRZJ (New Mexico); BLM, Eastern States Oil and Gas Leases, https://on.doi.gov/3bElRcd.

the MLA. *See* 43 U.S.C. §1337(g)(5)(A); 43 U.S.C. §1356a; 43 U.S.C. §1331 note; 30 U.S.C. §191(a). Because the Biden Ban systematically cancels lease sales, the resulting moratoriums deprive the States of this vital revenue—all in the midst of a once-in-a-century pandemic. *See* Zeringue Decl. ¶¶19-20. Indeed, the cancellations of Lease Sales 257, 259, and 261 will reduce Louisiana's GOMESA funding by up to $57 million. *See* Dismukes Decl. ¶22. Beyond that, the moratoriums cause substantial economic harm to Plaintiff States' citizens by causing billions of dollars of lost investments and thousands of lost jobs. *See* Considine Decl. ¶¶17, 25; Dismukes Decl. ¶44. And the moratoriums directly threaten the integrity of at least one State's coastline. Those harms more than suffice to establish standing. *See Massachusetts v. EPA*, 549 U.S. at 518-526 (once a concrete harm established, magnitude of harm irrelevant); *Texas v. United States*, 809 F.3d at 151-55; *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) (*parens patriae* standing appropriate when based on State's "interest in the health and well-being—both physical and economic—of its residents in general"). And the moratoriums will harm Plaintiff States' ability to purchase affordable energy to carry out their sovereign functions. *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1074 (D.C. Cir. 2017) ("[T]he city has demonstrated an imminent loss of the opportunity to purchase a desired product (reliable and low-cost wholesale power).").

Plaintiff States have a cause of action under the APA to challenge the Biden Ban's leasing moratoriums and actions taken in reliance on them. Those are final agency actions because they "mark[] the consummation of the agency's decisionmaking process" and "legal consequences" flow from them. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016); *Ensco Offshore*, 781 F. Supp. 2d at 336 ("And so, agency delay in issuing or denying a permit [under OCSLA], or the failure to act at all, is a final agency action made reviewable by the APA."); *Texas v. United States*, 2021 WL

10

723856, at *32 (holding 100-day moratorium on removals constituted final agency action).[5] The unlawful delays of Lease Sales 257 and 258, and the MLA leasing sales, constitute final agency action under the APA. *Ensco Offshore*, 781 F. Supp. 2d at 336; *Hornbeck Offshore Servs.*, 696 F. Supp. 2d at 636. Discovery in this case will also uncover other final agency actions issued at the Secretarial level that have not been made public.[6] *See Pub. Citizen, Inc. v. Trump*, 435 F. Supp. 3d 144, 146 (D.D.C. 2019) ("[The court] then granted Plaintiffs leave to take limited discovery concerning whether the Executive Order had caused any relevant delay or withdrawal of a rule.").

Finally, Plaintiff States are within the zone of interests that OCSLA and the MLA protect. *See Collins v. Mnuchin*, 938 F.3d 553, 574 (5th Cir. 2019). "The Court has said, in the APA context, that the test is not especially demanding." *Id.* (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014)) (cleaned up). Instead, the "benefit of any doubt goes to the plaintiff." *Id.* Therefore, the zone-of-interests test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue." *Id.* (quoting *Lexmark Int'l*, 572 U.S. at 130). Plaintiff States' interests easily clear this low threshold. OCSLA gives States a robust role in the leasing process by requiring the Secretary to take their input and justify, in writing, departures from their recommendations. *See, e.g.*, 43 U.S.C. §1345. The leasing moratoriums destroy this vital statutory right. *See infra* Section II.A.2. And both OCSLA and the MLA entitle States to substantial portions of the proceeds from lease sales and subsequent development. *See* 43 U.S.C. §1337(g)(5)(A); 43 U.S.C.

---

[5] Alternatively, Plaintiff States have a cause of action to challenge Defendants' ultra vires actions as they are beyond statutory authority and in conflict with OCSLA and the MLA, *see, e.g.*, *Associated Builders & Contractors of Se. Texas v. Rung*, 2016 WL 8188655, at *5 (E.D. Tex. Oct. 24, 2016), and a cause of action under OCSLA's citizen-suit provision, *see* 43 U.S.C. §1349.

[6] It is simply not plausible that the regional offices of BOEM and BLA unilaterally, simultaneously, and systematically moved to rescind and delay lease sales without direction from the Secretarial level. Such a directive would constitute final agency action. *Hawkes Co.*, 136 S. Ct. at 1813.

