**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| THE STATE OF LOUISIANA, By and through its Attorney General, JEFF LANDRY, et al.,<br><br>                           *Plaintiffs,*<br><br>    *v.*<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, et al.,<br><br>                    *Defendants*,<br><br>and<br><br>HEALTHY GULF, et al.,<br><br>           *Intervenor-Defendants.* | Civ. No.:    2:21-cv-00778-TAD-KK<br><br>Judge:     Terry A. Doughty<br><br>Mag. Judge:  Kathleen Kay |

**MEMORANDUM IN SUPPORT OF CONSERVATION GROUPS' MOTION TO INTERVENE**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 2

MOVANTS FOR INTERVENTION .......................................................................... 5

ARGUMENT ......................................................................................................... 10

I.  CONSERVATION GROUPS ARE ENTITLED TO INTERVENE AS OF
RIGHT. ........................................................................................................... 10

  A.  Conservation Groups' Motion to Intervene Is Timely ........................... 11

  B.  Conservation Groups and Their Members Have Legally Protected Interests
at Stake ................................................................................................. 12

  C.  If Successful, the States' Action Would Impair Conservation Groups'
Interests ................................................................................................. 14

  D.  Conservation Groups' Interests May Not Be Adequately Represented by
the Existing Parties. .............................................................................. 16

II.  ALTERNATIVELY, THE COURT SHOULD PERMIT CONSERVATION
GROUPS TO INTERVENE PERMISSIVELY. .................................................. 23

CONCLUSION ..................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                         **Page(s)**

*100Reporters LLC v. U.S. Dep't of Just.*,
307 F.R.D. 269 (D.D.C. 2014) ............................................................................22

*Abita Springs v. U.S. Army Corps of Eng'rs*,
No. CV 15-0451, 2015 WL 13533518 (E.D. La. Sept. 25, 2015) ........................18

*Am. Great Lakes Ports Ass'n v. Zukunft*,
No. CV 16-1019 (RC), 2016 WL 8608457 (D.D.C. Aug. 26, 2016) ....................18

*Amador Cty. v. U.S. Dep't of the Interior*,
772 F.3d 901 (D.C. Cir. 2014) ............................................................................22

*Ass'n of Pro. Flight Attendants v. Gibbs*,
804 F.2d 318 (5th Cir. 1986) ..............................................................................11

*Brumfield v. Dodd*,
749 F.3d 339 (5th Cir. 2014) ........................................................12, 14, 16, 22

*Coal. of Ariz./N.M Cntys. for Stable Econ. Growth v. Dep't of Interior*,
100 F.3d 837 (10th Cir. 1996) ......................................................................13, 20

*Crossroads Grassroots Pol'y Strategies v. FEC*,
788 F.3d 312 (D.C. Cir. 2015) ......................................................................16, 18

*Diamond v. Charles*,
476 U.S. 54 (1986) ..............................................................................................13

*Entergy Gulf States La., L.L.C. v. EPA*,
817 F.3d 198 (5th Cir. 2016) ..............................................................................11

*Fund for Animals, Inc. v. Norton*,
322 F.3d 728 (D.C. Cir. 2003) ............................................................................19

*Gulf Restoration Network et al. v. Zinke*,
No. 1:18-cv-01674 (D.D.C. filed July 16, 2018) .................................................21

*Gulf Restoration Network v. Salazar*,
683 F.3d 158 (5th Cir. 2012) ..............................................................................14

*Hanover Ins. Co. v. Superior Lab. Servs., Inc.*,
179 F. Supp. 3d 656 (E.D. La. 2016) ..................................................................23

*Healthy Gulf et al. v. Bernhardt*,
No. 1:19-cv-00707 (D.D.C. filed Mar. 13, 2019) ...............................................21

*Idaho Farm Bureau Fed'n v. Babbitt,*
    58 F.3d 1392 (9th Cir. 1995) ........................................................13

*John Doe No. 1 v. Glickman,*
    256 F.3d 371 (5th Cir. 2001) ...................................................12, 18

*Nat. Res. Def. Council v. Costle,*
    561 F.2d 904 (D.C. Cir. 1977) .................................................18, 24

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) .......................................................................19

*Ruiz v. Estelle,*
    161 F.3d 814 (5th Cir. 1998) ........................................................11

*Sierra Club et al. v. Angelle,*
    No. 19-13966 (E.D. La. filed June 11, 2019) .................................21

*Sierra Club v. Espy,*
    18 F.3d 1202 (5th Cir. 1994) ...............................................11, 16, 18

*Sierra Club v. Glickman,*
    82 F.3d 106 (5th Cir. 1996) ..........................................................16

*Stone v. First Union Corp.,*
    371 F.3d 1305 (11th Cir. 2004) .....................................................16

*Texas v. United States,*
    805 F.3d 653 (5th Cir. 2015) ...................................................11, 18

*Trans Chem. Ltd. v. China Nat. Mach. Imp. & Exp. Corp.,*
    332 F.3d 815 (5th Cir. 2003) ........................................................23

*Trbovich v. United Mine Workers,*
    404 U.S. 528 (1972) .....................................................................20

*Utah Ass'n of Ctys. v. Clinton,*
    255 F.3d 1246 (10th Cir. 2001) ...............................................20, 21

*Wal–Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n,*
    834 F.3d 562 (5th Cir. 2016) ................................................. *passim*

## Statutes

43 U.S.C. § 1332 ...........................................................................19

43 U.S.C. § 1344 ...........................................................................19

43 U.S.C. § 1702 ...........................................................................19

**Other Authorities**

86 Fed. Reg. 7619 (Feb. 1, 2021) ..............................................................................1, 3

Fed. R. Civ. P. 12 ...................................................................................................11

Fed. R. Civ. P. 24 .......................................................................................... *passim*

# INTRODUCTION

Healthy Gulf, Center for Biological Diversity, Cook Inletkeeper, Defenders of Wildlife, Friends of the Earth, Natural Resources Defense Council, Oceana, Sierra Club, and The Wilderness Society (collectively, "Conservation Groups") respectfully move under Federal Rule of Civil Procedure 24 to intervene as defendants in this action to protect their and their members' interests in minimizing harms to the environment and climate from oil and gas leasing on federal lands and in federal waters. On January 27, 2021, President Biden issued an Executive Order on Tackling the Climate Crisis at Home and Abroad, which directs the Secretary of the Interior to, "consistent with applicable law," pause new oil and gas leasing on federal lands and waters "pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts." Exec. Order No. 14008, § 208, 86 Fed. Reg. 7619, 7624–25 (Feb. 1, 2021). Plaintiff States Louisiana *et al.* ("the States") seek relief declaring the Executive Order and its implementation unlawful, enjoining the Secretary of the Interior from implementing that section of the Order, and compelling the Secretary to immediately hold lease sales of federal lands and waters. If granted, the States' requested relief would interfere with the Secretary of the Interior's lawful discretion to consider and balance economic, social, and environmental factors in oil and gas leasing decisions and would compel new oil and gas drilling and development in public lands and waters waters, causing harm to the environment and contributing to the climate crisis.

