# EXHIBIT I

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| THE STATE OF LOUISIANA, By and through its Attorney General, JEFF LANDRY, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, et al.,<br><br>*Defendants,*<br><br>and<br><br>HEALTHY GULF, et al.,<br><br>*Intervenor-Defendants.* | Civ. No.: 2:21-cv-00778-TAD-KK<br><br>Judge: Terry A. Doughty<br><br>Mag. Judge: Kathleen Kay |

**DECLARATION OF SOREN JESPERSEN**

I, Soren Bingham Jespersen, declare as follows:

    1.    I have personal knowledge of the matters stated in this declaration.

    2.    I am a Senior Field Representative for The Wilderness Society (TWS). I have a Master's Degree in International Environmental Policy from the Monterey Institute of International Studies in Monterey, California. I have been working on public lands policy and advocacy for 15 years, with 12 of those years at TWS. My work focuses on issues relating to public lands, specifically those managed by the Bureau of Land Management (BLM), including oil and gas leasing and development, wilderness, recreation, sage-grouse, and other wildlife.

    3.    Founded in 1935, TWS is a nonprofit organization headquartered in Washington, D.C., with offices throughout the country. TWS's mission is uniting people to protect America's

1

wild places. Primary strategic goals of TWS include transforming federal land management to prioritize climate resilience and biodiversity protection and helping develop and advance policies for just and equitable public land conservation on behalf of all people.

4. Currently, TWS has 135,531 total members. We have members in all the states where onshore federal oil and gas leasing is the most significant, along with Alaska where offshore development remains active, and where a leasing pause would have substantial positive impacts on those members, including in New Mexico, Wyoming, California, Colorado, North Dakota, South Dakota, Idaho, Utah, Montana, Alaska, Louisiana, Alabama, Georgia, Mississippi, Missouri, Oklahoma, and Texas.

5. Oil and gas leasing and the associated infrastructure have a profound impact on TWS members' experiences hiking, camping, bird watching, and otherwise recreating in these areas. Many of our members, including myself, use and enjoy federal public lands near or directly impacted by such operations.

6. I grew up in Utah and have recreated in its tremendous federal public lands ever since. I regularly use and enjoy these lands today and plan to continue recreating in them well into the future. I have personally seen places I regularly visit—places that are deeply meaningful to me—changed and negatively impacted by oil and gas development over my lifetime, including continuing adverse impacts today. Areas that I always enjoyed for their quiet recreational opportunities have been lost to well pads, associated roads and infrastructure, and resulting traffic. These places lose all value for the quiet recreation that I cherish.

7. I am a member of TWS and support the organization because our work is vital to protecting our shared federal public lands and waters. TWS helps to elevate the voices of communities that might otherwise be unable to engage in federal processes affecting public lands

and waters. My membership, along with the support of all our members across the country, allows TWS to fulfill its mission.

8. A key metric for TWS is achieving net zero fossil fuel emissions on federal public lands and offshore waters by 2030 and no fossil fuel development on those lands and waters by 2050 at the latest. We support transitioning to responsible onshore and offshore renewable energy and ensuring that any oil and gas development on public lands and offshore waters is sited in suitable locations that do not harm other crucial values. Ensuring ecological and economic sustainability for local communities with whom we work and are affected by oil and gas development is important to our work. All these priorities are essential to our members and critical to our mission.

9. For years, TWS has advocated for a pause on BLM's oil and gas leasing program. We consistently track BLM's quarterly lease sales across the western states and actively participate in many of the lease sale processes. With in-house science, policy, and legal expertise, TWS comments on BLM environmental reviews pursuant to the National Environmental Policy Act (NEPA) and often submits protests on lease sales. We have aggregated and analyzed significant amounts of leasing data, producing charts, maps, graphics, and other informational documents, which we have used in technical comments, distributed to our members and the public, and disseminated to the media. Addressing and ameliorating the harmful environmental impacts of federal oil and gas development is integral to our work and directly benefits our members who use and enjoy federal public lands and offshore waters where oil and gas leasing and development occurs. TWS also works extensively on the resource management planning processes undertaken by BLM field offices.

