# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| STATE OF LOUISIANA, ET AL. | ) ) | |
| Plaintiffs, | ) ) | Case No. 2:21-cv-00778 |
| v. | ) ) | Honorable Judge Terry A. Doughty |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, ET AL. | ) ) ) | Magistrate Judge Kathleen Kay |
| Defendants. | ) ) ) | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.    Introduction ................................................................................................................ 1

II.   Background ................................................................................................................. 2

    A.    Statutory Background ........................................................................................ 2

        1.    The Outer Continental Shelf Lands Act governs federal offshore
            leasing activity. ...................................................................................... 2

        2.    The Mineral Leasing Act governs federal onshore leasing activity. .......... 3

        3.    The National Environmental Policy Act (NEPA) ...................................... 4

    B.    Factual Background ........................................................................................... 4

    C.    The Standards of Review ................................................................................... 6

        1.    Judicial Review of Agency Action; the APA Standard ............................. 6

        2.    The Preliminary Injunction Standard ....................................................... 7

III.  Argument .................................................................................................................... 8

    A.    Plaintiffs Seek an Improper Permanent Injunction. ............................................ 8

    B.    Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits. ........... 9

        1.    Plaintiffs Have Not Demonstrated Their § 706(2) Claims Are Likely
            to Succeed. ............................................................................................. 9

            a.    Plaintiffs' "moratorium" challenges are unlikely to succeed ......... 9

            b.    Plaintiffs' efforts to "set aside" individual agency decisions
               are unlikely to succeed .............................................................. 13

            c.    Even if Rescission of the Lease Sale 257 Record of Decision
               Were a Final Agency Action, BOEM Has Authority to
               Reconsider Its Decisions. ........................................................... 16

        2.    Plaintiffs Have Not Demonstrated that Their § 706(1) Claim is
            Likely to Succeed .................................................................................. 18

    C.    Plaintiffs Have Not Demonstrated Irreparable Injury .......................................... 20

        1.    Plaintiffs Have Not Established That Jobs Likely Will Be
            Imminently and Irreparably Lost. ........................................................... 20

2.   Plaintiffs Have Not Established They Likely Will Suffer Imminent and Irreparable Financial Harm. ............................................................. 22

3.   Plaintiffs Have Not Established It Is Likely That Their Sovereign Integrity Will Be Harmed or That Any of the Planned Projects They Discuss Will Be Imminently and Irreparably Harmed. ........................... 23

D.   The Threatened Injury Alleged by Plaintiffs Does Not Outweigh the Harm the Injunction Could Do to Defendants. ............................................... 24

E.   A Preliminary Injunction Is Not in the Public Interest. ....................................... 25

IV.   CONCLUSION ............................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Alabama-Coushatta Tribe of Tex. v. United States*,
  757 F.3d 484 (2014)...................................................................................................... 10, 11, 12

*Albertson v. Fed. Commc'n Comm'n*,
  182 F.2d 397 (D.C. Cir. 1950) ............................................................................................. 16

*Alford v. Moulder*,
  No. 3:16-CV-350-CWR-LRA, 2016 WL 3449911 (S.D. Miss. June 20, 2016) ..................... 22

*Am. Airlines, Inc. v. Herman*,
  176 F.3d 283 (5th Cir. 1999) .......................................................................................... 13, 14

*Am. Petroleum Inst. v. EPA*,
  216 F.3d 50 (D.C. Cir. 2000)................................................................................................ 14

*Atieh v. Riordan*,
  727 F.3d 73 (1st Cir. 2013)..................................................................................................... 7

*Barnhart v. Walton*,
  535 U.S. 212 (2002)............................................................................................................... 19

*Bennett v. Spear*,
  520 U.S. 154 (1997)............................................................................................................... 13

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002).................................................................................................. 9

*BMO Harris Bank N.A. v. Montana Farms LLC*,
  No. 1:18-CV-14-SA-DAS, 2018 WL 2050154 (N.D. Miss. May 2, 2018)............................. 25

*Clean Water Action v. EPA*,
  936 F.3d 308 (5th Cir. 2019) ............................................................................................... 16

*Cohan v. TMBC, LLC*,
  No. 18-cv-1072, 2019 WL 2169185 (M.D. La. May 17, 2019) ................................................ 9

*ConocoPhillips Co. v. EPA.*,
  612 F.3d 822 (5th Cir. 2010) ............................................................................................... 17

*Dalton v. Specter*,
  511 U.S. 462 (1994)................................................................................................................. 9

*Davis v. FEC*,
  554 U.S. 724 (2008)................................................................................................................. 9

*Dresser-Rand Co. v. Virtual Automation, Inc.*,
  361 F.3d 831 (5th Cir. 2004) ............................................................................. 8

*El Paso Cnty. v. Trump*,
  982 F.3d 332 (5th Cir. 2020) ........................................................................... 15

*Ensco Offshore Co. v. Salazar*,
  781 F. Supp. 2d 332 (E.D. La. 2011) ............................................................... 14

*Ensco Offshore Co. v. Salazar*,
  786 F. Supp. 2d 1151 (E.D. La. 2011) ............................................................. 18

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
  762 F.2d 464 (5th Cir. 1985) ............................................................................. 8

*Fed. Power Comm'n v. Idaho Power Co.*,
  344 U.S. 17 (1952) ........................................................................................... 15

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ........................................................................................... 9

*Google, Inc. v. Hood*,
  822 F.3d 212 (5th Cir. 2016) .............................................................. 7, 11, 22

*Goonsuwan v. Ashcroft*,
  252 F.3d 383 (5th Cir. 2001) ............................................................................. 7

*Harlem Algonquin, LLC v. Canadian Funding Corp.*,
  742 F. Supp. 2d 957 (N.D.Ill.2010) ................................................................... 8

*Healthpoint, Ltd. v. Ethex Corp.*,
  273 F. Supp. 2d 817 (W.D. Tex. 2001) ............................................................ 24

*Holland Am. Ins. Co. v. Succession of Roy*,
  777 F.2d 992 (5th Cir. 1985) ........................................................................... 20

*Hornbeck Offshore Servs., L.L.C. v. Salazar*,
  696 F. Supp. 2d 627 (E.D. La. 2010) ......................................................... 14, 20

*Hornbeck Offshore Servs., L.L.C. v. Salazar*,
  No. CIV.A. 10-1663, 2010 WL 3523040 (E.D. La. Sept. 1, 2010) ..................... 16

*In re Am. Fed'n of Gov't Emps.*,
  837 F.2d 503 (D.C. Cir. 1988) ......................................................................... 20

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*,
  140 F. Supp. 3d 1123 (D.N.M. 2015) ......................................................... 15, 16

*JJ Plank Co., LLC v. Bowman*,
  No. CV 18-0798, 2018 WL 4291751 (W.D. La. Sept. 7, 2018) ............................. 7

*Judulang v. Holder*,
  565 U.S. 42 (2011) ............................................................................................. 7

*Kolluri v. United States Citizenship & Immigr. Serv.*,
    No. 3:20-CV-02897-N, 2021 WL 183316 (N.D. Tex. Jan. 17, 2021) ...................................... 20

*La. Pub. Serv. Comm'n v. FERC*,
    761 F.3d 540 (5th Cir. 2014) ............................................................................................. 7

*Louisiana v. U.S. Army Corps of Eng'rs*,
    834 F.3d 574 (5th Cir. 2016) ........................................................................................... 13

