# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THE STATE OF LOUISIANA, By and through its Attorney General, JEFF LANDRY, et al., | |
| *Plaintiffs,* | Civ. No.:     2:21-cv-00778-TAD-KK |
| *v.* | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, et al., | |
| *Defendants.* | |

## BRIEF OF *AMICI CURIAE* HEALTHY GULF, CENTER FOR BIOLOGICAL DIVERSITY, COOK INLETKEEPER, DEFENDERS OF WILDLIFE, FRIENDS OF THE EARTH, NATURAL RESOURCES DEFENSE COUNCIL, OCEANA, SIERRA CLUB, AND THE WILDERNESS SOCIETY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

ARGUMENT ................................................................................................................1

I.       THE STATES' REQUEST FOR A MANDATORY PRELIMINARY
         INJUNCTION IS IMPROPER. ........................................................................1

II.      THE STATES ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR
         CLAIMS. .........................................................................................................3

         A.       The States Are Not Likely to Succeed on Their Offshore Leasing Claims. ...........4

                  1.       OCSLA Gives Interior Broad Discretion to Forego Proposed Lease
                           Sales. ...........................................................................................5

                  2.       OCSLA Imposes No Procedural Requirements to Foregoing or
                           Delaying a Proposed Lease Sale. ..................................................9

         B.       The States Are Not Likely to Succeed on their Onshore Leasing Claims. ............12

                  1.       Interior Is Complying with the MLA. ..........................................12

                  2.       There Was No Requirement for Interior to Undertake Notice and
                           Comment Rulemaking to Postpone Onshore Oil and Gas Lease
                           Sales. .........................................................................................15

III.     THE STATES CANNOT DEMONSTRATE THEY WILL SUFFER
         IRREPARABLE HARM ABSENT AN INJUNCTION. ...................................15

         A.       The States Have Not Shown They Will Suffer Significant Harm Before a
                  Decision on the Merits. ..........................................................................16

         B.       Any Impacts from the Leasing Pause Are Not Irreparable. ...............................19

         C.       The States' Requested Relief Would Not Remedy the Alleged Harm
                  Because Leases May Not Be Issued Under the Remaining Processes. ...............21

IV.      AN INJUNCTION WOULD BE SERIOUSLY ADVERSE TO THE PUBLIC
         INTEREST. ....................................................................................................23

CONCLUSION ............................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                           **Page(s)**

*Ass'n Concerned About Tomorrow, Inc. v. Dole*,
    610 F. Supp. 1101 (N.D. Tex. 1985) ................................................................................25

*Burgess v. FDIC*,
    871 F.3d 297 (5th Cir. 2017) .........................................................................................15

*California v. Watt* (*California I*),
    668 F. 2d 1290 (D.C. Cir. 1981) .....................................................................................5

*California v. Watt* (*California II*),
    712 F.2d 584 (D.C. Cir. 1983) ...........................................................................6, 7, 22

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ........................................................................................4

*Chambless Enterprises, LLC v. Redfield*,
    No. 3:20-CV-01455, 2020 WL 7588849 (W.D. La. Dec. 22, 2020) ................................16, 20

*Citizens for Resp. & Ethics in Wash. v. FEC*,
    380 F. Supp. 3d 30 (D.D.C. 2019) ..................................................................................15

*Dalton v. Specter*,
    511 U.S. 462 (1994) ........................................................................................................4

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ......................................................................................................19

*Defs. of Wildlife v. Bureau of Ocean Energy Mgmt., Regul., & Enf't*,
    791 F. Supp. 2d 1158 (S.D. Ala. 2011) ..........................................................................22

*Dennis Melancon, Inc. v. New Orleans*,
    703 F.3d 262 (5th Cir. 2012) ........................................................................................20

*Ensco Offshore Co. v. Salazar*,
    781 F. Supp. 2d 332 (E.D. La. 2011) ...........................................................................2, 6

*Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*,
    441 F.2d 560 (5th Cir. 1971) ...........................................................................................1

*Haley v. Seaton*,
    281 F.2d 620 (D.C. Cir. 1960) ......................................................................................12

*Hornbeck Offshore Services, L.L.C. v. Salazar*,
    696 F. Supp. 2d 627 (E.D. La. 2010) ..........................................................................2, 6

*Hornbeck Offshore Servs., L.L.C. v. Salazar*,
   Civ. No. A. 10-1663, 2010 WL 3523040 (E.D. La. Sept. 1, 2010) ...........................................2

*League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton*,
   752 F.3d 755 (9th Cir. 2014) ...............................................................................................21

*Marathon Oil Co. v. Babbitt*,
   966 F. Supp. 1024 (D. Colo. 1997)..........................................................................................2

*Martinez v. Mathews*,
   544 F.2d 1233 (5th Cir. 1976) ...............................................................................................2

*Massachusetts v. Watt*,
   716 F.2d 946 (1st Cir. 1983).........................................................................................17, 24

*United States ex rel. McLennan v. Wilbur*,
   283 U.S. 414 (1931)..............................................................................................2, 12, 13

*Nat. Res. Def. Council v. Hodel*,
   865 F. 2d 288 (D.C. Cir. 1988) .............................................................................................8

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004)...........................................................................................................3, 12

*OOGC Am., L.L.C. v. Chesapeake Expl., L.L.C.*,
   975 F.3d 449 (5th Cir. 2020) ...............................................................................................4

*Pham v. Univ. of La.*,
   194 F. Supp. 3d 534 (W.D. La. 2016).....................................................................................2

*Pros. & Patients for Customized Care v. Shalala*,
   56 F.3d 592 (5th Cir. 1995) ................................................................................................11

*Sec'y of Interior v. California*,
   464 U.S. 312 (1984)................................................................................................5, 6, 9, 10

*Wyo. ex rel. Sullivan v. Lujan*,
   969 F.2d 877 (10th Cir. 1992) ..............................................................................................2

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
   989 F.3d 368 (5th Cir. 2021) ...............................................................................................3

*Texas v. United States*,
   No. 6:21-CV-00003, 2021 WL 723856 (S.D. Tex. Feb. 23, 2021) .......................................23

*Udall v. Tallman*,
   380 U.S. 1 (1965).................................................................................................................12

*W. Energy All. v. Jewell*,
 2017 WL 3609740 (D. N.M. Jan. 13, 2017) ................................................................14

*W. Energy All. v. Salazar*,
 No. 10–cv–0226, 2011 WL 3737520 (D. Wyo. June 29, 2011) ...................................13

*W. Energy All. v. Zinke*,
 877 F.3d 1157 (10th Cir. 2017) ..................................................................................14

*W. Energy All. v. Zinke*,
 No. 17-2005, 2017 WL 1383853 (10th Cir. April 12, 2017)........................................14

*Wash. Cty. v. Gunther*,
 452 U.S. 161 (1981) .......................................................................................................6

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ...................................................................................................15, 23

**Statutes**

5 U.S.C. § 551 ........................................................................................................................11

5 U.S.C. § 706 ..........................................................................................................................3

30 U.S.C. § 187 ......................................................................................................................24

30 U.S.C. § 226 ..........................................................................................................12, 13, 23

43 U.S.C. § 1332 ...............................................................................................................5, 24

43 U.S.C. § 1334 ....................................................................................................................24

43 U.S.C. § 1337 ........................................................................................................... *passim*

