# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| STATE OF LOUISIANA, ET AL. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 2:21-cv-00778 |
| | ) | |
| v. | ) | |
| | ) | Honorable Judge Terry A. Doughty |
| JOSEPH R. BIDEN, JR., in his official capacity | ) | |
| as President of the United States, ET AL. | ) | Magistrate Judge Kathleen Kay |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
<u>MOTION TO DISMISS PURSUANT TO RULE 12(b)</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

    I.      Statutory Background ........................................................................... 2

          A.      The Outer Continental Shelf Lands Act (OCSLA)...................................... 2

          B.      The Mineral Leasing Act (MLA) ................................................................ 3

          C.      The National Environmental Policy Act (NEPA)........................................ 6

    II.     Factual Allegations ............................................................................. 6

    III.    The Standards of Review ................................................................... 10

          A.      Judicial Review of Agency Action; the APA Standard ........................... 10

          B.      The Motion to Dismiss Standard ............................................................. 10

ARGUMENT .......................................................................................................... 11

    I.      Plaintiffs Fail to State a Claim for Relief From an Allegedly *Ultra Vires* Presidential Order ........................................................................... 11

    II.     Plaintiffs' OCSLA Citizen Suit Claims (Count IX) Should be Dismissed........... 16

    III.    Plaintiffs' APA Claims Should Be Dismissed.................................... 19

          A.      Plaintiffs assert an improper programmatic challenge............................. 19

          B.      Plaintiffs do not challenge final agency action ........................................ 22

CONCLUSION....................................................................................................... 25

i

## TABLE OF AUTHORITIES

**Cases**

*Alabama-Coushatta Tribe of Texas v. United States*,
  757 F.3d 484 (2014)................................................................................................. 20, 21

*Am. Airlines, Inc. v. Herman*,
  176 F.3d 283 (5th Cir. 1999) .......................................................................................... 23

*Am. Petroleum Inst. v. EPA*,
  216 F.3d 50 (D.C. Cir. 2000) .......................................................................................... 23

*Amerada Hess Corp. v. Dep't of Interior*,
  170 F.3d 1032 (10th Cir. 1999) ...................................................................................... 25

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................................................... 11

*Atieh v. Riordan*,
  727 F.3d 73 (1st Cir. 2013) ............................................................................................. 10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................................... 10

*Bennett v. Spear*,
  520 U.S. 154 (1997)......................................................................................................... 23

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ..................................................................................... 11, 12

*Bowlby v. City of Aberdeen*,
  681 F.3d 215 (5th Cir. 2012) .......................................................................................... 11

*Brown v. Offshore Specialty Fabricators, Inc.*,
  663 F.3d 759 (5th Cir. 2011) .......................................................................................... 17

*City and County of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ................................................................................... 12, 13

*City of Clinton, Ark. v. Pilgrim's Pride Corp.*,
  632 F.3d 148 (5th Cir. 2010) .......................................................................................... 10

*Common Cause v. Trump*,
  No. 120-cv-2023, 2020 WL 8839889 (D.D.C. Nov. 25, 2020)................................. 12, 13, 14

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
  563 F.3d 466 (D.C. Cir. 2009) ........................................................................................ 15

*Dalton v. Specter*,
  511 U.S. 462 (1994)..................................................................................... 19

*Duke Energy Field Servs. Assets, L.L.C. v. Fed. Energy Regul.Comm'n*,
  150 F. Supp. 2d 150 (D.D.C. 2001) ............................................................ 18

*Fisheries Survival Fund v. Jewell*,
  No. 16-cv-2409, 2018 WL 4705795 (D.D.C. Sept. 30, 2018)............................ 17, 18

*Funk v. Stryker*,
  631 F.3d 777 (5th Cir. 2011) ...................................................................... 11

*Goonsuwan v. Ashcroft*,
  252 F.3d 383 (5th Cir. 2001) ...................................................................... 10

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
  484 U.S. 49 (1987)..................................................................................... 17

*Hias, Inc. v. Trump*,
  2021 WL 69994 (4th Cir. Jan. 8, 2021) ...................................................... 13

*Judulang v. Holder*,
  565 U.S. 42 (2011)..................................................................................... 10

*La. Pub. Serv. Comm'n v. FERC*,
  761 F.3d 540 (5th Cir. 2014) ...................................................................... 10

*Louisiana v. U.S. Army Corps of Eng'rs*,
  834 F.3d 574 (5th Cir. 2016) ...................................................................... 23

*Louisiana v. United States*,
  948 F.3d 317 (5th Cir. 2020) ...................................................................... 22

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990)................................................................................ 20, 21

*Myers v. United States*,
  272 U.S. 52 (1926)..................................................................................... 11

*Nat. Res. Def. Council, Inc. v. Hodel*,
  865 F.2d 288 (D.C. Cir. 1988).................................................................. 2, 15

*Norris v. Hearst Trust*,
  500 F.3d 454 (5th Cir. 2007) ...................................................................... 11

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004)..................................................................................... 10

*OXY USA Inc v. Babbitt*,
  122 F.3d 251 (5th Cir. 1997) .................................................................. 24, 25

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
  139 S. Ct. 1881 (2019)................................................................................. 2

*Patients for Customized Care v. Shalala*,
  56 F.3d 592 (5th Cir. 1995) ................................................................................... 22

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ............................................................................................... 6

*Schraier v. Hickel*,
  419 F.2d 663 (D.C. Cir. 1969) ............................................................................... 3

*Shawnee Trail Conservancy v. Nicholas*,
  343 F. Supp. 2d 687 (S.D. Ill. 2004) ..................................................................... 23

*Sierra Club v. Glickman*,
  67 F.3d 90 (5th Cir. 1995) ..................................................................................... 10

*State of Cal. By & Through Brown v. Watt*,
  712 F.2d 584 (D.C. Cir. 1983) ............................................................................... 14

*Stem v. Gomez*,
  813 F.3d 205 (5th Cir. 2016) ........................................................................... 10, 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................................... 11

*Udall v. Tallman*,
  380 U.S. 1 (1965) ................................................................................................... 3

*United States ex rel McLennon v. Wilbur*,
  283 U.S. 414 (1931) ............................................................................................... 3

*W. Energy All. v. Salazar*,
  709 F.3d 1040 (10th Cir. 2013) ...................................................................... 3, 5, 16

*W. Energy All. v. Salazar*,
  No. 10-cv-0226, 2011 WL 3737520 (D. Wyo. June 29, 2011) ............................. 4, 5

*Walmart Inc. v. U.S. Dep't of Just.*,
  2021 WL 410618 (E.D. Tex. Feb. 4, 2021) ........................................................... 22

*WildEarth Guardians v. Bernhardt* (*WEG II*),
  No. 1:16-cv-1724, 2020 WL 6701317 (D.D.C. Nov. 13, 2020) ........................... 8, 9

