# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

STATE OF LOUISIANA ET AL        CASE NO.  2:21-CV-00778

VERSUS        JUDGE TERRY A. DOUGHTY

JOSEPH R. BIDEN, JR. ET AL        MAG. JUDGE KATHLEEN KAY

## MEMORANDUM RULING

The issue before this Court is whether the Plaintiff States[1] are entitled to a preliminary injunction against the Government Defendants[2] as a result of the implementation of a "pause" of new oil and natural gas leases on public lands or in offshore waters ("Pause") after Executive Order 14008 was signed by President Joseph R. Biden, Jr. ("President Biden") on January 27, 2021.

The Plaintiff States alleged the Government Defendants[3] violated provisions of the Administrative Procedure Act, ("APA") entitling Plaintiff States to a preliminary injunction.

---

[1] The Plaintiff States consist of the States of Louisiana, Alabama, Alaska, Arkansas, Georgia, Mississippi, Missouri, Montana, Nebraska, Oklahoma, Texas, Utah, and West Virginia.

[2] Government Defendants consist of Joseph R. Biden, Jr. in his official capacity as President of the United States; Deb Haaland, in her official capacity as Secretary of the Interior; Michael Nedd, in his official capacity as Deputy Director of the Bureau of Land Management; Chad Padgett, in his official capacity as Director of the Bureau of Land Management Alaska Office; Raymond Suazo, in his official capacity as Director for the Bureau of Land Management Arizona  Office; Karen Mouristen, in her official capacity as Director for the Bureau of Land Management California Office; Jamie Connell, in his official capacity as Director for the Bureau of Land Management Colorado Office; Mitchell Leverette, in his official capacity as Director for the Bureau of Land Management Eastern States Office; John Ruhs, in his official capacity as Director for the Bureau of Land Management Idaho Office; John Mehlhoff, in his official capacity as Director for the Bureau of Land Management Montana – Dakotas Office; Jon Raby, in his official capacity as Director for the Bureau of Land Management Nevada Office; Steve Wells, in his official capacity as Director for the Bureau of Land Management New Mexico Office; Barry Bushue, in his official capacity as Director for the Bureau of Land Management Oregon-Washington Office; Greg Sheehan, in his official capacity as Director for the Bureau of Land Management Utah Office; Kim Liebhauser, in her official capacity as Director for the Bureau of Land Management Wyoming Office; Amanda Lefton, in her official capacity as Director of the Bureau of Ocean Energy Management; Michael Celata, in his official capacity as Regional Director of the Bureau of Ocean Energy Management Gulf of Mexico Office; Lars Herbst, in his official capacity as Director of Bureau of Safety and Environmental Enforcement Gulf of Mexico OCS Office; and Mark Fesmire, in his official capacity as Regional Director of the Bureau of Safety and Environmental Enforcement Alaska and Pacific Office.

[3] With the exception of President Biden, who is not an "agency" under the Administrative Procedures Act.

A Motion for Preliminary Injunction [Doc. No. 3] was filed by Plaintiff States on March 31, 2021.  An Opposition [Doc. No. 120] was filed by Government Defendants on May 19, 2021.  A Reply [Doc. No. 126] was filed by Plaintiff States on May 28, 2021.

Having considered the pleadings, the record, the applicable laws, evidence, and oral arguments of counsel, for the reasons set forth herein, this Court finds Plaintiff States have satisfied the requirements for a preliminary injunction.  Accordingly, Plaintiff States' Motion for Preliminary Injunction is GRANTED.

## I.      BACKGROUND

The factual statements made herein should be considered as findings of fact regardless of any heading or lack thereof.   Similarly, the legal conclusions should be taken as conclusions of law regardless of any label or lack thereof.

On March 24, 2021, Plaintiff States filed a Complaint [Doc. No. 1] against Government Defendants asking for declaratory and injunctive relief as to Section 208 of Executive Order 14008, which ordered the Secretary of the Interior to pause new oil and gas leases on public lands, or in offshore waters pending completion of a comprehensive review.  This allegedly resulted in the halting of new oil and gas leases on public lands and offshore waters in violation of the United States Constitution, the APA, the Outer Continental Shelf Lands Act ("OCSLA"), and the Mineral Leasing Act ("MLA").

The Motion for Preliminary Injunction was filed by Plaintiff States on March 31, 2021. Briefs have been filed by Plaintiff States and by Government Defendants.  Amici Curiae briefs were filed by the County of Daggett, County of Rio Blanco, County of Uintah and County of Wayne [Doc. No. 116] and by Center for Biological Diversity, Cook Inletkeeper, Defenders of Wildlife, Friends of the Earth, Healthy Gulf, National Resources Defense Council, Oceana,

Sierra Club and Wilderness Society [Doc. No. 123].  Per a status conference held on June 3,

2021 [Doc. No. 127], the court set oral arguments on these issues to be heard on June 10, 2021.

The oral arguments were heard on that day in Lafayette, Louisiana.

**1.     Executive Order 14008**

On January 27, 2021, President Biden issued Executive Order 14008[4], entitled "Tackling

the Climate Crisis at Home and Abroad."  At issue in this proceeding is Section 208 of the

Executive Order, which reads as follows:

> Sec. 208.  Oil and Natural Gas Development on Public Lands and in Offshore
> Waters.  To the extent consistent with applicable law, the Secretary of the
> Interior shall pause new oil and natural gas leases on public lands or in offshore
> waters pending completion of a comprehensive review and reconsideration of
> Federal oil and gas permitting and leasing practices in light of the Secretary of
> the Interior's broad stewardship responsibilities over the public lands and in
> offshore waters, including potential climate and other impacts associated with
> oil and gas activities on public lands or in offshore waters.  The Secretary of the
> Interior shall complete that review in consultation with the Secretary of
> Agriculture, the Secretary of Commerce, through the National Oceanic and
> Atmospheric Administration, and the Secretary of Energy.  In conducting this
> analysis, and to the extent consistent with applicable law, the Secretary of the
> Interior shall consider whether to adjust royalties associated with coal, oil, and
> gas resources extracted from public lands and offshore waters, or take other
> appropriate action, to account for corresponding climate costs.

*Id.*

The implementation of Section 208 of Executive Order 14008 by the remaining

Government Defendants ("Agency Defendants") is at issue based upon the alleged violation of

the APA by the government agencies.  5 USC 551, et seq.

A court may review a Presidential Executive Order.  A President's authority to act, as

with the exercise of any governmental power, must stem either from an act of Congress, or from

the Constitution itself, or a combination of the two.  <u>Medellin v. Texas</u>, 552 U.S. 491, 128 S. Ct.

---

[4] Tackling the Climate Crisis at Home and Abroad, 86 FR 7619

1346, 170 L. Ed. 2d 190 (2008); <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579, 72 S. Ct. 863, 96 L. Ed. 1153 (1952);  <u>California v. Trump</u>, 379 F. Supp. 3d 928 (N.D. Cal. 2019), <u>aff'd,</u> 963 F.3d 926 (9th Cir. 2020), <u>cert. granted sub nom.</u> <u>Trump v. Sierra Club</u>, 141 S. Ct. 618, 208 L. Ed. 2d 227 (2020); and <u>Sierra Club v. Trump</u>, 379 F. Supp. 3d 883 (N.D. Cal. 2019), <u>aff'd,</u> 963 F.3d 874 (9th Cir. 2020), <u>cert. granted,</u> 141 S. Ct. 618, 208 L. Ed. 2d 227 (2020).

Plaintiff States have based their Motion for Preliminary Injunction on violations by the Government Agencies pursuant to the APA.  Although President Biden is not an agency subject to the APA, whether Section 208 of the Executive Order 14008 would be consistent with applicable law is at issue.  <u>California</u>, 379 F. Supp. 3d 928.  In reviewing the lawfulness of the defendants' conduct, the Court begins each inquiry by determining whether the disputed action exceeds statutory authority.  *Sierra Club v. Trump*, 379 F.Supp. 3d 883 (N.D. Cal. 2019).

A President may not transgress constitutional limitations.  Courts determine where constitutional boundaries lie.  <u>Indigenous Env't Network v. Trump</u>, 428 F. Supp. 3d 296 (D. Mont. 2019).

The case of <u>League of Conservation Voters v. Trump</u>, 363 F. Supp. 3d 1013 (D. Alaska 2019), <u>vacated and remanded sub nom.</u> <u>League of Conservation Voters v. Biden</u>, 843 F. App'x 937 (9th Cir. 2021) involved issues centered on OCSLA, which is one of the acts at issue in this proceeding. President Trump issued an Executive Order, (EO 13795) which purported to revoke previous Executive Orders involving a prior land withdrawal from OCSLA.[5] The Court found OCSLA allowed the President to withdraw lands from disposition, but it did not allow a President to revoke a prior withdrawal.  The Court held that since OCSLA does not give the President specific authority to revoke a prior withdrawal, the power to revoke a prior withdrawal

---

[5] 43 U.S.C. 1341(a) allows a President of the United States to withdraw from disposition any of the unleased lands of the Outer Continental Shelf.

lies solely with Congress under the Property Clause of the United States Constitution.  U.S. Const. art. IV, § 3, cl. 2.

