**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA**

THE STATE OF LOUISIANA,
By and through its Attorney General,
JEFF LANDRY, et al.,

PLAINTIFFS,

v.                                                              CIV. NO. 2:21-CV-00778-TAD-KK

JOSEPH R. BIDEN, JR., in his official capacity
as President of the United States, et al.,

DEFENDANTS.

PLAINTIFF STATES' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ii

INTRODUCTION ......................................................................................................................1

BACKGROUND .......................................................................................................................1

I. Statutory Framework for Oil and Gas Leasing ................................................1

    A.    Offshore Oil and Gas Leasing...........................................................................1

    B.    Oil and Gas Leasing on Public Lands ..............................................................4

II. Administration of Oil and Gas Leasing Program Prior to President Biden.............5

    A.    President Obama's Heavily Vetted Five-Year Program Governs Lease Sales Now
Through the End of 2022. ................................................................................5

    B.    President Obama's Five-Year Program Schedules Lease Sale 257 in the Gulf of
Mexico and Lease Sale 258 in Cook Inlet, Alaska and President Trump's Secretary
Implements the Sales. ......................................................................................7

    C.    Onshore MLA Lease Sales Proceed in the Midst of a Global Pandemic ....................9

III. The Biden Ban .........................................................................................................9

    A.    The Moratorium on Offshore and Onshore Oil and Gas Lease Sales................................9

    B.    The Cancellation of Lease Sales 257 and 258.......................................................11

    C.    The Cancellation of All Quarterly MLA Lease Sales ...............................................12

    D.    Procedural History of Plaintiff States' Challenge....................................................12

STANDARD OF REVIEW .......................................................................................................13

ARGUMENT...........................................................................................................................13

I.      Plaintiff States Adequately Allege an Ultra Vires Claim. ..................................13

II.     Plaintiff States Adequately Allege an OCSLA Citizen Suit Claim. ......................17

III.    Plaintiff States challenge final agency action under the APA. ...........................18

    A. The Biden Ban on New OCSLA and MLA Leasing is Final Agency Action. ......................18

    B. Each Lease-Sale Cancellation is Final Agency Action. ............................................22

CONCLUSION .......................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Al Otro Lado, Inc. v. McAleenan,*
  394 F. Supp. 3d 1168 (S.D. Cal. 2019) ......................................................................21

*Alabama-Coushatta Tribe of Texas v. United States,*
  757 F.3d 484 (5th Cir. 2014) .....................................................................................21

*Amadei v. Nielsen,*
  348 F. Supp. 3d 145 (E.D.N.Y. 2018) ......................................................................19

*Amigos Bravos v. U.S. Bureau of Land Mgmt.,*
  2011 WL 7701433 (D.N.M. Aug. 3, 2011) ...............................................................23

*Ancient Coin Collectors Guild v. U.S. Customs & Border Protection,*
  801 F. Supp. 2d 383 (D. Md. 2011) .................................................................... 13, 14

*Associated Builders & Contractors of Se. Texas v. Rung,*
  2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) .................................................... 13, 14

*Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.,*
  976 F.3d 585 (5th Cir. 2020) .....................................................................................10

*Bhd. of Locomotive Engineers & Trainmen v. FRRA,*
  972 F.3d 83 (D.C. Cir. 2020) ....................................................................................20

*Bldg. & Const. Trades Dep't v. Allbaugh,*
  295 F.3d 28 (D.C. Cir. 2002) ....................................................................................14

*BNSF Ry. Co. v. EEOC,*
  385 F. Supp. 3d 512 (N.D. Tex. 2018) ..........................................................20, 21, 22

*Cf. Motorola Credit Corp. v. Uzan,*
  561 F.3d 123 (2d Cir. 2009) ......................................................................................10

*Chamber of Com. of U.S. v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) ............................................................................ 14, 22

*Ciba-Geigy Corp. v. EPA,*
  801 F.2d 430 (D.C. Cir. 1986) ..................................................................................24

*City & Cty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ............................................................................. 14, 15

*City of Dallas, Tex. v. Hall,*
  2007 WL 3257188 (N.D. Tex. Oct. 29, 2007) ..........................................................14

*Common Cause v. Trump,*
  2020 WL 8839889 (D.D.C. Nov. 25, 2020)...........................................................................14

*Cure Land, LLC v. United States Dep't of Agric.,*
  833 F.3d 1223 (10th Cir. 2016)..........................................................................................24

*Duke Energy Field Servs. Assets, L.L.C. v. FERC,*
  150 F. Supp. 2d 150 (D.D.C. 2001)....................................................................................18

*Dunn-McCampbell Royalty Int., Inc. v. NPS,*
  2007 WL 1032346 (S.D. Tex. Mar. 31, 2007)...........................................................19, 22, 23

*Ensco Offshore Co. v. Salazar,*
  781 F. Supp. 2d 332 (E.D. La. 2011)...............................................................................2, 19

*Env't Def. Ctr. v. BOEM,*
  2018 WL 5919096 (C.D. Cal. Nov. 9, 2018) ..................................................................19, 24

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt,*
  381 F. Supp. 3d 1127 (D. Alaska 2019).............................................................................24

*Funk v. Stryker Corp.,*
  631 F.3d 777 (5th Cir. 2011)...............................................................................................10

*Gomez v. Trump,*
  485 F. Supp. 3d 145 (D.D.C. 2021)....................................................................................19

*Grand Canyon Tr. v. Pub. Serv. Co. of New Mexico,*
  283 F. Supp. 2d 1249 (D.N.M. 2003).................................................................................21

*Hias, Inc. v. Trump,*
  985 F.3d 309 (4th Cir. 2021)...............................................................................................15

*Hornbeck Offshore Servs., L.L.C. v. Salazar,*
  696 F. Supp. 2d 627 (E.D. La. 2010).................................................................................18

*Indigenous Env't Network v. United States Dep't of State,*
  347 F. Supp. 3d 561 (D. Mont. 2018)................................................................................24

*Laub v. U.S. Dep't of Interior,*
  342 F.3d 1080 (9th Cir. 2003).............................................................................................23

*League of Conservation Voters v. Trump,*
  303 F. Supp. 3d 985 (D. Alaska 2018)................................................................................14

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990).............................................................................................................21

*Luv N' Care, Ltd. v. Jackel Int'l Ltd.*,
  2020 WL 6881672 (W.D. La. Nov. 23, 2020) .......................................................................13

*Medellin v. Texas*,
  552 U.S. 491 (2008) ..............................................................................................................16

*Minard Run Oil Co. v. U.S. Forest Service*,
  670 F.3d 236 (3d Cir. 2011) ..................................................................................................23

*Montana Wildlife Fed'n v. Bernhardt*,
  2020 WL 2615631 (D. Mont. May 22, 2020) .......................................................................20

*Mountain States Legal Found. v. Bush*,
  306 F.3d 1132 (D.C. Cir. 2002) ...................................................................................... 13, 14

*NRDC v. Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020) .................................................................................................23

*Qureshi v. Holder*,
  663 F.3d 778 (5th Cir. 2011) .................................................................................................20

*R.I.L.-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015) .........................................................................................21

*Rosa v. McAleenan*,
  2019 WL 5191095 (S.D. Tex. Oct. 15, 2019) .......................................................................20

*Rosebud Sioux Tribe v. Trump*,
  428 F. Supp. 3d 282 (D. Mont. 2019).....................................................................................14

*SAS Inst., Inc. v. Iancu*,
  138 S. Ct. 1348 (2018)............................................................................................................22

*Sec'y of the Interior  v. California*,
  464 U.S. 312 (1984) ............................................................................................................ 2, 3

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  446 F.3d 808 (8th Cir. 2006)..................................................................................................24

*State of Cal. By & Through Brown v. Watt*,
  668 F.2d 1290 (D.C. Cir. 1981) ...............................................................................................3

