UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

STATE OF LOUISIANA, ET. AL.　　　:　　　CIVIL ACTION NO. 2:21-cv-778

VERSUS　　　　　　　　　　　　　:　　　JUDGE TERRY A. DOUGHTY

JOSEPH R. BIDEN, JR., ET. AL.　　　:　　　MAGISTRATE JUDGE KAY

## REPORT AND RECOMMENDATION

Before the court is defendants' Motion to Dismiss all Claims except for Count VI of the plaintiffs' complaint, a Motion to Dismiss for Lack of Jurisdiction, and a Motion to Dismiss the President of the United States as a defendant. Doc. 128. The motions have been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636. The plaintiffs oppose the motions and the defendants have replied. Docs. 124 and 145.

For the reasons stated herein, we **RECOMMEND** that the court **DENY** defendants' Motions to Dismiss.

## I.
### BACKGROUND

The present suit arises from the issuance of a pause[1] on offshore oil and gas lease sales by President Joseph Biden ("the President"). On January 27, 2021, President Joseph Biden issued Executive Order 14008 ("EO 14008"). Section 208 of the Order provides in pertinent part:

> To the extent consistent with applicable law, the Secretary of the Interior
> shall pause new oil and natural gas leases on public lands or in offshore

---

[1] Though plaintiffs entitle the collection of the challenged actions "the Biden Ban" or "Leasing Moratoriums", we will call the action a "pause" as that is the language used by the President in the executive order at issue.

waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters.

Exec. Ord. 14008, Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7619, 7624-25 (Jan. 27, 2021). In a purported attempt to comply with the executive order, agencies within the Department of the Interior ("DOI") rescinded or postponed all scheduled onshore and offshore lease sales. Doc. 1, pp. 26-36.

On March 24, 2021, plaintiffs[2] filed suit against the President and a number of government officials.[3] Plaintiffs allege that the defendants' actions were contrary to the Mineral Leasing Act ("MLA") and the Outer Continental Shelf Lands Act ("OCSLA"). *Id.*, p. 4. Plaintiffs bring eight claims under the Administrative Procedure Act ("APA"). *Id.*, pp. 43-48. The APA claims in Counts I and VI request that the court compel specific lease sales since the Bureau of Land Management ("BLM") and the Bureau of Ocean Energy Management ("BOEM") have "unlawfully withheld or

---

[2] The plaintiffs consist of the States of Louisiana, Alabama, Alaska, Arkansas, Georgia, Mississippi, Missouri, Montana, Nebraska, Oklahoma, Texas, Utah, and West Virginia. Each state has special interests in the execution of oil and gas lease sales and has sued "to vindicate its sovereign, proprietary, and *parens patriae* interests." Doc. 1, pp. 6-11, ¶¶ 8-20.

[3] The defendants consist of Joseph R. Biden, Jr. in his official capacity as President of the United States; Deb Haaland, in her official capacity as Secretary of the Interior; Michael Nedd, in his official capacity as Deputy Director of the Bureau of Land Management; Chad Padgett, in his official capacity as Director of the Bureau of Land Management Alaska Office; Raymond Suazo, in his official capacity as Director for the Bureau of Land Management Arizona Office; Karen Mouristen, in her official capacity as Director for the Bureau of Land Management California Office; Jamie Connell, in his official capacity as Director for the Bureau of Land Management Colorado Office; Mitchell Leverette, in his official capacity as Director for the Bureau of Land Management Eastern States Office; John Ruhs, in his official capacity as Director for the Bureau of Land Management Idaho Office; John Mehlhoff, in his official capacity as Director for the Bureau of Land Management Montana – Dakotas Office; Jon Raby, in his official capacity as Director for the Bureau of Land Management Nevada Office; Steve Wells, in his official capacity as Director for the Bureau of Land Management New Mexico Office; Barry Bushue, in his official capacity as Director for the Bureau of Land Management Oregon-Washington Office; Greg Sheehan, in his official capacity as Director for the Bureau of Land Management Utah Office; Kim Liebhauser, in her official capacity as Director for the Bureau of Land Management Wyoming Office; Amanda Lefton, in her official capacity as Director of the Bureau of Ocean Energy Management; Michael Celata, in his official capacity as Regional Director of the Bureau of Ocean Energy Management Gulf of Mexico Office; Lars Herbst, in his official capacity as Regional Director of Bureau of Safety and Environmental Enforcement Gulf of Mexico OCS Office; and Mark Fesmire, in his official capacity as Regional Director of the Bureau of Safety and Environmental Enforcement Alaska and Pacific Office.

unreasonably delayed" executions of these lease sales. *Id*., pp. 43-44, ¶¶ 127-133; pp. 46-47, ¶¶ 156-159. Counts II-V, VII, and VIII ask the court to vacate and enjoin the action of either BOEM or BLM for three different violations of the APA: acting in an "arbitrary and capricious" manner, acting "contrary to law," or failing to employ a notice and comment period before acting. *Id*., pp. 43-48, ¶¶ 141, 146, 150, 155, 163, 167. Alternatively, plaintiffs seek relief under Count IX, which alleges a citizen suit under OCSLA. *Id*., pp. 48-40, ¶¶ 168-174. Finally, Count X alleges a claim for *ultra vires* review of the President's issuance of EO 14008. *Id*., pp. 49-50, ¶¶ 175-177.[4]

On March 31, 2021, plaintiffs filed a Motion for Preliminary Injunction requesting that the district court enjoin defendants from implementing the rescission and postponements of certain lease sales and requesting that the court order the agencies to disregard the pause on new leases. Doc. 3, pp. 1-2. Plaintiffs sought injunctive relief pursuant to the APA. Doc. 3, att. 1, pp. 16-26. After hearing oral argument on the matter, the district court granted the motion and issued the injunction. Docs. 139 and 140. That ruling ordered that the named agency officials[5] be enjoined and restrained nationwide from implementing Executive Order 14008's pause "with respect to Lease Sale 257, Lease Sale 258, and all eligible lands onshore." *Id*., p. 43.

On June 7, 2021, the defendants filed the instant motions, seeking dismissal of all claims except for Count VI,[6] and seeking dismissal of the President as a defendant. Doc. 128.  Defendants

---

[4] As the district court pointed out, the President is not a proper defendant for the APA claims, as the law is clear that the president does not constitute an "agency" under the APA. Doc. 139, att. 1, p. 4; *see Franklin v. Massachusetts*, 112 S. Ct. 2767, 2775-76 (1992). Even so, the President's actions may still be reviewed for constitutionality. *Id*. at 2776. Plaintiffs acknowledge that they have alleged Count X, an *ultra vires* claim challenging the legality of EO 14008, as an "alternative" cause of action to the APA claims. Doc. 3, att. 1, p. 15, n. 5; Doc. 142, p. 20.

[5] The preliminary injunction applies to "the U.S. Department of the Interior, the United States Bureau of Land Management, the United States Bureau of Ocean Energy Management, and the United States Bureau of Safety and Environmental Enforcement, along with their directors, employees and Secretary." Doc. 139, att. 1, p. 43. The President is excluded from the preliminary injunction order. *Id.*

[6] Plaintiffs' APA claim in Count VI alleges under that BLM unlawfully and unreasonably delayed its quarterly land lease sales, and the complaint seeks to compel BLM to hold the sales "according to their previous schedules with reasonable modifications." Doc. 1, pp. 46-47, ¶¶ 156-159 (citing 5 U.S.C. §706(1)).

move to dismiss Count X, plaintiffs' *ultra vires* claim, arguing that the language of EO 14008 is "facially valid" and therefore could not have been in excess of authority. *Id*., att. 1, pp 18-21. For 12(b)(6) dismissal of Count IX, the OCSLA citizen suit, defendants argue that plaintiffs failed to comply with OCSLA's requirement that a would-be plaintiff provide notice of intent to sue 60 days before filing a citizen suit claim. *Id*., pp. 23-26. Defendants urge that plaintiffs have not sufficiently alleged that they would have suffered "immediate" harm to their legal interests, which constitutes a statutory exception to OCSLA's 60-day notice requirement for citizen suits. *Id*. Finally, defendants challenge the jurisdiction of the court and argue that the agency actions at issue are not reviewable under the APA. *Id*., pp. 26-32. While the APA only allows for review of "final agency action," defendants argue and plaintiffs' challenge pertains to a wide-ranging program and not discrete agency actions. *Id*., pp. 26-29. Even if there were proper "actions" to review, defendants contend that those actions would still not be "final" as they are only temporary pauses on leasing. *Id*., pp. 29-32.

