IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| STATE OF LOUISIANA, ET AL.<br><br>　　Plaintiffs,<br><br>　　v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity<br>as President of the United States, ET AL.<br><br>　　Defendants. | Case No. 2:21-cv-00778<br><br>Honorable Judge Terry A. Doughty<br><br>Magistrate Judge Kathleen Kay |

**DECLARATION OF PRINCIPAL DEPUTY ASSISTANT SECRETARY FOR
LAND AND MINERAL MANAGEMENT LAURA DANIEL DAVIS**

1.　My name is Laura Daniel-Davis. Since January 20, 2021, I have exercised the delegable functions and duties of the Assistant Secretary for Land and Mineral Management at the United States Department of the Interior ("Department"). The Assistant Secretary for Land and Mineral Management oversees the Bureau of Ocean Energy Management ("BOEM") and the Bureau of Land Management ("BLM"), the Departmental agencies responsible for offshore and onshore mineral leasing on the outer continental shelf and on public lands, respectively.

2.　In my official capacity, I am familiar with the Department's compliance with the Court's June 15, 2021 Order and can testify truthfully and accurately regarding that compliance.

3.　On January 27, 2021, President Biden issued Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*. Section 208 of the Executive Order directed that the Department "[t]o the extent consistent with applicable law . . . shall pause new oil and natural

gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices."

4. The Department explicitly relied on the instruction in Section 208 of the Executive Order to rescind the record of decision for proposed offshore lease sale 257 ("Sale 257"). 86 Fed. Reg. 10132 (Feb. 18, 2021). The Federal Register notice does not make the rescission contingent on any additional action by the Department. Instead, it notes that, "[a]fter completion of the review specified in the Executive Order, BOEM may reevaluate . . . Lease Sale 257 and publish an appropriate [record of decision] in the Federal Register." *Id*.

5. The Department also relied on the instruction in Section 208 of the Executive Order to cancel the scheduled public comment period on the draft environmental impact statement for proposed offshore lease sale 258 ("Sale 258"). 86 Fed. Reg. 10994 (Feb. 23, 2021). As with the rescission of proposed Sale 257, the cancellation of the public comment period for Sale 258 did not depend on additional Departmental action. Instead, the Federal Register Notice indicated that "if BOEM resumes its environmental review of Lease Sale 258, a notice will be published in the Federal Register." *Id*.

6. Finally, the Department cited Executive Order 14008 when exercising its discretion not to hold second quarter onshore lease sales. *See* BLM Statement on Second Quarter Oil and Gas Lease Sales (Apr. 21, 2021). Previously, Bureau of Land Management State Offices and the Office of the Principal Deputy Assistant Secretary for Land and Mineral Management had deferred certain first quarter lease sales pending further review to ensure compliance with the National Environmental Policy Act ("NEPA").

7. On June 15, 2021, this Court issued a preliminary injunction in this matter. The associated order ("Order") enjoined two categories of agency action pending judgment.

8. First, the Court's Order "enjoined and restrained" Defendants from "implementing the Pause of new oil and natural gas leases on public lands or in offshore waters as set forth in Section 208, Executive Order 14008 . . . and as set forth in all documents implementing the terms of said Executive Order."

9. Second, the Order enjoined and restrained Defendants from "implementing said Pause with respect to Lease Sale 257, Lease Sale 258 and to all eligible onshore properties."

10. The Court's Order did not purport to set aside or reverse any prior agency decisions or documents, nor did it command the Department to affirmatively render any particular agency decisions, e.g., the decision to offer particular parcels or areas for leasing as part of a sale.

11. Within an hour of the Court's decision, I and BLM and BOEM leadership were provided a copy of the Court's Order and advised that the Court had enjoined implementation of the pause described in Executive Order 14008.

12. Since the Court's Order, the Department has taken no action implementing the pause of new oil and natural gas leases on public lands or in offshore waters as set forth in Section 208, Executive Order 14008 or action implementing said Pause with respect to Lease Sale 257, Lease Sale 258 and to all eligible onshore properties.

13. Additionally, the Department has been evaluating future onshore and offshore lease sales according to the statutory requirements of the Outer Continental Shelf Lands Act ("OCSLA") and the Mineral Leasing Act ("MLA").

14. To begin, the Department has expended substantial time deliberating on and planning for proposed Lease Sale 257.

15. The planning process for offshore lease sales is lengthy. Although the five-year program under OCLSA sets out a schedule for potential sales in broad terms, "[e]ach lease sale that is scheduled in the . . . Program [is] subject to an established prelease evaluation and decision process whereby interested and affected parties . . . have multiple opportunities to participate" 2017–2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program (Nov. 2016), Doc. 129-2, at 1-15 ("Program").

