**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA**

THE STATE OF LOUISIANA,
By and through its Attorney General, JEFF
LANDRY, et al.,

PLAINTIFFS,

v.                                                                    CIV. NO. 2:21-CV-00778-TAD

JOSEPH R. BIDEN, JR., in his official capacity
as President of the United States; et al.,

DEFENDANTS.

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

    I.    BY STATUTE, THE FEDERAL GOVERNMENT MUST REGULARLY OPEN THE OUTER CONTINENTAL SHELF FOR ENERGY DEVELOPMENT. ....................................................... 1

        A.    The Outer Continental Shelf Lands Act Establishes a Mandatory, Four-Step Process for Scheduling Lease Sales in the Outer Continental Shelf. ................................... 1

        B.    President Obama's Heavily Vetted Five-Year Program Governs Lease Sales Occurring Now Through the End of 2022. ................................................................. 2

        C.    President Obama's Five-Year Program Approves Lease Sale 257 in the Gulf of Mexico and Lease Sale 258 in Cook Inlet, Alaska. ................................................. 4

    II.    THE MINERAL LEASING ACT REQUIRES THE FEDERAL GOVERNMENT TO HOLD LEASE SALES AT LEAST QUARTERLY FOR ENERGY DEVELOPMENT ON FEDERAL LANDS. ................ 6

    III.    PRESIDENT BIDEN ISSUES EXECUTIVE ORDER 14008, DECLARING A PAUSE ON OFFSHORE AND ONSHORE DOMESTIC ENERGY PRODUCTION. ........................................................ 6

        A.    Relying Solely on the Pause, BOEM Cancels Lease Sales 257 and 258. ............. 7

        B.    Relying Solely on the Pause, BLM Cancels All Quarterly Lease Sales. ............... 7

    III.    THIS COURT GRANTS PLAINTIFF STATES INJUNCTIVE RELIEF. ..................................... 8

ARGUMENT ...................................................................................................................... 9

    I.    PLAINTIFF STATES HAVE STANDING TO CHALLENGE THE PAUSE OF OFFSHORE AND ONSHORE OIL-AND-GAS LEASE SALES AND INDIVIDUAL LEASE SALE CANCELLATIONS. ..... 9

    II.    SECTION 208 OF EXECUTIVE ORDER 14008 IS UNLAWFUL. ....................................... 11

    III.    THE PAUSE IS CONTRARY TO LAW. ........................................................................... 13

        A.    The Pause Violates OCSLA and the MLA. ......................................................... 13

            1. The Pause Violates OCSLA. ....................................................................... 13

            2. The Pause Violates the MLA. ...................................................................... 17

        B.    The Pause Violates the APA's Notice-and-Comment Requirement. .................... 19

        C.    The Pause Is Arbitrary and Capricious. ............................................................... 20

    IV.    THE CANCELLATION AND PAUSE OF INDIVIDUAL LEASE SALES VIOLATES THE APA AND OCSLA. ....................................................................................................................... 22

        A.    The Cancellations Violate OCSLA and the MLA. .............................................. 22

        B.    The Cancellations Are Arbitrary and Capricious. ................................................ 23

        C.    The Pause's OSCLA leasing moratorium and the Recission of Lease Sale 257 unlawfully and unreasonably withhold agency action. ....................................... 24

D.    The Pause's MLA leasing moratorium unlawfully and unreasonably withholds agency action. ...........................................................................................................................25

CONCLUSION.............................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
      458 U.S. 592 (1982) ...................................................................................................10

*Ancient Coin Collectors Guild v. U.S. Customs & Border Protection,*
      801 F. Supp. 2d 383 (D. Md. 2011) ...........................................................................11

*Assoc. Builders & Contractors of Se. Texas v. Rung,*
      2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) .............................................................11

*California v. Bernhardt,*
      472 F. Supp. 3d 573 (N.D. Cal. 2020) ........................................................................23

*Chamber of Com. of the U.S. v. Reich,*
      74 F.3d 1322 (D.C. Cir. 1996) ....................................................................................11

*City & Cty. of San Francisco v. Trump,*
      897 F.3d 1225 (9th Cir. 2018) .....................................................................................12

*Clean Water Action v. EPA,*
      936 F.3d 308 (5th Cir. 2019) ............................................................................... 20, 23

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
      140 S. Ct. 1891 (2020) .................................................................................................24

*Dep't of Labor v. Kast Metals Corp.,*
      744 F.2d 1145 (5th Cir. 1984) .....................................................................................19

*Encino Motorcars, LLC v. Navarro,*
      136 S. Ct. 2117 (2016) .................................................................................................24

*Ensco Offshore Co. v. Salazar,*
      781 F. Supp. 2d 332 (E.D. La. 2011) ...............................................................2, 15, 24

*F.C.C. v. Fox Television Stations, Inc.,*
      556 U.S. 502 (2009) ..........................................................................................21, 23, 24

*FCC v. Prometheus Radio Project,*
      141 S. Ct. 1150 (2021) .................................................................................................21

*Hias, Inc. v. Trump,*
      985 F.3d 309 (4th Cir. 2021) .......................................................................................12

*Hornbeck Offshore Servs., L.L.C. v. Salazar,*
      696 F. Supp. 2d 627 (E.D. La. 2010) ................................................................2, 10, 22

*In re Aiken Cty.*,
  725 F.3d 255 (D.C. Cir. 2013) ...............................................................................21

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ...............................................................................................10

*Miles v. Apex Marine Corp.*,
  498 U.S. 19 (1990) ..................................................................................................17

*Motorola Credit Corp. v. Uzan*,
  561 F.3d 123 (2d Cir. 2009) ...................................................................................18

*Mountain States Legal Found. v. Bush*,
  306 F.3d 1132 (D.C. Cir. 2002) ..............................................................................11

*Perez v. Mortg. Bankers Ass'n*,
  135 S. Ct. 1199 (2015)............................................................................................20

*Pros. & Patients for Customized Care v. Shalala*,
  56 F.3d 592 (5th Cir. 1995) ....................................................................................19

*Rosebud Sioux Tribe v. Trump*,
  428 F. Supp. 3d 282 (D. Mont. 2019).....................................................................11

*Sec'y of the Interior  v. California*,
  464 U.S. 312 (1984) ..................................................................................................2

*State of Alabama v. State of Texas*,
  347 U.S. 272 (1954) ................................................................................................13

*Supreme Home Health Servs., Inc. v. Azar*,
  380 F. Supp. 3d 533 (W.D. La. 2019), *aff'd*, 812 F. App'x 229 (5th Cir. 2020)....................9

*Texas v. United States*,
  2021 WL 7238561 (S.D. Tex. Feb. 23, 2021) ...........................................10, 19, 21

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ........................................................................... 10, 19

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  136 S. Ct. 1807 (2016).............................................................................................10

*Udall v. Tallman*,
  380 U.S. 1 (1965) ....................................................................................................17

*W. Energy All. v. Jewell*,
  2017 WL 3600740 (D.N.M. Jan. 13, 2017) .............................................................17

*W. Energy All. v. Zinke,*

    877 F.3d 1157 (10th Cir. 2017) ...........................................................................................17

*Wages & White Lion Invs., LLC v. FDA,*

    16 F.4th 1130 (5th Cir. 2021) .............................................................................................21

