**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| STATE OF LOUISIANA, ET AL. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.  2:21-cv-00778 |
| | ) | |
| v. | ) | |
| | ) | Honorable Judge Terry A. Doughty |
| JOSEPH R. BIDEN, JR., in his official capacity | ) | |
| as President of the United States, ET AL. | ) | Magistrate Judge Kathleen Kay |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 3

    I.      Statutory Background ................................................................... 3

          A.      Mineral Leasing Act (MLA)............................................. 3

          B.      The Outer Continental Shelf Lands Act (OCSLA).................................... 4

          C.      The National Environmental Policy Act (NEPA)........................................ 5

    II.     Factual Background ..................................................................... 5

THE STANDARDS OF REVIEW ........................................................................... 9

    I.      Judicial Review of Agency Action; the APA Standard .......................... 9

    II.     Summary Judgment as Applied to Review of Agency Actions............................. 9

    III.    The Permanent Injunction Standard................................................. 10

ARGUMENT .......................................................................................................... 11

    I.      The Court Cannot Enjoin The Executive Order. ................................... 11

          A.      The Executive Order Is Not Subject To APA Review. ........................... 11

          B.      The Executive Order Is Lawful......................................... 11

                1.     The Executive Order is facially lawful ......................... 11

                2.     The MLA provides the Secretary with discretion to delay leasing ......................................................... 12

                3.     OCSLA provides the Secretary with discretion to delay lease sales........................................................ 14

    II.     There Is No Agency "Pause" That The Court Can Review................................ 15

    III.    Plaintiffs' Challenge To Individual Leasing Postponements Fails...................... 17

          A.      Plaintiffs' challenges to individual MLA actions fail.............................. 17

          B.      Plaintiffs' challenges to individual OCSLA actions fail.......................... 18

    IV.    Plaintiffs Are Not Entitled To Any Relief ........................................... 21

A.      Plaintiffs have not met the burden to seek a permanent injunction .......... 21

B.      Plaintiffs are not entitled to nationwide relief ........................................... 22

C.      Plaintiffs are not entitled to compelled lease sales, future or past ............ 23

D.      Plaintiffs are not entitled to declaratory relief .......................................... 24

E.      Plaintiffs are not entitled to any other relief ............................................. 25

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Atieh v. Riordan*,
  727 F.3d 73 (1st Cir. 2013) ................................................................................. 9

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ............................................................................ 12

*Boquet Oyster House, Inc. v. United States*,
  2011 WL 5187292 (E.D. La. Oct. 31, 2011) ..................................................... 10

*Burns Ranches, Inc. v. U.S. Dep't of the Interior*,
  851 F. Supp. 2d 1267 (D. Or. 2011) ................................................................. 25

*By & Through Brown v. Watt*,
  712 F.2d 584 (D.C. Cir. 1983) .......................................................................... 19

*Center for Biological Diversity v. Department of Interior*,
  563 F.3d 466 (D.C. Cir. 2009) .......................................................................... 19

*Center for Sustainable Economy v. Jewell*,
  779 F.3d 588 (D.C. Cir. 2015) .......................................................................... 19

*Chamber of Commerce of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) .......................................................................... 11

*Common Cause v. Trump*,
  506 F. Supp. 3d 39 (D.D.C. 2020) .................................................................... 11

*Dalton v. Specter*,
  511 U.S. 462 (1994) ........................................................................ 11, 24, 25

*Dep't of Com. v. New York*,
  139 S. Ct. 2551 (2019) ...................................................................................... 16

*Department of Homeland Sec. v. New York*,
  140 S. Ct. 599. 600 (2020) ................................................................................ 23

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ................................................................................. 11, 24

*Friends of the Earth v. Haaland*,
  2022 WL 254526 (D.D.C. Jan. 27, 2022) ....................................................... 8, 9

*Girling Health Care v. Shalala*,
  85 F.3d 211 (5th Cir. 1996) .............................................................................. 23

*Goonsuwan v. Ashcroft*,
  252 F.3d 383 (5th Cir. 2001) .............................................................................. 9

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*,
  140 F. Supp. 3d 1123 (D.N.M. 2015) ......................................................... 24

*Jonibach Mgmt. Tr. v. Wartburg Enterprises, Inc.*,
  750 F.3d 486 (5th Cir. 2014) ................................................. 10, 21, 22

*Judulang v Holder*,
  565 U.S. 42 (2011) ....................................................................................... 9

*La. Pub. Serv. Comm'n v. FERC*,
  761 F.3d 540 (5th Cir. 2014) ..................................................................... 9

*Louisiana v. United States*,
   948 F.3d 317 (5th Cir. 2020) .................................................................. 24

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ................................................................................... 24

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ........................................................................... 10, 21

*Nat. Res. Def. Council, Inc. v. Hodel*,
  865 F.2d 288 (D.C. Cir. 1988) ................................................................... 4

*Norton v. S. Utah Wilderness, All.*,
  542 U.S. 55 (2004) ......................................................................... 9, 23, 24

*Opati v. Republic of Sudan*,
  140 S. Ct. 1601 (2020) .............................................................................. 12

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
  139 S. Ct. 1881 (2019) ................................................................................ 4

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ..................................................................................... 5

*Sabine River Auth. v. U.S. Dep't of Interior*,
  951 F.2d 669 (5th Cir. 1992) ................................................................... 10

*Secretary of the Interior v. California*,
  464 U.S. 312 (1984) ..................................................................................... 4

*Sierra Club v. Glickman*,
  67 F.3d 90 (5th Cir. 1995) .......................................................................... 9

*Smiley v. Citibank*,
  517 U.S. 735 (1996) ............................................................................ 18, 20

*Udall v. Tallman*,
  380 U.S. 1 (1965) ................................................................................ 12, 14

*United States ex rel. McLennan v. Wilbur*,
  283 U.S. 414 (1931) ................................................................................... 13

iv

*Western Energy Alliance v. Salazar*,
   709 F.3d 1040 (10th Cir. 2013) ............................................................. 14

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ............................................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................... 10

**Statutes**

30 U.S.C. § 226(a) ........................................................................ 3, 12, 13, 14

30 U.S.C. § 226(b)(1)(A) .................................................................. 3, 13, 14

42 U.S.C. §§ 4321 ...................................................................................... 5

43 U.S.C. § 1331 ........................................................................................ 4

43 U.S.C. § 1332(3) ................................................................................... 4

43 U.S.C. § 1337 ........................................................................................ 4

43 U.S.C. § 1337(a) ................................................................................... 4

43 U.S.C. § 1337(a)(8) .............................................................................. 6

43 U.S.C. § 1337(g) ................................................................................... 4

43 U.S.C. § 1344 ................................................................................. 14, 20

43 U.S.C. § 1344(a) ................................................................................... 4

43 U.S.C. § 1344(e) ................................................................................. 15

43 U.S.C. §§ 1331 ...................................................................................... 4

5 U.S.C. § 553 ......................................................................................... 11

5 U.S.C. § 702 ..................................................................................... 11, 25

5 U.S.C. § 706(1) .................................................................................... 23

5 U.S.C. § 706(2) ...................................................................................... 9

5 U.S.C. § 706(2)(A) ............................................................................... 11

5 U.S.C. §§ 701–706 ................................................................................. 9

*Omnibus Budget Reconciliation Act of 1987*,
   Pub. L. No. 101 Stat. 1330 (1987) .......................................................... 3

