**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| STATE OF LOUISIANA, ET AL. | |
| Plaintiffs, | Case No. 2:21-cv-00778 |
| v. | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, ET AL. | Honorable Judge Terry A. Doughty |
| | Magistrate Judge Kathleen Kay |
| Defendants. | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS AND STATEMENT OF MATERIAL FACTS**

In accordance with Local Rule 56.1, Defendants respectfully submit this Response to Plaintiffs' Statement of Material Facts (Pls.' SMF), Doc. 199-11, and Statement of Material Facts in support of Defendants' Cross-Motion for Summary Judgment.  The first twenty-two enumerated responses below correspond to the respective paragraphs in Plaintiffs' Statement of Material Facts. The remaining paragraphs provide Defendants' Statement of Material Facts in support of their Cross-Motion for Summary Judgment.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

1.      Disputed as phrased.  In the Outer Continental Shelf Lands Act, 43 U.S.C. §§1331 et seq., Congress did not "direct[] the Executive Branch to lease parcels of the Outer Continental Shelf."  Pls.' SMF ¶ 1.  Rather, in its statement of purpose, Congress provided that the Outer Continental Shelf "should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs."  43 U.S.C. § 1332(3).

OCSLA prescribes a four-stage process for any oil or gas development on the Outer Continental Shelf.  The first stage is the development of a five-year program, which includes a

1

schedule of proposed lease sales.  § 1344(a).  The second stage is the lease sale.  § 1337.  At the lease sale stage, the Department of the Interior (Interior) chooses whether and when to hold a sale, which lease blocks to offer in any sale, and the terms of the sale.  § 1337(a)(1).  The Secretary is "authorized" to grant leases "to the highest responsible qualified bidder."  *Id.*  The third and fourth stages deal with post-leasing exploration and production.

2. The 2017–2022 Five Year Oil and Gas Leasing Program is in effect until June 30, 2022.  OCSLA does not require lease sales to occur on any particular date, *see* 43 U.S.C. § 1337 (governing lease sales), nor does it require that agencies proceed with lease sales proposed in the Five Year Program, *see* § 1344 (directing the Secretary to prepare and periodically revise a schedule of "proposed" lease sales).

Including the five-year program currently in force, there have been nine programs submitted to Congress.  *See Congressional Research Service, Five- Year Program for Offshore Oil and Gas Leasing: History and Program for 2017- 2022*, at 9–10 (Aug. 23, 2019), https://fas.org/sgp/crs/misc/R44504.pdf.  All of them have scheduled more lease sales than have actually occurred, sometimes many more, as set forth in the below table:

**Table 1. OCSLA Five-Year Programs Submitted to Congress Since 1980**

| Years | Administration Submitting Plan | Congress | Number of Sales Listed in Submission | Number of Sales Held | Approximate Acres Leased (in millions)[a] |
|---|---|---|---|---|---|
| 2017-2022 | Obama | 114th | 11 | 4 (through July 2019) | 3.3[b] (through July 2019) |
| 2012-2017 | Obama | 112th | 15 | 13 | 7.4 |
| 2007-2012[c] | Obama / G. W. Bush[c] | 111th / 110th | 16 / 21[c] | 11 | 21.7 |
| 2002-2007 | G. W. Bush | 107th | 20 | 15 | 20.5 |
| 1997-2002 | Clinton | 105th | 16 | 12 | 22.9 |
| 1992-1997 | G. H. W. Bush | 102nd | 18 | 12 | 22.6 |
| 1987-1992 | Reagan | 100th | 42 | 17 | 24.7 |
| 1982-1987 | Reagan | 97th | 41 | 23 | 21.0 |
| 1980-1982[d] | Carter | 96th | 36 | 12 | 4.1 |

**Source:** CRS.

a. Acreage leased is shown in BOEM, OCS Lease Sale Statistics, "All Lease Offerings," at http://www.boem.gov/OCS-Lease-Sale-Statistics-All-Lease-Offerings/.

b. The acreage total reflects *acres leased* for three of the sales (lease sales 249, 250, and 251) but *acres bid on* for one sale (lease sale 252), because acres leased were not yet available. Not all acres bid on are necessarily leased.

c. The George W. Bush Administration developed the original program for 2007-2012 and submitted it to the 110th Congress with a lease schedule containing 21 sales. Following a court order in 2009, DOI revised the program under the Obama Administration and resubmitted it to the 111th Congress with a revised lease schedule containing 16 sales.

d. This program was originally referred to as the Comprehensive Program 1980-1985, but the covered years were changed to 1980-1982 due mainly to judicial activity. *California v. Watt*, 688 F.2d 1290 (D.C. Cir. 1981).

*Id.* Out of the eight completed programs from 1980 to 2017, Interior held only 56% of the proposed sales as scheduled. *See id.* (showing that Interior held only 115 out of 204[1] scheduled sales from 1980 to 2017). The remaining 44% of proposed sales—89 sales—were not held as scheduled. *See id.* Because Interior did not conclude that any of those 89 delays or cancellations amounted to a significant revision of the applicable program, none were accomplished through a formal revision to the program under 43 U.S.C. § 1344.

---

[1] This excludes the five sales that were removed following a court order in 2009.

3.      Defendants do not dispute that the process of creating the 2017–2022 Five Year Oil and Gas Leasing Program began in 2014, or that BOEM received over 500,000 comments in response to its request for information.  Defendants dispute that the receipt of these comments "discharg[ed] [BOEM's] obligations under OCSLA . . . in making its leasing decisions."  Pls.' SMF ¶ 3.  The 2014 request for information and the comments received in response are part of the first stage in OCSLA's four-stage process.  *See* 43 U.S.C. § 1344(a).  BOEM does not "mak[e] its leasing decisions," Pls.' SMF ¶ 3, until the second stage of OCSLA's four-stage process, *see* 43 U.S.C. § 1337.  At the second stage, Interior chooses whether and when to hold a sale, which lease blocks to offer in any sale, the terms of the sale, and whether to issue any leases. § 1337(a)(1).  The 2017–2022 Five Year Oil and Gas Leasing Proposed Final Program (PFP) itself recognizes that the OCSLA lease sale stage occurs after approval of the Program.  *See* PFP § 1.5, Doc. 199-3 at 41-42.  Although "[n]o lease sale area can be offered that is not included in the area identified in the approved Program," the Program does not require that any proposed sale actually occur but instead outlines how BOEM will collect additional information during the lease sale phase as part of making the decision whether to proceed with any sale and under what terms and whether to issue any lease.  *See id.*; *see also infra* ¶ 6 (explaining that the Program itself does not purport to schedule any sale, but repeatedly states that the Secretary may limit, cancel, or otherwise reconsider proposed sales at the subsequent lease sale stage).

4.      Undisputed.

5.      Undisputed.

6.      Defendants do not dispute that BOEM published the PFP in November 2016. Defendants dispute that "[in the 2017–2022 Proposed Final Program], the Secretary determined which areas to include in the lease sales."  Pls.' SMF ¶ 6. Explicitly contradicting Plaintiffs'

assertion that the approved PFP requires 10 region-wide sales in the Gulf of Mexico, the PFP states "any individual sale could be scaled back during the pre-lease sale process to conform more closely to the traditional separate planning area model or, as one industry commenter suggested, only one region-wide sale a year could be held." PFP § S.2.1, Doc. 199-3 at 19.

By its own terms, the PFP provides that "within the five-year life of the Program, the Secretary has the authority to limit the number of sales or areas available for lease for many reasons, which allows her to re-evaluate the specific decisions once new information is available (e.g., prices, industry interest, future policies)." PFP § 6.5, Doc. 199-3 at 111. It repeatedly states the Secretary can "scale[] back," "re-evaluate," "reduce," or "cancel" sales at the lease sale stage while complying with and implementing the approved PFP. *E.g.*, PFP § 4.2.4.1, Doc. 199-3 at 65 ("any individual sale could be scaled back during the pre-lease sale process to conform more closely to the traditional separate planning area model should circumstances warrant"); PFP § 6.2.5, Doc. 199-3 at 99 ("throughout the implementation of the Five-Year Program, the Secretary has flexibility to re-evaluate the nation's energy needs and current market developments and can reduce or cancel lease offerings"); PFP § 6.2.6.1, Doc. 199-3 at 101 ("Lease sales can be cancelled . . . .").

