# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA

THE STATE OF LOUISIANA,
By and through its Attorney General, JEFF LANDRY, et al.,

                        PLAINTIFFS,

v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; et al.,

                        DEFENDANTS.

CIV. NO. 2:21-CV-00778-TAD

**REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**ARGUMENT**

In opposing Plaintiff States' motion for summary judgment, the Biden Administration doubles down on its position that it may remake national energy policy unilaterally. And it doubles down on its position that even if doing so is unlawful, no court may check it. Its arguments in support of these positions are wrong and, if accepted, would subvert our constitutional order. This Court should grant summary judgment for the Plaintiff States.

**I.   THERE IS A PAUSE, IT IS SUBJECT TO REVIEW, AND IT IS UNLAWFUL.**

Defendants assert that there is no Pause.[1] That no offshore lease sales—and passingly few (if any) onshore lease sales—have taken place since President Biden's leasing moratorium, except insofar as ordered by this Court, is, they say, just a coincidence. That cessation of lease sales is not due to the Pause, Defendants contend, because some lease sales were postponed or cancelled due to NEPA, even though others were concededly postponed or cancelled due to "limited implementations of the Executive Order." Opp. 16.

But the Pause is real and its effects are being felt every day. As this Court has already explained, the Administration stopped lease sales across the board in January 2021. Doc. 139 ("PI Op.") at 27. It did so right after President Biden ordered the Department of Interior to "pause new oil and natural gas leases in public lands or in offshore waters pending a comprehensive review." Exec. Order 14,008, §208, *Tackling the Climate Crisis at Home and Abroad*, 86 Fed. Reg. 7619, 7624 (Jan. 27, 2021). DOI immediately rescinded the Notice of Sale and Record of Decision for Lease Sale 257 based on the new policy. *Gulf of Mexico, Outer Continental Shelf, Oil and Gas Lease Sale 257*, 86 Fed. Reg. 10,132, 10,132 (Feb. 18, 2021); PI Op. at 28. It then rescinded the public review period for Lease Sale 258 based on

---

[1] Defendants also fault the Plaintiff States for calling it "the Pause." Cross. Mot. 22 ("Plaintiffs have never once defined this capitalized term."). But the Plaintiff States call it the Pause because that's what this Court calls it—as Defendants know. *See* PI Op. at 1. The Pause is the nationwide moratorium on leasing implemented as a result of Section 208 of President Biden's Executive Order 14,008.

1

the new policy. *Withdrawal of the Public Review Period for Cook Inlet Lease Sale 258*, 86 Fed. Reg. 10,994, 10,994 (Feb. 23, 2021). It published a universal notice that it was "hitting pause on new oil and gas leasing." *FACT SHEET: President Biden to Take Action to Uphold Commitment to Restore Balance on Public Lands and Waters, Invest in Clean Energy Future* (Jan. 27, 2021), on.doi.gov/3Rj3Xil. And then, as this Court has already once extensively documented, it indefinitely postponed lease sales throughout the country. PI Op. at 30-31. As the Administration itself puts it, its policy is clear: it is "not moving forward with additional drilling on public lands." Hallie Jackson Reports (@HallieOnMSNBC), Twitter (Apr. 20, 2022 3:41 pm), bit.ly/3xVmud1 (quoting Biden Administration official).

Of course, the Pause can have legally binding effects, and thus be subject to judicial review, even if NEPA would have prevented some lease sales within its scope from going forward anyway. *See* Opp. 16. All laws have some overlap with other laws. The binding legal effect of the Pause is to stop those lease sales that would have otherwise gone forward. *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 418 (2015); *see also Biden v. Texas*, No. 21-954, 2022 WL 2347211, at *13 (U.S. June 30) (agency action may have binding legal consequences even if it is not necessary and sufficient condition to some result). In any event, Defendants do not dispute that "no reasons were given for many of these cancellations" or that "the April, 2021 cancellations were as a direct result of the Executive Order," which is sufficient to show the Pause's binding legal consequences. PI Op. at 31.

