**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

**STATE OF LOUISIANA ET AL**          **CASE NO.  2:21-CV-00778**

**VERSUS**                            **JUDGE TERRY A. DOUGHTY**

**JOSEPH R BIDEN JR ET AL**          **MAG. JUDGE KATHLEEN KAY**

<u>**MEMORANDUM RULING**</u>

On January 27, 2021, President Joseph R. Biden, Jr. ("President Biden") signed

Executive Order 14008[1] entitled "Tackling the Climate Crisis at Home and Abroad." (hereinafter

"Executive Order 14008").  Section 208 of Executive Order 14008, in pertinent part, states:

> Oil and Natural Gas Development on Public Lands and in Offshore
> Waters.  To the extent consistent with applicable law, the Secretary of the
> Interior shall pause new oil and natural gas leases on public lands or in
> offshore waters pending completion of a comprehensive review and
> reconsideration of Federal oil and gas permitting and leasing practices in
> light of the Secretary of the Interior's broad stewardship responsibilities
> over the public lands and in offshore waters, including potential climate
> and other impacts associated with oil and gas activities on public lands or
> in offshore waters.

At issue in this proceeding is whether President Biden had the authority to order a stop on

oil and gas activities in light of the Outer Continental Shelf Lands Act[2] ("OCSLA") and the

Mineral Leasing Act[3] ("MLA").  Also at issue is whether the various Government Defendant

agencies' implementation of Section 208 of Executive Order 14008 violated the Administrative

Procedures Act[4] ("APA").

---

[1] 86 Fed. Reg. 7619
[2] 43 U.S.C. § 1332, et seq.
[3] 30 U.S.C. § 226, et seq.
[4]  5 U.S.C.  § 551, et seq.

Pending before the Court is a Motion for Summary Judgment [Doc. No. 199] filed by Plaintiff States[5] and a Cross Motion for Summary Judgment [Doc. No. 209] filed by Government Defendants.[6]  Oppositions [Doc. Nos. 208 and 217] have been filed by Government Defendants and Plaintiff States.  Replies [Doc. No. 215 and 218] have been filed by Government Defendants and Plaintiff States.

Additionally, Amici Curiae Memoranda [Doc. Nos. 213 and 214] have been filed by Conservation Groups[7] in opposition to Plaintiff States' Motion for Summary Judgment and in support of Government Defendants' Cross Motion for Summary Judgment.

For the reasons set forth herein, Plaintiff States' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, and Government Defendants' Cross Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

---

[5] The Plaintiff States consist of the States of Louisiana, Alabama, Alaska, Arkansas, Georgia, Mississippi, Missouri, Montana, Nebraska, Oklahoma, Texas, Utah, and West Virginia.

[6] Government Defendants consist of Joseph R. Biden, Jr. in his official capacity as President of the United States; Deb Haaland, in her official capacity as Secretary of the Interior; Michael Nedd, in his official capacity as Deputy Director of the Bureau of Land Management; Chad Padgett, in his official capacity as Director of the Bureau of Land Management Alaska Office; Raymond Suazo, in his official capacity as Director for the Bureau of Land Management Arizona  Office; Karen Mouristen, in her official capacity as Director for the Bureau of Land Management California Office; Jamie Connell, in his official capacity as Director for the Bureau of Land Management Colorado Office; Mitchell Leverette, in his official capacity as Director for the Bureau of Land Management Eastern States Office; John Ruhs, in his official capacity as Director for the Bureau of Land Management Idaho Office; John Mehlhoff, in his official capacity as Director for the Bureau of Land Management Montana – Dakotas Office; Jon Raby, in his official capacity as Director for the Bureau of Land Management Nevada Office; Steve Wells, in his official capacity as Director for the Bureau of Land Management New Mexico Office; Barry Bushue, in his official capacity as Director for the Bureau of Land Management Oregon-Washington Office; Greg Sheehan, in his official capacity as Director for the Bureau of Land Management Utah Office; Kim Liebhauser, in her official capacity as Director for the Bureau of Land Management Wyoming Office; Amanda Lefton, in her official capacity as Director of the Bureau of Ocean Energy Management; Michael Celata, in his official capacity as Regional Director of the Bureau of Ocean Energy Management Gulf of Mexico Office; Lars Herbst, in his official capacity as Regional Director of Bureau of Safety and Environmental Enforcement Gulf of Mexico OCS Office; and Mark Fesmire, in his official capacity as Regional Director of the Bureau of Safety and Environmental Enforcement Alaska and Pacific Office.

[7] Conservation Groups consist of Healthy Gulf, Center for Biological Diversity, Cook Inletkeeper, Defenders of Wildlife, Friends of the Earth, Natural Resources Defense Council, Oceana, Sierra Club and The Wilderness Society.

## I.      BACKGROUND

President Biden signed Executive Order 14008 on January 27, 2021.  Section 208 of
Executive Order 14008 "to the extent consistent with applicable law," ordered the Secretary of
the Department of the Interior to "pause" new oil and gas leases on public lands or in offshore
waters pending the completion of a comprehensive review of Federal oil and gas permitting and
leasing practices.

The offshore oil and gas leases are governed by the OCSLA.  The offshore oil and gas
leases are further governed by the 2017-2022 Five-Year Oil and Gas Leasing Program.  The
process of creating the current 2017-2022 OCSLA program began in 2014, during the Obama
Administration.  The Bureau of Ocean Energy Management ("BOEM") published a request for
information ("RFI") in the Federal Register, 79 Fed. Reg. 34349, and sent a letter to all
governors, tribes and interested federal agencies.[8]

A Draft Proposed Program[9] was published in 2015.  The publication of the program
started a sixty-day comment period in which BOEM received over one million comments.
Thereafter, BOEM published the Proposed Final Program in November 2016.  The Final
Program was approved on January 17, 2017.  The Final Program scheduled ten (10) lease sales in
the Gulf of Mexico and one (1) lease sale in Alaska in the Cook Inlet.  The lease sales were
scheduled with one sale in 2017, two sales in 2018, two sales in 2019, two sales in 2020, two
sales in 2021, and one sale in 2022.[10]  Of particular significance herein is Lease Sale number 257
in the Gulf of Mexico, and Lease Sale number 258 in the Alaskan Cook Inlet.

---

[8] BOEM received over 500,000 comments in a response to the RFI.
[9] [Doc. No. 199 Exh. 11 pp. 1-2 ]
[10] [Doc. No. 199 Exh 3, p. 18]

### A.  The Outer Continental Shelf Lands Act

Congress passed the OCSLA more than seventy years ago.[11] The policy behind the act was to declare that "the subsoil and seabed of the outer Continental Shelf" ("the Shelf") are subject to the jurisdiction, control, and power of disposition of the United States. 43 U.S.C. § 1332(1). The OCSLA establishes the Shelf as "a vital national resource reserve held by the Federal Government for the public." *Id.* at § 1332(3). It mandates the Secretary of the Interior ("the Secretary") to make this national resource reserve subject to expeditious, orderly development, and environmental safeguards. *Id.* This is known as the expeditious development policy.[12]

To facilitate this expeditious development of the Shelf, the OCSLA contains a four-step process that the Secretary must follow in order to administer a leasing program that sells exploration interests in portions of the Shelf to the highest bidder.[1] 43 U.S.C. §§ 1334(a); 1337(a)(1). The Secretary must (1) create a Five-Year Leasing Program, (2) hold lease sales, (3) grant or deny exploration permits and plans, and (4) grant or deny final development and production plans. *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F. Supp. 2d 632 (E.D. La. 2010).[13] The Five-Year Leasing Program is subject to procedural requirements, and the "requirements of the National Environmental Policy Act ("NEPA") and Endangered Species Act ("ESA") must be met before a lease sale can be held." 43 U.S.C. §§ 1344(c)-(d); 1337; *Sec'y of the Interior v. California*, 464 U.S. 312, 338 (1984).

The Secretary is responsible for regulating any lease issued under the OCSLA, and he may regulate provisions for suspension or prohibition of any operation on the Shelf, cancellation

---

[11] [Doc. No. 3-1 p. 6].
[12] [Doc. No. 3-1 p. 6].
[13] [Doc. No. 3-1 p. 6].

of leases, assignments of leases, subsurface storage of oil and gas, drilling, prompt and efficient exploration, etc. 43 U.S.C. § 1334(a). Issuance and continuation of leases will be determined by compliance with the Secretary's regulations. *Id.* at § 1334(b). The specific leases that are granted to the highest bidder include: "any oil and gas lease on the submerged lands of" the Shelf, sulphur leases, and other mineral leases. *Id.* at §§ 1337(a), (i), (k). The biddings on an oil and gas lease will be sealed and can be based on one of several options laid out within the statute. *Id.* at §§ 1337(a)(1)(A)-(I). Once an oil and gas lease is issued, it must meet certain requirements dictated within the statute, including covering an "area not exceeding 5,760 acres," being for an initial period of five years, absent a specific need, and entitling "the lessee to explore, develop, and produce the oil and gas contained within the lease area." *Id.* at § 1337(b).