§1356a; 43 U.S.C. §1331 note; 30 U.S.C. §191(a). It is thus "beyond doubt that Congress had the financial interests of States" like the Plaintiff States in mind when it enacted OCSLA and the MLA. *Texas v. United States*, 2021 WL 723856, at *29.

## II. PLAINTIFF STATES ARE ENTITLED TO A PRELIMINARY INJUNCTION.

To obtain a preliminary injunction, Plaintiff States "must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012). Each factor weighs in the Plaintiff States' favor.

### A. Plaintiffs Are Likely to Succeed on Their Claims that the Biden Ban on OCSLA Leasing, and the Recission of Lease Sale 257, Violate the APA.

#### 1. *The Biden Ban's OCSLA leasing moratorium did not go through required notice-and-comment procedures.*

With limited exceptions not relevant here, agency rules must go through the APA's notice-and-comment procedures. 5 U.S.C. §553; *see also Texas v. United States*, 2021 WL 723856, at *43. That includes rules that alter "rights and obligations" or do not leave agency decisionmakers free to exercise discretion. *See Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) (the focus is "primarily on whether the rule has binding effect on agency discretion or severely restricts it"); *Texas v. United States*, 809 F.3d at 171 ("'If a statement denies the decisionmaker discretion in the area of its coverage … then the statement is binding, and creates rights or obligations.'"). In deciding whether rules fall under those headings, courts must be "mindful but suspicious of the agency's own characterization" of the rule. *Id.*

On its face, the Biden Ban imposes a drilling moratorium that both alters rights and obligations and leaves agency decisionmakers without discretion. The Order uses mandatory language to command the Secretary to impose a blanket halt on lease sales. *See* 86 Fed. Reg. at 7624-25 ("[T]he

Secretary of the Interior shall pause new oil and natural gas leases on public lands or in offshore waters."). Because this so-called "pause" *alters* potential lessees' right to participate in sales—and Plaintiff States' entitlement to proceeds from lease sales under OCSLA and the Five-Year Program—it is a substantive rule that cannot be imposed by fiat, but must be promulgated following the APA's notice-and-comment procedures. *See Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984) ("An agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply.").

BOEM's Recission of Lease Sale 257 falls under the same heading. Relying solely on the Biden Ban, the Recission purports to immediately cancel the Secretary's prior Record of Decision approving the sale. 86 Fed. Reg. 10132 (Feb. 18, 2021). This Recission is itself a final rule that altered substantive rights and deprived the States of their entitlement to the substantial proceeds promised by Lease Sale 257. *See Texas*, 809 F.3d at 176-77 (rule is substantive if it "'change[s] the substantive standards by which the [agency] evaluates' applications which seek a benefit that the agency has the power to provide"). So it too must have been adopted through notice-and-comment rulemaking. But it was not.

Fifth Circuit precedent eliminates any remaining doubt about whether the Recission must have been the product of notice-and-comment rulemaking. Because the Recission made an about-face on Lease Sale 257, the Secretary "must [have] provide[d] a reasoned explanation for its revisions *and follow[ed] the same process to revise a rule as it used to promulgate it.*" *Clean Water Action v. EPA*, 936 F.3d 308, 312 (5th Cir. 2019) (emphasis added) (citing *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015)). The Secretary approved Lease Sale 257's Record of Decision only after holding a notice-and-comment period and building an extensive administrative record. *See* 85 Fed. Reg. 73508 (Nov. 18, 2020); 86 Fed. Reg. 6365 (Jan. 21, 2021). The Recission, however, follows none of these processes. It simply revokes the Record of Decision in a one-page Federal Register notice.

In short, no aspect of the Biden Ban's OCSLA leasing moratorium has been subject to the APA's required notice-and-comment procedure. The agency thus violated §553 of the APA in rescinding Lease Sale 257.[7] *See Kast Metals Corp.*, 744 F.2d at 1153 n.17 ("Section 553 was enacted to give the public an opportunity to participate in the rule-making process.").