Conservation Groups seek intervention as of right under Rule 24(a)(2) or, alternatively, permissive intervention under Rule 24(b). Conservation Groups have worked for decades to protect public lands and waters from the impacts of oil and gas development, and many devoted years to advocating for a pause in federal oil and gas leasing while the federal government

considers needed reforms. Conservation Groups and their members have legally cognizable interests in protecting public health, cultural resources, air and water quality, wildlife, and climate, which are harmed by oil and gas development. Those interests will be seriously impaired if the States prevail in their effort to set aside the Executive Order and the postponement of several onshore and offshore lease sales. Conservation Groups are not adequately represented by the parties to this action. Conservation Groups therefore respectfully request that this Court grant their Motion to intervene as defendants to protect their and their members' interests in ensuring that additional federal lands and waters are not irretrievably committed to new oil and gas development pending the comprehensive review of the leasing program, and to oppose the States' efforts to undermine federal authority to offer lease sales that properly balance public health, environmental, and energy concerns as permitted by law.

As described below, the States' requested relief in their pending motion for a preliminary injunction would seriously harm the protectable interests of Conservation Groups and their members. Conservation Groups have promptly moved to intervene and respectfully request expedited consideration of their Motion so that, if granted intervention, they may be able to file an opposition to the preliminary injunction motion in the regular course, by the deadline for oppositions set by the Court. *See* Mem. Order (Apr. 1, 2021), R. Doc. 7. If there is not a ruling on this Motion by that deadline, Conservation Groups intend to file a proposed opposition to the preliminary injunction motion on that date.

## **BACKGROUND**

On January 27, 2021, President Biden issued Executive Order 14008 on Tackling the Climate Crisis at Home and Abroad. The Order recognizes that climate change is already having dangerous and sometimes catastrophic effects in the United States—on our coastal communities, fisheries, farmers, and others—and that it is imperative to immediately reduce carbon emissions

and build resilience. *See* 86 Fed. Reg. at 7619, 7626. It declares a broad policy for federal agencies to reconsider whether their status quo approaches remain appropriate in the face of this crisis. The Executive Order directs the Interior Department to conduct "a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters." *Id.* at 7624–25. It directs that new leasing be paused in accordance with applicable law while the review is pending. *Id.*

Section 208 starts a process to address a range of well-established problems with the federal oil and gas program, both onshore and offshore. The Government Accountability Office (GAO) has pointed out a number of these problems, repeatedly criticizing Interior for, among other things, (1) engaging in poor regulatory oversight and enforcement,[1] (2) requiring insufficient reclamation bonding,[2] (3) exercising inadequate oversight of offshore oil and gas pipelines,[3] (4) allowing abuses of lease suspensions,[4] (5) setting below-market royalty rates and

---

[1] GAO, *Oil and Gas Development: Actions Needed to Improve Oversight of the Inspection and Enforcement Program*, GAO-19-7 (Feb. 14, 2019), https://www.gao.gov/products/gao-19-7; GAO, *Oil and Gas Management: Interior's Bureau of Safety and Environmental Enforcement Has Not Addressed Long-Standing Oversight Deficiencies*, GAO-16-245 (Feb. 10, 2016), https://www.gao.gov/products/gao-16-245.

[2] GAO, *Oil and Gas: Bureau of Land Management Should Address Risks from Insufficient Bonds to Reclaim Wells*, GAO-19-615 (Sept. 18, 2019), https://www.gao.gov/products/gao-19-615; GAO, *Offshore Oil and Gas Resources: Actions Needed to Better Protect Against Billions of Dollars in Federal Exposure to Decommissioning Liabilities*, GAO-16-40 (Dec. 18, 2015), https://www.gao.gov/products/gao-16-40.

[3] GAO, *Offshore Oil and Gas: Updated Regulations Needed to Improve Pipeline Oversight and Decommissioning*, GAO-21-293 (Mar. 19, 2021), https://www.gao.gov/products/gao-21-293.

[4] GAO, *Oil and Gas Lease Management: BLM Could Improve Oversight of Lease Suspensions with Better Data and Monitoring Procedures*, GAO-18-411 (June 19, 2018), https://www.gao.gov/products/gao-18-411.

poor fiscal terms,[5] and (6) conducting noncompetitive leasing.[6] Moreover, oil and gas lease statistics show that most existing leases are not even under production. Onshore, less than half of the 26.6 million acres of public land under lease were categorized as "producing" at the end of fiscal year 2020.[7] Offshore, less than one 20% of the nearly 12 million acres under lease were categorized as "producing" as of April 1, 2021.[8]

As Executive Order 14008 indicates, federal oil and gas development contributes significantly to global climate change. According to the U.S. Geological Survey, from 2005 to 2014, fossil fuels extracted from federal lands and waters accounted for nearly a quarter (23.7 percent) of all U.S. carbon dioxide emissions and 7.3 percent of methane emissions.[9]

Climate change resulting from such fossil fuel development is already having impacts throughout the United States. The Gulf of Mexico region is seeing coastal wetland loss from sea level rise, more intense and frequent hurricanes, and fishery declines, to name a few examples. Cook Inlet in Alaska is experiencing multiple hundred-year floods and warming waters in local salmon streams, and the federal fisheries service recently took the unprecedented step of closing the Lower Cook Inlet Pacific cod fishery because stocks were collapsing due to warming

---

[5] GAO, *Federal Energy Development: Challenges to Ensuring a Fair Return for Federal Energy Resources*, GAO-19-718T (Sept. 24, 2019), https://www.gao.gov/products/gao-19-718t.

[6] GAO, *Oil and Gas: Onshore Competitive and Noncompetitive Lease Revenues*, GAO-21-138 (Dec. 9, 2020), https://www.gao.gov/products/gao-21-138.