10. Fixing the broken federal leasing system would thus directly benefit TWS

members, including me, and is one of multiple tools for addressing substantial conservation issues affecting federal public lands and offshore waters, including reducing, and as quickly as possible, eliminating, greenhouse gas emissions on those lands and waters. A leasing pause provides a critical opportunity to address the many problems that currently exist with the federal oil and gas leasing program, which is harming our members.

11. For years, the oil and gas industry has stockpiled and failed to use thousands of leases and drilling permits, locking up public lands that our members have used and enjoyed, wasting government resources, and undermining principles of multiple-use management. Between 2009 and 2018, 63 percent of the acres leased sat idle each year, producing no oil or gas. A recent Government Accountability Office (GAO) study found that industry was not utilizing nearly 10,000 approved drilling permits[1], an increase of at least 32 percent from just five years ago.[2]

12. Additionally, lease-holding companies routinely fail to pay rent on their leases, which are then terminated by BLM. Over a recent 10-year period, BLM terminated well over half of all noncompetitive leases issued (over 1.6 million acres) and roughly 30 percent of all competitive leases issued.[3] This wasteful process unnecessarily keeps our members from enjoying these lands while they are leased.

13. Over three-fourths of public lands available for oil and gas leasing have little to

---

[1] See GAO, *Oil and Gas Permitting- Actions Needed to Improve BLM's Review Process and Data System* (Mar. 2020), https://naturalresources.house.gov/imo/media/doc/GAO%20Report%20on%20APDs%20-%20GAO-20-329%20-%20March%202020.pdf.
[2] BLM, *Approved Applications for Permit to Drill - Not Drilled* (Sept. 30, 2015), https://web.archive.org/web/20160929202757/http:/www.blm.gov/style/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_PROTECTION_/energy/oil___gas_statistics/data_sets.Par.86452.File.dat/AAPD%20Report%20(approved_apd_not_drilled_9_30_2014).pdf
[3] Kate Kelly et al., *Backroom Deals The Hidden World of Noncompetitive Oil and Gas Leasing*, CTR. FOR AM. PROGRESS (May 23, 2019), https://www.americanprogress.org/issues/green/reports/2019/05/23/470140/backroom-deals/.

no development potential. This inhibits our members from using these lands for recreation, and breeds speculation, waste, and low returns for American taxpayers. As of 2016, about 90 percent of lands managed by BLM in the West—close to 200 million acres—were open to oil and gas leasing.[4] Yet only 23 percent of BLM lands are considered to have a moderate to high potential for oil and gas development.[5]

14. Further underscoring the waste and speculation that is endemic to the leasing program, just 20 percent of the 47.5 million acres offered for lease were purchased between 2009 and 2018.[6] This drove a dramatic surge in noncompetitive leasing, a process that yields little to no return for taxpayers. Between 2003 and 2019, over 34 million acres of public lands were leased noncompetitively. According to the GAO, 99 percent of noncompetitive oil and gas leases issued between 2003 and 2009 never entered production in their primary 10-year term.

15. There is also a dire orphaned well problem on federal lands, which negatively impacts our members' ability, including my ability, to use and safely enjoy public lands even when no drilling is occurring. Currently, about 57,000 wells throughout the country are orphaned—meaning the operator has abandoned the well without plugging it or reclaiming the surrounding site. The Interstate Oil and Gas Compact Commission estimates that as many as 746,000 additional wells may also be orphaned.[7] It can cost $300,000 or more to plug a modern oil and gas well, but BLM presently requires companies to post a bond of just $10,000 per well.