*Louisiana v. United States*,
    948 F.3d 317 (5th Cir. 2020) ..................................................................................... 12, 15

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................................................... 10, 11

*Macktal v. Chao*,
    286 F.3d 822 (5th Cir. 2002) ........................................................................................... 16

*Martin v. Franklin Cap. Corp.*,
    546 U.S. 132 (2005) ........................................................................................................ 18

*Martinez v. Mathews*,
    544 F.2d 1233 (5th Cir. 1976) ......................................................................................... 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .......................................................................................................... 17

*NAACP v. Bureau of the Census*,
    945 F.3d 183 (4th Cir. 2019) ........................................................................................... 16

*Nat. Res. Def. Council, Inc. v. Hodel*,
    865 F.2d 288 (D.C. Cir. 1988) ...................................................................................... 2, 3

*Nichols v. Alcatel USA, Inc.*,
    532 F.3d 364 (5th Cir. 2008) ..................................................................................... 23, 24

*Norton v. SUWA*,
    542 U.S. 55 (2004) ................................................................................... 1, 7, 12, 16, 18

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
    139 S. Ct. 1881 (2019) ...................................................................................................... 2

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .......................................................................................................... 4

*Sabre Indus. Inc. v. McLaurin*,
    No. 5:19-CV-00934, 2019 WL 3933798 (W.D. La. Aug. 19, 2019) .................................... 20

*Schraier v. Hickel*,
    419 F.2d 663 (D.C. Cir. 1969) ........................................................................................ 18

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ........................................................................................................ 15

*Shawnee Trail Conservancy v. Nicholas,*
    343 F. Supp. 2d 687 (S.D. Ill. 2004)........................................................ 14

*Sierra Club v. Glickman,*
    67 F.3d 90 (5th Cir. 1995) ........................................................................ 7

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) .................................................................. 25

*Texas v. United States,*
    2021 WL 723856 (S.D. Tex. Feb. 23, 2021) .......................................... 14

*Texas v. United States,*
    86 F. Supp. 3d 591(S.D. Tex. 2015)........................................................ 25

*True the Vote v. Hosemann,*
    43 F. Supp. 3d 693 (S.D. Miss. 2014) ...................................................... 8

*Udall v. Tallman,*
    380 U.S. 1 (1965)................................................................................. 3, 18

*United States ex rel McLennon v. Wilbur,*
    283 U.S. 414 (1931).............................................................................. 18

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,*
    435 U.S. 519 (1978)............................................................................... 15

*W. Energy All. v. Salazar,*
    709 F.3d 1040 (10th Cir. 2013) .............................................................. 18

*W. Energy All. v. Zinke,*
    877 F.3d 1157 (10th Cir. 2017) .............................................................. 19

*Whitman v. Am. Trucking Associations,*
    531 U.S. 457 (2001)............................................................................... 14

*Wyo. Outdoor Council v. U.S. Forest Serv.,*
    165 F.3d 43 (D.C. Cir. 1999) ............................................................. 8, 25

**Statutes**

30 U.S.C. § 226(a) ...................................................................................... 3, 18

30 U.S.C. § 226(b)(1)(A) ............................................................................. 3, 19

30 U.S.C. §§ 181–287 ...................................................................................... 3

42 U.S.C. §§ 4321–4370m-12 ......................................................................... 4

43 U.S.C. § 1331 .............................................................................................. 2

43 U.S.C. § 1332(3) .......................................................................................... 2

43 U.S.C. § 1337(g) .......................................................................................... 2

43 U.S.C. § 1344 ...................................................................................................... 2

43 U.S.C. § 1344(a) ................................................................................................. 3

43 U.S.C. § 1344(e) ............................................................................................... 18

5 U.S.C. § 701–706 ................................................................................................. 6

5 U.S.C. § 704 ....................................................................................................... 13

5 U.S.C. § 706 ......................................................................................................... 9

5 U.S.C. § 706(1) ................................................................................................... 7

5 U.S.C. § 706(2) ................................................................................................... 6

**Rules**

Federal Rule of Civil Procedure 65(c) ................................................................. 8

**Regulations**

30 C.F.R. § 556.308 ............................................................................................... 4

30 C.F.R. § 556.516 ............................................................................................. 18

40 C.F.R. § 1501.5 ................................................................................................. 4

43 C.F.R. § 3170.1 (2019) ..................................................................................... 3

**Other Authorities**

85 Fed. Reg. 55,859 (Sept. 10, 2020) ................................................................... 5

85 Fed. Reg. 55,861 (Sept. 10, 2020) ................................................................... 5

85 Fed. Reg. 73,508 (Nov. 18 2020) ..................................................................... 4

86 Fed. Reg. 10,132 (Feb. 18, 2021) ............................................................... 5, 17

86 Fed. Reg. 10,994 (Feb. 23, 2021) ..................................................................... 5

86 Fed. Reg. 4117 (Jan. 15, 2021) ......................................................................... 5

86 Fed. Reg. 6365 (Jan. 21, 2021) ................................................................... 4, 23

86 Fed. Reg. 7619 (Jan. 27, 2021) ......................................................................... 4

88 Interior Dec. 20 (Jan. 5, 1981) ....................................................................... 18

Executive Order 14,008 ..................................................................................... 1, 9

## INTRODUCTION

Plaintiffs' preliminary-injunction motion seeks to set aside Executive Order 14,008 and, in the process, replace the Executive Branch's supervision of federal lands with a judicial order from this Court. This motion should be rejected on several jurisdictional grounds.

At the outset, Plaintiffs cannot demonstrate a likelihood of success on the merits of their challenge to the Executive Order. Because the President is not an "agency" under the Administrative Procedure Act (APA), the Executive Order is not subject to APA review. Even if it were, it would make no difference. The Executive Order merely directs the Secretary of the Interior, "to the extent *consistent* with applicable law," to pause new lease sales. Executive Order 14,008 § 208 (emphasis added). Because a direction to follow applicable law is not, by definition, a direction to violate the law, Plaintiffs' challenge to the Executive Order fails.

As to Plaintiffs' remaining arguments, they also are unlikely to succeed on the merits because they fail to allege justiciable claims under the APA. The APA allows litigants to challenge discrete, final agency actions; it does not permit a suit like this one, where Plaintiffs challenge an amalgam of errata, website postings, fact sheets, and other decisions, that they collectively label "moratoriums." The APA precludes such systemic attacks to Interior's management of its leasing program. And even where Plaintiffs do specifically challenge discrete actions, those too fail because they are directed at non-final, interlocutory actions.

The APA also allows litigants to seek, in the face of unreasonable agency delay, an order compelling the agency to act. But Plaintiffs spend only two paragraphs of their brief seeking such relief, as courts can compel only "*discrete* agency action that [an agency] is *required to take.*" *Norton v. SUWA*, 542 U.S. 55, 64 (2004). The Secretary is not required to issue leases by any statute because the relevant statutes instead grant the Secretary considerable discretion over the leasing and management of federal lands.

1

Nor can Plaintiffs show that any of the remaining Rule 65 considerations weigh in their favor. They have not demonstrated a likelihood of imminent irreparable harm because their harm projections are based on false assumptions. No existing lease has been cancelled as a result of any of the actions challenged here, and development activity from exploration through drilling and production has continued at similar levels as the preceding four years. As such, there is no indication that jobs or domestic production are being lost due to the Executive Order or agency action, and States will continue to receive revenues during the pendency of this litigation. Balanced against that, both the United States' interests and the public interest would be harmed by a preliminary injunction, because compelling the permanent disposal of federal property now would frustrate Interior's ongoing process of determining how best to manage those resources.