43 U.S.C. § 1340 .............................................................................................................5, 6, 23

43 U.S.C. § 1344 ........................................................................................................... *passim*

43 U.S.C. § 1345 ...............................................................................................................9, 10

43 U.S.C. § 1351 ...........................................................................................................5, 6, 23

43 U.S.C. § 1701 ....................................................................................................................24

**Regulations**

30 C.F.R. pt. 556, subpt. C ...................................................................................................10

30 C.F.R. § 550.231-.235 .........................................................................................................6

30 C.F.R. § 550.266-.273 .................................................................................................6

30 C.F.R. § 550.281 .......................................................................................................23

30 C.F.R. § 556.204 .........................................................................................................9

30 C.F.R. § 556.301 .....................................................................................................7, 22

30 C.F.R. § 556.302 .........................................................................................................7

30 C.F.R. § 556.304 .........................................................................................................9

30 C.F.R. § 556.305 .....................................................................................................9, 11

30 C.F.R. § 556.307 .....................................................................................................9, 11

30 C.F.R. § 556.308 .........................................................................................................9

30 C.F.R. § 556.516 .......................................................................................................22

43 C.F.R. 3100.0-3 .........................................................................................................13

43 C.F.R. § 3120.4-2 .......................................................................................................15

43 C.F.R. § 3162.3-1 .......................................................................................................23

**Federal Register**

75 Fed. Reg. 44,276 (July 28, 2010) ...............................................................................8

76 Fed. Reg. 11,506 (Mar. 2, 2011) .................................................................................7

80 Fed. Reg. 74,796 (Nov. 30, 2015) ...............................................................................7

80 Fed. Reg. 74,797 (Nov. 30, 2015) ...............................................................................7

85 Fed. Reg. 73,508 (Nov. 18, 2020) ...............................................................................8

86 Fed. Reg. 10,132 (Feb. 18, 2021) ...............................................................................4

## ARGUMENT

Plaintiff States Louisiana et al. (collectively, "the States") ask this Court to issue an unprecedented and improper order compelling the federal government to encumber public lands and waters with new oil and gas leases before the States' case can be heard on the merits. The States do not cite a single case where a court has ever issued such an injunction, and none of the States' legal claims would entitle them to such relief even following a decision on the merits.

What is more, the States have not met their heavy burden to show they are entitled to a mandatory preliminary injunction. They have not shown that they have viable claims on which they are likely to succeed. The States' merits arguments ignore the great discretion given the Department of the Interior, through the Outer Continental Shelf Lands Act (OCSLA) and Mineral Leasing Act (MLA), to determine whether to sell leases and what areas to offer for sale. They ask the Court to substitute its judgment for Congress' in how Interior is to manage federal lands and waters, and to construct procedural requirements that are not found in statute.

The States also have not shown that their allegations of harm are irreparable, or that such harm is even likely to occur without a preliminary injunction. The States' unprecedented requested relief would do great harm to public interest by wrongly disposing of public lands and waters and hindering Interior's efforts to address deficiencies in the federal leasing programs.

## I.     The States' Request for A Mandatory Preliminary Injunction Is Improper.

The States' motion for a preliminary injunction should be denied because it asks this Court to drastically alter the status quo and order Interior to encumber public lands and waters with new leases while this litigation is ongoing. The purpose of a preliminary injunction is to maintain the status quo and prevent irreparable harm while a lawsuit is pending. *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971). Thus, requests for mandatory injunctions forcing an action, like the States', are "particularly disfavored."

*Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976); *Pham v. Univ. of La.*, 194 F. Supp. 3d 534, 543 (W.D. La. 2016).

Specifically, the States seek to compel Interior to hold new oil and gas lease sales, and apparently to issue new leases, Mem. Supp. Mot. Prelim. Inj. 22–25, R. Doc. 3-1 [hereinafter PI Mem.] (asserting irreparable harm absent issuance of new leases, and requesting Interior be ordered to conduct leasing). The States fail to offer any precedent where a court has ordered Interior to hold a lease sale or issue oil and gas leases, let alone as preliminary injunctive relief.[1] To the contrary, federal courts have repeatedly held that, in light of Interior's broad discretion over mineral leasing, courts cannot order Interior to conduct leasing: "federal courts do not have the power to order competitive leasing. By law that discretion is vested absolutely in the federal government's executive branch and not in its judiciary." *Wyo. ex rel. Sullivan v. Lujan*, 969 F.2d 877, 882 (10th Cir. 1992); *Marathon Oil Co. v. Babbitt*, 966 F. Supp. 1024, 1026 (D. Colo. 1997), *aff'd*, 166 F.3d 1221 (10th Cir. 1999); *see also United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 419 (1931) (declining to issue mandamus relief in light of Interior's discretion over whether to issue leases). Ordering Interior to auction off and issue new leases while this case is pending would be unprecedented and contrary to the caselaw.

Moreover, Administrative Procedure Act (APA) Section 706(2), which forms the basis for most of the claims the States advance in support of their preliminary injunction request, PI Mem. 12–20 (sections II.A.1–3, B.1–3), authorizes a court to "hold unlawful and set aside" final

---

[1] *Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332 (E.D. La. 2011), and *Hornbeck Offshore Services, L.L.C. v. Salazar*, 696 F. Supp. 2d 627 (E.D. La. 2010), cited by the States, are factually distinct and inapplicable. They involved a moratorium on drilling *permits* for existing leases rather than on leasing. *See* note 6, *infra*. And the court did not even order issuance of the permits in either case. *See Ensco*, 781 F. Supp. 2d at 334, 340; *Hornbeck Offshore Servs., L.L.C. v. Salazar*, Civ. No. A. 10-1663, 2010 WL 3523040, at *1 (E.D. La. Sept. 1, 2010).

2

agency actions found to be invalid. 5 U.S.C. § 706(2). The typical remedy under Section 706(2), accordingly, is to remand the action to the agency for further consideration, rather than ordering the agency to take a different action. *See Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021). So if the States ultimately prevailed on the merits, the appropriate relief would be to set aside the announcements postponing the proposed sales and to remand to Interior—for example, to provide an opportunity for notice and comment—*not* an order directing any sale to take place.

The States' request for a preliminary injunctive relief is also unwarranted under Section 706(1). That section does authorize a court to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), but "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64–65 (2004). The Supreme Court explained, for example, that "when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be." *Id.* at 65. The States have not asserted meritorious Section 706(1) claims to justify such an order because they do not identify any discrete offshore action Interior is required to take under OCSLA, and their argument that Interior has a mandatory duty under the MLA to hold an onshore sale fails on the merits. PI Mem. 19, 22; *see* Section II.B.1, *infra*. Even if the States had identified a nondiscretionary duty, the Court could not "specify" that Interior implement a particular leasing process, *Norton*, 542 U.S. at 65, but rather could only compel that Interior make leasing decisions under its statutory authority, which provides discretion to decide whether and when to hold lease sales, *see* Sections II.A.1, II.B.1, III.C, *infra*.

## II.    The States Are Unlikely to Succeed on the Merits of Their Claims.

Despite the States' rhetorical attack on the so-called "Biden Ban," they only argue they

are likely to succeed on the merits of specific, narrow legal claims. They do not argue they are likely to succeed on either their *ultra vires* or OCSLA citizen suit claims. *See* PI Mem. 12–22. The States also do not argue they are likely to succeed on their claims regarding Lease Sale 258.[2] So the States have not shown they are likely to succeed and the Court cannot grant preliminary injunctive relief on those claims.