*WildEarth Guardians v. Bernhardt*,
  No. 1:20-cv-00056, 2020 WL 111765 (D.D.C. Jan. 9, 2020) ............................... 8, 9

*WildEarth Guardians v. Zinke* (*WEG I*),
  368 F. Supp. 3d 41 (D.D.C. 2019) ....................................................................... 7, 8

**Statutes**

5 U.S.C. § 551 ..................................................................................................................... 22

5 U.S.C. § 704 ..................................................................................................................... 23

5 U.S.C. § 706(2) ......................................................................................................... 10, 23

5 U.S.C. §§ 701–706 ......................................................................................... 10

30 U.S.C. § 226 ............................................................................................. 3, 4, 5

30 U.S.C. §§ 181–287 ......................................................................................... 3

30 U.S.C. §§ 351-360 ......................................................................................... 3

42 U.S.C. § 4321 ................................................................................................. 6

43 U.S.C. § 1331 ................................................................................................. 2

43 U.S.C. § 1332(3) ........................................................................................... 2

43 U.S.C. § 1337 ............................................................................................... 14

43 U.S.C. § 1337(g) ........................................................................................... 2

43 U.S.C. § 1344 ................................................................................................. 2

43 U.S.C. § 1349 ............................................................................................... 17

43 U.S.C. § 1351 ............................................................................................... 15

Pub. L. No. 100–203, title V, subtitle B ....................................................... 4, 5

**Regulations**

30 C.F.R. § 556.304 ........................................................................................... 18

30 C.F.R. § 556.305 ........................................................................................... 18

30 C.F.R. § 556.307 ........................................................................................... 18

30 C.F.R. § 556.308 ....................................................................................... 6, 19

30 C.F.R. § 556.516 ........................................................................................... 19

40 C.F.R. § 1501.5 .............................................................................................. 6

40 C.F.R. § 1502.1 .............................................................................................. 6

43 C.F.R. § 3100.0-3 .......................................................................................... 3

43 C.F.R. part 3130 ............................................................................................ 3

**Other Authorities**

100-4H4 at 108 (June 30, 1987) (Senate Committee Hearing) ........................ 4

75 Fed. Reg. 44,276 (July 28, 2010) ............................................................... 15

85 Fed. Reg. 55,861 (Sept. 10, 2020) ............................................................... 7

85 Fed. Reg. 73,508 (Nov. 18, 2020) ................................................................ 6

86 Fed. Reg. 10,132 (Feb. 18, 2021) ........................................................... 7, 24

86 Fed. Reg. 10,994 (Feb. 23, 2021) ................................................................. 7

86 Fed. Reg. 4117 (Jan. 15, 2021) ................................................................. 7

86 Fed. Reg. 6365 (Jan. 21, 2021) ................................................................. 6

86 Fed. Reg. 7619 (Jan. 27, 2021) ................................................................. 6

Executive Order 14,008 ............................................................................. 1, 12

H.R. 2851 (1987) ............................................................................................ 5

H.R. Conf. Rep. No. 100-495 (1987) .............................................................. 5

H.R. Rep. No. 100-378 (1987) ........................................................................ 4

S. Rep. No. 100-188 (1987) ........................................................................ 4, 5

**INTRODUCTION**

The bulk of Plaintiffs' wide-ranging complaint should be dismissed because the factual allegations, the documents cited, and the relief sought show that their claims fail as a matter of law. The President should also be dismissed as a party because Plaintiffs have pled no viable claim against the President for which relief can be granted.

Plaintiffs fail to allege a plausible claim that the President acted *ultra vires* when he issued Executive Order 14,008 § 208. As head of the Executive Branch, the President has general administrative authority over those charged with executing the law. He exercised that authority in Executive Order 14,008, explicitly directing the Secretary to pause new lease sales only "to the extent consistent with applicable law." *Id.* Because the order is facially valid, Plaintiffs' *ultra vires* count challenging its issuance must be dismissed.

Next, Plaintiffs' Outer Continental Shelf Lands Act (OCSLA) citizen suit count must be dismissed because Plaintiffs violated the statutory requirement that they provide notice of intent to sue 60 days before filing a citizen suit claim. Plaintiffs also made no allegations sufficient to meet the statute's exception to notice for "imminent harm."

Finally, Plaintiffs' Administrative Procedure Act (APA) counts fail to allege justiciable claims. To the extent Plaintiffs specifically challenge discrete actions, those claims too fail since they are directed at non-final, interlocutory actions. The APA provides a right of action for aggrieved litigants seeking judicial review of discrete and final agency actions. Plaintiffs have not filed suit in response to discrete agency actions, instead challenging an amalgam of interim decisions, press releases, and other actions that Plaintiffs have self-titled "moratoriums." The APA's limitation to discrete agency action precludes broad attacks to Interior's management of its leasing program. Because Plaintiffs' claims fail as a matter of law, they should be dismissed.

# BACKGROUND

I.    **Statutory Background**

A.    **The Outer Continental Shelf Lands Act (OCSLA)**

The Outer Continental Shelf Lands Act of 1953 (OCSLA), 43 U.S.C. §§ 1331 *et seq.*,

"gives the Federal Government complete 'jurisdiction, control, and power of disposition' over

the [Outer Continental Shelf], while giving the States no 'interest in or jurisdiction' over it,"

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1888–89 (2019), though the

States receive a portion of the revenues received by the Federal Government, 43 U.S.C. §§ 1331

n.1, 1337(g) . OCSLA provides for "expeditious and orderly development . . . subject to

environmental safeguards." 43 U.S.C. § 1332(3). It "sets only broad standards and leaves much

to the Secretary's discretion in achieving its goals." *Nat. Res. Def. Council, Inc. v. Hodel*, 865

F.2d 288, 302 (D.C. Cir. 1988).

OCSLA prescribes a multi-stage process for development. The first stage is the

development of the five-year program. *See* 43 U.S.C. § 1344. OCSLA directs the Secretary to

prepare "a schedule of proposed lease sales indicating, as precisely as possible, the size, timing,

and location of leasing activity which he determines will best meet national energy needs for the

five-year period following its approval or reapproval." 43 U.S.C. § 1344(a). Sales and dates in

the five-year program are not set in stone. OCSLA instead provides that the Secretary "shall

review" that program and may make a revision that is "not significant" outside of the process for

initial approvals. *Id.* § 1344(e). The second stage is the lease sale. *See generally id.* § 1337. At

this stage, Interior chooses whether and when to hold a sale, which lease blocks to offer in any

sale, and the terms of the sale. *Id.* § 1337(a)(1). The Secretary is "authorized" to grant leases "to

the highest responsible qualified bidder." *Id.* The third and fourth stages deal with post-leasing

exploration and production.