Similarly, since OCSLA does not grant specific authority to a President to "Pause" offshore oil and gas leases, the power to "Pause" lies solely with Congress.  Therefore, Plaintiff States have made a showing that there is a substantial likelihood that President Biden exceeded his powers in Section 208 of Executive Order 14008.

### 2.      Administrative Procedure Act

Plaintiff States' Motion for Preliminary Injunction centers upon alleged violations of the APA by the Agency Defendants, which includes the U.S. Department of the Interior ("DOI"), the U.S. Bureau of Land Management ("BLM"), the U.S. Bureau of Ocean Energy Management ("BOEM"), the U.S. Bureau of Safety and Environmental Enforcement and named officials.

The APA allows judicial review of certain agency actions.  The Plaintiff States allege that in implementing Section 208 of Executive Order 14008, the Agency Defendants violated the following provisions of the APA:

      i.      Acted contrary to law in violation of 5 USC 706(2)(A) and (C);

      ii.      Acted in an arbitrary and capricious manner in violation of  5 USC 706(2)(A);

      iii.      Failed to provide notice and comment required by 5 USC 553(a); and

      iv.      Unreasonably withheld and unreasonably delayed agency required activity in violation of 5 USC 706(1).

Each of these allegations will be discussed in greater detail herein.

### 3.      The Outer Continental Shelf Lands Act

Congress passed the OCSLA more than 70 years ago.  OCSLA declares "the outer Continental Shelf" o be "a vital national resource reserve held by the Federal Government for the

public." 43 U.S.C. §1332(3).  To maximize the benefit of that resource, OCSLA directs the Secretary of the Interior to make the Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs."  Ensco Offshore Co. v. Salazar, 781 F. Supp. 2d 332, 339 (E.D. La. 2011) (noting "OCSLA's overriding policy of expeditious development").

OCSLA facilitates the Shelf's expeditious development by directing the Secretary to administer a leasing program to sell exploration interests in portions of the Shelf to the highest bidder.  43 U.S.C. §§1334(a), 1337(a)(1).  To this end, OCSLA sets out a four-step process in which the Secretary must (1) create a Five-Year Leasing Program, (2) hold lease sales, (3) grant or deny exploration permits and plans, and (4) grant or deny final development and production plans.  Hornbeck Offshore Servs., L.L.C. v. Salazar, 696 F. Supp. 2d 627, 632 (E.D. La. 2010) (citing Sec'y of the Interior v. California, 464 U.S. 312, 337, 104 S. Ct. 656, 78 L. Ed. 2d 496 (1984)).  Each step must follow stringent administrative requirements designed to maximize the chances for the public – including affected states and industry—to provide input on those lease sales.

Current lease sales in the Outer Continental Shelf are governed by the 2017-2022 Five-Year Oil and Gas Leasing Program ("Five-Year Program").  The process of creating the Five-Year Program began in 2014 during the Obama Administration.  The BOEM published a Request for Information ("RFI") in the Federal Register and sent a letter to all Governors, Tribes, and interested federal agencies requesting input on the Program.  79 Fed. Reg. 34349 (June 16, 2014).  BOEM received over 500,000 comments in response to the RFI, allowing it to discharge its obligation under OCSLA to take into account economic, social, and environmental values in making its leasing decisions.  43 U.S.C. § 1344(a); Five-Year Program [Doc. No. 3, Exh 1].  In

2015, BOEM published the Draft Proposed Program.  That published draft incorporated responses to the RFI comments and set out a draft schedule of potential lease sales.  That started a 60-day comment period in which BOEM received over one million comments.  80 Fed. Reg. 4941 (Jan. 29, 2015).  After considering those comments, BOEM next published the Proposed Program, thereby starting a new 90-day comment period.  81 Fed. Reg. 14881 (Mar. 18, 2016). Again, BOEM received over one million comments, held public meetings, and created environmental impact statements in compliance with the National Environmental Policy Act (NEPA).

After that, BOEM published the Proposed Final Program ("PFP") November 2016.  In it, the Secretary determined which areas to include in the lease sales.  The PFP schedules ten (10) region-wide lease sales in the areas of the Gulf of Mexico that are not under the Congressional moratorium or otherwise unavailable for leasing.  Final Program S-2.  The PFP also observed that "[i]n the Gulf of Mexico, infrastructure is mature, industry interest and support from affected states and communities is strong, and there are significant oil and gas resources available." Thus, "[t]o take advantage of these incentives to OCS activity, the region-wide sale approach makes the entire leasable Gulf of Mexico OCS area available in each lease sale." *Id.*

On January 17, 2017—60 days after the Final Program was transmitted to President Obama and Congress—the Secretary approved the Final Program, "which schedules 11 potential oil and gas lease sales, one sale in the Cook Inlet (Alaska) Program Area and 10 sales in the GOM Program Areas," with "one sale in 2017, two each in 2018-2021, and one in 2022." Record of Decision and Approval of the 2017-2022 Outer Continental Shelf Oil and Gas Leasing Program 3 (Jan. 17, 2017).

The Final Program approved and scheduled two lease sales relevant in this proceeding. The first is GOM OCS Oil and Gas Lease Sale 257.  Lease Sale 257 would have comprised the Western and Central Planning Areas of the Gulf of Mexico. The second is Lease Sale 258 in Cook Inlet, Alaska.

### 4.     The Mineral Leasing Act

The Federal Government also holds energy-producing lands onshore.  Congress has likewise made those lands available for development.  Under the MLA, the Secretary of the Interior is required to hold lease sales "for each State where eligible lands are available at least quarterly."  30 U.S.C. §226(b)(1)(A).  MLA provides that for oil and natural gas leases on federal lands, in States other than Alaska, 50 percent of bonuses, production royalties, and other revenues are granted to the State in which the lease is located, and 40 percent is granted to the Reclamation Fund,  which maintains irrigation systems in several Western States.  30 U.S.C. §191(a).  For leases in Alaska, 90 percent of revenues are granted to the State. *Id*.

BLM has the authority to lease public lands with oil and gas reserves to private industry for development under MLA, the Federal Land Policy and Management Act, 43 U.S.C. §§1701-1787, and the BLM's own regulations and plans, see 43 C.F.R. Part 1600 (Planning, Programming, and Budgeting); 43 C.F.R. §§3120 (Competitive Leases) and 3160 (Onshore Oil and Gas Operations).  BLM's regulations also provide for quarterly lease sales, 43 C.F.R. §3120.1-2(a) ("Each proper BLM office shall hold sales at least quarterly if lands are available for competitive leasing.")

## II.     STANDING

At issue in this proceeding is whether the Agency Defendants exceeded their statutory and/or constitutional authority in implementing a pause on new oil and natural gas leases on

public lands and in offshore waters.  However, this Court must first determine whether it has judicial power to hear the case.  The United States Constitution limits exercise of judicial power to certain "cases" and "controversies."  U.S. Constitution Article III Section 2.

Under the doctrine of "standing," a federal court can exercise judicial power only where a plaintiff has demonstrated that it (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that it is likely to be redressed by a favorable decision.  Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).  The party invoking federal jurisdiction bears the burden of establishing these elements. Id. at 561.

### 1.      Plaintiff States' Argument

The Plaintiffs in this case are thirteen (13) states.  States are not normal litigants for purposes of invoking federal jurisdiction.  Massachusetts v. E.P.A., 549 U.S. 497, 518, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007).  Rather, a state is afforded "special solicitude" in satisfying its burden to demonstrate the traceability and redressability elements of the traditional standing inquiry whenever its claims and injury meet certain criteria.  Id. at 520; Texas v. United States, 809 F.3d 134, 151–55 (5th Cir. 2015), as revised (Nov. 25, 2015).  Specifically, a state seeking special solicitude standing must allege that a defendant violated a congressionally accorded procedural right that affected the state's "quasi-sovereign" interests in, for instance, its physical territory or lawmaking function.  Massachusetts, 549 U.S. at 520–21; Texas, 809 F.3d at 151–55.

Plaintiff States allege they have standing under the normal inquiry, and because they are entitled to special solicitude.  Plaintiff States aver they have standing to challenge the Pause because the Government Defendants' actions harm Plaintiff States' sovereign, proprietary, and parens patriae interests.

Plaintiff States allege the Pause deprives Plaintiff States of a substantial share of the proceeds from leasing sales under OCSLA, the Gulf of Mexico Energy Security Act ("GOMESA") and MLA.  Plaintiff States attach the Declarations of Jerome Zeringue ("Zeringue") [Doc. No. 3, Exh. 6], Professor David E. Dismukes ("Dismukes") [Doc. No. 3, Exh. 4], and Professor Timothy J. Considine ("Considine") [Doc. No. 3, Exh. 2].

## Declaration of Jerome Zeringue

Zeringue is a member of the Louisiana State Legislature representing LaFourche and Terrebonne Parishes.  He is Chairman of the Appropriations Committee and was previously a member of the Natural Resources Committee.  Zeringue is familiar with the Coastal Master Plan, which is the Louisiana coastal restoration plan.  He declared that the Coastal Master Plan is funded primarily by revenue from oil and gas proceeds from the Outer Continental Shelf under OCSLA.  The current Coastal Master Plan is based upon $389 million in GOMESA expenditures over the next three years.