*State of La. v. DOE*,
  507 F. Supp. 1365 (W.D. La. 1981) .......................................................................................23

*Strata Prod. Co. v. Jewell*,
  2014 WL 12789010 (D.N.M. Aug. 11, 2014) .......................................................................23

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019) ........................................................................................22

*Texas v. United States,*
   2021 WL 2096669 (S.D. Tex. Feb. 23, 2021) .............................................................18

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) .........................................18

*Velesaca v. Decker,*
   458 F. Supp. 3d 224 (S.D.N.Y. 2020) .................................................................. 19, 20

*Venetian Casino Resort, L.L.C. v. E.E.O.C.,*
   530 F.3d 925 (D.C. Cir. 2008) ............................................................................. 19, 21

*W. Energy All. v. Jewell,*
   2017 WL 3600740 (D.N.M. Jan. 13, 2017) ................................................................21

*W. Watersheds Project v. Bureau of Land Mgmt.,*
   629 F. Supp. 2d 951 (D. Ariz. 2009) ..........................................................................14

*W. Watersheds Project v. Zinke,*
   441 F. Supp. 3d 1042 (D. Idaho 2020) .......................................................................24

*Washington v. U.S. Dep't of Homeland Sec.,*
   2020 WL 1819837 (W.D. Wash. Apr. 10, 2020) ......................................................20

*Whitman v. Am. Trucking Associations,*
   531 U.S. 457 (2001) ...................................................................................................19

**Statutes**

30 U.S.C. §181 ...................................................................................................................4

30 U.S.C. §191(a) ..............................................................................................................5

30 U.S.C. §226(b)(1)(A) ....................................................................................................4

30 U.S.C. §226(b) ..............................................................................................................4

43 U.S.C. §1332 .................................................................................................................2

43 U.S.C. §1337(g)(2) ........................................................................................................2

43 U.S.C. §1344(a) ......................................................................................................... 2, 6

43 U.S.C. §1344(c)(1) ........................................................................................................3

43 U.S.C. §1344(c)(2) .........................................................................................................3

43 U.S.C. §1344(d) ....................................................................................................................3

43 U.S.C. §1344(e) ................................................................................................................ 4, 16

43 U.S.C. §1345(a) ....................................................................................................................3

43 U.S.C. §1345(c) ....................................................................................................................4

43 U.S.C. §1349(a)(1)(3) ........................................................................................................17

43 U.S.C. §1802(a) ....................................................................................................................2

**Other Authorities**

An Act to amend the Submerged Lands Act, H.R. 5134, 83rd Cong. § 8(a) (1953) .............................1

BLM Nat'l NEPA Register, July 2021 Competitive Oil and Gas Lease Sale - New Mexico State
    Office (last updated Apr. 12, 2021), https://bit.ly/3wzz9z6 ............................................................10

Executive Order 14008 ..................................................................................................passim

Federal Onshore Oil and Gas Leasing Reform Act of 1987, Pub. L. 100-203 .......................................4

**Rules**

Federal Rule of Evidence 201 ..........................................................................................................10

**Regulations**

40 C.F.R. §§1501.4 ........................................................................................................................24

43 C.F.R. §§3120.1-1, -2 ..................................................................................................................5

83 Fed. Reg. 22,814, 22,844 (June 17, 1988) ......................................................................................5

**Constitutional Provisions**

U.S. Const. art. I, §3, cl. 2 ................................................................................................................1

# INTRODUCTION

This Court has already issued a preliminary injunction determining that a "pause" on offshore and onshore oil and gas lease sales exists and that it constitutes final agency action. Defendants' motion to dismiss raises no new arguments undermining that conclusion. Instead, Defendants keep striving to build justiciability barriers in this straightforward case. Those efforts fare no better here than when the Court correctly rejected them and granted injunctive relief. Courts have long entertained ultra vires and citizen-suit claims like the Plaintiff States' to check executive edicts, such as Section 208 of Executive Order 14008, that conflict with statutory authorities. And Plaintiff States have adequately alleged imminent and immediate harms to public health and legal interests sufficient to invoke OCSLA's citizen-suit provision. The Court has properly rejected Defendants' attempt to avoid accountability once. It should do so again here and deny their motion to dismiss.

# BACKGROUND

## I. Statutory Framework for Oil and Gas Leasing

The Constitution provides that Congress—not the Executive—has plenary authority over federal property: "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. I, §3, cl. 2. Pursuant to this vested power, Congress has directed the Executive to open federal lands and the outer Continental Shelf to oil and natural gas development through two comprehensive statutory regimes: the Outer Continental Shelf Lands Act and Mineral Leasing Act. As this Court has recognized, both statutes "set forth requirements to hold lease sales of eligible land" and provide for how such sales should be conducted—mandates that the President and his officers cannot ignore. *See* Doc. 139 at 26.

### A.      Offshore Oil and Gas Leasing

OCSLA was enacted in 1953 "to meet the urgent need for further exploration and development of oil and gas deposits." An Act to amend the Submerged Lands Act, H.R. 5134, 83rd

Cong. § 8(a) (1953). The statute declares "the outer Continental Shelf" to be "a vital national resource reserve held by the Federal Government for the public." 43 U.S.C. §1332(3). After the shock of the OPEC oil embargo, years of declining domestic production, and dissatisfaction with the Secretary's management of the leasing program, Congress stepped in and amended OCSLA in 1978 to "establish policies and procedures for managing the oil and natural gas resources of the Outer Continental Shelf which are intended to result in expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." 43 U.S.C. §1802(a). To these ends, OCSLA directs the Secretary of the Interior to make the Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." *Id.*; *see also Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 339 (E.D. La. 2011) (noting "OCSLA's overriding policy of expeditious development"). OCSLA also provides that coastal States are entitled to a substantial portion of "all bonuses, rents, and royalties, and other revenues" resulting from oil and gas sales and development. 43 U.S.C. §1337(g)(2).

OCSLA facilitates the expeditious development of the Shelf's oil and gas resources by directing the Secretary to administer a competitive leasing program that consists of four parts and includes multiple robust consultation requirements. *See Sec'y of the Interior   v. California*, 464 U.S. 312, 337 (1984) ("Each stage includes specific requirements for consultation with Congress, between federal agencies, or with the States."). The first and second stages are relevant to this case.

First, the Secretary must formulate a five-year leasing plan. *See* 43 U.S.C. §1344(a) ("The leasing program shall consist of a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which he determines will best meet national energy needs for the five-year period following its approval or reapproval."). The five-year plan "achieves important

practical and legal significance" because it serves as "the basis for future planning by all affected entities, from federal, state and local governments to the oil industry itself." *State of Cal. By & Through Brown v. Watt*, 668 F.2d 1290, 1299 (D.C. Cir. 1981). Accordingly, "[c]ompliance with the mandates of [OCSLA] is extremely important to the expeditious but orderly exploitation of OCS resources." *Id.* Reflecting its importance, the creation of the five-year plan is a massive undertaking consisting of environmental assessments, mandatory consultation requirements, and multiple comment periods. *See California*, 464 U.S. at 337.

Specifically, OCSLA requires multiple State consultations during the promulgation of the five-year plan. The Secretary is required to "invite and consider suggestions for such program from ... the Governor of any State which may become an affected State under such proposed program." 43 U.S.C. §1344(c)(1). Then, after a proposed plan is completed, the Secretary "shall submit a copy of such proposed program to the Governor of each affected State for review and comment." 43 U.S.C. §1344(c)(2). If a State Governor requests "a modification of such proposed program, the Secretary shall reply in writing granting or denying such request in whole or in part, or granting such request in such modified form as the Secretary considers appropriate, and stating his reasons therefor." *Id.* "The proposed leasing program is then submitted to the President and Congress, together with comments received by the Secretary from the governor of the affected state." *California*, 464 U.S. at 337 (citing 43 U.S.C. §1344(d)).