In their opposition, plaintiffs argue that EO 14008 is invalid on its face as its directives cannot be implemented without contravening applicable law. Doc. 142, pp. 21-23. As to their OCSLA citizen suit claim, plaintiffs contend that their complaint sets out the immediate threat of both economic harm and to harm their statutorily vested legal interest in the notice and comment period of lease sales. *Id*., pp. 24-25. As to the leasing pause as an APA violation, plaintiffs argue that a decision need not be permanent to be considered "final" and therefore subject to judicial review under the APA. *Id*., pp. 25-29. They urge that the overarching decision to halt all processes for oil and gas leasing was a clear and discrete agency action. *Id*., p. 27. Further, the cancellation of specific onshore leases, the rescission of offshore Lease Sale 257, and the halt of Lease Sale

258 were certainly discrete and final agency actions that are subject to judicial review under the APA. *Id.*, pp. 29-32.[7]

## II.
### LAW & ANALYSIS

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows for dismissal of a claim when a plaintiff "fail[s] to state a claim upon which relief can be granted." When reviewing such a motion, the court should focus exclusively on the complaint and its attachments. *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012). The court may also take judicial notice of public records. *Papasan v. Allain,* 106 S. Ct. 2932, 2935 n.1 (1986). The court reviews such motions "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010). While factual assertions are presumed to be true, "labels and conclusions" and "formulaic recitation of the elements of a cause of action" are not enough to withstand a 12(b)(6) motion. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Additionally, "the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)). The court's task in evaluating a motion to dismiss under Rule 12(b)(6) is "not to evaluate the plaintiff's likelihood of success," but instead to determine whether the claim is both legally cognizable and plausible. *Billups v. Credit Bureau of Greater Shreveport*, No. 14-401, 2014 WL 4700254 at *2 (W.D. La. Sep. 22, 2014) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)).

---

[7] As the defendants point out, because a preliminary injunction hearing involves a less formal procedure and Counts IX and X were not briefed before the district judge at that time, findings on the motion for a preliminary injunction are not binding at trial on the merits. Doc. 145, pp. 1-2 (citing *Jonibach Mgmt. Tr. v. Wartburg Enterprises, Inc*., 750 F.3d 486, 491 (5th Cir. 2014)). As a result, the analysis on the merits below does not rest on the district judge's ruling, though we do reach similar conclusions.

### A. Statutory Scheme

OCSLA and the MLA are the two comprehensive statutory regimes that govern oil and natural gas development on the Outer Continental Shelf ("OCS") and on federal lands.

### 1. OCSLA

OCSLA directs the Secretary of the Interior ("the Secretary") to make the OCS "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3). By statute, states benefit economically from oil and gas leasing production on the OCS. OCSLA provides certain coastal states with a percentage of bonuses, rents, royalties, and other revenues arising from oil and gas sales and development. *Id*. § 1337(g). Several plaintiffs also receive revenues arising from leases under OCSLA's coastal impact assistance program and the Gulf of Mexico Energy Security Act. *Id*. § 1331(a) note and § 1356a.

OCSLA directs the Secretary to administer a leasing program and to sell exploration interests in portions of the OCS to the highest bidder. *Id*. § 1334(a) and 1337(a)(1). BOEM, a federal agency under the DOI, oversees the process of offshore oil and gas leasing. The statute sets out a four-stage process for developing federal offshore lands: (1) development of a Five-Year Leasing Program; (2) holding lease sales; (3) exploration of the leased land by the lessees; and (4) development and production. *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F. Supp. 2d 627, 632-33 (E.D. La. 2010) (citing *Sec'y of the Interior v. California*, 104 S. Ct. 656, 669-70 (1984)).

The first stage of the leasing process promotes dialogue with and input from affected states and local governments. *See* 43 U.S.C. §§ 1344(c)-(d);1345(a); 1351(a)(3). In developing a Five-Year Program, the Secretary "must solicit comments from interested federal agencies and the governors of affected states, and must respond in writing to all comments or requests received

from the state governors." *Sec'y of the Interior*, 104 S. Ct. at 669-70 (citing 43 U.S.C. § 1344). The Secretary must submit the proposed plan to the President and Congress, in addition to any comments received, at least sixty days before approval. 43 U.S.C. § 1344(d)(2). Further, such submission must indicate "why any specific recommendation of the Attorney General or a State or local government was not accepted." *Id*.

The second stage of the leasing process mandates further consultation with the states. OCSLA provides that, within sixty days of public notice of a proposed lease sale, any governor of an affected state or executive of an affected local government "may submit recommendations to the Secretary regarding the size, timing, or location of a proposed lease sale or with respect to a proposed development and production plan." *Id*. § 1345(a). Then, the Secretary "shall accept recommendations of the Governor and may accept recommendations of the executive of any affected local government" if it is determined that the recommendations "provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State." *Id*. §1345(c). OCSLA expressly requires that any revision of the Five-Year Program "shall be in the same manner as originally developed" unless the revision is "not significant." *Id*. § 1344(e). The statute sets forth the procedures with which the Secretary must comply in making "any significant revision or reapproval of the leasing program." *Id*. § 1344(f).[8]

---

[8] The specific procedures required in making a significant revision to the program are:
    **(1)** receipt and consideration of nominations for any area to be offered for lease or to be excluded from leasing;
    **(2)** public notice of and participation in development of the leasing program;
    **(3)** review by State and local governments which may be impacted by the proposed leasing;
    **(4)** periodic consultation with State and local governments, oil and gas lessees and permittees, and representatives of other individuals or organizations engaged in activity in or on the outer Continental Shelf, including those involved in fish and shellfish recovery, and recreational activities; and
    **(5)** consideration of the coastal zone management program being developed or administered by an affected coastal State pursuant to section 1454 or section 1455 of Title 16.

### 2.  MLA

BLM, a federal agency under the DOI, oversees the leasing process for federal lands. The MLA grants BLM the authority to lease public lands with oil or gas deposits to private industry for development. 30 U.S.C. § 226(a). The MLA requires that the Secretary hold lease sales "for each State where eligible lands are available at least quarterly. . . ." *Id*. § 226(b)(1)(A). BLM's regulations also require quarterly lease sales. *See* 43 C.F.R. § 3120.1-2(a) ("Each proper BLM … office shall hold sales at least quarterly if lands are available for competitive leasing."). The MLA provides a certain percentage of "[a]ll money received from sales, bonuses, [and] royalties including interest charges" to the state in which a lease is located. 30 U.S.C. § 191(a).

### B.  Plaintiffs' Factual Allegations as to All Counts

Plaintiffs allege that the formation of the current Five-Year Program began under the administration of former President Barack Obama in 2014, and BOEM appropriately performed its OCSLA-mandated statutory duties by publishing a request for information in the Federal Register and considering the comments in forming the Draft Proposed Program. Doc. 1, p. 18, ¶ 53. In 2015, BOEM published the Draft Proposed Program and in the 60 days following, received over one million comments in response. *Id*., ¶ 54. In 2016, BOEM then published the Proposed Program, initiating a ninety-day comment period. *Id*., ¶ 55. In November 2016, BOEM published the Proposed Final Program and, once the program had been submitted to President Obama and Congress, the Secretary ultimately approved the Final Program on January 17, 2017. *Id*., pp. 19-20, ¶¶ 56-59. The Final Program included eleven proposed lease sales, including Lease Sale 257 in the Gulf of Mexico and Lease Sale 258 in Cook Inlet, Alaska. *Id*., ¶¶ 57-59. Plaintiffs allege that, after the approval of the Final Program, seven of those lease sales occurred on schedule between August 2017 and November 2020. *Id*., p. 20, ¶ 60. Lease Sale 257's Proposed Notice of

Sale was published by BOEM in November 2020 and, after a period of public comment, was approved and formally scheduled to occur March 17, 2021. *Id.*, pp. 20-22, ¶¶ 61-64. Lease Sale 258 had not reached final approval yet, but as of January 2021, BOEM had published a Notice of Availability of the area proposed for sale and invited public comment. *Id.*, p. 22, ¶ 65.

On January 27, 2021, President Biden issued EO 14008, which commands that the Secretary "pause new oil and natural gas leases on public lands or in offshore waters" pending a comprehensive environmental review. *Id.*, p. 23, ¶ 67. This EO was issued citing "no authority" for the pause and providing no rationale for the departure from the Five-Year Program established by the Obama Administration and left in place by the administration of President Donald Trump. *Id.* Plaintiffs allege that the EO's only discernable rationale is to "follow through" on the President Biden's promises made during his campaign. *Id.* Additionally, plaintiffs claim that Secretarial Order No. 3395, issued on January 20, 2021, by the then-acting Secretary "constructively halted" development and exploration of existing oil and gas leases which suspended the previously-delegated authority of BOEM and BLM to oversee the permitting process in already-existing oil and gas leases. *Id.*, pp. 23-24, ¶ 68. This Order shifted the power to oversee the drilling and exploration process from the regional offices of BOEM and BLM to "nine politically appointed officials in Washington"—the Office of the Assistant Secretary for Land and Minerals. *Id.* ¶¶ 68-69. Plaintiffs' complaint contends that the effective combined result of Secretarial Order No. 3395 and EO 14008 has been a "comprehensive ban on the leasing and development of energy resources on public lands and offshore waters," as the orders have rendered it "impossible" for the DOI to perform its statutorily mandated duties under OCSLA and the MLA. *Id.*, p. 25, ¶¶ 71-72.

Discrete actions taken by regional offices of BOEM and BLM in the months following EO 14008, plaintiffs contend, further demonstrate the existence of a moratorium on oil and gas leasing.