16. As set forth in the most recent five-year program, the prelease process includes 15 individual steps and "can take between 3 and 5 years to complete." *Id.* The steps, which are detailed more fully in the 2017-2022 Program itself and which are governed by BOEM regulations, include: (1) a call for information and nominations; (2) notice of intent to prepare a document to comply with NEPA, such as an environmental assessment or environmental impact statement; (3) identification of the area of the Proposed Action to be analyzed in the NEPA document; (4) preparation of the draft NEPA document; (5) public review and comment on the NEPA document; (6) government-to-government consultations; (7) environmental consultations (i.e., consultation with other Federal agencies and under the National Historic Preservation Act); (8) preparation and publication of a final NEPA document; (9) proposed notice of sale; (10) consistency determination under the Coastal Zone Management Act (for states other than Alaska); (11) record of decision or finding of no significant impact; (12) letters to governors; (13) final notice of sale; (14) sale; and (15) lease issuance. *Id.* at 1-15-1-17.

17. In certain scenarios, applicable law and/or a lawful exercise of the discretion of the Secretary of the Interior ("Secretary") may require the Department to repeat certain steps. For example, the Secretary can make changes to a sale any time before it is held, and, if the Secretary determines between the proposed notice of sale and the final notice of sale to make

changes to the sale that would depart significantly from the terms of the proposed notice of sale—and if the Department determines that prior notice to the public and environmental analysis did not adequately anticipate the terms of the final sale—the Department may reissue the draft NEPA documents and proposed notice for comment.

18. As a general matter, the Department does not render formal announcements regarding the pace or substance of its internal deliberative process between these steps.

19. When the Department rescinded the record of decision for Sale 257, BOEM had completed eleven of the fifteen steps for the Sale.

20. The remaining preleasing steps for Lease Sale 257 included transmission of letters to governors and a final notice of sale.

21. The final notice for any offshore sale, including Sale 257, must be published at least 30 days before the sale. *See* 43 U.S.C. § 1337(l); 30 C.F.R. § 556.308(a).

22. Consistent with this timeline, the Department anticipated scheduling Sale 257 on March 17, 2021—or roughly two months after the record of decision—even before the Department rescinded the record of decision.

23. Because the recission of the record of decision for Sale 257 requires no further action to implement its terms, there is no record of decision for the Sale. The most recent documents issued in connection with the Sale include the proposed notice of sale, 85 Fed. Reg. 73508 (Nov. 18, 2020) and the NEPA documents for the sale, which were prepared in 2016, 2017, and 2018. *See* 86 Fed. Reg. 6365 (Jan. 21, 2021) (record of decision, referencing prior NEPA documentation).

24. To proceed with Sale 257, therefore, BOEM must conclude all of the preleasing process. That process includes, for example, "consideration of all comments and recommendations received in response to the proposed notice of sale." 30 C.F.R. § 556.307(a).

25. BOEM must also ensure that the NEPA analysis for Sale 257 is current and adequate. Although the prior NEPA documentation for Sale 257 purports to consider the environmental consequences of the sale, BOEM, like other Federal agencies, has an ongoing obligation to update NEPA analysis if "major Federal action remains to occur." 40 C.F.R. § 1502.9(d)(1). Specifically, BOEM must ensure that there are no "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Id.* § 1502.9(c)(1).

26. When the document undergirding a proposed Federal action is an Environmental Impact Statement—as is the case for Sale 257 (and Sale 258)—the relevant agency must consider several categories of effects from the proposed action, including: the environmental impacts of the proposed action and reasonable alternatives; any adverse environmental effects that cannot be avoided should the proposal be implemented; the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity; any irreversible or irretrievable commitments of resources that would be involved in the proposal should it be implemented; possible conflicts between the proposed action and the objectives of Federal, regional, State, Tribal, and local land use plans, policies and controls for the area concerned; energy requirements and conservation potential of various alternatives and mitigation measures; natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures; urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various

alternatives and mitigation measures; means to mitigate adverse environmental impacts; and economic and technical considerations, including the economic benefits of the proposed action. 40 C.F.R. § 1502.16(a).

27. These factors are merely a summary: additional NEPA regulations and caselaw include other requirements for and refinements of the requisite NEPA analysis.

28. Based on comments on the proposed Sale 257 and a review of valid NEPA documents, the Secretary will take action on the proposed notice of sale by selecting and announcing a sale that "considers the Governor's comments[] [and] . . . the oil and gas resource potential in context with social, environmental, economic, and environmental values, impacts, and concerns, and the terms and conditions of the lease sale." Program at 1-16. *See generally* 43 U.S.C. § 1332.

29. Since rescinding the record of decision for Sale 257, BOEM has continued to review existing NEPA analysis for Sale 257—now several years old—to ensure that the analysis appropriately describes the potential impacts from the proposed leasing, including by evaluating whether there is new information released since the initial record of decision that requires inclusion or consideration. BOEM has also deliberated regarding the potential scope of Sale 257 and proposed future sales in the Gulf of Mexico.

30. BOEM estimates that agency staff have, since June 15, 2021 and as of August 11, 2021, expended over 525 person-hours on deliberative work for further proposed sales in the Gulf of Mexico under the operative five-year program, including proposed Sale 257. That figure amounts to over 13 person-hours of work per business day, on average, since the Court's Order.

31. Consistent with its substantial work to date, BOEM anticipates sending a new Record of Decision for Sale 257 to the Federal Register by August 31, 2021. Once the new

Record of Decision is published, BOEM anticipates publishing a final notice of sale in September 2021 and holding the lease sale in October or November 2021.