*WildEarth Guardians v. Bernhardt,*

    502 F. Supp. 3d 237 (D.D.C. 2020) ...................................................................................17

## Statutes

5 U.S.C. §553 .........................................................................................................................19

5 U.S.C. §706(1) ..........................................................................................................22, 24, 25

5 U.S.C. §706(2)(A ...............................................................................................................20, 22

30 U.S.C. §191(a) ..................................................................................................................6, 10

30 U.S.C. §226(b)(1)(A) ...................................................................................................6, 17, 18

43 U.S.C. §1331 .......................................................................................................................10

43 U.S.C. §1332 .........................................................................................................................2

43 U.S.C. §1332(3) ................................................................................................................2, 22

43 U.S.C. §1337(a)(1) .................................................................................................................2

43 U.S.C. §1344(a) .....................................................................................................................2

43 U.S.C. §1344(c)(1) ...............................................................................................................16

43 U.S.C. §1344(c)(2) ...............................................................................................................16

43 U.S.C. §1344(e) .........................................................................................................14, 15, 16

43 U.S.C. §1345(a) ...............................................................................................................16, 22

43 U.S.C. §1345(c) ...................................................................................................................16

43 U.S.C. §1356a .....................................................................................................................10

43 U.S.C. §1701 .........................................................................................................................6

## Other Authorities

79 Fed. Reg. 34349 (June 16, 2014) .........................................................................................2

85 Fed. Reg. 73508 (Nov. 18, 2020) ......................................................................................20

86 Fed. Reg. 50,160 (Sept. 7, 2021) ......................................................................................15

86 Fed. Reg. 6365 (Jan. 21, 2021) ..........................................................................................20

Hallie Jackson Reports (@HallieOnMSNBC), Twitter (Apr. 20, 2022 3:41 pm),

    https://bit.ly/3xVmud1 ...........................................................................................................9

U.S. Const. art. I, §3, cl. 2 ..........................................................................................................13

**Rules**

Fed. R. Civ. P. 56(a)......................................................................................................................9

**Regulations**

43 C.F.R. §3120.............................................................................................................................6

43 C.F.R. §3120.1-2.......................................................................................................................6

43 C.F.R. §3160.............................................................................................................................6

## INTRODUCTION

For decades, presidents of both parties have faithfully executed the Outer Continental Shelf Lands Act and Mineral Leasing Act—Congress's meticulously crafted framework governing oil-and-gas leasing on federal lands. Those statutes' import is unambiguous: the Executive Branch must work with the States to facilitate the expeditious and safe development of onshore and offshore federal energy resources. By executive fiat, however, President Biden has brought this entire regime to a halt.

Defendants' administration-wide Pause on onshore and offshore oil-and-natural-gas development is unauthorized by any statute and directly violates OCSLA and the MLA. And the Pause is quintessential arbitrary-and-capricious decisionmaking: it lacks any explanation (much less a reasoned one), and it ignores statutory factors, State reliance interests, and previous administration positions. Had the Executive followed the law—by holding notice and comment on the pause, or consulting with the States about it—the Administration may have received this feedback. But it failed to do so—yet another independent violation of the law.

Those are not victimless violations. The States rely on statutory revenue-sharing provisions from lease sales for billions of dollars in annual funding, including for education and environmental-restoration projects. And energy production supports thousands of jobs and significant investment and tax revenue. The Court should end those illegalities and fix those errors by granting summary judgment to Plaintiffs and holding that the Biden Administration's Pause violates the law.

## BACKGROUND

I.  **BY STATUTE, THE FEDERAL GOVERNMENT MUST REGULARLY OPEN THE OUTER CONTINENTAL SHELF FOR ENERGY DEVELOPMENT.**

   A.  **The Outer Continental Shelf Lands Act Establishes a Mandatory, Four-Step Process for Scheduling Lease Sales in the Outer Continental Shelf.**

Congress passed OCSLA more than 70 years ago. OCSLA declares "the outer Continental Shelf" to be "a vital national resource reserve held by the Federal Government for the public." 43

U.S.C. §1332(3). To make the most of that resource, OCSLA directs the Secretary of the Interior to make the Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." *Id.*; *see also Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 339 (E.D. La. 2011) (noting "OCSLA's overriding policy of expeditious development").

OCSLA facilitates the Shelf's expeditious development by directing the Secretary to administer a leasing program to sell exploration interests in portions of the Shelf to the highest bidder. 43 U.S.C. §§1334(a), 1337(a)(1). To this end, OCSLA sets out a four-step process in which the Secretary must (1) create a Five-Year Leasing Program, (2) hold lease sales in accordance with that plan, (3) grant or deny exploration permits and plans, and (4) grant or deny final development and production plans. *See Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F. Supp. 2d 627, 632 (E.D. La. 2010) (citing *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984)). Each step must follow stringent administrative requirements designed to maximize the chances for the public—including affected States and industry—to provide input on those lease sales.

### B. President Obama's Heavily Vetted Five-Year Program Governs Lease Sales Occurring Now Through the End of 2022.

Current lease sales in the Outer Continental Shelf are governed by the 2017-2022 Five Year Oil and Gas Leasing Program ("the Current Five-Year Program" or "Five-Year Program"). The process of creating the Current Five-Year Program began in 2014 during the Obama Administration. President Obama's Bureau of Ocean Energy Management (BOEM) published a request for information in the Federal Register and sent a letter to all Governors, Tribes, and interested federal agencies seeking input on the Program. *See* 79 Fed. Reg. 34349 (June 16, 2014). BOEM received over 500,000 comments in response to the RFI, allowing it to discharge its obligation under OCSLA to consider economic, social, and environmental values in making its leasing decisions. *See* 43 U.S.C. §1344(a); Ex. 1 at 3-1.

2

In 2015, President Obama's BOEM published the Draft Proposed Program. That published draft incorporated responses to the RFI comments and set out a draft schedule of potential lease sales. And it started a 60-day comment period in which BOEM received over one million comments. Ex. 2. After considering those comments, BOEM next published the Proposed Program, thereby starting a new 90-day comment period. Ex. 3. Again, BOEM received over one million comments, held public meetings, and created environmental impact statements in compliance with the National Environmental Policy Act. Ex. 1 at S-2-3.

After all that, President Obama's BOEM published the Proposed Final Program in November 2016. In it, the Secretary determined which areas to include in the lease sales. In recognition that "[t]he Gulf of Mexico is known to contain significant oil and gas resources and already has world-class, well-developed infrastructure, including established spill response capability," the "PFP schedules 10 region-wide lease sales in the areas of the Gulf of Mexico that are not under Congressional moratorium or otherwise unavailable for leasing." Ex. 1 at S-2. The Proposed Final Program also observed that "[i]n the Gulf of Mexico, infrastructure is mature, industry interest and support from affected states and communities is strong, and there are significant oil and gas resources available." *Id.* Thus, "[t]o take advantage of these incentives to OCS activity, the region-wide sale approach makes the entire leasable Gulf of Mexico OCS area available in each lease sale." *Id.*

On January 17, 2017—60 days after the Final Program was transmitted to President Obama and Congress—the Secretary approved the Final Program, "which schedules 11 potential oil and gas lease sales, one sale in the Cook Inlet (Alaska) Program Area and 10 sales in the GOM Program Areas," with "one sale in 2017, two each in 2018-2021, and one in 2022." BOEM00015 The Secretary's approval further specifically affirms the Final Program's specification that "[t]he GOM sales would be region-wide and include unleased acreage not subject to moratorium or otherwise unavailable ... to

provide greater flexibility to industry, including more frequent opportunities to bid on rejected, relinquished, or expired OCS lease blocks." *Id.*

C. **President Obama's Five-Year Program Approves Lease Sale 257 in the Gulf of Mexico and Lease Sale 258 in Cook Inlet, Alaska.**

The Final Program approved and scheduled two lease sales relevant here. The first is GOM OCS Oil and Gas Lease Sale 257. Lease Sale 257 was set to comprise the Western and Central Planning Areas of the Gulf of Mexico and a portion of the Eastern Planning Area not subject to congressional moratorium. Ex. 1 at S-5. The second is Lease Sale 258 in Cook Inlet, Alaska, "where there is existing infrastructure currently supporting State leasing activities." *Id.* at S-2.