**Regulations**

85 Fed. Reg. 55,861 (Sept. 10, 2020) ......................................................... 6

85 Fed. Reg. 73,508 (Nov. 18, 2020) .......................................................... 6

86 Fed. Reg. 4,117 (Jan 15, 2021) ............................................................................... 6

86 Fed. Reg. 6,365 (Jan. 23, 2021) .............................................................................. 6

86 Fed. Reg. 7,619 (Feb. 1, 2021) ............................................................................... 5

**Other Authorities**

Executive Order 14,008 ................................................................................... passim

## INTRODUCTION

Defendants respectfully submit this Opposition to Plaintiffs' Motion for Summary Judgment (Mot.), Doc. 199. That Motion asks the Court to issue a sweeping, permanent, nationwide injunction that violates foundational statutory and constitutional constraints on judicial authority. The Court should deny that Motion because Plaintiffs' claims fail on the merits and Plaintiffs have not made the requisite equitable showing for such overbroad relief.

Plaintiffs' *ultra vires* challenge to Executive Order 14,008 ignores the entire history of how the Department of the Interior has managed its oil and gas leasing programs. In Section 208 of that Order, the President directed the Department of the Interior "to the extent consistent with applicable law" to pause oil and gas leasing pending a comprehensive review and reconsideration of those programs. Plaintiffs concede that courts cannot disregard that savings clause if there is any way to lawfully implement the Executive Order, and forty years of history demonstrates that the Executive Order can indeed be implemented in accordance with applicable law. Throughout its management of both leasing programs, Interior has regularly postponed or not held both offshore and onshore sales with substantial frequency—at rates of 44 and 73 percent, respectively, as explained below. Plaintiffs ask the Court unreasonably to construe two statutes to now mean that Interior has routinely violated the law for decades without anyone noticing. Plaintiffs' novel interpretation of those statutes is at odds with their text, judicial precedent, legislative history, and decades of consistent agency interpretation and practice.

Were the Court to adopt Plaintiffs' novel statutory construction, it would disrupt two well-established legal principles applicable to offshore leasing: that the Secretary has discretion to adjust the timing and execution of lease sales authorized under a Five-Year Program; and that Interior is therefore not required to complete lease-specific environmental reviews as part of the

five-year planning process.  Adopting Plaintiffs' view of the statute would undermine these well-settled ideas, thereby impeding offshore leasing going forward.

Plaintiffs' challenges to an agency "Pause" fare no better because the administrative record explicitly states that Interior had not adopted a blanket policy against leasing when Plaintiffs filed suit.  BLM_I002421 ("there's no blanket policy even with direction in the [Executive Order]").  Nor can Plaintiffs challenge a programmatic state comprising numerous individual agency actions, most of which occurred after Plaintiffs filed suit and are thus outside the Court's jurisdiction.  Because those numerous actions occurred over a period of eighteen months and have many different rationales—from complying with the National Environmental Policy Act (NEPA), to implementing Executive Order 14,008, to following a nationwide injunction, to responding to a lack of industry interest—the Court cannot group them together for programmatic review under the Administrative Procedure Act (APA), as explained more fully in Defendants' Memorandum in Support of Their Cross-Motion for Summary Judgment (Cross-Mot.), Doc. 209-1 at 15–18.

Plaintiffs' challenge to individual agency actions also fails because Plaintiffs do not engage with the agency's decision documents that are the basis for judicial review.  As to onshore actions, Plaintiffs' Memorandum in Support of their Motion (Mem.), Doc. 199-1, does not cite even a single page from the onshore administrative record dealing with any action taken under the current administration.  That administrative record reflects a reality that Plaintiffs want the Court to ignore—the Bureau of Land Management (BLM) under both the prior and current administrations was facing a significant litigation problem that would take "substantial time" to properly address.  BLM_I002701–02.  Given how Plaintiffs once contended BLM's documented NEPA concerns were mere pretext, the Court's preliminary ruling stated this contention would "need to be explored on the merits of this lawsuit."  Doc. 139 at 31.  But Plaintiffs have declined to do so.  Because no

court—including this Court—has ever held that BLM's lease sale decisions are exempt from NEPA, the Court should decline Plaintiffs' request to create an unprecedented exception.  As to offshore actions, Plaintiffs overlook that the Five-Year Program they purport to enforce explicitly contemplates that Interior could postpone or cancel proposed sales without formally revising the Program.

Even were the Court to find that Plaintiffs had prevailed on the merits, however, Plaintiffs' requested relief must still be denied because Plaintiffs make no effort to comply with the Supreme Court's mandatory four-factor test for permanent injunctive relief.  And Plaintiffs have no basis for obtaining nationwide relief, as the Fifth Circuit recently held in staying a nationwide injunction against a vaccine mandate.

## BACKGROUND

### I.    Statutory Background

#### A.    Mineral Leasing Act (MLA)

The MLA governs onshore lease sales of public land.  It provides that "[a]ll lands subject to disposition under [the statute] which are known or believed to contain oil or gas deposits *may* be leased by the Secretary."  30 U.S.C. § 226(a) (emphasis added).  In 1987, Congress amended the MLA to impose a number of new requirements regarding the means through which lease sales should be carried out.  *See* Pub. L. No. 100-203, tit. V, § 5102(a), 101 Stat. 1330 (1987). Among other things, Congress added a directive concerning the frequency of lease sales, providing that "[l]ease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary."  30 U.S.C. § 226(b)(1)(A).  Congress explained that its frequency directive was "[s]ubject to the Secretary's discretionary authority under [§ 226(a)] to make lands *available* for leasing."  H.R. Rep. No. 100-378 at 11 (1987) (emphasis added).