The PFP further recognizes that OCSLA's pyramidic multi-stage structure counsels in favor of scheduling more and bigger potential sales because the Secretary can limit, cancel, or otherwise re-evaluate whether to hold lease sales later, even after the Program is approved:

> The discussion of uncertainties and option value must always consider the pyramidal structure of the Program development and lease sale processes. The program development process begins by considering all leasing areas, and the potential areas are winnowed down into what is ultimately the final lease sale schedule. Program areas can be removed at any stage of the Program development process, but cannot be added back in once they are removed. Further, the Secretary has the flexibility to cancel a sale even after the Program is approved. Given these procedures, to maintain the maximum option value, USDOI may consider retaining

5

> Program Options in the Program in order to potentially hold sales in these areas during the next 5 years, should some of the independent information become available.  Theoretically omitting any area from the Program could cause a loss of option value to the Government.  USDOI retains the greatest flexibility, and therefore option value, by including areas in the Program . . . .

PFP § 10.1.1.2, Doc. 199-3 at 162.  Specifically regarding uncertainty surrounding environmental and social costs, the PFP notes that "[b]ecause the process from Program development to lease sale contains multiple steps, BOEM has several opportunities to incorporate new information and revise decisions."  PFP § 10.1.1.5, Doc. 199-3 at 168.  The PFP even directs that "any renewable energy leasing" would need to be "coordinated during the later stages of BOEM's oil and gas leasing process (e.g., [the] lease sale . . . stage)."  PFP § 6.6.2.1, Doc. 199-3 at 115-16.

The PFP also cites the greater flexibility to remove lease sales in the context of potential changes to oil and gas demand,[2] and explicitly contrasts the ease of cancelling or limiting sales with the "multi-year process of preparing a new Five-Year OCS Leasing Program":

> Should conditions warrant the need for energy production from areas not on the approved schedule of proposed lease sales, absent new legislation, the multi-year process of preparing a new Five-Year OCS Leasing Program must be undertaken, and it would take years before new lease sales could be held and leases awarded. . . . Conversely, if the United States need for oil and/or gas declines relative to supply, the USDOI can respond fairly quickly by cancelling or limiting lease sales . . . .

PFP 6.2.6.1, Doc. 199-3 at 100.  The PFP is clear:  "throughout the implementation of the Five-Year Program, the Secretary has the flexibility to re-evaluate the nation's energy needs and current market developments and can reduce or cancel lease offerings."  Program § 6.2.5, Doc. 199-3 at

---

[2] This is so even though the PFP recognizes "[g]iven the nature of offshore oil and gas development, the OCS cannot provide resources to quickly mitigate the effects of national energy emergencies, such as a large portion of the world's oil supply being taken offline."  PFP § 6.2.6.1, Doc. 199-3 at 100.

99. Once again, the PFP suggests an over-inclusive approach to scheduling proposed sales because sales proposed in the approved PFP can be cancelled and re-evaluated without going through the program approval or revision process.

7.      Defendants do not dispute that the Secretary approved the PFP on January 17, 2017. For the reasons explained in Paragraph 6, Defendants dispute any assertion or suggestion by Plaintiffs that the PFP required Interior to hold any particular sale, required Interior to do so on any particular date, required Interior to offer any particular area for lease, prohibited the Secretary from otherwise reviewing and reconsidering any sales at the lease sale stage, or required the Secretary to proceed with proposed sales during the pendency of any review and reconsideration.

8.      Defendants do not dispute that Lease Sales 257 and 258 were proposed lease sales included in the approved PFP.  For the reasons explained in Paragraph 6, Defendants dispute any assertion or suggestion by Plaintiffs that the PFP required Interior to hold any particular sale, required Interior to do so on any particular date, required Interior to offer any particular area for lease, prohibited the Secretary from otherwise reviewing and reconsidering any sales at the lease sale stage, or required the Secretary to proceed with proposed sales during the pendency of any review and reconsideration.

9.      Defendants do not dispute that BOEM published a Proposed Notice of Sale for Lease Sale 257 in November 2020, sent the Proposed Notice of Sale to certain Governors, and opened the Proposed Notice of Sale for comment.  Notably, BOEM sent the Proposed Notice of Sale to the Governors of certain Plaintiff States.  But the Plaintiff State governors did not submit any comment on the Proposed Notice of Sale or the potential timing of Lease Sale 257.  For the reasons explained in Paragraph 6, Defendants dispute any assertion or suggestion by Plaintiffs that the Program required Interior to hold any particular sale, required Interior to do so on any particular

7

date, required Interior to offer any particular area for lease, prohibited the Secretary from otherwise reviewing and reconsidering any sales at the lease sale stage, or required the Secretary to proceed with proposed sales during the pendency of any review and reconsideration.

10.    Defendants do not dispute that the Secretary approved the Proposed Notice of Sale in a Record of Decision published January 21, 2021 and do not dispute that the Record of Decision reflected Interior's decision at the time it was signed.  Defendants do not dispute that the January 21, 2021 Record of Decision relied on the Gulf of Mexico Outer Continental Shelf Lease Sale: Final Supplemental Impact Statement, among other NEPA documents.  Defendants dispute any suggestion that the approval of a Proposed Notice of Sale in a Record of Decision—a NEPA document—is the same as publishing a Final Notice of Sale, which Final Notice of Sale is a separate step required by OCSLA if the Secretary proceeds with a lease sale.  *See* 43 U.S.C. 1337(a)(8).

11.    Defendants dispute that "Lease Sale 257 was formally scheduled for March 17, 2021," Pls.' SMF ¶ 11, because a Final Notice of Sale was never published.  BOEM must publish a Final Notice of Sale at least 30 days before any lease sale can be held.  30 C.F.R. § 556.308.  In contrast to a final notice of sale, the January 21, 2021 Record of Decision for Lease Sale 257 was a NEPA document that only stated Interior's intent at the time it was signed.  At the time Interior rescinded the January 21, 2021 Record of Decision it was less than 30 days from March 17, 2021 and it would have been legally impossible for the sale to proceed on that date.  *See* 86 Fed. Reg. 10132 (Feb. 18, 2021).

12.    Defendants do not dispute that in September 2020 BOEM published a call for Information and Nominations in the Federal Register, nor that BOEM issued a Notice of Intent to Prepare an EIS.  Defendants further do not dispute that in January 2021 BOEM published a Notice

8

of Availability of a Draft EIS regarding potential Lease Sale 258 in Cook Inlet, Alaska.  These are parts of the NEPA process undertaken during OCSLA's second stage, the lease sale stage, during which Interior decides whether and when to hold a lease sale.  For this reason, and the reasons explained in Paragraph 6, Defendants dispute any assertion or suggestion by Plaintiffs that the Program required Interior to hold any particular sale, required Interior to do so on any particular date, required Interior to offer any particular area for lease, prohibited the Secretary from otherwise reviewing and reconsidering any sales at the lease sale stage, or required the Secretary to proceed with proposed sales during the pendency of any review and reconsideration, or required the Secretary to proceed with any particular NEPA process during the pendency of a review and reconsideration.

13.     Disputed.  Although the Federal Government owns onshore mineral estate that can be made available for oil and gas production, Congress has also directed the Secretary of the Interior to manage the public lands for "multiple use and sustained yield," 43 U.S.C. § 1701(a)(7), which means, in relevant part "the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of

9

the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output," 43 U.S.C. § 1702(c).  On that basis, Defendants deny that any particular lands are deemed "energy-producing," as Plaintiffs claim (Doc. 199-11 ¶ 13), prior to a determination of the Secretary of the Interior to make those lands eligible and available for such energy development.