Defendants also argue that there is no Pause because one internal e-mail written by Laura Daniel-Davis, who works within DOI, took the position that there was not a "blanket policy." Opp. 15-16. But it is not clear from that e-mail what blanket policy she is denying the existence of. Rather than denying the existence of the Pause, for instance, she might be explaining that there are different ways to comply with the Pause. In any event, the day before she wrote that e-mail, her Department took the position that, "in response to Executive Order 14008" alone, it would "cancel the comment period and public hearings for the Lease Sale 258." 86 Fed. Reg. 10,994. It explained that the "pause"

2

applied to all "new oil and gas leasing on public lands and offshore waters." *Id.* A few days before that, her Department "rescind[ed] the record of decision for GOM Lease Sale 257 to comply with Executive Order 14008." 86 Fed. Reg. 10,132. Either Ms. Daniel-Davis did not mean what the Defendants wish she had meant, or she was out of step with her Department and the rest of the Administration. All the Administration's long series of public statements and public actions show that it implemented a nationwide leasing moratorium.

Next, Defendants argue that if there was a Pause, the Pause is not subject to judicial review. Opp. 15-17. But the Pause is a discrete final agency action of the type regularly subject to review. Countless cases refute the notion that the judiciary must ignore final agency action simply because it is unwritten or not permanent.[2] Finality is a pragmatic test precisely so the Executive Branch cannot circumvent APA review by conducting its operations through unwritten policies. *BNSF Ry. Co. v. EEOC*, 385 F. Supp. 3d 512, 523 (N.D. Tex. 2018) ("An agency cannot skirt its obligations by acting illegally and then claiming it has not acted at all."). Defendant's narrow view of the final-agency-action doctrine "would allow an agency to shield its decisions from judicial review simply by refusing to put

---

[2] *See, e.g.*, *Texas v. United States*, 524 F. Supp. 3d 598, 642 (S.D. Tex. 2021) (100-day pause of deportations was final agency action); *Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 334-36 (E.D. La. 2011) (blanket moratorium on deepwater drilling in the Gulf of Mexico was a final agency action); *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 2018 WL 5919096, at *5 (C.D. Cal. Nov. 9) (document that effectively lifted a moratorium constituted final agency action); *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 2007 WL 1032346, at *5 (S.D. Tex. Mar. 31, 2007) (plan that effectively closed an area to drilling operations was final agency action); *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988) (portions of the Five-Year Plan under OCSLA could be reviewed so a decision to "Pause" the 5-year plan should also be able to be reviewed); *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), as revised (Nov. 25, 2015) (DACA memo making more persons eligible for the DAPA program and extending employment authorization was a final agency action); *Wilbur v. U.S. ex rel. Barton*, 46 F.2d 217 (D.C. Cir. 1930), *aff'd sub nom. U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 51 S. Ct. 502, 75 L. Ed. 1148 (1931) (temporary withdrawal of public lands by the Secretary of the DOI was found to be a final agency action); *Al Otro Lado, Inc. v. McAleenan*, 349 F. Supp 3d 1168 (S.D. Cal. 2019) (unwritten policy of limiting asylum seekers at ports of entry from accessing the asylum process by based on false claims of capacity restraints was final agency action); *Amadei v. Nielsen*, 348 F. Supp. 3d 145 (E.D.N.Y. 2018) (unwritten policy of searching travelers for identification documents after disembarking from domestic flights was a final agency action).

those decisions in writing.'" *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1206-07 (S.D. Cal. 2019). That is not the law.

Defendants do not attempt to independently defend the Pause's legality. There can be no dispute that it was enacted without notice and comment. *But see* 5 U.S.C. §553. It violates the commands of the Outer Continental Shelf Lands Act and the Mineral Leasing Act. *See* Doc. 199-1 (Mot.) at 14-19; *see also* Parts II-III, *infra*. And it is arbitrary and capricious because it is (completely) unreasoned and fails to account for reliance interests. Mot. 21-22. Accordingly, the Pause is unlawful and should be set aside.

## II. THE EXECUTIVE ORDER IS SUBJECT TO REVIEW AND IS UNLAWFUL.

As for the Executive Order, Defendants argue that this Court may not review it because the President is not an agency, Opp. 11, and because ultra vires claims are limited to constitutional violations, Opp. 24. Plaintiff States agree that the President is not an agency, but Defendants are wrong about ultra vires claims. In fact, Defendants' leading ultra vires case explicitly acknowledged that "some claims that the President has violated a statutory mandate" could be "judicially reviewable outside the framework of the APA," and made clear to limit its holding to the proposition that "review is not available *when the statute in question commits the decision to the discretion of the President*." *Dalton v. Specter*, 511 U.S. 462, 474 (1994) (emphasis added). Plaintiff States do not contest that statement of the law. And no statute commits the decision to impose a leasing moratorium to the President's discretion, so *Dalton* is of little help to the Defendants.