Under the OCSLA, any United States agency or person authorized by the Secretary may conduct geological and geophysical explorations of the Shelf as long as it does not interfere with operations under an OCSLA lease, or harm aquatic life. *Id.* at § 1340(a)(1). To conduct oil and gas exploration, the lessee must submit an exploration plan for approval, and the Secretary must approve the plan within thirty days of submission, absent any reason for cancelling the lease. *Id.* at § 1340(c). The exploration plan must include a schedule of the anticipated exploration activities, a description of the equipment to be used, the location of each well, and other pertinent information. *Id.* at § 1340(c)(3).

An oil and gas lessee must submit a development and production plan for approval prior to any development or production under said lease. *Id.* at § 1351(a)(1). The plan must describe the specific work to be done, a description of all facilities and operations to be related to the development, the environmental safeguards to be implemented, all safety standards to be met, an expected schedule of production, and other relevant information. *Id.* at § 1351(c). There must

also be a detailed statement describing all facilities and operations to be constructed or used in the development or production of oil and gas from the lease. *Id.* at § 1351(a)(2). After receipt of this plan, the Secretary must make the plan public within ten days,[14] receive comments and recommendations,[15] and approve or disprove the plan within sixty days.[16] The Secretary may disapprove a plan or require modifications for several reasons, but the lessee may reapply.[17]

The Secretary must follow strict regulations for the Shelf Five-Year leasing program. *Id.* at § 1344. After submission of the original leasing program, the Secretary must maintain an oil and gas leasing program that contains a schedule of proposed lease sales and the size, timing, and location of leasing activity for the next five-year period. *Id.* at § 1344(a). The Secretary must review the program every year to consider possible revisions. *Id.* at § 1344(e). He must also maintain the program in compliance with certain statutory principles and revise accordingly. *Id.* at §§ 1344(a)-(b). The Secretary must consider suggestions from governors of affected states and interested federal agencies and submit the program to Congress. *Id.* at §§ 1344(c)-(d).

Any OCSLA lease holder must maintain compliance with occupational safety and health standards and environmental regulations. *Id.* at § 1348(b). The Secretary will enforce safety and environmental regulations and conduct onsite inspections to maintain compliance. *Id.* at § 1348(c). The lease holders must maintain all places of employment or areas covered by the leases in compliance with regulations, maintain all operations in compliance with regulations, and allow prompt access to any inspector. *Id.* at § 1348(b). The OCSLA lease holders must also comply with regulations regarding the access to oil and gas information. *Id.* at § 1352. The

---

[14] *Id.* at § 1351(a)(3).
[15] *Id.* at § 1351(g).
[16] *Id.* at § 1351(h).
[17] *Id.*

required information and data collected by a lessee's activities are to be properly transmitted and provided to the Secretary.[18]

If there is any violation of an OCSLA provision, a civil action may be instituted to enforce the appropriate penalty. *Id.* at. § 1350. These can include a restraining order or injunction against the offender. *Id.* at § 1350(a).

### 1.  Lease Sale 257

Lease Sale 257 was to comprise the Western and Central Planning Areas of the Gulf of Mexico and a portion of the Eastern Planning Area not subject to congressional moratorium.[19] BOEM published a Proposed Notice of Sale for Lease 257 in November 2021. 85 Fed. Reg. 73508.  BOEM sent the Proposed Notice to governors of the affected States and opened it for public comment.  Lease Sale 257 was approved by the Secretary of the Interior in a Record of Decision ("ROD")[20] (86 Fed. Reg. 6365), and he scheduled Lease Sale 257 for March 17, 2021.

On February 18, 2021, Michael Celata, Regional Director of BOEM's Gulf of Mexico office, issued a Notice to Rescind the prior Lease Sale 257 ROD. 86 Fed. Reg. 10132. The only stated rationale for rescinding the prior ROD was "to comply with Executive Order 14008."  The Rescission Notice further stated that BOEM may reevaluate Lease Sale 257 and publish an appropriate ROD in the Federal Register.

This Court issued a Preliminary Injunction on June 15, 2021.[21]  The Injunction enjoined agency executive branch officials from implementing the pause of new oil and gas leases on public lands or in offshore waters, as set forth in Section 208 of Executive Order 14008.[22]  After

---

[18] *Id.*
[19] [Doc. No. 199-1, p 11].
[20] [Doc. No. 199-6, p. 2]
[21] [Doc. No. 140]
[22] *Id.*

no lease sale was rescheduled, on August 8, 2021, Plaintiff States filed a Motion for Order to Show Cause and Motion to Compel.[23]  Government Defendants opposed the motion and revealed in their brief that Lease Sale 257's ROD would be reissued.[24]  The new ROD rescheduled Lease Sale 257 to November 17, 2021.

Bids for Lease Sale 257 were received on November 17, 2021.  Thereafter, environmental advocacy organizations filed another suit against the Department of the Interior and BOEM in the United States District Court, District of Columbia. *Friends of the Earth, et al v. Haaland*, 2022 WL 254526 (D.D.C. Jan. 27, 2022). The suit alleged a violation of the National Environmental Policy Act ("NEPA"). On January 27, 2022, Judge Rudolph Contreras vacated the November 17, 2021, lease sale finding a violation of NEPA. The decision has been appealed by Louisiana, but Government Defendants did not appeal the decision.  Therefore, no lease has been issued by Government Defendants as to Lease Sale 257.

### 2.  Lease Sale 258

Lease Sale 258 involves property in the Cook Inlet of Alaska.  In September 2020, BOEM began the process of preparing the lease sale.  BOEM released a Call for Information and Nomination in the Federal Register to allow industry parties to indicate interest in parcels of the sale area. 85 Fed. Reg. 55861. BOEM also released a Notice of Intent to Prepare an Environmental Impact Statement ("EIS"), which provided the public with an opportunity to comment on the scope of the lease sale. *Id*.  In January 2021, after accounting for comments, BOEM published a Notice of Availability[25] indicating the area proposed for the sale and proposed a draft environmental impact statement.[26] Fed. Reg. 86 4116; 86 Fed. Reg. 4117.

---

[23] [Doc. No. 149]
[24] [Doc. No. 155]
[25] [Doc. No. 199-7 p. 2].
[26] [Doc. No. 199-8, p. 2].

In February 2021, after Executive Order 14008, BOEM published a press release on its website cancelling both the public comment period on the draft EIS, and public meetings about Lease Sale 258. 86 Fed. Reg. 10,132-01. The press release gave no justification for the cancellations except for Executive Order 14008.  On February 23, 2021, the information in BOEM's press release was later published in the Federal Register. 86 Fed. Reg. 10994. It also relied solely on Executive Order 14008 for the cancellations.  BOEM also indicated it would publish a subsequent notice in the Federal Record if it decided to resume its NEPA evaluation following the comprehensive review.[27]

On October 29, 2021, BOEM published in the Federal Register a notice of availability for a draft EIS analyzing the potential environmental impacts of Lease Sale 258. 86 Fed. Reg. 60068.  BOEM indicated it did not receive any nominations or direct indications of interest from potential bidders and BOEM decided not to proceed with Lease Sale 258.[28]

**B. The Mineral Leasing Act**

The MLA governs the energy-producing lands the Federal Government holds onshore and onshore lease sales of public land. 30 U.S.C. § 226(b)(1)(A). Land is "available" to be leased if statutory requirements are met and if it is in the public interest to approve the lease.[29] To be eligible for an oil and gas lease under the MLA, an applicant must establish that valuable deposits of oil or gas have been discovered within the limits of the land to be governed by a permit. 30 U.S.C. § 223. After establishing discovery of oil and gas, the permittee is entitled to a lease for one-fourth of the land governed by the permit, and the lease shall extend up to twenty years.[30] Any land leased under the MLA is subject to the condition that the lessee "use all

---

[27] *Id.*
[28] U.S. Dept. of Interior, Sale 258 Status Update
[29] [Doc. No. 209-1, pp. 9-10].
[30] *Id.*

reasonable precautions to prevent waste of oil or gas developed in the land, or the entrance of water through wells drilled by him to the oil sands or oil-bearing strata, to the destruction or injury of the oil deposits." *Id.* at § 225. Any violation of the MLA will be grounds to forfeit the lease.[31]

The Secretary is responsible for leasing lands under the MLA, and he is required to hold lease sales "for each State where eligible lands are available at least quarterly" and award the lease to the highest bidder. *Id.* at §§ 226(a)-(b). The winning bid must be for at least the national minimum acceptable bid, which is established by regulation from the Secretary, to avoid rejection. *Id.* at § 226(b)(1)(A). The lease will be issued within sixty days of the payment by the highest bidder of the remainder of the bonus bid and the first year's annual rent.[32] Land meeting certain criteria will be subject to other statutory regulations for leasing,[33] and certain federal lands are excluded from being leased. *Id.* at §§ 226(b)(2), (3); § 226-3.