> ### 2.    *The Biden Ban's OSCLA leasing moratorium and the Recission of Lease Sale 257 are contrary to law.*

Agency action is unlawful if it is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A) & (C). OCSLA sets out "four distinct statutory stages to developing an offshore oil well: (1) formulation of a five-year leasing plan by the Department of the Interior; (2) lease sales; (3) exploration by the lessees; (4) development and production." *Sec'y of the Interior v. California*, 464 U.S. at 337. In this complex process, "[e]ach stage involves separate regulatory review" and "specific requirements for consultation with Congress, between federal agencies, or with the States." *Id.*

The Biden Ban's OCSLA leasing moratorium and the Recission of Lease Sale 257 ignore those requirements. The moratorium effectively repeals the Five-Year Program—and does so without consulting with "the governors of affected states" or "respond[ing] in writing to all comments or requests received from the state governors," as OCSLA commands. *Id.* (citing 43 U.S.C. §1344). The President has no authority to alter those procedures; they would be rendered hortatory nullities if the President could alter a duly promulgated Five Year Program by fiat, as the Biden Ban purports to do.[8]

---

[7] Further harm is imminent because the agency has followed the same script for Lease Sale 258, which has been frozen by a cursory press release and a later Federal Register notice relying upon the Biden Ban. *See* BOEM, "BOEM Cancels Comment Period, Virtual Meetings for Proposed Lease Sale Offshore Alaska" (Feb. 4, 2021), https://bit.ly/3bF7Xqs; 86 Fed. Reg. 10994 (Feb. 23, 2021).

[8] OCSLA gives the President power to reserve land, *see* 43 U.S.C. §1341, but the President did not employ this authority regarding the lands subject to the Five-Year Program. In any event, land that has already been identified for leasing, vetted through a multi-year process, and planned for sale all through notice and comment could not be suddenly and arbitrarily reserved without further compliance with the APA.

The Recission of Lease Sale 257's Record of Decision similarly avoids OCSLA's exacting statutory lease-sale procedures. Most notably, at the lease-sale stage, "[a]ny Governor of any affected State or the executive of any affected local government in such State may submit recommendations to the Secretary regarding the size, timing, or location of a proposed lease sale," 43 U.S.C. §1345(a), and the Secretary "shall accept" such recommendations from a Governor if the Secretary "determines, after having provided the opportunity for consultation, that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State," *id.* §1345(c). By rescinding the duly promulgated Lease Sale 257 Record of Decision, which was based on consultation with the States, BOEM has flagrantly disregarded OCSLA's consultation requirements.[9]

Making matters worse, BOEM itself lacks statutory or delegated authority to issue the Recission. Congress entrusted the Secretary of the Interior with the authority to approve Notices of Sale and to administer the leasing program. *See* 43 U.S.C. §§1337, 1344. The Departmental Handbook *specifically* withholds any delegation of authority to BOEM for the "[a]cceptance or rejection of state recommendations on the size, timing, or location of oil and gas lease sales, pursuant to 43 U.S.C. §1345"; "[a]pproval of the Proposed and Final Notices of Sale for an oil and gas lease sale, pursuant to 43 U.S.C. §1337(1), and approval and signing of the related Record of Decision for such oil and gas lease sale"; and "[a]pproval of the length of the primary oil and gas lease terms to be offered in a lease sale, pursuant to 43 U.S.C. §1337(b)." 218 DM 1, at 2-3. Director Celata thus had no lawful authority to rescind the Lease Sale 257 Record of Decision, nor to undo the decisions that are statutorily entrusted to, and retained by, the Secretary.[10]

---

[9] Though throughout this brief Plaintiffs focus on consultation with States, its bears noting that local governments and tribes also play and important role in the consultation process.

[10] Removing even a pretense of authority, Secretarial Order 3395 explicitly divested Director Celata of any authority even "[t]o publish, cause to be published, or aid in the publication of any notice in the Federal Register."

By arbitrarily amending the Current Five-Year Program and withdrawing the duly issued Record of Decision by fiat, the moratorium and Recission ignore OCSLA's provisions that require consulting with the States, submitting a plan to Congress and the President, holding comment periods, and preparing several exhaustive environmental impact statements. Those agency actions also ignore the purpose of OCSLA—*expeditiously facilitating the development of the Outer Continental Shelf. See* 43 U.S.C. §1332(3); *Hornbeck Offshore Servs.*, 696 F. Supp. 2d at 632; *Ensco Offshore*, 781 F. Supp. 2d at 336-37. By so doing, the Biden Ban's OCSLA leasing moratorium substitutes OCSLA's finely wrought and carefully calibrated cooperative federalism process with an entirely new process of "because we said so":  Five-Year Programs cancelled by Executive Order and individual lease sales rescinded by press release and  unreasoned, cursory Federal Register notices. Those actions are contrary to law.