[7] Bureau of Land Mgmt., *Oil and Gas Statistics* (Tables 2 & 6), https://www.blm.gov/programs-energy-and-minerals-oil-and-gas-oil-and-gas-statistics (last visited Apr. 27, 2021).

[8] Bureau of Ocean Energy Mgmt., *Combined Leasing Report* (Apr. 1, 2021), https://www.boem.gov/sites/default/files/documents/regions/pacific-ocs-region/oil-gas/Lease%20stats%204-1-21.pdf.

[9] Matthew D. Merrill, et al., U.S. Geological Survey, *Federal Lands Greenhouse Gas Emissions and Sequestration in the United States: Estimates for 2005–14*, Scientific Investigations Report 2018–5131 (2018), https://pubs.usgs.gov/sir/2018/5131/sir20185131.pdf.

waters.[10] Onshore, climate change affects nearly all of the multiple uses—such as wildlife habitat, water resources, timber, recreation, grazing, and others—of public lands managed by federal land agencies. The outdated and inadequate oil and gas rules, the contribution of oil and gas development to climate change, and the critical need to build resilience to climate impacts undergird President Biden's decision to reevaluate the federal oil and gas program.

Consistent with the Executive Order, Interior announced that it was postponing a number of oil and gas lease sales that had been proposed to be held in March and April 2021, including offshore Lease Sale 257 in the Gulf of Mexico and quarterly lease sales in several western states. Compl. ¶¶ 73, 103–10 (Mar. 24, 2021), R. Doc. 1. Interior also announced that it was postponing a comment period for offshore Lease Sale 258, which was proposed to be held later in 2021. *Id.* ¶ 86. On March 24, 2021, the States filed a complaint challenging the Executive Order and the postponements of the proposed lease sales. *See generally id*. On March 31, 2021, the States filed a motion for a preliminary injunction to block the Order and compel Interior to hold the proposed sales. Mot. Prelim. Inj. (Mar. 31, 2021), R. Doc. 3.

## MOVANTS FOR INTERVENTION

HEALTHY GULF is a nonprofit organization headquartered in New Orleans, Louisiana. Eustis Decl. ¶ 1, attached as Ex. A. Healthy Gulf has a diverse network of individual citizens, local, regional, and national organizations whose purpose is to collaborate with and serve communities who love the Gulf of Mexico by providing research, communications and coalition-building tools needed to reverse the long-pattern of over exploitation of the Gulf's natural resources. *Id.* Healthy Gulf's membership includes people in Gulf states, and beyond, that live

---

[10] Kavitha George, *Alaska Cod Fishery Closes and Industry Braces for Ripple Effect*, NPR (Dec. 8, 2019), https://www.npr.org/2019/12/08/785634169/alaska-cod-fishery-closes-and-industry-braces-for-ripple-effect.

near, recreate in and otherwise enjoy the coastal and marine waters of the Gulf of Mexico that are the subject of oil and gas exploration and development (in both state and federal waters) and are impacted by infrastructure association with oil and gas development in the Western and Central Gulf of Mexico. *Id.* ¶ 5. Healthy Gulf works to promote a transition to clean energy, safeguard the health of the communities and the natural resources of Gulf of Mexico states through activism, public education and legal action. *Id.* ¶ 4. Heathy Gulf has been at the forefront of efforts to address environmental degradation associated with oil and gas development and production from leased areas in the Western and Central Gulf of Mexico and have actively opposed expansion of oil and gas leasing into the Eastern Gulf of Mexico. *Id.* ¶¶ 8–9.

CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a 501(c)(3) nonprofit organization incorporated in California, with field offices and 84,300 members located across the United States. Mckinnon Decl. ¶¶ 2, 8, attached as Ex. B. The Center's primary mission is to protect threatened and endangered species and their habitats both in the United States and abroad. *Id.* ¶ 2. In service of its mission, the Center provides public education, advocacy, litigation to enforce environmental laws, and participates in the government's decision-making process at the administrative level. *Id.* ¶ 5. For several years, the Center has actively campaigned to persuade Interior to comply with federal laws and has filed litigation to protect species from oil spills, water pollution, noise pollution, and other harms from the oil and gas industry. *Id.* ¶¶ 5–6.

COOK INLETKEEPER is a 501(c)(3) nonprofit organization headquartered in Homer, Alaska. Shavelson Decl. ¶ 3, attached as Ex. C. It was founded in 1995 by Alaskans impacted by the Exxon Valdez Oil Spill and concerned with oil and gas pollution, rapid ecological changes, and gaps in environmental protection in the Cook Inlet watershed. *Id.* Cook Inletkeeper engages

in a variety of research, education, and advocacy activities designed to inform and support its members and supporters around the Cook Inlet watershed and beyond in order to accomplish its mission to protect Alaska's Cook Inlet watershed and the life it sustains. *Id.* Cook Inletkeeper has 1,200 dues-paying members and more than 5,000 supporters, who include Alaskans from many walks of life, including commercial fishermen, sport fishermen, Alaska Natives, property owners, hunters, scientists, ecologists, small business owners, and subsistence users. *Id.* ¶ 4. Its members and supporters rely on the waters and the marine resources in the proposed million-acre Lease Sale 258 area in Lower Cook Inlet for commercial, sport and subsistence fishing. *Id.* ¶ 6. Cook Inletkeeper, its members, and supporters have a long history of working to protect the federal waters of Lower Cook Inlet from oil and gas development have taken action on oil and gas, beluga whale protection, mining, and related water quality and habitat issues. *Id.* ¶¶ 4, 9.

DEFENDERS OF WILDLIFE ("Defenders") is a 501(c)(3) nonprofit membership organization, founded in 1947, dedicated to the protection and restoration of all native wild animals and plants in their natural communities and the preservation of the habitats on which these species depend. Nelson Decl. ¶ 2, attached as Ex. D. Defenders is headquartered in Washington, DC, with regional and field offices in Alaska, Arizona, California, Colorado, Florida, Montana, New Mexico, North Carolina, Ohio, Oregon, Texas, Washington, and Wyoming. *Id.* It has 361,465 members and nearly 2 million supporters nationwide, and advocates on behalf of its members and on behalf of imperiled and protected species that cannot advocate for themselves to protect them from the impacts of fossil fuel exploration and extraction on federal lands and in federal waters. *Id.* ¶¶ 3, 7.