---

[4] Emily Samsel, *Facts: Big Oil CEOs Exploit Our Broken Leasing System. It's Time For Change.*, LVC (Jan. 27, 2021), https://lcv.org/article/facts-big-oil-ceos-exploit-our-broken-leasing-system-its-time-for-change/.
[5] Trout Unlimited, *Speculative Leasing*, https://www.tu.org/energy/low-potential-lands-campaign/ (last visited Apr. 20, 2021).
[6] Samsel, *supra* note 4.
[7] Interstate Oil and Gas Compact Commission, *Idle and Orphan Oil and Gas Wells: State and Provincial Regulatory Strategies* (2019), https://iogcc.ok.gov/sites/g/files/gmc836/f/2020_03_04_updated_idle_and_orphan_oil_and_gas_wells_report_0.pdf

According to the GAO, BLM has just $204 million in reclamation bonds[8], though the cost to reclaim the over 96,000 producible oil and gas wells on federal public lands could exceed $6 billion.[9] Cleaning up orphaned wells could therefore easily cost taxpayers hundreds of millions—if not billions—of dollars. Beyond the profound risk to taxpayers, orphaned wells are environmental hazards that threaten drinking water supplies, endanger wildlife, and serve as a significant source of methane pollution, all of which harm TWS members.

16. Other valuable uses of our federal public lands are constantly at odds with oil and gas leasing, even though conserving public lands for TWS member uses such as outdoor recreation creates jobs and generates revenue. Outdoor recreation is the economic lifeblood of many western states. But leasing public lands for oil and gas development has frequently been favored over all other values. As a result, broad swaths of the West are now burdened with improvidently issued leases and poorly managed development, including within sensitive habitat for wildlife, as well as surrounding numerous national parks and monuments. The leasing pause offers a critical opportunity to review and reform the oil and gas leasing program on federal public lands to better serve these valuable uses.

17. Oil and gas leasing and development thus directly affects TWS members, including me. I work on many of the issues and challenges facing public lands today, including oil and gas leasing and development. I have written comments for and otherwise engaged in lease sales in Colorado, Wyoming, Utah, and New Mexico. I have personally visited the sites of many proposed lease sales and inventoried such lands for other resource values, such as wilderness characteristics and recreational values. In my work at TWS, I have been on the

---

[8] GAO, *Oil and Gas- Bureau of Land Management Should Address Risks from Insufficient Bonds to Reclaim Wells* (Sept. 2019), https://www.gao.gov/assets/gao-19-615.pdf.
[9] Samsel, *supra* note 4.

ground visiting and inventorying public lands in New Mexico, Colorado, Wyoming, Idaho, Utah, Arizona, California, and Nevada and have documented these lands in reports and comments submitted to BLM.

18. Oil and gas leasing, especially in areas with significant conflicting resource values, also results in the foreclosure of other management possibilities for those lands, such as protective management for the recreation and wildlife values I enjoy. I have witnessed such places become single-use areas after being leased for oil and gas development. My ability to use and enjoy those public lands is diminished and, in many cases, completely lost.

19. A leasing pause, therefore, directly benefits our members, including me. It allows the Department of the Interior (DOI) and BLM field offices much-needed time to consider the impacts that oil and gas leasing and development has on existing resources. The leasing pause puts a hold on DOI practices that have continually locked up public lands and waters where our members, including myself, recreate, hunt, fish, and camp, while the government reviews the leasing program. A leasing pause and comprehensive review allows the government to evaluate and reform the existing practices that enable rampant waste and speculation and to address the serious environmental hazards of orphaned wells. This review also gives the government essential time to determine how best to fulfill its multiple-use mandate in administering public lands, which benefits all users of those lands, including our members, such as myself, and not solely the oil and gas industry.

20. If the States challenging this leasing pause succeed in invalidating it, the public lands and waters that TWS members, including myself, visit would once again be at risk of immediate leasing, which could take away our access, use, and enjoyment. Invalidating the pause could also make the government's comprehensive review less effective, impairing my and other

TWS members' ability to advocate for critical reforms. The oil and gas industry already has approximately 23 million acres under lease, much of which has not even been developed. Removing the leasing pause would strip the government of this crucial opportunity and essential time needed to review and reform a leasing program that is sorely outdated and harms the public, including TWS members such as me.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on April 20, 2021.

Soren Jespersen
Senior Field Representative
The Wilderness Society