## BACKGROUND

### I.    Statutory Background

#### A.      The Outer Continental Shelf Lands Act (OCSLA)

The Outer Continental Shelf Lands Act of 1953 (OCSLA), 43 U.S.C. §§ 1331 *et seq.*, "gives the Federal Government complete 'jurisdiction, control, and power of disposition' over the [Outer Continental Shelf], while giving the States no 'interest in or jurisdiction' over it," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1888–89 (2019), though the States receive a portion of the revenues received by the Federal Government, 43 U.S.C. §§ 1331 n.1, 1337(g). OCSLA provides for "expeditious and orderly development . . . subject to environmental safeguards." 43 U.S.C. § 1332(3). It "sets only broad standards and leaves much to the Secretary's discretion in achieving its goals." *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 302 (D.C. Cir. 1988).

OCSLA prescribes a multi-stage process for development. The first stage is the development of the five-year program. *See* 43 U.S.C. § 1344. OCSLA directs the Secretary to

prepare "a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which he determines will best meet national energy needs for the five-year period following its approval or reapproval." 43 U.S.C. § 1344(a). Sales and dates in the five-year program are not set in stone. OCSLA instead provides that the Secretary "shall review" that program and can make a "revision which is not significant" without following the initial approval process. *Id.* § 1344(e). The second stage is the lease sale. *See generally id.* § 1337. At this stage, Interior chooses whether and when to hold a sale, which lease blocks to offer in any sale, and the terms of the sale. *Id.* § 1337(a)(1). The Secretary is "authorized" to grant leases "to the highest responsible qualified bidder." *Id.* The third and fourth stages deal with post-leasing exploration and production.

### B.     The Mineral Leasing Act (MLA)

The Mineral Leasing Act of 1920 (MLA), 30 U.S.C. §§ 181–287, "gave the Secretary of the Interior broad power to issue oil and gas leases on public lands" while giving "discretion to refuse to issue any lease at all on a given tract." *Udall v. Tallman*, 380 U.S. 1, 4 (1965); *see also* 30 U.S.C. § 226(a) ("All lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits *may* be leased by the Secretary." (emphasis added)). The Secretary, in turn, delegated her "regulatory authority over onshore oil and gas development" on public lands to the Bureau of Land Management (BLM). 43 C.F.R. § 3170.1 (2019).

The MLA provides that "[l]ease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b)(1)(A). But nothing in the MLA requires the Secretary to offer any parcel, or any number of parcels, for sale. *See id.*

C.      **The National Environmental Policy Act (NEPA**)

NEPA—the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370m-12—is a procedural statute that requires federal agencies to consider the impacts of, and alternatives to, federal actions significantly affecting the environment. It ensures that federal agencies take a "hard look" at the environmental consequences of their proposed actions before deciding to proceed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989).

Interior complies with NEPA for oil and gas lease sales through detailed documents called Environmental Assessments (EAs), 40 C.F.R. § 1501.5, or even more detailed documents called Environmental Impact Statements (EISs), *id.* § 1502.1, that analyze environmental impacts associated with leasing. Even limited errors in these NEPA documents can result in lease sales being vacated by a court or lease development being enjoined. *See infra* Part II.

II.     **Factual Background**

*Executive Order 14008:* On January 27, 2021, the President issued Executive Order 14,008, "Tackling the Climate Crisis at Home and Abroad," which directs various agencies to take actions to address climate change. 86 Fed. Reg. 7619. That Order directs Interior to undertake a comprehensive review of federal oil and natural gas leasing—including royalty rates—while "to the extent consistent with applicable law" pausing new lease sales to preserve the status quo. *Id.* at 7624–25. Interior is working on an interim report that it expects to complete in early summer.

*Offshore Lease Sales:* On November 18, 2020, BOEM published a proposed notice of Lease Sale 257. 85 Fed. Reg. 73,508. BOEM then issued a record of decision on January 21, 2021, selecting its preferred alternative under NEPA. 86 Fed. Reg. 6365. BOEM, however, did not publish a Final Notice of Sale, which is required before a sale may proceed, 30 C.F.R. § 556.308.

With respect to Lease Sale 258, BOEM issued a notice of intent to prepare an environmental impact statement on September 10, 2020. 85 Fed. Reg. 55,861. The notice was "not an announcement to hold a lease sale" but instead a means for gathering information for NEPA analysis. *Id.* Also on September 10, 2020, BOEM issued a Call for Information and Nominations under OCLSA for Lease Sale 258, seeking nominations of leasing areas and comments from the public on issues to be considered. 85 Fed. Reg. 55,859. On January 15, 2021, BOEM published a Notice of Availability of a draft environmental impact statement for Lease Sale 258 and opened a comment period scheduled to close March 1, 2021. 86 Fed. Reg. 4117.

Following the President's Executive Order, BOEM rescinded the record of decision for Lease Sale 257 "to comply with Executive Order 14008." 86 Fed. Reg. 10,132 (Feb. 18, 2021). BOEM stated, "[a]fter completion of the review specified in the Executive Order, BOEM may reevaluate [Gulf of Mexico] Lease Sale 257 and publish an appropriate [record of decision] in the Federal Register."). *Id.* BOEM also canceled the public comment period for the Lease Sale 258 draft environmental impact statement. 86 Fed. Reg. 10,994 (Feb. 23, 2021). BOEM indicated that it would publish a subsequent notice in the Federal Register if it decides to resume its NEPA evaluation following the Presidentially directed comprehensive review. *Id.*

The foregoing deliberations concerning BOEM's ongoing leasing decision processes for two sales have no bearing on other aspects of Interior's offshore program. Interior has continued to approve offshore exploration plans and drilling permits at rates similar to the prior administration. Cruickshank Decl. ¶ 6; Brink Decl. ¶ 5.

*Onshore Lease Sales:* In recent years, BLM's oil and gas leasing decisions have faced numerous NEPA challenges alleging failures to consider groundwater impacts, greenhouse gas emissions, and impacts on the greater sage-grouse, as well as other issues. *See* Declaration of

Peter Cowan ¶ 3, Ex. C. Many of these lawsuits have exposed weaknesses in the relevant environmental reviews, resulting in several courts vacating leases and enjoining development. *Id.* ¶ 4. Additional lawsuits have challenged dozens of lease sales in a single action. *Id.* Ex. C. As a result, BLM has been required to go back to the drawing board on some lease sales and conduct supplemental NEPA analysis. *Id.* ¶ 5. The judicial determinations and resultant expanded NEPA reviews have led to heavy workloads in environmental assessments of BLM's oil and gas leasing program. *Id.* ¶¶ 5–6.