The States *only* argue that they are likely to succeed on the merits of their claims that Executive Order 14008, the Recission of the Record of Decision (ROD) for Lease Sale 257, 86 Fed. Reg. 10,132 (Feb. 18, 2021) [hereinafter Recission], and an alleged "MLA Moratorium" violate the APA. PI Mem. 12–22. The States, however, lack a cause of action under the APA to challenge the Executive Order, *Dalton v. Specter*, 511 U.S. 462, 469 (1994); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996), so the only remaining claims are the APA challenges to the Recission and the delay of certain onshore lease sales. It is on those narrow grounds that the States ask the Court to grant their expansive request for relief. The States have not shown they are likely to succeed on the merits of even these narrow claims.[3]

## A.   The States Are Not Likely to Succeed on Their Offshore Leasing Claims.

The States' offshore case is premised on the erroneous theory that Interior is limited in its ability to forego, delay, or otherwise decline to hold lease sales under OCSLA. *See* PI Mem. 7–8, 12–19. To the contrary, OCSLA does not require Interior to hold all or even any of the lease sales proposed in a five-year leasing program, or hold specific sales according to a particular schedule. Nor does it prescribe any procedure or even require affirmative action to refrain from

---

[2] The passing reference to Lease Sale 258 in a Lease Sale 257-related argument does not challenge Lease Sale 258 and is too "perfunctory" to constitute a legal claim. *See* PI Mem. 19; *see OOGC Am., L.L.C. v. Chesapeake Expl., L.L.C.*, 975 F.3d 449, 456 n.10 (5th Cir. 2020).
[3] Conservation Groups do not address all the States' arguments, to avoid repetitive briefing with Federal Defendants, but agree the States have not shown a likelihood of success on any claim.

or delay in holding a proposed sale. In fact, Interior has *never* held all the sales proposed in a five-year program, and lease sale delays have been commonplace. What the States repeatedly claim is some unusual and improper exercise of "executive fiat" by the Biden Administration, *e.g.*, *id.* at 1, 16, has actually been routine practice for decades.

Because OCSLA itself provides the authority for Interior to postpone or forego Lease Sales 257 and 258, no Executive Order, unidentified "OCSLA leasing moratorium," or Federal Register notice rescinding a record of decision was even required to take that course of action. Enjoining those purported actions would not prevent Interior from foregoing the sales (or require holding them). The States' grievance is ultimately with OCSLA rather than any "Biden Ban."

       *1.*     *OCSLA Gives Interior Broad Discretion to Forego Proposed Lease Sales.*

The States are incorrect that OCSLA is singularly concerned with "expeditiously facilitating the development of the Outer Continental Shelf." PI Mem. 16; *see also id.* at 1. Rather, OCSLA directs the Secretary of the Interior to balance the nation's energy needs with several other factors, including protection of the environment, coastal communities, and safety, when deciding whether and how oil and gas development in federal waters should proceed. *E.g.*, 43 U.S.C. §§ 1332, 1344(a)(1). The Secretary has been given discretion to determine how to "*best* meet national energy needs" based on these factors. *Id.* § 1344(a) (emphasis added); *see id.* § 1344(a)(2), (3); *California v. Watt* (*California I*), 668 F. 2d 1290, 1317 (D.C. Cir. 1981). OCSLA thus seeks to ensure "orderly development" that properly protects the environment, safety, and other national, state, and local interests. 43 U.S.C. § 1332(3).

The statute sets out a four-stage process for leasing and developing offshore oil wells: 1) the five-year leasing program stage; 2) lease sale stage; 3) exploration plan stage; and 4) development and production plan stage. 43 U.S.C. §§ 1337, 1340, 1344, 1351. *See generally Sec'y of Interior v. California*, 464 U.S. 312, 337–40 (1984). The States conflate the first two

5

stages and misconstrue the processes and discretion conferred in those stages.

During the first stage, Interior promulgates a five-year leasing program "consist[ing] of a schedule of *proposed* lease sales." 43 U.S.C. § 1344(a) (emphasis added). Promulgation of a five-year program does not commit Interior to hold all of the proposed sales. The plain text use of "proposed" means that the program does not formally schedule any lease sales. *See Propose, Merriam-Webster*, https://www.merriam-webster.com/dictionary/proposed (last visited May 16, 2021) (defining "propose" as "to set forth for acceptance or rejection").

The second, lease sale stage—where this case lies[4]—is where Interior considers whether to take the further action required to actually schedule and hold a sale proposed in the five-year program. OCSLA by its plain text "authorize[s]," but does not require, Interior to sell leases. 43 U.S.C. § 1337(a)(1). The use of "authorized" in a statute "denotes affirmative enabling action." *Wash. Cty. v. Gunther*, 452 U.S. 161, 169 & n.9 (1981) (noting "discretionary privileges").

In addition to its plain text, OCSLA has a "pyramidic" structure that provides Interior broad latitude at the lease sale stage to decide whether and when to hold sales proposed in a five-year program. *California v. Watt* (*California II*), 712 F.2d 584, 588 (D.C. Cir. 1983) (citation omitted). "Congress has . . . taken pains to separate the various federal decisions involved in formulating a leasing program [and] conducting lease sales . . . ." *Sec'y of Interior*, 464 U.S. at 340. The five-year program stage involves one set of federal decisions that creates the universe of potential lease sales that Interior has the option to offer. *See* 43 U.S.C. § 1344(d)(3) ("no lease

---

[4] The States' reliance on *Ensco Offshore*, 781 F. Supp. 2d 332, and *Hornbeck Offshore*, 696 F. Supp. 2d 627, *see, e.g.*, PI Mem. 10–11, 16, 24–25, is misplaced because those cases involved OCSLA's third and fourth stages, concerning exploration plans and development plans, not the lease sale stage. OCSLA prescribes specific actions Interior must take on plan submittals under deadlines and conditions that limit its scope of discretion. 43 U.S.C. §§ 1340(c)(1), 1351(h); 30 C.F.R. §§ 550.231–.235, .266–.273. No such limits exist at the lease sale stage.

shall be issued unless it is for an area included in the approved leasing program"). The lease sale stage involves a separate set of decisions and steps to determine how much, if any, of the leasing proposed in a five-year program to offer for sale. *See, e.g.*, 30 C.F.R. §§ 556.301, .302(a), (b); *California II*, 712 F.2d at 592 ("Before an area is actually put up for sale, other steps must be taken."). Interior's ultimate decisions about leasing at this stage are not required to match the leasing proposed in a five-year program: "while an area excluded from the leasing program cannot be leased . . . or developed, an area included in the program may be excluded at a latter stage." *California II*, 712 F.2d at 588; *see* 30 C.F.R. § 556.302(c) (stating that there may be "changes from the area(s) proposed for leasing").