2

B.      **The Mineral Leasing Act (MLA**)

The Mineral Leasing Act of 1920 (MLA), 30 U.S.C. §§ 181–287,[1] "gave the Secretary of the Interior broad power to issue oil and gas leases on public lands" while also giving her "discretion to refuse to issue any lease at all on a given tract." *Udall v. Tallman*, 380 U.S. 1, 4 (1965). Section 17(a) of the MLA establishes the Secretary's discretion by providing that lands "may"—not must—be leased by the Secretary. 30 U.S.C. § 226(a) ("All lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits may be leased by the Secretary."). And courts have consistently recognized the Secretary's discretion in oil and gas leasing decisions. *E.g.*, *United States ex rel McLennon v. Wilbur*, 283 U.S. 414, 419 (1931) (MLA "goes no further than to empower the Secretary to execute leases"); *W. Energy All. v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013) (Secretary has "considerable" discretion in leasing decisions); *Schraier v. Hickel*, 419 F.2d 663, 665-79 (D.C. Cir. 1969) (affirming Secretary has "discretion to decline to lease" even if BLM had published a notice that it would receive offers). Indeed, a unanimous Supreme Court has affirmed the Secretary's authority under the MLA to issue a "general order" rejecting oil and gas applications "[i]n order to effectuate the conservation policy of the President." *Wilbur*, 283 U.S. at 418.

As originally enacted, the MLA directed the Secretary to offer leases in two ways. "BLM initiated competitive bidding only for those parcels within a 'known geologic structure of a producing oil or gas field' (KGS). 30 U.S.C. § 226(b)(1). All other areas were leased through a

---

[1] Generally speaking, the MLA applies on public domain lands. The Mineral Leasing Act for Acquired Lands, 30 U.S.C. §§ 351-360, applies on acquired lands. Congress provided exceptions and authorizations for leasing oil and gas on specific lands as summarized in 43 C.F.R. § 3100.0-3. Leasing in the National Petroleum Reserve – Alaska and in the Arctic National Wildlife Refuge are pursuant to separate statutory authority and procedures. *See, e.g.*, 43 C.F.R. part 3130. Plaintiffs' complaint addresses only leasing under the MLA, and thus reaches only public domain lands subject to that Act.

3

noncompetitive lease process." *W. Energy All. v. Salazar*, No. 10-CV-0226, 2011 WL 3737520, at *4 (D. Wyo. June 29, 2011). By 1987, however, Congress noted concerns that the vast majority of leases were being issued through the noncompetitive process, thus depriving the public of a fair return in certain situations. *E.g.*, S. Rep. No. 100-188, at 2 (1987) (recounting "the criticism that the Federal Government is not receiving fair market value for potentially valuable deposits" when "over 95 percent of all outstanding leases have been issued on a noncompetitive basis"). Accordingly, Congress enacted the Federal Onshore Oil and Gas Leasing Reform Act of 1987 (1987 Reform Act), Pub. L. No. 100–203, title V, subtitle B, 101 Stat. 1330.

The 1987 Reform Act amended Section 17(b) of the MLA by directing the Secretary to offer most oil and gas leases through a competitive process. *Id.* § 5102(a) (codified at 30 U.S.C. § 226(b)(1)). Parcels that did not receive a minimum bid would then be available for noncompetitive leasing for a two-year period. *Id.* § 5102(b) (codified at 30 U.S.C. § 226(c)). But these amendments to Sections 17(b)–(c) of the MLA were not intended to displace the Secretary's general discretion over oil and gas leasing in Section 17(a). H.R. Rep. No. 100-378, at 11 (1987) ("*Subject to the Secretary's discretionary authority under section 17(a) of the 1920 Act to make lands available for leasing*, section 2(a) establishes a competitive oil and gas leasing program where lands are leased to the highest responsible qualified bidder by competitive bidding." (emphasis added)); Hearing Before the Senate Subcommittee on Mineral Resources Development and Production of the Committee on Energy and Natural Resources, 100th Cong. 100-4H4 at 108 (June 30, 1987) (Senate Committee Hearing) (sponsor of Senate bill explaining

4

that his bill did "not change the Secretary's discretion in refusing to lease").[2] Thus, the "MLA, as amended by the Reform Act of 1987, continues to vest the Secretary with considerable discretion to determine which lands will be leased." *W. Energy All. v. Salazar*, 709 F.3d at 1044.

To implement this shift toward competitive leasing, the 1987 Reform Act established that "[l]ease sales shall be held for each State where eligible lands are available at least quarterly." Pub. L. No. 100–203, title V, subtitle B § 5102(a) (codified at 30 U.S.C. § 226(b)(1)). While Congress did not elaborate on the meaning of the phrase "where eligible lands are available," the Department of the Interior informed Congress of its view that it retained discretion not to lease based on, *inter alia*, "compliance with NEPA protection of the environment." Legislation to Reform the Federal Onshore Oil and Gas Leasing Program on H.R. 933, H.R. 2851 Before the H. Comm. on Interior and Insular Affairs, at 67, 83 (July 28, 1987). And while the Senate initially sought to exempt lease sales from NEPA, S. Rep. No. 100-188, at 6, 49, the Senate receded from that position after conferencing with the House, H.R. Conf. Rep. No. 100-495, at 782 (1987).

Consistent with its position before Congress during the enactment of the 1987 Reform Act, Interior has interpreted the phrase "where eligible lands are available" to require, at a minimum, that "all statutory requirements and reviews have been met, including compliance with the National Environmental Policy Act." BLM Manual MS-3120 Competitive Leases (P).1.11 (2013). That longstanding interpretation has been in place for at least a quarter century. *See* ECF No. 120-6, at PR101, PR105.

---

[2] While the 1987 Reform Act did not authorize the Secretary "to reject a bid at or over the minimum bid if he determines it does not represent a reasonable return to the public," H.R. Conf. Rep. No. 100-495, at 780 (1987), the 1987 Reform Act otherwise, "like the previous version of the MLA, . . . vests the Secretary at the outset with considerable discretion to determine which public lands are suitable for leasing," *Salazar*, 2011 WL 3737520, at *5.

C.      The National Environmental Policy Act (NEPA)

NEPA—the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*—is a procedural statute that requires federal agencies to consider the impacts of, and alternatives to, federal actions significantly affecting the environment. It ensures that federal agencies take a "hard look" at the environmental consequences of their proposed actions before deciding to proceed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989).

Interior complies with NEPA for oil and gas lease sales through detailed documents called Environmental Assessments (EAs), 40 C.F.R. § 1501.5, or even more detailed documents called Environmental Impact Statements (EISs), *id.* § 1502.1, that analyze environmental impacts associated with leasing. Errors in these NEPA documents can result in lease sales being vacated by a court or lease development being enjoined. *See infra* Part II.

II.     Factual Allegations

*Executive Order 14,008:* On January 27, 2021, the President issued Executive Order 14,008, "Tackling the Climate Crisis at Home and Abroad," which directs various agencies to take actions to address climate change. 86 Fed. Reg. 7,619. That Order directs Interior to undertake a comprehensive review of federal oil and natural gas leasing—including royalty rates—while "to the extent consistent with applicable law" pausing new leases to preserve the status quo. *Id.* at 7624–25. Interior is working on an interim report that it expects to complete in early summer.