Zeringue declares that the cancellation of Lease 257 caused an immediate short-term loss for projected funds under OCSLA.  He further declares that if the funds vanish or are reduced, Louisiana will essentially be left without a major source of funding for a $50 billion coastal recovery and restoration program.

## Declaration of David E. Dismukes

Dismukes is a Professor, Executive Director, and Director of the Policy Analysis at the Center for Energy Studies at LSU.  He is also a Professor in the Department of Environmental Sciences and Director of the Coastal Marine Institute in the College of the Coast and Environment at LSU.

He additionally is a Consulting Economist with Acadian Consulting Group, L.L.C., a research and consulting firm that specializes in the analysis of regulatory, economic, financial, accounting, statistical, and public policy issues associated with regulated and energy industries. Dismukes is an expert in the analysis of economic, statistical, and public policy issues in energy and regulated industries.  He has testified as an energy expert on energy issues on over 150 occasions and has testified as an expert before the U.S. Senate, the U.S. House of Representatives, and several state legislatures.

Dismukes gave his opinion as to the harm he believes will occur due to the Pause on new oil and gas leasing and drilling permits.  He believed Louisiana would be harmed by the Pause due to the reduction in oil production, economic activity and state revenues resulting from the cancellation of Oil and Gas Lease Sale 257 and from Planned Lease Sales 259 and 261.

Dismukes further declared the Pause will cause a reduction in oil production, economic activity and state revenues due to foregone drilling under existing federal oil and gas leases and by reduced production by, and investment in, Louisiana's refining and chemical manufacturing industries caused by higher oil and gas prices.

He further believes the Pause will impact drilling in the Permion Basin, which will directly and immediately harm the States of Texas and Louisiana by resulting in fewer jobs for Louisiana and Texas gas sector workers and lower production of oil and gas, which will result in higher oil and gas prices.

Dismukes further declared the Pause would also affect revenues from initial lease payments, royalties, and rentals, which would immediately harm the States of Alabama, Louisiana, Mississippi, and Texas, who receive 37.5% of revenues under GOMESA.  In 2020, nearly $95.3 million was dispersed to Texas, $156 million to Louisiana, $50 million to Alabama,

and $51.9 million to Mississippi.  Dismukes projected that based upon BOEM estimates, the three cancelled or suspended lease sales (257, 259 and 261) will result in a decline in GOMESA funding of more than $1 billion.

Dismukes also declared the Pause would result in reduced funding for the Coastal Master Plan, which is used to fund the continuing loss of land mass along Louisiana's coast.

Further Dismukes testified the Pause would result in a substantial number of lost jobs in the oil and gas industry (which accounted for $6.8 billion in wages in 2019).  These job losses would result in reduction of Louisiana's energy export economy, and the loss of 114 jobs for each deep-water well not drilled as a result of the Pause.  He additionally noted losses to state and local government revenues as a result of the Pause.

### Declaration of Timothy J. Considine

Considine is a Professor of Energy Economics with the School of Energy Resources and the Department of Economics at the University of Wyoming.  He earned a B.A. in Economics from Loyola University in 1975, an M.S. from Purdue University in Agricultural Economics in 1977, and a Ph.D. from Cornell University in Natural Resources Economics in 1981.  He is an expert in the analysis of economic, statistical, and public policies in energy and regulated industries.

Considine gave an opinion in regard to the economic impact a leasing moratorium and a drilling ban would have on the States of Wyoming, New Mexico, Colorado, Utah, North Dakota, Montana, and Alaska.  Under a leasing moratorium over the next 5 years (2021-2025), the average annual investment loss to Wyoming would be $2.3 billion; the average annual investment loss to New Mexico would be $2.6 billion; to Colorado $586 million; to Utah $248 million; to North Dakota $279 million; to Montana $56 million; and to Alaska $412 million.

Considine also opined these States would lose a combined average of 58,676 jobs annually for the years 2021-2025.

Considine further estimated costs to said states under a drilling ban, and all would have significant annual investment losses for the years 2021-2025.

Considine estimates harm to state revenue for the said states if a leasing moratorium were imposed.  Under his estimates, for the years 2021-2025, the annual revenue losses to Wyoming would be $304 million; to New Mexico $946 million; to Colorado $59 million; to Utah $27 million; to North Dakota $136 million; to Montana $40 million; and to Alaska $100 million.

### 2.       Government Defendants' Argument

In opposition, the Government Defendants attack Plaintiff States standing for its 5 U.S.C.A. § 706(2) APA Claims.[6]  Government Defendants do not attack Plaintiff States' standing with regard to their failure to provide notice and comment, and their unreasonably withheld and unreasonably delayed claims.  The Government Defendants object to Plaintiff States' standing on its APA 706(2) claims on the basis of redressability.

Government Defendants argue that setting aside the individual lease sale postponements will not redress Plaintiff States alleged injuries (reduction in income, job losses and overall economic losses) because a favorable decision would not redress those injuries.  Government Defendants argue that if the individual sale postponements were set aside, that relief would not compel the agency to hold a lease sale because the agency has discretion to "implement another postponement with a different rationale." [Doc. No. 120 page 23].

In other words, Government Defendants maintain they cannot be compelled to actually sell the lease, instead, the Court can only remand the lease sales back for further consideration in

---

[6] Contrary to law and arbitrary and capricious.

which the Government Defendants could admittedly "come up with another reason" to postpone the lease sales. The lease sales would never go through, and Government Defendants argue that the Plaintiff States would not receive any proceeds.

Additionally, Government Defendants argue the Plaintiff States will not be harmed by the Pause because development activity from exploration through drilling and production has continued at the same levels as the preceding four years and because no existing lease has been cancelled as a result of the Pause. Government Defendants attach the Declaration of Walter D. Cruickshank ("Cruickshank") [Doc. No. 120-1], the Declaration of Peter Cowan ("Cowan") [Doc. No. 120-4] and the Declaration of Mustafa Haque ("Haque") [Doc. No. 120-3].

### Declaration of Walter D. Cruickshank

Cruickshank is a Deputy Director of BOEM in the United States Department of the Interior. He declared that under OCSLA, the DOI is responsible for the administration of energy and mineral exploration and development on the Outer Continental Shelf ("OCS"). Many of the DOI responsibilities for implementing OCSLA have been delegated to BOEM. These delegated responsibilities include conducting oil and gas lease sales, issuing leases on the OCS, and approving exploration and development plans under those leases. As part of his duties, Cruickshank supervises the BOEM Regional Directors.

Cruickshank denies that any existing OCS leases have been cancelled as a result of the Pause, or the comprehensive review. He also denies there is a drilling ban in existence. He states Gulf of Mexico development activity from exploration through drilling and production has continued at the same levels as the preceding four years.

Cruickshank also denies President Biden has "banned all new domestic oil and gas production by imposing a drilling moratorium."  He declares that BOEM has approved 13 exploration plans from January 20, 2021 to March 24, 2021.

He further declares the effects of the actions related to Lease Sales 257 and 258 will not have an immediate impact on royalty revenues during the pending litigation.  Royalty-generating production on a new lease does not typically begin sooner than five years from the date the lease was issued.

Cruickshank further declares that the United States' interests would be harmed by a preliminary injunction as it would frustrate the DOI's ongoing process of determining how best to carry out OCS leasing responsibilities and the mandated comprehensive review.

### Declaration of Peter Cowan

Cowan is employed by the U.S. DOI, BLM, in Grand Junction, Colorado, as Senior Mineral Leasing Specialist.  In his role, Cowan coordinates and develops leasing policy and guidance, analyzes the effectiveness of leasing oil and gas, and oversees manuals, handbooks, and procedural guidance to implement BLM's mineral leasing program.

Cowan lists several lawsuits against BLM under the NEPA.  Due to numerous lawsuits and adverse decisions in several lawsuits, BLM's NEPA workload has been growing.  He declares that because the existing NEPA analysis was found to be inadequate, BLM is obligated to do additional NEPA for at least seven lease sales involving over 200 leases and 200,000 acres of land.

Cowan declared that in light of this growing accumulation of NEPA analysis and adverse decisions, BLM postponed lease sales in the first quarter of 2021 to do additional NEPA analysis.  He stated that the lease sale deferrals that BLM undertook in the first quarter of 2021

were not the first time BLM has deferred sales to perform additional NEPA analysis, as it occurred under the prior administration.

Cowan also denied that BLM has implemented a drilling or production moratorium as BLM continues to review and approve drilling permits at rates similar to the prior administration. He further stated BLM has interpreted the statutory phrase "eligible lands are available for leasing" to mean, at a minimum, that "all statutory requirements and reviews, including compliance with NEPA have been met."

## Declaration of Mustafa Haque

Haque is employed by the U.S. DOI, BLM, Division of Fluid Minerals ("DFM") in the Headquarters office in Grand Junction, Colorado, as a Petroleum Engineer.  He oversees BLM's reservoir management program, including determining whether the wells are capable of producing oil and gas of a sufficient value to exceed direct operating costs.