The second stage of the OCSLA leasing process consists of holding lease sales and includes another round of mandatory State consultation. OCSLA grants "[a]ny Governor of any affected State or the executive of any affected local government" the right to "submit recommendations to the Secretary regarding the size, timing, or location of a proposed lease sale." 43 U.S.C. §1345(a). The Secretary "shall accept" these recommendations if the Secretary "determines, after having provided

3

the opportunity for consultation, that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State." *Id.* §1345(c).

OCSLA specifically prevents the Secretary from circumventing this carefully wrought process of congressional and State consultation and analysis by making significant amendments to the five-year plan after its enactment. The law expressly requires that any "revision" of the five-year plan "shall be in the same manner as originally developed," unless the revision is "not significant." 43 U.S.C. §1344(e). The Department has long defined the term "not significant" narrowly in light of congressional intent and OCSLA's structure. Doc. 121-1, PR 62-63. And a finding of not significant cannot be made sub silentio or on a whim; rather, it is a judicially reviewable decision that must include an administrative record. Doc. 121-1, PR 59.

### B.      Oil and Gas Leasing on Public Lands

Besides its offshore interests, the Federal Government also holds energy-producing lands onshore. Congress has likewise made those lands available for development. The MLA provides that "deposits of ... oil, oil shale, ... or gas, and lands containing such deposits owned by the United States, including those in national forests," but excluding specific lands, "shall be subject to disposition in the form and manner provided by this chapter." 30 U.S.C. §181. Oil and gas leases are specifically authorized. And significantly, in 1987, Congress inserted the specific command in the MLA requiring that "[l]ease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary." Federal Onshore Oil and Gas Leasing Reform Act of 1987, Pub. L. 100-203 (codified as amended at 30 U.S.C. §226(b)). Under the Mineral Leasing Act, the Secretary of the Interior is required to hold lease sales "for each State where eligible lands are available at least quarterly." 30 U.S.C. §226(b)(1)(A).[1] To comply with

---

[1] To implement the 1987 amendment, BLM adopted a regulation, following notice and comment procedures, providing that "[a]ll lands available for leasing shall be offered for competitive

the MLA, several BLM regional offices planned to hold quarterly sales in March and April 2021 to lease available lands. Doc. 1 at 33-34, ¶¶93-99.

The MLA provides that for oil and natural gas leases on federal lands, in States other than Alaska, 50 percent of bonuses, production royalties, and other revenues are granted to the State in which the lease is located, and 40 percent is granted to the Reclamation Fund, which maintains irrigation systems in several Western States. 30 U.S.C. §191(a). For leases in Alaska, 90 percent of revenues are granted to the State. *Id.*

## II. Administration of Oil and Gas Leasing Program Prior to President Biden

Presidents of both parties have faithfully implemented OCSLA and the MLA's oil and gas leasing programs for decades, resulting in economic prosperity and significant revenue to the federal government and States. To be sure, individual lease sales have occasionally been delayed on a case-by-case basis in response to specific emergencies such as the Deepwater Horizon Oil Spill and COVID-19, and individual sales have also been delayed due to court holdings regarding specific sales. *See e.g.*, Doc. 121-1, PR 87, 91; 75 Fed. Reg. 44,276 (July 28, 2010). Under the modern iterations of OCSLA and the MLA, however, there has never been a systematic, across the board cancellation and moratorium of all oil and gas lease sales.

### A.    President Obama's Heavily Vetted Five-Year Program Governs Lease Sales Now Through the End of 2022.

Current lease sales in the Outer Continental Shelf are governed by the 2017-2022 Five Year Oil and Gas Leasing Program ("the Current Five-Year Program" or "Five-Year Program"). *See* Doc. 135 (Five-Year Program). The process of creating the Five-Year Program began in 2014 during the Obama Administration. President Obama's BOEM published a request for information in the Federal

---

bidding," and "[e]ach proper BLM S[t]ate office shall hold sales at least quarterly if lands are available for competitive leasing." 83 Fed. Reg. 22,814, 22,844 (June 17, 1988) (codified at 43 C.F.R. §§3120.1-1, -2).

Register and sent a letter to all Governors, Tribes, and interested federal agencies requesting input on the Program. *See* Doc. 1 at 18, ¶53. BOEM received over 500,000 comments in response to the RFI, allowing it to discharge its obligation under OCSLA to take into account economic, social, and environmental values in making its leasing decisions. *See* 43 U.S.C. §1344(a); Doc. 1 at 18, ¶53. In 2015, President Obama's BOEM published the Draft Proposed Program. That published draft incorporated responses to the RFI comments and set out a draft schedule of potential lease sales. It also started a 60-day comment period in which BOEM received over one million comments. Doc. 1 at 18, ¶54. After considering those comments, BOEM next published the Proposed Program, thereby starting a new 90-day comment period. Doc. 1 at 18, ¶55. Again, BOEM received over one million comments, held public meetings, and created environmental impact statements in compliance with the National Environmental Policy Act (NEPA). *Id.*; *see also* Doc. 129-2.

After all that, President Obama's BOEM published the Proposed Final Program in November 2016. In it, the Secretary determined which areas to include in the lease sales. In recognition that "[t]he Gulf of Mexico is known to contain significant oil and gas resources and already has world-class, well-developed infrastructure, including established spill response capability," the "PFP schedules 10 region-wide lease sales in the areas of the Gulf of Mexico that are not under Congressional moratorium or otherwise unavailable for leasing." Doc. 129-2 at 16. The Proposed Final Program also observed that "[i]n the Gulf of Mexico, infrastructure is mature, industry interest and support from affected states and communities is strong, and there are significant oil and gas resources available." *Id.* Thus, "[t]o take advantage of these incentives to OCS activity, the region-wide sale approach makes the entire leasable Gulf of Mexico OCS area available in each lease sale." *Id.*

On January 17, 2017—60 days after the Final Program was transmitted to President Obama and Congress—the Secretary approved the Final Program, "which schedules 11 potential oil and gas lease sales, one sale in the Cook Inlet (Alaska) Program Area and 10 sales in the GOM Program

Areas," with "one sale in 2017, two each in 2018-2021, and one in 2022." Doc. 121-1, PR 55.  The Secretary's approval further specifically affirms the Final Program's specification that "[t]he GOM sales would be region-wide and include unleased acreage not subject to moratorium or otherwise unavailable ... to provide greater flexibility to industry, including more frequent opportunities to bid on rejected, relinquished, or expired OCS lease blocks." *Id.*[2]

### B. President Obama's Five-Year Program Schedules Lease Sale 257 in the Gulf of Mexico and Lease Sale 258 in Cook Inlet, Alaska and President Trump's Secretary Implements the Sales.

The Final Program approved and scheduled two lease sales relevant here. The first is GOM OCS Oil and Gas Lease Sale 257. Lease Sale 257 would have comprised the Western and Central Planning Areas of the Gulf of Mexico and a portion of the Eastern Planning Area not subject to congressional moratorium. Doc. 129-2 at 19; *see also* Doc. 121-1, PR 49. The second is Lease Sale 258 in Cook Inlet, Alaska, "where there is existing infrastructure currently supporting State leasing activities." Doc. 129-2 at 16.