On February 18, 2021, the Regional Director of BOEM's Gulf of Mexico Office issued a Notice to Rescind the Prior Lease 257 Record of Decision. *Id.*, p. 26, ¶ 73. Plaintiffs contend that the Notice involved "no analysis, no comment period, no reference to statutory factors, no reference to the Current Five-Year Program, and no consultation with the States, Tribes, or local governments." *Id.* Instead, BOEM's only stated reasoning was to comply with EO 14008. *Id.* On February 4, 2021, BOEM cancelled the public comment period and public meetings on Lease Sale 258, citing only EO 14008 for its reasoning. *Id.*, pp. 31-32, ¶ 86. Plaintiffs contend that the abrupt Rescission of Lease Sale 257 improperly amends the current Five-Year Program and contravenes OCSLA's requirements that BOEM consult with the states and local governments, submit the plan to Congress and the President, hold waiting and comment periods, and prepare environmental impact statements. *Id.*, p. 27, ¶ 76. Additionally, the unexplained delay of Lease Sale 258 and cancellation of its public comment period ignore the process set forth by OCSLA. *Id.*, p. 32, ¶ 90.

As to the onshore oil and gas lease sales, several BLM offices[9] planned to hold quarterly sales of available lands in March and April of 2021. *Id.*, pp. 33-34, ¶¶ 93-99. Plaintiffs allege that each pending quarterly sale was halted in response to EO 14008. *Id.*, p. 35, ¶ 102. Indeed, in the months following EO 14008, each sale under the MLA was halted, with most offices offering no reasoning for the postponement and BLM's Wyoming Office stating that the sales were postponed to "confirm the adequacy of the underlying environmental analysis." *Id.*, pp. 35-36, ¶¶ 103-110. Plaintiffs urge that BLM's delay of the land sales contravenes the MLA and abdicates BLM's mandatory statutory duty to hold lease sales "for each State where eligible lands are available at least quarterly." *Id.*, p. 37, ¶ 111 (citing 30 U.S.C. § 226(b)(1)(A)).

---

[9] These sales were to occur through BLM offices of Nevada, Montana-Dakotas, Utah, Colorado, Oklahoma and New Mexico. Doc. 1, pp. 33-34, ¶¶ 94-99.

1.   **Count X:** *Ultra Vires* **Claim**

Plaintiffs allege in Count X of their complaint that "[b]ecause neither OCSLA nor MLA authorizes the President to unilaterally impose a moratorium on oil and gas lease sales by Executive Order or otherwise, Section 208 of Executive Order 14008 is ultra vires." Doc. 1, p. 50, ¶ 177. The President's power to pause oil and gas leases "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 72 S. Ct. 863, 866 (1952). Judicial review is generally available to determine whether the President has exceeded statutory authority to take a particular action. *See, e.g.*, *Rosebud Sioux Tribe v. Trump*, 428 F. Supp. 3d 282, 291 (D. Mont. 2019) ("A court's power to enjoin the President extends to enjoining portions of an executive order where the order exceeds the statutory authority delegated by Congress and constitutional boundaries." (citing *Hawaii v. Trump*, 859 F.3d 741, 768 (9th Cir. 2017) (internal quotations omitted)); *Massachusetts Lobstermen's Ass'n v. Ross*, 349 F. Supp. 3d 48, 54 (D.D.C. 2018), *aff'd*, 945 F.3d 535 (D.C. Cir. 2019) ("Because Plaintiffs' claims assert that the President exceeded his statutory authority under the Antiquities Act—*i.e.*, that the Proclamation was *ultra vires*—they are generally reviewable.); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (recognizing a cause of action for judicial review of an executive order and noting that "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.")[10]

---

[10] The defendants' reply argues that *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.*[801 F. Supp. 2d 383, 406 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012)] and several cases that plaintiffs rely on in their opposition are inapposite because they either involve challenges to "self-executing" Presidential actions or involve *ultra vires* challenges to agency action only. Doc. 145, pp. 3-4, fn. 1. We note that an *ultra vires* claim can arise not only from the President's action, but generally from any executive officer's action that exceeds legal authority. *See California v. Trump*, 379 F. Supp. 3d 928, 942 (N.D. Cal. 2019) ("[A] court may grant injunctive relief against executive officers to enjoin both *ultra vires* acts—that is, acts exceeding the officers' purported statutory authority—and unconstitutional acts."). Here, our inquiry on a 12(b)(6) motion is limited to whether plaintiffs' complaint establishes their entitlement to *ultra vires* review of an executive order. While plaintiffs' cited cases do not each involve the same facts as those herein—an *ultra vires* challenge to a President's executive order that directs agency action—we still find plaintiffs' cited cases instructive on the availability of *ultra vires* review.

Here, defendants seek dismissal of plaintiffs' *ultra vires* claim on several grounds. First, defendants argue that, because EO 14008's language directs the Secretary to implement the pause only "to the extent consistent applicable law," the order is facially valid. Doc. 128, att. 1, p. 19. Defendants contend that this "savings clause" prevents the order from being implemented in any way that exceeds statutory authority; rather, it instructs the Secretary to follow the law. *Id*. Defendants urge that OCSLA "does not compel that lease sales occur on any particular date… nor does it require that the agencies proceed with the lease sales proposed in the Five-Year Program." *Id*., p. 21. Defendants argue that the MLA and OCSLA give the Secretary "considerable discretion" to alter the DOI's leasing programs in a manner consistent with the law—such as reducing the size of sales or postponing sales that require additional environmental analysis. *Id*., p. 23.

In their opposition, plaintiffs contend they have established that Section 208 of EO 14008 exceeded the President's powers, as the relevant statutes grant the President no authority to "pause" oil and gas leasing. Doc. 142, p. 21-23. Moreover, plaintiffs argue that the language "to the extent consistent with applicable law" does not render the executive order valid because the order also includes the language "shall pause"—a commandment for the Secretary to act. *Id*., p. 22. Plaintiffs contend that EO 14008's "savings clause" must be read in context with the rest of the executive order, and here, EO 14008 unambiguously directs the Secretary to pause oil and gas leases. *Id*. Thus, plaintiffs argue the mandatory directive cannot be read out of the executive order. *Id*. As such, plaintiffs argue that EO 14008 cannot possibly be implemented in a manner that is "consistent with applicable law." *Id*., p. 23.

Defendants reply argues that EO 14008 is akin to Executive Order No. 13202 challenged in *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, as both orders direct that an agency "shall"

take action to the extent "consistent with" or "permitted by" applicable law. 295 F.3d 28, 33 (D.C. Cir. 2002). The *Allbaugh* court ruled that the mere presence of the language "[t]o the extent permitted by law" would save the executive order from being invalid even if the directive was contrary to the National Labor Relations Act. *Id*.[11] The court upheld the executive order, reasoning that its language only compelled agency action[12] when doing so would not violate the law. *Id*. Courts since *Allbaugh,* however, have interpreted the language of executive orders more broadly.

Courts should interpret an executive order beginning with its text, and the text "must be construed consistently with the Order's 'object and policy.'" *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018) (quoting *Bassidji v. Goe*, 413 F.3d 928, 934 (9th Cir. 2005)). Both the Fourth and Ninth Circuit Court of Appeals have held that savings clauses as qualifiers in an executive order should not insulate an executive order from judicial review when that qualifying language would override the substance of the order itself. *Id*. at 1239 ("Savings clauses are read in their context, and they cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language."); *Hias, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. Jan. 8, 2021) ("[w]e reject the government's attempt to immunize the Order from review through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order."). These cases suggest that where an executive order has clear and commanding language, a court need not give effect to the savings clause. *Id*.; *but see Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.C. Cir. 2020) (giving effect to a savings

---

[11] In referring to the Supreme Court's decision in *Youngstown Sheet and Tube*, which struck down President Truman's executive order that purported to seize privately owned steel mills, the *Allbaugh* court noted that "had President Truman merely instructed the Secretary of Commerce to secure the Government's access to steel '[t]o the extent permitted by law,' *Youngstown* would have been a rather mundane dispute over whether the Secretary had statutory authority to act as he did." 295 F.3d at 33.

[12] In *Allbaugh*, the D.C. Circuit addressed an executive order issued by then-President George W. Bush that prohibited any federal agency from either requiring contractors and bidders to enter into project labor agreements ("PLA"s) or prohibiting them from doing the same. 295 F.3d 28, 29 (D.C. Cir. 2002).

clause included in a Presidential memorandum and finding that "[w]e cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum.").

In *City & Cnty. of S.F*, then-President Trump issued Executive Order 13768 which purported to withhold federal grants from "sanctuary" cities and counties whose policies "shield aliens from removal form the United States." 897 F.3d at 1232. The Ninth Circuit concluded that Congress, not the President, holds the spending power and therefore the President exceeded his authority by withdrawing federal grant money from certain jurisdictions. *Id*. at 1234. The court then found that Section 9(a) of the Order, which directed the Attorney General and Secretary of State to condition issuance of grants "in their discretion and to the extent consistent with law," did not immunize the Order from judicial review. *Id*. The court noted that the Order "unambiguously commands action" and therefore the so-called "savings clause" could not override rest of the Order. *Id*. at 1240.