32.   Work performed in conjunction with further action on Sale 257 has included (but has not been limited to), preparing possible new lease stipulations, evaluating potential sale areas, geographic information system ("GIS") analysis, review of NEPA analysis, and revision of documents.

33.   Simultaneously, BOEM has continued work on proposed Sale 258. That sale had proceeded only to the area identification and draft NEPA stages of the preleasing process. When BOEM cancelled the public comment period for the Sale 258 draft environmental impact statement, it had received zero expressions of interest from potential bidders.

34.   At a minimum, therefore, Sale 258 requires circulation of and comment on proposed NEPA analysis.

35.   To ensure that any such comment period considers the best available information and solicits the feedback necessary to inform BOEM's decision-making and ensure compliance with NEPA, the Department has continued to work on Sale 258.

36.   BOEM estimates that agency staff have, since June 15, 2021 and as of August 11, 2021, expended approximately 130 hours on Sale 258.

37.   That work has included reviewing and revising existing exploration and development scenarios to account for the May 2021 Oil and Gas Assessment (BOEM's annual estimate of undiscovered, technically and economically recoverable oil and natural gas resources outside of known oil and gas fields on the outer continental shelf) and recalculating the probabilities of discharge as part of the Bureau's Oil Spill Risk Analysis.

38. BOEM anticipates opening the public comment period for a revised Draft Environmental Impact Statement for Lease Sale 258 in September or October 2021.

39. While not as lengthy as planning for offshore sales under OCSLA, planning for onshore sales typically takes nine months.

40. In a typical process, BLM first considers expressions of interest from interested bidders.

41. Second, BLM prepares NEPA documents to evaluate the environmental consequences of leasing parcels, including by releasing lists of parcels for public scoping (e.g., circulating parcels alongside proposed stipulations for any lease). This process can take several months.

42. Third, BLM seeks comment on the draft NEPA documents, typically for periods of at least 30 days.

43. Fourth, BLM responds to public comment and otherwise updates NEPA analysis for the proposed sale. This step can take several weeks or, in some cases, months.

44. Fifth, BLM provides 45 days' notice of a final competitive lease sale consistent with the Mineral Leasing Act, 30 U.S.C. § 226(f) and BLM regulations, 43 CFR 3120.4-2.

45. Sixth, BLM considers and renders decisions on formal, administrative protests of proposed parcels for sale. *See* 43 C.F.R. § 3120.1-3. BLM usually seeks to resolve protests within 30 days of the protests' submission, and may not issue leases for the protested parcels until resolution of any applicable protest. *See* Bureau of Land Management Instruction Memorandum 2021-027, *Oil and Gas Leasing – Land Use Planning and Lease Parcel Reviews* (April 30, 2021).

46. The Department does not read the Court's Order to displace the Department's ordinary discretion with respect to onshore lease sales, only to forbid the Department from implementing the Pause from Section 208 of Executive Order 14008 in future leasing decisions. The Department has therefore continued to evaluate the next round of onshore lease sales independent of the Executive Order, including by considering whether to offer for sale parcels at issue in proposed first and second quarter leases.

47. BLM has continued to receive expressions of interest since the Court's Order and is preparing new lists of proposed parcels for scoping ahead of possible sale.

48. On August 17, 2021, BLM leadership directed BLM state offices to compile parcel lists from deferred first-quarter and second-quarter lease sales. BLM presently anticipates that state offices will publicly post parcel lists for scoping by August 31, 2021. In October 2021, BLM anticipates, draft NEPA documents for those parcel lists will be released, followed by a 30-day comment period. BLM then anticipates that it will publish notices of competitive sale in December 2021, followed by holding a lease sale approximately forty-five days after the lease sale notices are posted.

49. BLM has also spent considerable time deliberating how best to adjust its NEPA processes for onshore leasing going forward. As explained in the Declaration of Peter Cowan, BLM's onshore leasing program has faced significant NEPA litigation challenges, with over 5,000 leases covering nearly five million acres of land being challenged across dozens of lawsuits.

50. To develop more robust NEPA practices going forward, BLM began inventorying the leases subject to challenges in March 2021. BLM has also been revising its approaches to accounting for greenhouse gas emissions when preparing NEPA for proposed lease sales. As the

Department has previously noted, numerous judicial decisions have faulted BLM for its historic analysis of these emissions, and the Department is concerned about ensuring that future lease sales fully comply with NEPA, including by appropriately analyzing greenhouse gas emissions from proposed sales.

51. Thus, BLM has begun preparing an inventory of GHGs from fossil fuels produced on lands managed by the BLM in fiscal year 2020 and from reasonably foreseeable fossil fuel production and leasing over the next 12 months, as well as preparing an assessment of future GHG emissions trends from federal fossil fuel development and potential climate change impacts. BLM may use any final assessments as a tool in evaluating the cumulative impact of GHG emissions from BLM's fossil fuel energy leasing and development authorizations and supporting NEPA analysis.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on August 24, 2021 in Alexandria, VA

Laura Daniel-Davis