In accordance with the Five-Year Program, BOEM published a Proposed Notice of Sale for Lease 257 in the Gulf of Mexico in November 2020. *See* BOEM00021. As OCSLA requires, BOEM sent the Proposed Notice to Governors of the affected States. *Id.* It was also opened for public comment. *Id.*

The Secretary approved the Notice of Sale in a Record of Decision. *See* BOEM00206. In the ROD, the Secretary noted reliance on the "Gulf of Mexico Outer Continental Shelf Lease Sale: Final Supplemental Impact Statement" in considering how to proceed with Lease Sale 257. Ex. 4 at 3. The Secretary analyzed five separate alternatives, including a no-action option, and determined that Alternative A—a regionwide lease sale with minor exclusions—would be "in the best interest of the Nation and meets the purposes of the OCS Lands Act." *Id.* at 5. The Secretary also determined that Lease Sale 257 "promotes domestic energy production, which can reduce the need for oil imports," and promotes other national interests including "continued employment, labor income, [and] tax revenues." *Id.* at 8. Additionally, the Secretary found that "[c]ontinued oil and gas leasing on the OCS may also reduce the risk of spills from the transportation of imported energy resources," and that

"revenue sharing with applicable coastal states and political subdivisions ... can help mitigate the risks and costs assumed by the States and communities in the area of the lease sale." *Id.* at 5, 8.

In the ROD, the Secretary rejected the no-action alternative because "the needed domestic energy sources and the subsequent positive economic impacts from exploration and production, including employment, would not be realized. Furthermore, revenue would not be collected by the Federal Government nor subsequently disbursed to the States." *Id.* at 10. Additionally, the Secretary found that other sources of energy "may have different but comparable levels of negative environmental impacts, such as the risk of spills from the transportation of alternative oil supplies over long distances." *Id.* at 10. That meant the no-action alternative "would not avoid the incremental contribution of the energy substitutes' impacts to those same cumulative effects." *Id.* Finally, the Secretary's approval noted that the Leased Sale 257 stipulations included "all practicable means to avoid or minimize environmental harm from the selected alternative." *Id.* at 11. Lease Sale 257 was formally scheduled for March 17, 2021. *Id.* at 1.

As to Lease Sale 258—which would offer lands in the Cook Inlet, Alaska—BOEM in September 2020 began the process of preparing it in accordance with the Current Five-Year Program. BOEM released a Call for Information and Nominations in the Federal Register to allow industry parties to indicate interest in parcels of the sale area. BOEM00016. BOEM also released a Notice of Intent to Prepare an EIS, which provided the public with an opportunity to comment on the scope of the lease sale. BOEM00019. In January 2021, after accounting for comments, BOEM published a Notice of Availability indicating the area proposed for sale in the Cook Inlet and a draft environmental impact statement. Ex. 6; Ex. 7.

II.   **THE MINERAL LEASING ACT REQUIRES THE FEDERAL GOVERNMENT TO HOLD LEASE SALES AT LEAST QUARTERLY FOR ENERGY DEVELOPMENT ON FEDERAL LANDS.**

Besides its offshore interests, the Federal Government also holds energy-producing lands onshore. Congress has likewise made those lands available for development: Under the Mineral Leasing Act, the Secretary of the Interior is required to hold lease sales "for each State where eligible lands are available at least quarterly." 30 U.S.C. §226(b)(1)(A). The MLA provides that for oil and natural gas leases on federal lands, in States other than Alaska, 50 percent of bonuses, production royalties, and other revenues are granted to the State in which the lease is located, and 40 percent is granted to the Reclamation Fund, which maintains irrigation systems in several Western States. 30 U.S.C. §191**Error! Bookmark not defined.**(a). For leases in Alaska, 90 percent of revenues are granted to the State. *Id.*

BLM has the authority to lease public lands with oil and gas reserves to private industry for development under the MLA, the Federal Land Policy and Management Act, 43 U.S.C. §§1701-1787, and the BLM's own regulations and plans, *see* 43 C.F.R. Part 1600 (Planning, Programming, and Budgeting); 43 C.F.R. §§3120 (Competitive Leases) and 3160 (Onshore Oil and Gas Operations). BLM's regulations also provide for quarterly lease sales. 43 C.F.R. §3120.1-2(a) ("Each proper BLM S[t]ate office shall hold sales at least quarterly if lands are available for competitive leasing."). To comply with the MLA, several BLM regional offices planned to hold quarterly sales in March and April 2021 to lease available lands. Doc. 139 at 29-31.

III.   **PRESIDENT BIDEN ISSUES EXECUTIVE ORDER 14008, DECLARING A PAUSE ON OFFSHORE AND ONSHORE DOMESTIC ENERGY PRODUCTION.**

On January 27, 2021, President Biden issued Executive Order 14008. BLM-Q2000046. Notwithstanding all the preceding notice, comment, and final decisionmaking, the Pause arbitrarily institutes a moratorium on energy production leases in offshore waters and on public lands: Section

208 of EO14008 commands the Secretary of the Interior to "pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters." BLM-Q2000053.

### A.     Relying Solely on the Pause, BOEM Cancels Lease Sales 257 and 258.

On February 18, 2021, Michael Celata, Regional Director of BOEM's Gulf of Mexico Office, issued a Notice to Rescind the Prior Lease 257 Record of Decision. BOEM00179. The Notice declared that the Record of Decision "is rescinded immediately." *Id.* The half-page-long Federal Register Notice purports to rescind the prior Record of Decision, but it provides no analysis, no comment period, no reference to the statutory factors, no reference to the Current Five-Year Program, and no consultation with the States or Tribes. *Id.* BOEM's *only* stated rationale is that it must rescind the Record of Decision "to comply with Executive order 14008." BOEM00179-80.  The notice did not disclose firm plans to reschedule Lease Sale 257. Instead, the Recission Notice stated only that "BOEM may reevaluate GOM Lease Sale 257 and publish an appropriate ROD in the Federal Register." BOEM00180.

Lease Sale 258 fared no better. In early February 2021 BOEM published a *press release* on its website cancelling both the public comment period on the Draft EIS and public meetings about Lease Sale 258. *See* BOEM00070. The press release relied solely upon EO14008 to close the comment period. BOEM later memorialized its press release in a Federal Register notice that relies solely on the Pause. BOEM00142.