3

Consistent with that understanding, Interior has frequently exercised its discretion not to make any land available for leasing.  Defendants' Response to Plaintiffs' Statement of Material Facts (RSMF) ¶ 13.  For example, BLM did not offer any competitive MLA leases in each of the thirteen Plaintiff States during 73% of the quarters from 2017 to 2020.  *Id.*

### B.    The Outer Continental Shelf Lands Act (OCSLA)

The Outer Continental Shelf Lands Act of 1953 (OCSLA), 43 U.S.C. §§ 1331 *et seq.*, "gives the Federal Government complete 'jurisdiction, control, and power of disposition' over the" Outer Continental Shelf for purposes of energy production, *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1888–89 (2019), though the adjacent States receive a portion of the revenues received by the Federal Government, 43 U.S.C. § 1337(g)(2).  OCSLA provides for "expeditious and orderly development . . . subject to environmental safeguards."  43 U.S.C. § 1332(3).  It "sets only broad standards and leaves much to the Secretary's discretion in achieving its goals."  *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 302 (D.C. Cir. 1988).

OCSLA prescribes a four-stage process for development.  The first stage is the development of a five-year program, which includes a schedule of proposed lease sales.  43 U.S.C. § 1344(a).  OCSLA sets forth certain procedural requirements for the development of a five-year program, including consideration of suggestions from Governors of affected states as well as interested federal agencies, and submission of the program to Congress.  *Id.* § 1344(c)–(d).  The second stage consists of the actual lease sale planning process, when the Secretary decides whether and when to hold the individual lease sale and under what terms.  The sale involves the "solicitation of bids and the issuance of offshore leases," as specified in 43 U.S.C. § 1337(a).  But before a lease sale can take place, the "[r]equirements of the National Environmental Policy Act and the Endangered Species Act must be met," *Secretary of the Interior v. California*, 464 U.S. 312, 338 (1984), as well as a number of additional requirements, *see* 43 U.S.C. § 1337.

Although the five-year programs under OCSLA set out a number of planned areas and proposed years for which lease sales are scheduled, the schedule provides guideposts rather than rigid requirements.  Of the eight completed five-year programs—from 1980 to 2017—44% of the proposed sales have not been held as scheduled.  RSMF ¶ 2.

### C.    The National Environmental Policy Act (NEPA)

NEPA—the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*—is a procedural statute that requires federal agencies to consider the impacts of, and alternatives to, federal actions significantly affecting the environment.  It ensures that federal agencies take a "hard look" at the environmental consequences of their proposed actions before deciding to proceed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989).  Errors in NEPA analyses can result in lease sales being vacated or production being enjoined by a court.

## II.    Factual Background

*NEPA Decisions Through November 2020:* Before Executive Order 14,008 issued, BLM began work under the prior administration to prepare a stronger NEPA approach for analyzing greenhouse gases in response to court decisions beginning in 2019 and culminating in a November 2020 court decision.  Declaration of Susan Lee (Lee Decl.) ¶¶ 3–4, Doc. 186-5; BLM_I002701–04.  At that time, BLM recognized that this new NEPA approach "will require substantial time" to develop.  BLM_I002701–02.  BLM began work on its stronger NEPA approach around January 6, 2021, building from work initially done in May 2020.  Lee Decl. ¶¶ 3–4.

*Executive Order 14,008:* On January 27, 2021, the President issued Executive Order (EO) 14,008, which directs Interior to undertake a comprehensive review of federal oil and natural gas leasing, including royalty rates, while "[t]o the extent consistent with applicable law" pausing new oil and natural gas leases.  86 Fed. Reg. 7,619, 7624–25.

*Onshore Lease Postponements:* Facing significant NEPA challenges to its onshore leasing approach, Doc. 120-4 ¶¶ 3–6, BLM postponed six lease sales proposed for Q1 2021 based on NEPA compliance concerns in four separate decision documents, RSMF ¶ 18.  BLM also temporarily postponed a single, early Q2 2021 sale, while noting its "flexibility" to reschedule that sale to occur later in the quarter by June 2021, RSMF ¶ 18, as it expected "decisions on how the Department will implement the Executive Order . . . with respect to onshore sales . . . in the coming weeks," BLM_I001180.  But BLM explained at that time that "there's not a blanket policy even with direction in the EO," and thus reversed a lease sale postponement based on the "misinform[ed]" "'perception' that all future sales would be postponed."  BLM_I002421; RSMF ¶ 18.

*Offshore Lease Sales:* On November 18, 2020, BOEM published a proposed notice of Lease Sale 257.  85 Fed. Reg. 73,508.  BOEM then issued a record of decision on January 21, 2021, selecting its preferred alternative under NEPA.  86 Fed. Reg. 6,365.  BOEM, however, did not publish a Final Notice of Sale, which is a statutory prerequisite for any sale.  43 U.S.C. § 1337(a)(8).

With respect to Lease Sale 258, BOEM issued a notice of intent to prepare an environmental impact statement on September 10, 2020.  85 Fed. Reg. 55,861.  Also on September 10, 2020, BOEM issued a Call for Information and Nominations under OCSLA for Lease Sale 258, seeking nominations of leasing areas and comments from the public on issues to be considered.  *Id.* at 55,859.  On January 15, 2021, BOEM published a Notice of Availability of a draft environmental impact statement for Lease Sale 258 and opened a comment period scheduled to close March 1, 2021.  86 Fed. Reg. 4117.

Following the President's Executive Order, BOEM rescinded the record of decision for Lease Sale 257 "to comply with Executive Order 14008." 86 Fed. Reg. 10,132 (Feb. 18, 2021). BOEM stated, "[a]fter completion of the review specified in the Executive Order, BOEM may reevaluate [Gulf of Mexico] Lease Sale 257 and publish an appropriate [record of decision] in the Federal Register." *Id.* BOEM also canceled the public comment period for the Lease Sale 258 draft environmental impact statement. 86 Fed. Reg.  10,994 (Feb. 23, 2021).  BOEM indicated that it would publish a subsequent notice in the Federal Register if it decides to resume its NEPA evaluation following the Presidentially directed comprehensive review. *Id.*

*Preliminary Injunction:* On June 15, 2021, the Court preliminarily enjoined Interior from implementing the Pause directive of the Executive Order 14,008. Doc. 140. In the accompanying opinion, the Court noted that five onshore postponements—in Utah, Colorado, Montana/Dakotas, Eastern States and Wyoming—were explained on NEPA compliance grounds. Doc. 139 at 30–31 (citing PR 77, 79–84). The Court further stated that Plaintiffs' allegation that "the postponements based on an additional need for further environmental analysis is pretextual . . . will need to be explored on the merits of this lawsuit." *Id.* at 31. The Court noted that a sixth onshore postponement—in Nevada—did not provide a written rationale for the postponement. *Id.* at 30. Finally, the Court misquoted a decision about a single April sale in New Mexico as stating that "oil and gas lease sale<u>s</u> scheduled for April 2021 ha<u>ve</u> been postponed." Doc. 139 at 31 (quoting Doc. 120-6 at PR 86) (emphasized alterations added by the Court); *see also* RSMF ¶ 18 & n.7.