Congress has determined that the Secretary of the Interior—not Congress—makes land "available" for leasing and subsequent development under the Mineral Leasing Act of 1920 (MLA), 30 U.S.C. §§ 181–287.  The MLA "gave the Secretary of the Interior broad power to issue oil and gas leases on public lands" while giving her "discretion to refuse to issue any lease at all on a given tract." *Udall v. Tallman*, 380 U.S. 1, 4 (1965).  Section 17(a) of the MLA establishes the Secretary's discretion by providing that lands "may"—not must—be leased by the Secretary. 30 U.S.C. § 226(a).  And courts have consistently recognized the Secretary's discretion in oil and gas leasing decisions.  *E.g.*, *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 419 (1931) (MLA "goes no further than to empower the Secretary to execute leases"); *W. Energy All. v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013) (Secretary has "considerable" discretion in leasing decisions); *Schraier v. Hickel*, 419 F.2d 663, 665–68 (D.C. Cir. 1969) (affirming Secretary has "discretion to decline to lease" even if the Bureau of Land Management (BLM) had published a notice that it would receive offers).  A unanimous Supreme Court has affirmed the Secretary's authority under the MLA to issue a "general order" rejecting oil and gas applications "[i]n order to effectuate the conservation policy of the President." *Wilbur*, 283 U.S. at 418.

Congress enacted the Federal Onshore Oil and Gas Leasing Reform Act of 1987 (1987 Reform Act), Pub. L. No. 100–203, tit. V, subtitle B, 101 Stat. 1330, 1330-256 to address concerns that leasing procedures under the MLA as originally enacted allowed the vast majority of leases to

be sold on a non-competitive basis, thus depriving the public of a fair return.  *W. Energy All. v. Salazar*, No. 10-CV-0226, 2011 WL 3737520, at *4 (D. Wyo. June 29, 2011) (summarizing the MLA's original leasing provisions).  The Reform Act amended Section 17(b) of the MLA by directing the Secretary to instead offer most oil and gas leases through a competitive process, at least initially.  1987 Reform Act § 5102(a) (codified at 30 U.S.C. § 226(b)(1)(A)).  Parcels that did not receive a minimum bid would then be available for noncompetitive leasing for a two-year period.  *Id.*  But these amendments to Section 17(b) of the MLA were not intended to displace the Secretary's general discretion over oil and gas leasing in Section 17(a).  H.R. Rep. No. 100-378, at 11 ("*Subject to the Secretary's discretionary authority under section 17(a) of the 1920 Act to make lands available for leasing*, section 2(a) establishes a competitive oil and gas leasing program where lands are leased to the highest responsible qualified bidder by competitive bidding." (emphasis added)); Ex. 2, Federal Onshore Oil and Gas Leasing: Hearing on S. 66 and S. 1388 Before the Subcommittee on Mineral Resources Development and Production of the Committee on Energy and Natural Resources, S. Hrg. 100-464, 100th Cong. 106, 108 (1987) (sponsor of Senate bill explaining that his bill did "not change the Secretary's discretion in refusing to lease").[3]  Thus, the "MLA, as amended by the Reform Act of 1987, continues to vest the Secretary with considerable discretion to determine which lands will be leased."  *W. Energy All.*, 709 F.3d at 1044.

When asked to explain how the Secretary exercised her discretion during the 1987 legislative process, Interior explained that it could decline to lease based on concerns about

---

[3] While the 1987 Reform Act did not authorize the Secretary "to reject a bid at or over the minimum bid if he determines it does not represent a reasonable return to the public," H.R. Rep. No. 100-495, at 780 (1987) (Conf. Rep.), the 1987 Reform Act otherwise, "like the previous version of the MLA, . . . vests the Secretary at the outset with considerable discretion to determine which public lands are suitable for leasing," *Salazar*, 2011 WL 3737520, at *5.

"compliance with NEPA protection of the environment."  Ex. 1, Legislation to Reform the Federal

Onshore Oil and Gas Leasing Program: Hearing on H.R. 933 and H.R. 2851, Before the H. Comm.

on Interior and Insular Affairs, Ser. No. 100-11, 100th Cong. 66, 82–83 (1987) (Interior Hearing).

And while the Senate initially sought to exempt lease sales from NEPA, S. Rep. No. 100-188

(1987), at 6, 49, the Senate receded from that position after conferencing with the House, H.R.

Rep. No. 100-495, at 782.

Consistent with its position before Congress during the enactment of the 1987 Reform Act,

Interior has interpreted the phrase "where eligible lands are available," 30 U.S.C. § 226(b)(1)(A),

to require, at a minimum, that "all statutory requirements and reviews have been met, including

compliance with the National Environmental Policy Act."  BLM_I002689.  That longstanding

interpretation has been in place for over three decades.  BLM_I000017; BLM_I000008–9.  On the

foregoing basis, Defendants deny Plaintiffs' contention that "Congress has made [energy-

producing onshore] lands available for development" such that the MLA requires the Secretary "to

hold lease sales 'for each State where eligible lands are available at least quarterly.'"  Pls.' SMF ¶

13 (quoting 30 U.S.C. § 226(b)(1)(A)).

Onshore oil and gas lease sales under the MLA have not historically occurred on a regular

quarterly basis in each State.  For example, competitive lease sales under the MLA were held in

the thirteen Plaintiff States in only 27% of the quarters from 2017 to 2020.   Declaration of Peter

Cowan (Cowan Decl.) ¶ 3, Ex. A.   Additionally, most Plaintiff States—Alabama, Alaska,

Arkansas, Georgia, Missouri, Mississippi, Nebraska, and West Virginia—experienced a longer

absence of competitive MLA lease sales (at least seven consecutive quarters) from 2017 to 2020,

than has occurred in 2021 to 2022.  Cowan Decl. ¶¶ 3–8.  Those consecutive quarters without sales

were not due to an absence of expressions of interest (EOIs), as EOIs were pending in many of those States during the periods without competitive MLA lease sales from 2017 to 2020.  *Id.*

Defendants further deny Plaintiff's recounting of the division of revenues under the MLA as incomplete for addressing only the revenue sharing provision of 30 U.S.C. § 191(a).  *See* 30 U.S.C. § 191(a).  The next subsection states that "the amount of payments to the States . . . shall be reduced by 2 percent for any administrative or other costs incurred by the United States in carrying out the program authorized by this chapter."  30 U.S.C. § 191(b).  Additionally, Plaintiffs' recitation of the 90 percent figure for Alaska overlooks that the onshore lease sales that have occurred in Alaska arise under different statutory authority that provides for only a fifty percent share of revenue to the State of Alaska.  *See* 42 U.S.C. § 6506a(1) (providing that the State of Alaska receives 50 percent of the proceeds from sales from the National Petroleum Reserve in Alaska); Tax Cuts and Jobs Act, Pub. L. 115-97, § 20001, 131 Stat. 2054, 2235-37 (2017) (providing that the State of Alaska receives 50 percent of the proceeds from lease sales in the Coastal Plain for the two lease sales in that area that Congress required to be held by 2027).

14.    Disputed.    While BLM has authority to lease public lands for oil and gas development, it is also obliged under NEPA to analyze the environmental impacts of leasing before proceeding with lease sales.  42 U.S.C. § 4332.  Although BLM's regulations state that "[e]ach proper BLM [State] office shall hold sales at least quarterly if lands are available for competitive leasing," 43 CFR § 3120.1-2, BLM "explained that 'available' lands are those statutorily open to leasing under the MLA, that have met other statutory requirements, and for which leasing is in the public interest," BLM_I000008, when adopting that regulation.  Several BLM regional offices proposed holding lease sales in March and April 2021, but those offices did not determine that lands were "available" at that time as Congress entrusted those decisions to the Secretary of the

Interior, not individual BLM offices.  30 U.S.C. § 226(a) ("All lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits may be leased by the Secretary."); H.R. Rep. No. 100-378, at 11 (noting that the quarterly competitive sale provision, 30 U.S.C. § 226(b)(1)(A), is "[s]ubject to the Secretary's discretionary authority under [30 U.S.C. § 226(a)] to make lands available for leasing").