In reality, ultra vires review has long been understood to include review of a president's statutory compliance. Ultra vires review, as the Fifth Circuit has explained, asks whether the Executive "exceed[ed] the authority given to it *by Congress*." *Jean v. Gonzales*, 452 F.3d 392, 397 (5th Cir. 2006) (emphasis added). Courts around the country employ ultra vires review to determine "whether the President has violated … the statute under which the challenged action was taken, or other statutes,"

4

or whether he "did not have statutory authority to take a particular action." *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383, 406 (D. Md. 2011) (citing *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002)). Ultra vires means "[u]nauthorized," *Black's Law Dictionary* (10th ed. 2014), not unconstitutional, and ultra vires review is available when a president takes an act unauthorized—or prohibited—by statute.

On the merits, Defendants say that the Executive Order does not violate the MLA or OCSLA because it is possible to "lawfully implement the Executive Order" and the Executive Order includes a savings clause. Op. 12. First, they invoke legislative history for the proposition that the Secretary has discretion to indefinitely pause leasing under the MLA. Opp. 13. But "legislative history is not the law." *Azar v. Allina Health Services*, 139 S. Ct. 1804, 1814 (2019). "It is the business of Congress to sum up its own debates in its legislation," and "once it enacts a statute, [courts] do not inquire what the legislature meant; [they] ask only what the statute means." *EPIC Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018) (cleaned up). In any case, the legislative history—which Defendants misread in any event—cannot overcome the MLA's plain text. The MLA requires that "lease sales *shall* be held for each State where eligible lands are available at least quarterly." 30 U.S.C. §226(b)(1)(A); *see Maine Comm. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.' Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.") (internal quotation marks omitted).

Second, Defendants argue that it is possible to lawfully implement the Executive Order while complying with OCSLA because an indefinite pause of leasing is not "significant" and therefore complies with OCSLA. Opp. 14-15. But if an indefinite leasing moratorium, including the cancellation of the largest Gulf lease sale in American history, is not a "significant" revision to the leasing plan, 43 U.S.C. §1344(e), then nothing is. *See* Part III, *infra*. And when a revision is significant, it is unlawful.

5

*See* Mot. 14-15. Accordingly, the Executive Order's requirement of an indefinite pause is incompatible with both the MLA and OCSLA, so its savings clause cannot save it. It is ultra vires and unlawful.

**III.     THE CANCELLATION AND PAUSE OF INDIVIDUAL LEASE SALES ARE UNLAWFUL.**

As to their individual rescission and cancellation of Lease Sales 257 and 258, Defendants do not seem to dispute that they are subject to this Court's review. *See* Opp. 18-21. Instead, they primarily defend these actions on the theory that these cancellations were not "significant" under OCSLA and were therefore lawful. Opp. 18; 43 U.S.C. §1344(e). But OCSLA directs the Secretary to administer a leasing program to sell exploration interests in portions of the Shelf to the highest bidder. 43 U.S.C. §§1334(a), 1337(a)(1). It sets out a four-step process in which the Secretary must (1) create a Five-Year Leasing Program, (2) hold lease sales in accordance with that plan, (3) grant or deny exploration permits and plans, and (4) grant or deny final development and production plans. *See Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F. Supp. 2d 627, 632 (E.D. La. 2010) (citing *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984)). The Secretary must make the Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." *Id.*; *see also Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 339 (E.D. La. 2011) (noting "OCSLA's overriding policy of expeditious development"). And crucially, after the completion of Step (1), any revision to the Program must go through an extensive process when it is "significant." 43 U.S.C. §1344(e).

The cancellation of an entire lease sale, especially the largest Gulf lease sale in the nation's history, is a "significant" revision by any measure. DOI itself has long conceded that OCSLA's exception for insignificant revisions is narrow. In the very memorandum that Defendants cite in support of their position that the lease cancellations are not significant, DOI explained as a matter of statutory interpretation that, like any "exception to a positive statement of primary legislative policy," the insignificant-revision exception "should be narrowly construed." Department of Interior

6

Memorandum M-36983, *What are 'Significant' Revisions in the Five-Year Outer Continental Shelf (OCS) Oil and Gas Leasing Program?* 2 (Feb. 12, 1996), on.doi.gov/3c6Raz2 (collecting statutory-interpretation authorities). It took the position that a revision of a Five-Year Program is therefore "significant" whenever it significantly affects "the potential for discovery of oil and gas," "environmental or other impacts in coastal areas," or "the sharing of the developmental benefits and environmental risks of offshore development." *Id.* at 4. And it concluded that adding a "planning area" to a Five-Year Program would constitute a "significant" revision. *Id.* Defendants cite no cases supporting their new and contrary view that rescinding and cancelling massive lease sales is not a significant revision.