The Secretary will regulate all "surface-disturbing activities conducted pursuant to any lease issued" under the MLA. *Id.* at § 226(g). No permit to drill will be issued without the Secretary receiving and approving a plan of operations that describes the proposed surface-disturbing activities within the leased area.[34] The Secretary is further authorized to approve "operating, drilling, or development contracts" when either the conservation of natural products, the public convenience or necessity, or the United States' interests may be best served.[35]

The MLA provides that, for oil and gas leases on federal lands, in States other than Alaska, fifty percent of bonuses, production royalties, and other revenues are granted to the State

---

[31] *Id.*
[32] *Id.*
[33] These statutes dictate special tar sand areas and lands that the United States had a vested future interest in.
[34] *Id.*
[35] *Id.*

in which the lease is located, and forty percent is granted to the Reclamation Fund, which maintains irrigation systems in several Western States.[36] 30 U.S.C. §191(a). For leases in Alaska, ninety percent of revenues are granted to the State.[37]

### C. Post-Executive Order MLA Lease Sales

After the signing of Executive Order 14008, BLM offices halted all pending quarterly lease sales through an issuance of a BLM Fact Sheet.[38]  The BLM Fact Sheet relied on the Executive Order directing the Department of the Interior to "pause" new oil and gas leasing on public lands and offshore waters for the halt.

BLM postponed a Nevada lease sale on March 9, 2021, and there was no reason provided for the postponement.[39] On February 17, 2021, a March 25, 2021, Colorado sale was postponed, and, again, there was no reason provided for the postponement.[40]  On February 12, 2021, lease sales in Colorado, Montana, Wyoming, and Utah were postponed, with project sites listed as "paused."[41]  The reason listed was to confirm the adequacy of underlying environmental analyses.[42]

On February 12, 2021, a Utah oil and gas lease sale scheduled for March 30, 2021, was postponed.  The reason listed was to determine whether additional NEPA needed to be conducted to determine if parcels were suitable to be offered.[43]  On January 27, 2021, the DOI, BLM published Errata #1 with regard to an internet-based competitive oil and gas lease in

---

[36] [Doc. No. 3-1, p. 10]
[37] *Id.*
[38] BLM Fact Sheet, Hitting Pause on New Oil and Gas Leasing, biden-take-action-uphold-committment-restore-balance-public-lease-lands
[39] [Doc. No. 120-5 p. 2]
[40] [Doc. No. 120-5 p. 3]
[41] [Doc. No. 120-5 p. 4]
[42] [Doc. No. 120-5 p. 6]
[43] [Doc. No. 120-6 p. 1]

Nevada, which consisted of seventeen parcels containing approximately 73,600 acres.  The Notice stated the March 9, 2021, sale had been postponed, with no additional reasons given.[44]

On February 12, 2021, a Memorandum[45] from Travis Annatoyn to Laura Daniel-Davis stated it was Annatoyn's opinion that lease sales set in Colorado or Montana and the Dakotas be postponed because of a lack of analysis on greenhouse gas emissions due to a 2020 lawsuit.  The Memorandum also recommended cancelling lease sales scheduled in Utah and Wyoming due to lack of an environmental analysis.

On February 12, 2021,[46] Mitchell Leverette sent a Memorandum to Michael D. Nedd of BLM. The memorandum recommended postponing the scheduled March 18, 2021, lease sales in Alabama and Mississippi (14 parcels, 5439 acres) and rescheduling the sale for June 17, 2021. The reason given was to complete additional air quality analysis to comply with the *WildEarth Guardians* opinion.  On February 11, 2021, a Memorandum to Michael Nedd by Gregory Sheehan recommended postponing a March 30, 2021, competitive lease sale in order to reevaluate the parcels to comply with the opinion in the *Rocky Mountain Wild* case.[47]

On March 1, 2021, in an email from Laura Daniel-Davis to Michael Nedd,[48] Daniel-Davis told Nedd that Department officials were postponing further consideration of Quarter Two Sales pending decisions on how the Department would implement Executive Order 14008 with regard to onshore sales.  Daniel-Davis told Nedd to post on the relevant website that "[t]he oil and gas lease scheduled for April 2021 has been postponed."

---

[44] [Doc. No. 120-6 p. 2]
[45] [Doc. No. 120-6 pp. 3-4]
[46] [Doc. No. 120-6, pp. 5-6 ]
[47] [Doc. No. 120-6, pp. 7-8]
[48] [Doc. No. 120-6 p. 10]

Government Defendants filed Notices of Competitive Lease Sale Activity on April 22, 2022.[49] The Notices showed that competitive lease sales were scheduled in Utah, Nevada, New Mexico, Colorado, Wyoming, and Montana.[50]

Government Defendants maintain work began on the "comprehensive review" mentioned in Executive Order 14008 on January 6, 2021, and was completed on October 12, 2021.[51] Government Defendants indicated they relied on that comprehensive review to prepare a new NEPA approach in drafting NEPA analyses for Q1 2022 lease sales.  However, due to a court decision which enjoined some of the NEPA changes in the comprehensive review, Government Defendants maintain this decision prevented BLM from proceeding with Q1 2022 lease sales.[52] *The State of Louisiana, et al v. Joseph R. Biden, Jr., et al*, Case No. 2:21-1074, W.D. of Louisiana.

Therefore, after the United States Court of Appeals for the Fifth Circuit Stayed that injunction,[53] Government Defendants state they have rescheduled Q2 2022 lease sales for June 2022.[54]  There is nothing in the record for the Court to determine whether the June 2022, onshore lease sales took place.  Government Defendants have not provided any evidence showing even one onshore or offshore lease sale has taken place since Executive Order 14008 was signed on January 27, 2021.

---

[49] [Doc. No. 198]
[50] *Id.*
[51] [Doc. No. 208-1 p 32 ¶33] [Doc. No. 209-1 p. 14]
[52] [Doc. No. 209-1 p. 14] and Declaration of Peter Cowan, [Doc. No. 191-2]
[53] [Doc. No. 198-7].
[54] [Doc. No. 198-1-6, Exhibits. A-F]

## II.    LAW AND ANALYSIS

### A.  What is a Pause?

Prior to addressing jurisdictional arguments, Government Defendants question what a "Pause" is.  They argue that neither Plaintiff States nor the Court has defined Pause in a manner that Government Defendants can understand.  Additionally, Government Defendants maintain the word is too ambiguous to meet the specificity requirements of FED. R. CIV. P. 65.  The Fifth Circuit also believed the term was too vague to meet the specificity requirements of FRCP 65.[55]

This Court has previously used the noun "Pause" to describe the action referred to by President Biden in Section 208 of Executive Order 14008.[56] "Pause" is defined as "a temporary stop."[57]  In this case, the use of the term "Pause" referred to the temporary stop ordered by President Biden in Section 208 of Executive Order 14008, the one addressed by Michael Celata in the Notice to Rescind Lease Sale 257,[58] the one addressed by BOEM in its February 2021, press release and Federal Register publication,[59] the one addressed by the BLM Fact Sheet, HITTING PAUSE ON NEW OIL AND GAS LEASING, and the one addressed by Laura Daniel-Davis in her March 1, 2021, email to Michael Nedd.[60]

The word "Pause" was used because that is the word used in President Biden's Executive Order and thereafter by Government Defendant agencies.  However, the Court finds that, in this case, the most appropriate word to use would be "stop." This is because the offshore and onshore Federal leasing process was completely **stopped** as to eligible lands in all scenarios mentioned herein. This "stop" was enacted by Executive Order 14008 one week into President Biden's term

---

[55] United States Court of Appeals for the 5th Cir., Case No. 21-30505,  August 17, 2022
[56] "To the extent consistent with applicable law, the Secretary of the Interior shall **pause** new oil and gas leases on public lands, or in offshore waters pending completion of a comprehensive review…" (emphasis added)
[57] "Pause," *Merriam-Webster*, https://www.merriam-webster.com/dictionary/pause.
[58] 86 Fed. Reg. 10132
[59] 86 Fed. Reg. 10994
[60] [Doc. No. 120-6 p. 10 PR 86]

after a campaign promise to stop oil and gas leasing on federal lands.[61]  Based upon the previous campaign promise and the lack of lease sales on federal lands since the Executive Order was issued nineteen months ago, the Court finds there was an unwritten policy to "stop" the onshore and offshore leasing process by calling the stopping a "pause."  In the nineteen months after Executive Order 14008 was issued, the only onshore or offshore lease sale that took place was the sale of Lease Sale 257.  That would not have occurred if not for this lawsuit, the preliminary injunction, and Motion for Contempt[62] filed by Plaintiff States.  In other words, Government Defendants called it a "Pause," but it was really a complete "Stop" of the federal leasing process. The word "stop" is defined as "a cessation of movement or operation."[63]  As it relates to this case, the Court refers to the Stop as the cessation of the leasing process of eligible federal lands.