### 3.     *The Biden Ban's OCSLA leasing moratorium and the Recission of Lease Sale 257 are arbitrary and capricious.*

The APA commands courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion." 5 U.S.C. §706(2)(A). To meet this standard, "[f]ederal administrative agencies are required to engage in 'reasoned decisionmaking.'" *Texas v. United States*, 2021 WL 723856, at *39. "This necessarily means that '[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.'" *Id.*

Neither the Biden Ban nor the Rescission itself offers any explanation for the OCSLA leasing moratorium. Neither betrays any awareness or understanding that Outer Continental Shelf lease sales like Lease Sale 257 are both the result of *years* of analysis, consultation, environmental assessment, and public comment but also are integrated into *continuous, complex,* and *long-term* leasing and revenue production and *use*. Indeed, the Secretary's Record of Decision approving Lease Sale 257 was based on a robust administrative record and contained an extensive discussion of the OCSLA factors and

the national interest. The Recission never engages with those or any other specific factual findings in the ROD.  *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate ... when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy"). A command in an executive order does not exempt an agency from the APA's reasoned-decisionmaking requirement. *Cf. California v. Bernhardt*, 472 F. Supp. 3d 573, 600-01 (N.D. Cal. 2020) ("While the Executive branch holds the power to issue executive orders, an agency cannot flip-flop regulations on the whims of each new administration. The APA requires reasoning, deliberation, and process. These requirements exist, in part, because markets and industries rely on stable regulations.").

What's more, the ROD was based on the 2017-2022 Five-Year Program—itself the product of an extensive multiyear proceeding including millions of comments, multiple extensive environmental impact statements, consultation with State governments and relevant federal agencies, and submission to Congress and the President. The Rescission acts as if this extensive rulemaking record did not even exist. It does not engage with previous findings and does not even mention OCLSA's statutory factors. Instead, it occupies half a page of the Federal Register and cites only one source of authority—Executive Order 14008—which itself contains no analysis of the statute or previous rulemaking proceeding. *Clean Water Action*, 936 F.3d at 313-14 ("[A]gencies may amend rules provided that they 'use the same procedures when they amend ... a rule as they used to issue the rule in the first instance.'").

Nor does the Recission grapple with BOEM's specific factual finding in 2016 that directly contradicts the OCSLA leasing ban. Then, BOEM concluded that "[i]n each price case, and in each scenario for the 2017–2022 Program, U.S. GHG emissions would be slightly higher if BOEM were to have no lease sales, assuming no major market or policy changes. … Emissions from substitutions are higher due to the exploration, development, production, and transportation of oil from

international sources being more carbon-intensive." OSC Report BOEM 2016-065, at 36 (Nov. 2016). So much for stopping leases to stop climate change.

The Recission also ignores the overwhelming reliance interests that have grown up around the 2017-2022 Program generally and Lease Sale 257 specifically. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). Plaintiff States have structured significant environmental programs around the expected proceeds of OCSLA lease sales. *See* Zeringue Decl. ¶19 ("The currently approved Coastal Master Plan is based upon a projected $389 million dollars in GOMESA expenditures over the next three fiscal years."). Defendants' failure to take into account prior agency positions, and the reliance interests that have grown up around them, are the very definition of arbitrary and capricious agency action. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) ("[W]hen an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'); *Fox Television Stations*, 556 U.S. at 515 ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position."); *see also Texas v. United States*, 2021 WL 723856, at *42 ("the Court has basically no material from which it may evaluate if DHS considered any facts, let alone whether the facts the agency considered 'run[ ] counter' to DHS's ultimate choice to implement the 100-day pause").

The opaque and rushed nature of the Biden Ban's OCSLA moratorium and the Recission also undermines the integrity of this decisionmaking process. The Five-Year Program and Record of Decision took more than six years to produce; the Recission unraveled them with the stroke of a pen shortly after Inauguration Day after an agency decisionmaking process that, *at best*, took less than six weeks (and indeed occurred before the current Secretary had even been confirmed). "That did not leave much time for reflection and analysis." *Texas v. United States*, 2021 WL 723856, at *41. Given the extensive prior administrative records leading to the prior decisions, there is a "significant mismatch"

between the Biden Ban's OCSLA leasing moratorium and the administrative record. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).