FRIENDS OF THE EARTH ("FoE") is a 501(c)(3) nonprofit, membership-based organization with offices located in California and Washington, DC. Templeton Decl. ¶ 2,

7

attached as Ex. E. FoE currently has over 1.5 million activists and over 140,000 members, located across all 50 states and the District of Columbia. *Id.* FoE's primary mission is to defend the environment and champion a more healthy and just world by collectively ensuring environmental and social justice, human dignity, and respect for human rights and peoples' rights. *Id.* FoE and its members are dedicated to fighting to reduce greenhouse gas emissions and domestic reliance on fossil fuels and support the temporary pause on oil and gas leasing on federal public lands and water. *Id.* ¶ 3. Specifically, FoE's Climate & Energy and Oceans & Vessels programs directly engages in administrative and legal advocacy to protect the environment and society from climate change, pollution, and industrialization associated with fossil fuel development and greenhouse gas emissions. *Id.*

NATURAL RESOURCES DEFENSE COUNCIL ("NRDC") is a nonprofit environmental membership organization with hundreds of thousands of members nationwide, including many hundreds of members in each of the Plaintiff States. Chasis Decl. ¶ 3, attached as Ex. F. NRDC's mission is to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends. *Id.* ¶ 4. For several decades, NRDC has advocated for the protection of marine life and coastal ecosystems, including: advocating for safeguards from the impacts of offshore oil and gas exploration and development, curbing the disruptive seismic exploration associated with offshore oil and gas leasing, and transitioning the nation from its dependence on fossil fuels to a clean energy future. *Id.* ¶¶ 8–9.

OCEANA is a 501(c)(3) nonprofit, international advocacy organization headquartered in Washington, D.C. with regional offices located throughout the United States, including Juneau, Alaska. Savitz Decl. ¶ 2, attached as Ex. G. Oceana is the largest international advocacy organization dedicated solely to ocean conservation, with over 1.2 million members and

supporters in the United States, including nearly 6,000 members in Alaska and over 70,000 members in the states involved in this lawsuit bordering the Gulf of Mexico. *Id.* Oceana's primary mission is to protect and restore the abundance of our world's oceans and its Climate and Energy Campaign uses science and advocacy to drive policies aimed at stopping climate change, with a focus on preventing offshore oil drilling, preventing seismic airgun blasting, and promoting responsible offshore wind energy. *Id.* ¶ 3. Oceana's staff and members have been heavily engaged in opposing offshore oil drilling and have put significant resources and effort into advocating for permanent protections from offshore oil and gas drilling and supporting the Biden Administration's leasing pause. *Id.* ¶¶ 5, 9.

SIERRA CLUB is the nation's oldest grassroots organization dedicated to the protection and preservation of the environment. Collentine Decl. ¶ 2, attached as Ex. H. Sierra Club has approximately 3.8 million members and supporters nationwide, including chapters and members in each of the 50 states. *Id*. The Sierra Club is dedicated to averting the worst impacts of the climate crisis through slowing or stopping the expansion of fossil fuel production and infrastructure and protecting the environment and communities from the environmental impacts of these projects. *Id*. ¶ 5. For decades Sierra Club and its members have engaged in activism, submitted public comments, attended public meetings, promoted legislation, and filed administrative protests on oil and gas leasing, drilling and other harmful projects in efforts to protect the community, educate the public on the impacts of these projects, and encourage federal, state and local officials to take the most protective measures in regard to such projects. *Id.* ¶¶ 4, 8.

THE WILDERNESS SOCIETY ("TWS"), is a national nonprofit membership organization that works to unite people to protect America's wild places. Jespersen Decl. ¶ 3,

attached as Ex. I. Founded in 1935, TWS is headquartered in Washington, D.C. with offices throughout the country and 135,531 total members nationwide. *Id.* ¶¶ 3–4. TWS aims to transform federal land management to prioritize climate resilience and biodiversity protection and help develop and advance policies for just and equitable public land conservation on behalf of all people. *Id.* ¶ 3. In working toward its mission, TWS elevates the voices of communities that might otherwise be unable to engage in federal processes affecting public lands and waters. *Id.* ¶ 7. For years, TWS advocated for a pause on BLM's oil and gas leasing program. *Id.* ¶ 9. TWS has used in-house science, policy, and legal expertise to advocate for a pause on oil and gas leasing and to comment on BLM environmental reviews pursuant to the National Environmental Policy Act. *Id.*

## **ARGUMENT**

**I.      Conservation Groups Are Entitled to Intervene as of Right.**

Federal Rule of Civil Procedure 24(a)(2) provides, in pertinent part, "On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." The Fifth Circuit accordingly applies a four-part test to evaluate motions to intervene under this Rule: "(1) the application . . . must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; (4) the applicant's interest must be inadequately represented by the existing parties to the suit." *Wal–Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 565 (5th Cir. 2016) (alteration in original) (quoting *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015)). Rule 24 "'is to be liberally

construed,' with 'doubts resolved in favor of the proposed intervenor.'" *Entergy Gulf States La., L.L.C. v. EPA*, 817 F.3d 198, 203 (5th Cir. 2016) (citation omitted). When deciding a motion to intervene, courts accept the movant's factual allegations as true. *Texas*, 805 F.3d at 657. Conservation Groups satisfy each of the Rule's elements.

A.      **Conservation Groups' Motion to Intervene Is Timely.**

Courts in this Circuit consider four factors in determining timeliness: "(1) the length of time applicants knew or should have known of their interest in the case; (2) prejudice to existing parties caused by applicants' delay; (3) prejudice to applicants if their motion is denied; and (4) any unusual circumstances." *Ruiz v. Estelle*, 161 F.3d 814, 827 (5th Cir. 1998).

Conservation Groups' Motion is unquestionably timely. This case is still in its infancy. The States have not yet filed proof of service of their complaint on all Federal Defendants, and the deadline for Federal Defendants to file an answer is several weeks from now. *See* Fed. R. Civ. P. 12(a)(2); R. Doc. 34 (Apr. 16, 2021) (proof of service on U.S. Attorney for the Western District of Louisiana). The length of time that has elapsed since Conservation Groups knew or should have known of their interests in this case is minimal. *Cf., e.g.*, *Ass'n of Pro. Flight Attendants v. Gibbs*, 804 F.2d. 318, 321 (5th Cir. 1986) (holding five month lapse was not unreasonable).