In light of this accumulation of NEPA work and the evolving state of NEPA law, various BLM State Offices postponed individual lease sales in the first quarter of this year to allow sufficient time to complete, revisit, or supplement their NEPA analyses in light of recent court decisions. *Id.* ¶ 6. That approach is not without precedent; BLM also postponed lease sales to prepare additional NEPA analysis under the prior administration. *Id.* ¶ 7. In the prior administration, BLM also postponed lease sales "due to workload and staffing considerations," *id.*, and undertook widespread postponements across multiple state offices, *id.* ¶ 8. Following the prior administration's practices, the first deferral in 2021 simply continued a 2020 postponement in Nevada. *Id.* ¶ 6. Only one of the onshore deferrals cited in the Complaint even references Executive Order 14,008. *Id.*; PR086 (stating, on March 1, 2021, that the "Department has not yet rendered" "decisions on how [it] will implement the Executive Order").

### III.     The Standards of Review

#### A.      Judicial Review of Agency Action; the APA Standard

The Administrative Procedure Act, 5 U.S.C. § 701–706 (APA) governs judicial review of agency actions. Courts may "set aside" agency action that is arbitrary and capricious or contrary to law. 5 U.S.C. § 706(2). And courts may "compel" unreasonably delayed agency action. *Id.*

§ 706(1). Because judicial review is confined to "circumscribed, discrete agency actions," however, courts lack broader supervisory authority over agencies. *Norton*, 542 U.S. at 62.

APA review generally "involves neither discovery nor trial" because the "focal point of APA review is the existing administrative record." *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013); *accord Goonsuwan v. Ashcroft*, 252 F.3d 383, 391 (5th Cir. 2001). A reviewing court's role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (internal quotation marks omitted). Under this highly deferential standard, agency actions are presumed to be valid. *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 588 (5th Cir. 2014). The court must not "substitute its judgment for that of the agency as to which particular features might be most desirable or efficacious." *Sierra Club v. Glickman*, 67 F.3d 90, 97 (5th Cir. 1995).

### B.      The Preliminary Injunction Standard

"A preliminary injunction is an 'extraordinary remedy' that should not be granted unless its proponent clearly shows: (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016) (internal quotations omitted). The injury must be "imminent" and "non-speculative." *Id.* at 228. "If the movant fails to meet its burden as to any one of the four prerequisites, the injunction may not issue." *JJ Plank Co., LLC v. Bowman*, No. CV 18-0798, 2018 WL 4291751, at *4 (W.D. La. Sept. 7, 2018).

## ARGUMENT

### I.  **Plaintiffs Seek an Improper Permanent Injunction**.

Plaintiffs' motion for a "preliminary" injunction is *per se* improper insofar as they seek an order compelling the agencies to hold lease sales and dispose of federal property to third parties because such an order would provide permanent relief before Plaintiffs prevailed on the merits.[1] Such relief cannot be obtained through this motion because "[g]ranting a plaintiff final relief at the outset of the case would completely undercut the protections due a defendant . . . the defendant would often suffer a harm that cannot be undone." *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 743 (S.D. Miss. 2014) (denying preliminary injunction) (quoting *Harlem Algonquin, LLC v. Canadian Funding Corp.*, 742 F. Supp. 2d 957, 962 (N.D. Ill. 2010)).[2] Thus, the Fifth Circuit has held that a "preliminary injunction . . . should not grant relief properly awarded only in a final judgment, and it is an abuse of discretion for the district court to issue a preliminary injunction which permits one party to obtain an advantage by acting, while the hands of the adverse party are tied by the writ." *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 476 (5th Cir. 1985) (internal quotations omitted). Because Plaintiffs have not even attempted to establish that they are entitled to final relief—through a showing of "actual success," *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 847 (5th Cir. 2004)—their motion should be denied on this basis alone, without prejudice to Plaintiffs seeking the same relief after orderly briefing on summary judgment.

---

[1] *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999) (holding an "irrevisible and irretrievable commitment of resources" occurs when leases are issued).
[2] Plaintiffs notably do not provide any security—let alone sufficient security—to cover the costs and damages the United States would sustain from wrongful disposition of its property, in violation of Federal Rule of Civil Procedure 65(c).

II.     **Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits**.

    A.     **Plaintiffs Have Not Demonstrated Their § 706(2) Claims Are Likely to Succeed.**

        1.     Plaintiffs' "moratorium" challenges are unlikely to succeed.

Plaintiffs' preliminary injunction motion focuses on applying the APA standard of review to the Executive Order's alleged "OCSLA and MLA leasing moratoriums." *Compare* Mem. in Supp. of Mot. for Prelim. Inj. 13–22 (ECF No. 3-1) (Mot.) (arguing that these "moratoriums" are arbitrary and capricious, are contrary to law, were adopted without procedures required by law, and unreasonably withhold agency action), *with* 5 U.S.C. § 706 (establishing APA standards of review). But the "actions of the President . . . are not reviewable under the APA because, as [the Supreme Court] concluded in *Franklin*, the President is not an 'agency.'" *Dalton v. Specter*, 511 U.S. 462, 470 (1994) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 800-801 (1992)). Thus, to succeed on their APA claims, Plaintiffs must challenge agency actions, not Presidential actions.[3]

Plaintiffs' challenges fail at this threshold. While Plaintiffs identify individual agency lease sale deferrals, Mot. 8–9 & n.4, none of those actions purports to constitute a moratorium on lease sales. Nor does any of those actions practically accomplish a moratorium as each action is temporally and geographically limited in scope.[4] *See supra* Background Part II (explaining the

---

[3] Plaintiffs do not pursue their *ultra vires* count as a ground for preliminary injunctive relief. Mot. 12–24 (advancing only APA arguments). Nor is that argument likely to succeed because Section 208 of the Executive Order directs action only "to the extent consistent with applicable law." Executive Order 14,008 § 208. Thus, if Interior "may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

[4] To the extent that Plaintiffs' reply points to post-filing agency activity as the so-called moratorium, post-filing activity is outside the scope of the Complaint and insufficient to create jurisdiction, which must exist "when the suit was filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008); *see also Cohan v. TMBC, LLC*, No. 18-cv-1072, 2019 WL 2169185, at *2 (M.D. La. May 17, 2019) (holding that post-filing activity could not cure initial jurisdictional defect).

differing rationales leading to the individual deferrals for different BLM State Offices, and still different rationales for OCSLA deferrals).

Unable to identify a single discrete agency action tantamount to a program-wide moratorium, Plaintiffs still seek an order governing agency obligations "under the OCSLA's and MLA's oil and gas leasing programs," Compl. ¶ 7, in violation of the prohibition on programmatic challenges. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–93 (1990). In *Lujan*, the plaintiff sought judicial review of a "so-called 'land withdrawal review program'" that it described as consisting of numerous individual land use decisions. *Id.* But the Supreme Court held that "the flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA." *Id.* at 893. Instead, requests for "*wholesale* improvement of this program" must be brought "in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Id.*

The Fifth Circuit's decision in *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484 (2014), is also instructive. There, the plaintiff Tribe sought to challenge the approval of all "drilling leases and permits to third parties" on land to which the Tribe asserted title. *Id.* at 486. The Fifth Circuit held that it lacked jurisdiction to hear such a "blanket challenge to *all* of the Government's actions with respect to *all* permits and leases" that was directed at "the way the Government administers these programs and not to a particular and identifiable action taken by the Government." *Id.* at 491–92.