The Recission is a lease sale-stage decision. It is one that is well within the scope of discretion that OCSLA affords Interior at that stage; it is entirely consistent with OCSLA and reflects its four-stage decisionmaking structure. The Recission also is consistent with Interior's past practices exercising its OCSLA discretion. Despite the States' attempts to portray the Biden Administration as an outlier, Interior has regularly declined to hold individual proposed lease sales under multiple presidential administrations. In fact, since OCSLA was amended in 1978 to add the five-year program framework, there has *never* been a program in which all the proposed lease sales were held. *See* Cong. Rsch. Serv., *Five-Year Program for Offshore Oil and Gas Leasing: History and Program for 2017-2022*, at 10–12 (Aug. 23, 2019), https://fas.org/sgp/crs/misc/R44504.pdf. For example, the Reagan Administration did not hold 18 of the 41 proposed lease sales in its 1982–1987 Program, and the George W. Bush Administration opted not to hold 5 of the 20 proposed lease sales in its 2002–2007 Program. *Id.* Interior has more recently cancelled lease sales in Alaska due to market conditions or conservation reasons, 80 Fed. Reg. 74,796 (Nov. 30, 2015); 80 Fed. Reg. 74,797 (Nov. 30, 2015); 76 Fed. Reg. 11,506

(Mar. 2, 2011), and in the Mid-Atlantic and Gulf of Mexico to allow for the development of stronger protections following the *Deepwater Horizon* disaster, 75 Fed. Reg. 44,276 (July 28, 2010); *see also Nat. Res. Def. Council v. Hodel,* 865 F. 2d 288, 293 n.3 (D.C. Cir. 1988) (describing other actions to delay proposed sales). Simply postponing the individual proposed offshore sales at issue in this case (Lease Sales 257 and 258) is in no way out of the ordinary; it is consistent with more than four decades of Interior's leasing practices. What *would* be unusual would be if "all lease sales [proposed in the 2017–2022 Program] occurred on schedule," as the States apparently believe is required. *See* Compl. ¶ 60, R. Doc. 1.

The 2017–2022 Final Five-Year Program itself provides that Interior "can reduce or cancel lease offerings" proposed in the Program. Bureau of Ocean Energy Mgmt. (BOEM), *2017–2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program* 6-7 (Nov. 2016).[5] The States themselves quote the Approval of the Final Program, stating the lease sales are only "potential" sales. PI Mem. 3–4. *Contra id.* at 4 (wrongly claiming "Final Program approved and scheduled" sales). Even the Proposed Notice of Sale for Lease Sale 257 recognized that Interior still had discretion on whether to hold the sale and had not yet made that decision. BOEM, *GOM OCS Region-wide Oil and Gas Lease Sale 257, Proposed Notice of Sale* 18 (2020) [hereinafter PNOS], https://www.boem.gov/Sale-257; 85 Fed. Reg. 73,508 (Nov. 18, 2020).

The Recission in no way "effectively repeals the Five-Year Program," as the States contend, PI Mem. 14, but rather implements the Program as designed, in accordance with

---

[5] *See also id.* at 10-16 (discussing option value provided by Secretary's ability to cancel lease sales); BOEM, *2017–2022 Proposed Final Program Frequently Asked Questions–General,* https://www.boem.gov/2017-2022-Proposed-Final-Program-FAQs/ (last visited May 17, 2021) ("Once a Final Program is approved, the Secretary has discretion to cancel or delay a lease sale as well as to narrow the geographic scope of a proposed leasing area, without developing a new program.").

OCSLA's four-stage framework. Interior's postponement of the comment period for Lease Sale 258 is consistent with OCSLA and the Program for the same reasons.

2.     *OCSLA Imposes No Procedural Requirements to Foregoing or Delaying a Proposed Lease Sale.*

The States' complaints about the process followed in rescinding Lease Sale 257's ROD reflect a fundamental misunderstanding of OCSLA's procedural requirements and structure. OCSLA sets separate procedures for decisions at the program stage and at the lease sale stage, *see Sec'y of Interior*, 464 U.S. at 340, which the States conflate, PI Mem. 14–16.

At the program stage, Interior provides certain procedures for the public, federal agencies, and affected states and local governments, including an opportunity to submit comments and recommendations on a proposed five-year program before Interior approves it. 43 U.S.C. § 1344(c), (d); 30 C.F.R. § 556.204(b). The lease sale stage involves different procedures. If Interior decides to proceed with a proposed lease sale, then it first prepares a "proposed notice of sale" that it sends to governors of affected states and notices in the Federal Register. 30 C.F.R. § 556.304. Within 60 days after receiving the notice, governors of affected states and executives of affected local governments may submit recommendations to Interior regarding the "proposed lease sale." 43 U.S.C. § 1345(a), (b); 30 C.F.R. § 556.305(a). Only if those officials choose to submit recommendations are certain consultation obligations triggered for Interior. 43 U.S.C. § 1345(c), (d); 30 C.F.R. §§ 556.305(b), .307. OSCLA then requires Interior to, "[n]ot later than thirty days before any lease sale, . . . submit to the Congress and publish in the Federal Register a notice," known as a final notice of sale, that identifies the bidding system and designates the tracts to be offered for lease. 43 U.S.C. § 1337(a)(8); *see also id.* § 1337(*l*); 30 C.F.R. § 556.308(a). Only after completing those processes may Interior hold a lease sale.

The Recission does not implicate any of the procedures associated with the program stage

because, as explained above, it is a lease sale-stage decision and does not revise or repeal the 2017–2022 Program. *Contra* PI Mem. 14.[6] Requiring Interior to revert to program-stage procedures any time it did not convert a "proposed" lease sale to an actual lease sale would vitiate Congress's intent to "separate the various federal decisions" at each stage and create redundant processes. *Sec'y of Interior*, 464 U.S. at 340. The States also are incorrect that the same procedures for holding a lease sale apply to a decision *not* to hold a sale. PI Mem. 15. The lease sale cancellations referenced above were done without notice and comment. *See* p. 7–8, *supra*. Lease sale-stage procedures by their own terms apply only when taking action to *hold* a lease sale; they do not apply when no sale is held or one is delayed, as here. *See* 43 U.S.C. §§ 1337(a), (*l*), 1345 (referring to "sales" but not cancelling or delaying sales). In fact, the applicable regulatory procedures are titled "Planning and *Holding* a Lease Sale." 30 C.F.R. pt. 556, subpt. C (emphasis added). The States identify no provision of OCSLA or the regulations requiring Interior to follow prescribed procedures or even take affirmative action to forego or delay a proposed lease sale.

The Proposed Notice of Sale for Lease Sale 257 supports Interior's course of action. It expressly stated that Interior still had to "make a decision on whether" to proceed with Lease Sale 257, and would publish a final notice of sale for Lease Sale 257 "*[i]f* the Assistant Secretary for Land and Minerals Management decides to proceed." PNOS 18 (emphasis added). It listed no procedures to be followed if Interior decided *not* to proceed.

Interior never published a final notice of sale, so did not complete the process required by

---

[6] Even if the Recission were considered a "revision," OCSLA expressly allows Interior to revise a five-year program without triggering the program-stage procedural requirements if the revisions are not "significant." 43 U.S.C. § 1344(e). It surely cannot be said that forgoing a single proposed lease sale would be a significant revision, given that OCSLA does not require Interior to hold all of the proposed sales in a program.

OCSLA to officially schedule and proceed with Lease Sale 257. *See* 43 U.S.C. § 1337(a)(8). The States accordingly are incorrect that Interior took action to rescind a "formally scheduled" sale. PI Mem. 5; *see also id.* at 12–19 (referring to "the Recission of Lease Sale 257" and asserting Interior "violated §553 of the APA in rescinding Lease Sale 257"). True, Interior adopted a ROD identifying a date and parameters for the sale. But this was an interim step selecting the preferred alternative for Lease Sale 257—not a final notice of sale under OCSLA. Because it could not have proceeded with Lease Sale 257 without the final notice of sale, Interior did not even need to rescind the ROD to postpone the proposed sale; it could have simply refrained from publishing that final notice.