*Offshore Lease Sales:* On November 18, 2020, BOEM published a proposed notice of Lease Sale 257. 85 Fed. Reg. 73,508. BOEM then issued a record of decision on January 21, 2021, selecting its preferred alternative under NEPA. 86 Fed. Reg. 6,365. BOEM, however, did not publish a Final Notice of Sale, which is a statutory prerequisite for any sale, 30 C.F.R. § 556.308.

With respect to Lease Sale 258, BOEM issued a notice of intent to prepare an environmental impact statement on September 10, 2020. 85 Fed. Reg. 55,861. Also on September 10, 2020, BOEM issued a Call for Information and Nominations under OCSLA for Lease Sale 258, seeking nominations of leasing areas and comments from the public on issues to be considered. *Id.* 55,859. On January 15, 2021, BOEM published a Notice of Availability of a draft environmental impact statement for Lease Sale 258 and opened a comment period scheduled to close March 1, 2021. 86 Fed. Reg. 4117.

Following the President's Executive Order, BOEM rescinded the record of decision for Lease Sale 257 "to comply with Executive Order 14008." 86 Fed. Reg. 10,132 (Feb. 18, 2021). BOEM stated, "[a]fter completion of the review specified in the Executive Order, BOEM may reevaluate [Gulf of Mexico] Lease Sale 257 and publish an appropriate [record of decision] in the Federal Register." *Id.* BOEM also canceled the public comment period for the Lease Sale 258 draft environmental impact statement. 86 Fed. Reg. 10,994 (Feb. 23, 2021). BOEM indicated that it would publish a subsequent notice in the Federal Register if it decides to resume its NEPA evaluation following the Presidentially directed comprehensive review. *Id.*

*Onshore Lease Sales:* In recent years, BLM's oil and gas leasing decisions have faced numerous NEPA challenges alleging failures to consider groundwater impacts, greenhouse gas emissions, and impacts on the greater sage-grouse, as well as other issues. Adverse judicial determinations—and the expanded NEPA reviews that have followed—have led to heavy workloads in environmental analyses of BLM's oil and gas leasing program. For example, a trio of lawsuits in the District of Columbia illustrate how NEPA challenges to BLM's oil and gas leasing decisions have resulted in substantially increased NEPA workloads. *See WildEarth Guardians v. Zinke* (*WEG I*), 368 F. Supp. 3d 41 (D.D.C. 2019) (challenging eleven oil and gas

lease sales covering over 460,000 acres of land in Wyoming, Utah, and Colorado); *WildEarth Guardians v. Bernhardt*, No. 1:20-cv-00056, 2020 WL 111765 (D.D.C. Jan. 9, 2020), Compl. ¶¶ 6, 10–11 (challenging "23 BLM oil and gas lease sales across five Western states—Colorado, Montana, New Mexico, Utah, and Wyoming" covering more than two million acres of land); *WildEarth Guardians v. De La Vega*, No. 1:21-cv-00175-RC (D.D.C. Feb. 17, 2021), Am. Compl. ¶¶ 6, 11–13, ECF No. 13 (challenging "28 BLM oil and gas lease sales across four Western states—Colorado, New Mexico, Utah, and Wyoming" covering over 1.3 million acres of land). The first of those cases resulted in a 2019 decision holding that five BLM lease sales held in Wyoming—between May 2015 and August 2016—violated NEPA for failing to adequately evaluate greenhouse gas emissions. *WEG I*, 368 F. Supp. 3d at 67–77 (enjoining lease development pending remand to BLM to prepare additional NEPA analysis).

Following the 2019 *WEG I* decision, BLM prepared supplemental NEPA analysis for its 2015–16 Wyoming lease sales. *See WildEarth Guardians v. Bernhardt* (*WEG II*), 1:16-cv-1724, 2020 WL 6701317, at *4–5 (D.D.C. Nov. 13, 2020). Plaintiffs promptly challenged that supplemental analysis as containing still-inadequate analysis of greenhouse gas emissions. *Id.* at *5. And Plaintiffs filed their second lawsuit challenging 23 more lease sales—including nine lease sales in Wyoming covering more than 1.6 million acres—as violating *WEG I. WEG v. Bernhardt*, 2020 WL 111765, Compl. ¶ 133. BLM successfully sought remand without vacatur for 20 of the 23 challenged lease sales, *WildEarth Guardians v. Bernhardt*, No. 1:20-cv-00056, ECF No. 46 (D.D.C. Oct. 23, 2020), but any drilling approvals for leases sold during those sales could be vulnerable to similar NEPA challenges until BLM prepares supplemental NEPA analysis.

On November 13, 2020, the court issued its *WEG II* decision, finding that BLM's post-*WEG I* supplemental NEPA analysis was deficient in analyzing greenhouse gas emissions, by failing to adequately address issues such as carbon budgeting. *See WEG II*, 2020 WL 6701317, at *12. The court again enjoined BLM from approving drilling permits or other lease development activity, while remanding to BLM for further NEPA analysis. *Id.* at *15. In remanding, the court "urge[d] BLM to conduct a robust analysis, using conservative estimates based on the best data, analyzed in an unrushed fashion, so that the analysis can effectively serve as a model for the other leases." *Id.* n.16.

Following the November 2020 *WEG II* decision, plaintiffs filed their third lawsuit challenging 28 additional lease sales as violating *WEG I* and *WEG II*. *WEG v. De La Vega*, No. 1:21-cv-00175, Am. Compl. ¶¶ 6, 11–13, ECF No. 13. Thus, this trio of lawsuits brought by a single set of plaintiffs before a single district court judge has resulted in BLM (1) undertaking a third round of NEPA analysis for five oil and gas lease sales from 2015 and 2016, (2) considering additional NEPA analysis for twenty oil and gas lease sales in light of new caselaw in *WEG I* and *WEG II*, and (3) defending thirty-seven[3] more oil and gas lease sales against ongoing NEPA challenges. And there are numerous other ongoing NEPA challenges to BLM's oil and gas lease sales involving different issues, different plaintiff groups, and different courts.

In light of this growing NEPA workload and evolving NEPA case law, BLM postponed first-quarter sales "to confirm the adequacy of underlying environmental analysis." Compl. ¶ 105.

---

[3] This includes six outstanding lease sales from the first lawsuit, three from the second lawsuit, and twenty-eight from the third lawsuit.

III.     **The Standards of Review**

A.     **Judicial Review of Agency Action; the APA Standard**

The Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, governs judicial review

of agency actions. Courts may "set aside" agency action that is arbitrary and capricious or

contrary to law. 5 U.S.C. § 706(2). And courts may "compel" unreasonably delayed agency

action. *Id.* § 706(1). Because judicial review is confined to "circumscribed, discrete agency

actions," however, courts lack broader supervisory authority over agencies. *Norton v. S. Utah

Wilderness All.*, 542 U.S. 55, 62 (2004).