Haque examined the Declarations of Considine and Dismukes and believes both fail to consider important facts.  He first states that the Declarations fail to account for the significant amount of federal leased acreage that is not yet producing oil and gas.  He attaches a chart which shows that over half of leased federal land (13.89 million acres) is leased but not yet producing oil and gas.  Therefore, there is no reason to expect an imminent drop off in production from a temporary pause on leasing.

Second, Haque states that jobs will not be lost because a Federal Reserve Bank study shows jobs will just move across state borders with a shift in drilling from federal acreage.

Third, Haque disputes that a leasing pause would result in  higher costs from having to purchase more costly crude from foreign sources.

3.      **Injury in Fact**

A plaintiff seeking to establish injury in fact must show that it suffered "an invasion of a legally protected interest" that is "concrete," "particularized," and "actual or imminent, not conjectural or hypothetical." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548, 194 L. Ed. 2d 635 (2016), as revised (May 24, 2016).  For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." Id. at 1548.  A "concrete" injury must be "de facto," that is, it must "actually exist."  "Concrete" is not, however necessarily synonymous with "tangible."  Intangible injuries can nevertheless be "concrete." *Id.,* at 1548-49.

This Court finds the Plaintiff States' alleged injuries are both particularized and concrete. They have alleged loss of proceeds as a result of the Pause for new oil and gas leases on federal lands and waters, from bonuses, land rents, royalties, and other income.  Plaintiff States have also alleged loss of jobs and economic damage as a direct result of the Pause.  These alleged damages are concrete, particularized, and imminent.

4.      **Traceability**

Plaintiff States must now show a "fairly traceable" link between their alleged injuries and the Pause of new oil and gas leases on federal lands and in federal waters.  As a general matter, the causation required for standing purposes can be established with "no more than de facto causality." Dep't of Com. v. New York, 139 S. Ct. 2551, 2556, 204 L. Ed. 2d 978 (2019).  The plaintiff need not demonstrate that the defendant's actions are "the very last step in the chain of causation." Bennett v. Spear, 520 U.S. 154, 169–70, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997).

Plaintiff States must establish the Pause would result in the damages they allege.  They have.  The Declaration of Jerome Zeringue [Doc. No. 3-6], the Declaration of Professor Timothy J. Considine [Doc. No. 120-2], and the Declaration of Professor Davie E. Dismukes [Doc. No. 3-

4] are sufficient to establish the Pause at issue would result in damages including, funding for the Coastal Master Plan (which funds Louisiana's coastal restoration and recovery), reduction in State revenues, damages to the economy, loss of jobs, higher oil and gas prices, and reduction in the energy export economy.

Therefore, Plaintiff States can prove traceability.

### 5.    Redressability

The redressability element of standing to sue requires a plaintiff to demonstrate "a substantial likelihood that the requested relief will remedy the alleged injury in fact."  El Paso Cty., Texas v. Trump, 982 F.3d 332, 341 (5th Cir. 2020).

Government Defendants attack this element with the Declaration of Walter D. Cruickshank [Doc. No. 120-1], the Declaration of Peter Cowan [Doc. No. 120-4], and the Declaration of Mustafa Haque [Doc. No. 120-3].  Government Defendants argue that there has been no pause in drilling and permits for "existing" leases because drilling in federal lands is still proceeding at approximately the same rate as the prior four years, and therefore, a favorable ruling for Plaintiff States will not redress their alleged injuries.  However, these declarations only address "existing leases," not "new leases."  Just the cancellation of Lease Sale 257 itself has had immediate impact due to loss of bonus payments and ground rents.

Additionally, a Pause for any significant length of time would allegedly result in other losses.  Professor Considine [Doc. No. 3-2] noted that most oil and gas produced in the U.S. in the last decade has used technology known as hydraulic fracturing and horizontal drilling. Considine stated that oil and gas wells that use this technology produce at high rates just after initial production, but face steep production declines thereafter, raising the importance of drilling new wells to offset the production declines from previously completed wells.

This Court believes that Plaintiff States have also satisfied the redressability element.

### 6.      Special Solicitude

Although this Court has found the Plaintiff States have proven standing through the normal inquiry, they also can establish standing as a result of special solicitude.  Plaintiff States assert a congressionally bestowed procedural right (the APA), and the government action at issue affects the Plaintiff States' quasi-sovereign interests (damage to economics, loss of jobs, coastal erosion funding, funding for state and local governments).  Massachusetts, 549 U.S. at 519–20.

Therefore, any infirmity in Plaintiff States' demonstration of traceability or redressability are remedied by Plaintiff States' special solicitude.

## III.     JUDICIAL REVIEW

Although Plaintiff States have standing, the Court must additionally examine whether Plaintiff States' causes of action are reviewable.  This question requires the determination of the meaning of the congressionally enacted provision creating a cause of action.  The Court applies the traditional principles of statutory interpretation to determine whether Congress did in fact authorize the causes of action alleged by Plaintiff States.  Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 128, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014).

Plaintiff States' Complaint sets forth ten Claims for Relief.  Counts I, II, III, IV, V, VI, VII, and VIII are claims under the APA for unreasonable delay pursuant to 5 U.S.C. 706 (Counts I and VI), failure to employ notice and comment in violation of 5 U.S.C. 706 (Counts II and VIII), for acting contrary to law in violation of 5 U.S.C. 706 (Counts III and V) , and for acting in an arbitrary and capricious manner pursuant to 5 U.S.C. 706 (Counts IV and VII).

Count IX is a citizen suit under OCSLA pursuant to 43 U.S.C. 1349 and Count X is an ultra vires claim which alleges that the President and the applicable agencies violated the U.S.

Constitution and statutory authority and/or did not have authority to enact or implement a Pause on new oil and gas leases on federal land and in federal waters.

Eight of Plaintiff States' claims are under the APA.  The APA imposes four requirements that must be satisfied before a federal court can review agency action.  First, it must be demonstrated by plaintiffs that it is within the "zone of interests" to be protected by the statutes allegedly violated by the defendants.  Second, no statute may preclude judicial review.  Third, the Pause must constitute a "final agency action."  And fourth, the Pause must not be "committed to agency discretion by law."  Texas v. United States, No. 6:21-CV-00003, 2021 WL 2096669, at *21 (S.D. Tex. Feb. 23, 2021).

Government Defendants maintain that the Pause (and lease cancellation/postponements) are not "final agency actions," and that the Pause is "committed to agency discretion by law" under OCSLA and under MLA.

### 1.     Zone of Interests

Congress, through the APA, has provided a cause of action for persons seeking redress against the federal government for violating other federal laws.  5 U.S.C. 702, 706.  Congress has limited the availability of an APA cause of action to persons who allege an injury that is "arguably" within the "zone of interests" to be protected or regulated by the relevant statute.  Collins v. Mnuchin, 938 F.3d 553, 573–74 (5th Cir. 2019), cert. granted, 141 S. Ct. 193, 207 L. Ed. 2d 1118 (2020), and cert. granted, 141 S. Ct. 193, 207 L. Ed. 2d 1118 (2020).  The benefit of any doubt goes to the plaintiff.  The test is not "especially demanding" and the test forecloses suit only when the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably assumed that Congress authorized that plaintiff to sue.  Collins, 938 F.3d at 574.

20

This element does not need extended discussion.  Clearly, the Plaintiff States are within the "zone of interest" of all eight of their causes of action against Government Defendants under the APA.  Plaintiff States' interests are within the purposes of the APA for their contrary to law, failure to provide notice and comment, arbitrary and capricious, and unreasonably withheld or unreasonably delayed claims.  Additionally, Plaintiff States' claims for a citizen suit under OCSLA and ultra vires claim are also within the "zone of interests".

## 2.    Statutory Preclusion to Judicial Review

5 U.S.C. 701(a)(1) excepts the application of the APA to the extent that statutes preclude judicial review.  Government Defendants have cited no statutes which preclude judicial review of Plaintiff States' claims.  This Court has found no statutes which preclude Plaintiff States' APA claims.  Therefore, the Court concluded there is no statutory preclusion to judicial review of the Plaintiff States' claims.

## 3.    Final Agency Action

5 U.S.C. 704 provides that "final agency actions" for which there is no other adequate remedy in a court are subject to judicial review.  The Government Defendants argue that the Pause and/or the lease cancellations/postponements are not "final agency actions."

To determine whether an agency action is final, two conditions are required to be satisfied.  First, the action must mark the consummation of the agency's decision-making process.  It must not be of a merely tentative or interlocutory nature.  Second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.  U.S. Army Corps of Engineers v. Hawkes Co., 136 S. Ct. 1807, 1813, 195 L. Ed. 2d 77 (2016); Bennett, 520 U.S. at 177–78.

Government Defendants argue the challenged decisions are merely interim postponements of lease sales, not decisions to forego the sales entirely, citing Am. Petroleum Inst. v. U.S. E.P.A., 216 F.3d 50, 68 (D.C. Cir. 2000), as amended (Aug. 18, 2000) and Shawnee Trail Conservancy v. Nicholas, 343 F. Supp. 2d 687, 701 (S.D. Ill. 2004), for the proposition that interim postponements are not "final agency action."