In accordance with the Five-Year Program, BOEM published a Proposed Notice of Sale for Lease 257 in the Gulf of Mexico in November 2020. *See* Doc. 121-1, PR 6. As OCSLA requires, BOEM sent the Proposed Notice to Governors of the affected States. *Id.* It was also opened for public comment. *Id.*

The Secretary approved the Notice of Sale in a Record of Decision. *See* Doc. 121-1, PR 21-27. In the ROD, the Secretary noted reliance on the "Gulf of Mexico Outer Continental Shelf Lease Sale: Final Supplemental Impact Statement" in considering how to proceed with Lease Sale 257. Doc. 129-3 at 3. The Secretary analyzed five separate alternatives, including a no-action option, and determined that Alternative A—a regionwide lease sale with minor exclusions—would be "in the best interest of

---

[2] Until the Biden Ban, all lease sales in the Five-Year Program occurred on schedule.

the Nation and meets the purposes of the OCS Lands Act." *Id.* at 5. The Secretary also determined

that Lease Sale 257 "promotes domestic energy production, which can reduce the need for oil

imports," and promotes other national interests including "continued employment, labor income,

[and] tax revenues." *Id.* at 8. Additionally, the Secretary found that "[c]ontinued oil and gas leasing on

the OCS may also reduce the risk of spills from the transportation of imported energy resources," and

that "revenue sharing with applicable coastal states and political subdivisions ... can help mitigate the

risks and costs assumed by the States and communities in the area of the lease sale." *Id.* at 5, 8.

In the ROD, the Secretary rejected the no-action alternative because "the needed domestic

energy sources and the subsequent positive economic impacts from exploration and production,

including employment, would not be realized. Furthermore, revenue would not be collected by the

Federal Government nor subsequently disbursed to the States." Doc. 129-3 at 10. Additionally, the

Secretary found that other sources of energy "may have different but comparable levels of negative

environmental impacts, such as the risk of spills from the transportation of alternative oil supplies

over long distances." *Id.* That meant the no-action alternative "would not avoid the incremental

contribution of the energy substitutes' impacts to those same cumulative effects." *Id.* Finally, the

Secretary's approval noted that the Leased Sale 257 stipulations included "all practicable means to

avoid or minimize environmental harm from the selected alternative." *Id.* at 11. Lease Sale 257 was

formally scheduled for March 17, 2021. *Id.* at 1.[3]

As to Lease Sale 258—which would offer lands in the Cook Inlet, Alaska—BOEM in

September 2020 began the process of preparing it in accordance with the Current Five-Year Program.

BOEM released a Call for Information and Nominations in the Federal Register to allow industry

---

[3] In the ROD, the Secretary also referenced the Lease Sale 257 Final Notice of Sale several
times. The FNOS had been sent to the Office of the Federal Register along with the ROD, but by
happenstance was not published because the new Administration was able to pull it back before
publication in the Federal Register. *See* Doc. 121-1, PR 17-20.

parties to indicate interest in parcels of the sale area. Doc. 121-1, PR 1-3. BOEM also released a Notice of Intent to Prepare an EIS, which provided the public with an opportunity to comment on the scope of the lease sale. Doc. 121-1, PR 3-5. In January 2021, after accounting for comments, BOEM published a Notice of Availability indicating the area proposed for sale in the Cook Inlet and a draft environmental impact statement. Doc. 1 at 22, ¶65.

### C.     Onshore MLA Lease Sales Proceed in the Midst of a Global Pandemic

Onshore oil and gas lease sales proceeded in the midst of a global pandemic. Although there were individual sale delays in the early stages of COVID-19, BLM used innovative methods to continue holding lease sales in compliance with its statutory duties. NEPA lawsuits continued to be a fact of life for oil and gas lease sales, but BLM only delayed or cancelled individual sales in response to individual court holdings. *See supra* Sec. II. To comply with the MLA, several BLM regional offices planned to hold quarterly sales in March and April 2021 to lease available lands, and had either completed or were on pace to complete the needed environmental assessments before the sale dates. Doc. 1 at 33-34, ¶93-99.

## III. The Biden Ban

### A.     The Moratorium on Offshore and Onshore Oil and Gas Lease Sales

The onshore and offshore lease sale machinery ground to a precipitous halt for the first time in its history in January 2021. On January 27, the Department of the Interior published a "fact sheet" stating that President Biden would be issuing an executive order "direct[ing] the Department of the Interior to pause new oil and natural gas leasing on public lands and offshore waters." Doc. 135-9. As justification, the fact sheet speaks of the need to reduce greenhouse gas emissions; "[i]responsible leasing of public lands and waters"; impacts on community access, wildlife, and cultural sites; proposed (and defeated) legislation; and the supposed stockpiling of leases by the oil and gas industry. *Id.* NEPA compliance or pending court cases are not mentioned in the fact sheet. *Id.* Later that day, President

Biden issued Executive Order 14008, which directed the Secretary to implement a nationwide moratorium on offshore and onshore oil and gas leasing.[4]

The Department then acted to implement a comprehensive moratorium on oil and gas lease sales on the outer Continental Shelf and public lands. This Moratorium is a cancellation of the entire machinery of oil and gas development on public lands and offshore waters, and includes a halt of offshore oil and gas lease sales previously scheduled by the Five Year Plan and cancellation of quarterly public land lease sales. Not only have the sales themselves been cancelled, the Moratorium has also halted the environmental assessments that were scheduled to be completed in time to hold the sales on time.[5] As discussed below, this Moratorium is reflected in several discrete actions including the recission of Lease Sale 257's Record of Decision and pull back of that sale's notice from the Federal Register, the cancellation of Lease Sale 258's comment period, and the systematic cancellation of all First and Second Quarter onshore lease sales.[6]

---

[4] Even before January 27, the Administration began laying the foundation for a Moratorium. *See* Doc. 139 at 29 ("[O]n January 20, 2021, (the day President Biden was sworn in), Walter Cruickshank sent an email to Loren Thompson [Doc. No.121, PR 17], in which he stated they had received instructions to withdraw any notices that were pending at the Federal Register, which included the Final Notice of Sale for Lease Sale 257 and the Notice of the Record of Decision for Lease 257. (The Notice of the Record of Decision was evidently withdrawn too late because it was published). Cruickshank told Thompson in the email that the withdrawals do not signify anything more than the new leadership team wanting to evaluate the pending items.").

[5] Ironically, the Defendants have claimed that the sales have not been held because the environmental assessments were incomplete. But the environmental assessments, which were proceeding according to schedule, were incomplete because they were halted as part of the Moratorium. *Cf. Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 n.5 (2d Cir. 2009) ("The 'classic definition' of chutzpah has been described as 'that quality enshrined in a man who, having killed his mother and father, throws himself on the mercy of the court because he is an orphan.'").

[6] All indications are that Q3 lease sales have been cancelled as well given the lack of any environmental assessments or sale schedules. *See, e.g.*, BLM Nat'l NEPA Register, July 2021 Competitive Oil and Gas Lease Sale - New Mexico State Office (last updated Apr. 12, 2021) (noting environmental assessment of Third Quarter sale has been "paused"), https://bit.ly/3wzz9z6. These government documents are part of the record and also subject to judicial notice under Federal Rule of Evidence 201. *See Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 589 (5th Cir. 2020); *see also Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) ("[T]he district court took

As the government has conceded, no onshore or offshore oil and gas lease sales have occurred since January 27, 2021. *See* Doc. 139 at 27. This means that as of the date of filing, no onshore or offshore lease sale has occurred for five months. There appears to be no sign of the Moratorium lifting. On March 1, 2021, Interior leadership confirmed that lease sales will remain postponed in accordance with the Executive Order. Doc. 121-1, PR 86. And on March 19, 2021, Interior confirmed its rescission of delegated authority to field offices to issue, inter alia, "[l]ease sale notices." Doc. 121-1, PR 51. There has never been such a Moratorium on oil and gas lease sales.