In *Hias*, then-President Trump's Executive Order 13888 required the consent of states and local governments before the federal government could settle refugees within their borders. 985 F.3d at 317. States and localities could withhold their consent for any reason or no reason at all. *Id*. at 322. Section 2(b) of the Order allowed the Secretary of State to override a state's decision not to consent only if the Secretary determined that the failure to resettle refugees in that state would be "inconsistent with the policies and strategies established under [the Refugee Act of 1980] or other applicable law." *Id*. at 325. The Fourth Circuit held that the Order was irreconcilable with the Refugee Act, which required that the federal government "consult" with the states and localities and assess several factors in making resettlement decisions, such as the availability of employment and other resources in the destined resettlement states. *Id*. at 320, 322. The court reasoned that the

text of the order essentially "supplant[ed]" the Refugee Act's requirements of consultation with the states and consideration of the statutory criteria. *Id*. at 322. Additionally, the court rejected the government's argument that Section 2(b)'s "savings clause" immunized the Order from judicial review: "[t]he intent of the Order is clear… the savings clause 'does not and cannot override [the Order's] meaning.'" *Id*. at 325 (quoting *City & Cnty. of S.F., * 897 F.3d at 1240). Since the purported "savings clause" lacked any mechanism for agencies to implement the Order in a manner consistent with the Refugee Act, the court held that the clause could not "save" the Order from its "infirmities." *Id*.

Defendants urge that *Hias* and *City & Cnty. of S.F* are distinguishable as they both involved presidential directives that "facially contradict[ed] a federal statute." Doc. 128, att. 1, p. 20. We disagree. Rather, we find that *Hias* and *City & Cnty. of S.F.* are analogous and therefore applicable since EO 14008, as written, also contradicts two federal statutes—both the MLA and OCSLA. As we noted, the Secretary is required to consider the states' input and justify departures from their recommendations in writing. *Sec'y of the Interior*, 104 S. Ct. at 669-70 (citing 43 U.S.C. § 1344). Like the Executive Order in *Hias*, EO 14008 overwrites a statutorily mandated process of consultation with the states and localities. 985 F.3d at 317. EO 14008's across-the-board pause expressly prevents BLM from executing lease sales in accordance with this statutory duty under the MLA. 30 U.S.C. § 226(b)(1)(A). EO 14008 orders the DOI to pause all oil and gas leasing, essentially amending the current Five-Year Program without the requisite consultation with states and localities, and without the requisite review by the President and Congress before the Secretary approves the Final Plan. 43 U.S.C. § 1344(c); 1344(d)(2). Thus, on its face, EO 14008 contradicts the mandatory processes set forth by OCSLA and the MLA. As such, we follow *Hias* and *City & Cnty. of S.F.* and similarly decline to give effect to Section 208's so-called "savings clause." In

doing so, we also reject the reasoning of *Allbaugh* and *Common Cause* which, as applied here, would allow the President to evade judicial review with the mere inclusion of the savings clause. *See City & Cnty. of S.F.,* 897 F.3d at 1240 ("If 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues.").

Here, EO 14008 unambiguously commands the Secretary to act with the language "*shall pause.*" While it includes the boilerplate language "consistent with applicable law," this is a "purely theoretical" savings clause as it offers no mechanism for the DOI to implement the order in a manner consistent with law other than simply refusing to implement the order outright.[13] Much like the executive order in *City & Cnty. of S.F.,* the DOI simply cannot give effect to EO 14008's directive without otherwise violating OCSLA or the MLA. 897 F.3d at 1240 (citing *Allbaugh,* 295 F.3d at 33).

We find that plaintiffs have sufficiently alleged facts demonstrating that the President acted in excess of his statutory or constitutional authority in issuing EO 14008 and state a claim for *ultra vires* review. Plaintiffs have therefore demonstrated their entitlement to judicial review of the President's actions. We recommend that the court deny defendants' Motion to Dismiss as to Count X and deny defendants' Motion to Dismiss the President as a defendant.[14]

---

[13] Defendants' reply argues that since the Five-Year Program only proposed that each sale occur within a certain year, the Secretary could have implemented a "pause" by delaying 2021's Lease Sales until December. Doc. 145, pp. 5-6. This, defendants argue, would allow the Secretary to comply with the Five-Year Program while still giving effect to EO 14008. That point does not sway our reasoning—in our view, a 9-month delay of already-scheduled lease sales, such as Lease Sale 257, would still constitute a significant revision to the Five-Year Program.

[14] In their motions, defendants only argued generally that the President should be dismissed as a defendant because the plaintiffs pled "no viable claim against the President for which relief can be granted." Doc. 128, att. 1, p. 8. In defendants' reply, they suggest that dismissal of the *ultra vires* claim would call for dismissal of the President as a defendant. Doc. 145, p. 3. Otherwise, defendants raise no specific arguments for the President's dismissal. As such, we find dismissal of the President would be inappropriate at this time since plaintiffs have stated an *ultra vires* claim. We make no finding as to whether the President is a proper defendant for the remaining Counts.

### 2.   Count IX: OCSLA Citizen Suit

OCSLA's citizen suit provision allows citizens, as well as and local and state governmental officials, to participate in OCSLA's enforcement. *OXY USA Inc v. Babbitt*, 122 F.3d 251, 257 (5th Cir. 1997). OCSLA provides that "any person having a valid legal interest which is or may be adversely affected" can file suit to compel compliance with OCSLA. 43 U.S.C. § 1349(a)(1). The United States and "any other government instrumentality or agency" may be a proper defendant. *Id*. Moreover, OCSLA's definition of a "person" who can properly bring suit under this provision includes not only natural persons, but also states. *Id*. § 1331(d). Typically, a would-be plaintiff for an OCSLA citizen suit must give the Secretary sixty days' notice of the intent to file suit. *Id*. § 1349(a)(2). An exception to the 60-day notice requirement lies where the alleged violation "constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." *Id*. § 1349(a)(3). Under those circumstances, the plaintiff may file suit "immediately after notification of the alleged violation." *Id*. The Fifth Circuit has recognized that the immediacy exception does not apply where the alleged harm has occurred in the past. *Brown v. Offshore Specialty Fabricators, Inc.,* 663 F.3d 759, 768 (5th Cir. 2011).

Plaintiffs bring an OCSLA citizen suit claim in Count IX of their complaint, alleging that "Executive Order 14008 and its OCLSA Leasing Moratorium violate OCSLA by failing to adhere to its comprehensive procedures applicable to promulgating and amending Five Year Programs and holding lease sales." Doc. 1, p. 48, ¶ 170. Specifically, plaintiffs allege that the Secretary violated OCSLA in "failing to adhere to comprehensive lease sale procedures for Lease Sales 257 and 258 and by allowing an unauthorized officer to cancel Lease Sale 257." *Id*., ¶ 171. They also allege that they gave notice to the Secretary of their intent to file suit under OCSLA's citizen suit provision on March 21, 2021. *Id*., ¶ 173. Though they gave notice only two days before filing the

instant action, plaintiffs allege that the immediacy exception applies because the Secretary's violations "immediately affect Plaintiff States' legal interest by denying the States revenues from March 2021 lease sales, denying conservation funds to help protect the States' coastline from further degradation, and inflicting economic harms upon the States' citizens." *Id.*, ¶ 172.

As a preliminary matter, we address defendants' jurisdictional challenge to the OCSLA citizen suit. Defendants argue that judicial review of the Secretary's approval of a leasing program can only proceed in the United States Court of Appeal for the District of Columbia. Doc. 128, att. 1, p. 24 n. 6.[15]   The current 2017-2022 Five-Year Leasing Program was previously published to the states for the initial notice and comment period, properly reviewed by Congress and the President, and ultimately approved by the then-acting Secretary in January 2017. Doc. 1, pp. 19-20, ¶¶ 56-59. The plaintiffs' OCSLA citizen suit does not challenge the Secretary's preparation of the current Five-Year Program, but only the Secretary's failure to adhere to the already-promulgated Five-Year Program and OCLSA's procedures for execution of the scheduled lease sales. *Id.*, p. 49, ¶ 171. We therefore find that the violations alleged in plaintiffs' complaint do not fall within the scope of § 1349(c)(1) since the action does not challenge the Secretary's approval of a Five-Year Program but rather the Secretary's modification of that Program in contravention of the OCLSA's reapproval process.[16] We instead find that this court has jurisdiction over the

---

[15] "Any action of the Secretary to approve a leasing program pursuant to section 1344 of this title shall be subject to judicial review only in the United States Court of Appeal for the District of Columbia." 43 U.S.C. § 1349(c)(1).

[16] We note that challenges to prior Five-Year Programs under the citizen suit provision only required the D.C. Circuit's exclusive jurisdiction when the action challenged the initially approved Final Program—not the Secretary's subsequent failures to execute the Program. *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 595-96 (D.C. Cir. 2015) (challenging the 2012-2017 program); *Ctr. for Biological Diversity v. United States Dep't of Interior*, 563 F.3d 466 (D.C. Cir. 2009) (challenging the 2007-2012 Program); *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288 (D.C. Cir.1988) (challenging the 1987-1992 Program); *California v. Watt* (*Watt II*) 712 F.2d 584 (D.C.Cir.1983) (challenging the 1982-1987 Program); *State of Cal. By and Through Brown v. Watt* (*Watt I*), 668 F.2d 1290 (D.C. Cir. 1981) (challenging the 1980-1985 Program). These challenges were primarily based on the Secretary's failure to balance the need for expeditious development of the OCS with environmental concerns, such as negative effects on marine life (*see e.g.*, *Ctr. for Biological Diversity*, 563 F.3d 466) or the risk of damage from oil spills (*see e.g.*, *Watt II*, 712 F.3d 584), in the initial approval of the Program.

citizen suit under 43 U.S.C. § 1349(b) and would recommend the court deny defendants' Motion to Dismiss for Lack of Jurisdiction.[17]

Defendants also seek dismissal of plaintiffs' citizen suit on other grounds. First, they argue that plaintiffs "make no allegations regarding threats to public health and safety, and do not allege any 'immediate' threat to a legal interest." Doc. 128, att. 1, p. 24. Defendants argue that plaintiffs allege past injuries and potential remote future injuries but fail to allege "immediate harm" sufficient to merit the exception to the 60-day notice requirement. *Id*., pp. 24-25. They contend that the postponement of Lease Sale 257 and cancellation of the comment period for Lease Sale 258 have already occurred and there is no continued threat of immediate harm to plaintiffs' legal interest in participating in the notice and comment process. *Id*., p. 25. Additionally, they argue that the harms that plaintiffs characterize as "immediate" are only prospective injuries and that "many months and several intervening agency decisions" would stand between holding any lease sale and plaintiff-states' ultimate receipt of revenues from that sale. *Id*.[18]

In plaintiffs' opposition, they re-emphasize the points alleged in their complaint: that every month, the plaintiffs will lose revenue in the form of ground rents, bonuses, and royalties. Doc. 142, p. 24. Additionally, they contend that they have a "statutorily-vested right to be consulted

---

[17] **"**[T]the district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals, or (B) the cancellation, suspension, or termination of a lease or permit under this subchapter. Proceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the State nearest the place the cause of action arose." 43 U.S.C. § 1349(b)(1).