**B.      Relying Solely on the Pause, BLM Cancels All Quarterly Lease Sales.**

The Pause caused BLM offices to halt all pending quarterly lease sales in express contravention of the Mineral Leasing Act. Although BLM has published no formal notice in the Federal Register halting the previously planned, heavily vetted, approved, and statutorily *required* quarterly land sales, it did publish a "fact sheet" in which it noted that the President ordered the Secretary of the Interior to halt the leasing of public lands. *See* BOEM00051-55. And then BLM offices began systematically posting postponement or cancellation notices for their March and April 2021 lease sales. Doc. 139 at 29-31.

**III.     THIS COURT GRANTS PLAINTIFF STATES INJUNCTIVE RELIEF.**

On March 22, 2021, Louisiana submitted a notice of suit under OCSLA to the Secretary informing the Department that the States would be immediately injured by its violation of the law and were therefore preparing to file suit. On March 24, 2021, a coalition of thirteen States filed suit against the Moratorium and promptly moved for a preliminary injunction. The district court held a hearing on Plaintiff States' preliminary injunction motion on June 10, 2021. Five days later, the Court issued a nationwide preliminary injunction enjoining executive branch officials "from implementing the Pause of new oil and natural gas leases on public lands or in offshore waters as set forth in Section 208 of Executive Order 14008." Doc. 140.

On August 17, 2021, the Government appealed that preliminary injunction to the Fifth Circuit. The Government did not apply for a stay of the injunction, nor did it immediately comply with that order. Instead, for almost two months, it took no public action to reschedule Lease Sale 257. Indeed, the Government continued to deny that a "pause" existed at all until the Secretary of the Interior finally admitted to Congress that "the Pause is still in place." *See* Doc. 148-1 at 1:00:23. And all its intervening public statements indicated that the oil-and-gas leasing pause remained in place despite the injunction. Doc. 149-1.

8

After nearly two months of continued irreparable harm, and with no sign that Lease Sale 257 would be held, on August 9 the States filed a motion for an order to show cause and to compel compliance with the preliminary injunction. *Id.* The Government opposed this motion and revealed for the first time in their contempt briefing that Lease Sale 257's record of decision would be reissued on August 31, 2021. Doc. 155. After the Government issued the Lease Sale 257 Record of Decision and announced Lease Sale 257 would be held on November 17, 2021, the States withdrew their contempt motion without prejudice. The Lease Sale 257 auction was held on November 17, but leases have not yet been issued due to an order from a federal district court in Washington, D.C. *that the Administration has declined to appeal.*

And the Biden Administration has since said that, under compulsion of this Court's order, it was holding BLM lease sales (with drastically reduced parcel offerings compared to the original lease sale announcements). *See* Doc. 198. But after that, the Executive Branch made clear that those sales would not have happened (and future ones won't either) but for the Court's order: White House National Climate Advisor Gina McCarthy told a reporter that President Biden "remains absolutely committed to not moving forward with additional drilling on public lands." Hallie Jackson Reports (@HallieOnMSNBC), Twitter (Apr. 20, 2022 3:41 pm), https://bit.ly/3xVmud1.

## ARGUMENT

"Summary judgment is appropriate when the evidence before the court shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Supreme Home Health Servs., Inc. v. Azar*, 380 F. Supp. 3d 533, 552 (W.D. La. 2019), *aff'd*, 812 F. App'x 229 (5th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). "[T]he movant must affirmatively establish its right to prevail as a matter of law." *Id.* But "[t]he non-movant does not satisfy his burden merely by demonstrating some metaphysical doubt as to the material facts, by setting forth conclusory allegations and unsubstantiated assertions, or by presenting but a scintilla of evidence." *Id.*

I.    **PLAINTIFF STATES HAVE STANDING TO CHALLENGE THE PAUSE OF OFFSHORE AND ONSHORE OIL-AND-GAS LEASE SALES AND INDIVIDUAL LEASE SALE CANCELLATIONS.**

As this Court has determined multiple times, Doc. 139; Doc. 170, Plaintiff States have standing to challenge the Pause of OCSLA and MLA oil and gas leasing because it harms Plaintiff States' sovereign, proprietary, and *parens patriae* interests. *See Massachusetts v. EPA*, 549 U.S. 497, 518-520 (2007); *see also Texas v. United States*, 809 F.3d 134, 151-55 (5th Cir. 2015); *Texas v. United States*, 2021 WL 723856, at *10-21 (S.D. Tex. Feb. 23, 2021). Though Plaintiff States have standing under the traditional analysis, they also receive "special solicitude" on this issue. *Massachusetts v. EPA*, 549 U.S. at 518-520.

The Pause and individual cancellations inflict on Plaintiff States several legally cognizable harms. To take just one example, Plaintiff States are entitled to a substantial share of the proceeds from leasing sales under OCSLA, the Gulf of Mexico Energy Security Act, and the MLA. *See* 43 U.S.C. §1337(g)(2); 43 U.S.C. §1356a; P.L. 109-432, 120 Stat. 3000 (43 U.S.C. §1331 note); 30 U.S.C. §191(a). Because the Pause systematically cancels lease sales, the resulting moratoriums deprive the States of this vital revenue. *See* Doc. 3-6 ¶¶19-20. Indeed, the cancellations of Lease Sales 257, 259, and 261 will reduce Louisiana's GOMESA funding by up to $57 million. *See* Doc. 3-4 ¶4. Beyond that, the moratoriums cause substantial economic harm to Plaintiff States' citizens by causing billions of dollars of lost investments and thousands of lost jobs. *See* Doc. 3-2 ¶¶17, 24; Doc. 3-4 ¶23. And the moratoriums directly threaten the integrity of at least one State's coastline. Those harms amply establish standing. *See Massachusetts v. EPA*, 549 U.S. at 518-526 (once a concrete harm established, magnitude of harm irrelevant); *Texas v. United States*, 809 F.3d at 151-55**Error! Bookmark not defined.**; *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).

Plaintiff States also have a cause of action under the APA to challenge the Pause and actions taken in reliance on it. Those are final agency actions because they "mark[] the consummation of the

agency's decisionmaking process" and "legal consequences" flow from them. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016); *Ensco Offshore*, 781 F. Supp. 2d at 336. The unlawful delays of Lease Sales 257 and 258, and the MLA leasing sales, constitute final agency action under the APA. *Ensco Offshore*, 781 F. Supp. 2d at 336; *Hornbeck Offshore Servs.*, 696 F. Supp. 2d at 636. Additionally, Plaintiff States have a cause of action to challenge the Executive Order itself as ultra vires actions because they are beyond statutory authority and conflict with OCSLA and the MLA. *See, e.g.*, *Assoc. Builders & Contractors of Se. Texas v. Rung*, 2016 WL 8188655, at *5 (E.D. Tex. Oct. 24, 2016).

## II.   SECTION 208 OF EXECUTIVE ORDER 14008 IS UNLAWFUL.

Ultra vires review of an Executive Order is appropriate to determine "whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383, 406 (D. Md. 2011) (citing *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002)); *see also Assoc. Builders*, 2016 WL 8188655, at *5 ("The DOL, a federal agency also operating within the Executive Branch, has implemented the President's Executive Order by issuing the Guidance incorporated by reference in the new Rule. Therefore, the Executive Order may be challenged by Plaintiffs on both statutory and non-statutory grounds.") (citing *Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996)).