*Onshore Leasing Activity Following Preliminary Injunction:* As discussed *supra* 6, BLM had begun work on a stronger NEPA approach for its onshore leases before Executive Order 14,008 had issued. That work was completed around October 2021, Lee Decl. ¶¶ 3–4, when BLM published its <u>2020 BLM Specialist Report on Annual Greenhouse Gas Emissions and Climate</u>

Trends from Coal, Oil, and Gas Exploration and Development on the Federal Mineral Estate, BLM-Q3002462–2574.   This 113-page report contains substantial new data and analysis responsive to the November 2020 court decision.  *See id.*  BLM relied on that new approach to draft NEPA analyses for anticipated Q1 2022 lease sales, announcing that new NEPA approach, along with other NEPA changes, in an October 29, 2021 Fact Sheet.  Docs. 191, 191-1.

Six Plaintiff States then asked another court in this District to enjoin some of the NEPA changes announced in that Fact Sheet.  Doc. 191 at 2.  That court so enjoined BLM, thereby preventing BLM from proceeding with its previously anticipated Q1 2022 lease sales.  *Id.* at 2–3.  After the Fifth Circuit stayed that injunction, BLM noticed Q2 2022 lease sales in April, for lease sales scheduled for June 2022.  Doc. 198.

*Offshore Leasing Activity Following Preliminary Injunction:* On August 31, 2021 BOEM issued a new Record of Decision for Lease Sale 257, and on November 17, 2021 BOEM held Lease Sale 257.  *See* Mem. 9.  But on January 27, 2022, the United States District Court for the District of Columbia vacated BOEM's August 31, 2021 Record of the Decision for Lease Sale 257.  *Friends of the Earth v. Haaland*, 2022 WL 254526 (D.D.C. Jan. 27, 2022), *appeals filed* Nos. 22-5037, 22-5067 (D.C. Cir. Feb. 11 & Mar. 21, 2022).

BOEM also restarted the process to proceed with Lease Sale 258, but ultimately canceled that sale due to lack of industry interest.  On October 29, 2021, BOEM published in the Federal Register a notice of availability for a draft Environmental Impact Statement analyzing the potential environmental impacts of proposed Lease Sale 258.  86 Fed. Reg. 60,068.  This initiated a 45-day public comment period.  *See id.*  But BOEM did not receive any nominations or direct indications of interest from potential bidders.  *See* Sale 258 Status Update, https://www.boem.gov/oil-gas-

energy/leasing/sale-258-status-update.  Because of the lack of industry interest, and consistent with

prior BOEM practice in Alaska, BOEM decided not to proceed with Lease Sale 258.  *Id.*

## THE STANDARDS OF REVIEW

I.    **Judicial Review of Agency Action; the APA Standard**

The Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, governs judicial review

of agency actions.  Courts may "set aside" agency action that is arbitrary and capricious or contrary

to law.  5 U.S.C. § 706(2).  And courts may "compel" unreasonably delayed agency action.  *Id.*

§ 706(1).  Because judicial review is confined to "circumscribed, discrete agency actions,"

however, courts lack broader supervisory authority over agencies.  *Norton v. S. Utah Wilderness

All.*, 542 U.S. 55, 62 (2004).

APA review generally "involves neither discovery nor trial" because the "focal point of

APA review is the existing administrative record."  *Atieh v.  Riordan*, 727 F.3d 73, 76 (1st Cir.

2013); *accord Goonsuwan v. Ashcroft*, 252 F.3d 383, 391 n.15 (5th Cir. 2001).  A reviewing

court's role is to determine whether "the decision was based on a consideration of the relevant

factors and whether there has been a clear error of judgment."  *Judulang v.  Holder*, 565 U.S. 42,

53 (2011) (internal quotation marks and citation omitted).  Under this highly deferential standard,

agency actions are presumed to be valid.  *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 588 (5th

Cir. 2014).  The court must not "substitute its judgment for that of the agency as to which particular

features might be most desirable or efficacious."  *Sierra Club v. Glickman*, 67 F.3d 90, 97 (5th

Cir. 1995) (citation omitted).

II.    **Summary Judgment as Applied to Review of Agency Actions**

"Summary judgment is an appropriate procedure for resolving a challenge to a federal

agency's administrative decision when review is based on the administrative record even though

the [c]ourt does not apply the standard of review set forth in Rule 56."  *Boquet Oyster House, Inc.*

*v. United States*, No.  CIV.A. 09-3537, 2011 WL 5187292, at *4 (E.D. La. Oct. 31, 2011) (citations omitted).  Under these circumstances, "a motion for summary judgment 'stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the [c]ourt's review.'"  *Id.* (citations omitted).  As explained above, "the administrative agency is the fact finder.  Judicial review has the function of determining whether the administrative action is consistent with the law—that and no more."  *Girling Health Care. Inc. v.  Shalala*, 85 F.3d 211, 215 (5th Cir. 1996); *see also Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 679 (5th Cir. 1992) (in an APA case, "the district court's review pursuant to a summary judgment motion cannot turn on credibility determinations or conflicting factual inferences") (citation omitted).

## III.    The Permanent Injunction Standard

An injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted).  "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (reversing district court's permanent injunction).  Findings from the preliminary injunction stage are not binding at the permanent injunction stage.  *See, e.g.*, *Jonibach Mgmt. Tr. v. Wartburg Enterprises, Inc.*, 750 F.3d 486, 491 (5th Cir. 2014).

**ARGUMENT**

I.       **The Court Cannot Enjoin The Executive Order.**

         A.       **The Executive Order Is Not Subject To APA Review.**

Plaintiffs ask the Court to set aside the Executive Order for violating the APA's notice-and-comment procedures, Mem. 19 (citing 5 U.S.C. § 553), and judicial review standards, *id.* at 21 (citing 5 U.S.C. § 706(2)(A)).  But the President is not an agency, *see Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992), and therefore "actions of the President . . . are not reviewable under the APA," *Dalton v. Specter*, 511 U.S. 462, 470 (1994).  Instead, the text of the APA's judicial review provisions apply only to "agency" actions, not Presidential actions.  *See* 5 U.S.C. § 702, 706.  Thus, although final agency actions implementing Executive Order 14,008 may be subject to judicial review under the APA, *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996), the Executive Order itself is not.

Similarly, because the President is not an agency, he is not subject to the APA's notice and comment requirements for rulemaking.  As with the APA's judicial review provisions, the APA's notice and comment requirements apply only to "agency" action, not Presidential action.  *See* 5 U.S.C. § 553.  Plaintiffs' APA challenges to the Executive Order are thus non-justiciable and fail to state a claim upon which relief can be granted.