15.    Disputed.  On January 27, 2021, President Biden issued Executive Order 14,008, which states, "To the extent consistent with applicable law, the Secretary of the Interior shall pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters."  Defendants deny that Executive Order 14,008 "institutes a blanket moratorium on energy-production leases in offshore waters and on public lands," as the Executive Order is not self-executing.  To the contrary, since the Executive Order issued and before the Court's preliminary injunction issued, the Department of the Interior has both issued competitive leases and sold noncompetitive leases.  Cowan Decl. ¶ 8.

16.    Defendants do not dispute that Interior rescinded the January 21, 2021 Record of Decision for Lease Sale 257 on February 18, 2021.  Defendants dispute Plaintiffs' suggestion that the Federal Register Notice provides the only rationale for that rescission.  As Plaintiffs are aware, the Administrative Record reflects that BOEM's reasons for recommending the rescission included that Lease Sale 257 legally could not proceed on March 17, 2021.  BOEM must publish a Final Notice of Sale at least 30 days before any lease sale can be held, 30 C.F.R. § 556.308, which had not occurred by February 18, 2021.  Defendants further dispute any suggestion that Interior is

prohibited from reviewing or reconsidering a decision it has made, dispute any suggestion that Interior cannot rescind a record of decision during its reconsideration, and dispute any suggestion that Interior must open a comment period or publish extensive reasoning before it has made a new decision.

17.    Defendants do not dispute that in February 2021 BOEM cancelled the comment period on the Lease Sale 258 Draft EIS.

18.    Defendants deny that "[t]he Pause [in Executive Order 14,008][4] caused BLM offices to halt all pending quarterly lease sales," as Plaintiffs claim.  Pls.' SMF ¶ 18.  To the contrary, the first onshore administrative record expressly states that as of February 24, 2021, "there's not a blanket policy even with direction in the [Executive Order]."  BLM_I002421; *see also* BLM_I001180 (stating on March 1, 2021, that "The Department has not yet rendered any such decisions" "on how the Department will implement the Executive Order . . . with respect to onshore sales").

Rather than being based on "the Pause," as Plaintiffs' claim, all but one of the challenged onshore postponements were based on NEPA concerns, as explained below:

- **Utah:** On February 11, 2021, the BLM-Utah Director recommended postponing Utah's proposed March 2021 lease sale to account for a December 10, 2020 court decision, *Rocky Mountain Wild v. Bernhardt*, 506 F. Supp. 3d 1169 (D. Utah 2020), *appeal filed,* No. 21-4020 (10th Cir. Feb. 16, 2021). BLM_I001163–64.  That recommendation stated that the draft EA for the

---

[4] Defendants assume that Plaintiffs' Statement of Material Facts uses the capitalized-but-undefined term "the Pause" to refer to Section 208 of Executive Order 14,008.  *See* Pls.' SMF ¶ 17.  To the extent that Plaintiffs later assign a different meaning to "the Pause," Defendants reserve the right to respond further.

March 2021 sale "took a similar approach [of] analyz[ing] only two alternatives: lease all or lease nothing," where that approach was found deficient in *Rocky Mountain Wild*. BLM_I001164. The BLM Deputy Director, Operations, Michael Nedd approved that recommendation on February 12, postponing the sale. *Id.* On a parallel track that began on February 4, BLM-Utah sent a memorandum to Laura Daniel-Davis, who was exercising the delegated authority of the Assistant Secretary, Land and Minerals Management, requesting authorization by February 12 to post a competitive sale notice for a March 2021 Utah sale. BLM_I001148–49. That memo explained that while BLM-Utah had posted a draft EA for public comment, it had not yet prepared an "updated EA, responding to [the eight] comments received." BLM_I001149. On February 12, Acting Deputy Solicitor Travis Annatoyn recommended postponing the Utah sale given "serious questions as to NEPA compliance," and Daniel-Davis approved that recommendation on February 12. BLM_I001169–70.

- **Eastern States:** On February 12, the BLM-Eastern States Director recommended postponing its March 2021 lease sale because the underlying NEPA documentation "need[ed] additional air quality analysis, including [GHG] analysis" following *WildEarth Guardians v. Bernhardt (WEG II)*, 502 F. Supp. 3d 237, 245 (D.D.C. 2020), *dismissed*, No. 21-5006, 2021 WL 3176109 (D.C. Cir. Apr. 28, 2021). BLM_I001165–66.

- **Colorado & Montana-Dakotas:** On February 4, both BLM-Colorado and BLM-Montana-Dakotas sought approval by February 12 to post competitive

sale notices for March 2021 sales.  BLM_I001150–55.[5]  Their respective submissions indicated that their EAs were ready for review as the agency had responded to public comments.  BLM_I001153 ("BLM responded to [public] comments [on a draft EA]"); BLM_I001152 (referencing "response to comment section of the EA").  On February 12, Annatoyn recommended postponing the Colorado and Montana-Dakotas sales, because their EAs "may be problematic in their evaluation of greenhouse gasses" in light of recent court decisions such as *WEG II* and *Columbia Riverkeeper v. U.S. Army Corps of Engrs.*, No. 19-6071, 2020 WL 6874871, at *4 (W.D. Wash. Nov. 23, 2020).  BLM_I001170.  Annatoyn explained that "[g]iven the rapidly-evolving state of the law, the complex and novel challenges posed by greenhouse gas analysis, and the truncated period of your review, we advise you that there is a significant likelihood that analysis of the Colorado and Montana/Dakotas leases does not satisfy NEPA and is therefore vulnerable to litigation."  *Id.*  Daniel-Davis approved that recommendation on February 12.  *Id.*

- **Wyoming:**  On February 4, BLM-Wyoming requested next-day approval to hold a March 2021 lease sale.  BLM_I001156–57.  Unlike the Colorado and Montana requests, BLM-Wyoming's request did not indicate that its EA was ready for review.  BLM_I001157.  Instead, BLM-Wyoming sought authorization to proceed with offering parcels for leases based merely on the

---

[5] Although the BLM-Montana-Dakotas sale was previously planned for March 23—necessitating a February 5 posting—its request acknowledged that "the lease sale date [might] need to be changed from March 23 to March 30," making February 12 the relevant approval date.  BLM_I001154.

assurance that "[c]oncerns raised in ongoing litigation, including [*WEG II*, climate change and GHG emissions], *Western Watersheds Project vs. Zinke*, 1:18-cv-00187-REB [D. Idaho, BLM leasing policy IM 2018-034], and *Montana Wildlife Federation vs. Bernhardt*, 4:18-cv-00069-BMM [D. Mont., Greater Sage-Grouse leasing prioritization], will be satisfactorily addressed in the Environmental Assessment and Protest Decision before any lease is issued." BLM_I001157.   On February 12, the Wyoming sale was postponed due to "serious questions as to NEPA compliance."  BLM_I001169–70.