Defendants also defend the individual lease sales on consequentialist grounds. They make the elaborate argument that if this Court were to hold that rescinding and cancelling lease sales is "significant," then it follows that the original Program must have compelled an "irreversible and irretrievable commitment of resources," *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 599 (D.C. Cir. 2015), and that if the D.C. Circuit then followed this Court's holding in this case (and accepted the same implication), then NEPA challenges—which arise only within the D.C. Circuit—would be ripe earlier. Opp. 19-20. But this chain of reasoning is wrong at every step. First, holding that rescinding and cancelling lease sales is "significant" would not imply that the original Program is an "irreversible and irretrievable commitment of resources." Such a holding would still allow a Program to be revised, either in insignificant ways or through the heightened procedure. And no resources are irreversibly and irretrievably committed until concrete details about the lease are filled in at later stages. Second, even if this Court's holding had the consequence that Defendants describe in the D.C. Circuit—which is not how the federal judiciary works—the D.C. Circuit's opinion in *Jewell* takes a pragmatic approach to ripeness that would be unaffected by this Court's holding because it ultimately focuses on whether a challenge "would impose too onerous an obligation" on the agency, whether the NEPA challenger "suffer[s]" by "having to wait," and whether any "drilling will have occurred" at the early stage. 779

7

F.3d at 600. And third, it is not within this Court's purview when interpreting OCSLA to consider whether it can do so in a way that optimizes NEPA ripeness doctrine. This Court should reject Defendants' invitation to ignore the statutory text to play 4D chess with the D.C. Circuit.

## IV. DEFENDANTS' REMEDIAL AND JURISDICTIONAL ARGUMENTS ARE WRONG.

Plaintiff States need not satisfy the permanent injunction standard for their APA claims because the APA authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed" and "set aside agency action" that is arbitrary and capricious, not in accordance with law, or in excess of statutory authority or limitations. 5 U.S.C. §706(1)-(2). For their non-APA claims, Plaintiff States will sustain irreparable harm due to reduced funding for bonuses, ground rent, royalties, and rentals; lost jobs in the oil and gas sector; higher gas prices and losses to local municipalities and governments; and reduced funding to Louisiana's Coastal Master Plan, which would reduce proceeds that are used in Louisiana's coastal recovery and restoration program. PI Op. 40; Docs. 3-2 to 3-6; *see also* 43 U.S.C. §1337(g)(5)(A)(i) (Coastal States entitled to 27 "percent of all bonuses, rents, and royalties" under OCSLA); 30 U.S.C.A. §191(a) (State in which land located entitled to 50 percent of "sales, bonuses, royalties ..., and rentals" under MLA); BOEM, *2017-2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program* 10-20 (Nov. 2016). Plaintiff States will not be able to recover money damages against the Government Defendants due to sovereign immunity. *Wages & White Lion Invs. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021).

The balance of the equities and the public interest favor an injunction because the public interest is served when the law is followed. *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). And the public interest is not served when the federal Executive's lawless environmental agenda is allowed to further destroy Plaintiff States' economies and devastate the livelihoods of their people. PI Op. 41-42.

And although Defendants argue that this Court cannot compel agency action unreasonably delayed because they have not "failed to take a *discrete* agency action that it is *required to take*," Opp. 23, this new framing simply recycles their failed merits arguments. The Pause and their cancellations were discrete agency actions, not the nebulous "programmatic" challenges that Defendants paint them to be. The Pause sets a mandatory rule of decision in all lease sales. Although Defendants say that *Lujan v. National Wildlife Federation*, 497 U.S. 871, 893 (1990), precludes this claim, Opp. 24, *Lujan* specifically affirmed that a specific action "applying some particular measure across the board" would constitute final agency action. *Id.* at 890 n.2. And other courts have held in similar contexts that "requesting BLM conduct quarterly leases of eligible and available parcels is not a programmatic challenge, but a request that this Court enforce a discrete, non-discretionary duty contained in a single statutory provision, unlike the situation in *Lujan*." *W. Energy All. v. Jewell*, 2017 WL 3600740, at *13 (D.N.M. Jan. 13, 2017); *see also Dunn-McCampbell Royalty Int., Inc. v. NPS*, 2007 WL 1032346, at *5 (S.D. Tex. Mar. 31, 2007) (challenge to closure of "acreage to drilling operations" is "not a broad-based 'programmatic challenge'"). As to the notion that Plaintiff States improperly challenge "failures that have not yet occurred," Opp. 24-25, the reality is that Defendants have rescinded and cancelled a series of lease sales that they were required to hold. These are failures that have already occurred (and, of course, will continue to occur) since the Pause went into effect.