### B.  Jurisdiction

In their argument that Plaintiff States have no jurisdiction, Government Defendants assert that Plaintiff States do not have standing, that there is no jurisdiction over agency actions that occurred after the suit was filed, that there is no jurisdiction over an agency "Pause" (Stop) because it is a programmatic challenge, because no "Pause" (Stop) exists, and because Plaintiff States' requested relief is time barred under 28 U.S.C. § 2401(a).[64]

The Court will analyze the question of jurisdiction below.

### 1.  Standing

The United States Constitution limits the exercise of judicial power to certain "cases and controversies." U.S. Constitution Article III Section 2. Under the doctrine of "standing," a

---

[61] [Doc. No. 3-1 p.5]
[62] [Do. No. 149]
[63] "Stop," *Merriam-Webster*, https://www.merriam-webster.com/dictionary/stop.
[64] The Court only uses the word Pause here as it relates to Government Defendants' arguments; the Court finds that the word Pause does not appropriately or accurately address what the Executive Order did here, but it does find that the word Stop more accurately reflects the results of EO 14008. The Court will, hereafter, only use the word Pause if it is referring to Government Defendant's arguments.

federal court can exercise judicial power only where a plaintiff has demonstrated that it (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that it is likely to be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).  The party invoking federal jurisdiction bears the burden of establishing these elements.  *Id.* at 561.

The Plaintiffs in this case are thirteen (13) States.  States are not normal litigants for purposes of invoking federal jurisdiction. *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007).  Rather, a State is afforded "special solicitude" in satisfying its burden to demonstrate the traceability and redressability elements of the traditional standing inquiry, whenever its claims and inquiry meet certain criteria. *Id.* at 520. Specifically, a state seeking special solicitude standing must allege that a defendant violated a congressionally accorded procedural right that affects the state's "*quasi-sovereign*" interests in, for instance, its physical territory or lawmaking function. *Id.* at 520-21.

In *Massachusetts v. E.P.A.*, the United States Supreme Court found the State of Massachusetts had standing to review an EPA order refusing to regulate greenhouse gas emissions from motor vehicles under the Clean Air Act.  The Court found Massachusetts' alleged rise in sea levels was "actual and imminent" as "injury in fact." *Id* at 521. Additionally, the Court found Massachusetts had *parens patriae* standing because the alleged order affected Massachusetts' "*quasi-sovereign*" interests. *Id* at 520. In determining whether a state's "*quasi-sovereign*" interests are affected, the Court stated that one helpful indication is whether the injury is one that the state, if it could, would likely attempt to address through its sovereign lawmaking powers. *Id.*

Plaintiff States allege the Stop and/or individual sales postponed cost Plaintiff States a substantial share of proceeds from lease sales under the OCSLA, the Gulf of Mexico Energy Security Act, the MLA, and would result in loss of jobs for Plaintiff States' residents, along with tax revenue.

### a.  Injury in Fact

A plaintiff seeking to establish injury in fact must show that it suffered "an invasion of a legally protected interest" that is "concrete," "particularized," and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548, 194 L. Ed. 2d 635 (2016), *as revised* (May 24, 2016).  For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Id*. at 1548. A "concrete" injury must be "de facto," that is, it must "actually exist."  "Concrete" is not, however, necessarily synonymous with "tangible."  Intangible injuries can nevertheless be "concrete." *Id.* at 1548-49.

The Court finds Plaintiff States' alleged injuries are both particularized and concrete. They have alleged loss of proceeds as a result of the Stop of  new oil and gas leases on federal lands and waters, from bonuses, land rents, royalties, and other income.  Plaintiff States have also alleged loss of jobs and economic damage as a direct result of the Stop.  These alleged damages are concrete, particularized, and imminent.

### b.  Traceability

Plaintiff States must now show a "fairly traceable" link between their alleged injuries and the Stop of new oil and gas leases on federal lands and in federal waters.  As a general matter, the causation required for standing purposes can be established with "no more than de facto causality."  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2556, 204 L. Ed. 2d 978 (2019).  The

plaintiff need not demonstrate that the defendant's actions are "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169–70, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997).

The Court finds that Plaintiff States have established that the Stop would result in the damages they allege. The Declaration of Jerome Zeringue,[65] the Declaration of Professor Timothy J. Considine[66] and the Declaration of Professor Davie E. Dismukes[67] are sufficient to establish the Stop at issue would result in damages, including funding for the Coastal Master Plan (which funds Louisiana's coastal restoration and recovery), reduction in State revenues, damages to the economy, loss of jobs, higher oil and gas prices, and reduction in the energy export economy.

Plaintiff States have proved traceability.

### c. Redressability

The redressability element of standing to sue requires a plaintiff to demonstrate "a substantial likelihood that the requested relief will remedy the alleged injury in fact." *El Paso Cnty., Texas v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020).

Government Defendants argue that there has been no "Pause" (Stop) in drilling and permits for "existing" leases because drilling in federal lands is still proceeding at approximately the same rate as the prior four years, and, therefore, a favorable ruling for Plaintiff States will not redress their alleged injuries.  However, these declarations only address "existing leases" and not "new leases."  The cancellation of Lease Sale 257 itself has had immediate impacts on Plaintiff States due to loss of bonus payments and ground rents. A stop for any significant length of time would likely result in other losses.

---

[65] [Doc. No. 3-6]
[66] [Doc. No. 120-2]
[67] [Doc. No. 3- 4]

The Court finds that Plaintiff States have also satisfied the redressability element.

### 2. Special Solicitude

Although the Court finds that Plaintiff States have proven standing through the normal inquiry, they also can establish standing as a result of special solicitude.  Plaintiff States have special solicitude because they assert a congressionally bestowed procedural right (the APA), and the government action at issue affects the Plaintiff States' quasi-sovereign interests (damage to economics, loss of jobs, coastal erosion funding, funding for state and local governments). *See Massachusetts*, 549 U.S. at 519–20.

Therefore, any infirmities that may exist in Plaintiff States' demonstration of traceability or redressability are remedied by Plaintiff States' special solicitude.

### 3. Post-Suit Agency Actions

Government Defendants maintain the Court does not have jurisdiction over any agency actions which occurred after this suit was filed on March 24, 2021.  The Court agrees.  Subject matter jurisdiction is determined at the onset of the suit.  The action cannot be a final agency action under the APA before it occurs. *Mobile Oil Corp. v. Kelley*, 493 F.2d 784 (5th Cir. 1974); *Palmer v. Sun Coast Contracting Servs., LLC*, 2015 WL 5823938 (S.D. Miss. Oct. 6, 2015); *Veldhoen v. United States Coast Guard*, 35 F.3d 222 (5th Cir. 1994). Therefore, the Court does not have jurisdiction to review any pause/stop of lease sales which occurred after March 24, 2021.

### 4. Programmatic Challenge

Government Defendants argue Plaintiff States' attack of the "Pause" (Stop) is a nonjusticiable programmatic challenge, rather than a justiciable challenge to a discrete and final

agency action.  Therefore, Government Defendants argue the Court has no jurisdiction to review a programmatic challenge.

In *Sierra Club v. Peterson*, 228 F.3d 559 (5th Cir. 2000), the plaintiffs made an argument that the Forest Service's "on-the-ground" management of the Texas forests was unlawful.  The Fifth Circuit reversed the district court's ruling that gave broad relief, which barred almost all timber harvesting in the Texas forests.  The Fifth Circuit explained that courts can challenge specific and identifiable agency actions to general management practices but cannot challenge the agency's general administration.

Plaintiff States challenge to the Stop is not a programmatic challenge to the agency's general administration.  It is a challenge to specific things— the Government Defendants' agencies' cancellation and/or postponement of eligible onshore and offshore oil and gas leases because of Section 208 of Executive Order 14008.

### 5. Non-Plaintiff States

Government Defendants further argue that lease sales in the non-plaintiff states of Colorado, Wyoming, Nevada, and New Mexico are not subject to the Court's jurisdiction because they are not plaintiffs in this lawsuit. The Court agrees.  Because Plaintiff States argue lost revenue, and a *parens patria* standard on the basis of their citizens, the Court agrees that Plaintiff States do not have standing to challenge alleged final agency actions involving the non-plaintiff states of Colorado, Wyoming, Nevada, and New Mexico.

However, this would not prohibit Government Defendants from using evidence of these states' cancellation/postponement of lease sales in determining whether a pause/stop existed.