> **4.     *The Biden Ban's OSCLA leasing moratorium and the Recission of Lease Sale 257 unlawfully and unreasonably withhold agency action.***

Under the APA, a court "shall [] compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §706(1). The Recission offers no reasoning for delaying the sale. Instead, it refers only to the Biden Ban as the sole reason for delay. But the Executive Order itself offers no reason or statutory basis for the Ban or the delay. This unexplained delay, like that of Lease Sale 258, is particularly egregious and unlawful given "OCSLA's overriding policy of expeditious development." *Ensco Offshore Co.*, 781 F. Supp. 2d at 339.

> **B.     Plaintiffs Are Likely to Succeed on Their Claims that the Biden Ban on MLA Lease Sales Violates the APA.**

> **1.     *The Biden Ban's MLA leasing moratorium is contrary to law.***

The Biden Ban's moratorium on leasing onshore public lands contravenes the MLA's unambiguous commands to BLM. Like OCSLA, the MLA requires that "lease sales shall be held for each State where eligible lands are available at least quarterly." 30 U.S.C. §226(b)(1)(A). As the several scheduled lease sales attest, *see supra*, there were eligible lands available, but BLM unilaterally cancelled the quarterly sales anyway. The President has no power to abrogate this mandatory statutory command by fiat. Instead, BLM is required to hold the lease sales as previously scheduled. *See W. Energy All. v. Zinke*, 877 F.3d 1157, 1166 (10th Cir. 2017) ("If the BLM's current procedures, including those dictated by the Leasing Reform Policy, serve as a roadblock in achieving quarterly lease sales, the BLM will presumably have to abandon both its existing procedures and underlying policies."); *see also W. Energy All. v. Jewell*, 2017 WL 3600740, at *4 (D.N.M. Jan. 13, 2017) (noting that it would violate the MLA if "BLM offered grounds other than a lack of available eligible lands" for "cancell[ing] or postpon[ing]" lease sales).

## 2.   *The Biden Ban's MLA leasing moratorium is arbitrary and capricious.*

The Biden Ban's MLA leasing moratorium is arbitrary and capricious because neither Executive Order 14008 nor the individual lease cancellations offer any explanation—reasoned or otherwise—for why BLM cancelled the quarterly sales. *Texas v. United States*, 2021 WL 723856, at \*39. Indeed, the cancellations themselves were announced only in one-sentence postings on the sale-notice pages of BLM's websites that declared the sales to be postponed without explanation. To the extent the "factsheet" on BLM's website offers an explanation, it does so only by referring to Executive Order 14008, which itself offers no reasoning for the moratorium on leasing. *Cf. California v. Bernhardt*, 472 F. Supp. 3d at 605 ("A president's Executive Order cannot 'impair or otherwise affect' statutory mandates imposed on BLM by Congress." (citing *In re Aiken Cty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.)).

The Biden Ban's MLA leasing moratorium does not engage with BLM's prior decision to hold lease sales, *compare Fox Television Stations*, 556 U.S. at 515; build any kind of administrative record, *compare Texas v. United States*, 2021 WL 723856, at \*39; or consider the serious reliance interests of the Plaintiff States in the revenues and economic benefit of these sales, *compare Encino Motorcars*, 136 S. Ct. at 2126. States with BLM-leasable tracts stand to lose billions of dollars in investments and tax revenue, and thousands of jobs. *See* Considine Decl. ¶¶18-40; Dismukes Decl. ¶17. Defendants' actions ignore those serious reliance interests—a hallmark of arbitrary and capricious action.[11] *Cf. Texas v. United States*, 2021 WL 723856, at \*11 ("[T]he financial harm to States ... are not nebulous but rather 'serious

---

[11] Further demonstrating the arbitrariness of Leasing Moratorium, the Administration has treated Tribal lands separately and more favorably in the permitting process. *See* Memorandum to Darryl LaCounte, Director of the Bureau of Indian Affairs from Robert T. Anderson, Senior Counselor to the Secretary (Jan. 25, 2021), https://bit.ly/3r0lzku (exempting Tribal lands from Secretarial Order 3395, which revoked delegations of authority to BLM regional offices to approve permits).

and well recognized.'"). Because the cancellations of the quarterly lease sales are not the product of reasoned decision making, they must be enjoined as arbitrary and capricious. *See* 5 U.S.C. §706(2)(A).