Granting Conservation Groups intervention at this stage also will not prejudice the existing parties. "[P]rejudice must be measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation." *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994). Conservation Groups do not seek to delay any ongoing or future proceedings. Discovery, case management conferences, and merits proceedings have not yet occurred in this litigation. *See, e.g.*, *Wal-Mart Stores*, 834 F.3d at 565–66 (finding motion timely when it was filed "before discovery progressed and because it did not

11

seek to delay or reconsider phases of the litigation that had already concluded"). In addition,

Conservation Groups are filing their Motion at least 21 days before the deadline for opposing the

States' motion for a preliminary injunction so that, if granted intervention, they could participate

in that pending motion in accordance with existing deadlines. In sum, the timing of Conservation

Groups' intervention at this early point in the case would not cause any prejudice to the existing

parties. *See John Doe No. 1 v. Glickman*, 256 F.3d 371, 378 (5th Cir. 2001). Conversely, denying

Conservation Groups' Motion would deprive them of an opportunity to protect their interests

placed at risk by this litigation, as detailed below.[11]

**B.     Conservation Groups and Their Members Have Legally Protected Interests at Stake.**

Rule 24(a)(2) requires an applicant for intervention to possess an interest relating to the

property or transaction that is the subject matter of the litigation. Fed. R. Civ. P. 24(a)(2). This

requirement is not rigid. Rather, "[t]he 'interest' test is primarily . . . a practical guide to

disposing of lawsuits by involving as many apparently concerned persons as is compatible with

efficiency and due process." *Wal-Mart Stores*, 834 F.3d at 566 n.2 (quoting *Nuesse v. Camp*, 385

F.2d 694, 700 (D.C. Cir. 1967)). "The interest requirement may be judged by a more lenient

standard if the case involves a public interest question or is brought by a public interest group."

*Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2014) (quoting 6 James W. Moore, et al.,

Moore's Federal Practice § 24.03[2][c], at 24–34 (3d ed. 2008)). An interest is sufficient for

purposes of Rule 24 if it is "legally protectable"—that is, "if it is of the type that the law deems

worthy of protection, even if the intervenor does not have an enforceable legal entitlement or

would not have standing to pursue her own claim." *Wal–Mart Stores*, 834 F.3d at 566 (quoting

---

[11] There are no unusual circumstances relevant to this inquiry in this case.

*Texas*, 805 F.3d at 659); *see also Diamond v. Charles*, 476 U.S. 54, 75 (1986).

Conservation Groups have legally protectable interests arising from their long history of engagement in Interior's oil and gas leasing programs—both offshore and onshore—and more recent advocacy for a pause in leasing pending a comprehensive review and consideration of reforms to the program that is contemplated by the Executive Order. Courts have recognized that "[a] public interest group is entitled as a matter of right to intervene in an action challenging the legality of a measure it has supported." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995); *see also Coal. of Ariz./N.M Cntys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 841 (10th Cir. 1996) (party with a "persistent record of advocacy for [the environmental] protection[s]" adopted by an agency that were subsequently challenged in court has a "direct and substantial interest" sufficient "for the purpose of intervention as of right"). Many Conservation Groups have long advocated for the comprehensive review and pause in leasing that the federal government is now pursuing. *E.g.*, Eustis Decl. ¶ 9; Templeton Decl. ¶¶ 3, 9–10; Chasis Decl.¶¶ 6–7; Savitz Decl. ¶ 5, 7; Jespersen Decl. ¶ 9; McKinnon ¶¶ 20; Nelson Decl. ¶ 21. These efforts, and the Groups' longstanding litigation and administrative advocacy highlighting the deficiencies in the current leasing programs, establish sufficient interests for intervention.

Conservation Groups and their members also have cognizable recreational, aesthetic, and research interests in protecting federal lands and waters that are threatened by future oil and gas leasing. *E.g.*, Templeton Decl. ¶¶ 4–65; Savitz Decl. ¶ 10; Shavelson Decl. ¶¶ 4, 6; Jespersen Decl. ¶¶ 5–6; McKinnon Decl. ¶¶ 3, 9; Collentine Decl. ¶ 4, Nelson Decl ¶ 3–5; Chasis Decl. ¶ 5. For instance, Native Alaskan FoE members participate in traditional and cultural activities of hunting, gathering, and fishing that are directly inhibited by federal oil and gas activities.

13

Templeton Decl. ¶ 6. Healthy Gulf staff and NRDC members regularly fly over and boat in the Gulf, both for personal enjoyment and to assess wildlife habitat and wildlife such as sea turtles, reef fish, seabirds, whales, dolphins, and other marine mammals, and to support environmental research. Eustis Decl. ¶ 4–5, 11, 13, 15; Chasis Decl. ¶ 5. It is well-established that these types of interests are legally protectable. *E.g.*, *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 167 (5th Cir. 2012).

### C.   If Successful, the States' Action Would Impair Conservation Groups' Interests.

An applicant for intervention as of right must be "so situated that disposing of the action *may* as a practical matter impair or impede the movant's ability to protect its interest." Fed. R. Civ. P. 24(a)(2) (emphasis added). "[A] would-be intervenor must show only that impairment of its substantial legal interest is *possible* if intervention is denied. This burden is *minimal*." *Brumfield*, 749 F.3d at 345 n.2 (quoting *Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir. 1999)).

In their Complaint, the States ask this Court, among other things, to declare that Executive Order 14008 violates OCSLA and the MLA. Compl. ¶¶ e–f (Prayer for Relief). The States have also asked this Court to declare the leasing pause unlawful, enjoin Interior from implementing the pause, and compel Interior to hold previously proposed lease sales. *Id.* ¶¶ a–g. Most imminently, the States have moved for a preliminary injunction to compel Interior to immediately and irretrievably dispose of public lands and waters via lease sales throughout the Western and Central Gulf of Mexico, Cook Inlet, and several western states. R. Doc. 3.

As described above, Conservation Groups have advocated for years for reforms to the federal oil and gas leasing program to better protect the environment and human health, and to combat climate change. Many Conservation Groups have specifically advocated for the government to adopt a leasing pause in order to consider regulatory and policy reforms to the

14

leasing programs, such as provided for in the Executive Order. The short-term benefits of the pause and the longer-term benefits that may result from leasing policy review to wildlife, human health, and the climate from the broader review will be lost if the States prevail in this case.