Plaintiffs' challenge to the alleged moratoriums bears four hallmarks of an improper programmatic challenge. *First*, like the "so-called 'land withdrawal review program'" in *Lujan*, the term "moratoriums" "is not derived from any authoritative text" from the agency but "is

simply the name by which [Plaintiffs] have occasionally referred to the continuing (and thus constantly changing) operations of the BLM" and BOEM in evaluating oil and gas lease sales. 497 U.S. at 890. With no definitive meaning for the term "moratoriums"—even from Plaintiffs—their requested injunction "ordering Defendants to disregard the OCSLA Leasing Moratorium and the MLA Leasing Moratorium," Mot. 2, would be dangerously ambiguous, *cf. Google*, 822 F.3d at 227 (vacating preliminary injunction that "covers a fuzzily defined range" of conduct).

*Second*, Plaintiffs seek to control future conduct of the agency in "actions yet to be taken," *Lujan*, 497 U.S. at 893, namely an indefinite number of future lease sales. Plaintiffs "request a preliminary injunction requiring Defendants to . . . continue holding OCSLA and MLA oil and gas leasing sales." Mot. 25. But allegations that "cover actions that have yet to occur . . . . do not challenge specific 'agency action,'" *Alabama-Coushatta*, 757 F.3d at 490, and instead seek wholesale correction that "cannot be laid before the courts," *Lujan*, 497 U.S. at 892–93. Courts "intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect." *Id.* at 894.

*Third*, Plaintiffs' moratorium challenges focus on systemic changes, rather than individual agency decisions, *see* Compl. ¶ 152 (challenging "systematic delay of scheduled quarterly sales"), and improperly seek to inject this Court into day-to-day management of Interior's onshore and offshore programs. *See* ECF No. 3-7, at 2 (requesting that the agency provide "a report in writing setting forth in detail the manner in which Defendants have complied with the terms of this Preliminary Injunction"). As the Supreme Court has explained, such "systemic improvement[s]" must be sought before the legislative or executive branches, *Lujan*, 497 at 894. And "[t]he prospect of pervasive oversight by federal courts over the manner and

pace of agency compliance with [broad statutory mandates] is not contemplated by the APA." *Norton*, 542 U.S. at 55.

*Fourth*, Plaintiffs seek discovery at the outset of the case in order to cure their failure to identify a specific agency action. *See* Mot. 11 ("Discovery in this case will also uncover other final agency actions issued at the Secretarial level that have not been made public."); Compl. ¶ 102 n.8 ("Plaintiff States intend to pursue" a document explaining why "BLM State offices . . . systematically halt[ed] lease sales"). But the Fifth Circuit has rejected efforts to salvage an impermissible programmatic challenge by invoking the need for "discovery to learn what agency actions are currently pending" as "unavailing, especially given the fact that information regarding the Government's management of natural resources on public lands is readily available." *Alabama-Coushatta*, 757 F.3d at 491 (dismissing case for lack of jurisdiction without any discovery). If Plaintiffs need discovery to search for specific agency actions constituting the moratoriums, they have failed to demonstrate any entitlement to the extraordinary relief of a preliminary injunction.

In sum, Plaintiffs' APA challenges to the so-called moratoriums are unlikely to succeed. Either they challenge Executive Order 14008, which is not an "agency" action and thus not subject to the APA. Or their challenge "is to the way the Government administers these [leasing] programs and not to a particular and identifiable action taken by the Government," *Alabama-Coushatta*, 757 F.3d at 491, because "the term 'action' as used in the APA is a term of art that does not include all conduct such as, for example, . . . operating a program." *Louisiana v. United States*, 948 F.3d 317, 321 (5th Cir. 2020) (dismissing Louisiana's programmatic challenge). Neither challenge can succeed under the APA.

2.      Plaintiffs' efforts to "set aside" individual agency decisions are
unlikely to succeed.

In addition to programmatically challenging the alleged moratoriums, Plaintiffs challenge

the deferral of individual lease sales by BOEM and the various BLM State Offices. But their

preliminary injunction motion claims a likelihood of success as to only one such action—the

Rescission of the ROD for Lease Sale 257. *See* Mot. 18–23. Plaintiffs' arguments as to all of the

deferrals (including Lease Sale 257) are not likely to succeed because the Court lacks jurisdiction

over those deferrals on the independent grounds of finality and standing.

*First*, the individual actions are not "final" agency actions as required by 5 U.S.C. § 704.

"If there is no 'final agency action,' as required by the controlling statute, a court lacks subject

matter jurisdiction." *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999). To be a

"final" agency action subject to judicial review, an agency action "must mark the consummation

of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory

nature." *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 580–81 (5th Cir. 2016) (quoting

*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).[5]

Here, the challenged decisions are merely interim postponements of lease sales; they are

not decisions to forego the sales entirely. *E.g.*, PR086 ("postponing further consideration of

[sales] pending decisions on how the Department will implement the Executive Order," while the

"Department has not yet rendered any such decisions"). Deferrals or postponements of agency

decisions are generally found not to be "final" agency actions because they are merely

---

[5] To be final, an agency action also "must be one by which rights or obligations have been
determined, or from which legal consequences will flow." *Louisiana*, 834 F.3d at 580–81
(quoting *Bennett*, 520 U.S. at 177–78). The Rescission of the Lease Sale 257 Record of Decision
fails this prong. The Record of Decision was a NEPA document that did not grant any right,
determine any obligation, and would not have caused any lease sale to happen. Its rescission
similarly had no real-world consequences. The rescission simply told the world where the agency
stands in its decision-making process.

interlocutory actions. *See, e.g.*, *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 68 (D.C. Cir. 2000) ("A decision by an agency to defer taking action is not a final action reviewable by the court."); *Shawnee Trail Conservancy v. Nicholas*, 343 F. Supp. 2d 687, 701 (S.D. Ill. 2004) (postponing a decisional process regarding public land use "does not mark the consummation of an agency decisionmaking process but instead reflects an interim or interlocutory decision to postpone the decisionmaking process to a more convenient time and to a more comprehensive process. It is not, as the plaintiffs imply, an affirmative agency decision to prohibit" use).[6]

*Second*, Plaintiffs lack standing to challenge individual agency actions under § 706(2) because setting aside those individual postponements will not redress Plaintiffs' alleged injuries. "To establish redressability, a plaintiff must show a substantial likelihood that the requested

---

[6] Plaintiffs cite three cases to contend that these postponements are "final," none of which is availing. *See* Mot. 10–11 (citing *Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 336 (E.D. La. 2011), *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F. Supp. 2d 627, 636 (E.D. La. 2010) and *Texas v. United States*, 2021 WL 723856, at *32 (S.D. Tex. Feb. 23, 2021)). Plaintiffs' first two cases do not address the finality requirement. *Hornbeck* has nothing to do with when an agency action is final; instead, the cited portion addresses whether jurisdiction to review agency actions arises under OCSLA or the APA. Nor did *Ensco* analyze the finality requirement of § 704, as the decision does not even mention the canonical test for finality set forth in *Bennett*. The quoted portion of *Ensco* instead conflated "agency action" with "final agency action," and incorrectly stated that the APA "defines final agency action as 'the whole or a part of an agency rule, order, license, sanction, [or] relief.'" 781 F. Supp. 2d at 336 (quoting 5 U.S.C. § 551(13)). *Ensco* instead addressed a § 706(1) claim seeking to compel withheld agency action, not a § 706(2) claim seeking to set aside final agency action.