The States have not pointed to any statutory requirement to provide notice and comment procedures for a Recission notice for an interim step such as the ROD here; particularly a Recission that was not legally necessary to effect the sale's postponement. *Contra id.* at 12–16. They have not shown the Recission constitutes a "rule" requiring notice and comment because it does not "establish[] a standard of conduct which has the force of law." *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995); *see* 5 U.S.C. § 551(4) (defining a "rule" as "an agency statement . . . designed to implement, interpret, or prescribe law or policy"). *Contra* PI Mem. 21 (citing *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015), and *Texas v. United States*, No. 6:21-CV-00003, 2021 WL 723856, at *43 (S.D. Tex. Feb. 23, 2021), both of which involved program-wide agency deportation policies rather than discrete lease sales). Moreover, it would be illogical to require notice and comment before rescinding a lease sale record of decision when Interior does not provide such procedures for the issuance of such a record of decision—at the lease sale stage, Interior only provides limited notice and comment pursuant to OCSLA on the proposed notice of sale, not the ROD. 30 C.F.R. §§ 556.305, .307.

It is not Interior, but the States who seek to "substitute[] OCSLA's finely wrought and carefully calibrated cooperative federalism process with an entirely new process." PI Mem. 16. The additional process the States would like before Interior forgoes or delays a proposed lease sale are not required by OCSLA, and this Court cannot enact new legal requirements not found in the statute.

**B.      The States Are Not Likely to Succeed on their Onshore Leasing Claims.**

      *1.      Interior Is Complying with the MLA.*

The States' arguments regarding onshore leases are equally meritless. The States' claims that the leasing pause is contrary to the MLA, PI Mem. 19, and that Interior has violated that Act by having "unlawfully withheld and unreasonably delayed" leasing, *id.* at 22, both fail because they reflect a mischaracterization of Interior's duties under the law.

Interior manages public lands, including oil and gas, under the principle of "multiple use management." *Norton*, 542 U.S. at 58. This requires balancing "the many competing uses to which land can be put, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values.'" *Id.* (alteration in original) (quoting 43 U.S.C. § 1702(c)). As part of that balancing, the MLA provides that federal lands "*may* be leased" for oil and gas. 30 U.S.C. § 226(a) (emphasis added). Courts have made clear that this language leaves Interior with broad discretion to not offer leases. *See Udall v. Tallman*, 380 U.S. 1, 4 (1965) (holding MLA "left the Secretary discretion to refuse to issue any lease at all on a given tract"); *Haley v. Seaton*, 281 F.2d 620, 625 (D.C. Cir. 1960) (legislative intent of "may be leased" language was "to give the Secretary of the Interior discretionary power, rather than a positive mandate to lease").

The Supreme Court, in fact, has upheld a national oil and gas moratorium under the MLA. *McLennan*, 283 U.S. at 419, *aff'g Wilbur v. United States ex rel. Barton*, 46 F.2d 217, 218

(D.C. Cir. 1930) (describing that Hoover administration ordered pause to conserve federally owned oil). In *McLennan*, the Supreme Court accepted Interior's argument that the MLA "empower[s]" Interior to issue leases but does not compel them. *Id.* at 419–20. This controlling precedent authorizes Interior's actions here.

The States nevertheless assert that by postponing lease sales, Interior violates a provision of the MLA (enacted in 1987) stating that "lease sales shall be held for each State where eligible lands are available at least quarterly." 30 U.S.C. § 226(b)(1)(A), *quoted in* PI Mem. 19. But the States never address the meaning of the clause "where eligible lands are available." PI Mem. 19 (assuming that lands are eligible and available). This language actually provides Interior with broad discretion to determine that public lands are *not* eligible and available.[7] Here, the States have offered no evidence that public lands are eligible and available in the states where lease sales were postponed.

Lands are eligible and available for leasing when they are: (a) not barred from leasing by statute or regulation, (b) they are "open to leasing in the applicable resource management plan," and (c) "all statutory requirements and reviews have been met, including compliance with the National Environmental Policy Act (NEPA)." 43 C.F.R. 3100.0-3; BLM Manual MS-3120.11 (2013), https://www.blm.gov/sites/blm.gov/files/uploads/mediacenter_blmpolicymanual3120.

---

[7] The 1987 amendments did not change the MLA's central "may be leased" language, *see* 30 U.S.C. § 226(a), and nothing in their legislative history suggests Congress intended to alter Interior's discretion to not lease. *See W. Energy All. v. Salazar*, No. 10–cv–0226, 2011 WL 3737520, at *5 n.10 (D. Wyo. June 29, 2011) (noting legislative history indicated "that Congress did not intend to affect the Secretary's discretion in determining which lands would be suitable for leasing"). Instead, the quarterly lease sale language was added to the MLA in connection with amendments requiring that oil and gas leases be offered primarily through competitive auctions, rather than on an over-the-counter basis without competitive bidding, as had been the practice prior to 1987. *See id.* at *4. The quarterly leasing language served to ensure that competitive auctions would occur on a regular basis when Interior wanted to offer leases for sale.

13

pdf; BLM Handbook H-3101-1, § I.A.1, https://www.blm.gov/sites/blm.gov/files/uploads/Media

_Library_BLM_Policy_h3101-1.pdf; BLM Instruction Memorandum 2018-034 n.6 (2018),

https://www.blm.gov/policy/im-2018-034. As Interior explained to a court in 2017, lands

become eligible and available when they are "selected for lease at [the Bureau of Land

Management's (BLM)] discretion after compliance with all relevant statutory requirements." Br.

of United States as Amicus Curiae, *W. Energy All. v. Zinke*, No. 17-2005, 2017 WL 1383853, at

*2 (10th Cir. April 12, 2017).

Thus, the MLA does not require Interior to hold quarterly lease sales unless the agency

has determined that it wants to offer lands for lease in a particular state and it has completed the

necessary NEPA review and other statutory requirements to support that decision.[8] These

requirements were not yet met at the time Interior postponed the lease sales, so those lands were

not "eligible and available" for leasing—Interior had neither made a final determination that

particular lands should be leased nor completed its NEPA compliance for the March and April

2021 lease sales.[9]

The MLA does not require Interior to hold a lease sale every three months in each state,

and there was nothing improper about postponing the March and April 2021 sales. Indeed,

---

[8] The States cite two decisions from the same 2017 *Western Energy Alliance v. Zinke* case, neither of which supports their argument. PI Mem. 19 (citing district court and Tenth Circuit rulings). The cited district court passage merely describes the allegations offered by a plaintiff in support of its standing. *W. Energy All. v. Jewell*, 2017 WL 3609740, at *4 (D. N.M. Jan. 13, 2017). And the Tenth Circuit excerpt simply describes the relief sought by that plaintiff, in reversing the district court's denial of a motion to intervene by conservation groups. *W. Energy All. v. Zinke*, 877 F.3d 1157, 1166 (10th Cir. 2017). Contrary to the States' mischaracterization, neither decision ruled on the meaning of the MLA's quarterly lease sale provision.
[9] *See, e.g.*, *BLM National NEPA Register*, BLM (Feb. 12, 2021), https://eplanning.blm.gov/eplanning-ui/project/2003697/570 (March 2021 Utah lease sale, reflecting public comment period still open when Executive Order was issued on January 27); *BLM National NEPA Register*, BLM (Feb. 12, 2021), https://eplanning.blm.gov/eplanning-ui/project/2002224/510 (March 2021 Montana lease sale, reflecting NEPA process not yet complete when paused).