APA review generally "involves neither discovery nor trial" because the "focal point of

APA review is the existing administrative record." *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir.

2013); *accord Goonsuwan v. Ashcroft*, 252 F.3d 383, 391 (5th Cir. 2001). A reviewing court's

role is to determine whether "the decision was based on a consideration of the relevant factors

and whether there has been a clear error of judgment." *Judulang v. Holder*, 565 U.S. 42, 53

(2011) (internal quotation marks omitted). Under this highly deferential standard, agency actions

are presumed to be valid. *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 588 (5th Cir. 2014).

The court must not "substitute its judgment for that of the agency as to which particular features

might be most desirable or efficacious." *Sierra Club v. Glickman*, 67 F.3d 90, 97 (5th Cir. 1995).

B.     **The Motion to Dismiss Standard**

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), "all

well-pleaded facts are viewed in the light most favorable to the plaintiff." *City of Clinton, Ark. v.

Pilgrim's Pride Corp.*, 632 F.3d 148, 152–53 (5th Cir. 2010). A motion to dismiss should be

granted where the "complaint fails to plead sufficient facts to state a claim that is plausible,

rather than merely conceivable, on its face." *Stem v. Gomez*, 813 F.3d 205, 209 (5th Cir. 2016)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To survive a motion to dismiss,

the claim must have "facial plausibility" such that its "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 209 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A complaint is insufficient if it offers only 'labels and conclusions,' or 'a formulaic recitation of the elements of a cause of action.'" *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 668).

The Court "must consider the complaint in its entirety . . . in particular documents incorporated into the complaint by reference." *Funk v. Stryker*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). Moreover, "it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Id.* (quoting *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007)).

## ARGUMENT

**I.    Plaintiffs Fail to State a Claim for Relief From an Allegedly *Ultra Vires* Presidential Order.**

Plaintiffs do not deny that the Constitution vests the President with broad executive power, including the power to direct subordinate officers. Nor could they; as head of the Executive Branch, "the President's power necessarily encompasses 'general administrative control of those executing the laws.'" *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)). Plaintiffs instead allege that Executive Order 14,008 is *ultra vires* on its face, either because it unilaterally imposes a moratorium on lease sales or because it directs subordinate officers to impose such a moratorium, all in violation of the MLA and OCSLA. Compl. ¶ 177.

The claim cannot be reconciled with the plain text of the Executive Order. The Order does not unilaterally impose any such moratorium (it is not self-executing), and nothing in the Order directs a subordinate officer to act in violation of any law. To the contrary, Section 208 of

11

Executive Order 14,008 explicitly directs the Secretary to pause oil and gas leasing only "to the extent consistent with applicable law." Executive Order 14,008 § 208 ("To the extent consistent with applicable law, the Secretary of the Interior shall pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices . . . .").

Addressing an Executive Order with similar language, the D.C. Circuit held it could not be *ultra vires* because, if the agency "may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Bldg. & Const. Trades Dep't*, 295 F.3d at 33. Courts cannot ignore language in an Executive Order and must give effect to its plain meaning. *See Common Cause v. Trump*, No. 120-cv-2023, 2020 WL 8839889, at *6 (D.D.C. Nov. 25, 2020) ("[The presidential directive] "ends with a general instruction that '[t]his memorandum shall be implemented consistent with applicable law.' We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the [presidential directive].").

Because Executive Order 14,008 is facially valid, its directive to take action only "to the extent consistent with applicable law" disposes of Plaintiffs' *ultra vires* claim. And neither of the cases Plaintiffs cited in earlier briefing requires a different result. *See* Opp. to Transfer, ECF No. 95 at 9 n.3 (citing two cases, in the context of venue briefing, in response to the United States' explanation that the *ultra vires* claim is not colorable). The first, *City and County of San Francisco v. Trump*, dealt with an executive order directing the Executive Branch to condition federal grants on cooperation with the Administration's immigration policy goals. 897 F.3d 1225, 1233-34 (9th Cir. 2018). Recognizing that the Spending Clause "vests exclusive power to

Congress to impose conditions on federal grants," the court explained that "the Executive Branch may not refuse to disperse the federal grants in question without congressional authorization." *Id.* at 1231. And it found that the Administration had not shown that Congress had authorized the Executive to condition new grants on compliance with immigration laws or the Administration's immigration strategies." *Id.* at 1233-35. Thus, the court ruled that any implementation of the order by the executive branch would violate the constitution and federal statute or else would require the court to interpret the order as a nullity. *Id.* at 1238 ("the Administration argues that the Executive Order is all bluster and no bite . . . use of the presidential 'bully pulpit,' without any real meaning"). And it was on this basis that the court determined that the executive order's "savings clause," "to the extent consistent with law," did not immunize it from judicial review; the court reasonably concluded that the executive order's command could not be implemented "consistent with law." *See id.* at 1239-40.

The second case that Plaintiffs reference, *Hias, Inc. v. Trump*, also involved an executive order facially contradicting a federal statute. No. 20-1160, 2021 WL 69994, at *6 (4th Cir. Jan. 8, 2021). There, a statute required the Secretary of State, when resettling refugees, to "consult" with resettlement agencies, States, and localities, then make resettlement determinations based on the Secretary of State's assessment of resources available to refugees across the country. *Id.* The challenged order, however, provided that the federal government should "resettle refugees *only* in those jurisdictions in which both the State and local governments have consented to receive refugees," unless the Secretary of State determined that following the order in a given instance would be inconsistent with law, notified the President of that determination in advance, and provided his reasons for it. *Id.* at *2 (quoting executive order). The court concluded that the Executive Order had replaced the statutory consultation process with a one-sided, opt-in system

13

whereby the individual states could veto resettlement within their borders, despite Congress's choice "not to require the 'approval' or 'consent' of the states and localities." *Id.* at *5. Here again, the "savings clause" did no actual work because no implementation of the Executive Order could ever be consistent with the relevant statute.[4]

The common thread in both cases is that the presiding courts declined to credit the savings clauses after finding the challenged executive orders could not be implemented consistent with law. But here, the Secretary of the Interior holds broad discretion in the management of the leasing programs under the MLA and OCSLA, including the discretion not to lease any given parcel, or to defer lease sales, particularly when necessary to comply with other environmental and federal resource statutes.