In American Petroleum Institute, 216 F.3d at 68, the court stated that a decision to defer taking action is not a final action reviewable by the courts. The court went on to say the announcement of an agency's intent to establish law and policy in the future is not the actual promulgation of a final regulation. In Shawnee Trail Conservancy, 343 F. Supp. 2d at 701, the court held that the Forest Service's decision about how and when to conduct an all-terrain vehicles and off-highway motorcycles use review was not a final agency action.

The Plaintiff States maintain that the Pause itself is a final agency action, as is each cancellation and postponement. The label "pause" is not dispositive of whether the agency action is final. State of La. v. Dep't of Energy, 507 F. Supp. 1365, 1371 (W.D. La. 1981), aff'd sub nom. Dep't of Energy v. State of Louisiana, 690 F.2d 180 (Temp. Emer. Ct. App. 1982). As long as an agency has completed its decision-making on a challenged rule—even one interim in nature – the rule satisfies the first prong of the finality test. Nat. Res. Def. Council v. Wheeler, 955 F.3d 68, 79–80 (D.C. Cir. 2020).

There is no real question that Plaintiff States have met the second prong of the *Bennett* test, because the Pause and/or Lease cancellations are actions from which legal consequences will flow. The only real question is whether the Pause and/or lease cancellations mark the consummation of the decision-making process.

Numerous analogous cases support Plaintiff States' position: <u>Texas v. United States</u>, No. 6:21-CV-00003, 2021 WL 723856, at *32 (S.D. Tex. Feb. 23, 2021), <u>opinion amended and superseded,</u> No. 6:21-CV-00003, 2021 WL 2096669 (S.D. Tex. Feb. 23, 2021), (a 100 day pause of deportations was final agency action); <u>Ensco Offshore Co.</u>, 781 F. Supp. 2d at 334–36, (a blanket moratorium on deepwater drilling in the Gulf of Mexico was a final agency action); <u>Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.</u>, No. CV168418PSGFFMX, 2018 WL 5919096, at *5 (C.D. Cal. Nov. 9, 2018), (a document that effectively lifted a moratorium constituted final agency action); <u>Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.</u>, No. CIV.A.V 06 59, 2007 WL 1032346, at *5 (S.D. Tex. Mar. 31, 2007),  (a plan that effectively closed an area to drilling operations was final agency action); <u>Nat. Res. Def. Council, Inc. v. Hodel</u>, 865 F.2d 288 (D.C. Cir. 1988), (portions of the Five-Year Plan under OCSLA could be reviewed so a decision to "Pause" the 5-year plan should also be able to be reviewed.); <u>Texas</u>, 809 F.3d 134, (a DACA memo which made millions more persons eligible for the DAPA program and extended the employment authorization for three years, instead of two, was a final agency action); <u>Wilbur v. U.S. ex rel. Barton</u>, 46 F.2d 217 (D.C. Cir. 1930), <u>aff'd sub nom.</u> <u>U.S. ex rel. McLennan v. Wilbur</u>, 283 U.S. 414, 51 S. Ct. 502, 75 L. Ed. 1148 (1931)  (the temporary withdrawal of public lands by the Secretary of the DOI was found to be a final agency action);  *Al Otro Lado, Inc. v. McAleenan*, 349 F. Supp 3d 1168 (S.D. Cal. 2019), (an unwritten policy of limiting asylum seekers at ports of entry from accessing the asylum process by based on false claims of capacity restraints was final agency action); <u>Amadei v. Nielsen</u>, 348 F. Supp. 3d 145 (E.D.N.Y. 2018), (an unwritten policy of searching travelers for identification documents after disembarking from domestic flights was a final agency action); <u>BNSF Ry. Co. v. Equal Emp. Opportunity Comm'n</u>, 385 F. Supp. 3d 512 (N.D. Tex. 2018); (the issuance by EEOC of a right to sue letter was a final

agency action);  Clean Air Council v. Pruitt, 862 F.3d 1 (D.C. Cir. 2017), (a decision to stay, pending reconsideration, of the implementation of a final rule was a final agency action); Velesaca v. Decker, 458 F. Supp. 3d 224 (S.D.N.Y. 2020), appeal withdrawn sub nom. Velesaca v. Wolf, No. 20-2153, 2020 WL 7973940 (2d Cir. Oct. 13, 2020), (a no-release policy was found to be a final agency action); Gomez v. Trump, 485 F. Supp. 3d 145 (D.D.C.), amended in part, 486 F. Supp. 3d 445 (D.D.C. 2020), and amended in part sub nom. Gomez v. Biden, No. 20-CV-01419 (APM), 2021 WL 1037866 (D.D.C. Feb. 19, 2021) (State Department's Policy suspending VISA processing and adjudication due to COVID-19 was a final agency action);  Natural Resources Defense Council, 955 F.3d 68, (EPA's rule suspending a prior rule was a final agency action); Becerra v. United States Dep't of Interior, 276 F. Supp. 3d 953 (N.D. Cal. 2017), (the postponing of the application of a rule was final agency action); and W. Energy All. v. Jewell, No. 1:16-CV-00912-WJ-KBM, 2017 WL 3600740 (D.N.M. Jan. 13, 2017), (BLM's practice of cancelling or deferring lease auction sales less frequently than quarterly, for reasons other than lack of eligible parcels under MLA, was a final agency action).

These cases show that a "final agency action" does not have to be permanent. Additionally, there is a strong presumption of judicial review.  Establishing unreviewability is a heavy burden.  Texas, 809 F.3d at 163–64.

This Court has determined that the Pause in new oil and gas leases on federal lands and in federal waters, as well as the cancellation of Lease Sale 257, the stoppage of Lease Sale 258, and the cancellation or postponements of "eligible lands" under the MLA,  are final agency actions that are reviewable under the APA.

4.       **Committed to Agency Discretion by Law**

Under 5 U.S.C. 701(a)(2), a court is unable to review an agency decision that is committed to agency discretion by law.  Government Defendants argue that the decision to pause new oil and gas leases under MLA or under OCSLA are within its discretion.  The Government Defendants cite several statutes in which the agency is granted discretion.  Additionally, the Government Defendants argue that they have the discretion to reconsider a decision.

However, there is a huge difference between the discretion to stop or pause a lease sale because the land has become ineligible for a reason such as an environmental issue, and, stopping or pausing a lease sale with no such issues and only as a result of Executive Order 14008.

The discretion to pause a lease sale to eligible lands is not within the discretion of the agencies by law under either OSCLA or MLA.  OSCLA directs the Secretary of the DOI to make the OSC available for expeditious development.  Ensco Offshore Co., 781 F. Supp. 2d at 339.  OCSLA also directs the Secretary of the DOI to administer a leasing program to sell exploration interests in portions of the OSC to the highest bidder.  43 U.S.C.A. § 1334(a) and 1337(a)(1).

OCSLA sets up a four-step process to set up a Five-Year Program.  Currently, the Five-Year Program in effect is from 2017-2022.  At least one (Lease Sale 257) of the lease sales to be sold in the Five-Year Program has been cancelled due to the Pause.  Another (Lease Sale 258) was halted at the selling stage due to the Pause.  The Five-Year Program currently in effect went through a substantial vetting process, which included millions of comments, approval from affected Governors, publishing of a Final Program that was sent to the President and Congress, and final approval by the Secretary of the DOI.

Congress, through MLA, has also made energy-producing lands onshore available for development. Under MLA, the Secretary of DOI is required to hold lease sales for each state where eligible lands are available at least quarterly.  30 U.S.C. 226(b)(1)(A).

In Western Energy Alliance, 2017 WL 3600740, the court held a BLM policy, in which BLM cancelled or deferred eligible lands and did not have the lease sales quarterly was a final agency action that violated the APA.  The court denied defendant's Motion to Dismiss the plaintiff's claims that BLM was required to hold lease sales for eligible lands quarterly and did not have the discretion to do less, as long as there were eligible lands.  In other words, the plaintiffs had a cause of action based on these allegations.

The fact that a statute grants broad discretion to an agency does not render the agency's decisions completely unreviewable unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance to how that discretion is to be exercised. Texas, 809 F.3d at 168.

That is not the case here.  Both MLA and OCSLA set forth requirements to hold lease sales of eligible land and sets forth how it is to be conducted.

The agencies could cancel or suspend a lease sale due to problems with that specific lease, but not as to eligible lands for no reason other than to do a comprehensive review pursuant to Executive Order 14008.  Although there is certainly nothing wrong with performing a comprehensive review, there is a problem in ignoring acts of Congress while the review is being completed.

Additionally, two previous rulings from the Office of the Solicitor on February 12, 1996, [Doc. No. 14, PR 61] and on January 5, 1981, [Doc. No. 121 PR 56] confirm that any significant revisions of an existing Five-Year OCSLA Plan would require the Secretary of the Interior to

revise it "in the same manner that it was originally developed."  In other words, the Secretary of the DOI cannot make any significant changes to the Five-Year Plan without going through the same procedure by which the Five-Year Plan was developed.  The Pause and/or cancellation of one of the Lease Sales set out in the Five-Year Plan is subject to review.  This Court finds the agency actions at issue are not barred from APA review as actions committed to agency discretion by law.  The claims of Plaintiff States are reviewable by this Court.