### B. The Cancellation of Lease Sales 257 and 258

On February 18, 2021, Michael Celata, Regional Director of BOEM's Gulf of Mexico Office, issued a Notice to Rescind the Prior Lease 257 Record of Decision. Doc. 121-1, PR 49. The Notice declared that the Record of Decision "is rescinded immediately." *Id.* The half-page-long Federal Register Notice purports to rescind the prior Record of Decision, but it provides no analysis, no comment period, no reference to the statutory factors, no reference to the Current Five-Year Program, and no consultation with the States or Tribes. BOEM's *only* stated rationale is that it must rescind the Record of Decision "to comply with Executive order 14008." *Id.* BOEM now has *no* plans to hold Lease Sale 257. Instead, the Recission Notice states only that "BOEM may reevaluate GOM Lease Sale 257 and publish an appropriate ROD in the Federal Register." *Id.*

Lease Sale 258 fared no better. In early February BOEM published a *press release* on its website cancelling both the public comment period on the Draft EIS and public meetings about Lease Sale 258. *See* Doc. 1 at 31, ¶86. The press release relies solely upon Executive Order 14008 to close the comment period. BOEM later memorialized its press release in a Federal Register notice that relies solely on the Biden Ban. Doc. 1 at 31-32, ¶86.

---

appropriate judicial notice of publicly-available documents and transcripts produced by the FDA, which were matters of public record directly relevant to the issue at hand.").

C.      **The Cancellation of All Quarterly MLA Lease Sales**

At the same time BOEM was cancelling offshore lease sales, BLM cancelled each individual First and Second Quarter onshore sale. *See* Doc. 1 at 35-36, ¶¶103-110. It is at this point that the inadequate environmental analysis rationale emerged for the first time. Up until then, the cancellations were justified solely on EO 14008. Doc. 1 at 35, ¶102. But at least one BLM field office posted a notice that lease sales were cancelled "to confirm the adequacy of underlying environmental analysis." Doc. 1 at 35, ¶105. Internal documents reveal that this was just cover for the real reason: EO 14008. *See* Doc. 121-1, PR 86 ("Department officials with delegated authority to approve fossil fuel authorizations, including onshore lease sales, are postponing further consideration of Quarter Two sales (including authorization of the sales) pending decisions on how the Department will implement the Executive Order on Tackling the Climate Crisis at Home and Abroad with respect to onshore sales. ... [P]lease post the following update on the relevant website(s): 'The oil and gas lease sale scheduled for April, 2021 has been postponed.").

D.      **Procedural History of Plaintiff States' Challenge**

On March 22, 2021, Louisiana submitted a notice of suit under OCSLA to the Secretary informing the Department that the States would be immediately injured by its violation of the law and were therefore preparing to file suit. On March 24, 2021, a coalition of thirteen states, led by Louisiana, filed suit against the Moratorium and on March 31, 2021, Plaintiff States moved for a preliminary injunction. On June 8, 2021, Defendants filed a motion to dismiss Plaintiff States' complaint. This Court held a hearing on Plaintiff States' motion in Lafayette on June 10, 2021. Five days later, the Court issued a nationwide preliminary injunction prohibiting executive branch officials "from implementing the Pause of new oil and natural gas leases on public lands or in offshore waters as set forth in Section 208 of Executive Order 14008." Doc. 139 at 42-43.

## STANDARD OF REVIEW

"In evaluating a motion to dismiss under Rule 12(b)(6), the Court must 'accept all well-pleaded facts in the complaint as true and view the facts in the light most favorable to the plaintiff.'" *Luv N' Care, Ltd. v. Jackel Int'l Ltd.*, 2020 WL 6881672, at *3 (W.D. La. Nov. 23, 2020). Accordingly, "courts 'are not authorized or required to determine whether the plaintiff's plausible inference ... is equally or more plausible than other competing inferences....'" *Id.* This "plausibility standard is met "when the complaint pleads 'enough fact to raise a reasonable expectation that discovery will reveal evidence' in support of the alleged claims.'" *Id.*

## ARGUMENT

Defendants raise several procedural barriers to try to shield the Biden Ban on new oil and gas lease sales from judicial review. But as this Court has held, their arguments do not rebut the very simple facts of this case: a moratorium on leasing exists; it is final; and it violates the MLA, OCSLA, and APA. Moreover, Plaintiff States have adequately pled alternative causes of action under OCSLA's citizen suit provision and to challenge ultra vires Executive action. The Court should deny Defendants' motion to dismiss.

## I.   PLAINTIFF STATES ADEQUATELY ALLEGE AN ULTRA VIRES CLAIM.

Ultra vires review is available to determine "whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383, 406 (D. Md. 2011) (citing *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002)); *see also Associated Builders & Contractors of Se. Texas v. Rung*, 2016 WL 8188655, at *5 (E.D. Tex. Oct. 24, 2016) ("The DOL, a federal agency also operating within the Executive Branch, has implemented the President's Executive Order by issuing the Guidance incorporated by reference in the new Rule. Therefore, the Executive Order may be challenged by

13

Plaintiffs on both statutory and non-statutory grounds.") (citing *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996)).

Plaintiff States allege that Section 208 of Executive Order 14008's leasing "pause" is not authorized by law. Doc. 1 at 49, ¶176. This Court agreed that "since OCSLA does not grant specific authority to a President to 'Pause' offshore oil and gas leases, the power to 'Pause' lies solely with Congress. Therefore, Plaintiff States have made a showing that there is a substantial likelihood that President Biden exceeded his powers in Section 208 of Executive Order 14008." Doc. 139 at 5. This amounts to a quintessential ultra vires claim of the type reviewed by courts across the nation.[7] *Rosebud Sioux Tribe v. Trump*, 428 F. Supp. 3d 282, 291 (D. Mont. 2019) ("A court's power to enjoin the President extends to enjoining portions of an executive order where the order 'exceeds the statutory authority delegated by Congress and constitutional boundaries.'"); *see also City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1239-40 (9th Cir. 2018); *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002); *League of Conservation Voters v. Trump*, 303 F. Supp. 3d 985, 995 (D. Alaska 2018); *Ancient Coin Collectors Guild*, 801 F. Supp. 2d at 406; *Associated Builders & Contractors of Se. Texas*, 2016 WL 8188655, at *5; *W. Watersheds Project v. Bureau of Land Mgmt.*, 629 F. Supp. 2d 951, 960 (D. Ariz. 2009); *City of Dallas, Tex. v. Hall*, 2007 WL 3257188, at *15 (N.D. Tex. Oct. 29, 2007).

Defendants' only responses are to hide behind boilerplate language in the Executive Order and continue to argue that the Secretary of the Interior has unlimited discretion to disregard OCSLA

---

[7] Defendants' reliance (at 11) on *Bldg. & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002), is unpersuasive because unlike the executive order at issue there, Section 208 "unambiguously commands action" meaning "here there is more than a 'mere possibility that some agency might make a legally suspect decision.'" *City & Cty. of San Francisco*, 897 F.3d at 1239-40 (quoting *Allbaugh*, 295 F.3d at 33). Similarly, Defendants cannot rely (at 12) upon *Common Cause v. Trump*, because that case specifically found that the presidential memorandum at issue did not issue a blanket command to the Secretary and the Secretary had not yet acted to implement the memorandum. 2020 WL 8839889, at *6 (D.D.C. Nov. 25, 2020). Here, by contrast, Section 208 unambiguously directs a mandatory blanket "pause" and the Secretary has implemented that pause in explicit reliance upon the Executive Order.

and the MLA. Section 208 of Executive Order 14008 contains the standard disclaimer that the command to halt oil and gas leasing applies only "[t]o the extent consistent with applicable law." Courts, including this Court, have consistently held that such language is not a get out of jail free card to avoid judicial review of executive orders. *See, e.g.*, Doc. 139 at 37 ("[T]he Court notes the wording in the Executive Order, which states, 'To the extent consistent with applicable law,' but also notes the wording 'shall pause.' This does not leave the agency free to exercise discretion unless they disobey a Presidential Executive Order."). Such "savings clauses" must be "read in their context, and they cannot be given effect when the Court, by rescuing the [legality] of a measure, would override clear and specific language" in an executive order. *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018). Section 208's mandatory directive thus cannot be read out of the Executive Order based on the boilerplate savings clause. *See id.* at 1240 ("If 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues."); *see also Hias, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) ("[W]e reject the government's attempt to immunize the Order from review through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order.").