[18] The defendants also argue that at the preliminary injunction hearing, plaintiffs conceded that they did not immediately receive funds from new federal leases. Doc. 145, p. 9. However, considering the substance of the preliminary injunction hearing moves beyond the bounds of the 12(b)(6) analysis. We are limited to only the plaintiffs' complaint along with its attachments and may take judicial notice of public records. *Papasan v. Allain,* 106 S. Ct. 2932, 2935 n.1 (1986). Even if defendants' contentions were true, however, we note that the economic impacts claimed by plaintiffs are broader than revenue lost directly from the lease sales.

about the leasing program" and that their legal interests are immediately affected by the cancellation of the lease sales' notice-and-comment process. *Id*.

We find that plaintiffs' complaint sufficiently alleges that they have previously suffered and will immediately suffer additional economic harm from the agency action at issue. The complaint sets forth that "both OCSLA and the MLA expressly entitle States to substantial portions of the proceeds from lease sales and subsequent development." Doc. 1, pp. 42-43, ¶ 126. We find that plaintiffs' alleged injuries constitute "immediate" economic harm.  Plaintiffs will lose the opportunity to financially benefit from continued development under already-cancelled leases and future leases. We reject defendants' argument to the contrary: though plaintiffs' harm might have already been realized in part at the time they filed their complaint,[19] the economic vitality of the plaintiffs continues to be affected by the pause with each month that passes. According to plaintiffs, those lost economic benefits include not only the loss of direct lease sale revenue, but also lost tax revenue and employment opportunities. *Id.*, pp. 41-42, ¶ 123.

We find the anticipated economic harm as alleged in the complaint satisfies the "immediate[] … effect on legal interest" requirement of § 1349(a)(3). As such, we find that plaintiffs' complaint established their entitlement to OCSLA's exception to the 60-day notice requirement. Thus, the fact that plaintiffs only gave notice to the Secretary two days in advance does not bar this claim. We need not reach the parties' other arguments about whether plaintiffs' ongoing procedural injury is sufficient. Plaintiffs therefore state a claim for relief, and we would recommend the court deny defendants' Motion to Dismiss the OCSLA citizen suit.

---

[19] Though this court has found no guidance on this issue, we construe the statute as requiring the effect on legal interest to be "immediate" at the time the plaintiff filed suit. 43 U.S.C § 1349(a)(3). Otherwise, the immediacy exception would be meaningless, as the result would vary depending on the timeframe that a court makes the inquiry. Viewing the facts under either lens, however, we find that plaintiffs' monthly loss of revenue and effect on their economies constitutes an "immediate" effect on their legal interests.

### 3. Counts I-V, VII and VIII: APA Violation Claims

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA permits judicial review of "final agency action" for which there is no other adequate remedy in court. 5 U.S.C. § 704. Notably, both the Supreme Court and Fifth Circuit have recognized a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Academy of Family Physicians,* 106 S. Ct. 2133, 2135 (1986); *Deering Milliken, Inc. v. OSHA,* 630 F.2d 1094, 1099 (5th Cir. 1980).

Where an agency action is subject to judicial review, the APA also provides several specific remedies. It provides that a reviewing court "shall [] compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Additionally, under the APA, a "reviewing court shall ... hold unlawful and set aside agency action ... found to be ... not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id*. § 706(2)(A) and (C). A reviewing court shall also "hold unlawful and set aside agency action … found to be… arbitrary, capricious, [or] an abuse of discretion." *Id*. § 706(2)(A). Finally, agency action must be set aside if promulgated "without observance of procedure required by law." *Id*. § 706(2)(D).

### a. APA Reviewability Generally

Here, the threshold inquiry is whether plaintiffs' claims are reviewable under the APA. There are four requirements for review of an agency action: (1) the plaintiffs must demonstrate that their causes of action fall within the "zone of interests" under the relevant statutes; (2) the statutes that defendants have allegedly violated do not preclude judicial review; (3) the action at issue constitutes a "final agency action;" and (4) the action is not "committed to agency discretion

by law." *See Texas v. United States*, No. 21-3, 2021 WL 2096669, at *21 (S.D. Tex. Feb. 23, 2021).

### i.   Zone of Interests

The first requirement for APA review is that the plaintiffs establish they are in the "zone of interests" of the statutes that were allegedly violated: here, the OCSLA and MLA. *Id*. The general "zone of interests" test requires us to "determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014). Since the APA serves "a broad[] remedial purpose," [*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,* 90 S. Ct. 827, 831 (1970)] the test as applied in APA cases is not "especially demanding." *Lexmark Int'l*, 134 S. Ct. at 1389. APA review will be denied only "if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assured Congress intended to permit the suit." *Ensco v. Offshore Co. v. Salazar*, No.10-1941, 2010 WL 4116892, at *4 (E.D. La. Oct. 19, 2010) (citing *Clarke v. Sec. Indus. Ass'n*, 107 S. Ct. 750, 757 (1987)).

Here, the plaintiffs allege that their claims are within the zone of interests of both OCSLA and the MLA since both statutes grant states a statutory right to participate in the leasing process, and both statutes entitle the states to "substantial portions of the proceeds from lease sales and subsequent development." Doc. 1, p. 42-43, ¶ 126. We agree and find that each of plaintiffs' APA claims seek protection of their interests under OCSLA and the MLA. Noting that the zone of interest test has a low threshold, we find that plaintiffs have met the first requirement for APA review.

## ii.  Statutory Preclusion of Judicial Review

The second requirement for APA review is that the relevant statute does not preclude judicial review. 5 U.S.C. § 701(a)(1).

The general presumption favoring judicial review of administrative action controls unless congressional intent to preclude judicial review is "fairly discernable in the statutory scheme." *Block v. Cmty. Nutrition Inst*., 104 S. Ct. 2450, 2456 (1984) (quoting *Camp*, 90 S. Ct. at 831-32). The defendants have not argued that any portion of OCSLA or the MLA precludes judicial review, nor has our review of the statutes revealed Congress's intent to do so. Thus, plaintiffs meet the second requirement for APA review.

## iii.  Final Agency Action

The third requirement for APA review is that the challenged action is a "final agency action." The APA's requirement that only "agency action" is subject to judicial review means that courts cannot review and correct broad "programmatic challenges."[20] *Lujan v. Nat'l Wildlife Fed'n*, 110 S. Ct. 3177, 3189 (1990) (rejecting petitioners' challenge to the entirety of BLM's land withdrawal review program and holding that the broad challenge did not constitute an "agency action" under 5 U.S.C. § 702). As such, the plaintiffs must point to an "identifiable action or event" that will be subject to APA review. *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 490 (5th Cir. 2014).

Moreover, if the agency action at issue was not "final," we lack subject matter jurisdiction over review of that action. *Peoples Nat. Bank v. Off. of Comptroller of Currency of U.S*., 362 F.3d

---

[20] Courts may not entertain review of efforts to alter broad federal policies and programs since the APA does not waive sovereign immunity for such challenges. *See Walmart Inc. v. U.S. Dep't of Just*., --- F. Supp. 3d ---, No. 20-817, 2021 WL 410618, at *11 (E.D. Tex. Feb. 4, 2021) (citing *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 490 (5th Cir. 2014)). As such, requests for "wholesale" improvement of an agency's programs are not subject to judicial review. *Id*.

333, 336 (5th Cir. 2004). "Final" means that the action marks "the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps. of Engineers v. Hawkes Co*., 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 117 S. Ct. 1154, 1168 (1997)). We note that the Fifth Circuit has held that the inquiry into the finality of an agency decision is "flexible" and "pragmatic." *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011).

The defendants urge that the plaintiffs' complaint makes an "improper programmatic challenge"—that is, instead of challenging specific agency actions, plaintiffs instead challenge the OCSLA and MLA leasing moratoriums as a general program and policy of the DOI as set forth in EO 14008. Doc. 128, att. 1, p. 26. Defendants contend that plaintiffs seek review of an "amalgam of interim decisions, press releases, and other actions that Plaintiffs have self-titled 'moratoriums.'" *Id*., p. 8. Defendants contend that rather than review of individual agency decisions, that plaintiffs' claims seek "systemic changes" which only the executive or legislative branches of government may enact. *Id*., p. 28. Defendants argue that since plaintiffs cannot identify "a single discrete agency action tantamount to a program-wide moratorium" that would be properly reviewable under the APA, they have failed to state a claim for relief. *Id*., p. 27.