As this Court has correctly held, "since OCSLA does not grant specific authority to a President to 'Pause' offshore oil and gas leases, the power to 'Pause' lies solely with Congress," meaning the States "made a showing that there is a substantial likelihood that President Biden exceeded his powers in Section 208 of Executive Order 14008." Doc. 139 at 5. This is a quintessential ultra vires claim of the type that courts across the Nation have repeatedly reviewed. *E.g., Rosebud Sioux Tribe v. Trump*, 428 F. Supp. 3d 282, 291 (D. Mont. 2019) ("A court's power to enjoin the President extends to enjoining

11

portions of an executive order where the order 'exceeds the statutory authority delegated by Congress and constitutional boundaries.'").

The government's repeated arguments relying on boilerplate language in EO14008 and the President's purported unlimited discretion to disregard OCSLA and the MLA has no basis in law or the Constitution. The standard disclaimer in Section 208 of EO14008 that the command to halt oil and gas leasing applies only "[t]o the extent consistent with applicable law" is of no consequence because a Pause that facially contradicts both the MLA and OCSLA cannot be applied in a matter consistent with those laws. And Courts have consistently held that such language is not a get-out-of-jail-free card to avoid judicial review of executive orders. Such "savings clauses" must be "read in their context, and they cannot be given effect when the Court, by rescuing the [legality] of a measure, would override clear and specific language" in an executive order. *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018). Section 208's boilerplate savings clause thus does not override the EO14008's mandatory directive. *See id.* at 1240 ("If 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues."); *see also Hias, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) ("[W]e reject the government's attempt to immunize the Order from review through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order.").

To distinguish those cases, the Government rehashes its assertion that OCSLA and the MLA do not prohibit an across-the-board Pause on all oil-and-gas lease sales, and thus argue that Section 208 can be implemented consistent with applicable law. To be sure, *Hias* and *City and County of San Francisco* both held that "a court may disregard a savings clause only where it provides no mechanism for an agency to actually implement the order consistent with law." And as this Court has concluded, that is exactly the case here—the President has no authority to order a Pause of the oil-and-gas leasing

programs set out in OCSLA and the MLA. Doc. 139 at 25 ("The discretion to pause a lease sale to eligible lands is not within the discretion of the agencies by law under either OCSLA or MLA.").

Because OCSLA and the MLA provide no authority to implement a blanket pause on oil-and-gas lease sales, it is impossible to implement Section 208 of Executive Order 14008 in a manner consistent with law. Accordingly, Plaintiff States have adequately alleged an ultra vires claim against the President's unprecedented oil-and-gas lease sale moratorium.

## III.   THE PAUSE IS CONTRARY TO LAW.

### A.   The Pause Violates OCSLA and the MLA.

The Government grounds its argument for the Pause's legality in one central premise—the Executive has virtually limitless discretion to halt the Nation's oil-and-gas leasing machinery. Statutes belie this argument. Both OCSLA and the MLA set out comprehensive leasing requirements that the Secretary cannot ignore. Neither statute contains a hint of authorization for an across-the-board oil-and-gas leasing Pause. Indeed, each statute expressly requires that oil-and-gas leasing proceed in an expeditious manner. Particularly given Congress's plenary power over federal lands and the Outer Continental Shelf, U.S. Const. art. I, §3, cl. 2, the lack of express statutory authorization for the blanket Pause of congressionally mandated oil-and-gas lease sales is deafening, *see State of Alabama v. State of Texas*, 347 U.S. 272, 273 (1954) ("The power of Congress to dispose of any kind of property belonging to the United States 'is vested in Congress without limitation.'"). Accordingly, this Court correctly held that "the power to 'Pause' lies solely with Congress," and Congress has not delegated such power to the Executive. Doc. 139 at 4-5. In fact, Congress has done exactly the opposite by mandating comprehensive oil-and-gas leasing programs in OCSLA and the MLA.

### 1. The Pause Violates OCSLA.

The Pause is not only unauthorized, but also expressly conflicts with OCSLA's text and structure. Far from giving the Executive the standardless discretion that the government portrays,

13

OCSLA ensures that the Executive pursues the development of OCS resources in the most expeditious manner possible. OCSLA sets out a complex system of consultations and other requirements to ensure the OCS's orderly and expeditious development.

As discussed above, OCSLA sets out "four distinct statutory stages to developing an offshore oil well: (1) formulation of a five-year leasing plan by the Department of the Interior; (2) lease sales; (3) exploration by the lessees; (4) development and production." *Sec'y of the Interior v. California*, 464 U.S. at 337. In this complex process, "[e]ach stage involves separate regulatory review" and "specific requirements for consultation with Congress, between federal agencies, or with the States." *Id.* The Pause circumvents this entire statutory framework. And it fails to identify any authority in OCSLA whatsoever for doing so. That's because none exists: OCSLA contains no authority to pause the entire lease-sale machinery. Don't take Plaintiffs' word for it; the Executive has not identified even a potential toehold of statutory authority for the Pause of offshore lease sales. Yet the Pause halts all offshore oil-and-gas lease sales (while notably allowing wind sales to move forward) by simply declaring—without citation—that it has discretion to stop them.

Apart from being unauthorized and conflicting with OCSLA's structure, the Pause conflicts with at least five discrete statutory requirements.

First, the Pause constitutes a significant revision of the Five-Year Plan. But OCSLA specifically precludes the Secretary from unilaterally making significant amendments to the Five-Year Plan after its enactment and thereby circumventing this carefully wrought process of congressional and State consultation and analysis. OCSLA expressly requires that any "revision" of the Five-Year Plan "shall be in the same manner as originally developed," unless the revision is "not significant." 43 U.S.C. §1344(e). The Department has long defined the term "not significant" narrowly in light of OCSLA's text and structure. PR061. Indeed, its own lawyers emphasized that a determination that a

14

change is "not significant" is itself a judicially reviewable decision that must include an administrative record. PR059.

An across-the-board Pause on all oil-and-gas lease sales is the most significant alteration to an OCSLA Five Year Plan in history. Ex. 8. There has never been a blanket Pause on all OCS oil-and-gas lease sales from the Gulf of Mexico to Alaska. What's more, Lease Sale 257 is the largest Gulf lease sale in the nation's history. 86 Fed. Reg. 50,160, 50,161 (Sept. 7, 2021). If its cancellation is not significant, no lease-sale cancellation is.

This exposes the fatal flaw at the core of the government's significance argument. It asserts that because not every lease-sale cancellation constitutes a significant revision to the oil-and-gas leasing program, no lease-sale cancellation is a significant revision. Given (1) the unprecedented across-the-board nature of the pause, and (2) the unprecedented size of Lease Sale 257, adopting the government's position would mean that no lease-sale cancellation can ever constitute a significant revision. But neither the Department nor any court has ever adopted the interpretation that lease-sale cancellations are per se insignificant changes for purposes of §1344(e). And the government's attempt to engraft an extratextual distinction on to §1344(e) between holding an *additional* lease sale and cancelling an *existing* lease sale would establish a one-way ratchet (new sales are always significant, but sale cancellations never are) lacking any basis in OCSLA's text or structure—particularly considering its overriding purpose of expeditious development. *See Ensco Offshore Co.*, 781 F. Supp. 2d at 339.