         B.       **The Executive Order Is Lawful**.

                  1.       The Executive Order is facially lawful.

Even if Plaintiffs' challenges to the Executive Order were justiciable, they would fail on the merits.  Courts "cannot ignore . . . unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing" presidential directives, such as that found in Executive Order 14,008.  *Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (three-judge court).  Here, Executive Order 14,008 contains precisely such a qualifier, directing the Secretary to pause leasing

11

only "to the extent consistent with applicable law."  That provision means that if the agency "may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law."  *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

At most, as Plaintiffs' concede, "a court may disregard a savings clause only where it provides no mechanism for an agency to actually implement the order consistent with law."  Mem. 12.  And Plaintiffs do not dispute that lease sales have regularly been postponed or not held for numerous reasons throughout the history of both programs.  *See* RSMF ¶ 2 (44% of proposed offshore sales have not been held during the eight completed five-year programs from 1980–2017); *id.* ¶ 13 (in 73% of the quarters from 2017 to 2020, BLM held no competitive MLA sale in each of the thirteen Plaintiff States).  Thus, Plaintiffs are in a double-bind: either *some* leasing postponements are lawful, or these programs have always been managed unlawfully by administrations of both parties (and no one noticed until now).  If any leasing postponements are lawful, then the Court cannot disregard the Savings Clause because there are ways to lawfully implement the EO.  As explained next, both onshore and offshore postponements can be lawful.

2.    The MLA provides the Secretary with discretion to delay leasing.

The MLA provides that "[a]ll lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits *may* be leased by the Secretary."  30 U.S.C. § 226(a) (emphasis added).  "[T]he word 'may' *clearly* connotes discretion."  *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1609 (2020) (quotation marks and citations omitted).  Consistent with that text, the Supreme Court has repeatedly affirmed the Secretary's discretion to decide against leasing.  *Udall v. Tallman*, 380 U.S. 1, 4 (1965) (holding the MLA "gave the Secretary of the Interior broad power to issue oil and gas leases on public lands" while giving "discretion to refuse

to issue any lease at all on a given tract"); *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 418–19 (1931) (because the MLA "goes no further than to empower the Secretary to execute leases," the Secretary has authority to issue a "general order" rejecting oil and gas applications "[i]n order to effectuate the conservation policy of the President").

Plaintiffs incorrectly claim that Congress tacitly rejected those Supreme Court decisions when it added the quarterly lease sale provision in 1987.  Mem. 18.  That provision states "[l]ease sales shall be held for each State *where eligible lands are available* at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary."  30 U.S.C. § 226(b)(1)(A) (emphasis added).  As Congress explained when adopting that provision, that frequency directive was "[s]ubject to the Secretary's discretionary authority under [§ 226(a)] to make lands *available* for leasing."  H.R. Rep. No. 100-378, at 11 (emphasis added).  Thus, Congress not only explained that § 226(b)(1)(A) is "[s]ubject to" § 226(a), it also explained that it was using the term "available" to refer to "the Secretary's discretionary authority."  *Id.*

Plaintiffs ask the Court to ignore Congress' own explanation of how these two statutory provisions interact, and instead engage in judicial policy-making by redefining "available" to exclude the Secretary's discretionary authority.  Plaintiffs, however, provide no evidence that Congress in 1987 sought to displace the Secretary's foundational authority to decide which lands should be leased.[1]  If Congress had so intended, it surely would have changed the key language in

---

[1] Plaintiffs incorrectly cite an excerpt from a 1989 memorandum for the proposition that Congress intended to displace the Secretary's discretion under § 226(a).  Mem. 18 (citing BLM_I000008– 9).  To the contrary, that memorandum expressly states that "Congress did not amend the grant of discretion in" § 226(a) because § 226(b)(1)(A)'s "competitive leasing provisions . . . retain[] Secretarial discretionary power to lease lands."  BLM_I00008.  On that basis, Interior "explained that 'available' lands are those statutorily open to leasing under the MLA, that have met other statutory requirements, and for which leasing is in the public interest," so that "available" referred to "eligible lands subject to leasing by exercise of discretion."  *Id.* ("nothing in the Reform Act or its legislative history indicates how many parcels must be included in a quarterly sale").

30 U.S.C. § 226(a) that the Supreme Court had construed, but it did not.  Moreover, as the Supreme Court has cautioned, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (citation omitted).  And other courts have rejected Plaintiffs' argument, holding that the "MLA, as amended by the Reform Act of 1987, continues to vest the Secretary with considerable discretion to determine which lands will be leased." *W. Energy All. v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013).

Tellingly, Plaintiffs themselves concede that the Secretary—not Congress—decides which lands are "available" to lease.  Mem. 18 (claiming that "BLM had already decided (or was almost finished deciding) which lands to lease").  Plaintiffs instead suggest that the Secretary's discretion to determine which lands to lease excludes the ability to decide against leasing any lands in a given State in a particular quarter.  *See id.* at 19.  Thus, according to Plaintiffs, the prior administration acted unlawfully at least 73% of the time.  *See* RSMF ¶ 13.  In five Plaintiff States, the prior administration held no competitive MLA sales from 2017–2020.  *Id.*  Plaintiffs suggest that an absence of lease sales in *all* States in a particular quarter requires a different result, but there is no textual basis in § 226(b)(1)(A) for such a nationwide construction.  *See* 30 U.S.C. § 226(b)(1)(A) ("[l]ease sales shall be held *for each State* where eligible lands are available at least quarterly") (emphasis added).

3.      OCSLA provides the Secretary with discretion to delay lease sales.

OCSLA provides for a five-year program that includes a list of proposed sales, but there is no basis for Plaintiffs' contention that the Secretary lacked discretion to pause proposed sales in the 2017–2022 Program.  43 U.S.C. § 1344.  OCLSA says no such thing.  And the Proposed Final Program (PFP) at issue here clarified that "inclusion of an area in the Proposed Final Program or an approved program . . . does not necessarily mean that a lease sale will be held in that area."

PFP § S.1, Doc. 199-3 at 15.  Instead, "throughout the implementation of the Five-Year Program, the Secretary has flexibility to re-evaluate the nation's energy needs and current market developments and can reduce or cancel lease offerings."  PFP § 6.2.5, Doc. 199-3 at 99; PFP § 6.5, Doc. 199-3 at 111 (identifying "prices, industry interest, [and] future policies" as reasons the Secretary may re-evaluate and limit leases within a program).  The very PFP that Plaintiffs purport to enforce, therefore, provided ample discretion for deferral or cancellation of lease sales, and thus ample room for Interior to implement the Executive Order consistent with law.