- **Nevada:** Well before Executive Order 14,008, BLM-Nevada postponed a December 2020 Nevada sale by publishing an errata without further explanation to its ePlanning website.  Doc. 120-7, at PR100.  On January 25, 2021, BLM-Nevada made a similar decision to postpone its lease sale and announced this decision on its website.  BLM_I001131, BLM_I001184.  That decision was confirmed by a formal errata published on January 27, 2021.  BLM_I001132. The Nevada January 2021 postponement was made for the same reason as the prior Nevada December 2020 postponement: the need to prepare updated analysis of GHG emissions following *WEG II*.  Cowan Decl. ¶¶ 10–11.[6]

The foregoing concerns about NEPA analysis were not unique to the current administration.  Shortly after *WEG II* issued in November 2020, BLM analyzed the impact of that decision.  BLM_I002701–04.  In a memorandum dated November 18, 2020, BLM concluded that

---

[6] Defendants do not offer this declaration as a post hoc rationalization for the Nevada postponement.  Instead, in situations such as this, "[i]f . . . there was [a] failure to explain administrative action as to frustrate effective judicial review, the remedy was . . . to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary."  *Camp*, 411 U.S. at 142–43.

the *WEG II* decision placed several quarters of lease sales from 2019 to 2020 "at risk" because the NEPA approach rejected by the *WEG II* court had "been carried forward for each lease sale since its completion in early May 2019."  BLM_I002702.  BLM recounted five specific deficiencies the *WEG II* court identified with its NEPA approach, including the need "to address all BLM [oil and gas] leasing on a nationwide basis which will require substantial time in determining the appropriate methodology as well as compiling BLM state specific [reasonably foreseeable development] information and providing calculations of estimated direct emissions associated with development of the leases."  BLM_I002701–02

The only other postponement at issue involved New Mexico, and that postponement was based on the need for additional time to make a decision about how to implement the Executive Order onshore rather than an "unwritten implementation" of the Executive Order, as explained below.  On February 11, 2021, BLM-New Mexico announced a postponement of its planned April lease sale.  BLM_I001183.  That announcement surprised BLM and Interior leadership, as "there's not a blanket policy even with direction in the [Executive Order]."  BLM_I002421.  After investigating to understand the reason for the postponement, BLM and Interior leadership learned that BLM-New Mexico had developed a "'perception' that all future sales would be postponed," that was based on "misinformation."  *Id.*  Thus, the state office postponement was reversed, BLM_I002424, and BLM-New Mexico submitted a request to proceed with an April lease sale on February 25, BLM_I001174–78; Doc. 186-1, at 8 (reflecting February 25, 2021 date).

After receiving that request, Interior decided on March 1, 2021 to temporarily postpone the April sale "pending decisions on how the Department will implement the Executive Order . . . with respect to onshore sales.  The Department has not yet rendered any such decisions, but we hope to have further information in the coming weeks."  BLM_I001180 ("In the meantime, please post the

following update on the relevant website(s): 'The oil and gas lease sale scheduled for April, 2021 has been postponed.'").[7]   At the time of that postponement, BLM and Interior acknowledged that New Mexico had ample time remaining in the second quarter of 2021 to hold the proposed sale previously planned for April.  BLM_I002424 ("it is highly likely that the sale date would be moved and we have the flexibility to hold the sale [no later than] the end of the Quarter (end of June)").  Although Interior subsequently made an April 21, 2021 decision not to hold Q2 2021 sales, Plaintiffs have not challenged that decision as it occurred after their Complaint was filed.

Based on the foregoing explanation for each postponement, Defendants further deny that BLM systematically postponed or cancelled proposed March and April 2021 lease sales, as Plaintiffs claim.

Defendants further deny that the foregoing postponements were "in express contravention of the Mineral Leasing Act" or that the proposed sales were "statutorily required quarterly land sales," as Plaintiffs claim.  Pls.' SMF ¶ 18.  Congress has granted the Secretary of the Interior "discretionary authority . . . to make lands available for leasing," H.R. Rep. No. 100-378, at 11, in 30 U.S.C. § 226(a), that the Secretary exercises through, *inter alia*, adequately analyzing the environmental impacts of her leasing decisions under NEPA before making those decisions.  *See supra* ¶¶ 13–14.  Because Interior had determined that adequate NEPA analysis was not prepared for six of the postponed sales, those postponement decisions complied with the Mineral Leasing

---

[7] The Court's preliminary injunction order misquoted this sentence as stating "The oil and gas lease sales scheduled for April 2021 have been postponed."  Doc. 139, at 31 (quoting Doc. 120-6, at PR 86) (emphasis added).  But the administrative record states that the March 1 decision was limited to a single sale.  BLM_I001179 ("Also to clarify, the only sale that was anticipated is in NM.");  BLM_I001180 ("The oil and gas lease sale scheduled for April, 2021 has been postponed.");  BLM_I002428 (showing that only one sale was proposed for April, 2021); *compare* BLM_I001180 ("Circling back from our conversations of last week"), *with* BLM_I002427 (showing that those conversations were about the "April lease sale" in New Mexico).

Act. *Id.* And Plaintiffs have not provided any argument why temporarily postponing an April lease sale at a time when there was still ample time for BLM to hold a sale in the second quarter, BLM_I002424, violated any provision of the MLA.

Defendants further deny that the postponed lease sales were "previously planned," "heavily vetted" and "approved," as Plaintiffs claim. Pls.' SMF ¶ 18. Although preliminary steps were taken to advance the postponed lease sales, no formal decision was ever made to hold those sales or determine their scope. *E.g.*, BLM_I001154 ("BLM may adjust the number and size of the parcels offered up to the day of the sale."). Nor were the postponed lease sales "heavily vetted" at the time of the postponement decisions. To the contrary, significant portions of the NEPA analysis for certain lease sales had not yet been done at the time of the postponement decisions, *e.g.*, BLM_I001149 (stating that BLM-Utah had not yet prepared an "updated EA, responding to [the eight] comments received"); BLM_I001157 (noting that BLM-Wyoming's NEPA analysis had not yet addressed "[c]oncerns raised in ongoing litigation, including [*WEG II*, climate change and GHG emissions], *Western Watersheds Project vs. Zinke*, 1:18-cv-00187-REB [D. Idaho, BLM leasing policy IM 2018-034], and *Montana Wildlife Federation vs. Bernhardt*, 4:18-cv-00069-BMM [D. Mont., Greater Sage-Grouse leasing prioritization]"), and NEPA analysis for other lease sales remained legally vulnerable in light of the recently issued court decisions, including *WEG II*, *e.g.*, BLM_I001164 (acknowledging that BLM-Utah's analysis may not have analyzed a sufficient number of alternatives under *Rocky Mountain Wild*); BLM_I001165–66 (acknowledging that BLM-Eastern States "need[ed] additional air quality analysis, including [GHG] analysis" following *WEG II*); BLM_I001170 (acknowledging the "significant likelihood that analysis of the Colorado and Montana/Dakotas leases does not satisfy NEPA and is therefore vulnerable to litigation").

Defendants further deny that the fact sheet published by the Department of the Interior implemented or announced any agency action. That fact sheet merely reported that President Biden would sign Executive Order 14,008 and provided background information about the onshore leasing program.

19.    Defendants deny that that BLM has "not held one onshore oil and gas lease sale" "[b]etween the issuance of EO14008 and April 29, 2022," as Plaintiffs claim. Pls.' SMF ¶ 19. For example, BLM sold noncompetitive leases in Wyoming in February, 2021, and in Nevada on November 1, 2021. Cowan Decl. ¶ 8. Defendants do not dispute that Interior held Lease Sale 257 on November 17, 2021. Defendants do not dispute that conservation groups challenged the adequacy of the NEPA supporting Lease Sale 257, which suit Interior defended as did industry and state intervenors. Defendants do not dispute that the district court nonetheless ruled against Interior and vacated the lease sale. *Friends of the Earth v. Haaland,* 2022 WL 254526 (D.D.C. Jan. 27, 2022). That order is currently on appeal to the D.C. Circuit. Defendants do not dispute that they did not file a notice of appeal.

20.    Defendants deny that BLM's June 2022 lease sales are "under compulsion of this Court's [preliminary injunction] order," as Plaintiffs claim. Pls.' SMF ¶ 20. When the Department of the Interior announced those sales, the Department stated that those sales were "[i]n compliance with an injunction from the Western District of Louisiana," not that they were compelled by that injunction, as Plaintiffs' claim.[8] While the Court's preliminary injunction Order "enjoins" and "restrains" Interior from implementing the Executive Order's pause directive, it does not compel Interior to take any specific action. Doc. 140.