Finally, Defendants' novel attempt to prohibit this Court from reviewing statutory ultra vires claims, Opp. 24, fails for the reasons discussed in Part II, *supra*.

## CONCLUSION

This Court should grant Plaintiffs' motion for summary judgment.

9

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: July 13, 2022 | _/s/ Elizabeth B. Murrill_ |
| TYLER R. GREEN<br>JEFFREY S. HETZEL<br>CONSOVOY MCCARTHY PLLC<br>222 S. Main Street, 5th Floor<br>Salt Lake City, UT 84101<br>(703) 243-9423 | JEFF LANDRY<br>Attorney General<br>ELIZABETH B. MURRILL<br>  Solicitor General<br>JOSEPH S. ST. JOHN<br>  Deputy Solicitor General<br>LOUISIANA DEPARTMENT OF JUSTICE<br>1885 N. Third Street<br>Baton Rouge, LA 70804<br>Tel: (225) 326-6766<br>murrille@ag.louisiana.gov<br>stjohnj@ag.louisiana.gov<br><br>*Counsel for Plaintiff States* |

OTHER COUNSEL:

STEVE MARSHALL
  Attorney General of Alabama
Edmund G. LaCour Jr.
  Solicitor General
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130
Tel: (334) 353-2196
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAg.gov
*Counsel for the State of Alabama*

TREG TAYLOR
  Attorney General of Alaska
Ronald W. Opsahl (Colo. Bar No. 35662)
  Assistant Attorney General
Alaska Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5100
Fax: (907) 276-3697
ron.opsahl@alaska.gov
*Counsel for the State of Alaska*

LESLIE RUTLEDGE
   Attorney General of Arkansas
Nicholas J. Bronni
   Solicitor General
Dylan L. Jacobs
   Assistant Solicitor General
Office of Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.bronni@arkansasag.gov
*Counsel for the State of Arkansas*

CHRISTOPHER M. CARR
   Attorney General of Georgia
Stephen Petrany
   Solicitor General
Office of the Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Counsel for the State of Georgia*

LYNN FITCH
   Attorney General of Mississippi
Krissy C. Nobile
   Deputy Solicitor General
State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
*Counsel for the State of Mississippi*

ERIC S. SCHMITT
   Attorney General of Missouri
Justin D. Smith
   Deputy Attorney General for Special Litigation
Jeff P. Johnson
Michael E. Talent
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-0304
Fax: (573) 751-0774
Justin.Smith@ago.mo.gov

11

*Counsel for the State of Missouri*

AUSTIN KNUDSEN
  Attorney General of Montana
David M.S. Dewhirst
  Solicitor General
Montana Attorney General's Office
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
406.444.4145
david.dewhirst@mt.gov
*Counsel for the State of Montana*

DOUGLAS J. PETERSON
  Attorney General of Nebraska
James A. Campbell
  Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov
*Counsel for the State of Nebraska*

JOHN M. O'CONNOR
  Attorney General of Oklahoma
Bryan Cleveland
  Deputy Solicitor General
Oklahoma Office of Attorney General
313 N.E. 21ST Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
bryan.cleveland@oag.ok.gov
*Counsel for the State of Oklahoma*

KEN PAXTON
  Attorney General of Texas
Brent Webster
  First Assistant Attorney General
Judd E. Stone II
  Solicitor General
Patrick Sweeten
  Deputy Attorney General
Office of the Attorney General
P.O. Box 12548 (MC 009)
Austin, Texas 78711-2548
Tel.: (512) 463-4139

Fax: (512) 474-2697
Patrick.Sweeten@oag.texas.gov
Judd.Stone@oag.texas.gov
*Counsel for the State of Texas*

SEAN D. REYES
   Attorney General of Utah
Melissa A. Holyoak
   Solicitor General
Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(385) 271.2484
melissaholyoak@agutah.gov
*Counsel for the State of Utah*

PATRICK MORRISEY
   Attorney General of West Virginia
Lindsay S. See
   Solicitor General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(304) 558-2021
Lindsay.s.see@wvago.gov
*Counsel for the State of West Virginia*