### 6.   Does a Pause Exist?

Government Defendants continue to argue that the Court has no jurisdiction over the Pause because, in addition to not knowing what a Pause is, an alleged Pause does not exist.[68]  As discussed, the Court finds a Stop took place, which was disguised as a Pause in the federal leasing process.  Executive Order 14008, Section 208, instructed the Secretary of the Interior that "[t]he Secretary of the Interior shall **pause** new oil and gas leases on public lands or in offshore waters pending completion of a comprehensive review" (emphasis added). Nothing in the AR suggests any of the defendant agencies ever questioned whether the Pause in President Biden's Executive Order complied with applicable law.  The defendant agencies implemented the Executive Order.  Lease Sale 257's ROD was immediately rescinded, and Lease Sale 258's Draft EIS and public meeting were immediately cancelled. 86 Fed. Reg. 10132; 86 Fed. Reg. 10994. The justification for both was Executive Order 14008.

For the MLA lease sales, after the signing of Executive Order 14008, BLM offices halted all pending quarterly lease sales.[69] In addition to specifically calling it a Pause,[70] the only reason given for those halts was Executive Order 14008.  A March 9, 2021, Nevada lease sale was postponed with no reason given.[71]  On February 17, 2021, a March 25, 2021, Colorado sale was postponed with no reason given.[72] On January 27, 2021, the DOI, BLM published Errata #1 with regard to an internet-band competitive oil and gas lease in Nevada, which consisted of seventeen (17) parcels containing approximately 73,600 acres.  The Notice stated the March 9, 2021, sale had been postponed with no additional reasons given.[73] And, on March 1, 2021, in an email from

---

[68] This Court is unclear how Government Defendants know the Pause does not exist if they do not know what a Pause is.
[69] BLM Fact Sheet. See Footnote 33
[70] "Hitting Pause on New Oil and Gas Leasing"
[71] [Doc. No. 120-5 p. 2]
[72] [Doc. No. 120-5 p. 3]
[73] [Doc. No. 120-6 p. 2]

Laura Daniel-Davis to Michael Nedd,[74] Daniel-Davis told Nedd to post on the relevant website: "The oil and gas lease sales scheduled for April 2021, have been postponed." BLM additionally cancelled/postponed a number of lease sales for other reasons.[75]

The reason President Biden gave for pausing federal oil and gas drilling in Executive Order 14008 was that a comprehensive review and reconsideration of federal oil and gas permitting and leasing practices needed to occur.  According to Government Defendants' evidence, the comprehensive review mentioned in Executive Order 14008 began January 6, 2021, and was completed on October 12, 2021.[76]

The DOI states it had not adopted a blanket policy either pausing or stopping oil and gas leasing, but the evidence does not support that statement.[77] Although the Court does not have jurisdiction over the lease sales that took place after the suit was filed, the other cancelled or postponed lease sales are relevant to a determination of whether a Stop took place.  Despite Government Defendants' argument that no "Pause" (Stop) occurred, not even one onshore or offshore scheduled lease sale has been conducted since Executive order 14008 was signed on January 27, 2021.

## III.   *ULTRA VIRES* CLAIM

Government Defendants maintain the Court cannot review Executive Order 14008. Government Defendants are correct that Executive Order 14008 cannot be reviewed under the APA because the President is not an agency. *Dalton v. Specter* 511 U.S. 462 (1994). However, an Executive Order can be challenged as *ultra vires*.[78]  Therefore, reviewing an Executive Order

---

[74] [Doc. No. 120-6 p. 10]
[75] [Doc. No. 120-6 p. 3]
[76] *Id.*
[77] BLM IDB 2421
[78] *Ultra vires* is a Latin phrase that means "beyond the powers."

as to whether it was *ultra vires* is appropriate to determine whether the President has violated the Constitution, the statute under which the challenged action was taken violated the Constitution or conflicted with other statutes, or whether there was no statutory authority to take a particular action. *Ancient Coin Collector's Guild v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383, 406 (D. Md 2011); *Mountain State Legal Foundation v. Bush*, 306 F.3d 1132, 1136 (D. C. Cir. 2002).

A President's authority to act, as with the exercise of any governmental power, must stem either from an act of Congress, the Constitution itself, or a combination of the two. *Medellin v. Texas,* 552 U.S. 491 (2008). In reviewing the lawfulness of the defendant's conduct, the Court begins each inquiry by determining whether the disputed action exceeds statutory authority. *Sierra Club v. Trump*, 397 F. Supp 3d 883 (N.D. Cal. 2019). A President may not transgress constitutional limitations. *Indiganas Envit Network v. Trump,* 428 F. Supp. 3d 296 (D. Mont. 2019).

In *League of Conservative Voters v. Trump*, 363 F. Supp. 3d 1013 (D. Ala. 2019), vacated and remanded sub. Norm, 843 F. App'x 937 (9th Cir. 2021), issues centered around whether the President had the authority to issue an Executive Order withdrawing a prior Executive Order under the OCSLA. Title 43 U.S.C. § 1341(a) of OCSLA allows a President of the United States to withdraw from disposition any of the unleased lands of the Outer Continental Shelf.  President Trump issued an Executive Order (EO 13795) which purported to revoke previous Executive Orders involving a prior land withdrawal from the OCSLA.  The Court found that although the OCSLA allowed the President to withdraw lands from disposition, it did not allow a president to revoke a prior withdrawal by an Executive Order.

Under the United States Constitution, Congress has the sole authority under the Property Clause to regulate property. [1] U. S. Constitution Art. IV, Section 3, Cl. 2.  Generally, the OCSLA does not grant authority to the President to make revisions to the OCSLA with the exception of 43 U.S.C. § 1341(a).  Title 43 U.S.C. § 1344(e) only allows the Secretary to make "insignificant" changes.  Any "significant" changes are required to be in the same manner the plan was originally developed – by the OCSLA's four-step process. Therefore, any "significant change" under the OCSLA that is made without going through the OCSLA's formal process violates the OCSLA.

There is no dispute that the Secretary of the Interior did not go through the OCSLA's four-step process in implementing Executive Order 14008.  Rather than doing a comprehensive review while the scheduled oil and gas lease sales took place, the Secretary "put the cart before the horse."  The facts clearly show that the Secretary went about the process in the exact opposite way as the OCSLA four-step process. Instead of first performing the comprehensive review, the Secretary instituted a pause to drilling on federal land onshore and offshore and then went on to a review. This is erroneous.

The Stop was a "significant" revision of the 2017-2022 Five-Year Plan that violated the OCSLA.  There is no statutory authority that authorizes the Executive Branch to Pause the OCSLA Five Year Plan. Additionally, there is no authority under the MLA for the Executive Branch to completely Stop the process. The power to pause and/or stop the federal leasing process lies solely with Congress.

Because Government Defendants cite no authority giving the President the power to "Pause" (Stop) the process under the OCSLA or the MLA, Government Defendants look to the "savings clause" of Executive Order 14008 to escape review. Government Defendants are using

this as an umbrella term to justify the fact that the President lacked any authority to implement the Pause in such a manner. The savings clause of Executive Order 14008 states:

> **To the extent consistent with applicable law**, the Secretary of the Interior shall pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters.

(emphasis added).

Government Defendants argue the savings clause allows the Executive Order to escape judicial review because it informs the relevant agencies not to follow the Executive Order if is it inconsistent with applicable law.  In *City & Cty. Of San Francisco v. Trump*, 897 F. 3d 1225, 1239 (9th Cir. 2018), the court found similar savings clause language in an Executive Order was of no consequence and could not be used as an escape from judicial review when the Executive Order cannot be applied in a manner consistent with those laws.  Savings clauses must be read in context and cannot avoid judicial review when the agencies would have to override clear and specific language in an Executive Order.

If a "consistent with law" savings clause precludes a court from examining whether the Executive Order is consistent with law, judicial review would be a meaningless exercise, precluding resolution of critical legal issues. *Hias, Inc. v. Trump* 985 F.3d 309, 325 (4th Cir. 2021). The text of Executive Order 14008 is clear— "[t]he Secretary of the Interior shall pause new oil and natural gas leases in public lands or in offshore water pending completion of a comprehensive review [.]" Section 208 of Executive Order 14008 cannot be applied in a manner consistent with applicable law.  The Executive Branch does not have the authority to stop the process under the MLA or the OCSLA while a review is taking place.

25

Therefore, the Court finds Section 208 of Executive Order 14008 is *ultra vires*, beyond the authority of the President of the United States, and in violation of the OCSLA and the MLA. Even the President cannot make significant changes to the OCSLA and/or the MLA that Congress did not delegate.

## IV.    APA CLAIMS

The Court must additionally examine whether Plaintiff States' APA claims are reviewable.  To determine whether the claims are reviewable under the APA, the Court must determine the meaning of the provisions within the statute that create the causes of action.  The Court applies the traditional principles of statutory interpretation to determine whether Congress did in fact authorize the causes of action alleged by Plaintiff States. *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 128, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014).

Plaintiff States' Complaint sets forth ten Claims for Relief.  Counts I, II, III, IV, V, VI, VII, and VIII are claims under the APA for unreasonable delay pursuant to 5 U.S.C. § 706 (Counts I and VI), failure to employ notice and comment in violation of 5 U.S.C. § 706 (Counts II and VIII), for acting contrary to law in violation of 5 U.S.C. § 706 (Counts III and V) , and for acting in an arbitrary and capricious manner pursuant to 5 U.S.C. § 706 (Counts IV and VII).