> **3.** **The Biden Ban's MLA leasing moratorium is a final substantive rule that required notice-and-comment rulemaking.**

The process through which the quarterly lease sales have been delayed is at best opaque. As discussed, *supra* Section II.A.1, the Biden Ban uses mandatory language to direct the cancellation of lease sales. That makes the MLA lease moratorium a substantive rule; no discretion is left to decisionmakers and the MLA lease moratorium alters rights and obligations. *Texas v. United States*, 809 F.3d at 171.

At least for the Recission of Lease Sale 257, the agency published a Federal Register notice indicating that it was being delayed; BLM has not even done that for the delayed MLA lease sales. Instead, BLM State office websites began to include *one-sentence* notices that the sales had been "postponed." *See supra*.[12] That sort of identical, nationwide approach surely would not happen without a formal Secretarial-level directive to the State and regional offices to cancel their lease sales because of the Biden Ban—and such an order would constitute final agency action and a substantive rule that requires notice-and-comment procedures. *Texas v. United States*, 2021 WL 723856, at *43.

But even if each individual BLM office's cancellation order were not the result of a Secretarial-level directive, those orders themselves were rules that must have gone through the APA's notice-and-comment procedures because they are substantive rules that alter rights and obligations. *See* 5 U.S.C. §553; *Texas v. United States*, 809 F.3d at 171. They did not go through that process. That makes them unlawful.

---

[12] The one exception is the "*Errata*" issued by Nevada's office, which at least takes the form of a letter. It, however, also offers no reason for the cancellation.

4.     ***The Biden Ban's MLA leasing moratorium unlawfully and unreasonably withholds agency action.***

Finally, the Biden Ban's MLA leasing moratorium also constitutes "unlawfully withheld or unreasonably delayed" agency action. *See* 5 U.S.C. §706(1). As discussed, *supra* Section II.B.1, the MLA unambiguously requires BLM to hold quarterly land sales, but BLM has refused to do so despite the presence of available land. BLM's inaction ignores this statutory requirement—and BLM fails to offer any reason whatsoever for withholding these actions. The cancellations are thus both unlawfully withheld and unreasonably delayed agency action. *See Ensco Offshore*, 781 F. Supp. 2d at 336.

**C.     Plaintiff States Will Suffer Irreparable Harm Without An Injunction.**

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, Plaintiff States "need only show it 'cannot be undone through monetary remedies'" and that they are "'*likely* to suffer irreparable harm in the absence of preliminary relief.'" *Texas v. United States*, 2021 WL 723856, at *48. Plaintiff States easily clear this threshold. The Biden Ban's OCSLA and MLA leasing moratoriums will cause irreparable harm to Plaintiff States' sovereign, proprietary, and parens patriae interests.

*First*, the leasing moratoriums will deprive Plaintiff States of substantial revenue to which they are statutorily entitled under four programs. First, under OCSLA's revenue-sharing program, the States with offshore federal leases located within the first three miles from the State's seaward boundary receive 27 percent of the revenue generated from those leases. 43 U.S.C. §1337(g)(5)(A). Second, the Coastal Impact Assistance Program provides assistance from leases to Plaintiffs Alabama, Louisiana, Mississippi, and Texas. 43 U.S.C. §1356a. Third, the Gulf of Mexico Energy Security Act provides for the sharing of 37.5 percent of qualified Outer Continental Shelf revenues among Plaintiffs Alabama, Louisiana, Mississippi, and Texas to aid in coastal-restoration efforts. P.L. 109-432, 120 Stat. 3000, 43 U.S.C. §1331 note. Fourth, the MLA provides that States other than Alaska receive 50 percent of

22

bonuses, production royalties, and other revenues for leases located in their States, with 40 percent of the remaining funds granted to the Reclamation Fund, which maintains irrigation systems in several Western States. 30 U.S.C. §191(a).[13]

By rescinding Lease Sale 257 and indefinitely postponing all future lease sales, the Biden Ban's OCSLA moratorium irreparably divests these vital funds from Plaintiff States. Louisiana alone stands to lose up to $57 million from the cancellation of Lease Sales 257, 259, and 261. *See* Dismukes Decl. ¶22. Similarly, the MLA leasing moratorium deprives Plaintiff States of millions of dollars in revenue. *See* Considine Decl. ¶¶26-40. These injuries are irreparable because there is no conceivable path for Plaintiff States "to pierce the federal government's usual sovereign immunity or contrive a remedial cause of action sufficient to recover from its budgetary harm." *Texas v. United States*, 2021 WL 723856, at *50 (citing *Texas*, 809 F.3d at 186); *see also id.* ("Texas has 'alleged a concrete threatened injury in the form of millions of dollars of losses,' while the Government postulates harms with respect to Article II authority 'that are less substantial' and 'vague.'").