The States' requested relief, if granted, would also harm the recreational, aesthetic, and research interests of Conservation Groups and their members in protecting federal lands and waters threatened by oil and gas development. While a pause in leasing will not halt oil and gas development on existing leases on public lands and waters, it *will* ensure that new leases are not issued to commit additional lands to drilling pending Interior's review of the federal fossil fuel program. If the requested preliminary or permanent relief is granted, public lands and waters would be encumbered by leases and available for future oil and gas development. Such development would harm: native species and their habitats; air and water quality; public health (including increased risks of cancer, birth defects, infant mortality, and acute health effects); and commercial and subsistence fishing, among other impacts. *E.g.*, Eustis Decl. ¶¶ 12, 18–20; McKinnon Decl. ¶¶ 23–25; Shavelson Decl. ¶¶ 10–11; Templeton Decl. ¶¶ 5–7, 11–12; Chasis Decl. ¶ 9; Savitz Decl. ¶ 15; Jespersen Decl. ¶¶ 19–20; Collentine Decl. ¶¶ 11–12, Nelson Decl. ¶¶ 5–6, 22–23.

Moreover, the practical effects of the State's requested relief, if granted, could extend beyond just this case to prospectively limit Interior's ongoing review of the federal leasing program review and influence its options for protecting public lands and waters. For example, the States claim that OCSLA and the MLA both mandate Interior to offer lease sales. *See, e.g.*, Compl. ¶¶ 154 (alleging that Interior's actions "violate[] the MLA, which commands the Secretary to hold lease sales 'for each State where eligible lands are available at least quarterly.'"), 170 (alleging that "OCSLA confers no authority on the President to unilaterally

suspend leasing sales"). Their request for relief is forward-looking. *See e.g.*, *id.* ¶¶ e–f (seeking to enjoin Interior from implementing Executive Order 14008 and to compel agency to offer lease sales). Any declaration that the temporary leasing pause violates OCSLA or the MLA has the potential to set precedent that could impair Conservation Groups' interests in the application and implementation of Executive Order 14008. Pursuant to its review Interior, is currently considering a range and diversity of information and options for the future of the federal leasing program. If this Court were to accept the States' arguments, the nature and scope of Interior's ongoing review of whether to continue offering federal leases could be prematurely narrowed. Such potential effects satisfy the requirement that Conservation Groups' interests would be impaired as a practical matter sufficient to warrant intervention. *See, e.g.*, *Sierra Club v. Glickman*, 82 F.3d 106, 109–10 (5th Cir. 1996) ("the *stare decisis* effect of an adverse judgment constitutes a sufficient impairment to compel intervention" (citing *Espy*, 18 F.3d at 1207)); *see also Stone v. First Union Corp.*, 371 F.3d 1305, 1310 (11th Cir. 2004) (recognizing that "one court's ruling . . . could influence later suits," even though "a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects.").

### D.   Conservation Groups' Interests May Not Be Adequately Represented by the Existing Parties.

Finally, an applicant for intervention as of right must show that its interests may not be adequately represented by the existing parties to the litigation. Fed. R. Civ. P. 24(a)(2). This burden is "minimal." *Espy*, 18 F.3d at 1207 (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)). "The movant need not show that the representation by existing parties will be, for certain, inadequate." *Brumfield*, 749 F.3d at 345 (quoting 6 Moore et al., *supra*, § 24.03[4][a], at 24–27); *see also Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312,

321 (D.C. Cir. 2015) ("[A] movant 'ordinarily should be allowed to intervene unless it is *clear* that the [existing] party will provide adequate representation.'" (emphasis added) (citation omitted)). Rather, "[b]ecause intervention necessarily occurs before the litigation has been resolved, [an applicant for intervention] need only show that 'the representation *may* be inadequate.'" *Wal–Mart Stores*, 834 F.3d at 569 (quoting *Texas*, 805 F.3d at 662). Representation of Conservation Groups' interests in this case by the existing parties will—and certainly "may"—be inadequate. The States seek to vacate and enjoin the action Conservation Groups seek to defend, while Federal Defendants' have different ultimate objectives and divergent interests from Conservation Groups.

A showing of "differences in the objectives" of an intervenor and existing party establishes that representation may be inadequate. *Wal–Mart Stores*, 834 F.3d at 569. Although the government and Conservation Groups presumably share one particular objective in this lawsuit—denial of the State's effort to compel certain lease sales—the *ultimate* objectives and positions of the two parties differ as a result of their divergent interests and Interior's statutory obligations described below. Federal Defendants' ultimate objective presumably includes defending the Executive Order and actions related to the particular lease sales at issue in this case. Conservation Groups' ultimate objectives, on the other hand, are much further reaching. Conservation Groups are focused on ensuring Interior does not hold new lease sales *at least* until it has had an opportunity to implement an approach to oil and gas development on federal lands and waters that is sufficiently protective of the climate, environment, and public health; and some Conservation Groups' ultimate objective is a *permanent* end to new leasing of federal lands and waters. *See, e.g.*, McKinnon Decl. ¶20; Templeton Decl. ¶¶ 9, 11–12; Chasis Decl. ¶¶ 4, 9–10; Savitz Decl. ¶ 14–15; Jespersen Decl. ¶¶ 10–15, 19; Collentine Decl. ¶ 11; Nelson Decl. ¶¶

17

21–23. Moreover, even the shared objective of defending Interior's actions regarding the particular lease sales is not assured at this point. *Cf., e.g.*, *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 912 (D.C. Cir. 1977) ("[A] shared general agreement [between intervenors and the agency] that the [agency action] should be lawful does not necessarily ensure agreement in all particular respects about what the law requires."); *Am. Great Lakes Ports Ass'n v. Zukunft*, No. CV 16-1019 (RC), 2016 WL 8608457, at *4 (D.D.C. Aug. 26, 2016) (finding prospective-intervenor's interests may not be adequately represented because government might decide to settle with plaintiff).