While *Texas* at least dealt with the finality requirement, it addressed a different type of agency action. Unlike the challenged actions here, which merely postpone a decisional process, the agency action in *Texas* effected an immediate change in agency policy with "significant legal consequences" that adversely affected plaintiffs. 2021 WL 723856, at *32. In contrast, deferring decisions about whether to lease certain parcels may not injure Plaintiffs because those parcels might be leased in future sales at higher rates that would bring more revenue. And an agency action that "does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action" is a "nonfinal agency order." *Am. Airlines*, 176 F.3d at 288 (internal quotations omitted); *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 478 (2001) ("Only if the EPA has rendered its last word on the matter in question, is its action 'final' and thus reviewable") (internal quotations and citations omitted).

14

relief will remedy the alleged injury in fact." *El Paso Cnty. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020) (internal quotations and citations omitted). In *El Paso*, plaintiffs claimed injury by a diversion of funds from their preferred project to build a border wall. The Fifth Circuit held that it lacked jurisdiction over their claim because plaintiffs had not shown that enjoining the diversion of funds would result in the funds being reallocated to their preferred project.

So too here. Plaintiffs allege injuries in the form of lost revenue and economic harms due to lease sale postponements. *See* Mot. 9–10, 22–25. But a favorable decision on their § 706(2) claims will not redress those injuries, as it would merely "set aside" and remand the postponement decisions for further consideration—not compel lease sales to occur. After setting aside agency decisions under § 706(2), courts cannot "impose upon the agency [their] own notion of which procedures are 'best'" on remand, *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 549 (1978), without intruding "into the domain which Congress has set aside exclusively for the administrative agency," *id.* at 545 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Rather, "the function of the reviewing court ends when an error of law is laid bare." *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952). Thus, were the Court to "set aside" one of the individual postponement decisions as arbitrary and capricious, such relief would not compel the agency to hold a lease sale, because the agency would remain free to implement another postponement with a different rationale.

Instead, the only way Plaintiffs could endeavor to compel Interior to hold lease sales is by seeking relief under § 706(1). *Louisiana*, 948 F.3d at 323 ("seek[ing] to compel the [agency] to act in accordance with law . . . implicates a different section of the APA, § 706(1)"); *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123, 1197 (D.N.M. 2015) ("The only way to 'set aside' a failure to act is to compel agency action, however, which is the relief

that § 706(1) provides."); *see also Norton*, 542 U.S. at 63 ("A 'failure to act' is . . . . simply the omission of an action without formally rejecting a request—for example, the failure to . . . take some decision by a statutory deadline."). Plaintiffs nonetheless devote only two short paragraphs of their brief to § 706(1) relief, Mot. 19, 22, presumably out of concern that they cannot meet the strict requirements for such relief. *See infra* Argument Part II.B. But Plaintiffs "cannot escape" the limits on judicial direction of agency action by seeking to set aside agency inaction under § 706(2). *Jarita Mesa*, 140 F. Supp. 3d at 1197; *see also NAACP v. Bureau of the Census*, 945 F.3d 183, 190 (4th Cir. 2019) (questioning "whether the plaintiffs can avoid the strict limitations on suits to 'compel agency action' under Section 706(1) simply by framing their APA claims as requests to 'set aside' the Census Bureau's 'decisions' *not* to act," before rejecting their appeal as an improper programmatic challenge).

3.   Even if rescission of the Lease Sale 257 Record of Decision were a final agency action, BOEM has authority to reconsider its decisions.

Courts have long recognized that an agency can reconsider its decisions "in the absence of a specific statutory limitation." *Macktal v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002); *see also Albertson v. Fed. Commc'n Comm'n*, 182 F.2d 397, 399 (D.C. Cir. 1950) ("The power to reconsider is inherent in the power to decide."). And at least one court in this Circuit has recognized "nothing in OCSLA limits the Secretary's institutional authority to reconsider h[er] decisions." *Hornbeck Offshore Servs., L.L.C. v. Salazar*, No. 10-cv-1663, 2010 WL 3523040, at *3 (E.D. La. Sept. 1, 2010). Thus, the only limits on the reconsideration of the Lease Sale 257 record of decision[7] are that (1) it must not be arbitrary, capricious, or an abuse of discretion,

---

[7] Confusingly, Plaintiffs cite *Clean Water Action v. EPA*, 936 F.3d 308, 312 (5th Cir. 2019) for the proposition that the Secretary must "follow[] the same process to revise a rule as it used to promulgate it." Mot. at 14 (quoting *Clean Water Action*, 936 F.3d at 312 (emphasis omitted)). But the record of decision was not a rule in the first place because it did not "establish[] a

(2) it must occur within a reasonable time after the decision being reconsidered was made, and (3) the agency must give notice of its intent to reconsider. *ConocoPhillips Co. v. EPA.*, 612 F.3d 822, 832 (5th Cir. 2010). BOEM complied with these requirements.

BOEM's rescission of the NEPA record of decision for Lease Sale 257 was not arbitrary, capricious or an abuse of discretion. BOEM rescinded the notice of decision immediately following the change in administration and the entry of Executive Order 14,008 in order to allow for a comprehensive review of the offshore leasing program. A change in administration "is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part, dissenting in part), and in this case that appraisal would be hampered if the agency were forced to sell leases before it is completed. "As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Id.* The rescission was also timely. BOEM published the rescission only 28 days after publishing the record of decision. 86 Fed. Reg. 10,132 (Feb. 18, 2021). And, at the time of rescission, BOEM had not yet published a Notice of Sale under OCSLA which Notice would have been required for any sale to proceed. Finally, because the rescission was published in the Federal Register, there can be no dispute that the agency gave notice of its intent to reconsider.

---

standard of conduct which has the force of law." *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) (internal quotations omitted). It was a document prepared to comply with NEPA. *See supra*, Background II. Plaintiffs note States "may submit recommendations" about sales that the Secretary "shall accept" if she determines they "provide for a reasonable balance between the national interest and the well-being of citizens of the affected State." Mot. at 15. But this OCSLA procedure is not relevant to the rescission of the NEPA record of decision, and does not transform the record of decision—or any other part of the process—into a rule.  For similar reasons, none of the other deferral decisions constitute "rules" requiring notice and comment as they do not establish standards of conduct that bind the agency.

### B.   Plaintiffs Have Not Demonstrated Their § 706(1) Claim is Likely to Succeed

"Failures to act are sometimes remediable under the APA, but not always," because the APA places strict limits on "judicial review of agency inaction." *Norton*, 542 U.S. at 61. Those limits allow a claim seeking to compel agency action to "proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* at 64. Those limitations preclude both "broad programmatic attack[s]" like the one in *Lujan* and "judicial direction of even discrete agency action that is not demanded by law." *Id.* at 64–65.

In the oil and gas leasing context, the Secretary has considerable discretion over leasing. "It is clear that OCSLA confers broad regulatory authority and discretion upon Interior." *Ensco Offshore Co. v. Salazar*, 786 F. Supp. 2d 1151, 1160 n.9 (E.D. La. 2011). And Interior has long interpreted OCSLA as providing the Secretary "considerable discretion to determine whether the deletion, delay or advancement of sales or milestones within an approved 5-year program" requires BOEM to follow the five-year program approval process.[8] The central feature of the MLA's provision for onshore oil and gas leasing is the Secretary's discretion to lease (or not to lease) public lands.[9] Given the Secretary's considerable discretion in this area, the Court cannot compel her to sell any particular parcel or quantity of parcels. *See Norton*, 542 U.S. at 65.