Interior commonly postpones lease sales. Under the prior administration, for example, Interior canceled at least ten scheduled lease sales where it felt more consideration and analysis was required before offering leases. Delehanty Decl. ¶¶ 3–8 & Attach. 1, attached as Ex. A.

2.    *There Was No Requirement for Interior to Undertake Notice and Comment Rulemaking to Postpone Onshore Oil and Gas Lease Sales.*

The States also cannot succeed on their argument that "the MLA lease moratorium" and "each individual BLM office's cancellation order" are "substantive rules" that "must have gone through the APA's notice-and-comment procedures." PI Mem. 21. First, they fail to identify any agency directive imposing a nationwide "moratorium"; instead, the States only speculate there "surely" exists some "formal Secretarial-level directive" to cancel all lease sales. *Id.* Without any evidence of such a directive, the States cannot claim any agency action that is subject to APA challenge, much less one requiring notice and comment. *See Citizens for Resp. & Ethics in Wash. v. FEC,* 380 F. Supp. 3d 30, 44–45 (D.D.C. 2019). Nor have they shown that the postponements of the March and April onshore lease sales constitute "rules" requiring notice and comment. *See* p. 11, *supra* (discussing APA definition of "rule"). Interior does not conduct notice-and-comment rulemaking when deciding whether to *hold* onshore lease sales, *see* 43 C.F.R. § 3120.4-2 (requiring lease sale notices merely to "be posted in the proper BLM office"), and the States offer no explanation why such a process must be required to postpone them.

**III.    The States Cannot Demonstrate They Will Suffer Irreparable Harm Absent an Injunction.**

The States also cannot establish that they are "*likely* to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (emphasis added). For an injury to be "irreparable," the States must show that their alleged harms "cannot be undone" through later remedies in this case. *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017). For that reason, "as a general rule, a preliminary injunction is an

15

inappropriate remedy where the potential harm to the movant is strictly financial." *Chambless Enterprises, LLC v. Redfield*, No. 3:20-CV-01455, 2020 WL 7588849, at *14 (W.D. La. Dec. 22, 2020) (quoting *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989)). The States' allegations of irreparable harm are insufficient for three reasons.

First, their alleged harm is not "likely" to occur absent a preliminary injunction because it is based on potential future development on newly issued leases, which would not occur until after the Court is likely to have resolved the merits of this case. Second, the alleged harms are not irreparable because any temporarily foregone leasing revenues or economic benefits would be recovered if the postponed lease sales were held following this Court's decision on the merits. Third, the States' requested relief to hold lease sales would not remedy their alleged harms because Interior would still have discretion in how to execute the remaining leasing steps.

### A. The States Have Not Shown They Will Suffer Significant Harm Before a Decision on the Merits.

To obtain a preliminary injunction, the States must demonstrate they are "likely to suffer irreparable harm *before a decision on the merits can be rendered*." 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 2013) (emphasis added). They have not done so here. The States' alleged harms are premised on projected reductions in revenue and economic benefits that would come from developing newly issued leases.[10] But such impacts during litigation on the merits are unlikely because areas subject to foregone leasing would not be brought into production—or generate royalties and other economic benefits—for well over a year. By that point, this Court is likely to have decided the merits of

---

[10] The States allege three types of harm: (a) loss of federal mineral revenues, (b) economic impacts to states from reduced federal energy development, and (c) reduced funding for coastal restoration efforts. PI Mem. 22–25.

this case and whether to award any relief on final judgment.[11]

Analyses by the U.S. Energy Information Administration, the Federal Reserve Bank of Dallas, and independent researchers all conclude that halting new leasing will not reduce U.S. oil and gas production for at least one year onshore and more than two years offshore, with significant declines only occurring much later than two years in the future. Zachary Decl. ¶¶ 8–13, attached as Ex. B. There are several reasons for this.

First, according to the Congressional Budget Office, most leases are not brought into production until several years into the lease term. *Id.* ¶¶ 14, 16, 35, 37. And even in the (unusual) situation where an operator seeks to drill immediately after acquiring a lease, the process takes an average of at least 14.5 months between issuance of an onshore lease and initial production. *Id.* ¶ 34. Offshore wells typically take even longer to bring into production. *Id.* ¶¶ 10, 34 n.50. Thus, a decision on the merits is likely in this case before any of the impacts alleged by the States would be felt, if they were to occur at all.

Second, operators holding existing leases have already obtained approvals necessary to continue drilling operations for the next two years. Interior reports that it approved 126 permits for offshore oil and gas drilling in the Gulf of Mexico during February and March 2021 alone (more than during the same period at the start of the Trump administration). *Id.* ¶ 5. Onshore, Interior reports that as of March 2021, onshore operators held more than 7,800 approved drilling permits that had not been drilled—a supply far exceeding the number of wells likely to be drilled over the next two years. *Id.* ¶ 36, 39–46. For example, in Utah operators held 392 approved

---

[11] This is not a case in which an injunction is needed to keep bureaucratic commitment to a course of action from effectively locking in future outcomes. *Cf. Massachusetts v. Watt*, 716 F.2d 946, 952–53 (1st Cir. 1983). Instead, here, the leasing pause is for the express purpose of reconsideration.

drilling permits as of March 2021—more than *ten times* the average of 36 wells per year drilled in that state during 2016–2020. *Id.* ¶ 41; *see also id.* ¶ 42 (noting States' expert Timothy Considine forecasts 25 federal wells drilled in Utah in 2021 absent leasing pause). In Montana, the figures are even starker: operators hold 467 approved drilling permits in a state where only five new federal wells are drilled each year on average. *Id.* ¶ 39; *see also id.* ¶ 40 (noting Considine forecasts total of 11 new Montana wells completed in 2021–2022); *id.* ¶¶ 43–46 (similar figures for Alaska and New Mexico). Moreover, lessees hold millions of acres of federal leases that are not in production, which provide opportunities to obtain even more drilling permits notwithstanding the leasing pause. *Id.* ¶ 4, 39–45; *see* R. Doc. 73-1, at 4.

The States' attempts to sidestep these facts fail. First, they rely on declarations that discuss the impacts from a moratorium on both leasing *and drilling*. *See* Dismukes Decl. ¶¶ 15, 20, 21, 27, 29, 35, 39, 45, 46, R. Doc. 3-4 (discussing moratorium on "leasing and drilling permits" or a "production moratorium"); Considine Decl. ¶¶ 18–25, 34–40, R. Doc. 3-2 (estimating impacts of drilling ban). Interior, however, has not halted drilling. To the contrary, it has approved 126 offshore drilling permits and 561 onshore drilling permits during February and March 2021. Zachary Decl. ¶ 5. In essence, the States' witnesses attack a hypothetical moratorium that Interior has not imposed. Analyses of a drilling moratorium are irrelevant for purposes of assessing irreparable harm from a pause that only involves new leasing.