Beginning with OCSLA, the Secretary has regularly deferred or cancelled lease sales when necessary to allow review and consideration under relevant environmental laws, and pausing lease sales pending such a review is consistent with the statute. OCSLA does not compel that lease sales occur on any particular date, *see* 43 U.S.C. § 1337 (governing lease sales), nor does it require that agencies proceed with lease sales proposed in the Five Year Program, *see* § 1344 (directing the Secretary to prepare and periodically revise a schedule of "proposed" lease sales). Plaintiffs' arguments to the contrary ignore the "pyramidic" structure of OCSLA. *See State of Cal. By & Through Brown v. Watt*, 712 F.2d 584, 588 (D.C. Cir. 1983) (the OCSLA "process is 'pyramidic in structure, proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent.' . . . Thus, while an area excluded

---

[4] Also significant here, the "savings clause" in *Hias* is materially different from plain language in Executive Order 14,008. In *Hias*, the Secretary of State needed to jump through hoops in order to override the "consent" requirement, whereas Executive Order 14,008 simply directs the Secretary of the Interior to pause lease sales only where consistent with applicable law.

from the leasing program cannot be leased, explored, or developed, an area included in the program may be excluded at a later stage"). As the D.C. Circuit[5] has recognized, "the completion of the first stage of a leasing program [adopting a Five Year Program] . . . does not require any action . . . ." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 483 (D.C. Cir. 2009) (finding Endangered Species Act claim was not ripe at program approval stage because a program that does not require any action cannot cause any harm). In contrast, where Congress intended that an act occur within a certain time, OCSLA sets a deadline. *See, e.g.*, 43 U.S.C. § 1351 (requiring the Secretary to act on a development and production plan within 60 days from the completion of the NEPA process).

History is replete with examples of Interior pausing and cancelling lease sales proposed in the Outer Continental Shelf leasing program. *See* Cong. Rsch. Serv., *Five-Year Program for Offshore Oil and Gas Leasing: History and Program for 2017-2022*, at 10–12 (Aug. 23, 2019), https://fas.org/sgp/crs/misc/R44504.pdf. For example, Interior cancelled lease sales in the Mid-Atlantic and Gulf of Mexico to allow for the development of stronger protections following *Deepwater Horizon*. 75 Fed. Reg. 44,276 (July 28, 2010). And at least one sale has been postponed by a sitting administration in order to allow an incoming administration to decide whether to proceed with the sale. *See Nat. Res. Def. Council*, 865 F. 2d at 293 n.3 ("the Secretary delayed publication of a final environmental impact statement for Lease Sale 91 . . . to permit the new incoming administration to decide whether to proceed with the sale"). Plaintiffs' *ultra vires*

---

[5] Because the D.C. Circuit has exclusive jurisdiction under OCSLA to review the Secretary's approval of five year programs adopted pursuant to § 1344, that Circuit has the most relevant precedent explaining that the adoption of a five year program—OCSLA's first stage—does not compel any particular action or decision in OCSLA's subsequent stages, including lease sale.

count requests unprecedented relief that is inconsistent with OCSLA and its application over the decades.

Similarly, the "MLA, as amended by the Reform Act of 1987, continues to vest the Secretary with considerable discretion to determine which lands will be leased." *W. Energy All.*, 709 F.3d at 1044. Given the Secretary's "considerable discretion" in oil and gas leasing, she has numerous options to implement an onshore leasing pause to the extent consistent with law. For example, she could substantially reduce the size of sales pending the completion of the comprehensive review called for by the Executive Order, or postpone sales which require additional NEPA analysis, *see supra* Part II (*Offshore Lease Sales*). Recent history confirms the Secretary's authority in this area, with numerous examples of quarterly lease sale postponements over the last seven years. ECF No. 123-1, Attachment 1 (collecting 19 publicly available examples of such postponements).

Because Executive Order 14,008 directs the Secretary to pause new lease sales only to the extent "consistent with applicable law," and because both the MLA and OCSLA give the Secretary ample discretion in the management of Interior's leasing programs, there is no basis for Plaintiffs' contention that the Executive Order violates either statute. Accordingly, Plaintiffs' *ultra vires* claim should be dismissed and the President should be dismissed as a defendant.

## II.     Plaintiffs' OCSLA Citizen Suit Claims (Count IX) Should be Dismissed

Plaintiffs' OCSLA citizen suit claim should be dismissed because it fails to comply with OCSLA's statutory requirement that a would-be plaintiff give Interior notice of the plaintiff's intent to sue at least 60 days before filing a citizen suit. § 1349(a)(2).[6] Plaintiffs provided the

---

[6] Count IX claims "Executive Order 14008 and its [OCSLA] Leasing Moratorium violate OCSLA by failing to adhere to its comprehensive procedures applicable to promulgating and amending Five Year Programs and holding lease sales." Compl. ¶ 170 (citing, among other

Secretary of the Interior and the Director of BOEM with a letter stating they intended to sue on March 21, 2021. Compl. ¶ 173. But Plaintiffs filed suit only two days later, thus failing to comply with the notice requirement. *See Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 768 (5th Cir. 2011) ("notice is still deficient [where a party] gave it only one day before becoming a plaintiff"). OCSLA excuses plaintiffs from the 60-day notice requirement only where "the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349. Plaintiffs make no allegations regarding threats to public health and safety, and do not allege any "immediate" threat to a legal interest.

"A prospectively-worded citizen suit provision, like the OCSLA's, requires that 'the harm sought to be addressed . . . lie[ ] in the present or the future, not in the past.'" *Brown*, 663 F.3d at 769 (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 59 (1987)). Lease Sale 257 has already been postponed and the comment period for Lease Sale 258 has already been cancelled. To the extent Plaintiffs allege an ongoing procedural injury (rather than the possibility of lost revenue), qualifying such an injury as "immediate" harm would vitiate the 60-day notice requirement and eliminate Section 1349(a)(1)'s "'explicit and unambiguous' language that 'must be given palpable effect.'" *Fisheries Survival Fund v. Jewell*, No. 16-cv-2409, 2018 WL 4705795, at *10-11 (D.D.C. Sept. 30, 2018)[7] (quoting *Duke Energy*

---

sections, 43 U.S.C. § 1344); *see also id.* ¶ 76. Plaintiffs' claims should also be dismissed to the extent they plead claims over which the D.C. Circuit has exclusive jurisdiction. OCSLA provides that "[a]ny action of the Secretary to approve a leasing program pursuant to section 1344 of this title shall be subject to judicial review only in the United States Court of Appeal for the District of Columbia." 43 U.S.C. § 1349.

[7] *Aff'd sub nom. Fisheries Survival Fund v. Haaland*, No. 20-5094, 2021 WL 2206426 (D.C. Cir. May 20, 2021), and *aff'd sub nom. Fisheries Survival Fund v. Haaland*, No. 20-5094, 2021 WL 2206426 (D.C. Cir. May 20, 2021).

*Field Servs. Assets, L.L.C. v. Fed. Energy Regul. Comm'n*, 150 F. Supp. 2d 150, 155 (D.D.C. 2001)).[8] As such, Plaintiffs have established no immediate harm sufficient to excuse their compliance with the 60-day notice requirement.