## IV.    IS THERE A PAUSE?

Before addressing whether the implementation of a Pause by Agency Defendants violates the APA, a determination must be made whether there is one.  Government Defendants concede that Lease Sale 257 and Lease Sale 258 were postponed/delayed because of Section 208 of Executive Order 14008.  However, with respect to the lease sales under MLA, Government Defendants maintain the Pause in Section 208 had nothing to do with the six to seven new oil and natural gas lease sales cancelled in the first quarter of 2021, and with the new oil and natural gas lease sales cancelled in April, 2021.

The Government Defendants conceded at oral argument that zero (0) new sales have been completed by the Government Defendants under MLA during both the first and second quarters of 2021.  (With the exception of a lease sale that received no bids in the last quarter of 2020 but it was purchased in the first quarter of 2021).

Agency action need not be in writing to be final and judicially reviewable pursuant to the APA.  An unwritten policy can still satisfy the APA's final agency action requirement.  *Al Otro Lado, Inc. v. McAleean,* 349 F.Supp. 3d 1168 (S.D. Cal. 2019)*;* Amadei, 348 F. Supp. 3d 145; Bhd. of Locomotive Engineers & Trainmen v. Fed. R.R. Admin., 972 F.3d 83 (D.C. Cir. 2020); Velesaca, 458 F. Supp. 3d 224.

It is the effect of the agency rule that is most relevant. (A personnel manual letter implemented the executive order).  Nat'l Treasury Emps. Union v. Reagan, 685 F. Supp. 1346 (E.D. La. 1988).

In order for Plaintiff States to obtain a preliminary injunction against a new oil and natural gas lease Pause, they would need to demonstrate they have a substantial likelihood of proving on the merits that a Pause based upon Executive Order 14008 was implemented by Agency Defendants.

The first evidence of a Pause is Section 208 of Executive Order 14008, which states:  "To the extent consistent with applicable law, the Secretary of the Interior shall **pause** new oil and natural gas leases in public lands or in offshore waters pending a comprehensive review…".  86 Fed. Reg. 7619 (emphasis added).  By its own terms, the Pause applies to both onshore and offshore new oil and natural gas leases.

As to leases under OCSLA, there is strong evidence of a Pause.  There is not much doubt that Lease Sale 257 and Lease Sale 258 were rescinded/postponed because of the Pause.  The Record of Decision ("ROD") scheduling Lease Sale 257 was rescinded to comply with Executive Order 14008.  86 Fed. Reg. 10132 (February 18, 2021).  The public review period previously published for Lease Sale 258 was rescinded in response to Executive Order 14008. 86 Fed. Reg. 10994 (February 23, 2021).  On February 9, 2021, BOEM Acting Director, Walter D. Cruickshank sent a Request for Authorization [Doc. No. 121, PR 45] to Laura Daniel-Davis, Senior Advisor to the Secretary, recommending the rescission of the previous ROD with regard to Lease Sale 257, due to Executive Order 14008.  The ROD as to Lease Sale 257 was immediately rescinded [Doc. 121, RP 47-48] due to Executive Order 14008.

Additionally, on January 20, 2021, (the day President Biden was sworn in), Walter Cruickshank sent an email to Loren Thompson [Doc. No.121, PR 17], in which he stated they had received instructions to withdraw any notices that were pending at the Federal Register, which included the Final Notice of Sale for Lease Sale 257 and the Notice of the Record of Decision for Lease 257. (The Notice of the Record of Decision was evidently withdrawn too late because it was published).  Cruickshank told Thompson in the email that the withdrawals do not signify anything more than the new leadership team wanting to evaluate the pending items.  This email was sent one week prior to Executive Order 14008 being signed on January 27, 2021.

As to on-land leases under MLA, the Executive Order, by its own terms, applies the Pause to both new oil and natural gas leases in public land, or in offshore waters.  On January 20, 2021, Scott de la Vega, Acting Secretary of the Interior, issued Order No. 3395, which withdrew delegation of authority to Department Bureaus and offices (including the Asst. Secretary of Policy, Management and Budget,  Asst. Secretary of Land and Minerals Management, the Secretary and Deputy Secretary of the DOI) to issue any onshore or offshore fossil fuel authorization, including leases. [Doc. No. 121, PR 13-14].

On the same day the Executive Order was issued (January 27, 2021), the U.S. DOI, BLM published a "Fact Sheet" about the Executive Order President Biden was signing that day.  One section was entitled "HITTING PAUSE ON NEW OIL AND GAS LEASING."  It discussed the Executive Order directing the DOI to "pause" new oil and gas leasing on public lands and offshore waters.  Nothing in the Fact Sheet indicated that the Agency Defendants were not going to pause new oil and gas leases on public lands. Fact Sheet: President Biden to Take Action to Uphold Commitment to Restore Balance on Public Lands and Waters, Invest in Clean Energy

Future (Jan. 27, 2021), https://www.blm.gov/press-release/fact-sheet-president-biden-take-action-uphold-commitment-restore-balance-public-lands.

Since the date of Executive Order 14008, no new oil and gas leases on federal lands have taken place.  None of the scheduled sales for the first quarter took place.  A March 9, 2021 Nevada lease sale was postponed [Doc. No. 121, PR 72].  (No reason given.)  On February 17, 2021, a March 25, 2021 Colorado sale was postponed [Doc. No. 120, PR 73].   (No reason given.)  On February 12, 2021, lease sales in Colorado, Montana, Wyoming and Utah scheduled for March 2021 were postponed [Doc. No. 120, PR 74].   (Project status was listed as "Paused"). The reason listed was to confirm the adequacy of underlying environmental analysis  [Doc. No. 120, PR 76].

Also, on February 12, 2021, a Utah oil and gas lease sale scheduled for March 30, 2021 was postponed.  The reason listed was to determine whether additional NEPA needed to be conducted to determine if parcels were suitable to be offered [Doc. No. 120, PR 77].  On January 27, 2021, the DOI, BLM published Errata #1 with regard to an internet-based competitive oil and gas lease in Nevada, which consisted of 17 parcels containing approximately 73,600 acres.  The Notice stated the March 9, 2021, sale had been postponed [Doc. No. 120, PR 78].  (No additional reasons given.)

On February 12, 2021, a Memorandum [Doc. No. 12, PR 79-80] from Travis Annatoyn to Laura Daniel-Davis stated it was Annatoyn's opinion that lease sales set in Colorado or Montana and the Dakotas be postponed due to lack of analysis on greenhouse gas emissions due to a 2020 lawsuit.  The Memorandum also recommended cancelling lease sales scheduled in Utah and Wyoming due to lack of an environmental analysis.

Also, on February 12, 2021, [Doc. No. 120, PR 81-82], Mitchell Leverette sent a

Memorandum to Michael D. Nedd of BLM, recommending postponing the scheduled March 18,

2021 lease sales in Alabama and Mississippi (14 parcels, 5,439 acres) and rescheduling the sale

for June 17, 2021.  The reasons given were to complete additional air quality analysis to comply

with the *Wild Earth Guardians* opinion.

On February 11, 2021, in a Memorandum to Michael Nedd by Gregory Sheehan, a March

30, 2021 competitive lease sale in Utah was recommended to be postponed in order to re-

evaluate the parcels due to an opinion in the *Rocky Mountain Wild* Case [Doc. No. 120, PR 83-

84].

On March 1, 2021, in an email from Laura Daniel-Davis to Michael Nedd, [Doc. No.

120, PR 86], Daniel-Davis told Nedd that Department officials, with delegated authority to

approve onshore lease sales, are postponing further consideration of Quarter Two Sales

(including authorization of the sales) pending decisions on how the Department will implement

the Executive Order on Tackling the Climate Crisis at Home and Abroad with respect to onshore

sales.  Daniel-Davis told Nedd to post on the relevant website: "The oil and gas lease sales

scheduled for April 2021 have been postponed."

The Plaintiff States allege the postponements based on an additional need for further

environmental analysis is pretextual in order to give a reason (other than Executive Order 14008)

for the Pause.  Some of these will need to be explored on the merits of this lawsuit.  However,

based upon Agency Defendants' own records, no reasons were given for many of these

cancellations, and the April, 2021 cancellations were as a direct result of the Executive Order

14008.  Therefore, this Court believes the Plaintiff States have a substantial likelihood of success

on the merits on proving the Agency Defendants have implemented the Executive Order Pause to both on land sales under MLA and to offshore sales under OCSLA.

## V.    PRELIMINARY INJUNCTION

A preliminary injunction is an extraordinary remedy never awarded of right.  <u>Benisek v. Lamone</u>, 138 S. Ct. 1942, 1943, 201 L. Ed. 2d 398 (2018).  In each case, the courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008).

The standard for a preliminary injunction requires a movant to show (1) the substantial likelihood of success on the merits, (2) that he is likely to suffer irreparable harm in the absence of a preliminary injunction, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.  <u>Benisek</u>, 138 S. Ct. at 1944.  The party seeking relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted.  <u>Clark v. Prichard</u>, 812 F.2d 991, 993 (5th Cir. 1987).  None of the four prerequisites has a quantitative value.  <u>State of Tex. v. Seatrain Int'l, S. A.</u>, 518 F.2d 175, 180 (5th Cir. 1975).