To distinguish this line of authority, Defendants resort to rehashing their assertion that OCSLA and the MLA do not prohibit an across the board moratorium on all oil and gas lease sales to argue that Section 208 can be implemented consistent with applicable law. Defendants (at 14) accurately point out that the common thread in *Hias* and *City and County of San Francisco* was "that the presiding courts declined to credit the savings clauses after finding the challenged executive orders could not be implemented consistent with law." As this Court has concluded, that is exactly the case here—the President has no authority to order a "pause" of the oil and gas leasing programs set out in OCSLA and the MLA. Doc. 139 at 3-5. Contrary to Defendants' assertion that OCSLA's "structure"

is essentially a blanket grant of unreviewable discretion on the Secretary, the statute sets out a specific process to make significant revisions to the leasing process. Accomplishing the most significant revision in the history of the oil and gas leasing program through executive order makes a mockery of this statutory process. *See* 43 U.S.C. §1344(e); Doc. 139 at 39 ("[T]he Secretary of the DOI and other Agency Defendants do not have the authority to make significant revisions to OCSLA Five-Year Plan without Congressional approval. In this Court's opinion, pausing, stopping and/or cancelling lease sales scheduled in OCSLA Five-Year Plan would be significant revisions of the plan.").

Congress's creation of exhaustive procedures to create and amend the oil and gas leasing process demonstrates that the President has no authority to circumvent this process through executive order. Simply put, the President does not have authority to halt the statutorily mandated oil and gas leasing machinery and create a process that cuts out the States and ignores OCSLA and the MLA's specific procedures. *See* Doc. 139 at 25 ("The discretion to pause a lease sale to eligible lands is not within the discretion of the agencies by law under either OCSLA or MLA.").[8]

Because OCSLA and the MLA provide no authority to implement a blanket "pause" on oil and gas lease sales, it is impossible to implement Section 208 of Executive Order 14008 in a manner consistent with the law. Accordingly, Plaintiff States have adequately made out an ultra vires claim against the President's unprecedented oil and gas lease sale moratorium.

---

[8] Defendants' reference (at 15-16) to past practice is misleading. Defendants can point to only discrete onshore and offshore lease sale cancellations taken on a case by case basis in response to specific crises or court holdings, but the government has never issued a blanked moratorium on all onshore and offshore oil and gas lease sales. *See supra* Sec. II. It is Defendants that ignore decades of consistent practice in promulgating and implementing the oil and gas leasing program—always through the statutory process and never through executive order. And, in any event, Defendants assertion that the Executive Branch has acted lawlessly in the past is self-defeating. *See Medellín v. Texas*, 552 U.S. 491, 531-32 (2008) ("[T]he Court has been careful to note that '[p]ast practice does not, by itself, create power.'").

## II.     PLAINTIFF STATES ADEQUATELY ALLEGE AN OCSLA CITIZEN SUIT CLAIM.

OCSLA's citizen suit provision states that "[a]n action may be brought under this subsection immediately after notification of the alleged violation in any case in which the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C. §1349(a)(1)(3). As this Court's finding of irreparable harm demonstrates, Plaintiff States have easily met their burden to allege a violation that "would immediately affect a legal interest of the plaintiff." *Id.*; Doc. 139 at 41 (finding irreparable injury).

Defendants' assertion (at 17) that "Plaintiffs make no allegations regarding threats to public health and safety, and do not allege any 'immediate' threat to a legal interest" is absurd. Plaintiff States' Complaint contains a section devoted entirely to setting out the immediate and irreparable harms the States are suffering due to the Moratorium. *See* Doc. 1 at 38-43, ¶¶115-126. As Plaintiff States alleged in their complaint, they are statutorily entitled to specific proceeds from specific sales that were cancelled. This harm is immediate—every month that passes is a month without ground rents; a month without bonuses; and a month longer to obtain royalties. Moreover, Plaintiff States allege that the Moratorium immediately affects another of their legal interest—their statutorily-vested right to be consulted about the leasing program. Doc. 1 at 42-43, ¶126. Plaintiff States were immediately deprived of their right to be consulted regarding Lease Sale 257 and to comment about Lease Sale 258. Finally, Plaintiff States' Complaint makes extensive allegations regarding the Moratorium's threat to "public health and safety" by depriving environmental restoration funds of their major sources of funding. *See, e.g.*, Doc. 1 at 38-39 ¶¶116-117 ("Those funds are vital to not only the State's fiscal health but to the preservation of their territory and the safety of their citizens.").

Plaintiff States are losing revenue right now. They have lost and are being deprived of their consultation authorities right now. And the safety of their citizens and environment are being harmed

right now. They have easily cleared their burden of adequately alleging an imminent and immediate

threat to a legal interest and public health and safety.[9]

### III.   PLAINTIFF STATES CHALLENGE FINAL AGENCY ACTION UNDER THE APA.

This Court has already determined that a "Moratorium" or "Pause" halting all federal oil and

gas lease sales exists in fact and constitutes final agency action. Doc. 139 at 21-32. Moreover, the Court

has also determined that each individual lease sale cancellation or postponement constitutes final

agency action. *Id.* For the same reasons, this Court should once again reject Defendants' Hail Mary

arguments to the contrary.

#### A. The Biden Ban on New OCSLA and MLA Leasing is Final Agency Action.

"A 'final agency action' does not have to be permanent. Additionally, there is a strong

presumption of judicial review. Establishing unreviewability is a heavy burden." Doc. 139 at 24 (citing

*Texas v. United States*, 809 F.3d 134, 163-64 (5th Cir. 2015), *as revised* (Nov. 25, 2015)). Defendants come

nowhere near meeting this burden.

As with their PI opposition, Defendants' entire argument rests on the premise that no oil and

gas leasing moratorium is in place. As this Court has held, that premise contradicts EO 14008's explicit

direction to the Secretary of the Interior to "pause new oil and natural gas leases on public lands or in

offshore waters." And it cannot be reconciled with the cancellation of all oil and gas lease sales since

President Biden assumed office. In short, Defendants' premise is false: a moratorium exists and is a

discrete, final agency action of the type courts routinely review. *See* Doc. 139 at 23 ("Numerous

analogous cases support Plaintiff States' position."); *see also, e.g., Texas v. United States*, 2021 WL

---

[9] Defendants' reliance on D.D.C.'s holding in *Duke Energy* is misplaced. For one, the Eastern District of Louisiana has explicitly rejected *Duke Energy*'s reasoning: "A closer reading of § 1349(a) reveals that the conditions apply only to actions brought under subsection § 1349(a)(1)." *Hornbeck Offshore Servs., L.L.C. v. Salazar,* 696 F. Supp. 2d 627, 636 (E.D. La. 2010) (citing *Duke Energy Field Servs. Assets, L.L.C. v. FERC*, 150 F. Supp. 2d 150, 156 (D.D.C. 2001)). In any event, *Duke Energy* involved a motion to dismiss following a *denial* of a PI in which the court held that injury was not immediate— the exact opposite of the situation here.