Defendants also argue that the purported agency action challenged by plaintiffs is not "final" within the meaning of 5 U.S.C. § 704.  *Id*., p. 30. Rather, they contend the decisions are merely "interim" postponements of the lease sales, urging: "they are not decisions to forego the sales entirely, and the ultimate decision has not yet been made." *Id*. Deferrals and postponements of agency decisions, they argue, are "necessarily interlocutory in nature." *Id*. Defendants additionally urge that the challenged actions do not determine rights or obligations or trigger legal

consequences. *Id.*, p. 31. The Record of Decision would "not have caused any lease sale to happen" because it only constituted notice of where the agency stood in its decision-making process and did not guarantee a lease sale would happen. *Id.* Thus, the rescission of those specific lease sales "had no real-world consequences" since they were rescinded prior to being fully executed. *Id.*

In their opposition, plaintiffs urge that they have established that a moratorium is in place, and further that BOEM and BLM's decision to implement the moratorium is a final, discrete agency action of the type that courts frequently review under the APA. Doc. 142, pp. 25-26. Plaintiffs contend that they do not ask the court to impermissibly "dictate policy" or supervise the DOI's administration of the leasing program, but only ask the court to enjoin specific agency action. *Id.*, p. 28. Plaintiffs therefore urge that their lawsuit is not an improper programmatic challenge but only an appeal for the court to enforce the agencies' duties under OCSLA and the MLA. *Id.*, p. 29.

Additionally, plaintiffs argue that the pause is still a "final" action even though the DOI never formally committed it to writing. *Id.*, p. 27. Unwritten but clear and discrete policies may constitute reviewable agency action and here the Secretary clearly implemented an unwritten policy prompting the defendant agencies to suspend lease sales pursuant to EO 14008. *Id.* They also suggest that that denying APA review here would set bad precedent in allowing the Executive Branch to "make a major national decision in the most opaque manner possible." *Id.* Thus, federal agencies should not be able to circumvent APA review merely by declining to put a final decision in writing. *Id.*, pp. 27-28.

Finally, plaintiffs argue that the decision to implement the pause was a final agency action because it "left agency officials without discretion" to conduct oil and gas lease sales, therefore marking the "consummation of a decision making process." *Id.*, p. 29. Additionally, the decision

altered the obligations of federal officials to hold such lease sales, deprived the bidders of their right to acquire the lease sales and deprived the states of their right to collect revenue from those sales. *Id*. Thus, they urge, legal consequences certainly flowed from the implementation of the pause. *Id*.

As to whether the challenged agency actions at issue are "discrete," we start with *Lujan*, wherein the Supreme Court declined APA review of a plaintiff's challenge to the entirety of the Secretary's "land withdrawal review program." 110 S. Ct. at 3189. Plaintiff therein challenged the "continuing (and thus constantly changing) operations of the BLM" in withdrawal and classification of public lands. *Id*. Unlike the programmatic challenge like in *Lujan*, plaintiffs here seek relief from the cancellation and postponement of two specific Lease Sales in offshore waters—Lease Sale 257 and Lease Sale 258—in addition to the systematic cancellation of mineral leases on eligible lands. Indeed, they specifically request that the pause be vacated and enjoined[21] under the APA or that the court compel offshore Lease Sale 257 and Lease Sale 258, and BLM's previously scheduled onshore lease sales.[22] Doc. 1, pp. 43-48. Plaintiffs seek to compel the defendants to comply with their duties under OCSLA and the MLA.  In our view, such relief does not seek the kind of "wholesale revision" of a federal program in which *Lujan* precludes our engagement.[23]

Moreover, the Secretary's decision to implement the pause was a discrete agency action even if not formally published like the BOEM and BLM regional offices' decisions were. Doc. 1,

---

[21] Counts II-V, VII, and VIII request the court to vacate and enjoin the action of either BOEM or BLM for three violations of the APA: being arbitrary and capricious, contrary to law, or failing to employ a requisite notice and comment period. Doc. 1, pp. 43-48, ¶¶ 141, 146, 150, 155, 163, 167.

[22] Counts I and VI request the court compel specific lease sales since their executions have been "unlawfully withheld or unreasonably delayed." *Id*., ¶¶ 133, 159. Notably, the defendants are not seeking dismissal of Count VI.

[23] See *W. Energy All. v. Jewell*, No. 16-912, 2017 WL 3600740, at *13 (D.N.M. Jan. 13, 2017) ("The Court agrees with WEA that requesting BLM conduct quarterly leases of eligible and available parcels is not a programmatic challenge, but a request that this Court enforce a discrete, non-discretionary duty contained in a single statutory provision, unlike the situation in *Lujan*.")

p. 26, ¶ 73; pp. 31-32, ¶ 86; pp. 35-36, ¶¶ 104-110. A "final" agency action need not be committed to writing. *See, e.g., Bhd. of Locomotive Engineers & Trainmen v. FRRA*, 972 F.3d 83, 100 (D.C. Cir. 2020). Even though plaintiffs' complaint must deduce the Secretary's decision from the collective actions of the BOEM and BLM offices after the issuance of EO 14008, they have still sufficiently alleged it is a discrete action subject to APA review.

Defendants rely on *Alabama-Coushatta*, which held that a lawsuit challenging the federal management of natural resources in purported tribal territory was an improper programmatic challenge. 757 F.3d at 490. We find those facts distinguishable as well.  There, the court rejected the Tribe's lawsuit as a "blanket" challenge to "*all* of the Government's actions with respect to *all* permits and leases" on land covering several national parks in Texas. *Id*. (emphasis in original.) The court reasoned that the challenge was directed at broad policies and practices: specifically, the agencies' systematic failure to consider the Tribe's claim to aboriginal title and incidental rights relating to the land at issue. *Id*., p. 491. Here, plaintiffs are not challenging the DOI's overall management of the leasing program, nor have they lodged a "blanket" challenge as was present in *Alabama-Coushatta*. Instead, the challenge is specifically targeted towards the Secretary's unwritten decision to postpone and cancel previously scheduled lease sales under the MLA and OCLSA and the agencies' subsequent implementation of that decision.

Additionally, we find that challenged actions under the APA are "final." Neither the Secretary's implementation of the pause, nor BOEM and BLM's subsequent cancellations of lease sales, are "interlocutory in nature," as defendants urge. Rather, case law interpreting the finality requirement demonstrates that an action need not be permanent to constitute a "final" agency action. *See Texas,* 2021 WL 2096669 at *31 (S.D. Tex. Feb. 23, 2021) (the 100-day temporary pause on removal of aliens ordered by the Department of Homeland Security was a "final" agency

27

action subject to judicial review). The presently challenged actions are still "final" despite the possibility the DOI may decide to later make the same federal lands available for purchase. *Id.* (recognizing that the defendants' purported "'discretion' to reverse course, by itself, is insufficient to convert an action that is final to one that is nonfinal."); *See also Hawkes Co.*, 136 S. Ct. at 1814 (possibility that the U.S. Army Corps of Engineers would revise a jurisdictional determination is a "common characteristic of agency action, and does not make an otherwise definitive decision nonfinal."); *Sackett v. EPA.*, 132 S. Ct. 1367, 1372 (2012) (the mere possibility that the EPA would later reconsider a decision under the Clean Water Act was insufficient to make a final agency action nonfinal.)

While EO 14008 commands a "pause" of new oil and gas lease sales, that language is of no moment to the finality inquiry, which is flexible and pragmatic. *See Whitman v. Am. Trucking Associations*, 121 S. Ct. 903, 915 (2001) ("Though the agency has not dressed its decision with the conventional procedural accoutrements of finality, its own behavior thus belies the claim that its interpretation is not final."). Semantics aside, the essential actions at issue are the Secretary's decision to systematically cancel and postpone various onshore and offshore lease sales, and the agencies' subsequent cancellation and postponement of them. In our view, those actions are "final", as they action alter the obligations of the various federal officials charged with performing the lease sales and affect the statutory rights of plaintiffs to collect proceeds from the sales.

Accepting plaintiffs' allegations as true and noting that there is a strong presumption for reviewability of administrative action, we find that the Secretary's decision to pause oil and gas leases in compliance with EO 14008 is a discrete and final agency action. Additionally, plaintiffs have sufficiently alleged that each cancellation or postponement of specific lease sales, including

BOEM's Rescission of Lease Sale 257, [24]  BOEM's delay of Lease Sale 258,[25] and BLM's delay of quarterly onshore lease sales[26] is a discrete and final agency action.

## iv. Committed to Agency Discretion by Law

The fourth requirement for plaintiffs to obtain APA review is that the challenged actions under the APA are not "committed to agency discretion by law." *See* 5 U.S.C. § 701(a)(2). This inquiry requires "careful examination of the statute on which the claim of agency illegality is based." *Webster v. Doe*, 108 S. Ct. 2047, 2052 (1988). "Where statutes granting agency discretion are drawn in such broad terms" such that there are "no meaningful standards against which to judge the agency's exercise of discretion" then § 701(a)(2)'s exception will apply. *Perales v. Casillas*, 903 F.2d 1043, 1047 (5th Cir. 1990) (internal quotations omitted.) To honor the presumption in favor of reviewability of administrative action, courts construe the exception in § 701(a)(2) narrowly, "confining it to those rare administrative decision[s] traditionally left to agency discretion." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020) (internal quotations omitted).