Indeed, contrary to the government's representations, the Department has taken precisely the contrary position. By stating that the Department has discretion to determine whether a cancellation is a significant revision, the Department concedes that there are situations in which a cancellation can be significant. Beyond that, the Department's historical position is that the agency must actually make an affirmative significance determination, which it has not done here. As a result, there is no agency action on "significance" to which the Court must defer—the Department has never made an

insignificance determination. The government's argument that the Pause is not a significant revision is a made-for-litigation position rather than the product of agency expertise.

Second, the Pause violates OCSLA's State consultation requirements. As noted, a significant revision must be promulgated "in the same manner" as the initial Five-Year Plan. 43 U.S.C. §1344(e). The Secretary is required to "invite and consider suggestions for such program from ... the Governor of any State which may become an affected State under such proposed program." *Id.* §1344(c)(1). The Secretary failed to do so in promulgating the Pause.

Third, the Pause violates OCSLA's State submission requirement. After the Five-Year Plan (or a significant revision, *see* §1344(e)) is drafted, the Secretary "shall submit a copy of such proposed [revision] to the Governor of each affected State for review and comment." *Id.* §1344(c)(2). If a State Governor requests "a modification of such proposed program, the Secretary shall reply in writing granting or denying such request in whole or in part, or granting such request in such modified form as the Secretary considers appropriate, and stating his reasons therefor." *Id.* The Secretary failed to comply with this requirement in promulgating the Pause.

Fourth, the Secretary violated OCSLA's presentment requirement. The Secretary is required to submit the plan (or significant revision, *see* §1344(e)) to "the President and Congress, together with comments received by the Secretary from the governor of the affected state." *California*, 464 U.S. at 337 (citing 43 U.S.C. §1344(d)). The Secretary failed to comply with this requirement in promulgating the Pause.

Finally, the Secretary violated OCSLA's lease-sale-stage mandatory State consultation requirement. OCSLA grants "[a]ny Governor of any affected State or the executive of any affected local government" the right to "submit recommendations to the Secretary regarding the size, timing, or location of a proposed lease sale." 43 U.S.C. §1345(a). The Secretary "shall accept" these recommendations if the Secretary "determines, after having provided the opportunity for consultation,

that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State." *Id.* §1345(c). By unilaterally cancelling Lease Sale 257 entirely and Lease Sale 258's comment period, the Secretary nullified the State consultation that occurred for Sale 257, and deprived the States of consultation for Sale 258.

In sum, the blanket oil-and-gas lease-sale Pause is unauthorized by OCSLA, circumvents OCLSA's framework for developing OCS oil and gas, and violates several mandatory OCSLA provisions.

### 2. The Pause Violates the MLA.

The Pause's moratorium on leasing onshore public lands contravenes the MLA's unambiguous commands to BLM. Similar to OCSLA, the MLA requires that "lease sales shall be held for each State where eligible lands are available at least quarterly." 30 U.S.C. §226(b)(1)(A). As the several scheduled lease sales attest, eligible lands were available—but BLM unilaterally cancelled the quarterly sales anyway. Doc. 139 at 26. The Executive has no power to abrogate this mandatory statutory command by fiat. Instead, BLM is required to hold the lease sales as previously scheduled. *See W. Energy All. v. Zinke*, 877 F.3d 1157, 1166 (10th Cir. 2017) ("If the BLM's current procedures ... serve as a roadblock in achieving quarterly lease sales, the BLM will presumably have to abandon both its existing procedures and underlying policies."); see *also WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 243 (D.D.C. 2020) ("If a resource management plan authorizes oil and gas development on certain land parcels, BLM must sell leases for those parcels on a quarterly basis."); *W. Energy All. v. Jewell*, 2017 WL 3600740, at *4 (D.N.M. Jan. 13, 2017) (noting that it would violate the MLA if "BLM offered grounds other than a lack of available eligible lands" for "cancell[ing] or postpon[ing]" lease sales).

The government relies entirely on §226(a) of the MLA to support its claim of unlimited authority to refuse to hold any oil-and-gas lease sales. But its argument contravenes §226(b)'s mandatory command, which was added in the Federal Onshore Oil and Gas Leasing Reform Act of

17

1987. As the government notes, courts "assume that Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). The government also correctly notes that *Udall v. Tallman* emphasized the Secretary's broad discretion to hold lease sales. 380 U.S. 1 (1965). Congress thus was aware of the MLA's discretionary nature as things stood in 1987 and chose to add a mandatory command in §226(b) to pare back this discretion. Indeed, it's hard to identify a more unambiguous command than the one Congress added in 1987—"lease sales shall be held for each State where eligible lands are available at least quarterly." 30 U.S.C. §226(b)(1)(A) (emphasis added).

What's more, the Department's contemporaneous review of the 1987 amendments' legislative history conflicts with the government's post-hoc litigating position. Far from claiming broad authority, the Department understood that

> Section 17(b)(1)(A) [codified as §226(b)(1)(A)] requires a quarterly lease sale wherever eligible lands are available for leasing. The Committee reports indicate that Congress did not intend to give the Secretary any discretion in this regard. ... As long as interested bidders are not stymied by a limited number of parcels, BLM may exercise its discretion to limit its administrative work where, for example there is no demonstrable interest in leasing. A sale, however, must still be held each quarter.

BLM_I000008-9.

By the time the Pause was enacted, BLM had already decided (or was almost finished deciding) which lands to lease. The Pause halts this statutorily mandated process necessary to holding statutory mandated sales. *Id.* at 9 ("BLM must avoid a situation where an application is not processed because a State Office is not prepared to hold a sale."). The Administration cannot halt environmental reviews and scoping and then claim that there are no eligible lands available because environmental reviews and scoping has not occurred. *Cf. Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 n.5 (2d Cir. 2009) ("The 'classic definition' of chutzpah has been described as 'that quality enshrined in a man who, having killed his mother and father, throws himself on the mercy of the court because he is an orphan.'").

18

Finally, the government's consistent argument throughout this litigation that there are no constraints on when land must be deemed "eligible" or "available" would eviscerate the quarterly sale requirement. *Cf. Massachusetts v. E.P.A.*, 549 U.S. 497, 533 (2007) ("[T]he use of the word 'judgment' is not a roving license to ignore the statutory text."). The quarterly sale requirement would be a nullity if BLM could refuse to conduct the activities required to hold a sale, such as determining whether eligible lands are available. BLM has not determined that no lands in the entire country are eligible. *But see* BLM_I000009 ("BLM must make a decision either to lease the land or not to lease the land."). Instead, the Pause displaced BLM's ability to make eligibility decisions. If an executive fiat is all it takes to halt all onshore lease sales, MLA's quarterly sale requirement is an inkblot.