Even assuming the Secretary were required by OCSLA to hold all sales in a Five-Year Program, however, the statute provides that the Secretary "may revise and reapprove such program, at any time."  43 U.S.C. § 1344(e). Although certain revisions must occur in the "same manner" as the promulgation of the original program, this requirement does not apply to "a revision which is not significant."  *Id.*  Because the Secretary can indisputably revise the schedule by complying with relevant procedural requirements even for "significant" revisions, the Executive Order cannot be facially unlawful as it does not direct the Secretary to disregard those procedures.

## II.    There Is No Agency "Pause" That The Court Can Review.

Plaintiffs refer to the "Pause" to describe three very different things: the Executive Order (Mem. 6, 19); an allegedly unwritten, but singular, agency action establishing a blanket policy (Doc. 126 at 6); and a programmatic state in which lease sales have not been held for a period of time as a result of numerous individual actions (Mem. 15).  Defendants responded to Plaintiffs' first "Pause" meaning above, *supra* 11; Defendants respond to Plaintiffs' two other "Pause" meanings below.

*First*, Plaintiffs have no evidence that the agency had adopted an unwritten agency-wide "Pause" when they brought suit.  The onshore administrative record expressly states that, at the time Plaintiffs brought suit, "there[] [was] not a blanket policy even with direction in the EO,"

15

BLM_I002421, as Interior had not "yet rendered" decisions "on how the Department will implement the Executive Order . . . with respect to onshore sales," BLM_I001180.  When one BLM office independently postponed a lease sale based on its "'perception' that all future sales would be postponed," Interior reversed that postponement as being based on "misinformation," BLM_I002421; RSMF ¶ 18.  Had Interior already adopted an unwritten blanket policy against onshore leasing, its subsequent April 21, 2021 written decision not to hold Q2 2021 lease sales would have been superfluous.  And the Court has no jurisdiction over post-filing actions for reasons explained in Defendants' Cross-Motion for Summary Judgment.  Cross-Mot. 10–13.

Plaintiff's request that the Court review an unwritten, singular agency "Pause" improperly asks the Court to ignore the agency's stated reasons for acting.  Here, eight of the nine pre-filing postponements provide a stated rationale—five onshore postponements were based on NEPA concerns, one onshore postponement was a temporary decision to postpone an early Q2 sale pending forthcoming decisions about how the EO would be implemented onshore, and two offshore postponements were based on limited implementations of the Executive Order, rather than a blanket policy.[2]  RSMF ¶ 18.  The Court cannot ignore those stated reasons absent a "strong showing" that the agency's reasons were "contrived" instead of "genuine." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2574–76 (2019).  Plaintiffs have abandoned all attempts to make such a showing here.  *See generally* Mem.

*Second*, Plaintiffs' request that the Court review a programmatic state in which no lease sales have been held as a result of numerous individual decisions is a paradigmatic nonjusticiable

---

[2] The only pre-filing postponement that lacks a stated rationale—a January 25, 2021 postponement in Nevada—occurred before the Executive Order issued, and was similarly based on NEPA concerns.  RSMF ¶ 18.  Plaintiffs have no standing to challenge the Nevada postponement.  Cross-Mot. 13–14.

programmatic challenge rather than a justiciable challenge to a discrete, final agency action. The Court has no jurisdiction over such a programmatic challenge. *See* Cross-Mot. 15–18.

## III.    Plaintiffs' Challenge To Individual Leasing Postponements Fails.

### A.    Plaintiffs' challenges to individual MLA actions fail.

As the Court's preliminary injunction opinion recognized, five of seven challenged onshore postponements—for March sales in Colorado, Wyoming, Utah, Eastern States and Montana/Dakotas—were explained as being based on NEPA compliance concerns. Doc. 139 at 30–31. (In addition to those five, one additional onshore sale in Nevada also was postponed based on NEPA concerns. RSMF ¶ 18.) Plaintiffs all but ignore those NEPA rationales, erroneously claiming that BLM cancelled those sales "Relying Solely on the Pause." Mem. 8. Despite making that claim, Plaintiffs do not cite to a single onshore document created since the Executive Order issued; instead the only portion of any onshore administrative record they cite consists of just two pages from a 1989 memorandum.

Those NEPA-based postponements comply with the MLA because Congress expressly considered exempting onshore lease sales from NEPA, but declined to do so. When asked to explain how the Secretary exercised her discretion during the 1987 legislative process, Interior explained that it could decline to lease based on concerns about "compliance with NEPA protection of the environment." Ex. 1, Legislation to Reform the Federal Onshore Oil and Gas Leasing Program: Hearing on H.R. 933 and H.R. 2851, Before the H. Comm. on Interior and Insular Affairs, Ser. No. 100-11, 100th Cong. 66, 82–83 (1987) (Interior Hearing). And while the Senate initially sought to exempt lease sales from NEPA, S. Rep. No. 100-188 (1987), at 6, 49, the Senate receded from that position after conferencing with the House, H.R. Rep. No. 100-495, at 782 (1987). Plaintiffs do not present any serious statutory argument that BLM is required to proceed with lease sales before it has complied with the requirements of NEPA. *See* Mem. 18

(citing a 1989 memorandum as support for this proposition, while omitting that this memorandum expressly states "BLM may never include a parcel in a sale for which it has not completed its statutory requirements under laws such as the National Environmental Policy Act," BLM_I000009).  Because BLM has consistently interpreted its MLA obligations to accord with its NEPA obligations, the Court should not lightly upset such longstanding interpretations.  *Smiley v. Citibank*, 517 U.S. 735, 740 (1996) ("agency interpretations that are of long standing come before [a court] with a certain credential of reasonableness, since it is rare that error would long persist.").  As BLM cannot be legally required to violate NEPA, its NEPA-based postponements did not violate the MLA and were not arbitrary and capricious.

Turning to the only challenged postponement that was not based on NEPA compliance concerns, BLM opted to temporarily postpone a single, early Q2 2021 lease sale in New Mexico, when it had "flexibility" to reschedule that sale for later in the second-quarter.  RSMF ¶ 18.  Because that decision was not a final agency action, it is outside the Court's jurisdiction.  *See* Cross-Mot. 14–15.

### B.    Plaintiffs' challenges to individual OCSLA actions fail.

BOEM's rescission of the January 21, 2021 Record of Decision for Lease Sale 257 and cancellation of the Lease Sale 258 draft EIS comment period were not revisions of the Five-Year Program—or at least not significant revisions—for several reasons.  *First*, the Program itself explains that "[t]he inclusion of an area in the Proposed Final Program or an approved program . . . does not necessarily mean that a lease sale will be held in that area."  PFP § S.1, Doc. 199-3 at 15.  The decision to hold a lease sale is not made at the Program stage, but is instead part of the subsequent lease-sale stage of the OCSLA process.  And, as discussed above, the PFP recognized the Secretary's flexibility to re-evaluate the nation's energy needs and market developments, and to reduce or cancel lease offerings based on various policy considerations.  *See* PFP § 6.2.5, Doc.