---

[8]    https://www.doi.gov/pressreleases/interior-department-announces-significantly-reformed-onshore-oil-and-gas-lease-sales

Defendants further deny that BLM's June 2022 sales "comprise drastically reduced parcel offerings compared to the original lease sale announcements," as Plaintiffs claim.  Pls.' SMF ¶ 20. Because the sales were noticed for the first time in April 2022, it is unclear what "original lease sale announcements" Plaintiffs are referencing.  Defendants aver, however, that the number of parcels that BLM offered for sale are reduced from the number of parcels nominated for leasing.

21.     Defendants admit that Gina McCarthy stated the following during an April 2022 interview: "President Biden remains absolutely committed to not moving forward with additional drilling on public lands.  The challenge that we faced was that we had a court that ordered that a new lease to be done.  The Department of Energy had no choice but to put it out.  But they also found ways to reduce the size of that and its impact. We'll keep doing what we need to do to appeal those decisions and to make our case in a court."  Judicial review "is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019).  This statement from a press interview is not in the administrative record, and furthermore is not from the President or an official of the Department of the Interior.  Defendants deny that this statement establishes that the "President . . . would not have noticed [the] June 2022 lease sales, and will not notice future lease sales, but for this Court's preliminary injunction," as Plaintiffs claim.  Pls.' SMF ¶ 21.  Nor could it establish as much because the preliminary injunction did not require any specific lease sale to be held, *see* Doc. 140; Doc. 155, at 13, and Plaintiffs' assertion envisions a hypothetical world that did not exist when Interior made its April 2022 decision to notice the lease sales.

22.     Defendants deny that all "Plaintiff States are entitled to a substantial share of the proceeds from leasing sales under OCSLA, the Gulf of Mexico Energy Security Act, and the MLA," as Plaintiffs claim.  Pls.' SMF ¶ 22.  For example, states without onshore leases, such as

the Plaintiff State of Georgia, do not receive any revenue from leasing sales under those statutes. And Plaintiff States are not entitled to any proceeds from leasing sales that violate NEPA, as such sales and the associated leases may be vacated by courts following NEPA challenges.  *E.g., Friends of the Earth v. Haaland*, No. CV 21-2317 (RC), 2022 WL 254526, at *29 (D.D.C. Jan. 27, 2022); *Wildearth Guardians v. U.S. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 896–97 (D. Mont. 2020).  *See* Declaration of James Tichenor (Tichenor Decl.) ¶ 9.

Defendants further deny that "Because the Pause systematically cancels lease sales, the resulting moratoriums deprive the States of this vital revenue," as Plaintiffs claim.[9]  Pls.' SMF ¶ 22.  In 2021 and 2022, disbursements from the Office of Natural Resources Revenue (ONRR) to State and local governments have increased by 21% from Fiscal Year 2020 to Fiscal Year 2021, and by 88% from Fiscal Year 2021 (October to April) to Fiscal Year 2022 (October to April). Tichenor Decl. ¶ 5.  And onshore production of oil has similarly increased by 17% from Fiscal Year 2020 to Fiscal Year 2021, and by 13% Fiscal Year 2021 (October to January) to Fiscal Year 2022 (October to January).  *Id.*

Defendants dispute Plaintiffs' assertion that "[t]he cancellations of Lease Sales 257, 259, and 261 will reduce Louisiana's GOMESA funding by up to $57 million" for several reasons. First, BOEM held Lease Sale 257.  Although a district court has since vacated Lease Sale 257, that is different from BOEM cancelling the sale.  Because Plaintiffs do not provide any citation for their $57 million figure, it is not clear how any potential proceeds resulting from Lease Sale 257 impact that figure.  Next, to the extent Plaintiffs' $57 million figure is derived from the Dismukes

---

[9] Defendants have previously denied Plaintiffs' repeated claim that "the Pause [in Executive Order 14,008] systematically cancels lease sales," Pls.' SMF ¶ 22, as the Pause is not self-executing, *see supra* ¶ 15.  Defendants have also previously denied that any "resulting moratorium" was in effect onshore at the time Plaintiffs filed suit.  *See supra* ¶ 18.

Declaration cited in support of Plaintiffs' Motion for a Preliminary Injunction, the figures in that declaration were based on a "drilling moratorium" that does not exist, Dismukes Dec. ¶¶ 20-21, 27, 39, 46, and on a "production moratorium" that does not exist, *id.* ¶ 35.  Indeed, Louisiana's Gulf of Mexico Energy Security Act (GOMESA) disbursements continue.  In 2022 Louisiana received GOMESA disbursements in the amount of $111,822,095.[10]  This represents an increase over Louisiana's 2021 disbursement, and is larger than any other disbursement in history, except 2020.[11]

Defendants further deny that the Executive Order "causes substantial economic harm to Plaintiff States' citizens by causing billions of dollars of lost investments and thousands of lost jobs," as Plaintiffs claim.  Pls.' SMF ¶ 22.  To the contrary, Plaintiffs' claim is counterfactual, according to the Bureau of Labor Statistics:

---

[10] *See* U.S. Department of the Interior Natural Resources Revenue Data, FY 2022 GOMESA disbursements, https://revenuedata.doi.gov/how-revenue-works/gomesa/.

[11] *See* U.S. Department of the Interior Natural Resources Revenue Data, FY 2009-FY 2021 Louisiana GOMESA disbursements, https://nrrd-preview.app.cloud.gov/sites/upload-data/query-data/?dataType=Disbursements&period=Fiscal%20Year&fiscalYear=2009%2C2010%2C2011%2C2012%2C2013%2C2014%2C2015%2C2016%2C2017%2C2018%2C2019%2C2020%2C2021&groupBy=localRecipient&usStateName=Louisiana&source=GOMESA%20offshore.



Employment, Hours, and Earnings from the Current Employment Statistics survey (National)

Series Id:        CES1021100001
Seasonally Adjusted
Series Title:     All employees, thousands, oil and gas extraction, seasonally adjusted
Super Sector:     Mining and logging
Industry:         Oil and gas extraction
NAICS Code:       211
Data Type:        ALL EMPLOYEES, THOUSANDS

Tichenor Decl. ¶ 11; *see also id.* ¶¶ 5–8 (showing that Professor Considine's investment loss predictions are based on an unreproducible well spudding model whose predictions are counterfactual to actual well spudding data from 2021–2022); *id.* ¶ 10 (showing that Professor Dismukes' predictions of investment loss form Permian Basin production decreases are counterfactual to actual data from 2021–2022).

### DEFENDANTS' STATEMENT OF MATERIAL FACTS

**I.     The Bureau of Land Management (BLM) Has Not Historically Held Regular Quarterly Lease Sales In Each State.**

23.     Onshore oil and gas lease sales under the Mineral Leasing Act (MLA) have not historically occurred on a regular quarterly basis in each State.  For example, competitive lease sales under the MLA were held in the thirteen Plaintiff States in only 27% of the quarters from 2017 to 2020.  Cowan Decl. ¶ 3.

24.     Additionally, most Plaintiff States—Alabama, Alaska, Arkansas, Georgia, Missouri, Mississippi, Nebraska, and West Virginia—experienced a longer absence of competitive MLA lease sales (at least seven consecutive quarters) from 2017 to 2020, than has occurred in

2021 to 2022.  Cowan Decl. ¶¶ 3–8.  Those consecutive quarters without sales were not due to an absence of expressions of interest (EOIs), as EOIs were pending in many of those States during the periods without competitive MLA lease sales from 2017 to 2020.  *Id.*

25.     BLM manages widely varying quantities of mineral estate across the 50 States, from 0 acres in New Jersey, to 23 acres in Connecticut, to 800,000 acres in Kansas, to 1.9 million acres in Hawaii, to 33.7 million acres in Arizona, to 51.1 million acres in California, to 219 million acres in Alaska.  Cowan Decl. ¶ 9.

## II.     Interior Had Not Implemented A Blanket Policy Against Onshore Leasing When Plaintiffs Filed Suit.

26.     As of February 24, 2021, neither BLM nor the Department of the Interior had adopted a "blanket policy" against onshore leasing.  BLM_I002421 ("there's not a blanket policy even with direction in the [Executive Order]").