Count IX is a citizen suit under the OCSLA pursuant to 43 U.S.C. § 1349, and Count X is an ultra vires claim which alleges that the President and the applicable agencies violated the United States Constitution and statutory authority and/or did not have authority to enact or implement a Stop of new oil and gas leases on federal land and in federal waters.

Eight of Plaintiff States' claims are under the APA. These claims only apply to the defendant agencies and employees.  They do not apply to President Biden because the President is not an agency.  The APA imposes four requirements that must be satisfied before a federal

court can review agency action.  First, the plaintiffs must demonstrate that the agency action at issue in their claim is within the "zone of interests," and that the statute was intended to protect from the type of agency action taken by the defendants. Second, no statute may preclude judicial review.  Third, the Stop must constitute a "final agency action."  And fourth, the Stop must not be "committed to agency discretion by law." *Texas v. United States*, 524 F.Supp.3d 598 (S.D. Tex. 2021).

Government Defendants maintain that the "Pause"(Stop) is not a "final agency action" and that the "Pause" (Stop) is "committed to agency discretion by law" under the OCSLA and under the MLA.

### A.  Zone of Interests

Congress, through the APA, has provided a cause of action for plaintiffs seeking redress against the federal government for violating federal laws.  5 U.S.C. §§ 702, 706.  Congress has limited the availability of an APA cause of action to plaintiffs who allege an injury that is "arguably" within the "zone of interests" to be protected or regulated by the relevant statute. *Collins v. Mnuchin*, 938 F.3d 553, 573–74 (5th Cir. 2019), *cert. granted*, 141 S. Ct. 193, 207 L. Ed. 2d 1118 (2020), and *cert. granted,* 141 S. Ct. 193, 207 L. Ed. 2d 1118 (2020).  The benefit of any doubt goes to the plaintiff.  The test is not "especially demanding," and the test forecloses suit only when the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute, that it cannot be reasonably assumed that Congress authorized that plaintiff to sue. *Id*., at 573.

This element does not need extended discussion.  Clearly, all of the Plaintiff States' causes of action against Government Defendants are within the "zone of interests" under the APA.

### B.  Statutory Preclusion to Judicial Review

Title 5 U.S.C.§ 701(a)(1) excepts the application of the APA to the extent that statutes preclude judicial review.  Government Defendants have cited no statutes which preclude judicial review of Plaintiff States' claims.  This Court has found no statutes which preclude review of Plaintiff States' APA claims.  Therefore, the Court concludes there is no statutory preclusion to judicial review of Plaintiff States' claims.

### C.  Final Agency Action

Title 5 U.S.C. § 704 provides that "final agency actions" for which there is no other adequate remedy in a court are subject to judicial review. Government Defendants argue that the "Pause" (Stop) and/or the lease cancellations/postponements are not "final agency actions."

To determine whether an agency action is final, two conditions are required to be satisfied.  First, the action must mark the consummation of the agency's decision-making process and must not be merely tentative or interlocutory in nature. Second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow. *U.S. Army Corps of Engineers v. Hawkes Co.,* 136 S. Ct. 1807, 1813, 195 L. Ed. 2d 77 (2016); *Bennett*, 520 U.S. at 177–78.

Government Defendants argue the challenged decisions are merely interim postponements of lease sales, not decisions to forego the sales entirely. In support, they cite *Am. Petroleum Inst. v. U.S. E.P.A.*, 216 F.3d 50 (D.C. Cir. 2000) and *Shawny Trail Conservancy v. Nicholas*, 343 F.Supp.2d (S.D. Ill. 2004) for the proposition that interim postponements are not "final agency action."

In *American Petroleum Institute*, the court stated that a decision to defer taking action is not a final action reviewable by the courts.  The court went on to say the announcement of an

agency's intent to establish law and policy in the future is not the actual promulgation of a final regulation.  In *Shawnee Trail Conservancy*, the court held that the Forest Service's decision about how and when to conduct an all-terrain vehicles and off-highway motorcycles use review was not a final agency action.

Plaintiff States maintain that the Stop itself, as well as each cancellation and postponement, constitute final agency action.  Government Defendants' use of the label "Pause" is not dispositive of whether the agency action is final. *State of La. v. Dep't of Energy*, 507 F. Supp. 1365, 1371 (W.D. La. 1981), *aff'd sub nom. Dep't of Energy v. State of Louisiana*, 690 F.2d 180 (Temp. Emer. Ct. App. 1982). As long as an agency has completed its decision-making on a challenged rule—even one interim in nature—the rule satisfies the first prong of the finality test. *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 79–80 (D.C. Cir. 2020).

There is no real question that Plaintiff States have met the second prong of the *Bennett* test because the Stop and/or lease cancellations are actions from which legal consequences will flow.  The only real question is whether the Stop and/or lease cancellations mark the consummation of the decision-making process.

Numerous analogous cases support Plaintiff States' position:  *Texas v. United States*, No. 6:21-CV-00003, 2021 WL 723856, at *32 (S.D. Tex. Feb. 23, 2021), *opinion amended and superseded,* No. 6:21-CV-00003, 2021 WL 2096669 (S.D. Tex. Feb. 23, 2021), (a 100 day pause of deportations was final agency action);  *Ensco Offshore Co.,* 781 F. Supp. 2d at 334–36, (a blanket moratorium on deep-water drilling in the Gulf of Mexico was a final agency action); *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, No. CV168418PSGFFMX, 2018 WL 5919096, at *5 (C.D. Cal. Nov. 9, 2018), (a document that effectively lifted a moratorium constituted final agency action);  *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, No.

CIV.A.V 06 59, 2007 WL 1032346, at *5 (S.D. Tex. Mar. 31, 2007),  (a plan that effectively closed an area to drilling operations was final agency action);  *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988), (portions of the Five-Year Plan under OCSLA could be reviewed so a decision to "Pause" the five-year plan should also be able to be reviewed.);  *Texas*, 809 F.3d 134, (a DACA memo which made millions more persons eligible for the DAPA program and extended the employment authorization for three years, instead of two, was a final agency action);  *Wilbur v. U.S. ex rel. Barton*, 46 F.2d 217 (D.C. Cir. 1930), *aff'd sub nom. U.S. ex rel. McLennan v. Wilbur,* 283 U.S. 414, 51 S. Ct. 502, 75 L. Ed. 1148 (1931)  (the temporary withdrawal of public lands by the Secretary of the DOI was found to be a final agency action);  *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp 3d 1168 (S.D. Cal. 2019), (an unwritten policy of limiting asylum seekers at ports of entry from accessing the asylum process by based on false claims of capacity restraints was final agency action);  *Amadei v. Nielsen*, 348 F. Supp. 3d 145 (E.D.N.Y. 2018), (an unwritten policy of searching travelers for identification documents after disembarking from domestic flights was a final agency action); *BNSF Ry. Co. v. Equal Emp. Opportunity Comm'n,* 385 F. Supp. 3d 512 (N.D. Tex. 2018); (the issuance by EEOC of a right to sue letter was a final agency action);  *Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017), (a decision to stay, pending reconsideration, of the implementation of a final rule was a final agency action); *Velesaca v. Decker*, 458 F. Supp. 3d 224 (S.D.N.Y. 2020), *appeal withdrawn sub nom. Velesaca v. Wolf*, No. 20-2153, 2020 WL 7973940 (2d Cir. Oct. 13, 2020), (a no-release policy was found to be a final agency action); *Gomez v. Trump*, 485 F. Supp. 3d 145 (D.D.C.), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), and *amended in part sub nom. Gomez v. Biden,* No. 20-CV-01419 (APM), 2021 WL 1037866 (D.D.C. Feb. 19, 2021) (State Department's Policy suspending VISA processing and adjudication due to COVID-19 was a

final agency action);  *Natural Resources Defense Council*, 955 F.3d 68, (EPA's rule suspending

a prior rule was a final agency action); *Becerra v. United States Dep't of Interior*, 276 F. Supp.

3d 953 (N.D. Cal. 2017), (the postponing of the application of a rule was final agency action)*;*

and *W. Energy All. v. Jewell*, No. 1:16-CV-00912-WJ-KBM, 2017 WL 3600740 (D.N.M. Jan.

13, 2017), (BLM's practice of cancelling or deferring lease auction sales less frequently than

quarterly, for reasons other than lack of eligible parcels under MLA, was a final agency action).

These cases show that a "final agency action" does not have to be defined as permanent

to be considered final. Additionally, there is a strong presumption of judicial review.

Establishing un-reviewability is a heavy burden. *Texas*, 809 F.3d at 163–64.