*Second*, the Biden Ban's OCSLA leasing moratorium causes irreparable injury to the sovereign integrity of the State of Louisiana. Louisiana is losing large swaths of coastal land—nearly two thousand square miles and counting—due to follow-on effects from environmental catastrophes. *See* LCRPA, "Coastal Crisis" *available at* https://bit.ly/3ewyqZ3; *see also* USGS, Land Area Change in Coastal Louisiana (1932 to 2016), https://bit.ly/38ySDcU ("To put these numbers into perspective, this equates to long-term average loss rates of approximately an American football field's worth of coastal wetlands within 34 minutes when losses are rapid to within 100 minutes at more recent, slower

---

[13] *See* n.2, *supra*, (noting that Arizona, California, Colorado, Idaho, Kansas, Montana, Nebraska, New Mexico, Oregon, Texas, Utah, Washington, and Wyoming all recently received grants for important environmental projects from the Reclamation Fund.) Because the Fund has been supporting projects, including the Hoover Dam, for more than 120 years, all the Western United States suffer from draining or diminishing the royalty revenues that supply the funds for their ongoing projects.

rates."). Proceeds from lease sales contribute substantial funds to coastal restoration and protection programs. *See* Dismukes Decl. ¶27 ("For example, $50 million in GOMESA funds have been committed to construct a permanent gate structure that will protect portions of six parishes from storm surges and flooding."); *see also* Zeringue Decl. ¶12 ("The CPRA's only annual recurring source of revenue from the federal government comes from the [GOMESA], which created a standing revenue-sharing arrangements between the states of Texas, Louisiana, Mississippi and Alabama."). And OCSLA leases themselves often provide essential materials for the restoration of Louisiana's coastline. *See, e.g.*, "BOEM Announces Restoration Project for Louisiana's Gulf Coast" (June 4, 2019), https://bit.ly/3bFNC4p ("BOEM has issued 58 leases to convey over 162 million cubic yards of OCS sand for projects to restore approximately 346 miles of the U.S. Atlantic and Gulf Coasts. Approximately 63 million cubic yards of OCS sand have been leased to restore Louisiana's coast."). The deprivation of funds caused by the Biden Ban's OCSLA leasing moratorium directly and irreparably contributes to the loss of Louisiana's coastline, coastal communities, and environmental habitat.[14] *Cf. Massachusetts v. E.P.A.*, 549 U.S. at 519 (State's "independent interest 'in all the earth and air within its domain'" and "well-founded desire to preserve its sovereign territory" constitutes injury).

*Third*, the Biden Ban's leasing moratoriums will significantly harm Plaintiff States' economies and inflict economic harm on their citizens. *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607 (allowing State to defend its "interest in the health and well-being—both physical and economic—of its residents in general"). The leasing moratoriums will result in lost jobs and billions of dollars in lost revenue in Plaintiff States. *See* Considine Decl. ¶¶4, 26-40; Dismukes Decl. ¶¶18-24, 44. These facts establish irreparable harm to "'both … the parties and to the public.'" *Hornbeck*, 696 F. Supp. 2d at 638-39. Indeed, just as in *Hornbeck*, the "effect on employment, jobs, [and] loss of domestic energy

---

[14] *See* LCPRA, Strategic Plan FY 2020-2025, https://bit.ly/3rGjH1D.

supplies caused by the moratorium ... will clearly ripple throughout the economy in this region" and therefore constitutes irreparable harm. *Id.*; *see id.* at 638 ("[T]he Court is persuaded that it is only a matter of time before more business and jobs and livelihoods will be lost. The defendants trivialize such losses by characterizing them as merely a small percentage of the drilling rigs affected, but it does not follow that this will somehow reduce the convincing harm suffered.").