Even when a would-be intervenor has the same ultimate objective as an existing party, the prospective intervenor can establish that representation may be inadequate if it shows that its "interests diverge from the putative representative's interests in a manner germane to the case." *Texas*, 805 F.3d at 662; *see also Crossroads*, 788 F.3d at 321 (cautioning that treating "general alignment" of parties as dispositive is the "wrong legal standard"). Conservation Groups' interests diverge from those of Federal Defendants in several respects that could affect this litigation. Foremost is that the government must represent the "broad public interest," while Conservation Groups' have much more discrete and particularized interests. *Espy*, 18 F.3d at 1208; *see Abita Springs v. U.S. Army Corps of Eng'rs*, No. CV 15-0451, 2015 WL 13533518, at * 3 (E.D. La. Sept. 25, 2015) ("[T]he Fifth Circuit has found that a government defendant does not adequately represent the interest of a private entity, even if they seek the same ultimate outcome." (citing cases)); *see also Wal–Mart Stores*, 834 F.3d at 569 n.9 (collecting cases); *John Doe No. 1*, 256 F.3d at 381 (finding government agency may not adequately represent interests of public interest animal welfare organization "[g]iven . . . [the agency's] duty to represent the broad public interest"). The Secretary of the Interior must balance a wide variety of interests

18

when managing federal waters and lands. OCSLA, for example, requires the Secretary to balance energy needs with environmental protection, safety, state and local interests, and "other national needs." 43 U.S.C. § 1332(3), (5); *see also id.* 1344(a) (listing several interests and factors to be balanced when developing an offshore leasing program). And the Federal Land Policy and Management Act requires the Secretary to manage public lands under a "multiple use" mandate that requires balancing interests as ranging as "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." 43 U.S.C. § 1702(c); *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) ("'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put."). In striking those balances, Interior often compromises environmental, cultural, and health protections (i.e., Conservation Groups' interests) in favor of oil and gas development and other resource uses. *See infra* at 20–23.

By contrast, the Conservation Groups have narrower interests: abating the climate crisis and protecting wildlife, water and air quality, public health, and cultural resources from the harms that result from additional leasing on federal lands and in federal waters, and ensuring a leasing process that adequately addresses these harms. *See, e.g.*, Templeton Decl. ¶¶ 3, 6, 8, 11; Chasis Decl. ¶¶ 4–5, 8; Eustis Decl. ¶¶ 4, 8, 18–19; McKinnon Decl. ¶¶ 4, 24, 26; Savitz Decl. ¶¶ 3, 10; Shavelson Decl. ¶¶ 9–11; Collentine Decl. ¶ 4, 11–12, Nelson Decl. ¶¶ 5–7, 20. Interior is charged with representing the broader range of multiple interests of the public generally, which, although they may overlap, do not precisely coincide with these narrower interests. That difference in scope, even if the government may take these interests into account, prevents Federal Defendants from giving these narrower interests "the kind of primacy that the [prospective intervenor] would give them." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736

(D.C. Cir. 2003); *see also Utah Ass'n of Ctys. v. Clinton*, 255 F.3d 1246, 1255–56 (10th Cir. 2001) ("In litigating on behalf of the general public, the government is obligated to consider a broad spectrum of views, many of which may conflict with the particular interest of the would-be intervenor."); *Coal. of Cntys.*, 100 F.3d at 845 ("We have here . . . the familiar situation in which the governmental agency is seeking to protect not only the interest of the public but also the private interest of the petitioners in intervention, a task which is on its face impossible." (citation omitted)). And without giving these interests the same importance that Conservation Groups would, the government cannot—and at least may not—adequately represent those interests.

The Supreme Court's opinion in *Trbovich* reinforces the principle that the government cannot adequately represent a specialized set of interests when it is tasked with serving the broad public interest. 404 U.S. at 538–39. Even as the statute at issue there required the Secretary of Labor to serve the prospective intervenor union member's interest, it also imposed on the Secretary "an obligation to protect the 'vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member.'" *Id.* at 539 (citation omitted). The Court held that the Secretary's paramount obligation to the "public interest" raised "sufficient doubt about the adequacy of representation to warrant intervention." *Id.* at 538. The same is true here.

These divergent interests are illustrated by numerous Interior decisions that compromised Conservation Groups' interests in favor of oil and gas development. For example, BOEM failed to adequately address the concerns voiced by several Conservation Groups about coastal and environmental harms when proceeding to offer nearly the entire unleased portion of the Western and Central Gulf of Mexico for oil and gas leasing in 2018, 2019, and 2020. *See, e.g.*, Savitz Decl. ¶9; Chasis Decl ¶ 7; McKinnon Decl. ¶¶ 18-19, 26; Eustis Decl. ¶ 7; Collentine Decl. ¶ 10.

20

The adversarial history between Conservation Groups and Interior regarding oil and gas development provides further evidence that representation may be inadequate. *See, e.g.*, *Coal. of Ctys.*, 100 F.3d at 845–46 (holding Interior Department did not adequately represent conservationist where history of litigation existed). For example, three Conservation Groups are currently engaged in pending litigation with BOEM about recent leasing decisions in the Gulf. *Healthy Gulf et al. v. Bernhardt*, No. 1:19-cv-00707 (D.D.C. filed Mar. 13, 2019); *Gulf Restoration Network et al. v. Zinke*, No. 1:18-cv-01674 (D.D.C. filed July 16, 2018); *see also Sierra Club et al. v. Angelle*, No. 19-13966 (E.D. La. filed June 11, 2019) (challenging Interior's weakened offshore safety regulations). Many Conservation Groups also have a long history of litigating against BLM over the agency's approval of oil and gas leasing and development. *See, e.g.*, Jesperson Decl. ¶17; McKinnon Decl. ¶¶16-17; Collentine Decl. ¶¶ 8–9; Nelson Decl ¶ 9, 11-12; Templeton Decl. ¶ 8.

Even in adopting the leasing pause, the federal government's and Conservation Groups' interests have diverged: many of the Conservation Groups advocated for a pause on not just new leasing, but also on approvals of new drilling permits. Templeton Decl. ¶ 10 Nelson Decl. ¶¶ 14, 17, 21 Eustis Decl. ¶ 9; Savitz Decl. ¶¶ 6, 9; Collentine Decl. ¶ 8; Jesperson Decl. ¶ 9; McKinnon Decl. ¶ 20.[12] Such an approach would have further limited new impacts from oil and gas development while the government considered programmatic reforms. The federal government, however, opted to continue approving new drilling permits and only pause issuance

---

[12] *See also* Letter from Ctr. for Biological Diversity et al., to Pres.-Elect Biden, Re: Day one promise to ban new federal fossil fuel leasing and permitting on public lands and waters (Dec. 15, 2020), https://pdf.wildearthguardians.org/support_docs/Federal-Fossil-Fuels-EO-Transition-Letter.pdf.

of new leases—an approach that will allow continued drilling and adverse impacts on numerous existing leases.