---

[8] 88 Interior Dec. 20, 23 (Jan. 5, 1981); *see also* 43 U.S.C. § 1344(e) (authorizing the Secretary to make a "revision which is not significant" to the 5-year program); 30 C.F.R. § 556.516 ("BOEM reserves the right to reject any and all bids received, regardless of the amount offered.").

[9] *Tallman*, 380 U.S. at 4 (the MLA vests "the Secretary discretion to refuse to issue any lease at all on a given tract"); *United States ex rel McLennon v. Wilbur*, 283 U.S. 414, 419 (1931) (MLA "goes no further than to empower the Secretary to execute leases"); *W. Energy All. v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013) (Secretary has "considerable" discretion in leasing decisions); *Schraier v. Hickel*, 419 F.2d 663, 665-79 (D.C. Cir. 1969) (affirming Secretary has "discretion to decline to lease" even if BLM had published a notice that it would receive offers). The MLA provides only that the Secretary "may"—not "must"—lease these lands, 30 U.S.C. § 226(a), a choice of words that "clearly connotes discretion." *Martin v. Franklin Cap. Corp.*, 546

Plaintiffs nonetheless focus on the MLA's statement that "lease sales shall be held for each State where eligible lands are available at least quarterly." Mot. 19 (quoting 30 U.S.C. § 226(b)(1)(A)). But "eligible lands are available" when, at a minimum, "all statutory requirements and reviews have been met, including compliance with the National Environmental Policy Act." BLM Manual MS-3120 Competitive Leases (P).1.11 (2013); *see also W. Energy All. v. Zinke*, 877 F.3d 1157, 1164 (10th Cir. 2017) (adopting BLM Manual definitions).[10] Thus, because NEPA compliance work remained to be done at the time of the postponements, *see supra* Background Part II, there were no eligible lands available. Were the Court to hold otherwise, it would effectively be forcing the agency to ignore the requirements of NEPA, thereby exposing the agency to significant litigation risk in NEPA challenges. As NEPA-based postponements from the prior administration demonstrate, Cowan Decl. ¶ 7, additional time is necessary to account for new NEPA circumstances, such as intervening court decisions.

In sum, Plaintiffs have not established a likelihood of success on their § 706(1) claims because they have not identified a discrete agency action that the agency is required to take. The Secretary instead has broad discretion to adjust the schedule for OCSLA lease sales and to determine whether to lease lands under the MLA. Even if Plaintiffs had identified a non-discretionary legal obligation, however, the §706(1) claims would still fail because Plaintiffs

---

U.S. 132, 136 (2005).

[10] This definition has been in place for a quarter century. Cowan Decl. ¶ 10. The Supreme Court has accorded longstanding agency interpretations in complex statutory schemes deference, even when those interpretations were not reached through notice-and-comment rulemaking. *Barnhart v. Walton*, 535 U.S. 212, 222 (2002) ("the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time all indicate that *Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue").

have not carried their burden to establish that the delay was unreasonable. *See Kolluri v. United States Citizenship & Immigr. Serv.*, No. 3:20-cv-02897, 2021 WL 183316, at *4–7 (N.D. Tex. Jan. 17, 2021) (describing six-factor test for evaluating whether delay is unreasonable). Nor is injunctive relief appropriate to prevent future delay. *See In re Am. Fed'n of Gov't Emps.*, 837 F.2d 503, 507 (D.C. Cir. 1988) ("[T]he possibility of unreasonable delay in the future," "does not justify burdening the [agency] with a court-ordered schedule for managing its docket.").

III.     **Plaintiffs Have Not Demonstrated Irreparable Injury.**

"A plaintiff seeking a preliminary injunction . . . must show that the irreparable injury will occur during the pendency of the litigation unless the preliminary injunction issues." *Sabre Indus. Inc. v. McLaurin*, No. 5:19-cv-00934, 2019 WL 3933798, at *6 (W.D. La. Aug. 19, 2019) (internal quotations omitted). "Speculative injury is not sufficient." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). Plaintiffs' arguments fall short.

    A.     **Plaintiffs Have Not Established That Jobs Likely Will Be Imminently and Irreparably Lost**.

Plaintiffs' alleged harms are based on false premises. They claim "President Biden . . . banned all new domestic oil and gas production" by "impos[ing] a drilling moratorium." Mot. 5, 16. This is false, as oil and gas exploration and drilling activities continue to be approved.[11]

Plaintiffs' declarations invoke nonexistent drilling and production bans to conjure irreparable harms. The Declaration of Professor David Dismukes, ECF No. 3-4, for example, forecasts harms based on a "drilling moratorium," *id.* ¶¶ 20-21, 27, 39, 46, and a "production

---

[11] Interior continues to approve onshore drilling permits at similar rates to the prior administration. Cowan Decl. ¶ 9. And Interior continues to approve offshore Exploration Plans and drilling permits at rates similar to the prior administration. Cruickshank Decl. ¶ 6; Brink Decl. ¶ 5. *Hornbeck* is readily distinguishable because—unlike here—it actually *did* deal with a "moratorium on issuance of new permits and on drilling," by numerous oil rigs. 696 F. Supp. 2d 627, 638 (E.D. La. 2010).

moratorium," *id.* ¶ 35, that do not exist. Because Interior continues to approve exploration plans and drilling permits at the same rate it did over the last four years, Dismukes' testimony is based on false premises and is not reliable.[12] The Declaration of Professor Peter Timothy J. Considine, ECF No. 3-2, suffers from similar problems. *E.g.*, *id.* ¶¶ 18–24 (forecasting harm from a "drilling ban").

Plaintiffs' declarations also contradict the studies their own declarants rely on in claiming job losses in Plaintiff States. For example, Dismukes claims that Plaintiff States, such as Texas, will lose jobs due to decreased oil and gas activity on federal land in the Permian Basin. Dismukes Decl. ¶¶ 17, 39, 41 (citing Federal Reserve Bank of Dallas, Garret Golding & Kunal Patel, Anticipated Federal Restrictions Would Slow Permian Basin Production (Mar. 4, 2021) (Federal Reserve Bank study)). But the very study he relies on draws the opposite conclusion: "With an expected shift in drilling from federal acreage, employment moves across state borders from New Mexico to Texas" because "Texas will require between 5,400 and 7,400 more workers" as "production and employment across the basin will gradually shift from federal lands in New Mexico to private and state lands in New Mexico and Texas." Decl. of Mustafa Haque ¶¶ 6–7 (quoting Federal Reserve Bank study). Similarly, the Considine Declaration discusses job losses only in the aggregate, including many States that are not Plaintiffs. Considine Decl. ¶ 25. At bottom, none of those declarations establish that the Plaintiff States face imminent job losses that would be required to establish irreparable harm.

---

[12] Dismukes also misunderstands the scope of the Complaint as challenging Secretarial Order 3395. *Compare* Dismukes Decl. ¶ 15, *with* Compl. ¶ 71 n.5.