Second, the States fail to distinguish between impacts occurring in the next year while this case is litigated, and those occurring over the longer term. PI Mem. 22–24; *see also, e.g.*, Dismukes Decl. ¶ 24 & n.6 (estimate of reduced production and revenues from hypothetical cancellation of *three* Gulf of Mexico lease sales relies on figures for entire five-year offshore

program);[12] Considine Decl. ¶¶ 10–17, 27–33 (estimating "average annual investment loss" for 2021–2025, and average annual state revenue impacts for 2021–2025). The States ignore the timelines (discussed above) on which oil and gas leases actually are developed in practice. Their allegations of economic losses if all federal leasing is halted for the next 5 to 10 years do not demonstrate any harm will occur before this Court can decide the merits of the case.

Third, the declarations of the States' experts, Timothy Considine and David Dismukes, are riddled with errors and offer no reasoned explanation or supporting evidence for many of their predictions.[13] These flaws are detailed in the attached review by Laura Zachary. For example, Dr. Dismukes gets a number of facts wrong regarding the timing and amount of offshore mineral (GOMESA) payments. Zachary Decl. ¶¶ 15–22. He also cites studies that actually undercut his opinion because they show similar predictions he has made in the past about job losses proved inaccurate. *Id.* ¶¶ 23–27; *see also id.* ¶¶ 31–55 (critique of Dr. Considine's conclusions). For all these reasons, the States have not shown that any significant harm is likely while the Court decides the merits of this case.

### B. Any Impacts from the Leasing Pause Are Not Irreparable.

Moreover, any impacts the States might experience while this case is pending are not irreparable. To the extent some leasing revenues or other benefits are delayed by the leasing pause, *e.g.*, Zeringue Decl. ¶¶ 13–14, 16, R. Doc. 3-6; Zachary Decl. ¶ 56, they would be made

---

[12] The States and Dismukes artificially inflate the alleged harm by basing it on "the cancellation of Lease Sales 257, 259, and 261," rather than the one sale at issue in this case (257). PI Mem. 10, 23; *see* Dismukes Decl. ¶¶ 15, 22, 24. The States do not challenge any actions related to Lease Sales 259 or 261, nor could they as Interior has not cancelled or suspended either proposed future sale. *See* Zachary Decl. ¶ 19 & n.26.

[13] The States bear the burden to show their expert testimony meets the standards of Federal Rule of Evidence 702, which requires that expert testimony be "based on sufficient facts or data" and be "the product of reliable principles and methods," and that "the expert has reliably applied the principles and methods to the facts of the case." *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993).

up if lease sales start again following this Court's decision on the merits.

The Fifth Circuit has held that the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (citation omitted). Here, if the Court rules in the States' favor on the merits, resulting in Interior commencing to sell oil and gas leases again, the States will obtain the same relief as from a preliminary injunction motion. The mineral revenues paid to the States, and other economic benefits from developing the leases, will accrue to the States at that point.

The federal oil and gas leasing pause is analogous to the recent decision in *Chambless*, where this Court denied a motion for preliminary injunction against a federal order imposing a temporary eviction moratorium in connection with the COVID-19 pandemic. 2020 WL 7588849, at *16. This Court held the plaintiffs had not established irreparable harm from the moratorium: "the Order does not bar Plaintiffs from evicting their tenants forever; it merely postpones that remedy for a limited time in furtherance of urgent public health goals." *Id.* at *15. The Court also rejected plaintiffs' argument that practical difficulties in obtaining later relief from non-paying tenants made their harm irreparable: "Nothing in the Order prevents Plaintiffs from suing their tenants for unpaid rent," even if collecting on those judgments would be difficult. *Id.* at *14.

Indeed, the States' claim of irreparable harm here is substantially weaker than in *Chambless*, where plaintiffs offered evidence showing that the tenants who benefitted from the federal eviction moratorium were "insolvent." *Id.* By contrast, the States offer no evidence that their alleged financial losses cannot be recovered if the Court ultimately directs lease sales to resume. That "lack of evidence precludes a finding of irreparable harm." *Id.* (citation omitted).

The States, in fact, may actually *benefit* from postponing the lease sales. The market for

oil and gas has been at historic lows for the past year but has begun to recover. If oil and gas prices continue to climb over the next 12 months, interest in federal leases—and the prices paid for them at auction—likely will increase as well. At that point, the States will receive additional revenue from their share of those larger payments. *See League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755, 765–66 (9th Cir. 2014) ("Because the jobs and revenue [from timber project] will be realized if the project is approved," relevant harm from enjoining project "is the value of moving those jobs and tax dollars to a future year, rather than the present").

Moreover, a primary goal of Interior's oil and gas program review, proceeding concurrent with this litigation, is to determine whether to increase royalty rates for oil and gas leases and obtain a better return for American taxpayers. Increasing the royalty rate on onshore leases from the current 12.5 percent to 18.75 percent could yield $15 billion for states over the next 30 years, with states such as Wyoming and New Mexico receiving more than $100 million annually in additional federal mineral revenue. Zachary Decl. ¶ 56. If Interior increases royalty rates while this case is pending, leases sold after a decision on the merits would provide a greater return for federal and state governments. *Id.* ¶¶ 20, 56. But if the preliminary injunction were granted and the March and April 2021 lease sales were held today, those leases would carry only a 12.5 percent royalty rate and the States will lose out on that additional royalty revenue. *Id.* ¶ 56; *see also id.* ¶¶ 47–52 (market impacts from leasing pause will modestly increase total revenues to states). The States have not shown they will suffer any harms that would not be redressable in a final judgment.

### C. The States' Requested Relief Would Not Remedy the Alleged Harm Because Leases May Not Be Issued Under the Remaining Processes.

The States' Preliminary Injunction Motion asks the Court to enjoin Interior from

implementing the Recission. R. Doc. 3, at 2. Such relief would not remedy the States' alleged harms because the remaining processes give Interior discretion to not issue leases.

For offshore leasing, first, even if Interior were required to reinstate the ROD, it may not proceed with Lease Sale 257 until it completes the additional step of publishing a final notice of sale. 43 U.S.C. § 1337(a)(8). As explained above, Interior could simply refrain from publishing the final notice of sale to forego or further delay Lease Sale 257.

Second, even if Interior were compelled to hold Lease Sale 257, it could still choose to exclude any or all of the area proposed for leasing from the final sale. *See* 30 C.F.R. § 556.301(c); *California II*, 712 F.2d at 588; *see also* PNOS 17 (reserving "the right to withdraw any block from this lease sale prior to issuance of a written acceptance of a bid for the block").

Third, even if Interior offered the entire originally proposed area for lease, it would not necessarily accept bids and issue any or all leases receiving bids. OCSLA does not require Interior to issue leases offered in a sale, giving the agency broad discretion in deciding whether to award leases after reviewing bids. 43 U.S.C. § 1337(a)(1) (noting Secretary makes a "decision on *whether* to accept the bids" (emphasis added)), (c) (antitrust review). Interior's regulations explain that "BOEM does not accept or reject any bids" on the lease sale date, 30 C.F.R. § 556.516(a), and that "BOEM reserves the right to reject any and all bids received," *id.* § 556.516(b); *see Defs. of Wildlife v. Bureau of Ocean Energy Mgmt., Regul., & Enf't*, 791 F. Supp. 2d 1158, 1178 (S.D. Ala. 2011) (explaining Interior has "discretion to reject [bids] and to consider noneconomic factors in deciding whether or not to approve them"); Cong. Rsch. Serv., *supra*, at 10 ("Not all acres bid on are necessarily leased."). Interior will not, for example, award a lease unless, among other things, "[t]he amount of the bid has been determined to be adequate by the authorized officer." PNOS 17; *see* 43 U.S.C. § 1344(a)(4) ("Leasing activities shall be

conducted to assure receipt of fair market value for the lands leased and the rights conveyed by the Federal Government."). This discretion means Interior may not ultimately issue leases that were offered for sale, creating a disconnect between the States' requested relief to compel lease *sales*, R. Doc. 3, at 2, and their alleged harm, which flows from lease *issuance* and development, PI Mem. 22–24.