Plaintiffs' assertion that they will eventually receive less money because the federal government will eventually collect less money in bonuses, rents, and royalties, of which Plaintiffs get a share, *see* Compl. ¶¶ 116, 122, also is not the type of immediate harm that can excuse a plaintiff from OCSLA's 60-day notice requirement. *See Fisheries Survival Fund*, 2018 WL 4705795, at *10-11 (rejecting plaintiffs' argument that "since the lease auction occurred only forty-five days after the Final Sale Notice was published, they did not have sixty days to notify Defendants of their claims before the Final Sale and should therefore be excused from compliance with the sixty-day requirement"). There are many months and several intervening agency decisions between holding any lease sale and the receipt of funds by Plaintiffs.

For example, Alaska's legal conclusion that it will be "imminently harmed" by the halt of Lease Sale 258 lacks any facts to render it plausible. Compl. ¶ 118. Instead, Alaska cites a study projecting the number of jobs and amount of money that it claims could *eventually* result from a lease sale in the Cook Inlet. *Id.* But these projected benefits are in the indefinite future, not "imminent." Moreover, when the Secretary paused the Lease Sale 258 NEPA process, BOEM was only about halfway through the sale planning process. *See* 30 C.F.R. §§ 556.304, 305, 307, 308. This administrative process must be completed before Interior can hold a lease sale under OCSLA. Even for Lease Sale 257, a Final Notice of Sale would need to be published at least 30

---

[8] Relevant to Plaintiffs' other claims, *Duke Energy Field Servs. Assets, L.L.C. v. Fed. Energy Regul. Comm'n*, also dismissed claims brought under the APA for alleged violation of OCSLA procedures based on failure to provide 60-day notice. 150 F. Supp. 2d at 155.

days before any sale could be held, *id.* § 556.308, then the Attorney General in consultation with the Federal Trade Commission has 30 days to review the results of the lease sale before BOEM may accept any bid, *id.* § 556.516, BOEM has at least 90 days to decide whether to accept any bid, *id.*, and ultimately BOEM could reject all bids, *id.* ("BOEM reserves the right to reject any and all bids received, regardless of the amount offered."). For all these reasons, Plaintiffs have not pled "immediate" harm sufficient to excuse compliance with the 60-day notice requirement.

III.    **Plaintiffs' APA Claims Should Be Dismissed**

    A.    **Plaintiffs assert an improper programmatic challenge**

Plaintiffs' APA counts repeatedly challenge the "OCSLA Leasing Moratorium," Compl. Count I-IV headings, ¶¶ 136, 137, and the "MLA Leasing Moratorium," Compl. Count V-VIII headings, ¶¶ 152, 154, 155, 162, 163, 166, 167. Tellingly, although capitalized through the Complaint, these terms are never defined. The Complaint does define "Biden Ban," and regularly cites Executive Order 14,008, but the "actions of the President cannot be reviewed under the APA because the President is not an 'agency' under that Act." *Dalton v. Specter*, 511 U.S. 462, 476 (1994). Thus, to succeed on their APA claims, Plaintiffs must challenge agency actions, not Presidential actions.

Plaintiffs' challenges fail at this threshold. While Plaintiffs identify individual agency lease sale deferrals, *e.g.*, Compl. ¶¶ 138, 140, none of those actions purports to constitute an across-the-board moratorium on lease sales. Instead, the Complaint acknowledges that those actions occurred at different times with different rationales. *See, e.g.*, Compl. ¶ 78 (citing February 18 rescindment of record of decision to comply with Executive Order); *id.* ¶ 103 (citing Nevada "*Errata*," which published on January 27, 2021, and "provides no reasons for postponing" lease sale); *id.* ¶ 105 (citing Wyoming February 12, 2021 announcement that "lease

sales are postponed to confirm the adequacy of underlying environmental analysis" (internal quotations omitted)).

Unable to identify a single discrete agency action tantamount to a program-wide moratorium, Plaintiffs still seek an order governing agency obligations "under the OCSLA's and MLA's oil and gas leasing programs," Compl. ¶ 7, in violation of the prohibition on programmatic challenges. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–93 (1990). In *Lujan*, the plaintiff sought judicial review of a "so-called 'land withdrawal review program'" that it described as consisting of numerous individual land use decisions. *Id.* But the Supreme Court held that "the flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA." *Id.* at 893.

The Fifth Circuit's decision in *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484 (2014), is also instructive. There, the plaintiff Tribe sought to challenge the approval of all "drilling leases and permits to third parties" on land to which the Tribe asserted title. *Id.* at 486. The Fifth Circuit held that it lacked jurisdiction to hear such a "blanket challenge to *all* of the Government's actions with respect to *all* permits and leases" that was directed at "the way the Government administers these programs and not to a particular and identifiable action taken by the Government." *Id.* at 491–92. Even though the Tribe alleged that a particular policy applied across all permitting decisions—"namely the agencies' failure to consider and accommodate the Tribe's aboriginal title"—the Fifth Circuit rejected the challenge as directed to "the federal agencies' broad policies and practices" rather than an "'agency action' sufficient to trigger the sovereign immunity waiver from [5 U.S.C.] § 702." *Id.*

20

As in *Lujan* and *Alabama-Coushatta*, Plaintiffs' challenge to the alleged moratoriums should be rejected as an improper programmatic challenge. Like the "so-called 'land withdrawal review program'" in *Lujan*, the term "moratoriums" "is not derived from any authoritative text" from the agency but "is simply the name by which [Plaintiffs] have occasionally referred to the continuing (and thus constantly changing) operations of the BLM" and BOEM in evaluating oil and gas lease sales. 497 U.S. at 890. Plaintiffs also seek to control future conduct of the agency in "actions yet to be taken," *Lujan*, 497 U.S. at 893, namely an indefinite number of future lease sales,[9] despite the rule that allegations "cover[ing] actions that have yet to occur . . . . do not challenge specific 'agency action,'" *Alabama-Coushatta*, 757 F.3d at 490. Plaintiffs' moratorium challenges focus on systemic changes, rather than individual agency decisions, *see* Compl. ¶ 152 (challenging "systematic delay of scheduled quarterly sales"), even though such "systemic improvement[s]" must be sought before the legislative or executive branches, *Lujan*, 497 at 894. And Plaintiffs seek discovery at the outset of the case in order to cure their failure to identify a specific agency action,[10] in contravention of *Alabama-Coushatta*, 757 F.3d at 491 (rejecting efforts to salvage an impermissible programmatic challenge by invoking the need for "discovery to learn what agency actions are currently pending" as "unavailing, especially given the fact that information regarding the Government's management of natural resources on public lands is readily available").

Nor can Plaintiffs' improper programmatic challenge be salvaged by invoking the rare instances in which challenges to unwritten agency actions have been allowed to proceed. A

---

[9] For example, Plaintiffs allege injury based on the presumed "cancellation of future lease sales," Compl. ¶ 121, and thus seek to compel "Defendants to proceed with leasing sales," *id.* p.50 ¶ f.