### 1.    Likelihood of Success on the Merits

### (a) Contrary to law 5 U.S.C. 706 (2)(A) and (C)

Title 5 U.S.C. 706 (2)(A) and (C) authorizes courts to hold unlawful and set aside agency actions not in accordance with law, or in excess of statutory authority.  Plaintiff States assert that the Pause on new oil and gas leases on federal land and in federal waters pending a comprehensive review is not in accordance with law and exceeds the agencies authority under both the OSCLA and under MLA.

The Court must first determine whether Plaintiff States' challenges are programmatic challenges or discrete agency actions.  Government Defendants cite Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 890–93, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990) in support of its argument that the Plaintiff States are making a programmatic APA challenge, rather than to discrete agency actions. In Lujan, 497 U.S. 871, the plaintiff sought review of a land withdrawal review program.  The court found requests for wholesale improvement of the entire program, rather than discrete agency actions, cannot be reviewed under the APA.

Plaintiff States argue this is not a programmatic challenge, but a challenge as to discrete agency actions—the Pause itself, the cancellation of Lease Sale 257, the stoppage of Lease Sale 258, and the cancellation of other leases.  This Court agrees.  Plaintiff States are not challenging the entire program.  They are attacking a Pause of federal oil and gas leasing allegedly in violation of two Congressional statutes—MLA and OCSLA.

Next, the Court will determine whether Plaintiff States have a substantial likelihood of success on the merits that the Government Defendants' Pause is contrary to law.  The Pause is in violation of both OCSLA and of MLA.  As previously discussed, both statutes require the Agency Defendants to sell oil and gas leases.  OCSLA has a Five-Year Plan in effect, in which requires eligible leases to be sold.  As noted in the previously discussed opinions of the Office of the Solicitor, the Agency Defendants have no authority to make significant revisions in OCSLA Five-Year Plan without going through the procedure mandated by Congress.  MLA requires the DOI to hold lease sales, where eligible lands are available at lease quarterly.

By pausing the leasing, the agencies are in effect amending two Congressional statutes, OCSLA and MLA, which they do not have the authority to do.  Neither OCSLA nor MLA gives the Agency Defendants authority to pause lease sales.  Those statutes require that they continue

to sell eligible oil and gas leases in accordance with the statutes.  Therefore, the Plaintiff States have a substantial likelihood of success on the merits of this claim.  The legislative powers are granted to the legislative branch. U.S. Const. art. I, § 1.

    **(b).    Arbitrary and Capricious 5 U.S.C. 706(2)(A)**

Federal administrative agencies are required to engage in reasoned decision-making. Allentown Mack Sales & Serv., Inc. v. N.L.R.B., 522 U.S. 359, 374, 118 S. Ct. 818, 139 L. Ed. 2d 797 (1998).  Plaintiff States allege the Pause is arbitrary and capricious under 5 U.S.C. 706(2)(A) both as to MLA and OCSLA claim.

If an administrative agency does not engage in reasoned decisionmaking, a court, under the APA, shall hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. 706(2)(A).

The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.  Sec. & Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed. 626 (1943).

Neither Executive Order 14008, nor the cancellation of sale of Lease Sale 257, offers any explanation for the Pause (other than to perform a comprehensive review).  It also gives no explanation for the postponement of Lease Sale 257, other than reliance on Executive Order 14008.[7]  A command in an Executive Order does not exempt an agency from the APA's reasoned decisionmaking requirement.  California v. Bernhardt, 472 F. Supp. 3d 573, 600–01 (N.D. Cal. 2020).  A decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order.  Texas, 2021 WL 2096669, at *39–41.

_____

[7] 86 Fed. Reg. 10132

34

The recission of Lease Sale 257 and the Executive Order itself[8] provides no rationale for departing from OCSLA or MLA requirements.

As to Lease Sale 258, BOEM cancelled both the public comment and public meetings with regard to Lease Sale 258.  No explanation was given, other than to rely on Executive Order 14008.[9]

BLM did not publish a formal notice in the Federal Register halting MLB quarterly land sales but did publish a Fact Sheet which noted the President's Executive Order.  No explanation (other than the Executive Order) was given. After that, the regional BLM offices began posting postponement or cancellation notices for March and April 2021 lease sales, again, without explanation.

The omission of any rational explanation in cancelling the lease sales, and in enacting the Pause, results in this Court ruling that Plaintiff States also have a substantial likelihood of success on the merits of this claim.

### (c)      Failure to Provide Notice and Comment

Plaintiff States also claim they are entitled to injunctive relief under the APA because the Pause and lease cancellations are substantive rules that required notice and comment pursuant to 5 U.S.C. 553.  The APA requires rules to undergo notice and comment unless they are exempt.  5 U.S.C. 553(a)(b).  The two exceptions set forth in 5 U.S.C. 553 are (1) interpretive rules, general statements of policy, or rules of agency organization, procedure, and practices, and (2) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons in the rule issued) that notice and public procedure are impracticable, unnecessary, or contrary to the public interest.

---

[8] 86 Fed. Reg. 7624-25
[9] 86 Fed. Reg. 10994

The only exception which could possibly apply is the first.  These exceptions are to be narrowly construed.  Texas, 809 F.3d at 171.  Section 553 was enacted to give the public an opportunity to participate in the rule-making process.  U.S. Dep't of Lab. v. Kast Metals Corp., 744 F.2d 1145, 1153 n.17 (5th Cir. 1984).

Is the implementation of the Executive Order Pause an interpretive rule, general statement of policy, or a rule of agency organization, procedure, or practice?  In analyzing whether an agency pronouncement is a statement of policy or a substantive rule, the starting point is the agency's characterization of the rule.  Pros. & Patients for Customized Care v. Shalala, 56 F.3d 592, 596 (5th Cir. 1995).  As to the offshore leases, there is no classification, just reference to Executive Order 14008.  As to the land leases, the Government Defendants deny there is any pause at all, so the language in Executive Order 14008 should also be referenced.  In reading Section 208 of Executive Order 14008, there is no classification.  The Executive Order language states: "To the extent consistent with applicable law, the Secretary of the Interior shall pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review"…Id.

In looking closely at an agency's actions, the Fifth Circuit instructs district courts to evaluate two criteria to distinguish policy statements from substantive rules:  whether the rule (1) imposes any rights and obligations, and (2) genuinely leaves the agency and its decisionmakers free to exercise discretion.  Texas, 809 F.3d at 171.  In evaluating the first criteria, the Executive Order effectively commands that the DOI stop performing its obligations under OCSLA and MLA to sell oil and natural gas leases.  The impact is legal in nature, effectively stopping the scheduled sale of Lease Sale 257, putting the brakes on Lease Sale 258, and stopping the quarterly lease sales, under MLA.  In evaluating whether the rule leaves the agency and its

decisionmakers free to exercise discretion, the Court notes the wording in the Executive Order, which states, "To the extent consistent with applicable law," but also notes the wording "shall pause."  This does not leave the agency free to exercise discretion unless they disobey a Presidential Executive Order.

This Court believes that the Pause in Executive Order 14008 is a substantive rule as implemented by the DOI and MLB, and the exceptions to 5 U.S.C. 553 do not apply.

The "Pause" is also not procedural, because it modifies substantive rights and interests under the "substantial impact test".  Texas, 809 F.3d at 176.  Therefore, the exceptions in 5 U.S.C. 553 do not apply and notice and comment was required under 5 U.S.C. 553 (b) and (c).

It is uncontested that no notice and comment was conducted by the Agency Defendants pursuant to 5 U.S.C. 553.  Since there was no notice and comment, there is a substantial likelihood of success on the merits by Plaintiff States on this claim.  Texas, 809 F.3d at 177–78; Natural Resources Defense Council, 955 F.3d at 85.

### (d)        Unreasonably Withheld and Unreasonably Delayed

5 U.S.C. 706(1) provides that the reviewing court under the APA shall compel agency action unlawfully withheld or unreasonably delayed.  In Norton v. S. Utah Wilderness All., 542 U.S. 55, 124 S. Ct. 2373, 159 L. Ed. 2d 137 (2004), an environmental group brought an action against the DOI, BLM and others seeking to compel agency action under 5 U.S.C. 706(1) in light of the defendants' alleged failure to manage off-road vehicle use in federal lands classified as wilderness study areas.  The Supreme Court held that a claim under 5 U.S.C. 706(1) to compel agency action unlawfully withheld or unreasonably delayed can only proceed where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take.

Plaintiff States are asking this Court to compel the Government Defendants to complete the sale of Lease Sale 257 and to compel the Government Defendants to re-start the procedure for Lease Sale 258, and to compel the Government Defendants to conduct sales of eligible onshore leases under the MLA.  These are "discrete agency actions." The question is whether these are actions the Government Defendants are "required to take."

The Government Defendants argue that they have discretion to determine whether to go forward with Lease Sale 257, Lease Sale 258, and lease sales under the MLA.  Additionally, the Government Defendants argue that they also have the right to reconsider their decisions and therefore, those are not actions that the Government Defendants are "required to take."