2096669, at *31-32 (S.D. Tex. Feb. 23, 2021) (100-day pause of deportations is final agency action); *Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 334, 336 (E.D. La. 2011) ("blanket moratorium on deepwater drilling in the Gulf of Mexico" is a "final agency action"); *Env't Def. Ctr. v. BOEM*, 2018 WL 5919096, at *5 (C.D. Cal. Nov. 9, 2018) (NEPA document that "effectively lift[ed] [a] moratorium" constitutes final agency action); *Dunn-McCampbell Royalty Int., Inc. v. NPS*, 2007 WL 1032346, at *5 (S.D. Tex. Mar. 31, 2007) ("Plan 'effectively clos[ing]' ... areas to drilling operations, does constitute 'final agency action.'"); *Velesaca v. Decker*, 458 F. Supp. 3d 224, 242-43 (S.D.N.Y. 2020) (no-release policy is final agency action); *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 164 (E.D.N.Y. 2018) ("policy or routine practice of CBP conducting identification searches of disembarking domestic airline passengers" constitutes final agency action); *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 931 (D.C. Cir. 2008) ("adopting a policy of permitting employees to disclose confidential information without notice is surely" final agency action). This authority belies Defendants' contention (at 21) that such review is "rare." On the contrary, "numerous analogous cases support Plaintiff States' position." Doc. 139 at 23-24 (collecting cases).

Defendants' assertion (at 20) that Plaintiff States are "[u]nable to identify a single discrete agency action tantamount to a program-wide moratorium" ignores the overwhelming evidence that a comprehensive moratorium on all oil and gas lease sales is in place. *See* Doc. 139 at 27-32 (exhaustively examining the facts and determining that moratorium exists). Again, Defendants' argument boils down to the lack of a piece of paper declaring a moratorium. But the lack of a writing provides no insulation from judicial review. *See Whitman v. Am. Trucking Associations*, 531 U.S. 457, 479 (2001) ("Though the agency has not dressed its decision with the conventional procedural accoutrements of finality, its own behavior thus belies the claim that its interpretation is not final."); *see also Gomez v. Trump*, 485 F. Supp. 3d 145, 193 (D.D.C. 2021) ("cluster of guidance documents, cables, and directives, have ordered consular offices and embassies to cease processing and issuing visas for otherwise

19

qualified applicants" constitutes final agency action). Rather, the final-agency-action inquiry is pragmatic and elevates substance over form. *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) ("The Supreme Court's interpretation of the APA's finality requirement [i]s 'flexible' and 'pragmatic.'"); *see also BNSF Ry. Co. v. EEOC*, 385 F. Supp. 3d 512, 522 (N.D. Tex. 2018) ("Buoying this pragmatic framework is an increasing hesitance by the Supreme Court and lower courts alike to shelter agencies from judicial enforcement of congressional mandates."); *Montana Wildlife Fed'n v. Bernhardt*, 2020 WL 2615631, at *6 (D. Mont. May 22, 2020) ("The 2018 IM definitively settles the question of how BLM will implement the prioritization requirement and represents a 'final agency action.'"). The substance in this case is the Moratorium, which is reviewable final agency action.

Courts, including this Court, have consistently found that unwritten but clear and discrete policies constitute final agency action regardless of whether it is committed to a formal writing or published in the Federal Register. *See Bhd. of Locomotive Engineers & Trainmen v. FRRA*, 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting cases holding that "[a]gency action generally need not be committed to writing to be final and judicially reviewable"); *see also Rosa v. McAleenan*, 2019 WL 5191095, at *19 (S.D. Tex. Oct. 15, 2019) (same); *Velesaca*, 458 F. Supp. 3d at 237 n.7 ("[A] number of cases have involved courts inferring from a course of agency conduct that the agency has adopted a general policy, even in the face of agency denials of such policies existing."); *Washington v. U.S. Dep't of Homeland Sec.*, 2020 WL 1819837, at *5 (W.D. Wash. Apr. 10, 2020) (rejecting notion that agency "has no policy" because it has not committed it to writing). This Court should again reject Defendants' assertion that there is no oil and gas leasing moratorium in place despite (1) an Executive Order suspending oil and gas lease sales and (2) the Defendant agencies' subsequent suspension of such lease sales. *See* Doc. 139 at 27-32.

Denying judicial review here would allow the Executive Branch to make a major national decision in the most opaque manner possible. Finality is a pragmatic test precisely so the Executive

Branch cannot circumvent APA review this way. *BNSF Ry. Co.*, 385 F. Supp. 3d at 523 ("An agency cannot skirt its obligations by acting illegally and then claiming it has not acted at all."); *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1206-07 (S.D. Cal. 2019) ("[A] contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'"); *Grand Canyon Tr. v. Pub. Serv. Co. of New Mexico*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003) (same); *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (same). Because "the record leaves no doubt" that a Moratorium is in place, the lack of a piece of paper does not exempt it from judicial review. *See Venetian Casino Resort*, 530 F.3d at 929-30.

As this Court has held, Plaintiff States' suit comes nowhere close to the type of amorphous programmatic challenges cited by Defendants (at 19-22). Contrary to Defendants' assertion, this lawsuit does not ask this Court to dictate policy. Rather, it seeks to enjoin a discrete agency action—the Moratorium on oil and gas leasing—of the type that courts routinely issue. *See* Doc. 139 at 33 ("Plaintiff States are not challenging the entire program. They are attacking a Pause of federal oil and gas leasing allegedly in violation of two Congressional statutes—MLA and OCSLA."). Unlike the challengers in *Lujan v. Nat'l Wildlife Fed'n* and *Alabama-Coushatta Tribe of Texas v. United States*, Plaintiff States do not seek to enlist the Court in an ongoing supervision of the Department's administration of a program. And this suit is a far cry from the "blanket challenge" to *all* actions at issue in *Alabama-Coushatta*, 757 F.3d 484, 490 (5th Cir. 2014), or the attempt in *Lujan* to obtain better management of BLM's land-withdrawal review program, 497 U.S. 871, 891 (1990). Instead, Plaintiff States challenge a discrete action—the leasing Moratorium—that sets a mandatory rule of decision in all lease sales. Indeed, *Lujan* specifically affirmed that a specific action "applying some particular measure across the board" would constitute final agency action. *Id.* at 890 n.2; *see also W. Energy All. v. Jewell*, 2017 WL 3600740, at *13 (D.N.M. Jan. 13, 2017) ("The Court agrees with WEA that requesting BLM conduct quarterly leases of eligible and available parcels is not a programmatic challenge, but a request that this

Court enforce a discrete, non-discretionary duty contained in a single statutory provision, unlike the situation in *Lujan*."); *Dunn-McCampbell Royalty Int., Inc.*, 2007 WL 1032346, at *5 (challenge to closure of "acreage to drilling operations" is "not a broad-based 'programmatic challenge.'").

Contrary to the hall of mirrors Defendants construct,[10] this is a straightforward issue. The Moratorium marks the consummation of a (flawed) decisionmaking process because it left agency officials without discretion to hold any oil and gas lease sales on public lands and in offshore waters. And it alters the obligations of federal officials to hold such lease sales—and the rights of bidders to engage in them and the States to obtain their statutorily vested right to proceeds from the sales. *See* Doc. 139 at 22 ("There is no real question that Plaintiff States have met the second prong of the *Bennett* test, because the Pause and/or Lease cancellations are actions from which legal consequences will flow."); *see also Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019) ("'[I]f a statement denies the [agency] discretion in the area of its coverage[,] then the statement is binding, and creates rights or obligations." Put differently, 'where agency action withdraws an entity's previously-held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency action.'"). This case thus falls in the heartland of APA review. *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018); *see also BNSF Ry. Co.*, 385 F. Supp. 3d at 523 ("[N]either finality nor discretion provide agencies cover for illegality.").