While the OCSLA vests the Secretary with some discretion in development of the Five-Year Program,[27] we find that plaintiffs' claims arise from specific provisions of the statute that command action. "'[T]he word 'shall' usually connotes a requirement." *Maine Cmty. Health Options v. United States*, ⎯ U.S. ⎯, 140 S. Ct. 1308, 1320 (2020). A sister court has noted,

---

[24] Doc. 1, pp. 25-31.
[25] *Id.*, pp. 31-32.
[26] *Id*., pp. 32-38.
[27] Specifically, the statute requires the Secretary to "prepare and periodically revise, and maintain an oil and gas leasing program" which "shall consist of a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which he determines will best meet national energy needs for the five-year period following its approval or reapproval." 43 U.S.C. § 1344(a). Moreover, the statute sets forth several considerations for the Secretary to make, including economic, social, and environmental factors. *Id*. § 1344(a)(1). Additionally, the Secretary considers specific factors in determining the timing and location of the leasing, ultimately striking a "proper balance between the potential for environmental damage, the potential for discovery of oil and gas, and the potential for adverse impact on the coastal zone." *Id*. § 1344(a)(2)-(3).

however, that the use of "shall" alone cannot compel government action unless coupled with "'some stronger indication' from the legislature that the call to action was mandatory." *Texas*, 2021 WL 2096669, at \*34 (S.D. Tex. Feb. 23, 2021) (citing *Cairo & F.R. Co. v. Hecht*, 95 U.S. 168, 170 (1877) and *Town of Castle Rock, Colo. v. Gonzales*, 125 S. Ct. 2796, 2806 (2005)).

OCSLA states that the Secretary "shall prepare and periodically revise" a Five-Year Leasing Program. 43 U.S.C. § 1344(a). In preparing a Five-Year Program, the statute further states that the Secretary "shall invite and consider suggestions" from any State potentially affected by the leasing program, and "shall submit a copy of such proposed program to the Governor of each affected States for review and comment." *Id*. § 1344(c)(1)-(2). In executing the lease sales, the Secretary "shall" again solicit recommendations from state governors and "shall" accept such recommendations if the recommendations strike a "reasonable balance" between national and state interests. *Id*. § 1345(c). In contrast, the statute uses the language "may" in referring to the Secretary's duty to solicit and accept recommendations from affected local governments. *See id*. §§ 1344(c)(1)-(2), 1345(c). From the statutory construction, it is clear Congress intended the language "shall" to impose a mandatory duty upon the Secretary, while the reciprocal use of "may" is permissive and allows the Secretary to use her discretion. *Fogerty v. Fantasy, Inc*., 114 S. Ct. 1023, 1033 (1994) ("The word 'may' [] clearly connotes discretion.").

Moreover, the policy of the United States, as declared through OCSLA, is that the OCS is a "vital national resource reserve" that the federal government holds "for the public." 43 U.S.C. § 1332(3). Additionally, it recognizes that certain states and local governments will be affected by exploration, development, and production on the OCS and are therefore "entitled to an opportunity to participate" in the development of oil and gas exploration and production. *Id*. § 1332(4) & (4)(C). *See Texas*, 2021 WL 2096669, at \*34. Thus, while the Secretary may hold a residuum of

discretion over oil and gas leasing operations on the OCS, we find that the specific OCSLA provisions forming the basis of plaintiffs' complaint supersede that discretion. *See Webster,* 108 S. Ct. at 2052 (in determining whether certain decisions were committed to the discretion of the Director of the CIA, the Supreme Court examined not only to the general purpose of the National Security Act, but also the specific provisions under which plaintiffs sued). OCLSA sets forth the machinery by which oil and gas leasing must take place while the Secretary maintains some discretion in how to operate that machinery. However, the presently challenged actions stem from non-discretionary duties that OCSLA imposes upon the Secretary and BOEM and are therefore not "committed to agency discretion by law."

Like OCSLA, the MLA similarly juxtaposes the words "may" and "shall," [28] committing some decisions to the discretion of the Secretary but also imposing non-discretionary duties. The MLA explicitly provides that the Secretary "shall" hold lease sales "for each State where eligible lands are available at least quarterly…" 30 U.S.C. § 226(b)(1)(A). Thus, when eligible lands are available, BLM must hold quarterly lease sales. *Id.*; *See also W. Energy All. v. Jewell*, 16-0912, 2017 WL 3600740, at *7 (D.N.M. Jan. 13, 2017). Notably, plaintiffs allege that there were eligible lands available. Doc. 1, p. 37, ¶ 111. Accepting plaintiffs' allegation as true, we can only conclude that the Secretary's decision to cancel the onshore leases when eligible lands were available was not one "committed to agency discretion by law."

Based on the allegations of plaintiffs' complaint, we have determined that the challenged actions herein, including the Secretary's decision to implement the pause, the Rescission of Lease Sale 257, the delay of Lease Sale 258, and the cancellation of onshore leases meet all four

---

[28] *See, e.g.*, 30 U.S.C. § 226(b)(1)(B): "The national minimum acceptable bid *shall* be $2 per acre for a period of 2 years from December 22, 1987. Thereafter, the Secretary, subject to paragraph (2)(B), *may* establish by regulation a higher national minimum acceptable bid for all leases based upon [certain findings]." (emphasis added)

requirements for APA review. Since judicial review is proper, we now look to the sufficiency of plaintiffs' claims brought under specific provisions of the APA.

### b.  Unreasonable Delay: Count I

The APA requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). A claim under this provision may only proceed "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Louisiana v. United States*, 948 F.3d 317, 323 (5th Cir. 2020) (quoting *Norton v. S. Utah Wilderness All.*, 124 S. Ct. 2373, 2380 (2004) (emphasis in original)). This limitation means that if a discrete agency action "is not demanded by law," a court may not compel the action under § 706(1). *Id*.

Plaintiffs allege in Count I that acting in reliance on EO 14008, BOEM unlawfully and unreasonably rescinded Lease Sale 257 and delayed Lease Sale 258, and additionally unreasonably and unlawfully withheld and delayed the remaining lease sales in the Five-Year Program. Doc. 1, p. 43, ¶¶ 129-132. We have already determined that the delays and cancellations of specific sales were final and discrete agency actions. *See supra* Part II(B)(3)(a)(iii). The question remains as to whether the Secretary was required to hold Lease Sales 257 and 258 and the remainder of the lease sales under the current Five-Year Program.

As plaintiffs allege, the current Program set forth the schedule of offshore lease sales to occur throughout the five-year period. Doc. 1, pp. 19-20, ¶¶ 56-60. While the Secretary may "revise and reapprove" the Program at any time, any significant revisions must be "in the same manner as originally developed." 43 U.S.C. § 1344(e). The Secretary and BOEM complied with none of the required procedures for revision of the program set forth in § 1344(f).[29] As such, we

---

[29] *See* supra fn. 8.

find that BOEM was required to hold the scheduled lease sales. Per plaintiffs' allegations, BOEM's delays contravened OCSLA's requirements without providing any rationale for its decisions and were therefore "unlawful" or "unreasonable" by definition. Doc. 1, p. 30, ¶ 83 and p. 32, ¶ 88. Plaintiffs have sufficiently plead that BOEM unlawfully or unreasonably delayed and withheld the Five-Year Program's scheduled lease sales. Thus, they state an APA claim under § 706(1).

### c.   Failure to Employ Notice and Comment: Counts II and VIII.

The APA provides that a reviewing court shall "hold unlawful and set aside agency action … found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The APA requires rules to undergo notice and comment unless they are exempt. *Texas*, 2021 WL 2096669 at *42 (S.D. Tex. Feb. 23, 2021).

An exemption to APA's notice and comment requirement applies under 5 U.S.C. § 553(b)(A) when a rule is interpretive, a general statement of policy, or a rule of agency organization, procedure, or practice.  "In contrast, if a rule is 'substantive,' the exemption is inapplicable, and the full panoply of notice-and-comment requirements must be adhered to scrupulously. The APA's notice and comment exemptions must be narrowly construed." *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015), *as revised* (Nov. 25, 2015) (internal citations omitted). To determine whether the rule is substantive or interpretive, the inquiry is twofold: "whether the rule (1) 'impose[s] any rights and obligations' and (2) 'genuinely leaves the agency and its decision-makers free to exercise discretion.'" *Id*. (citing *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995). "If a statement denies the decisionmaker discretion in the area of its coverage ... then the statement is binding, and creates rights or obligations." *Id*. "While mindful but suspicious of the agency's own characterization, we ... focus[ ] primarily on whether the rule has binding effect on agency discretion or severely restricts it." *Id*.

(internal quotations omitted). Additionally, "[a]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Id*. (quoting *Gen. Elec. Co. v. E.P.A*., 290 F.3d 377, 383 (D.C. Cir. 2002)).