## B.     The Pause Violates the APA's Notice-and-Comment Requirement.

With limited exceptions not relevant here, agency rules must go through the APA's notice-and-comment procedures. 5 U.S.C. §553; *see also Texas v. United States*, 2021 WL 723856, at *43. That includes rules that alter "rights and obligations" or do not leave agency decisionmakers free to exercise discretion. *See Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) (the focus is "primarily on whether the rule has binding effect on agency discretion or severely restricts it"); *Texas v. United States*, 809 F.3d at 171 ("'If a statement denies the decisionmaker discretion in the area of its coverage ... then the statement is binding, and creates rights or obligations.'"). In deciding whether rules fall under those headings, courts must be "mindful but suspicious of the agency's own characterization" of the rule. *Id.*

On its face, the Pause imposes a drilling moratorium that both alters rights and obligations and leaves agency decisionmakers without discretion. The Order uses mandatory language to command the Secretary to impose a blanket halt on lease sales. *See* 86 Fed. Reg. at 7624-25 ("[T]he Secretary of the Interior shall pause new oil and natural gas leases on public lands or in offshore waters."). Because this so-called "pause" *alters* potential lessees' right to participate in sales—and

Plaintiff States' entitlement to proceeds from them—it is a substantive rule that must be promulgated following the APA's notice-and-comment procedures. *See Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984) ("An agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply.").

BOEM's Recission of Lease Sale 257 falls under the same heading. Relying solely on the Pause, the Recission purports to immediately cancel the Secretary's prior Record of Decision approving the sale. PR049. This Recission is itself a final rule that altered substantive rights and deprived the States of their entitlement to the substantial proceeds promised by Lease Sale 257. *See Texas*, 809 F.3d at 176-77 (rule is substantive if it "'change[s] the substantive standards by which the [agency] evaluates' applications which seek a benefit that the agency has the power to provide"). So it too must have been adopted through notice-and-comment rulemaking. But it was not.

Fifth Circuit precedent eliminates any remaining doubt about whether the Recission must have been the product of notice-and-comment rulemaking. Because the Recission made an about-face on Lease Sale 257, the Secretary "must [have] provide[d] a reasoned explanation for its revisions *and follow[ed] the same process to revise a rule as it used to promulgate it.*" *Clean Water Action v. EPA*, 936 F.3d 308, 312 (5th Cir. 2019) (emphasis added) (citing *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015)). The Secretary approved Lease Sale 257's Record of Decision only after holding a notice-and-comment period and building an extensive administrative record. *See* 85 Fed. Reg. 73508 (Nov. 18, 2020); 86 Fed. Reg. 6365 (Jan. 21, 2021). The Recission, however, follows none of these processes. It simply revokes the Record of Decision in a one-page Federal Register notice.

In short, no aspect of the Pause's OCSLA leasing moratorium has been subject to the APA's required notice-and-comment procedure. The agency thus violated §553 of the APA in rescinding Lease Sale 257. *See Kast Metals Corp.*, 744 F.2d at 1153 n.17 ("Section 553 was enacted to give the public an opportunity to participate in the rule-making process.").

### C.    The Pause Is Arbitrary and Capricious.

The APA commands courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion." 5 U.S.C. §706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). In the Fifth Circuit, "[t]his review 'is not toothless.'" *Texas*, 2021 WL 5882670, at *41. Quite the contrary, "after *Regents*, it has serious bite." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021). And the Court "can consider only the reasoning 'articulated by the agency itself'" and "cannot consider post hoc rationalizations." *Texas*, 2021 WL 5882670, at *41.

The Pause is the very definition of arbitrary and capricious action. It offers no reasoning for abruptly abandoning the comprehensive factual findings underlying the Five-Year Plan, which were developed over years and after several rounds of consultation and revision. The Pause offers no explanation for the OCSLA leasing moratorium. It betrays no awareness that OCS lease sales like Sale 257 are the result of *years* of analysis, consultation, environmental assessment, and public comment but also are integrated into *continuous, complex,* and *long-term* leasing and revenue production and *use*.

The Pause is also arbitrary and capricious because neither EO14008 nor the individual lease cancellations offer any explanation—reasoned or otherwise—for why BLM cancelled the quarterly sales. *Texas*, 2021 WL 5882670, at *41 ("Put simply, we must set aside any action premised on reasoning that fails to account for relevant factors."). Indeed, the cancellations themselves were announced only in one-sentence postings on the sale-notice pages of BLM's websites that declared the sales to be postponed without explanation. Doc. 139 at 35. To the extent the "factsheet" on BLM's website offers an explanation, it does so only by referring to EO14008, which itself offers no reasoning for the moratorium on leasing. *Id.*; *cf. California v. Bernhardt*, 472 F. Supp. 3d at 605 ("A president's

Executive Order cannot 'impair or otherwise affect' statutory mandates imposed on BLM by Congress." (citing *In re Aiken Cty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.)).

The Pause does not engage with BLM's prior decision to hold lease sales, *cf. Fox Television Stations*, 556 U.S. at 515; build any kind of administrative record, *cf. Texas v. United States*, 2021 WL 723856, at *39; or consider the Plaintiff States' serious reliance interests in the revenues and economic benefit of these sales, *cf. Encino Motorcars*, 136 S. Ct. at 2126. States with BLM-leasable tracts stand to lose billions of dollars in investments and tax revenue, and thousands of jobs. *See* Doc. 139 at 10-13. The government's actions ignore those serious reliance interests—a hallmark of arbitrary and capricious action. *Cf. Texas*, 2021 WL 723856, at *11 ("[T]he financial harm to States ... are not nebulous but rather 'serious and well recognized.'"). "That alone is fatal." *Texas*, 2021 WL 5882670, at *42. Because the Pause is not the product of reasoned decisionmaking, it must be enjoined as arbitrary and capricious. *See* 5 U.S.C. §706(2)(A).

## IV.   THE CANCELLATION AND PAUSE OF INDIVIDUAL LEASE SALES VIOLATES THE APA AND OCSLA.

### A.   The Cancellations Violate OCSLA and the MLA.

This Court correctly held that the Recission of Lease Sale 257's Record of Decision is contrary to law because it circumvents OCSLA's exacting statutory lease-sale procedures. Doc. 139 at 33-34. By withdrawing the duly issued Record of Decision by fiat, the Recission ignores OCSLA's provisions that require consulting with the States, submitting a plan to Congress and the President, holding comment periods, and preparing several exhaustive environmental impact statements. 43 U.S.C. §1345 (a), (c). The recission also ignores the purpose of OCSLA—*expeditiously facilitating the development of the Outer Continental Shelf. See* 43 U.S.C. §1332(3); *Hornbeck Offshore Servs.*, 696 F. Supp. 2d at 632; *Ensco Offshore*, 781 F. Supp. 2d at 336-37.

22

Additionally, this Court correctly held that each onshore lease-sale cancellation violates the MLA's quarterly sale requirement. Doc. 139 at 33; 30 U.S.C. §226(b). And it correctly held that each cancellation constitutes "unlawfully withheld or unreasonably delayed" agency action. Doc. 139 at 37-40; *see* 5 U.S.C. §706(1). The MLA unambiguously requires BLM to hold quarterly land sales, but BLM has refused to do so despite the presence of available land. BLM's inaction ignores this statutory requirement—and BLM fails to offer any reason whatsoever for withholding these actions. The cancellations are thus both unlawfully withheld and unreasonably delayed agency action. *See Ensco Offshore*, 781 F. Supp. 2d at 336.

**B.     The Cancellations Are Arbitrary and Capricious.**

Because the Rescission of Lease Sale 257's comment period offers no explanation, it is textbook arbitrary agency action. It betrays no awareness or understanding that Outer Continental Shelf lease sales like Lease Sale 257 are both the result of *years* of analysis, consultation, environmental assessment, and public comment, but also are integrated into *continuous, complex,* and *long-term* leasing and revenue production and *use*. Indeed, the ROD approving Lease Sale 257 was based on a robust administrative record and contained an extensive discussion of the OCSLA factors and the national interest. The Recission never engages with those or any other specific factual findings in the ROD. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate ... when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy"). And a command in an executive order does not exempt an agency from the APA's reasoned-decisionmaking requirement. *Cf. California v. Bernhardt*, 472 F. Supp. 3d 573, 600-01 (N.D. Cal. 2020) ("While the Executive branch holds the power to issue executive orders, an agency cannot flip-flop regulations on the whims of each new administration.").

The ROD was based on the 2017-2022 Five-Year Program—itself the product of an extensive multiyear proceeding involving millions of comments, multiple extensive environmental impact statements, consultation with State governments, and submission to Congress and the President. The Rescission acts as if this extensive rulemaking record did not exist and does not even mention OCLSA's statutory factors. Instead, it occupies half a page of the Federal Register and cites only one source of authority—EO14008—which itself contains no analysis of the statute or previous rulemaking proceeding. *Clean Water Action v. EPA*, 936 F.3d 308, 313-14 (5th Cir. 2019).

Nor does the Recission grapple with BOEM's specific factual finding in 2016 that directly contradicts it. Then, BOEM concluded that "[i]n each price case, and in each scenario for the 2017–2022 Program, U.S. GHG emissions would be slightly higher if BOEM were to have no lease sales, assuming no major market or policy changes. … Emissions from substitutions are higher due to the exploration, development, production, and transportation of oil from international sources being more carbon-intensive." Ex. 7 at 36. So much for stopping leases to stop climate change.

The Recission also ignores the overwhelming reliance interests that have grown up around the 2017-2022 Program generally and Lease Sale 257 specifically. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). Plaintiff States have structured significant environmental programs around the expected proceeds of OCSLA lease sales. *See* Doc. 139 at 10. The government's failure to consider prior agency positions, and the reliance interests that have grown up around them, are the very definition of arbitrary and capricious agency action. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) ("[W]hen an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'"); *Fox Television Stations*, 556 U.S. at 515.

C.     **The Pause's OSCLA leasing moratorium and the Recission of Lease Sale 257 unlawfully and unreasonably withhold agency action.**

Under the APA, a court "shall [] compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §706(1). The Recission offers no reasoning for delaying the sale. Instead, it refers only to the Pause as the sole reason for delay. But the Executive Order itself offers no reason or statutory basis for the Pause or the delay. This unexplained delay, like that of Lease Sale 258, is particularly egregious and unlawful given "OCSLA's overriding policy of expeditious development." *Ensco Offshore Co.*, 781 F. Supp. 2d at 339.

D.     **The Pause's MLA leasing moratorium unlawfully and unreasonably withholds agency action.**

Finally, the Pause's MLA leasing moratorium also constitutes "unlawfully withheld or unreasonably delayed" agency action. *See* 5 U.S.C. §706(1). As discussed, *supra* §II.B.1, the MLA unambiguously requires BLM to hold quarterly land sales, but BLM refused to do so for more than a year despite this Court's injunction and the presence of available land. BLM's inaction ignores this statutory requirement—and BLM fails to offer any reason whatsoever for withholding these actions. The cancellations are thus both unlawfully withheld and unreasonably delayed agency action. *See Ensco Offshore*, 781 F. Supp. 2d at 336.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for summary judgment.

Respectfully submitted,

Dated: April 29, 2022                        */s/ Elizabeth B. Murrill*

TYLER R. GREEN                         JEFF LANDRY
DANIEL SHAPIRO                     Attorney General
CONSOVOY MCCARTHY PLLC     ELIZABETH B. MURRILL
222 S. Main Street, 5th Floor        Solicitor General
Salt Lake City, UT 84101           JOSEPH S. ST. JOHN
(703) 243-9423                       Deputy Solicitor General
                                   LOUISIANA DEPARTMENT OF JUSTICE
                                   1885 N. Third Street
                                   Baton Rouge, LA 70804
                                   Tel: (225) 326-6766
                                   murrille@ag.louisiana.gov
                                   stjohnj@ag.louisiana.gov

                                   *Counsel for Plaintiff States*

OTHER COUNSEL:

STEVE MARSHALL
  Attorney General of Alabama
Edmund G. LaCour Jr.
  Solicitor General
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130
Tel: (334) 353-2196
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAg.gov
*Counsel for the State of Alabama*

TREG TAYLOR
  Attorney General of Alaska
Ronald W. Opsahl (Colo. Bar No. 35662)
  Assistant Attorney General
Alaska Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5100
Fax: (907) 276-3697
ron.opsahl@alaska.gov
*Counsel for the State of Alaska*

26

LESLIE RUTLEDGE
  Attorney General of Arkansas
Nicholas J. Bronni
  Solicitor General
Dylan L. Jacobs
  Assistant Solicitor General
Office of Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.bronni@arkansasag.gov
*Counsel for the State of Arkansas*

CHRISTOPHER M. CARR
  Attorney General of Georgia
Stephen Petrany
  Solicitor General
Office of the Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Counsel for the State of Georgia*

LYNN FITCH
  Attorney General of Mississippi
Krissy C. Nobile
  Deputy Solicitor General
State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
*Counsel for the State of Mississippi*

ERIC S. SCHMITT
  Attorney General of Missouri
Justin D. Smith
  Deputy Attorney General for Special
Litigation
Jeff P. Johnson
Michael E. Talent
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-0304

27

Fax: (573) 751-0774
Justin.Smith@ago.mo.gov
*Counsel for the State of Missouri*

AUSTIN KNUDSEN
  Attorney General of Montana
David M.S. Dewhirst
  Solicitor General
Montana Attorney General's Office
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
406.444.4145
david.dewhirst@mt.gov
*Counsel for the State of Montana*

DOUGLAS J. PETERSON
  Attorney General of Nebraska
James A. Campbell
  Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov
*Counsel for the State of Nebraska*

JOHN M. O'CONNOR
  Attorney General of Oklahoma
Bryan Cleveland
  Deputy Solicitor General
Oklahoma Office of Attorney General
313 N.E. 21ST Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
bryan.cleveland@oag.ok.gov
*Counsel for the State of Oklahoma*

KEN PAXTON
  Attorney General of Texas
Brent Webster
  First Assistant Attorney General
Judd E. Stone II
  Solicitor General
Patrick Sweeten
  Deputy Attorney General
Office of the Attorney General

P.O. Box 12548 (MC 009)
Austin, Texas 78711-2548
Tel.: (512) 463-4139
Fax: (512) 474-2697
Patrick.Sweeten@oag.texas.gov
Judd.Stone@oag.texas.gov
*Counsel for the State of Texas*

SEAN D. REYES
   Attorney General of Utah
Melissa A. Holyoak
   Solicitor General
Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(385) 271.2484
melissaholyoak@agutah.gov
*Counsel for the State of Utah*

PATRICK MORRISEY
   Attorney General of West Virginia
Lindsay S. See
   Solicitor General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(304) 558-2021
Lindsay.s.see@wvago.gov
*Counsel for the State of West Virginia*