199-3 at 99; PFP § 6.5, Doc. 199-3 at 111.  The decisions taken with respect to Lease Sales 257 and 258 were thus consistent with the 2017–2022 Program, not revisions thereto.

Plaintiffs misunderstand OCSLA's structure when they assert the government is creating an "extratextual distinction . . . between holding an *additional* lease sale and cancelling an *existing* lease sale [to] establish a one-way ratchet."  Mem. 15.  The very program that Plaintiffs purport to enforce explains that it errs on the side of being over-inclusive with lease sales *because* adding a sale is a significant change while cancelling a sale is not:

> Should conditions warrant the need for energy production from areas not on the approved schedule of proposed lease sales, absent new legislation, the multi-year process of preparing a new Five-Year OCS Leasing Program must be undertaken, and it would take years before new lease sales could be held and leases awarded. . . . Conversely, if the United States need for oil and/or gas declines relative to supply, the USDOI can respond fairly quickly by cancelling or limiting lease sales. . . .

PFP § 6.2.6.1, Doc. 199-3 at 100-01.  What Plaintiffs dismiss as a "one-way ratchet," courts have recognized as an intentional "pyramidic" structure.  *See State of Cal. By & Through Brown v. Watt*, 712 F.2d 584, 588 (D.C. Cir. 1983) (explaining that the OCSLA "process is 'pyramidic in structure, proceeding from broad-based planning to an increasingly narrower focus['] . . .  Thus, while an area excluded from the leasing program cannot be leased, explored, or developed, an area included in the program may be excluded at a latter stage").

In asking the Court to reject OCSLA's pyramidic structure, Plaintiffs would make it substantially more difficult to adopt the next five-year program.  The D.C. Circuit—which has exclusive jurisdiction over challenges to five-year programs—has held that NEPA challenges are not ripe when the program issues because at that time "no irreversible and irretrievable commitment of resources has been made," *Ctr. for Sustainable Economy v. Jewell*, 779 F.3d 588, 599 (D.C. Cir. 2015), as "the completion of the first stage of a leasing program . . . does not require any action," *Ctr. for Biological Diversity v. Department of Interior*, 563 F.3d 466, 483 (D.C. Cir.

2009).  Plaintiffs nonetheless ask this Court to hold that completing the leasing program *does* require action, by specifically requiring BOEM to hold all of the proposed sales.  If Plaintiffs' interpretation were correct, it would undermine the D.C. Circuit's basis for holding in *Center for Biological Diversity* that no enforceable NEPA duty arises when a five year program takes effect, and that no NEPA challenge can be ripe at that stage.

*Second*, even if the decision to not hold a lease sale constitutes a revision, it is not a significant revision.  The Secretary has consistently interpreted OCSLA for over forty years so that postponing or cancelling a proposed lease sale did not constitute a significant revision.  Just two years after Congress added the five-year program provision to OCSLA, the Solicitor of the Interior issued a memorandum interpreting OCSLA to grant the Secretary discretion to decide when a delay or cancellation of a lease constitutes a "significant" revision, and further explained that the Secretary has "considerable discretion to determine whether the deletion, delay or advancement of sales or milestones within an approved 5-year program is significant or not." *Annual Review, Revision and Reapproval of 5-Year OCS Oil and Gas Leasing Programs*, M-36932, 88 I.D. 20, 23 (Jan. 5, 1981).  The Solicitor reiterated that position in 1996, although noting that *adding* any new lease sales to the schedule would necessarily be "significant." *What are Significant Revisions in the Five-Year Outer Continental Shelf (OCS) Oil and Gas Leasing Program*, M-36983 at 4 (Feb. 12, 1996).  Consistent with that long-standing interpretation, Interior has not held 44% of the proposed lease sales as scheduled in the eight completed five-year programs from 1980 to 2017.  RSMF ¶ 2.  Because Interior did not conclude that any of these delays or cancellations amounted to a significant revision of the applicable program, *none* were accomplished through a formal revision to the program under 43 U.S.C. § 1344.  *Id.*  The Court should not upset that longstanding interpretation.  *Smiley*, 517 U.S. at 740.

*Third*, the size of the lease sale does not change the Secretary's authority.  *Every* sale proposed in the 2017–2022 Program was proposed as a region-wide sale, which the Program explicitly acknowledged was a new approach that the Secretary could change at the lease sale stage—including by not holding sales—within the parameters of the program.  PFP § S.2.1, Doc. 199-3 at 19 ("any individual sale could be scaled back during the pre-lease sale process to conform more closely to the traditional separate planning area model or, as one industry commenter suggested, only one region-wide sale a year could be held").

## IV.    Plaintiffs Are Not Entitled To Any Relief.

### A.    Plaintiffs have not met the burden to seek a permanent injunction.

As explained *supra* 10, the Supreme Court has established a strict four-factor test for permanent injunctive relief that requires, *inter alia*, balancing Plaintiffs' showing of irreparable harm against harm to Defendants and the public interest.  *Monsanto*, 561 U.S. at 156–57.  Plaintiffs have made no attempt to carry their burden under that four-factor test, and thus are not entitled to a permanent injunction.

To the extent Plaintiffs attempt to rely on their preliminary injunction showing, that approach fails for two reasons.  *First*, preliminary injunction rulings are not binding at later stages of the case.  *Jonibach Mgmt.*, 750 F.3d at 491.

*Second*, Plaintiffs' evidentiary showing at the preliminary injunction stage is obsolete and counterfactual.  At the preliminary stage, Plaintiffs claimed that a leasing moratorium would decrease onshore oil and gas production in the Permian Basin, but that claim is not substantiated. Declaration of James Tichenor ¶ 10.  Similarly, Plaintiffs initially claimed that a leasing moratorium would cause the loss of thousands of oil and gas jobs, but that too is false.  *Id.* Additionally, Plaintiffs predicted substantial investment, production, and revenue declines based on an unreproducible well spudding model predicting a 62% decline in onshore well spudding

activity in the first year of an onshore leasing moratorium. *Id.* ¶¶ 6–7. But BLM's well spudding data shows otherwise. *Id.* ¶¶ 7–8; *see also id.* ¶ 5 (disproving predicted production declines). In sum, many of Plaintiffs' year-old predictions have turned out to be counterfactual. As a result, Plaintiffs' failure to address, let alone consider, the intervening data demonstrates that it has failed to carry its burden to prove irreparable harm.

Because Plaintiff has made no effort to address the relevant equitable factors in its opening brief, despite bearing the burden to do so, Defendants expressly reserve the right to make a full, responsive evidentiary showing in a future filing, should Plaintiffs attempt to make a belated evidentiary showing.

### B.    Plaintiffs are not entitled to nationwide relief.

"[N]ationwide injunctions have not been good for the rule of law." *Arizona v. Biden*, 31 F.4th 469, 485 (6th Cir. 2022) (C.J. Sutton, concurring). As the Fifth Circuit recently held, "[p]rinciples of judicial restraint" counsel against allowing "one district court [to] make a binding judgment for the entire country" when "many states . . . have not brought suit" and "[o]ther courts are considering these same issues." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (staying this Court's nationwide injunction against a vaccine mandate to the extent it applied outside the plaintiff states).

So too here. Thirty-five other States have not brought suit, suggesting they "may well have accepted and even endorsed" the challenged actions. *Id.* Two other courts are currently considering similar challenges to onshore actions. *See W. Energy All. v. Biden*, No. 21-cv-13 (D. Wyo.); *North Dakota v. Dep't of Interior*, No. 21-cv-148 (D.N.D.). Because similar questions are "currently being litigated throughout the country," "ultimate resolution [of these issues] will benefit from 'the airing of competing views' in" sister courts. *Louisiana*, 20 F.4th at 264 (quoting

*Department of Homeland Sec. v. New York*, —— U.S. ——, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in the grant of a stay)).

Although this Court issued nationwide preliminary relief, its nearly identical rationale for doing so in *Louisiana v. Becerra* was specifically rejected by the Fifth Circuit as inapplicable outside the immigration context. *Id.* at 263 ("That justification existed in *Texas* because of the constitutional command for 'uniform' immigration laws and a concern that 'a geographically-limited injunction would be ineffective because DAPA beneficiaries would be free to move among states.").  Similarly here, there is no constitutional basis for a uniform approach to oil and gas leasing.  BLM manages widely varying amounts of mineral estate in different States, from zero acres in some States to over 200 million acres in Alaska.  Declaration of Peter Cowan ¶ 9.  Given that variance, there is no reasoned basis for a uniform, nationwide approach.

Further, Plaintiffs have not shown that they will be irreparably harmed by leasing postponements in other States, such as Nevada or Colorado, that have declined to bring suit.  Because Plaintiffs have no entitlement to leasing revenues from lands in those States, there is no basis for a nationwide injunction.

### C.    Plaintiffs are not entitled to compelled lease sales, future or past.

On the last page of their brief, Plaintiffs ask the Court to "compel agency action unlawfully withheld or unreasonably delayed." Mem. 25 (quoting 5 U.S.C. § 706(1)).  But nothing in Section 706(1) allows a plaintiff to obtain programmatic judicial review of *anticipated* delays pertaining to *future* deadlines, much less authorizes injunctive relief on that basis.  Rather, the Supreme Court has explained that a "claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).  In so holding, the Supreme Court excluded both (1) programmatic delay claims and (2) anticipatory delay claims relating to failures that have not yet occurred,

premised on legal duties that have not yet ripened.  *See id.*; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990) (holding that challenges involving agency "actions yet to be taken . . . cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects" a plaintiff).  Because the APA does not authorize judicial review of programmatic and anticipatory unreasonable delay claims, there can be no basis for an injunction forever compelling future lease sales based on anticipated delay.

Nor can the Court compel lease sales by enjoining future delays, as Plaintiffs request.  *See* Doc. 199-12.  Plaintiffs cannot side-step *Norton*'s foundational limits on when courts can compel agency action by asking the Court to set aside inaction through an order "enjoin[ing] the Pause." *Louisiana v. United States*, 948 F.3d 317, 323 (5th Cir. 2020) ("seek[ing] to compel the [agency] to act in accordance with law. . . implicates a different section of the APA, § 706(1)"); *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123, 1197 (D.N.M. 2015) ("The only way to 'set aside' a failure to act is to compel agency action, however, which is the relief that § 706(1) provides." (citing *Norton*, 542 U.S. at 61–62)); *see also Norton*, 542 U.S. at 63 ("A 'failure to act' is . . . . simply the omission of an action without formally rejecting a request—for example, the failure to . . . take some decision by a statutory deadline.").

### D.   Plaintiffs are not entitled to declaratory relief.

Finally, Plaintiffs are not entitled to their requested declaration that the Executive Order is unlawful.  *See* Doc. 199-12.  Plaintiffs have not alleged that the President has violated his constitutional authority; nor could they given the President's constitutional authority to supervise the Executive Branch.  And "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review under the" exception for suits challenging *ultra vires* actions recognized in *Franklin*, 505 U.S. at 801.  *Dalton*, 511 U.S. at 473. Further, as explained *supra* 11-15, the Executive Order is both facially and substantively lawful.

Because the President has not violated any statutory authority, but instead merely instructed the Secretary of the Interior how to exercise her congressionally delegated authority to manage the public lands "to the extent consistent with applicable law," there is no lawful basis for *ultra vires* review of the Executive Order. *See id.* at 472-73.

Additionally, the Court lacks jurisdiction to issue a freestanding declaratory judgment about agency authority under OCSLA and the MLA because Congress has not waived sovereign immunity to such claims. *Burns Ranches, Inc. v. U.S. Dep't of the Interior*, 851 F. Supp. 2d 1267, 1270 (D. Or. 2011) ("The fact that a court may grant declaratory relief against any type of defendant in a case otherwise within the court's jurisdiction does not imply, let alone expressly state, that the United States has waived its immunity for all declaratory relief claims."). Instead, the only waiver of sovereign immunity conceivably applicable to Plaintiffs' case is the waiver of sovereign immunity in the APA, which is expressly limited to agency actions. 5 U.S.C. § 702. Thus, while the Court has jurisdiction to hold unlawful a specific, discrete, final agency action based upon reviewing an administrative record, Congress has not issued a broader waiver of sovereign immunity for declaratory relief against the United States divorced from an agency action. *Burns Ranches*, 851 F. Supp. 2d at 1270–71 (collecting cases throughout the country).

### E.     Plaintiffs are not entitled to any other relief.

Plaintiffs' Motion last requests that the Court grant other relief including attorneys' fees and costs. Mot. 2. Because Plaintiffs have not briefed the basis for any such relief, the Court cannot grant the requested relief.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment.

Respectfully submitted this 13th day of June, 2022.

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S.  Department of Justice

*/s/ Michael S. Sawyer*
THOMAS W.  PORTS, JR.
MICHAEL S.  SAWYER
Trial Attorneys, Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C.  20044-7611
Telephone:      (202) 305-5492 (Ports)
                        (202) 514-5273 (Sawyer)
Fax:               (202) 305-0506
Email:            Thomas.Ports.Jr@usdoj.gov
                        Michael.Sawyer@usdoj.gov

*Counsel for Defendants*

26