27.     As of March 1, 2021, neither BLM nor Interior had "yet rendered" decisions "on how the Department will implement the Executive Order . . . with respect to onshore sales." BLM_I001180.

28.     Plaintiffs have no evidence that either BLM or Interior adopted a blanket policy against onshore leasing between February 24, 2021 and March 24, 2021.  Had Interior adopted such a policy during that timeframe, BLM's April 21, 2021 decision regarding second-quarter 2021 lease sales would have been superfluous.

29.     Of the seven onshore postponements that occurred before March 24, 2021, six postponements—in BLM's Eastern States, Utah, Montana-Dakotas, Wyoming, Colorado and Nevada State Offices—were based on concerns about National Environmental Policy Act (NEPA) compliance:

- **Utah:** On February 11, 2021, the BLM-Utah Director recommended postponing Utah's proposed March 2021 lease sale to account for a December 10, 2020 court decision, *Rocky Mountain Wild v. Bernhardt*, 506 F. Supp. 3d 1169 (D. Utah 2020), *appeal filed,* No. 21-4020 (10th Cir. Feb. 16, 2021). BLM_I001163–64. That recommendation stated that the draft EA for the March 2021 sale "took a similar approach [of] analyz[ing] only two alternatives: lease all or lease nothing," where that approach was found deficient in *Rocky Mountain Wild*. BLM_I001164. The BLM Deputy Director, Operations, Michael Nedd approved that recommendation on February 12, postponing the sale. *Id.* On a parallel track that began on February 4, BLM-Utah sent a memorandum to Laura Daniel-Davis, who was exercising the delegated authority of the Assistant Secretary, Land and Minerals Management, requesting authorization by February 12 to post a competitive sale notice for a March 2021 Utah sale. BLM_I001148–49. That memo explained that while BLM-Utah had posted a draft EA for public comment, it had not yet prepared an "updated EA, responding to [the eight] comments received." BLM_I001149. On February 12, Acting Deputy Solicitor Travis Annatoyn recommended postponing the Utah sale given "serious questions as to NEPA compliance," and Daniel-Davis approved that recommendation on February 12. BLM_I001169–70.

- **Eastern States:** On February 12, the BLM-Eastern States Director recommended postponing its March 2021 lease sale because the underlying NEPA documentation "need[ed] additional air quality analysis, including [GHG] analysis" following *WildEarth Guardians v. Bernhardt (WEG II)*, 502 F. Supp. 3d

237, 245 (D.D.C. 2020), *dismissed*, No. 21-5006, 2021 WL 3176109 (D.C. Cir. Apr. 28, 2021).  BLM_I001165–66.

- **Colorado & Montana-Dakotas:** On February 4, both BLM-Colorado and BLM-Montana-Dakotas sought approval by February 12 to post competitive sale notices for March 2021 sales.   BLM_I001150–55.[12]   Their respective submissions indicated that their EAs were ready for review as the agency had responded to public comments.  BLM_I001153 ("BLM responded to [public] comments [on a draft EA]"); BLM_I001152 (referencing "response to comment section of the EA").   On February 12, Annatoyn recommended postponing the Colorado and Montana-Dakotas sales, because their EAs "may be problematic in their evaluation of greenhouse gasses" in light of recent court decisions such as *WEG II* and *Columbia Riverkeeper v. U.S. Army Corps of Engrs.*, No. 19-6071, 2020 WL 6874871, at *4 (W.D. Wash. Nov. 23, 2020).  BLM_I001170.  Annatoyn explained that "[g]iven the rapidly-evolving state of the law, the complex and novel challenges posed by greenhouse gas analysis, and the truncated period of your review, we advise you that there is a significant likelihood that analysis of the Colorado and Montana/Dakotas leases does not satisfy NEPA and is therefore vulnerable to litigation."  *Id.*  Daniel-Davis approved that recommendation on February 12.  *Id.*

---

[12] Although the BLM-Montana-Dakotas sale was previously planned for March 23—necessitating a February 5 posting—its request acknowledged that "the lease sale date [might] need to be changed from March 23 to March 30," making February 12 the relevant approval date. BLM_I001154.

- **Wyoming:** On February 4, BLM-Wyoming requested next-day approval to hold a March 2021 lease sale. BLM_I001156–57. Unlike the Colorado and Montana requests, BLM-Wyoming's request did not indicate that its EA was ready for review. BLM_I001157. Instead, BLM-Wyoming sought authorization to proceed with offering parcels for leases based merely on the assurance that "[c]oncerns raised in ongoing litigation, including [*WEG II*, climate change and GHG emissions], *Western Watersheds Project vs. Zinke*, 1:18-cv-00187-REB [D. Idaho, BLM leasing policy IM 2018-034], and *Montana Wildlife Federation vs. Bernhardt*, 4:18-cv-00069-BMM [D. Mont., Greater Sage-Grouse leasing prioritization], will be satisfactorily addressed in the Environmental Assessment and Protest Decision before any lease is issued." BLM_I001157. On February 12, the Wyoming sale was postponed due to "serious questions as to NEPA compliance." BLM_I001169–70.

- **Nevada:** Well before Executive Order 14,008, BLM-Nevada postponed a December 2020 Nevada sale by publishing an errata without further explanation to its ePlanning website. Doc. 120-7, at PR100. On January 25, 2021, BLM-Nevada made a similar decision to postpone its lease sale and announced this decision on its website. BLM_I001131, BLM_I001184. That decision was confirmed by a formal errata published on January 27, 2021. BLM_I001132. The Nevada January 2021 postponement was made for the same reason as the prior

30

Nevada December 2020 postponement: the need to prepare updated analysis of

GHG emissions following *WEG II*.  Cowan Decl. ¶¶ 10–11.[13]

30.    The last of the seven postponements that occurred before March 24, 2021—

regarding a sale in BLM's New Mexico State Office—was only a temporary postponement about

how to proceed in the "meantime" "pending decisions on how the Department will implement the

Executive Order . . . with respect to onshore sales."  BLM_I001180.  When making that decision,

Interior was aware that it had "the flexibility to hold the sale [no later than] the end of the Quarter

(end of June)."  BLM_I002424.

31.    After BLM issued its April 21, 2021 decision not to hold second quarter sales,

Plaintiffs never supplemented their Complaint under Federal Rule of Civil Procedure 15(d) to

challenge the April 21, 2021 decision.  Plaintiffs disclaimed "challeng[ing] these post-filing

actions as independent final agency actions."  Doc. 179 at 2.

### III.    BLM Undertook Necessary Work To Address Specific Flaws With The Existing Environmental Analyses For Its Onshore Lease Sales.

32.    Shortly after *WEG II* issued in November 2020, BLM analyzed the impact of that

decision.  BLM_I002701–04.  In a memorandum dated November 18, 2020, BLM concluded that

the *WEG II* decision placed several quarters of lease sales from 2019 to 2020 "at risk" because the

NEPA approach rejected by the *WEG II* court had "been carried forward for each lease sale since

its completion in early May 2019."  BLM_I002702.  BLM recounted five specific deficiencies the

*WEG II* court identified with its NEPA approach, including the need "to address all BLM [oil and

gas] leasing on a nationwide basis which will require substantial time in determining the

---

[13] Defendants do not offer this declaration as a post hoc rationalization for the Nevada postponement.  Instead, in situations such as this, "[i]f . . . there was [a] failure to explain administrative action as to frustrate effective judicial review, the remedy was . . . to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary."  *Camp*, 411 U.S. at 142–43.

appropriate methodology as well as compiling BLM state specific [reasonably foreseeable development] information and providing calculations of estimated direct emissions associated with development of the leases."  BLM_I002701–02.

33.     Consistent with the recognized need "to address all BLM [oil and gas] leasing on a nationwide basis," *id.*, BLM convened its air resources team with other BLM specialists beginning around January 6, 2021 under the prior administration to begin preparing "an inventory of [greenhouse gases (GHGs)] from fossil fuels produced on lands managed by BLM in fiscal year 2020 and from reasonably foreseeable fossil fuel production and leasing over the next 12 months." Declaration of Susan Lee (Lee Decl.) ¶¶ 3–4, Doc. 186-5.  Work on that process occurred from January 6 to October 12, 2021, culminating in the 2020 BLM Specialist Report on Annual Greenhouse Gas Emissions and Climate Trends from Coal, Oil, and Gas Exploration and Development on the Federal Mineral Estate (Specialist Report), *id.* ¶ 4, which is available at BLM-Q3002462–2574.  That work built off of earlier work done in May 2020 in response to a 2019 court decision.  Lee Decl. ¶ 3.

34.     Starting on October 29, 2021, BLM began publishing draft NEPA analyses for its anticipated first-quarter 2022 lease sales with a revised approach to analyzing GHG impacts associated with leasing decisions.  Lee Decl. ¶ 4; Doc. 191-2 ¶ 3.  That revised approach to analyzing GHG impacts featured several changes, which BLM described in a Fact Sheet it published on October 29, 2021.  BLM, Fact Sheet: Analyzing the effects of fossil fuel leasing and development on greenhouse gases (Oct. 29, 2021), Doc. 191-1.  One of those changes involved an analysis of the social cost of greenhouse gases based on interim estimates prepared by the Interagency Working Group on the Social Cost of Greenhouse Gases (IWG) established by Executive Order 13,990.  *Id.*

35.     Ten States—including six Plaintiffs in this litigation—sought to preliminarily enjoin numerous federal agencies from, *inter alia*, relying upon the interim estimates prepared by the IWG.  *See Louisiana v. Biden*, --- F. Supp. 3d ---, No. 2:21-CV-01074, 2022 WL 438313, at *15 (W.D. La. Feb. 11, 2022) (Cain, J.).  Those States identified BLM's October 29, 2021 Fact Sheet as one of the actions that they sought to enjoin.  *Id.* at *8.  On February 11, 2022, Judge Cain granted their motion, preliminarily enjoining Interior from relying upon the interim estimates prepared by the IWG.  *Id.* at *5, 21.

36.     To hold a first-quarter 2022 lease sale, BLM was required to publish competitive sale notices by February 14, 2022.  See 30 U.S.C. § 226(f) ("At least 45 days before offering lands for lease . . . the Secretary shall provide notice of the proposed action.").  Because the February 11, 2022 order enjoined Interior from "relying upon the work product of the Interagency Working Group, including without limitation, any and all Social Cost of Greenhouse Gas estimates published by the Interagency Working Group," *Louisiana*, 2022 WL 438313, at *5, 21, Interior could not rely upon its existing NEPA analysis in order to publish competitive sale notices in time to hold first-quarter 2022 sales.  Cowan Decl. ¶ 4; Declaration of Dominic J. Mancini ¶ 21, Doc. 191-3.

37.     Since that preliminary injunction issued on February 11, 2022, the defendant agencies promptly sought to stay that injunction.  On February 19, 2022, the defendant agencies appealed the injunction and moved the district court to stay the injunction pending resolution of their appeal.  Defs.' Mot. for a Stay Pending Appeal, Doc. 198-7.  On March 1, 2022, the defendant agencies moved the United States Court of Appeals for the Fifth Circuit to stay the injunction; the Fifth Circuit granted that motion on March 16, 2022.  *Louisiana by & through Landry v. Biden*, No. 22-30087, 2022 WL 866282, at *3 (5th Cir. Mar. 16, 2022).  The State of Louisiana filed a

petition for rehearing en banc on March 30, 2022.  Pet. for Rehearing En Banc, *Louisiana by & through Landry v. Biden,* Case No. 22-30087 (5th Cir. Mar. 30, 2022).  The Fifth Circuit denied that rehearing petition on April 14, 2022.  Order on Petition for Rehearing En Banc, Doc. 198-8.

38.    On April 15, 2022, the Department of the Interior announced that it would publish competitive lease sale notices.  Interior published those competitive sale notices the following business day, on April 18, 2022.  Docs. 198-1 to 198-6.

**IV.    Interior Has Never Held All Sales In A Five-Year Program.**

39.    Including the five-year program currently in force, there have been nine programs submitted to Congress.  *See Congressional Research Service, Five- Year Program for Offshore Oil and Gas Leasing: History and Program for 2017–2022*, at 9–10 (Aug. 23, 2019), https://fas.org/sgp/crs/misc/R44504.pdf.  All of them have scheduled more lease sales than have actually occurred, sometimes many more, as set forth in the below table:

**Table 1. OCSLA Five-Year Programs Submitted to Congress Since 1980**

| Years | Administration Submitting Plan | Congress | Number of Sales Listed in Submission | Number of Sales Held | Approximate Acres Leased (in millions)[a] |
|---|---|---|---|---|---|
| 2017-2022 | Obama | 114th | 11 | 4 (through July 2019) | 3.3[b] (through July 2019) |
| 2012-2017 | Obama | 112th | 15 | 13 | 7.4 |
| 2007-2012[c] | Obama / G. W. Bush[c] | 111th / 110th | 16 / 21[c] | 11 | 21.7 |
| 2002-2007 | G. W. Bush | 107th | 20 | 15 | 20.5 |
| 1997-2002 | Clinton | 105th | 16 | 12 | 22.9 |
| 1992-1997 | G. H. W. Bush | 102nd | 18 | 12 | 22.6 |
| 1987-1992 | Reagan | 100th | 42 | 17 | 24.7 |
| 1982-1987 | Reagan | 97th | 41 | 23 | 21.0 |
| 1980-1982[d] | Carter | 96th | 36 | 12 | 4.1 |

**Source:** CRS.

a. Acreage leased is shown in BOEM, OCS Lease Sale Statistics, "All Lease Offerings," at http://www.boem.gov/OCS-Lease-Sale-Statistics-All-Lease-Offerings/.

b. The acreage total reflects *acres leased* for three of the sales (lease sales 249, 250, and 251) but *acres bid on* for one sale (lease sale 252), because acres leased were not yet available. Not all acres bid on are necessarily leased.

c. The George W. Bush Administration developed the original program for 2007-2012 and submitted it to the 110th Congress with a lease schedule containing 21 sales. Following a court order in 2009, DOI revised the program under the Obama Administration and resubmitted it to the 111th Congress with a revised lease schedule containing 16 sales.

d. This program was originally referred to as the Comprehensive Program 1980-1985, but the covered years were changed to 1980-1982 due mainly to judicial activity. *California v. Watt*, 688 F.2d 1290 (D.C. Cir. 1981).

*Id.* Out of the eight completed programs from 1980 to 2017, Interior held only 56% of the proposed sales as scheduled. *See id.* (showing that Interior held only 115 out of 204[14] scheduled sales from 1980 to 2017). The remaining 44% of proposed sales—89 sales—were not held as scheduled. *See id.* Because Interior did not conclude that any of these 89 delays or cancellations amounted to a significant revision of the applicable program, none were accomplished through a formal revision to the program under 43 U.S.C. § 1344.

---

[14] This excludes the five sales that were removed following a court order in 2009.

40.     Interior has held 73% (8 out of 11) sales under the 2017–2022 PFP.  That rate exceeds Interior's historical average of holding only 56% of proposed sales as scheduled from 1980 to 2017.

Respectfully submitted this 13th day of June, 2022.

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

*/s/     Michael S. Sawyer*
THOMAS W. PORTS, JR., Trial Attorney
MICHAEL S. SAWYER, Senior Attorney
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone:     (202) 305-5492 (Ports)
                       (202) 514-5273 (Sawyer)
Fax:             (202) 305-0506
Email:           Thomas.Ports.Jr@usdoj.gov
                       Michael.Sawyer@usdoj.gov

*Counsel for Defendants*