The Court finds that the Stop in new oil and gas leases on federal lands and waters, the

cancelling of Lease Sale 257, the stopping of Lease Sale 258, and the cancelling or postponing of

"eligible lands" under the MLA that were cancelled before March 24, 2021, and involved

Plaintiff States, are final agency actions that are reviewable under the APA.

### D.  Committed to Agency Discretion by Law

Under 5 U.S.C. § 701(a)(2), a court is unable to review an agency decision that is

committed to agency discretion by law.  Government Defendants argue that the decision to stop

new oil and gas leases under the MLA or under the OCSLA are within its discretion.

Government Defendants cite several statutes in which the agency is granted discretion.

Additionally, Government Defendants argue that they have the discretion to reconsider a

decision.

The discretion to stop the lease process for eligible lands is not within the discretion of

the agencies by law under either the OCSLA or the MLA.  The OCSLA directs the Secretary of

the DOI to make the OSC available for expeditious development. *Ensco Offshore Co.,* 781 F.

Supp. 2d at 339.  The OCSLA also directs the Secretary of the DOI to administer a leasing program to sell exploration interests in portions of the OSC to the highest bidder. 43 U.S.C. §§ 1334(a) and 1337(a)(1).

The OCSLA sets up a four-step process to set up a Five-Year Program.  Currently, the Five-Year Program in effect is from 2017-2022.  At least one (Lease Sale 257) of the lease sales to be sold in the Five-Year Program has been cancelled due to the Stop.  The Stop also halted Lease Sale 258 at the selling stage.  The Five-Year Program currently in effect went through a substantial vetting process, which included millions of comments, approval from affected governors, publishing of a Final Program that was sent to the President and Congress, and final approval by the Secretary of the DOI.

Congress, through the MLA, has also made energy-producing lands onshore available for development. Under the MLA, the Secretary of DOI is required to hold lease sales for each state where eligible lands are available at least quarterly. 30 U.S.C. § 226(b)(1)(A).

In *Western Energy Alliance*, 2017 WL 3600740, the court held a BLM policy was a final agency action that violated the APA. There, the BLM policy in question cancelled or deferred eligible lands and did not have the lease sales quarterly. The court denied defendant's motion to dismiss the plaintiff's claims that BLM was required to hold lease sales for eligible lands quarterly and did not have the discretion to do less, so long as there were eligible lands.  In other words, the plaintiffs had a cause of action based on these allegations.  Here, because there were admittedly "eligible lands" available for leasing under both the OCSLA and the MLA, Government Defendants do not have the authority to stop the process.

The fact that a statute grants broad discretion to an agency does not render the agency's decisions completely unreviewable unless the statutory scheme, taken together with other

relevant materials, provides absolutely no guidance as to how that discretion is to be exercised. *Texas*, 809 F.3d at 168.  That is not the case here. Both the MLA and the OCSLA set forth requirements to hold lease sales of eligible lands and sets forth how it is to be conducted.

The agencies could cancel or suspend a lease sale due to problems with that specific lease, but not as to "eligible" lands for no reason other than to do a comprehensive review pursuant to Executive Order 14008.  Although there is certainly nothing wrong with performing a comprehensive review, there is a problem in ignoring acts of Congress and stopping the process while the review is being completed.

Two previous rulings from the Office of the Solicitor on February 12, 1996[79], and on January 5, 1981,[80] confirm that any significant revisions of an existing Five-Year OCSLA Plan would require the Secretary of the Interior to revise it "in the same manner that it was originally developed."  The Secretary of the DOI cannot make any significant changes to the Five-Year Plan without going through the same procedure by which the Five-Year Plan was developed. The Stop itself and/or cancellation of one of the Lease Sales set out in the Five-Year Plan is subject to review.

The Court finds the agency actions at issue are not barred from APA review as actions committed to agency discretion by law.  The APA claims of Plaintiff States are reviewable by this Court.

### E.  Contrary to Law 5 U.S.C. § 706 (2)(A) and (C)

Title 5 U.S.C. § 706 (2)(A) and (C) authorizes courts to hold unlawful and set aside agency actions not in accordance with law or in excess of statutory authority.  Plaintiff States assert that the Stop of new oil and gas leases on federal land and in federal waters pending a

---

[79] [Doc. No. 121-1, p. 61]
[80] [Doc. No. 121, p. 56]

comprehensive review is not in accordance with law and exceeds the agencies authority under both the OCSLA and the MLA.

The Court finds the Stop is in violation of both the OCSLA and the MLA.  Both statutes require Government Defendants' agencies to sell oil and gas leases.  The OCSLA has a Five-Year Plan in effect that requires eligible leases to be sold. Government Defendants' agencies have no authority to make significant revisions in the OCSLA Five-Year Plan without going through the procedure mandated by Congress.  The MLA requires the DOI to hold lease sales, where eligible lands are available at lease quarterly.

By stopping the process, the agencies are in effect amending two Congressional statutes. Neither the OCSLA nor the MLA gives the Government Defendants' agencies the authority to implement a Stop of lease sales. Those statutes require eligible oil and gas leases to continue to be sold in accordance with the statutes. The Court finds that the stopping of leasing of eligible lands and waters is contrary to law.

### F. Arbitrary and Capricious 5 U.S.C. § 706(2)(A)

Federal administrative agencies are required to engage in reasoned decision-making. *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374, 118 S. Ct. 818, 139 L. Ed. 2d 797 (1998).  Plaintiff States allege the Pause is arbitrary and capricious under 5 U.S.C. § 706(2)(A) as to both the MLA and the OCSLA claim.

If an administrative agency does not engage in reasoned decision-making, a court, under the APA, shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based. *Sec. & Exch. Comm'n v. Chenery Corp.*, 318

U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed. 626 (1943). Other than a reference to Executive Order

14008, no reasons or explanations were given by the agencies for stopping the oil and gas leasing

process.

A command in an Executive Order does not exempt an agency from the APA's reasoned

decision-making requirement. *California v. Bernhardt*, 472 F. Supp. 3d 573, 600–01 (N.D. Cal.

2020). A decision supported by no reasoning whatsoever in the record cannot be saved merely

because it involves an Executive Order. *Texas*, 2021 WL 2096669, at *39–41. The recission of

Lease Sale 257 and the Executive Order itself (86 Fed. Reg. 7624-25) provides no rationale for

departing from the OCSLA or the MLA requirements. As to Lease Sale 258, BOEM cancelled

both the public comment and public meetings.  No explanation was given, other than an

adherence Executive Order 14008. 86 Fed. Reg. 10994.

BLM did not publish a formal notice in the Federal Register halting BLM quarterly land

sales, but it did publish a Fact Sheet, which noted the President's Executive Order.  No

explanation (other than the Executive Order) was given for stopping the lease sales. After that,

the regional BLM offices began posting postponement or cancellation notices for the March and

April 2021, lease sales without explanation.

Because no rational explanation was given, the Court finds that the cancellation of the

leases and enactment of the Stop were arbitrary and capricious actions under the APA.

### G.  Failure to Provide Notice and Comment 5 U.S.C. § 553

Plaintiff States also claim they are entitled to injunctive relief under the APA because the

Stop and lease cancellations are substantive rules that require notice and comment pursuant to 5

U.S.C. § 553. Section 553 was enacted to allow the public an opportunity to participate in the

rule-making process. *U.S. Dep't of Lab. v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir.

1984). The APA requires rules to undergo notice and comment unless the rule is exempt. 5 U.S.C. § 553(a)(b). The two exceptions set forth in 5 U.S.C. § 553 are (1) interpretive rules, general statements of policy, or rules of agency organization, procedure, and practices, and (2) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons in the rule issued) that notice and public procedure are impracticable, unnecessary, or contrary to the public interest. These exceptions are to be narrowly construed, and the only exception which conceivably could apply here is the first. *Texas,* 809 F.3d at 171.

In analyzing whether an agency pronouncement is a statement of policy or a substantive rule, the starting point is the agency's characterization of the rule. *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 (5th Cir. 1995). As to the offshore leases, there is no characterization, just reference to Executive Order 14008.  As to the land leases, Government Defendants deny there is any "Pause" (Stop) at all.  In reading Section 208 of Executive Order 14008, there is no characterization.  Executive Order 14008 states: "To the extent consistent with applicable law, the Secretary of the Interior shall Pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review[.]"

When distinguishing policy statements from substantive rules, the Fifth Circuit instructs district courts to determine whether the rule imposes any rights and obligations, and whether it genuinely leaves the agency and its decisionmakers free to exercise discretion. *Texas*, 809 F.3d at 171.

Executive Order 14008 imposes rights and obligations and does not leave the agency and its decisionmakers room to exercise discretion. The Executive Order effectively commands that the DOI stop performing its obligations under the OCSLA and the MLA to sell oil and natural gas leases. That impact is legal in nature and effectively stopped the scheduled sale of Lease Sale

257, put the brakes on Lease Sale 258, and stopped the quarterly lease sales under the MLA. The Executive Order also leaves the agency and its decisionmakers with no true discretion. Although the Order contains the savings clause, Executive Order 14008 also uses the wording "shall pause." That wording eliminates the agency's discretion because exercising discretion would be disobeying a Presidential Executive Order.

The Stop, or "Pause" as referred to in Executive Order 14008, is a substantive rule as implemented by the DOI and BLM, and the exceptions to 5 U.S.C. § 553 do not apply. The order is not procedural because it modifies substantive rights and interests under the "substantial impact test." *Texas,* 809 F.3d at 176. The exceptions in 5 U.S.C. § 553 do not apply, and notice and comment was required under 5 U.S.C. § 553(b) and (c).

It is uncontested that no notice and comment was conducted by Government Defendant agencies pursuant to 5 U.S.C. § 553. The actions taken were substantive in nature, and the agency did not have good cause to forego the notice and comment requirement.  Accordingly, the actions of the Government Defendants violate the APA's notice and comment procedure.

### H. Unreasonably Withheld and Unreasonably Delayed 5 U.S.C. § 706(1)

Title 5 U.S.C. § 706(1) provides that the reviewing court under the APA shall compel agency action unlawfully withheld or unreasonably delayed.

Because the Court finds Government Defendants violated the APA because their actions were contrary to law, arbitrary and capricious, and failed to provide notice and comment, it is unnecessary to determine whether Government Defendants' actions were unreasonably withheld and unreasonably delayed.

## V. CITIZEN'S SUIT

Count IX of Plaintiff States' Complaint alleges a citizen's suit pursuant to 43 U.S.C. § 1349.  Plaintiff States have not pursued and/or briefed this claim.  Additionally, the citizen suit provision was not intended to operate as a means of obtaining "umbrella" review for a series of agency decisions that were or will be subject to judicial review under the APA. *OXY USA, Inc. v. Babbitt*, 122 F.3d 251, 258 (5th Cir. 1997).

Therefore, Government Defendants' Cross-Motion for Summary Judgment is GRANTED as to the Plaintiff States' citizen suit claim.

## VI.   PERMANENT INJUNCTION

A permanent injunction is an extraordinary remedy never awarded of right. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943, 201 L. Ed. 2d 398 (2018). In each case, the courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008).

The standard for a permanent injunction requires a movant to show (1) the substantial likelihood of success on the merits, (2) that he is likely to suffer irreparable harm in the absence of an injunction, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Benisek*, 138 S. Ct. at 1944.  The party seeking relief must satisfy a cumulative burden of proving each of the four elements enumerated before an injunction can be granted. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).  None of the four prerequisites has a quantitative value. *State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975).

### A.  Success on the Merits

For the reasons set forth herein, Plaintiff States have been successful on their eight claims under the APA (Counts I, II, III, IV, V, VI, VII and VIII) and on the ultra vires claim (Count X). Plaintiff States have not been successful on their citizens suit claim (Count IX).  Therefore, Plaintiff States have met the first factor on Counts I-VIII and on Count X.

### B.  Irreparable Injury

Plaintiff States must demonstrate "a substantial threat of irreparable injury" if the injunction is not issued. *Texas*, 809 F.3d at 150.  For the threat to be sufficiently "substantial," plaintiffs must show they are likely to suffer irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 20.  For the injury to be sufficiently "irreparable," plaintiffs need only show they "cannot be undone through monetary remedies." *Burgess v. Fed. Deposit Ins. Corp.,* 871 F.3d 297, 304 (5th Cir. 2017).

Plaintiff States are alleging they would sustain damages due to reduced funding for bonuses, ground rent, royalties, and rentals as a result of the Stop of new oil and gas leases in federal waters or on federal land.  Additionally, Louisiana is also claiming damage for reduced funding to the Coastal Master Plan, which would reduce proceeds that are used in Louisiana's coastal recovery and restoration program.  Plaintiff States are also claiming damages through loss of jobs in the oil and gas sector, higher gas prices, losses by local municipalities and governments, as well as damage to Plaintiff States' economy.  Additionally, Plaintiff States argue that they will not be able to recover money damages against Government Defendants due to sovereign immunity. *Texas*, 809 F.3d at 186 and *Texas*, 2021 WL 2096669, at *47.

Government Defendants maintain that drilling and the issuing of drilling permits is continuing at the same level as it did prior to the Pause. However, just with the loss of proceeds

from Lease Sale 257, which would have been already completed, Plaintiff States would have been entitled to ground rents and bonuses that they will not receive. Plaintiff States have alleged substantial damages from Government Defendants, which would be difficult, if not impossible, to recover due to sovereign immunity.  Even though existing leases are proceeding, the fact that new oil and gas leases on federal lands and in federal waters are paused will ultimately result in losses to Plaintiff States from which they will likely not be able to recover.

Accordingly, this Court finds Plaintiff States have demonstrated a substantial threat of irreparable injury.

### C.  The Balance of Equities and the Public Interest

The final two elements Plaintiff  States must satisfy for a permanent injunction to be issued are that the threatened harm outweighs any harm that may result to Government Defendants, and, that the injunction will not undermine the public interest. *Valley v. Rapides Par. Sch. Bd.,* 118 F.3d 1047, 1051 (5th Cir. 1997).  These two factors overlap considerably. *Texas,* 809 F.3d at 187. In weighing equities, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter*, 555 U.S. at 24.  The public interest factor requires the court to consider what public interests may be served by granting or denying an injunction. *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 997–98 (8th Cir. 2011).

Both sides argue equity and public interest in their own favor.  The Court finds both factors weigh in favor of Plaintiff States.  If the Stop were enjoined, Government Defendants would simply be doing what they are statutorily required to do under the OCSLA and the MLA. Government Defendants even maintain there is no "Pause" (Stop) with regard to MLA, so there

would be no harm in enjoining Government Defendants from implementing something that they deny even exists.

Plaintiff States' claims are substantial.  Millions and possibly billions of dollars are at stake.  Local government funding, jobs for Plaintiff States' workers, and funds for the restoration of Louisiana's Coastline are at stake.  Plaintiff States have a reliance interest in the proceeds derived from offshore and onshore oil and gas lease sales.

Additionally, the public interest is served when the law is followed.[81]  The public will be served if Government Defendants are enjoined from taking actions contrary to law. In a time of high gas and oil prices, draining of the Strategic Petroleum Reserve, and looking to other nations to supply the United States' oil and gas needs, the public interest would be served by a permanent injunction.

Therefore, the Court finds that Plaintiff States have satisfied all four elements required for a permanent injunction to be issued.

Specifically, the Court finds Government Defendants are enjoined and restrained from imposing a Stop, referred to in Executive Order 14008 as a Pause, of federal oil and gas leases as to eligible lands, or by pretext, to make eligible lands ineligible.  This order will not apply to lease sales cancelled after March 24, 2021, and will not apply to lease sales in states other than in Plaintiff States.  This order specifically includes the following lease sales: Lease Sale 258; Quarter 2 onland lease sales scheduled for April 2021, in Utah and Montana that were cancelled on March 1, 2021; any of the following lease sales cancelled prior to March 24, 2021, due to Section 208 of Executive Order 14008; and any lease sale involving Plaintiff States that was

---

[81] *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013).

cancelled prior to March 24, 2021 for reasons other than Executive Order 14008, that are determined to be pretextual.

## VII.    CONCLUSION

For the reasons set forth herein, the Court finds Plaintiff States Motion for Summary Judgment [Doc. No. 199] is **GRANTED** with regard to its APA claims and its ultra vires claim. It is **DENIED** with regard to its citizen suit claims.  It is also **DENIED** with regard to any Lease Sales cancelled or postponed after March 24, 2021, and as to any lease sales involving non-plaintiff states.

Government Defendants' Cross-Motion for Summary Judgment is **DENIED** with regard to the eight APA claims and the ultra vires claim. It is **GRANTED** as to the citizen suit claim, any lease sales cancelled or postponed after March 24, 2021, and any lease sales involving non-plaintiff states.

The Court further issues a permanent injunction against Government Defendants, and they are **ENJOINED** from implementing a Stop, referred to in Executive Order 14008 as a Pause, on new oil and gas leases on public lands and in offshore waters, as set forth in Section 208 of Executive Order 14008, as to all "eligible" lands both onshore and offshore.

The geographic scope of the permanent injunction shall be limited to the thirteen Plaintiff States of Louisiana, Alabama, Alaska, Arkansas, Georgia, Mississippi, Missouri, Montana, Nebraska, Oklahoma, Texas, Utah, and West Virginia.  The previous nationwide injunction[82] is lifted except to the thirteen Plaintiff States.

The Court will not require security to be posted for the Plaintiff States under FED. R. CIV. P. 65.

---

[82] [Doc. No. 140]

This permanent injunction shall remain in effect until there are further orders from this Court, the United States Court of Appeals for the Fifth Circuit, or the United States Supreme Court.

MONROE, LOUISIANA, this 18th day of August 2022.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**