### D.    An Injunction Would Not Harm Defendants or Disserve the Public Interest.

Finally, the public interest and balance of harms weigh in favor of granting a preliminary injunction. Simply put, Defendants "have no legitimate interest in the implementation of an unlawful" Moratorium. *Texas*, 2021 WL 723856, at *49. Instead, "the public is served when the law is followed." *Id.* at *51 (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)); *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). And the public has a strong interest in the proper function of oil and gas leasing and development programs. *See, e.g.*, *Hornbeck*, 696 F. Supp. 2d at 639 ("An invalid agency decision to suspend drilling of wells in depths of over 500 feet simply cannot justify the immeasurable effect on the plaintiffs, the local economy, the Gulf region, and the critical present-day aspect of the availability of domestic energy in this country."). Accordingly, the public interest and balance of harms weigh heavily in Plaintiff States' favor.

### CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request a preliminary injunction requiring Defendants to disregard Executive Order 14008's Leasing Moratoriums and continue holding OCSLA and MLA oil and gas leasing sales as those statutes and the Five-Year Plan require.

Respectfully submitted,

Dated: March 31, 2021

TYLER R. GREEN
DANIEL SHAPIRO
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

_/s/_____

JEFF LANDRY
Attorney General
ELIZABETH B. MURRILL
  Solicitor General
JOSEPH S. ST. JOHN
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
emurrill@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff States*

OTHER COUNSEL:

STEVE MARSHALL
  Attorney General of Alabama
Edmund G. LaCour Jr.*
  Solicitor General
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130
Tel: (334) 353-2196
Fax: (334) 353-8400
Edmund.LaCourt@AlabamaAg.gov
*Counsel for the State of Alabama*

TREG TAYLOR
  ATTORNEY GENERAL
Ronald W. Opsahl (Colo. Bar No. 35662)
  Assistant Attorney General
Alaska Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5100
Fax: (907) 276-3697
Email: ron.opsahl@alaska.gov
*Counsel for the State of Alaska*

26

LESLIE RUTLEDGE
  Attorney General of Arkansas
Nicholas J. Bronni*
  Solicitor General
Dylan L. Jacobs*
  Assistant Solicitor General
Office of Arkansas Attorney General Leslie
Rutledge
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.bronni@arkansasag.gov
*Counsel for the State of Arkansas*

CHRISTOPHER M. CARR
  Attorney General of Georgia
Andrew A. Pinson*
  Solicitor General
Office of the Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3409
apinson@law.ga.gov
*Counsel for the State of Georgia*

LYNN FITCH
  Attorney General of Mississippi
Krissy C. Nobile*
  Deputy Solicitor General
State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
*Counsel for the State of Mississippi*

ERIC S. SCHMITT
  Attorney General of Missouri
Justin D. Smith*
  Deputy Attorney General for Special
Litigation
Jeff P. Johnson*
Michael E. Talent*

Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-0304
Fax: (573) 751-0774
Justin.Smith@ago.mo.gov
*Counsel for the State of Missouri*

AUSTIN KNUDSEN
   Attorney General of Montana
David M.S. Dewhirst*
   Solicitor General
Montana Attorney General's Office
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
406.444.4145
david.dewhirst@mt.gov
*Counsel for the State of Montana*

DOUGLAS J. PETERSON
   Attorney General of Nebraska
James A. Campbell*
   Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov
*Counsel for the State of Nebraska*

MIKE HUNTER
   Attorney General of Oklahoma
Mithun Mansinghani*
   Solicitor General
Bryan Cleveland*
   Assistant Solicitor General
Oklahoma Office of Attorney General
313 N.E. 21ST Street
Oklahoma City, OK 73105
Phone: (405) 522-4392
mithun.mansinghani@oag.ok.gov
*Counsel for the State of Oklahoma*

KEN PAXTON
   Attorney General of Texas
Brent Webster

28

   First Assistant Attorney General
Judd E. Stone II
   Solicitor General
Patrick Sweeten
   Deputy Attorney General
Office of the Attorney General
P.O. Box 12548 (MC 009)
Austin, Texas 78711-2548
Tel.: (512) 463-4139
Fax: (512) 474-2697
Patrick.Sweeten@oag.texas.gov
Judd.Stone@oag.texas.gov
*Counsel for the State of Texas*

SEAN D. REYES
   Attorney General of Utah
Melissa A. Holyoak*
   Solicitor General
Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
385.271.2484
melissaholyoak@agutah.gov
*Counsel for the State of Utah*

PATRICK MORRISEY
   West Virginia Attorney General
Lindsay S. See*
   Solicitor General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(304) 558-2021
Lindsay.s.see@wvago.gov
*Counsel for the State of West Virginia*

*\*Admission application forthcoming*