    The consequences of this divergence of interests could manifest itself in this litigation either procedurally or in the substantive arguments. For example, Federal Defendants may make different legal arguments than Conservation Groups in terms of the scope of the government's authority under OCSLA or the MLA, or required processes under the Administrative Procedure Act. *See* Chasis Decl. ¶ 10; *cf. Wal–Mart Stores*, 834 F.3d at 569 (noting differences in scope of legal arguments parties could make); *Brumfield*, 749 F.3d at 346 (same). Conservation Groups are not required to show that these possible impacts *will* occur in order to satisfy the intervention requirements; it is enough that representation *may* be inadequate. *Brumfield*, 749 F.3d at 345–46 ("We cannot say for sure that the state's more extensive interests will *in fact* result in inadequate representation, but surely they might, which is all that the rule requires."); *see Wal–Mart Stores*, 834 F.3d at 569 (noting "intervention necessarily occurs before the litigation has been resolved" and actual adequacy of representation can be determined).[13] Accordingly, intervention is appropriate here because Conservation Groups' interests diverge from those of Federal

___

[13] The District Court for the District of Columbia persuasively explained why this standard makes sense:

> Requiring [the applicant] to monitor the DOJ's litigation posture from the sidelines until [the applicant] disagrees with a decision by the agency is inefficient and impractical; indeed, [the applicant] likely would have limited, if any, insight into the DOJ's strategy during the litigation, and once [the applicant] did learn of a hypothetical shift in the DOJ's position, such as a decision to release a specific category of materials, it might be too late for [the applicant] to undue any damage done. . . . It also might be too late for [the applicant] to intervene at all, as both Rule 24(a) and Rule 24(b) require a timely motion to intervene.

*100Reporters LLC v. U.S. Dep't of Just.*, 307 F.R.D. 269, 280 & n.2 (D.D.C. 2014); *cf. Amador Cty. v. U.S. Dep't of the Interior*, 772 F.3d 901, 905 (D.C. Cir. 2014) (denying intervention as untimely when party waited to file motion until "its suspicion of inadequate representation became a reality").

Defendants in a manner germane to this case. Conservation Groups' interests in this case will

not, and at least may not, be adequately represented by the existing parties.

## II.   Alternatively, the Court Should Permit Conservation Groups to Intervene Permissively.

If the Court denies intervention as of right, Conservation Groups request the Court to

grant permissive intervention under Rule 24(b). "[P]ermissive intervention is appropriate where

'an applicant's claim or defense and the main action have a question of law or fact in common.'"

*Trans Chem. Ltd. v. China Nat. Mach. Imp. & Exp. Corp.*, 332 F.3d 815, 824 (5th Cir. 2003)

(quoting Fed. R. Civ. P. 24(b)(2)). Upon finding that permissive intervention is appropriate,

"district courts have 'broad discretion' in allowing intervention." *Hanover Ins. Co. v. Superior

Lab. Servs., Inc.*, 179 F. Supp. 3d 656, 667 (E.D. La. 2016) (citation omitted). Conservation

Groups satisfy Rule 24(b)'s requirements and request the Court to exercise its discretion to

permit intervention.

Conservation Groups' Motion is timely, as demonstrated above. Conservation Groups'

defense also shares questions of law and fact with the States' main action against Federal

Defendants; for example, the legal authority for the President, Secretary of the Interior, BLM,

and BOEM to make the decisions challenged in this case. Intervention by Conservation Groups

at this early stage would not delay this case or prejudice the existing parties. This Motion is

being filed before any deadlines for Federal Defendants have passed, and Conservation Groups,

if granted intervention, intend to follow any briefing schedules set by the parties and to support

the efficient adjudication of this case.

In addition to meeting the standards for permissive intervention, Conservation Groups'

participation may aid the Court's review by bringing expertise and familiarity with how the

leasing program has been implemented in the past and the reasons a pause is necessary and

proper. *See, e.g., Costle*, 561 F.2d at 912–13 (granting intervention in part because intervenor "may also be likely to serve as a vigorous and helpful supplement to EPA's defense"). Many Conservation Groups have advocated for a leasing pause to allow comprehensive review of the federal oil and gas program for years. Their perspective will assist the Court in understanding the broad range of stakeholder support for Federal Defendants' actions. Conservation Groups accordingly request this Court to grant permissive intervention.

## **CONCLUSION**

For the above reasons, Conservation Groups respectfully ask this Court to grant them intervention as of right, or, in the alternative, by permission, to protect them and their members' interests in the appropriate and necessary leasing pause pending review of the federal oil and gas program.

Respectfully submitted this 27th day of April, 2021.

/s/ Corinne Van Dalen
Corinne Van Dalen (LA Bar # 21175)
Earthjustice
900 Camp Street, Unit 303
New Orleans, LA 701
T: 415-283-2335  F: 415-217-2040
cvandalen@earthjustice.org

/s/ Christopher Eaton
Christopher Eaton (*pro hac vice* pending)
Shana E. Emile (*pro hac vice* pending)
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
T: 206-343-7340  F: 415-217-2040
ceaton@earthjustice.org
semile@earthjustice.org

/s/ Thomas R. Delahanty
Thomas R. Delahanty (*pro hac vice* pending)
Michael S. Freeman (*pro hac vice* pending)
Earthjustice
633 17th St., Suite 1600

/s/ Joel Waltzer
Joel Waltzer (LA Bar #19268)
Waltzer, Wiygul, and Garside
3201 General De Gaulle Dr., Ste. 200
New Orleans LA, 70114
T: 504-340-6300  F: 504-340-6330
joel@wwglaw.com

/s/ Robert Wiygul
Robert Wiygul (LA Bar #17411)
Waltzer, Wiygul, and Garside
1011 Iberville Dr.
Ocean Springs, MS 39564
T: 228-872-1125  F: 228-872-1128
robert@wwglaw.com

s/ Brad Sewell
Brad Sewell (*pro hac vice* forthcoming)
Irene Gutierrez (*pro hac vice* forthcoming)
Natural Resources Defense Council
40 W. 20th St., 11th Fl.
New York, NY 10011
T: 212-727-2700

Denver, CO 80202
T: 303-623-9466  F: 720-550-5757
tdelahanty@earthjustice.org
mfreeman@earthjustice.org

 /s/ Erik Grafe
Erik Grafe (*pro hac vice* pending)
Earthjustice
441 W 5th Ave., Suite 301
Anchorage, AK 99501
T: 907-277-2500  F: 907-277-1390
egrafe@earthjustice.org

*Counsel for Intervenor-Defendants Healthy Gulf, Center for Biological Diversity, Cook Inletkeeper, Defenders of Wildlife, Friends of the Earth, Oceana, Sierra Club, and The Wilderness Society*

bsewell@nrdc.org
igutierrez@nrdc.org

*Counsel for Intervenor-Defendant Natural Resources Defense Council*