**B.      Plaintiffs Have Not Established They Likely Will Suffer Imminent and Irreparable Financial Harm**.

Plaintiffs have failed to show that any alleged harm they incur would be imminent, as required for a preliminary injunction. *Google*, 822 F.3d at 228. Instead, their experts discuss harms over a 5-year period from 2021–2025, *e.g.*, Considine Decl. ¶¶ 26–33, which is insufficient to merit a preliminary injunction. *Alford v. Moulder*, No. 3:16-cv-350, 2016 WL 3449911, at *2 (S.D. Miss. June 20, 2016) (ruling harms were not sufficiently imminent where they could occur "within the next three years" or "at least six months away"). Nor could their experts establish imminent harm from a production decrease, as most leased federal land is not yet producing oil and gas, leaving plenty of land for development to continue on during the pendency of this litigation. Haque Decl. ¶¶ 4, Ex. A (showing, for example, that 99% of leases in Alaska and 82% of leases in Louisiana are not yet producing). Accordingly, Plaintiffs have failed to establish any imminent, irreparable harm from decreased royalty payments. *See id.* ¶ 5 (explaining that the Federal Reserve Bank forecasts no decrease in Permian Basin production this year and only a minimal 4% decrease in production after five years of paused federal leasing). To the contrary, sales held after the conclusion of this litigation might generate *more* royalties for Plaintiffs because the Secretary is considering adjusting royalty rates as part of the comprehensive review ordered by the President. Thus, a preliminary injunction could decrease Plaintiffs' royalty revenue, thereby causing—not preventing—harm.

Plaintiffs' only potential harm incurred during the pendency of this litigation would be a potential delay in revenue from their share of potential lease sale bonus and rental payments, but they have not shown that this harm is irreparable. Plaintiffs seek a final judgment compelling Interior to hold postponed lease sales, and if they could receive that relief now, then they could have an equally adequate remedy after judgment. Mere delay in receiving funds is insufficient

22

justification for a preliminary injunction. *See, e.g.*, *Merit Energy Co. v. Bernhardt*, No. 20-cv-32, at *15-16 (D. Wyo. Apr. 29, 2020) (finding delay in recovering money was insufficient to warrant preliminary injunction). Were the Court to issue a preliminary injunction compelling Interior to hold lease sales, it would not necessarily address Plaintiffs' claimed injuries as the scope and size of the lease sale is within Interior's discretion. *See supra* Argument II.B. Forcing sales to occur before Interior has had adequate time to consider the environmental impacts of those sales could backfire, resulting in smaller sales and smaller payments to Plaintiffs.

> **C.     Plaintiffs Have Not Established It Is Likely That Their Sovereign Integrity Will Be Harmed or That Any of the Planned Projects They Discuss Will Be Imminently and Irreparably Harmed**.

Plaintiffs assert "the moratoriums directly threaten the integrity of at least one State's coastline." Mot. 14. But they do not provide any evidence establishing this is likely.

Most obviously, the fact that "OCSLA leases themselves often provide essential materials for the restoration of Louisiana's coastline," Mot. 28, is irrelevant since Interior did not pause any lease sales for those materials. Record of Decision for Lease Sale 257, 86 Fed. Reg. 6365 (Jan. 21, 2021). In an effort to show a possible *indirect* impact, Plaintiffs point out that some funds generated by leasing activities are spent on restoration projects. Mot. 26-27. But because Interior continues to approve drilling permits and exploration plans, Plaintiffs will continue to receive most of those funds during this litigation. *See* Redford Decl. ¶ 5. Thus, to qualify for a preliminary injunction, Plaintiffs would at least need to demonstrate that the funds they will receive during the pendency of this litigation are insufficient to cover their restoration projects and that a delay in receiving funds from lease sales would harm some planned project that is necessary to maintain their sovereign integrity. *See Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 378 (5th Cir. 2008) (denying preliminary injunction compelling employer to continue providing

health insurance to retirees where retirees did not show any retiree lost coverage or could not pay for insurance during pendency of the action). Plaintiffs have not done so.

The available evidence, moreover, does not support the contentions in the Zeringue Declaration. In 2020, for example, bonus payments from new lease sales made up less than one-third of revenues received by the States under the cited statute, the Gulf of Mexico Energy Security Act (GOMESA). Redford Decl. ¶ 5. That year, 71.4% of revenue came from rents and royalties. *Id.* This totaled over $78.5 million paid in Louisiana alone. *Id.* Over the three-year period cited in the Zeringue Declaration, ¶ 19, these continuing revenues would more than cover the flood protection projects he outlines as "earmarked" from expected funds, *id.* ¶ 20. These funds will not be significantly impacted by any delay in new leasing—even over the next several years—because royalty-generating production on a new lease typically takes more than five years to begin. Cruickshank Decl. ¶ 7. Indeed, since 2017, out of 1,016 leases issued, only one lease has achieved production within two years of lease issuance. *Id.* In sum, Plaintiffs have not demonstrated that an injunction is necessary to prevent them from receiving diminished GOMESA revenues to protect their interests during the pendency of this litigation.

## IV.   The Threatened Injury Alleged by Plaintiffs Does Not Outweigh the Harm the Injunction Could Do to Defendants.

"The burden on the party seeking a preliminary injunction is especially heavy when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits." *Healthpoint, Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817, 868–69 (W.D. Tex. 2001) (internal quotations and citations omitted). Here, in order to potentially remedy their alleged harms, Plaintiffs would need to compel the agencies to transfer mineral estates from the United States to third-party purchasers. This remarkable change in the status quo is "particularly disfavored" in any context, *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976), and

contrary to Fifth Circuit law on preliminary injunctions, *see supra* Argument I. The allegedly threatened injuries caused by waiting a relatively short time for a ruling on the merits are far less harmful than forcing Interior to incur an "irreversible and irretrievable commitment of resources" by issuing leases before a ruling on the merits and before Interior completes its comprehensive review. *Wyo. Outdoor*, 165 F.3d at 49. Tellingly, Plaintiffs do not even attempt to balance the competing potential injuries; nor do they offer security under Rule 65(c).

## V.     A Preliminary Injunction Is Not in the Public Interest.

"If no public interest supports granting preliminary relief, such relief should ordinarily be denied, even if the public interest would not be harmed by one." *BMO Harris Bank N.A. v. Montana Farms LLC*, No. 1:18-cv-14, 2018 WL 2050154, at *4 (N.D. Miss. May 2, 2018) (quoting *Texas v. United States*, 86 F. Supp. 3d 591, 675 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015) as revised (Nov. 25, 2015) (citation omitted)). Here, Interior is reasonably undertaking a comprehensive review of oil and gas leasing on federal lands to determine how best to manage them. Pausing new lease sales in the meantime keeps lands unencumbered so they can best serve the public, as informed by the review. Oil and gas development is still ongoing, people continue to work in the industry, and Plaintiffs continue to receive their share of royalties. Accordingly, a preliminary injunction altering the status quo is not in the public interest.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for a Preliminary Injunction. Should the Court issue any preliminary relief, however, it should be limited to the Plaintiff States, as they have not demonstrated standing to seek relief based on revenue allegedly lost by other states, such as Wyoming or Colorado.

Respectfully submitted this 19th day of May, 2021.

JEAN E. WILLIAMS
Acting Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

*/s/      Michael S. Sawyer*
THOMAS W. PORTS, JR.
MICHAEL S. SAWYER
Trial Attorneys, Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone:      (202) 305-5492 (Ports)
                (202) 514-5273 (Sawyer)
Fax:            (202) 305-0506
Email:          Thomas.Ports.Jr@usdoj.gov
                Michael.Sawyer@usdoj.gov

*Counsel for Defendants*

26

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 19, 2021, I filed the foregoing document electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.


*/s/ Thomas W. Ports, Jr.*
Thomas W. Ports, Jr.