Onshore, even if Interior were required to hold lease sales, nothing in the MLA or any other statute dictates the number of leases that must be offered. *See* 30 U.S.C. § 226(b)(1)(A) (referring to quarterly lease sales but not content of those sales). Interior retains the discretion to offer no, or virtually no, leases in any sales.

It also is not a foregone conclusion that leases would be developed for production after they are issued, as the States and their experts imply. The small proportion of existing leases under production undermines that assumption. *See* R. Doc. 73-1, at 4. Additional approvals also are needed before development could occur. *E.g.*, 43 U.S.C. §§ 1340, 1351; 30 C.F.R. § 550.281; 43 C.F.R. § 3162.3-1(c). The States have not shown that compelling lease sales would result in lease issuance and development to remedy their alleged harm.

## IV.    An Injunction Would Be Seriously Adverse to the Public Interest.

The States pay no heed to the serious harm their requested relief would have on the public interest. The Supreme Court has emphasized that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). "[T]he public interest factor requires the court to consider what public interests might be injured and what public interests might be served by granting or denying a preliminary injunction." *Texas v. United States*, 2021 WL 723856, at *49 (citing cases). The States' requested relief would injure the public interest in two main ways. First, it seeks to commit federal lands and waters belonging to the American public to oil and gas

development before the case can be heard on the merits. Second, it would force Interior to immediately implement leasing programs found to carry safety and environmental risks and deprive American taxpayers of a fair return for leases, and hinder its review of the programs.

Federal lands and waters are managed by the federal government for the benefit of the American public. *See* 43 U.S.C. §§ 1332(3), 1701(a); 30 U.S.C. § 187. The public has a strong interest in ensuring that the government does not convey or encumber those lands and waters without careful consideration and a fair return. *See, e.g.*, 43 U.S.C. §§ 1344(a)(4), 1701(a)(9); 30 U.S.C. § 187. The States seek to force Interior to immediately sell leases committing federal lands and waters to future oil and gas development before the Court has had an opportunity to thoroughly evaluate the merits of the States' claims. If the Court later concludes that the States' challenge was without merit and Interior *was* justified in pausing leasing, it would be difficult for the federal government to claw back those leases at that point. *See Massachusetts*, 716 F.2d at 952 (recognizing difficulty in undoing the "chain of bureaucratic commitment" resulting from issuance of offshore leases). For example, OCSLA prescribes a detailed process for cancelling leases that requires making specified findings and holding a hearing, and takes a statutory minimum of five years. 43 U.S.C. § 1334(a)(1)–(2). A preliminary injunction likely would create a significant administrative burden for Interior, diverting agency resources from things like environmental reviews, safety enforcement, and even approving drilling permits on existing leases. Forcing Interior to sell leases while this case is pending would harm the public interest.

Second, the States acknowledge "the public has a strong interest in the proper function of oil and gas leasing and development programs." PI Mem. 25. Conservation Groups agree. But that interest weighs strongly against granting a preliminary injunction, rather than in favor. A preliminary injunction would require Interior to offer leases before it can identify and implement

reforms to ensure those leases are not contrary to the public interest. The Government Accountability Office has repeatedly found that the current oil and gas programs are plagued by significant problems and are in need of comprehensive review and reforms. *See* R. Doc. 73-1, at 3–4 (citing reports on poor oversight, insufficient bonding, abuses of lease suspensions, failure to get a fair return, and others). The challenged leasing pause seeks to evaluate and correct those problems, and will serve to ensure the proper functioning of the programs. A preliminary injunction compelling Interior to immediately proceed with leasing would short circuit that review, resulting in leases that may not be charging adequate royalties based on reviews to date. *See* p. 21, *supra* (also describing various economic benefits to states from leasing pause). It would also potentially deprive the public of potential benefits like public participation opportunities, increased environmental and climate review and protection, and others. *Cf., e.g.* *Ass'n Concerned About Tomorrow, Inc. v. Dole*, 610 F. Supp. 1101, 1119 (N.D. Tex. 1985) ("When the opportunity to adequately review environmental factors is lost, the harm becomes irreparable."). It would force the agency to implement a program that evidence shows is not properly functioning, contrary to the public's interest.

## <u>CONCLUSION</u>

The States have not come close to meeting their heavy burden to establish a preliminary injunction is warranted, much less the type of extraordinary mandatory relief they request here. The Court accordingly should deny the States' motion.

Respectfully submitted this 19th day of May, 2021.

/s/ Corinne Van Dalen
Corinne Van Dalen (LA Bar #21175)
Earthjustice
900 Camp Street, Unit 303
New Orleans, LA 701
T: 415-283-2335  F: 415-217-2040
cvandalen@earthjustice.org

/s/ Christopher Eaton
Christopher Eaton (*pro hac vice*)
Shana E. Emile (*pro hac vice*)
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
T: 206-343-7340  F: 415-217-2040
ceaton@earthjustice.org
semile@earthjustice.org

/s/ Thomas R. Delehanty
Thomas R. Delehanty (*pro hac vice*)
Michael S. Freeman (*pro hac vice*)
Earthjustice
633 17th St., Suite 1600
Denver, CO 80202
T: 303-623-9466  F: 720-550-5757
tdelehanty@earthjustice.org
mfreeman@earthjustice.org

/s/ Erik Grafe
Erik Grafe (*pro hac vice*)
Earthjustice
441 W 5th Ave., Suite 301
Anchorage, AK 99501
T: 907-277-2500  F: 907-277-1390
egrafe@earthjustice.org

*Counsel for Amici Curiae Healthy Gulf,
Center for Biological Diversity, Cook
Inletkeeper, Defenders of Wildlife, Friends of
the Earth, Oceana, Sierra Club, and The
Wilderness Society*

/s/ Joel Waltzer
Joel Waltzer (LA Bar #19268)
Waltzer, Wiygul, and Garside
3201 General De Gaulle Dr., Ste. 200
New Orleans LA, 70114
T: 504-340-6300  F: 504-340-6330
joel@wwglaw.com

/s/ Robert Wiygul
Robert Wiygul (LA Bar #17411)
Waltzer, Wiygul, and Garside
1011 Iberville Dr.
Ocean Springs, MS 39564
T: 228-872-1125  F: 228-872-1128
robert@wwglaw.com

s/ Brad Sewell
Brad Sewell (*pro hac vice*)
Irene Gutierrez (*pro hac vice*)
Natural Resources Defense Council
40 W. 20th St., 11th Fl.
New York, NY 10011
T: 212-727-2700
bsewell@nrdc.org
igutierrez@nrdc.org

*Counsel for Amicus Curiae Natural Resources
Defense Council*