[10] *See* Compl. ¶ 102 n.8 ("Plaintiff States intend to pursue . . . in discovery" a document explaining why "BLM State offices . . . systematically halt[ed] lease sales").

21

recent decision from a sister court demonstrates this principle. *Walmart Inc. v. U.S. Dep't of Just.*, --- F. Supp. 3d ---, No. 4:20-cv-817, 2021 WL 410618, at \*3–4, 11–12 (E.D. Tex. Feb. 4, 2021). In *Walmart*, the plaintiff sought declaratory relief that the agency's "unwritten expectations" were contrary to the Controlled Substances Act (CSA). *Id.* at \*3–5. But the court dismissed their claim as an improper programmatic challenge, explaining that their relief sought to "comprehensively address the standard of liability for pharmacists under any and all circumstances arising from the provisions of the CSA." *Id.* at \*11–12. Similarly here, Plaintiffs seek a comprehensive declaration that any leasing pause under any set of circumstances (*i.e.*, an undefined "Leasing Moratorium") is "contrary to OCSLA and the MLA." Compl. p.50 ¶ a.

In sum, Plaintiffs' challenges to the so-called moratoriums are not cognizable under the APA and must be dismissed, because "the term 'action' as used in the APA is a term of art that does not include all conduct such as, for example, . . . operating a program." *Louisiana v. United States*, 948 F.3d 317, 321 (5th Cir. 2020) (dismissing Louisiana's programmatic challenge).[11]

### B.        Plaintiffs do not challenge final agency action

In addition to programmatically challenging the alleged moratoriums, Plaintiffs challenge the deferral of individual lease sales by BOEM and the various BLM State Offices. Plaintiffs'

---

[11] Although the APA allows challenges to agency action in the form of "rules," 5 U.S.C. § 551, the challenged actions here are not "rules." The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). But a mere "intent" to take action is not a "rule" within the meaning of the APA. *Walmart*, 202 WL 410618, at \*8 (rejecting challenge to unwritten agency interpretation of statute because there was no "fixed 'statement' from a government agency 'designed to implement, interpret, or prescribe law or policy'" (quoting 5 U.S.C. § 551(4)); *see also Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) (a rule "establish[es] a standard of conduct which has the force of law." (internal quotations omitted)). Nothing in the Complaint identifies any fixed statement from a government agency—let alone one with the force of law—prescribing how future lease sales will be conducted. Accordingly, Plaintiffs do not challenge agency action in the form of a "rule."

counts challenging the deferrals must be dismissed because those deferrals are not final agency actions subject to judicial review under 5 U.S.C. § 706(2).

The individual actions are not "final" agency actions as required by 5 U.S.C. § 704. "If there is no 'final agency action,' as required by the controlling statute, a court lacks subject matter jurisdiction." *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999). To be a "final" agency action subject to judicial review, an agency action must meet two conditions" "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 580–81 (5th Cir. 2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Here, the challenged actions do not meet the first condition because they are merely interim postponements of lease sales; they are not decisions to forego the sales entirely, and the ultimate decision has not yet been made. *E.g.*, Compl. ¶ 103 (alleging Nevada sale was "postponed"), *id.* ¶ 104 (alleging Colorado, Montana, Utah, and Wyoming sales were "postponed"). Deferrals or postponements of agency decisions are not "final" agency actions because they are necessarily interlocutory in nature. *See, e.g.*, *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 68 (D.C. Cir. 2000) ("A decision by an agency to defer taking action is not a final action reviewable by the court."); *Shawnee Trail Conservancy v. Nicholas*, 343 F. Supp. 2d 687, 701 (S.D. Ill. 2004) (postponing a decisional process regarding public land use "does not mark the consummation of an agency decisionmaking process but instead reflects an interim or interlocutory decision to postpone the decisionmaking process to a more convenient time and to

a more comprehensive process. It is not, as the plaintiffs imply, an affirmative agency decision to prohibit" use).

The challenged actions also do not meet the second condition because they do not determine rights or obligations, and do not trigger legal consequences. For example, the Record of Decision for Lease Sale 257 was a NEPA document that did not grant any right or determine any obligation, and would not have caused any lease sale to happen. Its rescission therefore had no real-world consequences. *See* 86 Fed. Reg. 10132 (Feb. 18, 2021) ("After completion of the review specified in the Executive Order, BOEM may reevaluate GOM Lease Sale 257 and publish an appropriate ROD in the Federal Register."). It simply told the world where the agency stands in its decision-making process.

Nor could Plaintiffs' OCSLA citizen suit count circumvent the APA's limits on judicial review of agency action. In *OXY USA Inc v. Babbitt* (*OXY*), the Fifth Circuit held the citizen suit provision cannot operate as "a means of obtaining 'umbrella' review for a series of agency decisions that were or will be otherwise subject to judicial review under the APA, or as an express avenue for appealing to the district court an initial agency decision that is subject to further review within the agency." 122 F.3d 251, 258 (5th Cir. 1997).

The court rejected the plaintiffs' claim that, much like Count IX here, challenged an alleged "final determination" that they argued was "'revealed by,' 'reflected in,' and otherwise manifested 'through'" certain other agency actions. *Id.* There, as here, Plaintiffs sought to use the citizen suit provision "as an avenue of obtaining judicial review of OCSLA-related agency decisions that is wholly independent of the judicial review procedures set forth in the APA." *Id.* The Fifth Circuit rejected this attempt because the actions Plaintiffs challenged were—by their own terms—subject to further review within the agency. *Id.* To hold otherwise, it reasoned,

24

"would be to interpret the citizen suit provision as implicitly repealing the APA with respect to such agency action" *Id.*; *see also Amerada Hess Corp. v. Dep't of Interior*, 170 F.3d 1032, 1034–35 (10th Cir. 1999) (agreeing with *OXY* but holding a suit challenging an agency decision could not be brought under OCSLA). Mirroring *OXY*, Plaintiffs' OCSLA citizen suit claim rehashes allegedly final agency actions that Plaintiffs also challenge in their APA counts. Compl. ¶ 171. Applying *OXY*, Plaintiffs' claims should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss all claims in Plaintiffs' complaint other than Count VI, and that it dismiss the President as a party.

Respectfully submitted this 7th day of June, 2021.

JEAN E. WILLIAMS
Acting Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

*/s/ Thomas W. Ports, Jr.*
THOMAS W. PORTS, JR.
MICHAEL S. SAWYER
Trial Attorneys, Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone:      (202) 305-5492 (Ports)
                      (202) 514-5273 (Sawyer)
Fax:               (202) 305-0506
Email:            Thomas.Ports.Jr@usdoj.gov
                      Michael.Sawyer@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 7, 2021, I filed the foregoing document electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.


*/s/ Thomas W. Ports, Jr.*
Thomas W. Ports, Jr.