However, both Lease Sale 257 and Lease Sale 258 were in the Five-Year Program that was approved in accordance with law under OCSLA.  Lease Sale 257 was actually scheduled for sale on March 17, 2021.  The Secretary of DOI approved the Notice of Sale in a Record of Decision.[10]  In the ROD, the Secretary of DOI, in relying on the Final Supplemental Impact Statement determined that Alternative A – a regionwide lease sale with minor exclusions – would be in the best interest of the Nation and meets the purposes of OCSLA.[11]  When the sale of Lease Sale 257 was postponed, the only reason given was Executive Order 14008[12]  As it has been previously determined that there is a substantial likelihood of success on the merits that Section 208 of Executive Order 14008 is contrary to law, and in excess of authority, the reliance on nothing but Executive Order 14008 results in a substantial likelihood of success on the merits of the unreasonably withheld claim under 5 U.S.C. 706(1) as to Lease Sale 257.  Without any

---

[10] 86 Fed. Reg. 6365 (January 21, 2021)
[11] Approval 5, 8, 10 and 11
[12] 86 Red. Reg. 10132 (Feb. 18, 2021)

other reason to delay the sale, the Government Defendants were legally required to go through with the sale of Lease Sale 257.

Lease Sale 258 was included in the Five-Year Program, but the sale had not been set or approved by the Secretary of the DOI. BOEM released a Call For Information and Nominations, in the Federal Register to allow parties to indicate interest in parcels of the sale area.[13] BOEM also released a Notice of Intent to prepare an Environment Impact Statement, which provided the public with an opportunity to comment on the scope of the lease sale.[14] In January, 2021, after accounting for comments, BOEM published a Notice of Availability indicating the area proposed for sale in the Cook Inlet and a draft environmental impact statement.[15] The reason for the cancellation or the stoppage of the procedure for the ultimate sale of Lease Sale 258 was also Executive Order 14008.

As discussed previously, the Office of the Solicitor's two opinions, [Doc. No. 121, PR-56 and PR 62] to the DOI show that the Secretary of the DOI and other Agency Defendants do <u>not</u> have the authority to make significant revisions to OCSLA Five-Year Plan without Congressional approval. In this Court's opinion, pausing, stopping and/or cancelling lease sales scheduled in OCSLA Five-Year Plan would be significant revisions of the plan.

Without a valid reason to stop Lease Sale 258, the Agency Defendants were also required to complete the statutorily required procedure for the sale of Lease Sale 258.

Additionally, at least some of the onshore leases were cancelled due to the Pause, without any other valid reason. Some were cancelled to do additional environmental analysis, (which

---

[13] 85 Fed. Reg. 55859 (Sept. 10, 2020)
[14] 85 Fed. Reg. 55861 (Sept. 10, 2020)
[15] 86 Fed. Reg. 4116 (Jan. 15, 2021)

Plaintiff States maintain is pretextual), but the Pause has obviously been implemented by Agency Defendants for some of the lease sales.

Therefore, this Court finds that the Plaintiff States are substantially likely to prevail upon the merits under 5 U.S.C. 706(1) with regard to Lease Sale 257, with regard to Lease Sale 258, and with regard to eligible lands under the MLA.

### 2. Irreparable Injury

This issue is also contested by Government Defendants.  Plaintiff States must demonstrate "a substantial threat of irreparable injury" if the injunction is not issued.  Texas, 809 F.3d at 150.  For the threat to be sufficiently "substantial," plaintiff must show it is likely to suffer irreparable harm in the absence of preliminary relief.  Winter, 555 U.S. at 20.  For the injury to be sufficiently "irreparable," plaintiffs need only show it "cannot be undone through monetary remedies."  Burgess v. Fed. Deposit Ins. Corp., 871 F.3d 297, 304 (5th Cir. 2017).

As shown by the Declarations of Professor Timothy J. Considine, Professor David E. Dismukes and Jerome Zeringue, Plaintiff States are alleging they would sustain damages due to reduced funding for bonuses, ground rent, royalties, and rentals as a result of the Pause of new oil and gas leases in federal waters or on federal land.  Additionally, Louisiana is also claiming damage for reduced funding to the Coastal Master Plan, which would reduce proceeds that are used in Louisiana's coastal recovery and restoration program.  Plaintiff States are also claiming damages through loss of jobs in the oil and gas sector, higher gas prices, losses by local municipalities and governments, as well as damage to Plaintiff States' economy.  Additionally, Plaintiff States argue that they will not be able to recover money damages against the Government Defendants due to sovereign immunity.  Texas, 809 F.3d at 186 and Texas, 2021 WL 2096669, at *47.

Government Defendants maintain, through the Declaration of Peter Cowan, Declaration of Mustafa Haque and Declaration of Walter P. Cruickshank that drilling permits and drilling is continuing at the same level as it did previously as to existing leases.  However, just with the loss of proceeds from Lease Sale 257, which would have been already completed, Plaintiff States would have been entitled to ground rents and bonuses that they will not receive.  The Plaintiff States have alleged very substantial damages from Government Defendants, which would be difficult, if not impossible to recover, due to sovereign immunity.  Even though existing leases are proceeding, the fact that new oil and gas leases on federal lands and in federal waters are paused will ultimately result in losses to Plaintiff States which they will likely not be able to recover.

Accordingly, this Court finds the Plaintiff States have demonstrated a substantial threat of irreparable injury.

### 3.      The Balance of Equities and The Public's Interest

Plaintiff States have satisfied the first two elements to obtain a Preliminary Injunction. The final two elements they must also satisfy are that the threatened harm outweighs any harm that may result to the Government Defendants, and, that the injunction will not undermine the public interest.  Valley v. Rapides Par. Sch. Bd., 118 F.3d 1047, 1051 (5th Cir. 1997).  These two factors overlap considerably.  *Texas,* 809 F.3d at 187.  In weighing equities, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  Winter, 555 U.S. at 24.  The public interest factor requires the court to consider what public interests may be served by granting or denying a preliminary injunction.  Sierra Club v. U.S. Army Corps of Engineers, 645 F.3d 978, 997–98 (8th Cir. 2011).

Both sides argue equity and public interest favor their side.  This Court believes both the factors weigh in favor of Plaintiff States.  If the Pause were enjoined, the Government Defendants would simply be doing what they had already been doing and doing what they were statutorily required to do under OCSLA, the Five-Year Program, and MLA.  The Government Defendants even maintain there is no Pause with regard to MLA, so there would not be any harm in enjoining the Government Defendants from implementing a Pause, which they deny even exists.

The Plaintiff States' claims are substantial.  Millions and possibly billions of dollars are at stake.  Local government funding, jobs for Plaintiff State workers, and funds for the restoration of Louisiana's Coastline are at stake.  Plaintiff States have a reliance interest in the proceeds derived from offshore and on land oil and gas lease sales.

Additionally, the public interest is served when the law is followed.  Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C., 710 F.3d 579, 585 (5th Cir. 2013).  The public will be served if Government Defendants are enjoined from taking actions contrary to law.

Therefore, this Court finds that Plaintiff States have satisfied all four elements required for a preliminary injunction to be issued.

**VI.    CONCLUSION**

The Plaintiff States have satisfied all four elements required for a preliminary injunction to be issued.  After considering all factors, this Court has determined that a preliminary injunction should be issued by Plaintiff States against the Government Defendants.

The Court will now address the geographic scope.  This Court does not favor nationwide injunctions unless absolutely necessary.  However, it is necessary here because of the need for uniformity.  Texas, 809 F.3d at 187–88.  The Agency Defendants' lease sales are located on

42

public lands and in offshore waters across the nation.  Uniformity is needed despite this Court's reluctance to issue a nationwide injunction.  Therefore, the scope of this injunction shall be nationwide.

Additionally, this Court will address security under FED. R. CIV. P. 65.  The requirement of security is discretionary.  Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 628 (5th Cir. 1996). Plaintiff States are thirteen sovereign states.  The Government Defendants pay a substantial amount of proceeds under the MLA and OCSLA to Plaintiff States.  The Court will not require Plaintiff States to post security for this Preliminary Injunction.

For the foregoing reasons, the Court GRANTS Plaintiff States' Motion for Preliminary Injunction [Doc. No. 3].  Therefore, the U.S. Department of the Interior, the United States Bureau of Land Management, the United States Bureau of Ocean Energy Management,  and the United States Bureau of Safety and Environmental Enforcement, along with their directors, employees and Secretary are hereby ENJOINED and RESTRAINED from implementing the Pause of new oil and natural gas leases on public lands or in offshore waters as set forth in Section 208 of Executive Order 14008, 86 Fed. Reg. 7619, 7624-25 (Jan. 27, 2021) as to all eligible lands, both onshore, and offshore.

Additionally, said Agency Defendants shall be ENJOINED and RESTRAINED from implementing said Pause, with respect to Lease Sale 257, Lease Sale 258, and all eligible lands onshore.

This preliminary injunction shall remain in effect pending the final resolution of this case, or until further orders from this Court, the United States Court of Appeals for the Fifth Circuit, or the United States Supreme Court.

No security bond shall be required under Federal Rule of Civil Procedure 65.

43

MONROE, LOUISIANA, this 15th day of June, 2021.

                                        TERRY A. DOUGHTY
                                        UNITED STATES DISTRICT JUDGE