**B. Each Lease-Sale Cancellation is Final Agency Action.**

As this Court has already determined, it has jurisdiction to review the cancellations of the individual lease sales. Each BLM lease cancellation is the consummation of the decisionmaking

---

[10] As this Court has held, Defendants also cannot hide behind Executive Order 14008 to avoid judicial review because agency actions taken to implement executive orders are subject to APA review. *See* Doc. 139 at 4; *see also Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question.").

process—each cancels a lease sale that was scheduled. Simply put, the cancellation of Q1 and Q2 lease sales means there will never be Q1 and Q2 lease sales. *See* Doc. 139 at 24. Defendants' only response is to again revert to empty form, calling those cancellations "interim" actions. But it remains black-letter law that an agency's labelling an action "interim" does not make it so. *See* Doc. 139 at 22 (citing *State of La. v. DOE*, 507 F. Supp. 1365, 1371 (W.D. La. 1981)). BLM did not merely "defer" the decisional process for Q1 and Q2 oil and gas lease sales. It cancelled them. No further decisional process for these lease sales exists. That the agency might one day make lands available again does not vitiate this finality. *NRDC v. Wheeler*, 955 F.3d 68, 80 (D.C. Cir. 2020) ("[A]s long as an agency has completed its decisionmaking on a challenged rule—even one interim in nature—the rule satisfies the first prong of the finality test."); *see also Strata Prod. Co. v. Jewell*, 2014 WL 12789010, at *9 (D.N.M. Aug. 11, 2014) ("[E]ven though other EISs and notices to proceed would be completed as to specific drilling requests that would also constitute 'final agency action,' because statement represented consummation of Service's decision-making process on question of whether to issue notices to proceed while Service conducted lengthy EIS.") (discussing *Minard Run Oil Co. v. U.S. Forest Service*, 670 F.3d 236, 247-48 (3d Cir. 2011)).

The Rescission of Lease Sale 257's Record of Decision similarly marks the consummation of the agency's decisionmaking process. The ROD determined that Lease Sale 257 should proceed in accordance with the Five-Year Plan. The Rescission vacated the ROD, ensuring that Lease Sale 257 would not go forward. Such RODs, and even their summaries, are routinely held to be final agency actions. *Amigos Bravos v. U.S. Bureau of Land Mgmt.*, 2011 WL 7701433, at *36 (D.N.M. Aug. 3, 2011) ("[I]n the leasing context, the ROD and the Forest Service's leasing decision constitute final agency action authorizing specific activities."); *Dunn-McCampbell Royalty Int., Inc.*, 2007 WL 1032346, at *7 (same); *see also Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1091 (9th Cir. 2003) ("[B]ecause the ROD pre-determines the future through the selection of a long-term plan (to the exclusion of others which

23

will not be among the available options at the implementation phase), it is ripe for review."). And the ROD's inconvenient findings cannot be casually disregarded. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1140-42 (D. Alaska 2019) (findings in ROD must be acknowledged and addressed); *Indigenous Env't Network v. United States Dep't of State*, 347 F. Supp. 3d 561, 583–84 (D. Mont. 2018) (same). This is particularly so given the ROD's unequivocal conclusions. *See Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986) ("Once the agency publicly articulates an unequivocal position ... and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review."); *see also Cure Land, LLC v. United States Dep't of Agric.*, 833 F.3d 1223, 1231 (10th Cir. 2016) ("The FONSI satisfies the first finality requirement because it is the final step in the agency's NEPA decision-making process, see 40 C.F.R. §§1501.4, and there is no indication that the FONSI's conclusion—namely, that the proposed expansion of the conservation program will not have significant negative environmental impacts—is tentative or interlocutory in nature."); *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 816 (8th Cir. 2006) (same); *Env't Def. Ctr. v. BOEM.*, 2018 WL 5919096, at *5 (C.D. Cal. Nov. 9, 2018) ("[T]he FONSI was a final agency action because it was 'the final step in BOEM and BSEE's NEPA process' and 'effectively lift[ed] the moratorium on WSTs in the POCS.' It also emphasized the fact that the FONSI was not equivocal and that the agencies would not have to conduct additional environmental analysis on a programmatic level before allowing WSTs.").[11]

The BLM cancellations, Rescission of Lease Sale 257, and halt of the Lease Sale 258 process determine the rights of Plaintiff States and their citizens who wish to participate in lease sales. They

---

[11] Moreover, the cancellation of Lease Sale 258's comment period clearly has legal consequences for both the States and the public. *W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1066 (D. Idaho 2020) ("legal consequences necessarily flow from ... the elimination of comment periods"); *see also* Doc. 139 at 39 ("Without a valid reason to stop Lease Sale 258, the Agency Defendants were also required to complete the statutorily required procedure for the sale of Lease Sale 258.").

also obligate BLM offices and BOEM not to engage in the previously scheduled sales. Because legal consequences flow from these actions, both elements of finality are easily met.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motion to dismiss.

Respectfully submitted,

Dated: June 28, 2021

TYLER R. GREEN
DANIEL SHAPIRO
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

_/s/ Elizabeth B. Murrill_

JEFF LANDRY
Attorney General
ELIZABETH B. MURRILL (LSBN 20685)
 Solicitor General
JOSEPH S. ST. JOHN (LSBN 36682)
 Deputy Solicitor General
BENJAMIN WALLACE (LSBN 39516)
 Assistant Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
wallaceb@ag.louisiana.gov

*Counsel for Plaintiff States*

OTHER COUNSEL:

STEVE MARSHALL
  Attorney General of Alabama
Edmund G. LaCour Jr.
  Solicitor General
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130
Tel: (334) 353-2196
Fax: (334) 353-8400
Edmund.LaCourt@AlabamaAg.gov
*Counsel for the State of Alabama*

TREG TAYLOR
  ATTORNEY GENERAL
Ronald W. Opsahl (Colo. Bar No. 35662)
  Assistant Attorney General
Alaska Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5100
Fax: (907) 276-3697
Email: ron.opsahl@alaska.gov
*Counsel for the State of Alaska*

26

LESLIE RUTLEDGE
  Attorney General of Arkansas
Nicholas J. Bronni
  Solicitor General
Dylan L. Jacobs
  Assistant Solicitor General
Office of Arkansas Attorney General Leslie
Rutledge
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.bronni@arkansasag.gov
*Counsel for the State of Arkansas*

CHRISTOPHER M. CARR
  Attorney General of Georgia
Andrew A. Pinson
  Solicitor General
Office of the Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3409
apinson@law.ga.gov
*Counsel for the State of Georgia*

LYNN FITCH
  Attorney General of Mississippi
Justin L. Matheny
  Assistant Solicitor General
State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
*Counsel for the State of Mississippi*

ERIC S. SCHMITT
  Attorney General of Missouri
D. John Sauer
  Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102

27

Tel: (573) 751-0304
Fax: (573) 751-0774
Justin.Smith@ago.mo.gov
*Counsel for the State of Missouri*

AUSTIN KNUDSEN
  Attorney General of Montana
David M.S. Dewhirst
  Solicitor General
Montana Attorney General's Office
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
406.444.4145
david.dewhirst@mt.gov
*Counsel for the State of Montana*

DOUGLAS J. PETERSON
  Attorney General of Nebraska
James A. Campbell
  Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov
*Counsel for the State of Nebraska*

MIKE HUNTER
  Attorney General of Oklahoma
Mithun Mansinghani
  Solicitor General
Oklahoma Office of Attorney General
313 N.E. 21ST Street
Oklahoma City, OK 73105
Phone: (405) 522-4392
mithun.mansinghani@oag.ok.gov
*Counsel for the State of Oklahoma*

KEN PAXTON
  Attorney General of Texas
Judd E. Stone II
  Solicitor General
Office of the Attorney General
P.O. Box 12548 (MC 009)
Austin, Texas 78711-2548
Tel.: (512) 463-4139

Fax: (512) 474-2697
Judd.Stone@oag.texas.gov
*Counsel for the State of Texas*

SEAN D. REYES
  Attorney General of Utah
Melissa A. Holyoak
 Solicitor General
Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
385.271.2484
melissaholyoak@agutah.gov
*Counsel for the State of Utah*

PATRICK MORRISEY
  West Virginia Attorney General
Lindsay S. See
 Solicitor General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(304) 558-2021
Lindsay.s.see@wvago.gov
*Counsel for the State of West Virginia*

29

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 28, 2021, I filed the foregoing document electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means.

*/s/ Elizabeth B. Murrill*