Plaintiffs allege in Count II that the Rescission of Lease Sale 257 and delay of Lease Sale 258 was each a "substantive rule that was required to undergo notice-and-comment rulemaking," and BOEM's decision to forgo notice and opportunity for public comment violated the APA. Doc. 1, p. 27, ¶ 77, pp. 31-32, ¶ 86, p. 44, ¶¶ 134-141. Plaintiffs also contend that the "OCSLA Leasing Moratorium" was also a substantive rule requiring notice and comment procedures before its issuance. *Id*., p. 44, ¶ 136. Additionally, Count VIII alleges that the BLM's cancellation of the onshore leases failed to employ the notice and comment period required under § 553. *Id*., pp. 47-48, ¶¶ 164-167. Plaintiffs urge that because the OCSLA and MLA leasing "moratoriums" do not fit the exemption under § 553, the court should vacate and enjoin the decisions of BLM and BOEM to cancel and delay the sales. *Id*., p. 44, ¶ 141 and p. 48, ¶ 167.

We find here that Rescission of Lease Sale 257 and delay of Lease Sale 258 were substantive rules since they determined legal rights and obligations. As discussed in our analysis at Part II(B)(3)(a)(iii), those actions affect the statutory rights of plaintiffs to collect proceeds from the sales. While courts do consider the agency's own characterization of the action, this consideration is not dispositive. *Gen. Elec.*, 290 F.3d at 382. Thus, government's ex post facto labelling of the rescission and delay as "interim" does not render those decisions interpretive rules. The original Notice to Rescind Lease Sale 257's only stated rationale was to comply with EO 14008, and provided "no analysis, no comment period, no reference to statutory factors, no reference to the Current Five-Year Program, and no consultation with States, Tribes, or local

governments." Doc. 1, p. 26, ¶ 73. Similarly, the cancellation of the public comment period and subsequent delay of Lease Sale 258 relies solely on EO 14008. *Id.*, pp. 31-32, ¶ 86. The abrupt cancellations offer no suggestion that BOEM may later reassess its decision. The mere reliance on EO 14008 and lack of independent rationale suggests that BOEM has no discretion in the decisions on Lease Sales 257 and 258.

Additionally, the imposition of the OCSLA and MLA "moratoriums" constitutes a substantive rule requiring the notice and comment procedures of § 553. Our inquiry here is more difficult because, to the plaintiffs' knowledge, the Secretary's reasoning and ultimate decision to implement EO 14008's pause was not committed to writing. The decision to implement EO 14008, however, is evident from the systematic cancellation and delay of lease sales in the months immediately following EO 14008. Despite the government's arguments that the Secretary has vast discretion in this area and its labelling of the pause as "interim," we must look to the government's actual treatment of the rule. *Gen. Elec.,* 290 F.3d at 383. As to the OCSLA "moratorium," BOEM's notice of the cancelled and delayed leases refers solely to EO 14008 for its rationale. Doc. 1, p. 27, ¶ 73 and pp. 31-32, ¶ 86. As to the MLA "moratorium," various regional offices of BLM either provided no reasoning at all for the cancellations or, in only one case, stated that the cancellation was to "confirm the adequacy of underlying environmental analysis." *Id.*, pp. 34-36, ¶¶ 100-110. The public record of the Secretary's implementation of the moratoriums offered no mechanism for the agency to exercise its discretion moving forward, only deferring to an executive order. Thus, the decisions appear to be binding on the agencies.  Moreover, the "moratoriums" altered the existing obligations of federal officers to make the OCS and onshore federal lands available for lease. As such, we find the pause as applied to OCLSA and MLA leases was a substantive rule subject to the APA notice and comment requirements. We find that plaintiffs have stated a claim

for relief under Counts II and VIII for the agencies' failures to employ requisite notice and comment periods.

### d.   Contrary to Law or in Excess of Authority: Counts III and V

The APA provides that a reviewing court shall "hold unlawful and set aside agency action" found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). This sort of claim "necessarily entails a firsthand judicial comparison of the claimed excessive action with the pertinent statutory authority." *W. Union Tel. Co. v. F.C.C.*, 541 F.2d 346, 354 (3d Cir. 1976) (citing *FPC v. Moss*, 96 S. Ct. 1003 (1976)).

In Count III, plaintiffs contend that the Rescission of Lease Sale 257 and cancellation of Lease Sale 258's notice and comment procedures must be vacated and enjoined as "not being in accordance with the law" or "in excess of statutory jurisdiction, authority, or limitations" since the decision circumvented statutorily mandated procedures. Doc. 1, pp. 26-27, ¶ 76 and p. 45, ¶¶ 142-146. Plaintiffs also allege in Count V that the MLA leasing moratorium is contrary to law or "in excess of statutory jurisdiction, authority, or limitations" since the MLA commands the Secretary to hold lease sales "for each State where eligible lands are available at least quarterly." *Id.*, p. 46, ¶¶ 151-155.

We have already discussed at length the duties imposed upon federal officials to conduct oil and gas lease sales. OCSLA requires the leasing of the OCS in accordance with a Five-Year Program developed with input from the states and submitted to the President and Congress before final approval. Moreover, OCSLA does not permit "significant" revisions of the plan without going through the same procedures. As such, we find that plaintiffs have sufficiently alleged that DOI's cancellations and delays of the Five-Year Program's sales without adhering to the statutorily mandated process was contrary to law.

The MLA also imposes a nondiscretionary duty for BLM to hold quarterly lease sales when eligible lands are available. Since the plaintiffs allege that eligible lands were available, BLM would have cancelled the onshore leases in derogation of that statutory duty and in excess of its authority. We therefore find that plaintiffs have stated a claim under 5 U.S.C. § 706(2)(C).

### e.   Arbitrary and Capricious: Counts IV and VII

The APA provides that a reviewing court shall "hold unlawful and set aside agency action found to be … arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The law requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Texas*, 2021 WL 2096669 at *38 (S.D. Tex. Feb. 23, 2021) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 103 S. Ct. 2856, 2866 (1983)). An agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Texas v. EPA*, 829 F.3d 405, 425 (5th Cir. 2016) (quoting *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998)). Moreover, a court must look to the agency's "stated rationale at the time of its decision" and must disregard any "*post hoc* rationalizations" of the agency action. *Id*. (quoting *Luminant Generation Co. v. EPA.*, 675 F.3d 917, 925 (5th Cir. 2012)).

Count IV of the plaintiffs' complaint urges that the Rescission of Lease Sale 257 and cancellation of Lease Sale 258's comment period were "issued without any reasoning whatsoever and rely only upon Executive Order 14008, which itself provides no reasons. Both decisions also ignore the statutory factors, prior inconsistent agency positions, and reliance instances." Doc. 1,

pp. 45-46, ¶ 149. In Count VII, the plaintiffs make the same allegations relative to the MLA leasing "moratorium." *Id.*, p. 45, ¶¶ 142-146. They urge that the foregoing agency actions were arbitrary and capricious and must be vacated and enjoined under § 706(2)(A).

Here, the only rationales of BOEM and BLM at the time they issued their decisions to postpone and cancel the lease sales were either (1) none given; (2) reliance on EO 14008; or (3) in the case one of specific onshore lease sale,[30] environmental concerns. As discussed above in Part II(B)(3)(b)-(c), these agency decisions provided very limited rationale. The formal Notice to Rescind Lease Sale 257's only stated rationale was to comply with EO 14008, and provided "no analysis, no comment period, no reference to statutory factors, no reference to the Current Five-Year Program, and no consultation with States, Tribes, or local governments." *Id.*, p. 26, ¶ 73. Similarly, the cancellation of the public comment period and subsequent delay of Lease Sale 258 relies solely on EO 14008. *Id.*, pp. 31-32, ¶ 86. Plaintiffs contend, however, that mere reference to the executive order is insufficient rationale since the executive order itself "contains no analysis of the statute or previous rulemaking proceedings." *Id.*, p. 28, ¶ 79. Section 208 of EO 14008 only states that pause is for "completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices." Exec. Ord. 14008, Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7619, 7624-25 (Jan. 27, 2021). As to BLM's postponements of the onshore leases, besides the BLM Wyoming Office, no BLM Office provided any reasoning for its decision. Doc. 1, pp. 35-36.

As plaintiffs allege, neither the agencies' public notices of the pause nor EO 14008 "examine relevant data" or "articulate a satisfactory explanation for its action." *Texas*, 2021 WL 2096669 at *38. We need not consider the government's "post hoc rationalizations" of its decision.

---

[30] Plaintiffs allege that BLM's Wyoming Office updated the posting for its March 2021 sale to note that lease sales "are postponed to confirm the adequacy of underlying environmental analysis." Doc. 1, p. 35, ¶ 105.

As such, we find that plaintiffs have sufficiently alleged that the challenged actions are arbitrary and capricious and that they state claims under § 706(2)(A).

### f.   Summation of the APA Claims

Having determined that the plaintiffs' APA claims are subject to judicial review and that they have stated a claim as to all alleged APA violations, we recommend the court deny the defendants' Motion to Dismiss those claims.

### III.
### CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that the court **DENY** defendants' Motions to Dismiss.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n,* 79 F.3d 1415, 1428–20 (5th Cir. 1996), *superseded by statute on other grounds,* 28 U.S.C. § 636(b)(1)), *as recognized in Cruz v. Rodriguez,* 828 F. App'x 224, 2020 WL 6478502 (5th Cir. 2020) (unpubl.).

THUS DONE AND SIGNED in Chambers this 23rd day of August, 2021.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE